UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, <br><br> Plaintiff, <br><br> v. <br><br> MUTUAL OF OMAHA INSURANCE COMPANY, <br><br> Defendant. | C.A. No. 1:16-cv-11381-GAO |

**PLAINTIFF JOHN DOE'S SUBMISSION OF PAGES OF DEPOSITION TRANSCRIPTS RELEVANT TO COURT'S CONSIDERATION OF DISCOVERY MOTIONS TO BE HEARD ON AUGUST 9, 2017**

On July 19, 2017 the Plaintiff took the deposition of Defendant Mutual of Omaha Insurance Company ("Mutual") pursuant to Fed. R. Civ. P. 30(b)(6). One of the witnesses Mutual designated to testify on its behalf was Lisa Ging, RN, Chief Underwriter. Plaintiff submits certain pages of Ms. Ging's testimony that contradict the arguments and statements made by Mutual in its various submissions in the discovery dispute pending before the Court.

1. Mutual has argued that the reasons Doe is taking the medication Truvada as preexposure prophylaxis for HIV ("PrEP) are relevant. Ms. Ging testified that the reasons that an applicant for long-term care insurance uses PrEP are "irrelevant to the underwriting process." *See* Ging testimony, p. 51, attached as Addendum 1.

2. Mutual has stated that "[p]laintiff's own compliance with Truvada protocols reflects on the reasonableness of Mutual of Omaha's underwriting decisions." *See, e.g.*, Document No. 42 at p. 3. Ms. Ging, however, testified that whether Doe was adherent to

1

Truvada does shed any light on the reasonableness of Mutual's policy. *See* Ging testimony, pp. 213-214, attached at Addendum 6.

3. Mutual claims that it needs to know whether Doe is complying with the Truvada protocol. Mutual, however, provides long-term care insurance to people with conditions such as depression and diabetes as long as they are adherent to their medication, but takes no steps to monitor an insured's medication compliance. *See* Ging testimony, pp. 96-99, attached at Addendum 2.

4. Mutual asserts that it is entitled to obtain all of Doe's medical records to present date based on its claim that he did not disclose Truvada on his application. Ms. Ging testified, however, that it "not uncommon for an applicant to omit a medication from an application." *See* Ging testimony, p. 176, attached at Addendum 3. That is the reason that Mutual's underwriting requirements also include a check of pharmacy databases and a personal health interview in which it also asks about an applicant's medications. *See* Ging testimony at pp. 172-177, 185, attached at Addendum 3-5.  Ms. Ging stated that "[a]pplicants don't always give all of their health to an agent during the application. Sometimes they are more forthcoming during an interview." *See* Ging testimony, p. 175, attached at Addendum 3. Ms. Ging testified that the failure to list a medication on an application is not even a reason to decline an application. *See* Ging testimony, p. 177, attached at Addendum 4. There is thus no basis to make any negative inference about Doe from his application when he disclosed his Truvada use in his personal health interview and it was also contained in the pharmacy check and medical records submitted to his primary care physician.

Respectfully submitted,

JOHN DOE
By his attorneys,


/s/ Bennett H. Klein
Bennett H. Klein
BBO # 550702
GLBTQ Legal Advocates & Defenders
30 Winter St. Suite 800
Boston, MA 02108
617-426-1350
bklein@glad.org

/s/ John P. Ward
John P. Ward
BBO # 515860
Law Offices of John P. Ward
584 Castro St., No. 802
San Francisco, CA 94114
johnpward@gmail.com

## **CERTIFICATE OF SERVICE**

I certify that the within document was electronically filed with the clerk of the court on August 4, 2017 and that it is available for viewing and downloading from the Court's ECF system. Service by electronic means has been effectuated on all counsel of record.


Brooks R. Magratten, BBO# 650393
Pierce Atwood LLP
72 Pine Street, 5th Floor
Providence, RI 02903
(401) 490-3422
bmagratten@pierceatwood.com

Mark A. Pogue, BBO# 550807
Pierce Atwood LLP
72 Pine Street, 5th Floor
Providence, RI 02903
(401) 490-3422
mpogue@pierceatwood.com

Katharine E. Kohn, BBO# 675362
Pierce Atwood LLP
72 Pine Street, 5th Floor
Providence, RI 02903
(401) 490-3422
kkohm@pierceatwood.com

/s/ Bennett H. Klein
Bennett H. Klein
BBO # 550702
GLBTQ Legal Advocates & Defenders
30 Winter St. Suite 800
Boston, MA 02108
617-426-1350
bklein@glad.org

# **ADDENDUM**

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2
       JOHN DOE,                ) C.A. NO. 1:16-CV-11381-GAO
 3                              )
              PLAINTIFF,        ) DEPOSITION OF
 4                              ) LISA GING, RN
         VS.                    )
 5                              )
       MUTUAL OF OMAHA          )
 6     INSURANCE COMPANY,       )
                                )
 7            DEFENDANT.        )
 8     - - - - - - - - - - - - - - -
 9              DEPOSITION OF LISA GING, RN, taken before
10     Morgan M. Catania, RPR, CSR(IA), General Notary
11     Public within and for the State of Nebraska,
12     beginning at 10:11 a.m., on July 19, 2017, at
13     Thomas & Thomas Court Reporters & Certified Legal
14     Video, LLC, 1321 Jones Street, Omaha, Nebraska.
15
...
25
```

Lisa Ging
7/19/2017

15 (48 - 51)

Page 48

1 reason listed as -- in the guide as the primary
2 reason, then they would be uninsurable. There are
3 off-label uses of medication. Those are considered
4 on a case-by-case basis.
5    Q. All right. And what -- what were the
6 reasons listed in the guide for the use of Truvada
7 as an uninsurable medicine?
8    A. HIV.
9    Q. HIV diagnosis?
10    A. It just states HIV.
11    Q. Okay. In 2014 and 2015 were there any
12 exceptions to Mutual's policy that somebody who
13 takes Truvada for PrEP was uninsurable?
14       MR. MAGRATTEN: Objection to form.
15 You're in the context of long-term care insurance;
16 correct?
17       MR. KLEIN: Yes.
18       THE WITNESS: I'm not aware of us
19 issuing coverage to anyone who took the medication
20 Truvada.
21 BY MR. KLEIN:
22    Q. Is it your understanding of the -- do you
23 understand -- do you have an understanding of
24 Mutual's policy with respect to Truvada as prep in
25 2014 and 2015?

Page 49

1    A. I can't speak to Mutual's policy.
2    Q. I'm sorry. For long-term care insurance?
3    A. Yes.
4    Q. All right. And is it your
5 understanding -- well, based on that understanding,
6 were there any exceptions to the policy that anybody
7 who took PrEP was declined?
8    A. I'm not aware of us ever knowingly
9 insuring someone who took Truvada?
10    Q. What was your policy?
11    A. The medication --
12       MR. MAGRATTEN: Objection to the
13 form.
14       THE WITNESS: The medication is
15 uninsurable for long-term care underwriting.
16 BY MR. KLEIN:
17    Q. All right. And -- and was it your
18 understanding that there are no -- that under
19 Mutual's long-term care insurance policy with
20 respect to Truvada there were no exceptions that
21 would allow somebody who is taking Truvada to obtain
22 long-term care insurance?
23    A. Truvada is indicated for the treatment of
24 HIV or for PrEP. We -- to the best of my knowledge,
25 we never knowingly insured somebody who takes the

Page 50

1 medication Truvada.
2    Q. Okay. And that was the goal of the
3 long-term care insurance underwriting in 2014 and
4 '15; correct?
5       MR. MAGRATTEN: Objection to form.
6       THE WITNESS: What do you mean by
7 "goal"?
8 BY MR. KLEIN:
9    Q. Mutual's goal was that anybody -- was
10 it -- was it the policy of Mutual of Omaha that
11 anybody who takes Truvada as PrEP is automatically
12 declined for long-term care insurance?
13       MR. MAGRATTEN: Objection to form.
14       THE WITNESS: Long-term care
15 underwriting did not offer coverage to anyone who
16 took the medication Truvada.
17 BY MR. KLEIN:
18    Q. All right. And there were no exceptions
19 to that policy that you're aware of?
20    A. None that I'm aware of.
21    Q. All right. So in 2014 and 2015, for
22 purposes of long-term care insurance underwriting,
23 it didn't matter why somebody took pre-exposure --
24 Truvada as PrEP; is that right?
25    A. The reason they were taking Truvada did

Page 51

1 not matter. As long as they were taking the
2 medication, they were uninsurable.
3    Q. Okay. In 2014 to 2015 did Mutual through
4 its underwriting process ever inquire of somebody
5 who was taking Truvada as PrEP the reasons they
6 decided to go on that medication?
7    A. No.
8    Q. Okay. And was -- were the reasons that
9 somebody decided to go on the medication Truvada
10 relevant in any way to Mutual of Omaha's
11 underwriting practices?
12       MR. MAGRATTEN: Objection to form.
13       THE WITNESS: We did not insure
14 anyone who took the medication regardless of the
15 reason they took it.
16 BY MR. KLEIN:
17    Q. All right. So the reasons that they took
18 it would be irrelevant to the underwriting process;
19 is that correct?
20       MR. MAGRATTEN: Objection to form.
21       THE WITNESS: For long-term care
22 underwriting, that is correct.
23 BY MR. KLEIN:
24    Q. All right. Now, did Mutual -- in 2014 and
25 2015, had Mutual assessed the efficacy of Truvada as

Page 96

1  THE WITNESS: We insure based upon
2  the health at the time of underwriting.
3  BY MR. KLEIN:
4  Q. I understand.
5  So you don't have a view as to whether
6  somebody who is insured for long-term care insurance
7  and is on medication for manic depression, whether
8  the condition, if they go off the medication, could
9  worsen to the extent they would no longer be
10 eligible for the insurance?
11  MR. MAGRATTEN: Objection to the form
12 of the question. Seeks expert opinion, and it
13 seeks -- it's a hypothetical question.
14  THE WITNESS: Every individual is
15 different. I can't answer that question.
16 BY MR. KLEIN:
17  Q. Okay. Could you please turn to page 30 of
18 the underwriting guide? Are you there?
19  A. Uh-huh.
20  Q. All right. And do you see the -- the
21 category that says depression?
22  A. Yes.
23  Q. Okay. And do you see about halfway down
24 it says major, less than 70 years of age after
25 six-month -- six months controlled with medication.

Page 97

1  Do you see that?
2  A. Yes.
3  Q. Okay. And is it --
4  MR. MAGRATTEN: Objection. You
5  didn't complete the text that's there.
6  BY MR. KLEIN:
7  Q. All right. "Fully functional, no
8  psychiatric hospitalizations in the past 3 years."
9  Do you see that?
10  A. Yes.
11  Q. All right. Is it correct that, if
12 somebody is otherwise qualified for long-term care
13 insurance and has that mental health profile, they
14 would receive long-term care insurance at the select
15 rate?
16  A. If they proved insurable based upon our
17 underwriting, yes.
18  Q. Okay. And for that particular individual,
19 is their insurability contingent upon their
20 condition being controlled with medication?
21  MR. MAGRATTEN: Objection to form.
22  THE WITNESS: The guideline states
23 that that needs to be controlled with medication,
24 and we follow that guideline.
25

Page 98

1  BY MR. KLEIN:
2  Q. Okay. And after the issuance of a
3  long-term care insurance policy to such a person,
4  does Mutual monitor the insured's compliance with
5  their depression medication?
6  MR. MAGRATTEN: Objection: Asked and
7  answered.
8  THE WITNESS: No.
9  BY MR. KLEIN:
10  Q. Okay. Why not?
11  MR. MAGRATTEN: Objection.
12  THE WITNESS: Underwriting is a
13 snapshot. It's a moment in time, how somebody looks
14 at the time that we underwrite them. Once we issue
15 the policy, I have no control what happens to
16 someone. They could be hit by a car.
17 BY MR. KLEIN:
18  Q. Okay. Now, looking further down the page,
19 do you see the heading that says diabetes insipidus?
20  A. Yes.
21  Q. And what is diabetes insipidus?
22  A. It's a endocrine disorder.
23  Q. All right. And is somebody who is
24 otherwise qualified for long-term care insurance
25 from Mutual of Omaha who has diabetes insipidus

Page 99

1  controlled on medication eligible for the insurance?
2  MR. MAGRATTEN: Objection to form.
3  Can you repeat that question, please?
4  (Whereupon, the pending question
5  was read back by the court
   reporter.)
6  THE WITNESS: If they meet all of our
7  underwriting requirements, yes.
8  BY MR. KLEIN:
9  Q. Okay. And it's also true that for such a
10 person eligibility for the insurance is dependent
11 upon their being controlled by medication; correct?
12  A. It's unlikely they could function if they
13 are not on medication; so, yes.
14  Q. All right. All right.
15 And does Mutual of Omaha monitor
16 compliance with the diabetes medication after the
17 issuance of a long-term care policy?
18  MR. MAGRATTEN: Objection: Asked and
19 answered.
20  THE WITNESS: No.
21 BY MR. KLEIN:
22  Q. Okay. Why not?
23  A. As I previously stated, we -- we are
24 underwriting at the time of the application.
25  Q. Now, do you see below that there are

### Page 172

```
 1  application in 2015.
 2       And could you turn to page 46 of the
 3  underwriting manual?  And do you see on that page it
 4  says "Underwriting Requirements"?  Do you see that
 5  heading?
 6    A.  Yes.
 7    Q.  All right.  And below that there are boxes
 8  that list four things:  Pharmaceutical check,
 9  medical records, personal health interview,
10  cognitive assessment.
11       Is that the -- are those the complete
12  steps of medical underwriting for a long-term care
13  insurance applicant in 2015?
14         MR. MAGRATTEN:  Objection to form.
15         THE WITNESS:  At the time of the
16  underwriting of Doe's application, those were the
17  steps that were taken in an individual case.  If it
18  appears to be missing information or the underwriter
19  needs additional information, they would request
20  additional information.
21  BY MR. KLEIN:
22    Q.  And do you mean like -- well, we'll hold
23  that for a moment.  All right.
24       So what is the pharmaceutical check?
25    A.  It's a query of a database for
```

### Page 173

```
 1  prescription fills for an applicant.
 2    Q.  And is that something that an applicant
 3  fills out in a form authorizing Mutual of Omaha to
 4  check?
 5    A.  It's included on the authorization that
 6  they sign.
 7    Q.  Okay.  And is it -- is it a database that
 8  includes prescription fills from, like, all
 9  pharmacies?
10    A.  It only includes prescription fills from
11  participating pharmacies.
12    Q.  Okay.  And is CVS one of the participating
13  pharmacies?
14    A.  I don't know.
15    Q.  Okay.  And why do you do a
16  prescription check -- a pharmaceutical check?
17    A.  In the event that there is health that the
18  client did not disclose to us.
19    Q.  I'm sorry.  I didn't quite hear you.  In
20  the event what?
21    A.  In the event there is health or
22  medications that the client did not disclose to us.
23    Q.  Okay.  And did you do a pharmaceutical
24  check for Doe?
25    A.  I would have to look at the actual file.
```

### Page 174

```
 1  But it's automatically ordered at the time the
 2  application is entered; so I would have to say that
 3  I would think so, yes.
 4    Q.  Okay.  Do you know what -- you don't know
 5  any of the pharmacies that participate in the
 6  pharmaceutical check database?
 7    A.  I do not.
 8    Q.  Okay.  Who would know that?
 9    A.  The vendor who has the pharmaceutical
10  database might know.
11    Q.  Nobody at Mutual of Omaha has that
12  information?
13    A.  There is nothing on the information that
14  we get back that lists the pharmacy.
15    Q.  Okay.  And the second section says
16  "medical records" and "all applicants."  And what
17  does that entail?
18    A.  We obtain records from the primary care
19  physician listed on the application.  If there are
20  specialist physicians, we may also request those
21  medical records.
22    Q.  Okay.  And do you know if that was done in
23  Doe's case?
24    A.  We ordered medical records for him, yes.
25    Q.  Okay.  And did you receive those?
```

### Page 175

```
 1    A.  We received medical records.  I don't know
 2  if it's his complete medical record.
 3    Q.  Okay.  And then the next category is
 4  called "personal health interview," and it says
 5  telephone, ages 30 to 64.  Face-to-face, ages 65 to
 6  79.
 7       What is the purpose of a personal health
 8  interview?
 9    A.  Applicants don't always give all of their
10  health to an agent during the application.
11  Sometimes they are more forthcoming during an
12  interview.
13    Q.  So some of the questions you ask in the
14  personal health interview are the same questions
15  that are asked on the application; is that correct?
16    A.  Not exactly.  The questions asked on the
17  health interview are asking do you have this
18  condition.  They are not going to be worded the same
19  as they are on the application.
20    Q.  All right.  And during the personal health
21  interview as it was conducted in 2015, does the
22  interviewer ask the applicant what medications they
23  are on?
24    A.  Yes.
25    Q.  And what is the purpose of asking the
```

Page 176

1  person what medications they are on when you've
2  already asked that in the application?
3      A.  Because the medications may not have been
4  listed on the application but they may be disclosed
5  on the telephone interview.
6      Q.  In your entire experience as a long-term
7  care -- involved with long-term care underwriting at
8  Mutual of Omaha, have you ever encountered a
9  situation in which a medication was not listed on
10 someone's long-term care insurance application but
11 was then disclosed in the phone interview?
12     A.  The medication was not listed on Doe's
13 application.  It was disclosed in the phone
14 interview.
15     Q.  Yes.  I understand that.
16         But my question is are there any other
17 times in your entire career as a long-term care
18 insurance underwriter at Mutual of Omaha in which an
19 applicant did not list a medication on an
20 application but disclosed it in the phone interview?
21     A.  Yes.
22     Q.  All right.  Like, about how many times has
23 that happened?
24     A.  It's not uncommon.
25         MR. MAGRATTEN:  Objection to the

Page 177

1  question.
2  BY MR. KLEIN:
3      Q.  Okay.  It's not uncommon.  Okay.
4          And is it Mutual's policy in 2015 that if
5  somebody didn't list a medication on the application
6  but disclosed it on the phone interview, that that
7  in and of itself was grounds for denying them
8  long-term care insurance?
9          MR. MAGRATTEN:  Objection to the
10 form.
11         THE WITNESS:  If they failed to
12 disclose on the application and we found out later,
13 would that mean that we would decline someone?  No.
14 BY MR. KLEIN:
15     Q.  Okay.  If somebody failed to list a
16 medication on their application but disclosed it in
17 the phone interview, you wouldn't consider that
18 they've made a misrepresentation, would you?
19         MR. MAGRATTEN:  Objection to form.
20         THE WITNESS:  They made a
21 misrepresentation on the application.  They
22 disclosed it during the interview.
23 BY MR. KLEIN:
24     Q.  Okay.  So they -- if they disclosed it
25 during the underwriting process, there would be no

Page 178

1  penalty with respect to underwriting their
2  application; is that correct?
3          MR. MAGRATTEN:  Objection to form.
4  Seeks hypothetical question.
5          THE WITNESS:  To me it depends upon
6  what it is.  I don't -- I don't know how to answer
7  that.
8  BY MR. KLEIN:
9      Q.  Okay.  Now, once you -- well, let's --
10 before I move on, the fourth category under
11 underwriting requirements says "cognitive
12 assessment."  Do you see that?
13     A.  Yes.
14     Q.  And it says that's only for people ages 65
15 to 79 or younger ages if history of CVA, TIA, memory
16 loss, or depression.
17         What is the cognitive assessment?
18     A.  It's a series of questions that are asked,
19 and it's assigned a score to determine whether or
20 not the person is cognitively impaired or not.
21     Q.  Okay.  Do you know if a cognitive
22 assessment was done for Doe?
23     A.  I don't recall if it was based upon his
24 age.  I don't believe he would have -- his age isn't
25 here or his date of birth; so I can't speak to that.

Page 179

1      Q.  Okay.  I just want to -- I just want to go
2  back to the rating -- the classification -- the
3  rating classifications.
4          And you said those are all -- they
5  determine the amount of the premiums; is that right?
6      A.  They determine the amount of the premium
7  and also if benefit restrictions are required.
8      Q.  Okay.  And are premiums different based on
9  a person's geographical location, or is it all based
10 on the health assessment that is done in the
11 underwriting process?
12     A.  That would be a question for the
13 actuaries.
14     Q.  When you say "the actuaries," who are you
15 referring to?
16     A.  Mutual of Omaha Insurance Company's
17 actuaries.
18     Q.  Do you know who is the head of -- is it
19 called the actuary department or what is the name?
20     A.  Actuarial department, yes.
21     Q.  Do you know who is the head of that
22 department?
23     A.  I do not.
24     Q.  Okay.  Have you ever crossed paths with
25 anybody in the actuarial department in the course of

**Page 184**

1. of this litigation, did you review Doe's application
2. and file?
3.   A.  Yes.
4.   Q.  Okay. And so you were -- you're basically
5. familiar with the steps that were taken to evaluate
6. his application and to arrive at a conclusion?
7.   A.  Yes.
8.   Q.  Okay. Now, at the time that Mutual
9. received -- well, when Mutual received the results
10. of the pharmaceutical check, it discovered at that
11. time that Doe was taking the medication Truvada; is
12. that correct?
13.   A.  The pharmaceutical check indicated a
14. prescription had been filled for that medication.
15.   Q.  Okay. And so at that time -- and was that
16. in January of 2015?
17.   A.  I don't recall the day. It would have
18. been after the application was entered into the
19. system.
20.   Q.  All right. It would have been after the
21. application was entered and obviously before the
22. denial?
23.   A.  Correct.
24.   Q.  All right. So at that time Mutual was
25. aware that Doe did not list Truvada on his

**Page 185**

1. application; is that right?
2.   A.  Yes.
3.   Q.  All right. And what, if anything, did
4. Mutual do as a result of discovering that Doe did
5. not list Truvada on his application?
6.   A.  Nothing.
7.   Q.  Okay. Nothing was warranted?
8.       MR. MAGRATTEN: Objection to form.
9.       THE WITNESS: We -- we were getting
10. an interview and medical records.
11. BY MR. KLEIN:
12.   Q.  Okay. So that covered the issue of
13. prescriptions?
14.   A.  If it was in the interview or medical
15. records, yes, it would.
16.   Q.  Okay. And during the personal telephone
17. interview, the personal health interview, do you
18. know whether Doe voluntarily disclosed that he was
19. taking the medication Truvada?
20.   A.  They're asked to advise of the medications
21. they take, and the transcript that I received
22. indicated that he disclosed the medication Truvada.
23.   Q.  Okay. Now, on this person -- in the
24. personal health interview as it was conducted in
25. 2015, do you know whether any questions were asked

**Page 186**

1. about a person's risk factors for HIV disease?
2.   A.  There are no questions on the interview
3. that ask if you -- if a person is at risk for HIV
4. disease.
5.   Q.  Okay. Are there any questions on the
6. application that ask about risk factors related to
7. any other behaviors?
8.       MR. MAGRATTEN: Objection to form.
9.       THE WITNESS: There are questions
10. about tobacco, alcohol, and drug use.
11. BY MR. KLEIN:
12.   Q.  Okay. Did Mutual of Omaha in the
13. application process also -- you said they asked for
14. medical records from Doe's primary care physician?
15.   A.  Correct.
16.   Q.  Did they receive those records?
17.   A.  Yes.
18.   Q.  All right. And they reviewed those
19. records -- and they reviewed the records as part of
20. the underwriting process?
21.   A.  Yes.
22.   Q.  All right. Was -- okay.
23.       So you -- of the things, then, that you
24. asked for in Doe's -- with respect to Doe's -- the
25. underwriting of Doe's application, was there

**Page 187**

1. anything that was incomplete or missing?
2.       MR. MAGRATTEN: Objection to form.
3.       THE WITNESS: I don't know if they
4. were missing application questions. Sometimes
5. questions aren't answered. We ask for those.
6.       In terms of underwriting requirements, we
7. obtain the required underwriting requirements. And
8. whether his provider gave us complete medical
9. records, I do not know.
10.       (Exhibit No. 7
11.       marked for identification.)
12. BY MR. KLEIN:
13.   Q.  Have you ever seen Exhibit 7 before?
14.   A.  Yes.
15.   Q.  Can you tell me what it is?
16.   A.  It's the telephone interview for Doe.
17.   Q.  Okay. And who conducted this?
18.   A.  We use a vendor to do the interviews.
19.   Q.  And who is the vendor?
20.   A.  It's someone through Long Term Care Group.
21.   Q.  I'm sorry. Is that the name of the
22. vendor? Long Term Care Group?
23.   A.  That's the name of -- we use a third-party
24. administrator called Long Term Care Group.
25.   Q.  Okay.

Thomas & Thomas Court Reporters                1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                 Tel: (402) 556-5000 | Fax: (402) 556-2037

005

Lisa Ging
7/19/2017

56 (212 - 215)

Page 212

1  Aymie forwarded the -- Aymie forwarded
2  Megan Diehm's inquiry to John Blair; is that
3  correct?
4      A. Correct.
5      Q. Okay. And did it matter for purposes of
6  Mutual of Omaha's underwriting why Doe was taking
7  the medication Truvada?
8      A. No.
9      Q. Okay. All right.
10         Now, if I can ask you to look at the next
11  to last page. And it says reasons for decline of
12  appeal.
13         "As per our letter of February 9th, 2015,
14  we would consider additional information received
15  within 60 days of the letter date. We regret that
16  we will be unable to consider any additional
17  information related to this application."
18         Is that from the text of your letter to
19  Doe denying his appeal?
20      A. It is. It's not the complete letter. The
21  complete letter is on the previous page.
22      Q. Okay. Was there any additional
23  information that Doe could have provided with
24  respect to Truvada that would have resulted in the
25  reversal of Mutual's denial?

Page 213

1         MR. MAGRATTEN: Objection to form.
2         THE WITNESS: We had confirmation
3  that he was taking the medication; so, no.
4  BY MR. KLEIN:
5      Q. Okay. Now, in deciding whether or not to
6  insure somebody who takes PrEP, does Mutual consider
7  whether or not the person is adherent to the
8  medication?
9      A. No.
10     Q. So is it your view as the chief
11  underwriter for long-term care insurance that
12  whether or not Doe was adherent to Truvada in his
13  particular case would make no difference as to his
14  eligibility for insurance?
15     A. It was uninsurable due to the use of the
16  medication Truvada.
17     Q. All right. So Doe's particular adherence
18  would have made no difference to the application of
19  the exclusion to him; correct?
20     A. Correct.
21     Q. Do you think whether or not Doe was
22  adherent to Truvada himself sheds any light on the
23  reasonableness of Mutual's policy?
24         MR. MAGRATTEN: Objection to form.
25  Calls for speculation and expert opinion.

Page 214

1         THE WITNESS: We don't insure anyone
2  who takes the medication regardless of their
3  compliance with the medication.
4  BY MR. KLEIN:
5      Q. So the answer is no?
6      A. The answer is --
7         MR. MAGRATTEN: Objection to form.
8         THE WITNESS: -- no.
9  BY MR. KLEIN:
10     Q. All right. I'm almost done. I've got one
11  more thing.
12         At some point -- now, I will say that we
13  have received five different versions of the
14  underwriting guide from Mutual of Omaha. And I'm
15  not going to go through those with you.
16         But -- although, I may -- well, can we
17  go -- well, let me ask you this.
18         MR. KLEIN: Brooks, is it possible --
19  because I don't know that it makes sense to take the
20  time -- that we could get for you -- and you gave us
21  three different underwriting guides in your initial
22  disclosures, and you gave us two, I believe, in your
23  response to our request for production of documents.
24         Can we get from Mutual just the dates that
25  those were in effect or were utilized?

Page 215

1         MR. MAGRATTEN: I will ask again.
2         MR. KLEIN: I mean, there is
3  similar -- I've actually identified the differences
4  between all of them, which -- but -- or I'd say my
5  wonderful assistant has. But it would be good --
6  so -- you know, to get those, you know, because
7  otherwise I'm just going to have to ask. Is that
8  something you can provide to me?
9         MR. MAGRATTEN: I will see what's
10  available, Ben.
11  BY MR. KLEIN:
12     Q. Okay. Are you able to tell by looking at
13  the underwriting guidelines when they were in
14  effect?
15     A. There would need to be a date on them.
16     Q. Okay. I mean, the five -- I have five
17  different versions. Would you be able to look at
18  them?
19     A. Only if there is a date on them.
20     Q. Okay. There doesn't appear to be a date
21  on them that I could tell of any of them.
22         All right. Now, at some point there is a
23  heading -- in two of the underwriting guidelines
24  that we have, there is a provision in the medical
25  impairments section that says high-risk sexual

Thomas & Thomas Court Reporters
and Certified Legal Video, LLC

1321 Jones Street, Omaha, NE 68102
Tel: (402) 556-5000 | Fax: (402) 556-2037