# Exhibit A

JOHN (JD) LODEN
6/30/2017

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE,
                Plaintiff,
vs.                                Civil Action No.:
                                   1:16-cv-11381

MUTUAL OF OMAHA INS. CO.,

                Defendant.
_____x

DEPOSITION OF:    JOHN DAVID (JD) LODEN
DATE TAKEN:       Friday, June 30, 2017
START TIME:       2:19 p.m.
LOCATION:         5660 Strand Court
                  Naples, Florida 34110
COURT REPORTER:   Dianne N. Sarkisian, CSR, RPR,
                  Notary Public - State of Florida.

Page 2

APPEARANCES:

    BENNETT H. KLEIN, ESQUIRE
    GLBTQ Legal Advocates & Defenders
    30 Winter Street
    Suite 800
    Boston, Massachusetts 02108
    (617) 426-1350

        Appearing on behalf of the Plaintiff
        (via telephone.)


    BROOKS MAGRATTEN, ESQUIRE
    Pierce Atwood LLP
    72 Pine Street
    Suite 500
    Providence, Rhode Island 02903
    (401) 490-3422
        Appearing on behalf of the Defendant
        (via telephone.)

Page 3

                    INDEX
Witness                                     Page
John David (JD) Loden

DIRECT EXAMINATION
BY MR. MAGRATTEN:                             4

CROSS EXAMINATION
BY MR. KLEIN:                                30

REDIRECT EXAMINATION
BY MR. MAGRATTEN:                            41

                   EXHIBITS

Exhibit                                     Page

(Exhibits attached to transcript
electronically only.)
DEFENDANT'S EXHIBIT A, SUBPOENA TO           14
PRODUCE DOCUMENTS, INFORMATION OR
OBJECTS OR TO PERMIT INSPECTION OF
PREMISES IN A CIVIL ACTION

DEFENDANT'S EXHIBITS B, C, D,                14
MUTUALCARE SECURE SOLUTION, LONG TERM
CARE INSURANCE POLICY

DEFENDANT'S EXHIBIT E, SEPTEMBER 17,         17
2014 LETTER
DEFENDANT'S EXHIBIT F, MUTUAL CARE           18
SOLUTIONS APPLICATION

DEFENDANT'S EXHIBIT G, 12/17/14 EMAIL        19

DEFENDANT'S EXHIBIT H, EMAIL CHAIN           21

DEFENDANT'S EXHIBIT I, APPLICATION           24
FOR LONG TERM CARE COVERAGE
DEFENDANT'S EXHIBIT J, NOTES/HISTORY         28

Page 4

1   Naples, Florida
2   Friday, June 30, 2017
3   2:19 p.m.
4              JOHN DAVID (JD) LODEN,
5       was thereupon called as a witness herein, and after
6       having first been duly sworn to testify to the truth,
7       was examined and testified as follows:
8                    DIRECT EXAMINATION
9   BY MR. MAGRATTEN:
10  Q.  All right, Mr. Loden. Again, I'm Brooks Magratten,
11      representing Mutual of Omaha Insurance Company.
12      Thanks for coming in this afternoon.
13              I'm going to be asking you a series of
14      questions. If at any time you don't clearly hear or
15      understand a question that I have asked, please let me
16      know and I will rephrase or repeat the question. It's
17      important as we go through that you only respond to
18      those questions that you clearly heard and understood.
19      Is that agreeable?
20  A.  Yes.
21  Q.  And if at any time you need a break or need something
22      to drink, just let us know. We can stop the process
23      for a while.
24              Have you ever been at a deposition before?
25  A.  Once.

1 (Pages 1 to 4)

JOHN (JD) LODEN
6/30/2017

Page 5

1  Q.  Okay. Well, I'm just going to be asking you a series
2      of questions, mostly pertaining to ▮▮ ▮▮▮▮, who's a
3      plaintiff in the case, and I will be referring to some
4      of the exhibits that we shipped to your office
5      previously. Mr. Klein also has a set of the exhibits.
6          And it's important, JD, when you're done
7      with this deposition, to leave these exhibits with
8      Dianne. She will take custody of the exhibits and
9      keep them with the transcript.
10         Can you tell us please your occupation, JD?
11 A.  I'm a licensed financial advisor.
12 Q.  How long have you been a licensed financial advisor?
13 A.  31 years.
14 Q.  Who's your employer?
15 A.  I'm self-employed.
16 Q.  Is there a business name you operate under?
17 A.  JD Loden Wealth Management.
18 Q.  And how long has that business been in existence?
19 A.  1998.
20 Q.  So continuously since 1998?
21 A.  Yes.
22 Q.  Do you live in Florida?
23 A.  Yes.
24 Q.  Are you a full-time Florida resident?
25 A.  Yes.

Page 6

1  Q.  Do you have any professional licenses?
2  A.  Yes, several.
3  Q.  What are they?
4  A.  Series 7, Series 65. I have State of Florida
5      insurance licenses for life, health, variable annuity.
6      And the Series 65, I'm a registered representative
7      investment advisor.
8  Q.  Anything else?
9  A.  No.
10 Q.  Tell me, what is your relationship with Mutual of
11     Omaha Insurance Company?
12 A.  I've used their contracts for various client needs.
13     I'm an independent contractor, so occasionally we use
14     their Medicare Supplements or long term care. On
15     occasion their life insurance, when appropriate, for
16     clients.
17 Q.  So you've sold Medicare Supplement, life insurance,
18     and long term care policies for Mutual of Omaha?
19 A.  Yes.
20 Q.  Have you sold long term care policies written by other
21     insurance companies?
22 A.  Yes.
23 Q.  Can you name a few?
24 A.  Originally, Travelers, CNA, Unum.
25 Q.  Okay. What is the Ash, A-s-h, Brokerage?

Page 7

1  A.  They're an independent marketing organization. Many
2      advisors around the country -- we call them "IMOs,"
3      independent marketing organizations, I believe, and
4      they have -- they act as like a general agency,
5      representing lots of insurance companies. So
6      independent advisors like us around the country use
7      them as a resource to obtain quotes for our clients
8      and we typically spreadsheet quotes to clients 'cause
9      our obligation is to provide the best thing for our
10     clients and not sell products.
11 Q.  So if you're selling a client a Mutual of Omaha long
12     term care policy, would you go through Ash Brokerage
13     typically?
14 A.  Well, I used Ash in this occasion to see if I could
15     find something that would provide a spousal discount
16     for a gay couple.
17 Q.  Okay.
18 A.  So Mutual of Omaha offered a contract for, uh, you get
19     a discount when you have two members of a family
20     applying.
21 Q.  Did you solicit long term care coverage from any other
22     insurance companies for ▮▮ ▮▮▮▮ and his partner?
23 A.  Well, that's what Ash did. I believe we had quotes
24     from other carriers. Off the top of my head, it could
25     have been John Hancock maybe, I don't recall, but, you

Page 8

1      know, we... We did certainly get quotes from other
2      carriers and found that Mutual of Omaha was a carrier
3      that gave them a discount.
4  Q.  I see. Provided them a discount as a committed
5      couple?
6  A.  Yes.
7  Q.  I see.
8  A.  In addition, since we... I have an obligation to make
9      sure that the coverage is suitable, that the company
10     has substantial financial resources and high ratings,
11     and that's one of the reasons why we chose them.
12 Q.  Okay. And other insurance companies are out there.
13     Was it the case that they would not provide a discount
14     in the case of ▮▮ ▮▮▮▮ and his partner?
15 A.  That's what I was told.
16 Q.  By the Ash Brokerage?
17 A.  Yes.
18 Q.  And did you have a primary contact at Ash Brokerage?
19 A.  Yeah. I think I put it in the notes and all the
20     emails I supplied Teresa. I can't pronounce her last
21     name. It's in the notes and all the emails.
22 Q.  C-u-r-r-e-r-i?
23 A.  Yes.
24 Q.  Curreri?
25 A.  Yeah.

JOHN (JD) LODEN
6/30/2017

Page 9

1  Q.  And where is Ash Brokerage located?
2  A.  They have several offices, but primarily Fort Wayne,
3      Indiana. I think they're in Fort Wayne, Tampa. They
4      may have an office in Arizona, also.
5  Q.  All right. And what is Cetera Advisors, C-e-t-e-r-a?
6  A.  That's my broker-dealer where I park my securities
7      license.
8  Q.  And, I'm sorry, I'm not in your industry very much,
9      but can you explain to me in English how that works?
10 A.  Yeah. Similar to a realtor. You have to park your
11     license at a broker.
12 Q.  Okay.
13 A.  So I'm an independent advisor. I work for my clients,
14     but I have to have my license with a broker-dealer.
15     That helps me satisfy all the compliance of regulatory
16     and continuing education that's required.
17 Q.  All right. How long have you been affiliated with
18     Cetera?
19 A.  Well, they are part of a large organization that was
20     part of a merger. I was with Investors Capital, which
21     got bought by the parent company, which was part of
22     Cetera, so I don't... I officially, maybe October of
23     last year became Cetera, but we were part of the same
24     organization.
25 Q.  All right. And where is your office?

Page 10

1  A.  Naples.
2  Q.  And how long have you maintained a Naples office?
3  A.  My own business, since '98.
4  Q.  Have you ever had an office in Massachusetts?
5  A.  No.
6  Q.  Okay.
7  A.  My broker-dealer, Investors Capital, was based in
8      Boston.
9  Q.  Okay. But you, yourself never maintained an office in
10     Massachusetts?
11 A.  No.
12 Q.  Have you been licensed to sell any insurance products
13     in Massachusetts?
14 A.  Well, I have to be licensed wherever I'm soliciting or
15     writing a contract. So I'm licensed in probably 15 or
16     16 states for my securities license. And I couldn't
17     tell you, off the top of my head, how many states I'm
18     licensed for insurance.
19 Q.  All right.
20 A.  But it's the law that you can't write a contract
21     unless you have a state license, it's called a non-
22     resident license, and of course I pay a fee for that.
23 Q.  Understood.
24           How did you meet ▓▓ ▓▓▓▓ and ▓▓▓▓▓▓▓▓?
25 A.  ▓▓▓▓▓▓, uh, his parents were clients of mine for

Page 11

1      many, many years.
2  Q.  Are they in Naples?
3  A.  They're deceased.
4  Q.  I see. But when they were alive and clients of yours,
5      were they living in Naples?
6  A.  Yes.
7  Q.  And did they introduce you to their son, ▓▓▓▓?
8  A.  Yes. And he is a client.
9  Q.  When did that happen that they introduced you to ▓▓▓▓?
10 A.  It's got to be 10 years ago.
11 Q.  And when you met ▓▓▓▓, was that in Florida?
12 A.  Yes.
13 Q.  And was that a face-to-face meeting?
14 A.  Yes.
15 Q.  From the time you met ▓▓▓▓ up to his application for
16     long term care insurance, did you have any business
17     interactions with ▓▓▓▓▓▓▓▓?
18 A.  Yes.
19 Q.  And can you tell me generally what they were?
20 A.  I manage his IRA, a rollover IRA, and I now manage an
21     investment account for him that he inherited from his
22     parents.
23 Q.  And when did you first meet ▓▓ ▓▓▓▓?
24 A.  Never met him personally. Only talked to him on the
25     phone.

Page 12

1  Q.  All right. When was the first time you spoke to ▓▓
2      ▓▓▓▓ on the phone?
3  A.  I couldn't be certain.
4  Q.  How did the topic of long term care coverage come up
5      in the course of your interactions with ▓▓▓▓ and
6      ▓▓▓▓?
7  A.  So as I said, the ▓▓▓▓▓▓, ▓▓▓▓▓ and ▓▓▓▓, ▓▓▓▓
8      parents, were clients of mine. They came to a seminar
9      for long term care that I did way back in probably the
10     late to mid '80s. They became clients. We had long
11     term care coverage on them. They subsequently needed
12     the care and the contract paid out some very, very
13     nice benefits for them, and ▓▓▓▓ really appreciated
14     how much it meant and how much it did for his parents.
15 Q.  So did ▓▓▓▓ ask you for an application for long term
16     care coverage?
17 A.  Yes, because they saw what it did for their parents.
18 Q.  I see. And were you and he both in Florida when that
19     happened?
20 A.  Well, I mean, we talked over the years about, you
21     know, 'cause I helped... I helped their family quite
22     a bit. They were very nice people and I visited them
23     at their facilities often. I even had the parents
24     over for dinner at my house.
25 Q.  Understood.

JOHN (JD) LODEN
6/30/2017

Page 13

1  A.  So the conversation of long term care was very
2      prominent because it was an ongoing situation because
3      his parents were older and needing care.
4  Q.  I understand. Can you walk me through the process
5      that you followed to obtain long term care coverage
6      for ▇▇▇ and ▇▇▇?
7  A.  Well, how we... A long term care policy has basically
8      three components: A daily benefit, a pot of money,
9      how long -- how many years, some inflation options.
10     And so what we do is it's our obligation to provide
11     them a spreadsheet of quotes. They have different
12     waiting periods. The contracts are pretty... They're
13     a bit complicated and the definitions vary from one
14     company to another.
15 Q.  All right. I'm going to take a detour for one moment.
16         In the documents that you have with you,
17     there is a document with the letter A in the upper
18     right-hand corner?
19 A.  Yeah.
20 Q.  Which, uh, is that the subpoena that was served on you
21     in this matter?
22 A.  Yes.
23 Q.  And in response to the subpoena, did you search for
24     records pertaining to ▇▇▇ ▇▇▇?
25 A.  Yeah. I emailed documents to you. And I actually, as

Page 14

1      soon as I got this, because we're in such a heightened
2      regulatory environment, I contacted the Compliance
3      Department at my broker-dealer, Cetera, to let them
4      know of this, and I corresponded with their office and
5      provided everything I could find regarding emails and
6      notes and quotes and so forth.
7  Q.  All right. And thank you for doing that.
8          And you're here today for this deposition
9      pursuant to a subpoena as well, correct?
10 A.  Can you state that again? I'm not sure what you
11     meant.
12         (DEFENDANT'S EXHIBIT A, SUBPOENA TO PRODUCE
13         DOCUMENTS, INFORMATION OR OBJECTS OR TO
14         PERMIT INSPECTION OF PREMISES IN A CIVIL
15         ACTION WAS MARKED FOR IDENTIFICATION.)
16 BY MR. MAGRATTEN:
17 Q.  Yeah. You received one subpoena for production of
18     documents, correct, what we just looked at, Exhibit A?
19 A.  Yes.
20 Q.  And then you got a second subpoena to ask you to show
21     up for this deposition?
22 A.  Yes, that's correct.
23         (DEFENDANT'S EXHIBITS B, C, D, MUTUALCARE
24         SECURE SOLUTION, LONG TERM CARE INSURANCE
25         POLICY WAS MARKED FOR IDENTIFICATION.)

Page 15

1  BY MR. MAGRATTEN:
2  Q.  All right. There are three similar documents that
3      have been marked Exhibits B, C and D. What are these
4      documents?
5  A.  These are quotes for long term care.
6  Q.  Quotes from Mutual of Omaha?
7  A.  Yeah, supplied by Ash Brokerage.
8  Q.  That was my next question. Where did you get these
9      documents?
10 A.  From Ash Brokerage.
11 Q.  Okay.
12 A.  I don't have the software to generate the quotes.
13 Q.  Okay. And what's the difference between Exhibit B, C
14     and D; is it just sort of the terms of the benefits?
15 A.  Yeah, exactly. If you look at A, it's, uh... Let me
16     just skim this real quick.
17         You can see the daily, the maximum monthly
18     amount varies.
19 Q.  Okay.
20 A.  So document B is quoting $6,000 a month with various
21     options throughout the pages, and those options are
22     waiting periods, inflation options, and so forth.
23         And option C is a $3,000 versus $6,000.
24         And then D is...
25         And I believe we had to... We also had to,

Page 16

1      during the process they took a long time to review
2      this. If you see in the notes from the original
3      quotes back in May, by the time we did an application,
4      one of their ages had changed and the premium changed
5      because the age changed, so we had to get some new
6      quotes and an application updated.
7  Q.  I see. So when you got Exhibits B, C and D, did you
8      forward them to ▇▇▇ or ▇▇▇?
9  A.  Yeah, via email.
10 Q.  Okay. And did they select one of these options?
11 A.  Yes.
12 Q.  Do you remember which one?
13 A.  Well, it's designated by the application.
14 Q.  Okay. Please walk me through, you know, once... Once
15     ▇▇▇ and ▇▇▇ selected the parameters of a long
16     term care policy they were interested in, what was the
17     next step?
18 A.  Well, I emailed them the application to complete. And
19     if you look at the application, it's electronically
20     completed.
21 Q.  And what does that mean?
22 A.  Well, it wasn't handwritten, meaning, it was done with
23     a, you know, computer, you know, checking boxes. You
24     know, a fillable PDF, I suppose.
25 Q.  So you sent a PDF file of the application to ▇▇▇?

4 (Pages 13 to 16)

JOHN (JD) LODEN
6/30/2017

### Page 17

1  A.  Yeah.
2  Q.  And you did this from your Naples office?
3  A.  Yes.
4  Q.  And then you wait for them to complete the PDF and
5      return it to you?
6  A.  Right. Well, of course. We give them instructions
7      and all the different -- and plus, Ash Brokerage has
8      some underwriting requirements and disclosures.
9      There's several different disclosures and also
10     requiring a binder premium, a refundable binder
11     premium.
12 Q.  I was going to direct your attention -- I'm sorry --
13     go ahead.
14 A.  There's a cover letter on September 17th, you know,
15     attached is the application and so forth.
16          (DEFENDANT'S EXHIBIT E, SEPTEMBER 17, 2014
17          LETTER WAS MARKED FOR IDENTIFICATION.)
18 BY MR. MAGRATTEN:
19 Q.  That's my next question. I was going to ask you about
20     Exhibit E. Exhibit E appears to be your letter of
21     September 17, 2014?
22 A.  Right.
23 Q.  And tell me what's going on here. You sent the PDF
24     file to ▓ to complete. Presumably, he sent it back
25     to you. And what are you doing?

### Page 18

1  A.  Well, we printed it off. I think they call it a
2      telephone application. You know, it's been a long
3      time, but... So we sent the... 'Cause they had to
4      have a hand, you know, a signature, and there were
5      some, you know, the Ash Brokerage authorization and
6      instructions of what premiums to return.
7  Q.  Okay.
8  A.  So you can see the application has a wet signature.
9  Q.  Let's turn to the next exhibit, which is F.
10 A.  Uh-huh.
11 Q.  And is this the application that you sent up to ▓
12     with your letter of September 17?
13 A.  Right.
14 Q.  So this is what they had to sign and return to you?
15 A.  Right.
16 Q.  With two checks, right?
17 A.  And if you notice the date, it's dated November. I
18     think that's why later on we had to get an updated
19     signature or application. It was awhile ago, but they
20     had to execute a new document.
21 Q.  When you sent the letter of September 17, 2014, this
22     is coming from your Naples office?
23 A.  Yes.
24          (DEFENDANT'S EXHIBIT F, MUTUALCARE
25          SOLUTIONS APPLICATION WAS MARKED FOR

### Page 19

1          IDENTIFICATION.)
2  BY MR. MAGRATTEN:
3  Q.  Okay. Now, Exhibit F, which this is... Is this the
4      application for long term care coverage that ▓
5      and ▓ signed in November 2014?
6  A.  Yes.
7  Q.  And this is what they mailed back to you?
8  A.  Yes.
9  Q.  Okay. What happened after you got that application?
10 A.  Well, I submit it to Ash Brokerage.
11 Q.  Okay. And what happened after that?
12 A.  Well, Ash Brokerage submits it to Mutual of Omaha for
13     underwriting, and I don't know if it's Mutual of Omaha
14     that obtains the attending physician statements or,
15     you know, if Mutual of Omaha reaches out to get that.
16     There was a long delay in getting some records from,
17     uh, some of ▓ physicians because they had changed
18     locations and so forth.
19          (DEFENDANT'S EXHIBIT G, 12/17/14 EMAIL
20          WAS MARKED FOR IDENTIFICATION.)
21 BY MR. MAGRATTEN:
22 Q.  Can you turn to Exhibit G?
23 A.  Yeah.
24 Q.  Tell us, what is Exhibit G?
25 A.  This is just a cover letter or an email actually.

### Page 20

1  Q.  And this is from you to Ash Brokerage?
2  A.  Correct.
3  Q.  Can you just tell me from the email what was going on
4      in this process?
5  A.  Yeah. I mean, the completed documents were forwarded
6      to Teresa.
7  Q.  This is the second time you forwarded the application
8      documents to Ash?
9  A.  I'm not sure.
10 Q.  Okay. This Exhibit G is dated December 17, 2014?
11 A.  Right.
12 Q.  Okay.
13 A.  I don't have the timeline of notes, but it's possible
14     that this could be the revised one. I couldn't tell
15     you, off the top of my head.
16 Q.  That's right. You testified earlier that there had to
17     be a revision because of a change in age by ▓
18     and ▓?
19 A.  Right.
20 Q.  Okay. And looking near the bottom of Exhibit G, there
21     is an address there for 6 Kimball Lane, Lynnfield,
22     Massachusetts. Do you see that?
23 A.  Yes.
24 Q.  Was that the address for Investors Capital
25     Corporation?

JOHN (JD) LODEN
6/30/2017

Page 21

1  A.  Exactly.
2  Q.  Okay.
3  A.  It's a disclosure requirement for all our documents.
4  Q.  All right. This is not your office in Lynnfield,
5      Mass?
6  A.  No.
7  Q.  Okay.
8  A.  And that's because it's email, and that's a FINRA
9      requirement.
10         (DEFENDANT'S EXHIBIT H, EMAIL CHAIN
11         WAS MARKED FOR IDENTIFICATION.)
12 BY MR. MAGRATTEN:
13 Q.  Understood. Thank you.
14        So turning to Exhibit H, and I'd like to
15     start on the second page of Exhibit H.
16        Is Exhibit H an email string between you
17     and ▊           ?
18 A.  Um-hum.
19 Q.  Okay. On the second page at the top it reads,
20     "Unfortunately, the application and checks were sent
21     back to me because more than 30 days had expired
22     between the date you and ▊    signed the applications
23     and the date the company received the applications."
24        And it goes on to say, "In addition, you
25     both had a birthday since we originally quoted the

Page 22

1   plans. Therefore, there is a modest monthly premium
2   difference for each ($7.10 ▊    and $3.38 ▊ ). To
3   complete the applications, please sign and date the
4   attached signature pages and return them with new
5   checks, payable to Mutual of Omaha."
6        Do you see where I was reading?
7  A.  Yeah.
8  Q.  Can you explain to me in laymen's terms what's going
9      on there?
10 A.  Yeah. Again, the applications were forwarded to them.
11     They took a long time to complete the applications.
12     You know -- and it's been some while. It's very
13     possible -- and I've seen clients, you know, get
14     paperwork, sign a document, but then not return it
15     with whatever response, you know, other forms or
16     premium deposits are required.
17        And so the applications were returned
18     because it didn't comply with the underwriting rules.
19 Q.  Meaning, in terms of the date of the signature and the
20     date the company received the application?
21 A.  Exactly.
22 Q.  Okay.
23 A.  Because, you know, people's health conditions can
24     change from th date they fill out an application to
25     the time the company gets the application.

Page 23

1  Q.  Okay. And then on the bottom of page 1 of Exhibit H,
2      there's a note. It appears to be from ▊ . It says,
3      "Hi JD, thank you for the update. I apologize for any
4      additional work entailed on your behalf as a result of
5      our lapse in not getting back to you sooner. I will
6      return the application to you this week."
7         That's the email that ▊ wrote you on
8      December 22?
9  A.  Yeah.
10 Q.  And then you responded on December 23, saying, "What
11     do you want me to do with the checks," correct?
12 A.  Yeah, the other checks. I didn't know if they wanted
13     me to return them or destroy them.
14 Q.  I see, okay. And then the top email on page 1 of
15     Exhibit H, this apparently is ▊ emailing to you
16     again, saying, "I have sent the completed applications
17     to you via FedEx. I have included two checks for the
18     new premium amounts. Please destroy the original
19     checks."
20 A.  Yeah.
21 Q.  Did I read that correctly?
22 A.  Yeah.
23 Q.  So when you sent the new applications up to ▊ for
24     signatures, he completed them and sent them back to
25     you?

Page 24

1  A.  Yeah.
2  Q.  And that would be in your Naples, Florida, office?
3  A.  Correct.
4        (DEFENDANT'S EXHIBIT I, APPLICATION FOR
5        LONG TERM CARE COVERAGE WAS MARKED FOR
6        IDENTIFICATION.)
7  BY MR. MAGRATTEN:
8  Q.  Can we turn to Exhibit I?
9  A.  Sure.
10 Q.  And what is Exhibit I?
11 A.  It's a binder premium.
12 Q.  Is this an application for long term care coverage?
13 A.  Yes.
14 Q.  And turning to page 16, it looks like there are
15     signatures there for ▊        and for ▊        .
16     The date is not quite clear, but it looks, December
17     2014, correct?
18 A.  Yeah.
19 Q.  So is this the application that ▊       sent you
20     that's referred to in the email that's marked Exhibit
21     H?
22 A.  I believe so.
23 Q.  Okay. What happened? Excuse me, what did you do with
24     Exhibit I, once you got it?
25 A.  Well, that was forwarded to Ash Brokerage. I believe

6 (Pages 21 to 24)

JOHN (JD) LODEN
6/30/2017

Page 25

1  you have a cover letter.
2  Q. And is that sent to Ash Brokerage in Indiana?
3  A. Yes, correct.
4  Q. What happened next?
5  A. From there, that's when Ash Brokerage works the...
6     They're the IMO and they work with Mutual of Omaha to
7     obtain whatever underwriting requirements are required
8     to issue the contract.
9  Q. Okay.
10 A. And that's, you know, they get attending physician
11    statements, medical records.
12 Q. All right. And what happened next?
13 A. Well, at some point the carrier declined coverage for
14    ███ ███.
15 Q. Okay. And why did they do that?
16 A. Based on records they found.
17 Q. Are you aware of any more specific reason?
18 A. I think it was a prescription, but they don't give us
19    those details. I mean, that HIPAA stuff is pretty
20    private.
21 Q. Okay.
22 A. I think even the disclosure stuff I'm allowed to find
23    out, but they didn't tell me specifically. It's just
24    something, some prescription that he was taking, if I
25    recall. I think it was a prescription of some sort.

Page 26

1  Q. After you sent Exhibit I to Ash Brokerage, did you
2     have any more involvement with this application for
3     long term care coverage?
4  A. Yeah. I was quite involved with helping ███ try to
5     get some records because we were having a heck of a
6     time tracking down his physicians. They had
7     changed... There were some ownership changes and some
8     address changes and we had to really work on trying to
9     get some records.
10 Q. Okay.
11 A. But nothing, never had to help ███ with anything, if
12    I recall.
13 Q. Okay.
14 A. It was just ███. We had to work on getting some
15    records for him.
16 Q. And were you ultimately successful in obtaining
17    records for ███?
18 A. Yes.
19 Q. And after you went through this process of helping
20    ███ get records, did you have any more involvement
21    with this application for long term care coverage?
22 A. I'm not sure what you mean.
23    ███ I mean, at some point we notified them that
24    ███ was declined and ███ never proceeded with his
25    own contract.

Page 27

1  Q. Okay.
2  A. I have had conversations with ███ and he is still
3     interested in getting some coverage.
4  Q. All right, that was my next question.
5     After the application with Mutual of Omaha
6     was declined, did ███ or ███ ask you to
7     procure coverage with another insurance company?
8  A. No.
9  Q. Do you recall anything else about the application that
10    was submitted to Mutual of Omaha for ███ and for
11    ███ that you haven't testified about so far in
12    this deposition?
13 A. No. I mean, it's a fairly simple process.
14 Q. I'm just wondering if there's any other details that
15    come to mind that we haven't talked about.
16 A. I did have a couple of conversations with ███ after
17    he was declined, but I don't, you know, I don't recall
18    ever getting any sort of letter from Mutual of Omaha.
19    The reason for the decline, I think they deal directly
20    with the insured for the purpose or why he was
21    declined, but I don't have any documents that say why
22    he was declined.
23 Q. And what did you discuss with ███ about the
24    application?
25 A. Just regarding the declination?

Page 28

1  Q. Yeah. I think you testified a moment ago you had a
2     few conversations with ███ about the application
3     and the fact that it was declined.
4  A. Yeah. Well, he asked for copies of the applications
5     and things like that. So I, you know, sent him, you
6     know, stuff that I had.
7  Q. Anything else?
8  A. I don't recall.
9         (DEFENDANT'S EXHIBIT J, NOTES/HISTORY
10        WAS MARKED FOR IDENTIFICATION.)
11 BY MR. MAGRATTEN:
12 Q. Okay. Last document in the packet I gave you is
13    marked Exhibit J, which is labeled Notes/History.
14    What is this document?
15 A. That's all the emails and attachments, correspondence
16    between ███ and I.
17 Q. Okay. I see occasional references in here to ███
18    ███. Is that ███ mother?
19 A. Yeah.
20 Q. Understood. And from this document marked notes and
21    history, were you able to retrieve and produce to us
22    all of the emails and attachments that are referenced
23    in this document?
24 A. Yeah. I sent several different... I had to save them
25    as separate PDFs by date and keep the size small. I

JOHN (JD) LODEN
6/30/2017

Page 29

1  think it was your office that had difficulty because
2  of the size of the documents.
3  Q.  I'm not surprised. All right. But in any event...
4      So what you produced to us, the emails you produced to
5      us is everything you were able to retrieve from your
6      computer that was on this Exhibit J?
7  A.  Right.
8  Q.  Okay.
9  A.  Well, let me step back. I didn't provide you
10     documents regarding anything to do with Mrs. ███.
11     These were only strictly documents associated with the
12     underwriting of ███ and ███ long term care
13     policy.
14 Q.  Understood.
15 A.  The other documents or correspondence that I had with
16     ███ regarding his mother would not be included.
17 Q.  Understood. That's fine.
18     So if I am correct then, you never met ███
19     ███ face to face, correct?
20 A.  No.
21 Q.  And your correspondence and your emailing with ███
22     and ███ about the long term care application was
23     all done from your Naples, Florida, home and office?
24 A.  Yeah. I may have talked to ███, you know, in person
25     a few times if he was visiting his mom.

Page 30

1  Q.  And that would be in Florida?
2  A.  Yeah, yeah.
3  Q.  Understood.
4      MR. MAGRATTEN: And I think that's all the
5      questions I have.
6      MR. KLEIN: Okay. Mr. Loden, my name is
7      Ben Klein, as I indicated at the beginning of this
8      deposition. I have a few more questions, nothing too
9      long, so hopefully we can get you on your way pretty
10     soon, but I'd like to start with just understanding a
11     little bit better the chronology of the application
12     process.
13              CROSS EXAMINATION
14 BY MR. KLEIN:
15 Q.  Did you happen to bring with you the documents that
16     you provided to Mr. Magratten in response to the
17     subpoena?
18 A.  I have the documents that were forwarded to me via
19     FedEx.
20 Q.  And did you bring with you the documents that you
21     provided to Mr. Magratten?
22 A.  No.
23 Q.  Do you recall when ███ and ███ first approached you
24     with an interest in pursuing long term care insurance?
25 A.  I can't give you a specific date, but it was over a

Page 31

1  period of time while I was taking care of his parents.
2  Q.  Okay. Do you have a ballpark sense in the... It was
3      clearly in 2014. Do you have a ballpark sense of what
4      month or time of year it might have been?
5      MR. MAGRATTEN: Objection, but you can
6      answer.
7  A.  I would have no idea. In fact, you know, the date of
8      the application or the quotes being in 2014, I'm sure
9      that we had conversations a year before that just
10     because I was taking care of his parents under a long
11     term care for many years, so I'm sure the conversation
12     came up well before they finally got around to an
13     application.
14 BY MR. KLEIN:
15 Q.  One of the documents you provided to Mr. Magratten is
16     an email from Teresa Curreri to you dated May 15th,
17     2014, and it says: Amy Ash asked that I forward you a
18     Care Solution for your Mass clients, ███ and ███.
19     I've attached a MutualCare Secure Solution proposal
20     for your review.
21     Would that have been the beginning of the
22     application process with Mutual of Omaha?
23 A.  That's not the underwriting. That's the process of
24     getting quotes.
25 Q.  Okay.

Page 32

1  A.  That wasn't... That wasn't... As I said earlier, I
2      have no bias towards an insurance company. We reach
3      out to Ash to provide us quotes to give us a solution
4      for our clients.
5  Q.  And so the quotes from Mutual were obtained in May of
6      2014?
7  A.  I think so.
8  Q.  Okay. And at that time, let me just ask you a couple
9      of questions about your business.
10     Did you, in order to... Well, can you
11     describe to me what it is you do with respect to long
12     term care insurance for a client?
13 A.  Well... So I held a securities license and we take a
14     comprehensive view of our client's financial
15     situation. Not everybody needs long term care. Some
16     of our clients are quite wealthy, so it's not
17     appropriate. Some clients are adverse to risk and
18     sometimes insurance solutions are a good option for
19     them. Not everybody needs long term care.
20     And so when we have that conversation with
21     a client to protect assets, we spreadsheet quotes. We
22     have no bias, as I said, towards an insurance company.
23     We try to get alternatives and provide the clients an
24     unbiased view of what's available.
25 Q.  So is it correct that one aspect of your role for

8 (Pages 29 to 32)