# Exhibit B

## In The Matter Of:

*Doe vs*

*Mutual of Omaha Insurance Company*



September 7, 2017



**ALLIED COURT REPORTERS, INC.** *and* **VIDEO CONFERENCE CENTERS**

Phone: 401-946-5500    Toll Free: 888-443-3767
www.alliedcourtreporters.com    info@alliedcourtreporters.com

*Min-U-Script® with Word Index*

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3
 4  JOHN DOE
         Plaintiff
 5
         vs.              C.A. No. 1:16-cv-11381-GAO
 6
    MUTUAL OF OMAHA
 7  INSURANCE COMPANY
         Defendant
 8
 9
10
11
              DEPOSITION OF _____, a Plaintiff in
12   the above-entitled case, taken on behalf of the
     Defendant, before Linda L. Guglielmo, RPR-RMR, a
13   Notary Public in and for the State of Rhode
     Island, at the offices of Pierce Atwood, LLP, 72
14   Pine Street, Providence, Rhode Island on September
     7, 2017 at 9:30 A.M.
15
16  APPEARANCES:
17  FOR THE PLAINTIFF.....GLBTQ LEGAL ADVOCATES & DEFENDERS
                       BY: BENNETT H. KLEIN, ESQ.
18                         30 WINTER STREET
                           BOSTON MA  02108
19
    FOR THE DEFENDANT.....PIERCE ATWOOD, LLP
20                     BY: BROOKS R. MAGRATTEN, ESQ.
                           72 PINE STREET
21                         PROVIDENCE, RI  02903
22
23  ALSO PRESENT: John P. Ward, Esq.
24
25
```

Page 2

```
 1                    I N D E X
 2  WITNESS                                       PAGE
 3     EXAMINATION BY MR. MAGRATTEN..............3
 4
 5
 6
 7                  E X H I B I T S
 8                    (DEFENDANT'S)
    NO.     DESCRIPTION                           PAGE
 9  EXHIBIT 1  APPLICATION FOR LONG TERM CARE
               INSURANCE, 26 PGS...................19
10  EXHIBIT 2  LONG-TERM CARE INSURANCE APPLICATION,
               19 PGS..............................21
11  EXHIBIT 3  DR. KATZ MEDICAL NOTE, 9-24-15......32
    EXHIBIT 4  DR. KATZ MEDICAL NOTE, 10-5-15......32
12  EXHIBIT 5  COMPLAINT, 7 PGS....................37
    EXHIBIT 6  PLAINTIFF'S MEMO IN SUPPORT OF MOTION TO
13             REMAND CASE TO STATE COURT, 10 PGS..58
14
15
16
17  FOR INSTRUCTIONS TO WITNESS NOT TO ANSWER
    SEE PAGES: 4, 30, 31, 32, 33, 35, 37, 39, 56, 58
18
19
20
21
22
23
24
25
```

Page 3

```
 1       (DEPOSITION COMMENCED AT 9:34 A.M.)
 2  _____
 3  Being duly sworn, deposes and testifies as follows:
 4       THE REPORTER: Would you state
 5  your full name for the record, please.
 6       THE WITNESS: _____
 7       EXAMINATION BY MR. MAGRATTEN
 8  Q. Good morning, Mr. ___, I'm Brooks Magratten,
 9  we're here today for your deposition. Your
10  counsel, Mr. Klein, has suggested that we
11  stipulate that all objections are preserved except
12  as to form; is that agreeable?
13     MR. KLEIN: Yes.
14  Q. Have you been at a deposition before?
15  A. Yes.
16  Q. How many times?
17  A. Numerous.
18  Q. Okay. You yourself have been deposed before?
19  A. Yes.
20  Q. How many times?
21  A. Once or twice.
22  Q. Okay. I'm going to ask you a series of questions
23  related to your lawsuit John Doe versus Mutual of
24  Omaha, if at any time you don't clearly hear or
25  understand a question I've asked, please let me
```

Page 4

```
 1  know so I can rephrase or repeat the question.
 2  It's important going forward that we both
 3  understand that you will only be responding to
 4  those questions that you have clearly heard and
 5  understood; is that agreeable?
 6  A. Yes.
 7  Q. What is your age?
 8  A. I'm 63.
 9  Q. Have you taken any medications in the last 24
10  hours?
11     MR. KLEIN: Objection. I'm going to
12  instruct him not to answer that because although I
13  understand your intent, it's an innocent question,
14  it goes into the area of the magistrate's order
15  about not asking any health questions beyond
16  February 9, 2015. If you want to ask him if he is
17  on any -- if there's anything that's impairing his
18  ability to understand and answer your questions,
19  that's fine, but I will instruct him not to answer
20  the question about what medications he's taking.
21     (SO NOTED)
22  Q. Have you taken any medications in the last 24
23  hours that would affect your ability to recall and
24  testify truthfully today?
25  A. No.
```

Doe vs
Mutual of Omaha Insurance Company

September 7, 2017

Page 5

1  Q.  Where do you live?
2  A.  I live at [redacted], Saunderstown,
3  Rhode Island, and also [redacted], Boston,
4  Massachusetts.
5  Q.  [redacted], is that a stand-alone house?
6  A.  Yes.
7  Q.  Who owns that?
8  A.  I do.
9  Q.  Does anyone else own that property?
10 A.  No.
11 Q.  How long have you owned that property?
12 A.  Over 19 years.
13 Q.  Have you resided there continuously in the last 19
14    years?
15 A.  I'm not sure what you mean by continuously.
16 Q.  Were there any periods of time in the last 19
17    years when you were not at the [redacted]
18    residence on a weekly basis?
19 A.  Yes.
20 Q.  Okay. When?
21 A.  I don't recall, but there were times where I
22    spent more time in Boston.
23 Q.  Okay. The [redacted], Boston, residence,
24    what kind of structure is that?
25 A.  It's a condominium.

Page 6

1  Q.  Who owns that?
2  A.  [redacted], [redacted].
3  Q.  Is Mr. [redacted] the sole owner of that property?
4  A.  Yes.
5  Q.  And how often are you in the Boston property
6    clean?
7     MR. KLEIN: Objection as to time
8    frame.
9  A.  Three to four days a week.
10 Q.  How often are you in the Saunderstown, Rhode
11    Island, property?
12 A.  Four or five days a week.
13 Q.  Was that the case in 2014?
14 A.  Yes.
15 Q.  Was that the case in 2015?
16 A.  Yes.
17 Q.  Do you have a driver's license?
18 A.  Yes.
19 Q.  Issued in what state?
20 A.  Rhode Island.
21 Q.  Did you vote in the last Presidential election?
22 A.  Yes.
23 Q.  Where did you cast your ballot?
24 A.  North Kingstown, Rhode Island.
25 Q.  Do you pay property taxes?

Page 7

1  A.  Yes.
2  Q.  Where?
3  A.  Rhode Island.
4  Q.  Does Mr. [redacted] pay property taxes?
5  A.  I don't know.
6  Q.  Do you pay state income taxes?
7  A.  Yes.
8  Q.  Where?
9  A.  Rhode Island and Massachusetts.
10 Q.  All right. Are you married?
11 A.  Yes.
12 Q.  To whom are you married?
13 A.  Mr. [redacted].
14 Q.  Okay. When did you and Mr. [redacted] marry?
15 A.  July 14, 2017.
16 Q.  Prior to that were you living together?
17 A.  Yes.
18 Q.  For how long?
19 A.  27 years.
20 Q.  Okay. Are you a Rhode Island resident?
21     MR. KLEIN: Objection. Calls for a
22    legal conclusion.
23 A.  I live in Rhode Island.
24 Q.  The question is are you a Rhode Island resident?
25 A.  I don't understand the term resident.

Page 8

1      MR. KLEIN: Objection.
2  Q.  You don't understand what residency means?
3  A.  In the legal form, no.
4  Q.  Okay. You completed college?
5  A.  Yes.
6  Q.  Where did you attend college?
7  A.  Lafayette College in Easton, Pennsylvania.
8  Q.  When did you get your degree?
9  A.  1976.
10 Q.  Do you have a law degree?
11 A.  Yes, sir.
12 Q.  Where did you go to law school?
13 A.  University of Miami in Coral Cables, Florida.
14 Q.  When did you get your degree?
15 A.  1979.
16 Q.  That was a JD?
17 A.  Yes, sir.
18 Q.  Have you had any other formal education beyond
19    your law degree in '79?
20 A.  No, sir.
21 Q.  Are you admitted to practice?
22 A.  Yes, sir.
23 Q.  In what states?
24 A.  Massachusetts, and I'm admitted in New York,
25    although it's not current.

Page 9

1  Q. What is your employment currently?
2  A. I'm an attorney, and I also am the president
3  of ▬▬▬, Inc.
4  Q. Okay. Are you familiar with ▬▬ Gym of Rhode
5  Island?
6  A. Yes, sir.
7  Q. What is that?
8  A. That is a ▬▬▬▬▬▬▬, Inc.
9  Q. ▬▬▬, Inc., is that a Rhode Island
10 corporation?
11 A. Yes, sir.
12 Q. What is the principal place of business of ▬
13 ▬▬▬?
14 A. Pawtucket, Rhode Island, ▬▬▬▬▬
15 ▬▬▬.
16 Q. Okay. And was that the case in 2014 and 2015?
17    THE WITNESS: What are you asking,
18 is what the case?
19 Q. In 2014 was ▬▬▬, Inc., a Rhode Island
20 corporation?
21 A. Yes.
22 Q. Headquartered in Pawtucket, Rhode Island?
23 A. Yes.
24 Q. In 2015 was ▬▬▬, Inc., a Rhode Island
25 corporation?

Page 10

1  A. Yes.
2  Q. Headquartered in Pawtucket, Rhode Island?
3  A. Yes.
4  Q. And since 2014 you've been president of ▬
5  ▬▬, Inc.?
6  A. Yes.
7  Q. What is the business of ▬▬▬, Inc.?
8  A. Fitness facility.
9  Q. Okay. How many fitness facilities does ▬
10 ▬▬, Inc., own?
11 A. One.
12 Q. Where is that facility?
13 A. Pawtucket, Rhode Island, ▬▬▬▬▬
14 ▬▬▬.
15 Q. Does ▬▬▬, Inc., have any other business
16 activities?
17 A. No.
18 Q. When was ▬▬▬, Inc., incorporated?
19 A. I believe 1994.
20 Q. And has it remained continuously incorporated
21 since then --
22 A. Yes.
23 Q. -- as a Rhode Island corporation?
24 A. Yes, sir.
25 Q. What is Joe Paul Fitness?

Page 11

1  A. Joe Paul Fitness, I don't know.
2  Q. You're not familiar with that term?
3  A. Joe Paul Fitness, no.
4  Q. Are you familiar with ▬▬▬?
5  A. Yes, sir.
6  Q. What is ▬▬▬?
7  A. ▬▬▬ is a former business that I had
8  an ownership interest in.
9  Q. You were president of ▬▬▬?
10 A. Yes, sir.
11 Q. That was incorporated in 2003?
12 A. Yes, sir.
13 Q. What happened to ▬▬▬, Inc.?
14 A. It was sold.
15 Q. When did you sell it?
16 A. 2016.
17 Q. That was a Rhode Island corporation?
18 A. Yes, sir.
19 Q. Headquartered in Rhode Island?
20 A. Yes, sir, the assets were sold, I'm sorry.
21 Q. Is ▬▬▬, Inc., still a corporation in
22 good standing?
23 A. No.
24 Q. ▬▬▬, Inc., went into receivership?
25 A. Yes, sir.

Page 12

1  Q. What is U.S. Auto Brokers, LLC?
2  A. I've never heard of that.
3  Q. You said you're admitted to practice law in
4  Massachusetts and New York; is that correct?
5  A. I am admitted, yes.
6  Q. I think you said your New York license is
7  inactive?
8  A. Correct.
9  Q. Any other states?
10 A. No, sir.
11 Q. And tell me about your law practice, can you
12 describe that for me?
13 A. I'm not sure what you mean.
14 Q. Are you a sole practitioner?
15 A. Yes.
16 Q. Where is your office?
17 A. In Boston.
18 Q. What's the address?
19 A. ▬▬▬▬▬▬, Boston.
20 Q. What sort of work do you do?
21 A. I generally do small business and personal
22 injury.
23 Q. How long have you been practicing law?
24 A. 38 years.
25 Q. Have you been a party in any other lawsuits --

**Page 13**

1  A.  Yes.
2  Q.  -- other than John Doe versus Mutual of Omaha?
3  A.  Yes.
4  Q.  Tell me about that, or lawsuits?
5  A.  There are currently two lawsuits outstanding
6     that relate to the receivership in ▌.
7  Q.  Both relate to the ▌ receivership?
8  A.  Correct.
9  Q.  Anything else?
10 A.  Not that I recall.
11 Q.  Do you have any affiliation with GLAD?
12 A.  I do.
13 Q.  Okay. Tell me about that affiliation.
14 A.  I am a dedicated member of GLAD. I support
15    them wholeheartedly, and I'm a former board member
16    and ▌.
17 Q.  Do you currently hold any office with GLAD?
18 A.  No.
19 Q.  For clarity of the record, let me just go back.
20    I'm sorry, sometimes it takes me a while to get
21    the full question out on the table. Are you
22    currently a board member of GLAD?
23 A.  No.
24 Q.  Do you currently hold any office with GLAD?
25 A.  I'm an ambassador.

**Page 14**

1  Q.  What does that mean?
2  A.  It means I talk nicely about them.
3  Q.  To whom?
4  A.  To anybody who will listen.
5  Q.  Do you give speeches on behalf of GLAD?
6  A.  No.
7  Q.  So perhaps you can elaborate a little bit more
8     about what being an ambassador means?
9  A.  Ambassador is simply somebody who has had
10    connection with GLAD who they want to keep active
11    in their development area, and when we go to
12    events we try to get other people to give money.
13 Q.  So you do fundraising for GLAD?
14    MR. KLEIN: Objection.
15 A.  Not to speak of.
16 Q.  Do you do anything else for GLAD?
17 A.  Not that I recall.
18 Q.  All right. When did you step down from the board?
19 A.  Ten years ago.
20 Q.  During what time --
21 A.  Excuse me, I believe 12 years ago.
22 Q.  Okay. And when did you step down from being
23    ▌?
24 A.  I believe that would be about 2005, in that
25    range.

**Page 15**

1  Q.  Why did you apply for long-term care coverage?
2  A.  I had an elderly father who I had to take
3     care of, and he had some type of insurance, but it
4     wasn't enough, so he depended on his children.
5     ▌'s parents were in their 90s, and they
6     utilized long-term care insurance. And in a
7     discussion with his father he said he recommended
8     that I look into it since I don't have any
9     children.
10 Q.  All right. I'm just trying to understand your
11    last response. ▌ was speaking with his father,
12    and ▌'s father --
13 A.  I was speaking with ▌'s father.
14 Q.  You were speaking with ▌'s father, and ▌'s
15    father recommended that you look into it?
16 A.  Yes, sir.
17 Q.  When did that conversation occur?
18 A.  Oh, it probably occurred on numerous
19    occasions three, four, five years ago.
20 Q.  All right. How did you start the process of
21    applying for long-term care coverage?
22 A.  Mr. ▌, Sr., ▌ had used JD
23    Loden as a broker.
24 Q.  Loden, L-o-d-e-n?
25 A.  I believe that's how it's spelled. So I

**Page 16**

1     called Mr. Loden, or ▌ called Mr. Loden.
2  Q.  Do you remember which it is, was it ▌?
3  A.  ▌. I had no relationship with Mr. Loden.
4  Q.  So ▌ initiated contact with Mr. Loden about
5     long-term care coverage?
6  A.  Correct.
7  Q.  Where was Mr. Loden?
8  A.  In Florida.
9  Q.  What happened next?
10 A.  Discussions went back and forth as far as
11    types of insurance.
12 Q.  These are discussions between whom?
13 A.  Mr. Loden, ▌ and myself at some point.
14 Q.  What happened next?
15 A.  I believe Mr. Loden presented some possible
16    choices for long-term care.
17 Q.  What happened after that?
18 A.  We had discussions, and we chose a plan that
19    we thought we could utilize.
20 Q.  Okay. Again, these discussions were between you
21    and Mr. ▌ and Mr. Loden?
22 A.  Yes.
23 Q.  And your discussions with Mr. Loden, how did they
24    occur?
25 A.  Via telephone.

Page 17

1  Q.  Prior to submitting an application for long-term
2  care coverage, did you ever meet Mr. Loden?
3  A.  No.
4  Q.  Are you familiar with Ash Brokerage?
5  A.  Yes.
6  Q.  Who are they?
7  A.  From what I've read recently, they are the
8  connection between Mr. Loden and Mutual of Omaha.
9  Q.  What was it you recently read that give you that
10  impression?
11  A.  I'm not sure.
12  Q.  Did you ever communicate directly with anyone at
13  Ash Brokerage?
14  A.  I don't recall.
15  Q.  Did you ever meet with anyone at Ash Brokerage?
16  A.  No.
17  Q.  Did you ever speak with a Brittany Jordan at Ash
18  Brokerage?
19  A.  I don't recall the name.
20  Q.  Did you ever tell anyone at Ash Brokerage that you
21  and Mr. ▮▮▮ do not live together?
22  A.  I don't believe so.
23  Q.  Why did you elect to apply for coverage with
24  Mutual of Omaha specifically?
25  A.  I didn't elect to buy.  It was just the plan

Page 18

1  I was interested in.  I had no idea that it was
2  Mutual to be -- that I was applying with.  It was
3  recommended by Mr. Loden.
4  Q.  All right.  You said you looked at the plan.  Tell
5  me about the plan.
6  A.  I believe the plan costs approximately $240 a
7  month.  It was coverage of $200 a day, with
8  increases, and a very generous lifetime cap.
9  Q.  And you didn't realize that the plan was offered
10  by Mutual of Omaha?
11  A.  If I did, I don't remember.
12  Q.  Did you look at any other plans from any other
13  insurance companies?
14  A.  I don't recall.
15  Q.  Did you examine a plan from Transamerica?
16  A.  I don't recall.
17  Q.  Did you speak to anyone else in Massachusetts
18  other than Mr. ▮▮▮ about applying for
19  long-term care coverage?
20  A.  I don't recall.
21  Q.  Is it possible you did?
22  A.  Probably not.
23  Q.  At some point did you fill out an application for
24  long-term care coverage?
25  A.  I'm not sure what you mean by fill it out.

Page 19

1  MR. MAGRATTEN: Can you repeat the last
2  question?
3  (QUESTION READ)
4  A.  I signed an application.  I don't recall
5  filling it out.
6  MR. MAGRATTEN: Okay.  Mark this 1.
7  EXHIBIT 1 (DEFENDANT'S EXHIBIT 1
8  MARKED FOR IDENTIFICATION)
9  Q.  Showing you what's been marked Exhibit 1.  I ask
10  you to review Exhibit 1.
11  MR. KLEIN: Look at every page.  Just
12  scan through it.
13  (PAUSE)
14  Q.  So what is Exhibit 1?
15  A.  It reads, Application for Long-Term Care
16  Insurance, Massachusetts.
17  Q.  Is this the application for long-term care
18  insurance that you signed in November of 2014?
19  A.  It appears to be.
20  Q.  Where did you get this application from?
21  A.  From Mr. Loden.
22  Q.  Did you review it before you signed it?
23  A.  I did.
24  Q.  Prior to you getting the application, did somebody
25  interview you?

Page 20

1  A.  I believe so.
2  Q.  Who was that?
3  A.  I don't recall.
4  Q.  How long did the interview take?
5  A.  I don't recall.
6  Q.  Was it just one interview?
7  A.  I don't recall.
8  Q.  Were there multiple phone calls -- strike that.
9  How did the interview take place --
10  A.  By phone.
11  Q.  -- one call, or was there more than one call?
12  A.  I don't recall.
13  Q.  Where were you when you took the call?
14  A.  I don't remember.
15  Q.  When did the call occur?
16  A.  I don't remember.
17  Q.  When you got the application, that's Exhibit 1,
18  did you review it before you signed it?
19  A.  Yes.
20  Q.  What happened after you signed this?
21  A.  We put it down and sat with it for a while.
22  Q.  Why?
23  A.  We had to determine whether we could afford
24  it, whether we wanted to go ahead with it.
25  Q.  Okay.  And how long did this deliberation take

Page 21

1  place?
2  A.  Over a month.
3  Q.  Okay.  What happened next?
4  A.  We sent it to Mr. Loden together with some
5     checks.
6  Q.  Okay.  What happened after that?
7  A.  We received the checks back at some point
8     because we were told that he did not receive the
9     document within 30 days after our signature.
10 Q.  Okay.  What happened after that?
11 A.  We sent a signature page, told to sign and
12    redate it.
13 Q.  What happened after that?
14 A.  We sent the signed and higher check amounts
15    to Mr. Loden.
16 Q.  You said the signed application and --
17 A.  No, the signed signature page.
18 Q.  Signature page and new checks?
19 A.  Because the rates had gone up.
20 Q.  To Mr. Loden?
21 A.  Yes.
22    MR. MAGRATTEN: Mark that, please,
23    Number 2.
24    EXHIBIT 2 (DEFENDANT'S EXHIBIT 2
25    MARKED FOR IDENTIFICATION)

Page 22

1  Q.  Showing you what's been marked as Exhibit 2.
2     (PAUSE)
3  Q.  What is Exhibit 2?
4  A.  It reads Individual Long-Term Care Insurance
5     Application, Mutual of Omaha Insurance Company.
6  Q.  What do you understand Exhibit 2 to be?
7  A.  Second application.
8  Q.  Okay.  And turn your attention, please, to the
9     page with the number 148 in the lower right.
10 A.  Yes.
11 Q.  Is that your signature appearing dated some time
12    in December 2014?
13 A.  Yes.
14 Q.  Is that Mr. ▆▆▆▆'s signature next to it also
15    dated December 2014?
16 A.  It appears to be.
17 Q.  All right.  And at the top of that page there's a
18    paragraph numbered 1 that reads, "The underlined
19    applicant agrees that, A, all answers in this
20    application are true and complete and Mutual of
21    Omaha Insurance Company will rely on these answers
22    to determine insurability."  Do you see where that
23    is printed?
24 A.  I do.
25 Q.  Were all answers in this application true and

Page 23

1     complete as of December 2014?
2  A.  I didn't see this application when I signed
3     this page.
4  Q.  All right.  Before you signed the page, did you
5     ask Mr. Loden for a copy of the application?
6  A.  No, because -- no.
7  Q.  All right.  Did you do anything to review the
8     pages -- strike that.  Did you do anything to
9     review the responses in the application before you
10    submitted the signature page in December 2014?
11 A.  No.
12 Q.  What did you do with the signature page on Exhibit
13    2 after you signed it?
14 A.  It was sent to Mr. Loden upon his
15    instructions.
16 Q.  What happened after that?
17 A.  He received it, I hope, and submitted it to
18    whoever he needed to submit it to.
19    MR. MAGRATTEN: Could you read that
20    back, please.
21    (ANSWER READ)
22 Q.  What happened after that?
23 A.  At some point I received a letter from Mutual
24    of Omaha which denied me coverage.  I'm sorry,
25    before that --

Page 24

1  Q.  Go ahead.
2  A.  I'll stand with that.  I'm fine with my
3     answer.
4  Q.  All right.  So I'm clear, let me ask it again more
5     clearly.  You said that after you signed the
6     signature page, which is in Exhibit 2, you sent it
7     to Mr. Loden, and I asked what happened after
8     that.
9  A.  Yes.
10 Q.  Can you answer that question?
11 A.  Someone who represented themselves to be from
12    Mutual of Omaha called me, interviewed me.
13 Q.  Okay.  Now, prior to that phone call and interview
14    had you had any prior direct communications with
15    Mutual of Omaha?
16 A.  Not that I believe.
17 Q.  What happened after the telephone call and
18    interview?
19 A.  After that, that's when I received a denial
20    letter.
21 Q.  What did the denial letter say?
22    MR. KLEIN: Objection.
23 A.  The denial letter said essentially,
24    obviously, the letter speaks for itself, but my
25    memory of it is that I was being denied coverage

Page 25

1   because I took the drug known as Truvada.
2   Q. What did you do after that?
3      MR. KLEIN: Objection.
4   A. I thought a lot about whether I wanted to go
5   through an appeals process, which I finally
6   decided to do.
7   Q. Okay. What happened next?
8   A. I drafted a letter appealing it.
9   Q. What happened after that?
10  A. Sent the letter to Mutual of Omaha.
11  Q. What happened next?
12  A. I received a letter back denying my appeal.
13  Q. On what basis?
14  A. That the drug known as Truvada, no matter if
15  it was used as a prophylactic or treatment drug,
16  was a banned drug under their policies, and that
17  even such, as a prophylactic use still banned.
18  Q. Did you do anything after you received that letter
19  with respect to your efforts to obtain long-term
20  care coverage?
21  A. I thought about what my next steps were and
22  decided I would not accept their denial.
23  Q. What did you do next?
24  A. I talked to some friends, and they told me
25  that I should contact an attorney.

Page 26

1   Q. Who were the friends you spoke with?
2   A. Just general friends. I don't even remember.
3   Q. You don't remember their names?
4   A. No.
5   Q. When did you first consult an attorney about
6   taking legal action?
7   A. A couple weeks after the letter.
8   Q. Have you applied for long-term care coverage with
9   any other insurer?
10  A. No.
11  Q. Why not?
12  A. I thought if one of you, one of these
13  companies rejected me for Truvada, I didn't want
14  to go through it again.
15  Q. Your assumption was no other insurer out there
16  would extend long-term care coverage to you?
17  A. Correct.
18  Q. And on what did you base that assumption?
19  A. Just my general assumption.
20  Q. Did you have any information to inform that
21  assumption?
22  A. No.
23  Q. Have you ever been covered by a long-term care
24  policy?
25  A. No.

Page 27

1   Q. Did [redacted], Inc., offer long-term care
2   coverage to its plan participants?
3   A. No.
4   Q. When did you first start taking Truvada as PrEP?
5   A. I believe November 10th, 2014.
6   Q. Who prescribed it?
7   A. Dr. Ronald Katz.
8   Q. Why did you start taking Truvada?
9   A. It's -- you know I lived through the
10  holocaust --
11  Q. I'm sorry?
12  A. I lived through the holocaust of watching my
13  friends die, so it was an emotional decision.
14  It's tough being in your prime and watching your
15  friends melt away, and I thought what a horrible
16  disease. I'm sorry for crying.
17     MR. MAGRATTEN: That's all right. If
18  you need to take a break, that's fine.
19     THE WITNESS: No, I'd like some
20  tissues.
21  A. To me it was an emotional decision. I was
22  like damn, if this thing can do this, if it can
23  prevent one person from probably getting HIV --
24  sorry --
25     MR. MAGRATTEN: Take your time.

Page 28

1   A. Then I'm there. I read about its efficacy,
2   which is amazing, and I thought even though I'm
3   low risk, why not try it, just to make sure.
4      You know, I've walked through the streets of
5   Boston and I see houses where my friends lived,
6   and they're not there anymore and I watched them
7   die, I watched them melt away, you know, just
8   really a horrible thing to watch. When it happens
9   by the dozens, when the first thing you read is
10  the obituaries in the morning, and they're 40
11  years old; it's horrible. And I thought, damn,
12  wow, what a great thing this company is doing.
13  And I talked to my doctor, and he said that there
14  were very few side effects, if any, and he said
15  try it. I'm sorry.
16     MR. MAGRATTEN: It's all right.
17  Q. Your discussion with your doctor, that was
18  Dr. Katz?
19  A. Yes.
20  Q. Do you understand that Truvada is a medication for
21  individuals who are at high risk of contracting
22  HIV?
23     MR. KLEIN: Objection.
24  A. I did not.
25  Q. You just testified about your discussion with

Page 29

1  Dr. Katz. Tell me everything that you said to
2  Dr. Katz?
3      MR. KLEIN: Just one moment. The
4  magistrate has allowed some inquiry, that's the
5  words of the order, some inquiry into the reasons
6  that the plaintiff started taking Truvada, and I
7  think there is some limit there, obviously, in the
8  language. I will allow this answer, but I want to
9  make sure, Number 1, we're not waiving any
10 privilege with respect to any other communications
11 with Dr. Katz. And second of all, I am going to
12 be mindful of the limit the magistrate set, which
13 we may disagree about, but clearly there was a
14 limit in the order. She allowed some inquiry, so
15 I'll allow this question, but we're not waiving --
16 will you agree we're not waiving any privilege
17 with respect to other communications with
18 Dr. Katz?
19     MR. MAGRATTEN: Can you read the last
20 question back, please.
21     (QUESTION READ)
22 Q. Can you answer that question?
23 A. I can't answer because I don't know
24 everything I said.
25 Q. Tell me as much as you remember about your

Page 30

1  discussions with Dr. Katz?
2      MR. KLEIN: Objection. Can I have
3  one moment, please.
4      (PAUSE)
5      (MR. KLEIN CONFERRING WITH MR. WARD)
6      MR. KLEIN: I'm going to instruct him
7  not to answer questions about his communications
8  with Dr. Katz; one, it's privileged. The
9  magistrate has declined to grant your motion to
10 compel for Dr. Katz's records. She's allowed some
11 inquiry into the reasons the plaintiff here takes
12 Truvada and, Brooks, I understand that to mean
13 that's allowing you some background and context on
14 the basic reason the plaintiff decided to take
15 Truvada, but not to go deeply into that because
16 the record, both your representations and the
17 motions and the magistrate's own order, indicates
18 that she is mindful of Mutual's position that the
19 reasons that Doe takes Truvada are irrelevant in
20 this case and, therefore, I view her order as
21 allowing some basic context of Doe's explanation
22 of why he took Truvada, but not communications
23 with his physician.
24     (SO NOTED)
25 Q. Mr. ___, your last response, or your response a

Page 31

1  few times ago you testified about your discussions
2  with Dr. Katz. Tell me everything you recall
3  Dr. Katz told you about Truvada?
4      MR. KLEIN: Objection. I'm going to
5  instruct him not to answer that.
6      (SO NOTED)
7  Q. Where do you get Truvada?
8  A. CVS.
9  Q. CVS where?
10 A. East Greenwich.
11 Q. Have you gotten it at any other location between
12 November 2014 and February 2015?
13 A. Not that I recall.
14 Q. Did you take Truvada continuously from November
15 2014 to February 2015?
16 A. Yes.
17 Q. Did you take it every day?
18 A. Yes, sir.
19 Q. Who was aware you were taking Truvada during that
20 time period?
21 A. I was, and I --
22     MR. KLEIN: Objection. One moment.
23 I'm sorry, because I have to be very careful about
24 the scope of the magistrate's order. Brooks, can
25 you tell me, A, how this is relevant, and how it's

Page 32

1  allowed under the magistrate's order that the
2  reasons he takes Truvada are irrelevant.
3      MR. MAGRATTEN: I have the
4  magistrate's order with me. The question stands.
5  Either allow the witness to answer, or tell him
6  not to.
7      MR. KLEIN: Can we have the question
8  back?
9      (QUESTION READ)
10     MR. KLEIN: I'm going to instruct him
11 not to answer that under the magistrate's order.
12     (SO NOTED)
13     MR. MAGRATTEN: Can we have these
14 marked 3 and 4.
15     EXHIBIT 3, EXHIBIT 4 (DEFENDANT'S
16 EXHIBITS 3 AND 4 MARKED FOR
17 IDENTIFICATION)
18 Q. Mr. ___, what is Exhibit 3?
19 A. Exhibit 3 is a -- looks like some type of
20 medical record.
21 Q. Have you seen Exhibit 3 before?
22 A. No.
23 Q. I can represent to you this Exhibit 3 is a
24 document produced to Mutual of Omaha by your
25 doctor, Ronald Katz, it pertains to list as a

Page 33

1  visit date of November 10, 2014. Did you see
2  Dr. Katz on that day?
3  A.  I assume so.
4  Q.  The note indicates reviewed compliance, risks.
5  What does that refer to?
6      MR. KLEIN: Objection. I'm going to
7  ask him -- instruct him not to answer because I
8  think that the magistrate's order limits your
9  discovery to the records that Mutual had before it
10 in the application process and to any inquiries
11 they made of Doe during the application process.
12     (SO NOTED)
13 Q.  The next line, "Please read package literature
14 instruction side effects." What does that refer
15 to?
16     MR. KLEIN: Same objection.
17     (SO NOTED)
18 Q.  The next line reads, "F/U three months, HIV test
19 then," what does that refer to?
20     MR. KLEIN: Same objection.
21     (SO NOTED)
22 Q.  The last line reads, "Precautions discussed in
23 detail." What does that refer to?
24     MR. KLEIN: Same objection.
25     (SO NOTED)

Page 34

1  Q.  Direct your attention, please, to Exhibit 4. What
2  is Exhibit 4?
3  A.  It appears to be a similar medical record.
4  Q.  From Dr. Katz --
5  A.  Yes. With the word addendum on it from
6  Dr. Katz.
7  Q.  Okay. The record indicates pertains to a visit
8  date November 10, 2014, correct?
9  A.  Correct.
10 Q.  All right. The record indicates, "Truvada written
11 today for its indication." Do you see that?
12 A.  I see that.
13 Q.  "Prevention of HIV," do you see that?
14 A.  I do.
15 Q.  Why was Dr. Katz prescribing Truvada on this day
16 for prevention of HIV in your case?
17     MR. KLEIN: Objection. Lack of
18 foundation and --
19     MR. MAGRATTEN: You can answer?
20     MR. KLEIN: You can't testify to
21 communications with Dr. Katz. I'm going to
22 instruct you not to testify about any
23 communications you had with Dr. Katz, and I'll
24 also object to the form of the question as to --
25 he can't -- you asked why Dr. Katz was doing

Page 35

1  something.
2      THE WITNESS: Apparently -- should I
3  answer?
4      MR. MAGRATTEN: You can answer the
5  question.
6      MR. KLEIN: I'm going to instruct him
7  not to answer the question as asked for the same
8  reasons I've already articulated.
9  Q.  The next line in the record, "We reviewed side
10 effects and followed up in detail." What does
11 that refer to?
12     MR. KLEIN: Objection. I'm going to
13 instruct him not to answer for anything other
14 than -- because, Brooks, the magistrate's order
15 limits what you're entitled to through the records
16 Mutual had at the time of the application and to
17 the questions it asked Doe at the time of the
18 application.
19     (SO NOTED)
20 Q.  You testified previously that you were at low risk
21 for contracting HIV. What do you mean by that?
22 A.  I am in a committed relationship, and as such
23 my understanding is that my risk of contracting
24 HIV is very low risk.
25 Q.  Any other reasons that you believe that you are at

Page 36

1  low risk for acquiring HIV?
2  A.  No others. I mean -- I think I stated what I
3  believe.
4  Q.  You said you were at low risk for acquiring HIV,
5  but your knowledge is that you have some risk of
6  acquiring HIV?
7  A.  I think we all have some risk of acquiring
8  HIV.
9  Q.  In your case, what was your risk of acquiring HIV?
10 A.  Well, I work in a gym, there's times when
11 there's blood and vomit and fecal matter I might
12 come in contact with.
13 Q.  Any other reasons?
14 A.  No.
15     MR. KLEIN: We've been going about
16 an hour, can we take a short break?
17     MR. MAGRATTEN: Sure.
18     (BRIEF RECESS)
19 Q.  Turning your attention back to Exhibit 3, about
20 two-thirds of the way down that text there is a
21 line that reads, "F/U here three months." Did you
22 have a follow-up examination with Katz in about
23 February 2015?
24     MR. KLEIN: Objection. I'm going to
25 instruct him not to answer that based on the

Page 37

1  magistrate's order.
2      (SO NOTED)
3      MR. MAGRATTEN: Let's mark that as 5.
4      EXHIBIT 5 (DEFENDANT'S EXHIBIT 5
5      MARKED FOR IDENTIFICATION)
6  Q. Actually, before we get into questions on Exhibit
7      5, I'm going to ask you to turn back to Exhibit 2.
8      Can you turn to page 140 of Exhibit 2.
9  A. Yes.
10 Q. Okay. Directing your attention to Page 140 of
11     Exhibit 2, at the top of that page there is a list
12     of medications, correct?
13 A. Yes, sir.
14 Q. And are these medications you were taking when you
15     completed the application?
16 A. Yes, sir.
17 Q. Truvada is not listed, correct?
18 A. Correct.
19 Q. And why is that?
20 A. Because I was not taking it at the time of
21     the application.
22 Q. Okay. We talked earlier about two applications,
23     one marked Exhibit 1 in this deposition and you
24     completed that -- strike that. You signed that on
25     November 1st, 2014, correct?

Page 38

1  A. On the first application, yes.
2  Q. All right. And that's when you supplied the list
3      of medications that's on Page 140 of Exhibit 2?
4  A. I believe I supplied that list a bit earlier
5      to someone who put it on the application.
6  Q. Who was that person?
7  A. I don't know.
8  Q. Now, when you signed the application in December,
9      2014, was this list true and complete?
10 A. I merely signed the signature page. I did
11     not see the list at that time.
12 Q. All right. But my question is as of December 2014
13     when you signed the application the second time,
14     was this list true and complete?
15 A. No.
16 Q. In what way was it not true and complete?
17 A. By then, as stated, I was taking Truvada.
18 Q. Turning to the next page, Page 141, under Section
19     G there's a line that's Number 5, "Are you
20     scheduled for a visit with a medical professional
21     within the next six months?" and the yes box is
22     checked; do you see that?
23 A. Yes.
24 Q. Was that true as of December 2014?
25 A. Yes.

Page 39

1  Q. As of December 2014, what was the scheduled visit
2      with a medical professional that was due to occur
3      in the next six months?
4      MR. KLEIN: Objection. I'm going to
5      instruct him not to answer because of the
6      magistrate's order that you're not entitled to
7      health information after February 9, 2015 other
8      than what Mutual had before it in the application
9      process.
10     (SO NOTED)
11 Q. Turn to Exhibit 5. What is Exhibit 5?
12 A. Exhibit 5 reads Complaint.
13 Q. Thank you. What does it mean to you?
14 A. To me it means the complaint that was filed
15     on my behalf in this matter.
16 Q. You are the John Doe identified as the plaintiff
17     in this complaint?
18 A. Yes.
19 Q. This is your complaint in this lawsuit, which is
20     the reason we're here today?
21 A. Yes.
22 Q. Did you read it before it was filed?
23 A. Yes.
24 Q. Turning to Paragraph 15 which says, "Current
25     scientific and medical information including

Page 40

1      authoritative peer reviewed journals indicates
2      that PrEP reduces the risk of HIV transmission by
3      close to 100 percent, in other words, it virtually
4      eliminates the risk of HIV transmission." Do you
5      see that?
6  A. Yes, I do.
7  Q. What was the current scientific medical
8      information upon which that statement was based?
9      MR. KLEIN: Objection. Calls for an
10     expert opinion. You can answer if you know.
11 A. I Googled Truvada and had read many articles
12     from the Internet discussing it. I don't remember
13     the exact names and authors, but it seemed that
14     every single one of them discussed its great
15     efficacy.
16 Q. When did you Google Truvada?
17 A. Probably numerous occasions. I don't recall
18     the dates.
19 Q. When did you first Google Truvada?
20 A. I don't recall.
21 Q. Was it before you were prescribed Truvada?
22 A. Yes.
23 Q. About how far before you were prescribed Truvada?
24 A. A week or two.
25 Q. So in November 2014?

Page 41

1  A. Or even October.
2  Q. As you sit here today, are you aware of any
3  specific scientific or medical information
4  authoritative peer reviewed journals that support
5  the allegations in Paragraph 15?
6     MR. KLEIN: Objection. Calls for an
7  expert opinion.
8  A. The information seems to have gotten even
9  more certain.
10 Q. Okay. I thank you, but that's not my question.
11 As you sit here today, are you aware of any
12 specific articles that support the allegations of
13 Paragraph 15?
14    MR. KLEIN: Objection. Calls for an
15 expert opinion.
16 A. No.
17 Q. Paragraph 16 says, "Use of Truvada PrEP has been
18 hailed by public health and medical authorities as
19 a scientific breakthrough that can end the HIV
20 epidemic"; do you see that?
21 A. Yes.
22 Q. As you sit here today can you identify any public
23 health or medical authorities that have made this
24 claim?
25    MR. KLEIN: Objection. Calls for an

Page 42

1  expert opinion.
2  A. No.
3  Q. In Paragraph 18 you say Mutual of Omaha was aware
4  of Doe's sexual orientation from his application;
5  do you see that?
6  A. Yes.
7  Q. What's your basis for making that allegation?
8  A. That I had lived with -- had been in a
9  committed relationship with ▮▮▮▮▮▮▮, so we
10 sent the application together as a submitted
11 couple.
12 Q. Okay. Does the application anywhere indicate you
13 were a committed couple?
14 A. I believe so. I don't recall.
15 Q. Can you look at Exhibit 1 or Exhibit 2 and show me
16 where it says that?
17 A. We were told -- (witness perusing documents)
18 "Partner means one person who is your spouse. Do
19 you have a partner? Yes. Is he/she applying for
20 coverage? Yes." Page 136.
21    MR. KLEIN: Are you on Exhibit 2 or
22 1?
23    THE WITNESS: I'm on Exhibit 2.
24 Q. All right. Paragraph 23 you say, "A person who is
25 on Truvada has a dramatically lower risk of

Page 43

1  acquiring HIV infection than a similarly situated
2  person who is not on Truvada." What is your basis
3  for saying that?
4     MR. KLEIN: Objection. Calls for an
5  expert opinion.
6  A. My investigations.
7  Q. Can you be more specific?
8  A. Articles I read through Googling.
9  Q. Okay. So as an individual who takes one Truvada
10 pill a week at a dramatically -- strike that. If
11 an individual who takes one Truvada pill a week,
12 is he or she at a dramatically lower risk of
13 acquiring HIV infection than a similarly situated
14 person who is not on Truvada?
15    MR. KLEIN: Objection. Calls for an
16 expert opinion.
17 A. I'm not aware of the facts of that. I
18 haven't done -- strike that.
19 Q. You'd agree with me the effectiveness of Truvada
20 depends on compliance with prescription
21 instructions?
22    MR. KLEIN: Objection. Calls for an
23 expert opinion.
24 A. I don't know what you mean by compliance.
25    MR. MAGRATTEN: Taking the medication

Page 44

1  as indicated.
2     MR. KLEIN: Same objection.
3  A. I have heard -- I can't agree with that, no.
4  Q. Why not?
5  A. Because I'm not an expert.
6  Q. So, in your opinion -- strike that. So, in
7  saying, in making the allegation in Paragraph 23,
8  you're saying a person who is on Truvada has a
9  dramatically lower risk of acquiring HIV
10 irrespective of their adherence to prescription
11 instructions?
12    MR. KLEIN: Objection. Calls for an
13 expert opinion.
14 A. I believe the paragraph reads as it reads.
15 Q. But my question is your allegation in Paragraph
16 23, is that true for any individual taking
17 Truvada?
18    MR. KLEIN: Objection. Calls for an
19 expert opinion. You can answer if you know.
20 A. I don't know.
21 Q. Okay. In Paragraph 24 you say, "The individuals
22 who take Truvada as PrEP are predominantly gay
23 men, and Mutual of Omaha was aware of this at the
24 time it denied Doe's application." What's your
25 basis for making that claim?

Page 45

1    MR. KLEIN: Objection. It calls for
2  an expert opinion.
3  A. Again, I don't know.
4  Q. Do you have a basis in good faith to make that
5  allegation in Paragraph 24?
6    MR. KLEIN: Objection. It calls for
7  an expert opinion.
8  A. Yes.
9  Q. What is that basis?
10 A. That most of the people I know who take
11 Truvada are gay. Most of the articles I've read
12 discuss gay men taking it.
13 Q. And what is your basis for saying that Mutual of
14 Omaha was aware of this at the time it denied your
15 application?
16   MR. KLEIN: Objection. Calls for an
17 expert opinion, and calls for information beyond
18 the allegation of the complaint.
19 A. I'm unable to answer that question.
20 Q. Do you have a good faith basis for claiming that
21 Mutual of Omaha was aware that Truvada as PrEP was
22 taken by predominantly gay men at the time it
23 denied your application?
24   MR. KLEIN: Objection. Calls for an
25 expert opinion. Also calls for a legal conclusion

Page 46

1  insofar as the complaint is a legal document that
2  is prepared by an attorney, it's not a sworn
3  statement time of the plaintiff, and that's the
4  basis for my objection.
5  A. No.
6  Q. In paragraph 25 you say, "Mutual of Omaha's
7  decision to deny Doe long-term care insurance
8  because he is on PrEP was not based on a sound
9  medical basis or rational underwriting policy."
10 Stop there. What is your basis for making that
11 claim?
12   MR. KLEIN: Objection. Calls for a
13 legal conclusion as well as expert testimony as
14 well as information to be elicited from the
15 defendant in discovery.
16   MR. MAGRATTEN: You can answer the
17 question.
18 A. Truvada is a means of eliminating HIV, and
19 for someone to be denied underwriting of the
20 policy doesn't make any sense to me.
21 Q. Do you have any other basis for making that claim?
22   MR. KLEIN: Same objection as to the
23 preceding question.
24 A. Yes.
25 Q. What else?

Page 47

1  A. I felt that their underwriting policies were
2  written prior to the date that PrEP was declared
3  to be approved for prophylactic use, and that
4  their policies are outdated.
5  Q. When did you form this belief?
6  A. When I looked up their pamphlet of
7  underwriting policies.
8  Q. When did you do that?
9  A. After I got denied coverage.
10 Q. In Paragraph 26 you go on to claim that, "Mutual
11 of Omaha's decision to deny your application was
12 based on bias against gay men." I'll stop there.
13 What is your basis for making that claim?
14   MR. KLEIN: Objection. Calls for a
15 legal conclusion. Calls for expert testimony, and
16 calls for facts to be elicited from the defendant
17 in discovery.
18 A. I don't have an answer.
19 Q. So you have no good faith basis to make that
20 claim?
21 A. I did not say that.
22   MR. KLEIN: Objection to the words
23 good faith, which are vague and ambiguous as used
24 in this context and calls for a legal conclusion
25 about the proper basis for the complaint.

Page 48

1  A. I didn't say that. I said I don't have an
2  answer.
3  Q. All right. I'm trying to understand what is your
4  basis -- strike that. You're an attorney admitted
5  to practice in Massachusetts, correct?
6  A. Correct.
7  Q. You're aware the rules of practice in
8  Massachusetts require a good faith basis in law
9  and fact to file a complaint in the courts of
10 Massachusetts, correct?
11 A. Yes.
12 Q. So, you've made a claim here in Paragraph 25 that
13 the denial of your application for insurance was
14 based on bias against gay men. I'm trying to
15 understand what is your good faith basis in law or
16 fact to make that allegation?
17   MR. KLEIN: Objection. Calls for
18 expert testimony, calls for a legal conclusion,
19 uses terms that are undefined and are legal terms
20 that notwithstanding the fact that someone is an
21 attorney is a matter of a legal issue, and that
22 such information will be responded to in the
23 Answers to Interrogatories.
24 A. I discussed with my attorney and decided that
25 this was a good faith assertion.

Page 49

1  Q. What was a good faith assertion?
2  A. The wording in Paragraph 25.
3  Q. Okay. What was the specific bias that you believe
4    that Mutual of Omaha exhibited in denying your
5    application?
6       MR. KLEIN: Objection. I want to
7    caution you that I don't want you to answer the
8    question if doing so requires you to disclose
9    attorney/client communications between us.
10 A. I cannot answer that question.
11 Q. Why not?
12 A. Because it is privileged discussion with my
13   attorney.
14 Q. Is your basis for making this allegation Mutual of
15   Omaha was biased against gay men based on facts
16   provided to you by your attorney?
17      MR. KLEIN: Objection. That calls
18   for attorney/client communications.
19 A. Again, I can't answer based on privileged
20   information.
21 Q. I'm not asking you for any legal advice provided
22   to you by your attorney, but I am entitled to know
23   if you received or became aware of any facts from
24   your attorney that became the basis of you making
25   this claim in Paragraph 25?

Page 50

1       MR. KLEIN: You can answer that only
2    if you can do so without disclosing attorney
3    community calculations.
4  A. I believe it was all in attorney/client
5    communications that this was discussed.
6  Q. I understand you've said that. My question is in
7    your discussions with your attorneys, and I'm not
8    asking for legal advice, I'm asking did your
9    attorneys give you any facts, make you aware of
10   any facts which became the basis of you making the
11   claim in Paragraph 25 that Mutual of Omaha denied
12   your application for long-term care insurance
13   based on a bias against gay men?
14      MR. KLEIN: You can answer that
15   question as a yes or no. He asked without
16   disclosing any attorney/client communications.
17 A. Yes.
18 Q. What were the facts that your attorneys made you
19   aware of, again, I'm not asking for legal advice,
20   I'm asking you for the facts that your attorneys
21   made you aware of that became the basis for you
22   making this claim in Paragraph 25?
23      MR. KLEIN: I'm going to object to
24   that question, not only based on it calls for
25   attorney/client communications but also is

Page 51

1    protected by the Work Product Doctrine. You're
2    asking him essentially -- Brooks, what you're
3    asking is what is our theory of the case. While
4    you're entitled to know facts which we will be
5    providing to you, as I've indicated before in some
6    of our discovery issues, we had a good faith basis
7    for this, we have legal theories that we will be
8    positing at the appropriate point in this case,
9    and the facts will be presented to you in the
10   answers to the interrogatories that you have
11   propounded to us and the court has ruled we
12   answer.
13      MR. MAGRATTEN: It seems likely we're
14   going to end up in motion practice on this. I
15   would caution you against speaking objections
16   which are a way of educating the witness in how to
17   respond to questions. I'd ask you not to do that.
18      MR. KLEIN: Let me respond to that,
19   because it is appropriate for me to put the basis
20   for my objections on the record, and if you want
21   to get into that, you objected and gave speaking
22   objections to every single question I asked of the
23   witnesses of Mutual of Omaha in which I told you
24   that I felt you were doing the same thing and you
25   rejected that notion. So I think that you're not

Page 52

1    on any solid basis to say that I'm coaching the
2    witness, and I resent the implication of that.
3       MR. MAGRATTEN: Let's end the
4    speeches and let's continue with the deposition so
5    we can get done.
6  Q. Further in Paragraph 25 you allege that Mutual of
7    Omaha's decision to deny your application of
8    long-term care insurance was based on stereotypes
9    that gay male sexuality is inherently risky and
10   unhealthy; do you see that?
11 A. Yes, I do.
12 Q. What is your basis for making that claim?
13 A. Again --
14      MR. KLEIN: Objection. Calls for a
15   legal conclusion and expert testimony.
16 A. Again, that was through discussions with my
17   attorney, and I can't answer any further.
18 Q. In your discussions with your attorney does your
19   attorney make you aware of any facts upon which
20   you have relied in making this claim?
21      MR. KLEIN: Objection. You can
22   answer that yes or no as he's asked it as long as
23   you don't disclose attorney/client communication.
24 A. Yes.
25 Q. What are those facts?

Page 53

1  MR. KLEIN: Objection.  Calls for
2  attorney/client privileged communications.  You
3  can answer it if you don't disclose our
4  conversations.  And also calls for work product.
5  A.  I can't answer that.
6  Q.  Also in Paragraph 25 you make the claim Mutual of
7  Omaha's decision to deny your application for
8  long-term care insurance was based on false and
9  unscientific beliefs about the contagion of HIV;
10 do you see that?
11 A.  Yes.
12 Q.  What is your basis in fact for making that
13 allegation?
14     MR. KLEIN: Objection.  Calls for
15 expert testimony and a legal conclusion.
16 A.  The articles I had read in Google.  That's my
17 answer.
18 Q.  What articles were those?
19 A.  I don't recall.  The articles I referred to
20 earlier concerning the use of PrEP.
21 Q.  What did the articles say about false and
22 unscientific beliefs about the contagion of HIV?
23 A.  That was also, I believe, in addition to
24 discussions with my attorney, which I won't
25 discuss.  Could you repeat that last question?

Page 54

1     (QUESTION READ)
2  A.  That the efficacy of the drug is nearly 100
3  percent if taken daily, that's it.
4  Q.  Did the articles say anything about Mutual of
5  Omaha's underwriting decisions being influenced by
6  false or unscientific beliefs about the contagion
7  of HIV?
8  A.  I don't recall.
9  Q.  Turning to Paragraph 26.  You allege that Mutual
10 of Omaha's denial of your application for
11 long-term care insurance -- strike that.  In
12 Paragraph 26 you allege by denying Doe long-term
13 care insurance because he is on PrEP, Mutual of
14 Omaha failed to treat Doe in accordance with an
15 actual and accurate classification of his risk
16 because of myths, stereotypes and negative
17 attitudes about the nature and riskiness of Doe's
18 sexuality because he is a gay man and about gay
19 male sexuality in general"; do you see that?
20 A.  Yes.
21 Q.  What is your basis for alleging that Mutual of
22 Omaha's denial of your application for long-term
23 care insurance was based on myths?
24     MR. KLEIN: Objection.  Calls for
25 expert testimony and a legal conclusion.

Page 55

1  A.  After discussions with my attorney I believe
2  this to be accurate.
3  Q.  What were the myths on which Mutual of Omaha
4  relied in denying your application?
5     MR. KLEIN: You can answer that if
6  you can without disclosing attorney/client
7  communications.
8  A.  I cannot answer that question because it
9  would disclose attorney/client communications.
10 Q.  Did your attorneys provide you with any facts upon
11 which you relied in making this allegation in the
12 complaint?
13     MR. KLEIN: Objection.  Calls for
14 attorney/client communications and attorney work
15 product.
16 A.  Again, I can't answer that because of
17 privilege.
18 Q.  All right.  You go on to allege that Mutual of
19 Omaha's denial of your insurance application was
20 based on stereotypes.  What is your good faith
21 basis for making that allegation that Mutual of
22 Omaha's actions were based on stereotypes?
23     MR. KLEIN: Are you referring to
24 Paragraph 26?
25     MR. MAGRATTEN: Yes.

Page 56

1     MR. KLEIN: Same objection.  Calls
2  for a legal conclusion and also facts to be
3  obtained from the defendant in this case.
4  A.  Again, it's privileged conversation.
5  Q.  I understand.  Did your attorneys provide you with
6  any facts, however, upon which you relied in
7  making this allegation?
8     MR. KLEIN: You can answer that as
9  he's framed it yes or no without disclosing our
10 communications.
11 A.  Yes.
12 Q.  What were those facts?
13     MR. KLEIN: Objection.  Calls for
14 attorney/client communications and attorney work
15 product, and I'm going to instruct him not to
16 answer.
17     (SO NOTED)
18 Q.  Understand I'm not asking for legal advice your
19 attorney may have provided you; however, if your
20 attorney provided facts upon which you have relied
21 in making this allegation, I ask you to disclose
22 those facts now.
23 A.  I cannot disclose those facts.
24 Q.  Why not?
25 A.  It's privileged communication.

Doe vs
Mutual of Omaha Insurance Company

September 7, 2017

Page 57

1  Q.  Later in Paragraph 26 you allege that Mutual of
2  Omaha in denying your long-term care insurance
3  application -- strike that.  Later in Paragraph 26
4  you allege that Mutual of Omaha's denial of your
5  long-term care insurance application was based on
6  negative attitudes.  What is your good faith basis
7  for making that allegation?
8      MR. KLEIN: Objection.  Calls for a
9  legal conclusion.
10 A.  I cannot answer that based upon privileged
11 communication.
12 Q.  In your communications with your attorneys did
13 your attorneys make you aware of any facts, not
14 legal opinions, but facts upon which you have
15 relied in making this allegation?
16     MR. KLEIN: Objection.  Calls for
17 attorney/client communications, legal conclusion
18 and also attorney work product.
19 A.  I cannot answer that.
20 Q.  Why not?
21 A.  Privileged communication.
22 Q.  In Paragraph 28 you say, "By denying Doe long-term
23 care insurance because he is on PrEP, Mutual of
24 Omaha failed to treat Doe in accordance with an
25 actual and accurate classification of his risk."

Page 58

1  Do you see that?
2  A.  Yes.
3  Q.  What do you mean by that?
4      MR. KLEIN: Objection.  Calls for a
5  legal conclusion?
6  A.  Again, privileged communication.
7  Q.  If your attorneys provided you with any facts, not
8  legal opinions, but facts upon which you have
9  relied in making this allegation, I ask you to
10 disclose them now.
11     MR. KLEIN: Objection.  Calls for
12 attorney/client communications and attorney work
13 product, and I will instruct him not to answer.
14     (SO NOTED)
15     THE WITNESS: Again, privileged
16 communication.
17     EXHIBIT 6 (DEFENDANT'S EXHIBIT 6
18     MARKED FOR IDENTIFICATION)
19 Q.  What is Number 6?
20 A.  It reads Plaintiff's Memorandum in Support of
21 Motion to Remand the Case to State Court.
22 Q.  What does Exhibit 6 mean to you?
23 A.  That it's my attorney's motion to change
24 courts from United States District Court to the
25 state court.

Page 59

1  Q.  Did you read this document before today?
2  A.  No.
3  Q.  I'm going to ask you to turn to Page 2, halfway
4  down there is a page, there is a sentence, "In the
5  present case all that Doe seeks, indeed, all he
6  could legitimately seek is to enjoin Mutual of
7  Omaha from denying coverage a priori solely
8  because Doe takes Truvada." Do you see that?
9  A.  Yes, I do.
10 Q.  Do you agree with that sentence?
11     MR. KLEIN: Objection.  It asks for
12 a legal conclusion.
13 A.  Yes.
14 Q.  So, is the only thing you're seeking in this
15 lawsuit is a long-term care coverage policy for
16 yourself?
17     MR. KLEIN: Objection.  Calls for a
18 legal conclusion, and the complaint speaks for
19 itself.
20 A.  I haven't read all the motions and things so
21 I can't tell you.
22 Q.  What are you seeking in this lawsuit?
23     MR. KLEIN: Objection.  Calls for a
24 legal conclusion, and the complaint speaks for
25 itself.

Page 60

1  A.  My main objective is to be able to obtain
2  long-term care.
3  Q.  Anything else?
4  A.  I don't know.  I haven't read all the motions
5  and supporting memoranda.
6  Q.  You've read your complaint, haven't you?
7  A.  In the complaint that's what I believe it
8  states.
9  Q.  In the complaint --
10 A.  The complaint speaks for itself.
11 Q.  As you sit here today, apart from seeking
12 long-term care coverage for yourself, are you
13 seeking anything else from this lawsuit?
14     MR. KLEIN: Objection.  Calls for a
15 legal conclusion, and the complaint speaks for
16 itself in the section on remedy requested.
17 A.  Again, I'm not sure what the remedies that
18 have been requested are.
19 Q.  You're not sure what you're seeking in this case?
20     MR. KLEIN: Objection.
21 A.  I know most of the things that I -- I know
22 that I am seeking to be able to have long-term
23 care.  Other than that, I am not sure of what my
24 attorney has concluded in other motions.
25 Q.  Turning to Exhibit 5, Page number 6.  Looking

Page 61

1  under request for relief, do you see the paragraph
2  numbered 1?
3  A.  Yes, sir.
4  Q.  Which reads, "Enter a permanent injunction
5  enjoining Mutual of Omaha from categorically
6  excluding from its long-term care insurance
7  individuals, including Doe, who take the
8  medication Truvada as prevention for PrEP."
9     MR. KLEIN: As prevention for HIV.
10 Q.  I'm sorry, "as prevention for HIV," do you see
11 that?
12 A.  Yes.
13 Q.  Is that what you're seeking in this case?
14 A.  Yes, sir.
15 Q.  So you're seeking more than just insurance
16 coverage for yourself, correct?
17 A.  Yes, sir.
18 Q.  You're trying to have the court order Mutual of
19 Omaha to change its underwriting criteria for
20 everyone, correct?
21    MR. KLEIN: Objection.  Calls for a
22 legal conclusion, and the complaint speaks for
23 itself.
24 A.  The complaint does speak for itself.
25 Q.  What's your understanding of what you're seeking

Page 62

1  in this lawsuit?
2     MR. KLEIN: Same objection.
3  A.  Again, to allow me to be able to get
4  long-term care, and I wish that the courts say to
5  enjoin Mutual of Omaha from categorically
6  excluding from its long-term health care
7  individuals who take the medication Truvada as
8  prevention for HIV.
9  Q.  So the statement in Exhibit 6 about what you're
10 seeking in this case is not correct; is that
11 right?
12    MR. KLEIN: Objection.  Calls for a
13 legal conclusion, was not written by Doe, is not a
14 sworn statement.
15 Q.  Can you answer the question?
16 A.  No, I can't.
17 Q.  Why not?
18 A.  Because I haven't -- I did not write this.
19 My attorney wrote it, so I believe it's
20 privileged.
21 Q.  The sentence we're discussing which says, "In the
22 present case all that Doe seeks, indeed, all he
23 could legitimately seek is to enjoin Mutual from
24 denying coverage a priori solely because Doe takes
25 Truvada."  Do you see that sentence?

Page 63

1  A.  Yes.
2  Q.  Is that an accurate statement?
3     MR. KLEIN: Objection.  Calls for a
4  legal conclusion.  You can answer if you know.
5  A.  I don't know.
6  Q.  You don't know if that's accurate?
7  A.  Correct.  I didn't sign this.
8  Q.  Why don't you know if this is an accurate
9  statement?
10 A.  I've never seen this.
11 Q.  But this is your lawsuit, Mr. ▮.
12    MR. KLEIN: He said he didn't see
13 it.
14 Q.  You're looking at it now.
15    MR. KLEIN: The question calls for a
16 legal conclusion.  You can answer it.  If you
17 don't know the answer, tell him you don't know the
18 answer which I think you already answered.
19 A.  Yes.  As I said, I don't know the answer.
20 Q.  Why not?
21 A.  Because I did not do the legal writing on
22 this.  I didn't draft this document.  I've never
23 seen this document.
24 Q.  You're a lawyer, Mr. ▮?
25 A.  Yes, sir.

Page 64

1  Q.  You can read English, Mr. ▮?
2     MR. KLEIN: Objection.  That is a
3  harassing question and statement, Brooks.  If you
4  have questions for the witness, ask them, but that
5  kind of a question, and it's a snide question, is
6  really inappropriate.
7     MR. MAGRATTEN: Can you answer the
8  question, Mr. ▮?
9     MR. KLEIN: What is the question
10 pending?
11    (QUESTION READ)
12 A.  Yes.
13 Q.  All right.  The question is very simple, is this
14 statement in this motion in the context of your
15 lawsuit truthful and accurate?
16    MR. KLEIN: Objection.  It calls for
17 a legal conclusion, and the question has been
18 asked and answered.
19 A.  Plus part of it is not in English.
20 Q.  Can you respond to the question?
21 A.  No.
22 Q.  What are considered to be the long-term health
23 risks of taking Truvada?
24    MR. KLEIN: Objection.  Calls for an
25 expert opinion, it's a medical question.  You can

Page 65

1   answer if you know.
2   A.  I don't know.
3   Q.  Does the long-term use of Truvada increase the
4   risk of stroke?
5       MR. KLEIN: Objection. Calls for an
6   expert medical opinion.
7   A.  I don't know.
8   Q.  Does the long-term use of Truvada increase the
9   risk of cardiovascular disease?
10      MR. KLEIN: Objection. Calls for an
11  expert medical opinion.
12  A.  I don't know.
13  Q.  Does the long-term use of Truvada increase the
14  risk of dementia?
15      MR. KLEIN: Objection. Calls for an
16  expert medical opinion.
17  A.  I don't know.
18  Q.  Does the long-term use of Truvada increase the
19  risk of drug resistant sexually transmitted
20  diseases?
21      MR. KLEIN: Objection. Calls for an
22  expert medical opinion.
23  A.  I don't know.
24  Q.  You testified earlier that Dr. Katz told you that
25  the side effects of Truvada are minimal; do you

Page 66

1   recall saying that?
2   A.  Correct.
3   Q.  What specifically did he say about the side
4   effects of Truvada?
5       MR. KLEIN: Objection. I'm going to
6   instruct him not to answer that on the basis of
7   the magistrate's order, and that she has
8   restricted Mutual of Omaha to information in Doe's
9   medical records and the information it had in the
10  application and other documents at the time of its
11  denial.
12      (SO NOTED)
13  Q.  What are the long-term health risks of an HIV
14  infection?
15      MR. KLEIN: Objection. Calls for an
16  expert medical opinion.
17  A.  I don't know.
18  Q.  Do they include cardiovascular disease?
19      MR. KLEIN: Objection. Calls for an
20  expert medical opinion.
21  A.  I don't know.
22  Q.  Do they include lung disease?
23      MR. KLEIN: Objection. Calls for an
24  expert medical opinion.
25  A.  I don't know.

Page 67

1   Q.  Do they include cancer?
2       MR. KLEIN: Objection. Calls for an
3   expert medical opinion.
4   A.  Again, I don't know.
5   Q.  Do they include neurocognitive disorders?
6       MR. KLEIN: Objection. Calls for an
7   expert medical opinion.
8   A.  Again, I don't know.
9   Q.  Do they include liver disease?
10      MR. KLEIN: Objection. Calls for an
11  expert medical opinion.
12  A.  I don't know.
13  Q.  Are you aware of any insurance company that will
14  issue long-term care coverage to someone taking
15  Truvada?
16  A.  I'm not aware.
17  Q.  Are you aware of any insurance company that will
18  issue long-term care coverage to someone who is
19  HIV positive?
20  A.  I'm not aware.
21  Q.  Did you drive here this morning?
22  A.  Yes, sir.
23  Q.  Okay. In your car?
24  A.  Yes, sir.
25  Q.  Where is your car registered?

Page 68

1   A.  Rhode Island. Can I correct something?
2       MR. MAGRATTEN: Yes.
3   A.  It wasn't my car. It's a business car.
4   Q.  All right. This is a car for            ?
5   A.  Yes. It's leased.
6   Q.  Do you have a personal car?
7   A.  No.
8       MR. MAGRATTEN: One minute.
9       (BRIEF PAUSE)
10      MR. MAGRATTEN: I have no more
11  questions. We're done.
12      THE REPORTER: Do you want a
13  transcript?
14      MR. KLEIN: I do. Mini electronic.
15      (DEPOSITION CLOSED AT 11:33 A.M.)

C-E-R-T-I-F-I-C-A-T-E

I, LINDA L. GUGLIELMO, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of ███████, Plaintiff in the above-entitled cause, was taken before me on behalf of the Defendant, at the offices of Pierce Atwood, LLP, 72 Pine Street, Providence, Rhode Island, on September 7, 2017 at 9:30 A.M., that previous to examination of said witness, who was of lawful age, he was first sworn by me and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth, and that he thereupon testified as in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5 (d) and 30 (f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by Defendant's attorney, Brooks Magratten.

I have enclosed with a copy of the deposition a correction and signature page.

   IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of September 2017.

   _____
   LINDA L. GUGLIELMO, NOTARY PUBLIC/RPR-RMR
   (MY COMMISSION EXPIRES AUGUST 13, 2021)