# Exhibit B

# In The Matter Of:

*John Doe v.*
*Mutual of Omaha Insurance Company*

---

*Kenneth Mayer, M.D.*
*January 29, 2018*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Original File Kenneth Mayer 1-29-18.txt
Min-U-Script® with Word Index

John Doe v.
Mutual of Omaha Insurance Company

Kenneth Mayer, M.D.
January 29, 2018

---

**Page 1**

```
 1
 2
 3            UNITED STATES DISTRICT COURT
 4            DISTRICT OF MASSACHUSETTS
 5   - - - - - - - - - - - - - - - - - - - - - x
 6   JOHN DOE,
 7                        Plaintiff,
 8      v.                Civil Action
 9                        No. 1:16-cv-11381-GAO
10   MUTUAL OF OMAHA INSURANCE
11   COMPANY,
12                        Defendant.
13   - - - - - - - - - - - - - - - - - - - - - x
14
15
16
17           DEPOSITION OF KENNETH MAYER, M.D.
18                 January 29, 2018
19                    1:05 p.m.
20                 PIERCE ATWOOD, LLP
21                 100 Summer Street
22                 Boston, Massachusetts
23
24          Reporter:  Nancy L. LaCivita
```

---

**Page 2**

```
 1   APPEARANCES:
 2      GLBTQ LEGAL ADVOCATES & DEFENDERS
 3      By Bennett H. Klein, Esquire
 4      30 Winter Street, Suite 800
 5      Boston, Massachusetts 02108
 6      (617) 426-1350
 7      Counsel for the Plaintiff
 8
 9      LAW OFFICES OF JOHN P. WARD
10      By John P. Ward, Esquire
11      584 Castro Street, No. 802
12      San Francisco, CA 94114
13      (415) 255-4996
14      Co-Counsel for the Plaintiff
15
16      PIERCE ATWOOD, LLP
17      By Brooks R. Magratten, Esquire
18      One Financial Street
19      Providence, Rhode Island 02903
20      (401) 490-3422
21      Counsel for the Defendant,
22      Mutual of Omaha Insurance Company
23   ALSO PRESENT:  Susan Lewis (via telephone)
24               Joshua Gluck
```

---

**Page 3**

```
 1                 I N D E X
 2   EXAMINATION OF:                      PAGE
 3   KENNETH MAYER, M.D.
 4
 5   Direct Examination by Mr. Magratten      4
 6
 7
 8
 9
10              E X H I B I T S
11   NO.                                  PAGE
12
13   A   Expert Report of Kenneth Mayer, M.D.    13
14
15
16
17
18
19
20
21
22
23
24   *Original exhibit returned to Brooks R. Magratten.
```

---

**Page 4**

```
 1              P R O C E E D I N G S
 2                     * * *
 3        KENNETH MAYER, M.D., having been
 4   satisfactorily identified and duly sworn by the Notary
 5   Public, was examined and testified as follows:
 6                     * * *
 7        MR. KLEIN: Can we do the usual
 8   stipulations that we have been using in other
 9   depositions?
10        MR. MAGRATTEN: That is fine.  I assume
11   the deponent will read and sign?
12        MR. KLEIN: Yes.  And all objections,
13   except as to form, and motions to strike are reserved
14   until the time of trial.
15                     * * *
16              DIRECT EXAMINATION
17   BY MR. MAGRATTEN:
18      Q.  Good afternoon, Dr. Mayer.  Thank you for
19   coming in this afternoon.  I am Brooks Magratten.  I
20   represent Mutual of Omaha.  Have you ever been in a
21   deposition before?
22      A.  I have not.
23      Q.  It's a simple process.  I'm going to be
24   asking you a series of questions based largely on the
```

John Doe v.
Mutual of Omaha Insurance Company

Kenneth Mayer, M.D.
January 29, 2018

Page 13

1    Q.  How long did you serve on the board for the
2    Gay and Lesbian Medical Association?
3    A.  I don't recall.  I would say at least three
4    years, but I don't recall the exact term.
5    Q.  How long ago was that?
6    A.  This was more than a decade ago.
7         (Exhibit No. A marked for
8    identification.)
9    Q.  Showing you what has been marked as
10   Exhibit A.  Is this the expert report you have provided
11   in this case?
12   A.  Assuming that there was nothing redacted or
13   added to this -- I can't read every word here -- but it
14   looks like the report that I saw previously.
15   Q.  Did you write it yourself?
16   A.  I wrote it with input from Ben --
17   conversations with Ben Klein.
18   Q.  Did anyone else assist you in writing this
19   report?
20   A.  No.
21   Q.  Turning your attention, please, to paragraph
22   number 11 on pages three and four.  At the end of
23   paragraph 11, there is a citation to a CDC.gov website.
24   And then you wrote updated December 4, 2014.  What does

Page 14

1    that mean?
2    A.  This is -- the CDC periodically updates their
3    information.  So this is the version looked at.
4    Q.  So the version you looked at was updated on
5    December 4, 2015?
6    A.  Yes.  That would be what the CDC would have
7    indicated.  And the access is when I actually looked
8    at.
9    Q.  Is that true for all your citations in this
10   report where it says updated, that means the website
11   was updated as of that date?
12   A.  Yes.  That's the way in which we do that.  I
13   don't know if there is a different legal convention,
14   but I would be citing something for a medical report.
15   Websites update frequently.
16   Q.  Turning to paragraph 14, you wrote in the
17   first sentence "For example, it is now established that
18   individuals who are infected with HIV take ARV as
19   prescribed and have an undetectable viral load have
20   effectively no risk of transmitting HIV to an HIV
21   negative partner."
22         The first part of that sentence you say
23   "It is now established."  The question is, how has that
24   been established?

Page 15

1    A.  There have been several clinical trials.  One
2    was a randomized control clinical trial called
3    HPTN-052.  This study was a randomized control clinical
4    trial.  It randomized more than 1750 HIV discordant
5    couples.
6         One was infected and the other was
7    uninfected.  And there were no transmissions that
8    occurred when the infected individuals were on
9    treatment and had become virologically suppressed.  So
10   that is a randomized control trial which is the highest
11   standard of evidence, but there were two subsequent
12   trials --
13   Q.  Pardon me.  Before you get into the
14   subsequent trials, the trial that you just referred to,
15   is that identified in the sources section of your
16   report?
17   A.  Yes.  It's number four.  MS Cohen.
18       MR. KLEIN:  Can you actually let him
19   finish his answer before asking follow-up's in the
20   future?
21       MR. MAGRATTEN:  I'm trying to keep the
22   record as clear and simple as possible.
23       MR. KLEIN:  I understand, but I want him
24   to be able to give a fully responsive answer to your

Page 16

1    question which entails you not interrupting him and you
2    can ask follow-up questions subsequently.
3    Q.  Dr. Mayer, you were about to talk about other
4    clinical trials in response to my question.
5    A.  Right.  And then the next paper, which is
6    reference number six which is Rodger, et al., that was
7    an observational study.
8         So it was not a randomized controlled
9    trial, but this was a large study in Europe of
10   heterosexual and homosexual HIV discordant couples, one
11   infected and one uninfected and there were no HIV
12   transmissions when the infected person was on
13   antiretroviral therapy and virologically suppressed.
14        A third study which has been presented
15   at meetings, but I don't believe has been formally
16   published, also informs this.  That was called the
17   Opposite Attract Study.  The first author for the
18   presentation last year at the International AIDS
19   Conference in Paris July 2017 was Benjamin Babington.
20        And this was a study of Australian,
21   Brazilian and Thai men who have sex with men -- and,
22   again, discordant couples, one infected, one
23   uninfected.  No transmission occurred when the infected
24   person was on antiretroviral therapy and virologically

John Doe v.
Mutual of Omaha Insurance Company

Kenneth Mayer, M.D.
January 29, 2018

Page 17

1  suppressed. The number of sexual acts of these
2  couples, the heterosexual couples in the Rodger study
3  and the Babington study exceeded 50,000 exposures of
4  individuals to an HIV infected partner.
5        So the data are very compelling and the
6  data are sufficiently compelling that the Centers for
7  Disease Control and Prevention has endorsed a policy
8  that is very similar to what I stated in the affidavit.
9    Q.  You provided an affidavit in this case?
10       MR. KLEIN: He means his report.
11   A.  This report, I'm sorry.
12   Q.  So I understand your comments in paragraph
13  14 -- strike that.
14       In making your comments in paragraph 14,
15  you're relying on the Cohen study, which is number
16  four, and your source is the Rodger study, number six,
17  in your sources and Babington study done in 2017?
18   A.  Presented in 2017, yes.
19   Q.  Dr. Mayer, turning to paragraph number 19 on
20  page seven, you write "Scientific research and data
21  demonstrate that PrEP reduces the risk of HIV
22  transmission among gay and bisexual men and transgender
23  women by close to 100 percent when taken daily."
24       You go on to say "I base this conclusion

Page 18

1  on the post-hoc analyses, open label studies and
2  demonstration projects that follow the initial double
3  blind placebo controlled studies of PrEP."
4        What are the post-hoc analyses you are
5  referring to there?
6    A.  The first study to demonstrate the efficacy
7  of PrEP was called the iPrEX study. We were actually
8  one of the sites that participated in the study. It
9  enrolled 2499 men who have sex with men and transgender
10  women international sites and two sites in the US.
11       The study used a very rigorous
12  intent-to-treat analysis for the initial estimate of
13  efficacy. Intent-to-treat means that every person the
14  day they sign the informed consent was considered in
15  the trial whether they ever filled the prescription for
16  medication or not.
17       So that was placebo controlled and in
18  the intent-to-treat analysis, the initial efficacy was
19  44 percent. But when they went back and did drug
20  levels on participants in the study, they found about
21  half the participants in the study assigned to the
22  active medication had not taken the medication.
23       So when they went back and said of the
24  people who had levels consistent with taking the

Page 19

1  medication, what did the efficacy look like. So that
2  is why it is post-hoc because the initial specified
3  analysis is all-comers, what is efficacy. Post-hoc
4  analysis says let's now look is there biological
5  plausibility? If people actually take the medication,
6  how good is it?
7        In that analysis, nobody who had drug
8  levels consistent with taking the medicine on a daily
9  basis became infected. In fact, no one who had drug
10  levels consistent with taking at least four pills
11  became infected in the study.
12       So that is the first post-hoc analysis.
13  Another analysis was done in the real world setting was
14  at Kaiser Permanente in California in the Bay Area.
15  They followed more than 900 individuals, mainly men who
16  have sex with men.
17       They had about 850 person years of
18  follow-up and they found that none of these individuals
19  who were prescribed PrEP became HIV infected during
20  that period of time. I can go on in that there were
21  also studies of heterosexuals doing a similar post-hock
22  analysis study conducted in Kenya and Uganda.
23       And, again, when they looked at people
24  who had drug levels consistent with daily medication

Page 20

1  use, no new infections occurred. We have reason to
2  think this is not going to be 100 percent, but
3  certainly the data are certainly compelling that very
4  high level of efficacy when the medication is taken
5  consistent on a daily basis.
6    Q.  Are you through?
7    A.  I am.
8    Q.  You mentioned the iPrEX study.
9    A.  Yes.
10   Q.  Is that referenced in your sources?
11   A.  It is.
12   Q.  Which number is that?
13   A.  It would be Grant, et al. Number eight.
14   Q.  You mentioned the Kaiser Permanente study.
15  Which study is that?
16   A.  That would Volk (phonetic) number 17. Number
17  eight is the primary reference. Number 13 is the --
18  you want to look at eight and 13 together for the iPrEX
19  study. Eight is the primary study analysis and 13 is
20  the post-hoc analysis. So eight and 13 go together.
21  Similarly number 16 and 17 are two reports on the same
22  cohort.
23   Q.  All right. So, in paragraph 19, when you
24  refer to post-hoc analyses, you're referring to the

John Doe v.
Mutual of Omaha Insurance Company

Kenneth Mayer, M.D.
January 29, 2018

Page 21

1　papers that appear in your sources.  It is numbers 8,
2　13, 16 and 18?
3　　　　MR. KLEIN:  Objection.  I don't think
4　that is his complete answer.
5　　Q.  You can respond to the question.
6　　A.  Those would be the primary papers.  There is
7　additional information that one can obtain from number
8　11 and number 15 which are two other large pragmatic
9　studies.
10　　Q.  In the second sentence of your paragraph 19,
11　you're referring to post-hoc analyses.  Are there any
12　other studies referenced in your sources section upon
13　which you rely when you're referring to posthoc
14　analyses?
15　　A.  I would say not.
16　　Q.  You refer to open label studies.  Which
17　studies are you referring to?
18　　A.  I would say eight and 13 are the post-hoc
19　analyses and 16 and 17 are the open label studies.
20　　Q.  Anything else?
21　　A.  Yes.  Number 20 and 21 are the demonstration
22　projects.
23　　Q.  I haven't asked that question yet.  We're
24　still on open label studies.  Apart from -- I think you

Page 22

1　said it was 16 and 17 -- are there any other open label
2　studies referred to in the sources that you are
3　referring to there when you talk about open label
4　studies?
5　　A.  Yes, number ten.
6　　Q.  So when you're talking about open label
7　studies, you're talking about numbers 10, 16 and 17?
8　　A.  Actually number 11 as well.
9　　Q.  10, 11, 16 and 17?
10　　A.  Yes.
11　　Q.  In that second sentence of paragraph 19, you
12　also refer to demonstration projects.
13　　　　Tell me which demonstration projects
14　you're referring to in that paragraph.
15　　A.  20, 21.
16　　Q.  Anything else?
17　　A.  No.
18　　Q.  Referring to your paragraph 21, you indicate
19　in the second sentence "Nonadherence occurs because a
20　number of factors work to reduce the motivation of
21　study participants to take the pill."
22　　　　What are the factors that you're
23　referring to there?
24　　A.  One of the factors in a clinical trial when

Page 23

1　there is a placebo is that an individual knows that
2　there is a 50/50 chance -- not 100 percent chance they
3　are actually receiving the medication that can benefit
4　them.
5　　　　When you do a clinical trial, the
6　informed consent will say we're doing the trial because
7　we don't know if this medication works as indicated or
8　if there may be side effects.  So there is a fair
9　amount of uncertainty when conducting clinical trials.
10　　Q.  Any other factors?
11　　A.  Some individuals who are at risk for HIV may
12　have other reasons -- may have other factors in their
13　lives that may impede adherence.  Individuals may be
14　depressed.  They may have issues around substance abuse
15　which can affect the risk for HIV but could affect
16　adherence.
17　　Q.  Substance abuse can retard adherence in a
18　Truvada study?
19　　A.  It can.
20　　Q.  Any other factors that you're referring to
21　there?
22　　A.  Can you rephrase the question?
23　　Q.  Sure.  I'm referring to your second sentence
24　of your paragraph 21 when you wrote "Nonadherence

Page 24

1　occurs because a number of factors work to reduce the
2　motivation of study participants to take the pill."
3　I'm trying to understand what factors you're referring
4　to there.
5　　A.  So I think I tried to delineate -- there are
6　factors that are specific to being in a trial in which
7　case there is placebo.  There is lack of certainty of
8　what one is receiving.
9　　　　And then there are factors that may be
10　more behavioral associated which would be issues like
11　depression or substance use.  I think those are the
12　key.
13　　Q.  In your paragraph 24, about almost halfway
14　down the page on page nine you're referring to the
15　iPrEX study and you wrote "The study found a relative
16　reduction of HIV incidents on an intention-to-treat
17　basis of 44 percent."  Do you see that sentence?
18　　A.  I do.
19　　Q.  What do you mean by that?
20　　A.  Intention-to-treat or intent-to-treat means
21　that an individual when they start a study signs an
22　informed consent and they get randomized to being one
23　of two conditions in the case of this trial.  Condition
24　one is they receive active medication.  Condition two

John Doe v.
Mutual of Omaha Insurance Company

Kenneth Mayer, M.D.
January 29, 2018

---

Page 33

1  is a concept called altruistic adherence that people
2  feel played a role here.
3         And that was that both the infected
4  partner and the uninfected partner had a stake in the
5  uninfected partner staying uninfected. So the thought
6  was that by enrolling couples, you might have a higher
7  level of adherence and their subsequent analysis showed
8  a much higher percentage of people in that trial were
9  taking the pills but different parts of the world,
10 different modes of transmission and, again, couples
11 versus enrolling individuals.
12    Q.  You're referring to the partners PrEP trial
13 there, correct?
14    A.  I am, yes, but there are other studies that
15 have higher efficacy estimates also in men who have sex
16 with men, and those were studies conducted after we
17 knew that the medication was effective if you took it
18 regularly.
19         So the Proud study that I referenced by
20 McCormack is a very important study in that regard with
21 intent-to-treat analysis 86 percent efficacy. That is
22 reference 10 and 11.
23    Q.  Turning, please, to paragraph 30, you write
24 "The preponderance of the data to date suggests that

---

Page 34

1  PrEP is safe and well tolerated and has been associated
2  with highly significant decreases in HIV incidents when
3  used as prescribed."
4         When you're referring to the data to
5  date, are you referring to any specific studies?
6    A.  All the studies that have been cited up to
7  that point are being referenced there.
8    Q.  So everything listed in your sources?
9    A.  Yes. I would also point out that this is not
10 my opinion. This is the food and drug, the FDA and
11 Centers for Disease Control and Prevention.
12    Q.  Beginning paragraph 31 you say "Adherence to
13 PrEP is strongly correlated to the level of HIV
14 protection. Demonstration projects and open label
15 studies show a high level of adherence among those who
16 seek out PrEP in a real world setting."
17         When you say demonstration projects,
18 what demonstration projects are you referring to?
19    A.  20, 21 and LIU papers.
20    Q.  Also in that sentence you say "Demonstration
21 projects and open label studies." What open label
22 studies are you referring to there?
23    A.  The bulk as Marcus references that is 16 and
24 17. There are also many additional presentations at

---

Page 35

1  peer review international meetings, but my
2  understanding is we were to cite papers that were
3  published and not presented yet.
4         So I'm adding expert opinion based on
5  presentations and communications in addition to the
6  published literature.
7    Q.  Further in the next sentence you write "It is
8  uncommon that an individual seeks out PrEP and does not
9  take it." What do you mean by that?
10    A.  Meaning, that the vast majority of clinical
11 providers are not the ones initiating the conversations
12 with patients, that patients who ask for PrEP are
13 motivated to take PrEP.
14         So particularly based on my experience
15 in working with providers at Fenway Health with more
16 than 2000 people initiating PrEP, that's the
17 experience.
18    Q.  A person who takes PrEP is instructed to take
19 one pill a day; is that correct?
20    A.  Yes.
21    Q.  They are instructed to see their physician
22 every 90 days thereafter?
23    A.  Yes.
24    Q.  And they are instructed to get regular

---

Page 36

1  testing of HIV status?
2    A.  Yes.
3    Q.  And they are instructed to get regular
4  testing of renal function?
5    A.  Yes.
6    Q.  They are instructed to use condoms when
7  engaging in sexual intercourse?
8    A.  They are educated about the use of condoms,
9  yes.
10    Q.  What do you say to people when you educate
11 them about the use of condoms?
12    A.  That PrEP is not 100 percent effective and
13 that other sexually transmitted infections -- you won't
14 be protected if you use PrEP. So you're still at risk
15 for gonorrhea, chlamydia and syphilis.
16    Q.  You said you have prescribed PrEP to patients
17 on 2000 occasions?
18    A.  I am the medical research director of an
19 institution that has prescribed PrEP to more than 2000
20 patients.
21    Q.  In your experience, when you prescribe PrEP
22 to an individual, do they always take the pill every
23 day?
24    A.  In clinical practice, the main way we

---

John Doe v.
Mutual of Omaha Insurance Company

Kenneth Mayer, M.D.
January 29, 2018

---

Page 41

1     A.  And I would concur with Ben that condom use
2  is not considered a component of adherence to PrEP
3  because the premise is that it would be desirable to
4  use condoms, but not absolutely necessarily.  The CDC
5  even comments that.
6          So we try to promote condom use and
7  explain the reasons for condom use, but as a harm
8  reduction strategy, it is preferable for an individual
9  to be highly adherent to PrEP and not be using condoms
10  than to not be using PrEP.
11          In terms of the other three variables
12  that you asked about, there are not precise numbers
13  because we are talking about real world settings and
14  the variability across clinical practices and across
15  groups makes it very difficult to quantify and
16  characterize those issues.
17     Q.  So when we are talking about taking the pill
18  every day, seeing a doctor every three months, regular
19  testing, you're not aware of any studies that quantify
20  the level of adherence for those requirements, correct?
21     MR. KLEIN: Objection to the
22  characterization of the testimony.
23     A.  That quantify -- no.  In terms of
24  presentations about clinical experience, there is ample

---

Page 42

1  data, but, again, people shy away.  Numerically these
2  are -- quantification is very difficult here.  Someone
3  starts PrEP and goes on it for six months, stops for
4  three months, goes back on, how to characterize the
5  three months off.
6          So people avoid the numbers because they
7  are not really meaningful.  It is really the gestalt
8  that is important.  Again, that's why the Kaiser study
9  is so important because there is a huge period of
10  follow-up from a large number of individuals with no
11  HIV seroconversions.  In a total real world setting, it
12  was not a clinical trial.
13     Q.  So your response to my last question is no?
14     MR. KLEIN: If you can recall the last
15  question.  If you need him to repeat it --
16     A.  It's no in terms of having these discreet
17  metrics, but, again, we don't think -- it's not how we
18  would measure adherence in the real world.
19     Q.  Turning to your paragraph 32, you wrote "PrEP
20  is more effective at preventing HIV than condoms.
21  Studies of real world efficacy of condoms in protecting
22  against HIV show a range of protection of 70 to
23  80 percent."  What studies are you referring to there?
24     A.  The CDC has a compendium of studies.  We

---

Page 43

1  should try to get that.  It's not cited.  I think
2  that's a good point.  That is the CDC's estimate, and
3  this is particularly for anal intercourse where there
4  is a high rate of condom breakage.
5     Q.  Is the CDC compendium available on the CDC
6  website?
7     A.  It should be, yes.
8     Q.  What is the formal name of this study?
9     A.  I would have to go on line.  They have a
10  whole discussion of condoms and about condom efficacy.
11     Q.  Is that where you get the 70 to 80 percent
12  numbers?
13     A.  Yes.
14     Q.  When was the last time you consulted this
15  compendium?
16     A.  Within the last two months.
17     Q.  When was the compendium last updated?
18     A.  I will have to go back and provide that to
19  you.
20     Q.  Paragraph 33 you say "The studies of PrEP
21  demonstrate that Truvada is a medication that is well
22  tolerated by patients with side effects that are
23  modest, easily monitored and managed and reversible."
24  What studies are you referring to there?

---

Page 44

1     A.  All of the studies that have been cited
2  previously, definitive clinical trials.  Do you want me
3  to give you the specific numbers?
4     Q.  Yes.
5     A.  Number eight, number nine, number ten, number
6  11, number 12, number 13, number 14, number 15, 16, 17,
7  20 and 21.
8     Q.  Near the bottom of your paragraph 33 you
9  write "PrEP is not a medication that has to be taken
10  long term for a chronic condition."
11     MR. KLEIN: Is that 33?
12     MR. MAGRATTEN: Paragraph 33.
13     A.  Yes.
14     Q.  What is the average length of time that an
15  individual takes PrEP?
16     A.  It is early days.  So we don't know.
17     Q.  You said it's early days?
18     A.  Early days.  FDA approval was in 2012.  So we
19  can project about people's sexual behaviors and know
20  that as people get older, they may be less likely to
21  engage in behaviors that might warrant PrEP, but we
22  don't have a definitive number.
23          But the point is that as soon as the
24  risk stops, the need for PrEP stops which is different

---

John Doe v.
Mutual of Omaha Insurance Company

Kenneth Mayer, M.D.
January 29, 2018

---

Page 45

1  **than chronic medication.**
2  Q.  What are the medical complications associated
3  with the consistent use of PrEP over ten years?
4  **MR. KLEIN:** Objection to form.
5  **A.  We know over the course of one year, the**
6  **incidents of reversible elevations in renal function is**
7  **under 5 percent.  We have no evidence going into years**
8  **two and three in our clinical experience in Fenway that**
9  **rate increases over time.  So it's a fixed risk as best**
10  **we can tell.**
11  Q.  Have there been any studies about the medical
12  complications and the consistent use of PrEP over a
13  ten-year period?
14  **A.  There have not.**
15  Q.  Have there been any studies about the
16  consistent use of PrEP by patients over -- let me
17  strike that.
18  Have there been any studies about the
19  medical complications experienced by patients who have
20  used PrEP consistently over an eight-year period of
21  time?
22  **A.  There have not.**
23  Q.  Have there been any studies of the medical
24  complications experienced by patients who have taken

---

Page 46

1  PrEP consistently over a six-year period of time?
2  **A.  There have not, to my knowledge.**
3  Q.  Turning to your paragraph 35 on page 14, you
4  write "The FDA approves many new medications each year
5  for a wide range of health conditions, e.g., diabetes,
6  high blood pressure based on an assessment that they
7  are sufficiently safe for use."
8  Is it your position that Mutual of Omaha
9  should accept the application of any individual who is
10  taking a prescription drug so long as that drug is FDA
11  approved?
12  **MR. KLEIN:** Objection.  I don't think
13  that is what the report says.
14  **A.  That's not the question I was asked to**
15  **address.  So I don't have a position on that matter.**
16  Q.  I'm asking your opinion.
17  **A.  I honestly don't have a position on that**
18  **matter.  It's not the question I address in my work.  I**
19  **do infectious disease research and when there is**
20  **specific indications, I focus on that since I like to**
21  **think I have some knowledge about that.  These other**
22  **things I don't believe I am sufficiently informed to**
23  **have a global opinion.**
24  Q.  Do you agree with me there are some FDA

---

Page 47

1  approved prescription medications for which Mutual of
2  Omaha should deny LTC coverage?
3  **A.  I don't have an opinion on that.**
4  **MR. KLEIN:** Can we take a quick break?
5  **MR. MAGRATTEN:** Sure.
6  (Recess taken.)
7  Q.  Turning to the very end, please, of paragraph
8  37 of the report.  In your last sentence you say "It is
9  well known in the field of HIV medicine and by
10  clinicians and researchers with knowledge of HIV and
11  PrEP that approximately 80 percent of PrEP users to
12  date are gay men."  What is the source for that
13  statement?
14  **A.  The Mermin report that we mentioned, changes**
15  **in Truvada for HIV pre-exposure prophylaxis.**
16  Q.  Which number is that?
17  **MR. KLEIN:** It's attached.
18  **A.  Number 19.**
19  Q.  The beginning of paragraph 38 you write
20  "Mutual of Omaha's categorical exclusion of PrEP users
21  from long-term care insurance is irrational and based
22  on a gross misunderstanding of the nature of HIV
23  transmission."  Do you see that?
24  **A.  Yes.**

---

Page 48

1  Q.  Do any insurance companies extend LTC
2  insurance coverage to individuals who take PrEP?
3  **A.  I don't know.**
4  Q.  So, as you sit here today, you're not aware
5  of any insurance companies in the industry who extends
6  LTC coverage to PrEP users?
7  **A.  That is correct.  The statement does not**
8  **compare to other companies.**
9  Q.  I'm asking you to do that now.  Are you aware
10  of any other insurance company that extends LTC
11  coverage to PrEP users?
12  **A.  No.  If they do, I would have the same**
13  **opinion.**
14  Q.  At the top of paragraph 39, you say "The
15  stated reason for Mutual of Omaha's exclusion of PrEP
16  users is to reduce the prevalence of HIV disease in its
17  insured pool."  Do you see that?
18  **A.  Yes.**
19  Q.  What is the basis for that statement?
20  **A.  This was based on discussions that I had with**
21  **expert counsel.  I do not have direct knowledge of the**
22  **exclusion.**
23  Q.  Well, are you referring to the stated reason
24  that Mutual of Omaha has given?  Have you read any

---