# Exhibit C

# Exhibit C
# Vol. I

# In The Matter Of:

*Doe vs*

*Mutual of Omaha Insurance Company*

___

*September 7, 2017*

___



*Min-U-Script® with Word Index*

Case 1:16-cv-11381-GAO    Document 111-3    Filed 05/18/18    Page 4 of 18

Doe vs
Mutual of Omaha Insurance Company
September 7, 2017

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF MASSACHUSETTS
 3
 4   JOHN DOE
          Plaintiff
 5
              vs.              C.A. No. 1:16-cv-11381-GAO
 6
     MUTUAL OF OMAHA
 7   INSURANCE COMPANY
          Defendant
 8
 9
10
11
             DEPOSITION OF              , a Plaintiff in
12       the above-entitled case, taken on behalf of the
         Defendant, before Linda L. Guglielmo, RPR-RMR, a
13       Notary Public in and for the State of Rhode
         Island, at the offices of Pierce Atwood, LLP, 72
14       Pine Street, Providence, Rhode Island on September
         7, 2017 at 9:30 A.M.
15
16   APPEARANCES:
17   FOR THE PLAINTIFF.....GLBTQ LEGAL ADVOCATES & DEFENDERS
                          BY: BENNETT H. KLEIN, ESQ.
18                        30 WINTER STREET
                          BOSTON MA  02108
19
     FOR THE DEFENDANT.....PIERCE ATWOOD, LLP
20                        BY: BROOKS R. MAGRATTEN, ESQ.
                          72 PINE STREET
21                        PROVIDENCE, RI  02903
22
23   ALSO PRESENT: John P. Ward, Esq.
24
25
```

**Page 2**

```
 1                    I N D E X
 2   WITNESS                                          PAGE
 3             EXAMINATION BY MR. MAGRATTEN..............3
 4
 5
 6
 7                    E X H I B I T S
 8                      (DEFENDANT'S)
     NO.       DESCRIPTION                            PAGE
 9   EXHIBIT 1  APPLICATION FOR LONG TERM CARE
                INSURANCE, 26 PGS......................19
10   EXHIBIT 2  LONG-TERM CARE INSURANCE APPLICATION,
                19 PGS.................................21
11   EXHIBIT 3  DR. KATZ MEDICAL NOTE, 9-24-15..........32
     EXHIBIT 4  DR. KATZ MEDICAL NOTE, 10-5-15..........32
12   EXHIBIT 5  COMPLAINT, 7 PGS........................37
     EXHIBIT 6  PLAINTIFS'S MEMO IN SUPPORT OF MOTION TO
13              REMAND CASE TO STATE COURT, 10 PGS.....58
14
15
16
17   FOR INSTRUCTIONS TO WITNESS NOT TO ANSWER
     SEE PAGES: 4, 30, 31, 32, 33, 35, 37, 39, 56, 58
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1     (DEPOSITION COMMENCED AT 9:34 A.M.)
 2
 3  Being duly sworn, deposes and testifies as follows:
 4     THE REPORTER: Would you state
 5  your full name for the record, please.
 6     THE WITNESS:
 7     EXAMINATION BY MR. MAGRATTEN
 8  Q.  Good morning, Mr.    , I'm Brooks Magratten,
 9  we're here today for your deposition.  Your
10  counsel, Mr. Klein, has suggested that we
11  stipulate that all objections are preserved except
12  as to form; is that agreeable?
13     MR. KLEIN: Yes.
14  Q.  Have you been at a deposition before?
15  A.  Yes.
16  Q.  How many times?
17  A.  Numerous.
18  Q.  Okay.  You yourself have been deposed before?
19  A.  Yes.
20  Q.  How many times?
21  A.  Once or twice.
22  Q.  Okay.  I'm going to ask you a series of questions
23  related to your lawsuit John Doe versus Mutual of
24  Omaha, if at any time you don't clearly hear or
25  understand a question I've asked, please let me
```

**Page 4**

```
 1  know so I can rephrase or repeat the question.
 2  It's important going forward that we both
 3  understand that you will only be responding to
 4  those questions that you have clearly heard and
 5  understood; is that agreeable?
 6  A.  Yes.
 7  Q.  What is your age?
 8  A.  I'm 63.
 9  Q.  Have you taken any medications in the last 24
10  hours?
11     MR. KLEIN: Objection.  I'm going to
12  instruct him not to answer that because although I
13  understand your intent, it's an innocent question,
14  it goes into the area of the magistrate's order
15  about not asking any health questions beyond
16  February 9, 2015.  If you want to ask him if he is
17  on any -- if there's anything that's impairing his
18  ability to understand and answer your questions,
19  that's fine, but I will instruct him not to answer
20  the question about what medications he's taking.
21     (SO NOTED)
22  Q.  Have you taken any medications in the last 24
23  hours that would affect your ability to recall and
24  testify truthfully today?
25  A.  No.
```

Min-U-Script®    Allied Court Reporters, Inc. (401)946-5500    (1) Pages 1 - 4
115 Phenix Avenue, Cranston, RI 02920  www.alliedcourtreporters.com

**Page 5**

1  Q. Where do you live?
2  A. I live at [REDACTED], Saunderstown, *(Plaintiff Doe's Rhode Island home address)*
3  Rhode Island, and also [REDACTED], Boston,
4  Massachusetts. *(Doe's Partner's Boston address)*
5  Q. [REDACTED], is that a stand-alone house? *(Plaintiff Doe's Rhode Island home address)*
6  A. Yes.
7  Q. Who owns that?
8  A. I do.
9  Q. Does anyone else own that property?
10 A. No.
11 Q. How long have you owned that property?
12 A. Over 19 years.
13 Q. Have you resided there continuously in the last 19
14 years?
15 A. I'm not sure what you mean by continuously.
16 Q. Were there any periods of time in the last 19
17 years when you were not at the [REDACTED] *(Plaintiff Doe's Rhode Island home address)*
18 residence on a weekly basis?
19 A. Yes.
20 Q. Okay. When?
21 A. I don't recall, but there were times where I
22 spent more time in Boston.
23 Q. Okay. The [REDACTED], Boston, residence,
24 what kind of structure is that? *(Doe's Partner's Boston address)*
25 A. It's a condominium.

**Page 6**

1  Q. Who owns that?
2  A. [REDACTED]
3  Q. Is Mr. [REDACTED] the sole owner of that property?
4  A. Yes.
5  Q. And how often are you in the Boston property
6  clean?
7      MR. KLEIN: Objection as to time
8  frame.
9  A. Three to four days a week.
10 Q. How often are you in the Saunderstown, Rhode
11 Island, property?
12 A. Four or five days a week.
13 Q. Was that the case in 2014?
14 A. Yes.
15 Q. Was that the case in 2015?
16 A. Yes.
17 Q. Do you have a driver's license?
18 A. Yes.
19 Q. Issued in what state?
20 A. Rhode Island.
21 Q. Did you vote in the last Presidential election?
22 A. Yes.
23 Q. Where did you cast your ballot?
24 A. North Kingstown, Rhode Island.
25 Q. Do you pay property taxes?

**Page 7**

1  A. Yes.
2  Q. Where?
3  A. Rhode Island.
4  Q. Does Mr. [REDACTED] pay property taxes?
5  A. I don't know.
6  Q. Do you pay state income taxes?
7  A. Yes.
8  Q. Where?
9  A. Rhode Island and Massachusetts.
10 Q. All right. Are you married?
11 A. Yes.
12 Q. To whom are you married?
13 A. Mr. [REDACTED]
14 Q. Okay. When did you and Mr. [REDACTED] marry?
15 A. July 14, 2017.
16 Q. Prior to that were you living together?
17 A. Yes.
18 Q. For how long?
19 A. 27 years.
20 Q. Okay. Are you a Rhode Island resident?
21    MR. KLEIN: Objection. Calls for a
22 legal conclusion.
23 A. I live in Rhode Island.
24 Q. The question is are you a Rhode Island resident?
25 A. I don't understand the term resident.

**Page 8**

1     MR. KLEIN: Objection.
2  Q. You don't understand what residency means?
3  A. In the legal form, no.
4  Q. Okay. You completed college?
5  A. Yes.
6  Q. Where did you attend college?
7  A. Lafayette College in Easton, Pennsylvania.
8  Q. When did you get your degree?
9  A. 1976.
10 Q. Do you have a law degree?
11 A. Yes, sir.
12 Q. Where did you go to law school?
13 A. University of Miami in Coral Cables, Florida.
14 Q. When did you get your degree?
15 A. 1979.
16 Q. That was a JD?
17 A. Yes, sir.
18 Q. Have you had any other formal education beyond
19 your law degree in '79?
20 A. No, sir.
21 Q. Are you admitted to practice?
22 A. Yes, sir.
23 Q. In what states?
24 A. Massachusetts, and I'm admitted in New York,
25 although it's not current.

Page 9

1  Q.  What is your employment currently?
2  A.  I'm an attorney, and I also am the president
3     of ▓ Fitness, Inc.
4  Q.  Okay. Are you familiar with ▓ Gym of Rhode
5     Island?
6  A.  Yes, sir.
7  Q.  What is that?
8  A.  That is a d/b/a of ▓ Fitness, Inc.
9  Q.  ▓ Fitness, Inc., is that a Rhode Island
10    corporation?
11 A.  Yes, sir.
12 Q.  What is the principal place of business of ▓
13    Fitness?
14 A.  Pawtucket, Rhode Island, ▓
15    ▓
16 Q.  Okay. And was that the case in 2014 and 2015?
17     THE WITNESS: What are you asking,
18    is what the case?
19 Q.  In 2014 was ▓ Fitness, Inc., a Rhode Island
20    corporation?
21 A.  Yes.
22 Q.  Headquartered in Pawtucket, Rhode Island?
23 A.  Yes.
24 Q.  In 2015 was ▓ Fitness, Inc., a Rhode Island
25    corporation?

Page 10

1  A.  Yes.
2  Q.  Headquartered in Pawtucket, Rhode Island?
3  A.  Yes.
4  Q.  And since 2014 you've been president of ▓
5     Fitness, Inc.?
6  A.  Yes.
7  Q.  What is the business of ▓ Fitness, Inc.?
8  A.  Fitness facility.
9  Q.  Okay. How many fitness facilities does ▓
10    Fitness, Inc., own?
11 A.  One.
12 Q.  Where is that facility?
13 A.  Pawtucket, Rhode Island, ▓
14    ▓
15 Q.  Does ▓ Fitness, Inc., have any other business
16    activities?
17 A.  No.
18 Q.  When was ▓ Fit Fitness, Inc., incorporated?
19 A.  I believe 1994.
20 Q.  And has it remained continuously incorporated
21    since then --
22 A.  Yes.
23 Q.  -- as a Rhode Island corporation?
24 A.  Yes, sir.
25 Q.  What is Joe Paul Fitness?

Page 11

1  A.  Joe Paul Fitness, I don't know.
2  Q.  You're not familiar with that term?
3  A.  Joe Paul Fitness, no.
4  Q.  Are you familiar with ▓ Fitness?
5  A.  Yes, sir.
6  Q.  What is ▓ Fitness?
7  A.  ▓ Fitness is a former business that I had
8     an ownership interest in.
9  Q.  You were president of ▓ Fitness?
10 A.  Yes, sir.
11 Q.  That was incorporated in 2003?
12 A.  Yes, sir.
13 Q.  What happened to ▓ Fitness, Inc.?
14 A.  It was sold.
15 Q.  When did you sell it?
16 A.  2016.
17 Q.  That was a Rhode Island corporation?
18 A.  Yes, sir.
19 Q.  Headquartered in Rhode Island?
20 A.  Yes, sir, the assets were sold, I'm sorry.
21 Q.  Is ▓ Fitness, Inc., still a corporation in
22    good standing?
23 A.  No.
24 Q.  ▓ Fitness, Inc., went into receivership?
25 A.  Yes, sir.

Page 12

1  Q.  What is U.S. Auto Brokers, LLC?
2  A.  I've never heard of that.
3  Q.  You said you're admitted to practice law in
4     Massachusetts and New York; is that correct?
5  A.  I am admitted, yes.
6  Q.  I think you said your New York license is
7     inactive?
8  A.  Correct.
9  Q.  Any other states?
10 A.  No, sir.
11 Q.  And tell me about your law practice, can you
12    describe that for me?
13 A.  I'm not sure what you mean.
14 Q.  Are you a sole practitioner?
15 A.  Yes.
16 Q.  Where is your office?
17 A.  In Boston.
18 Q.  What's the address?
19 A.  ▓, Boston.   *Doe's Partner's Boston address*
20 Q.  What sort of work do you do?
21 A.  I generally do small business and personal
22    injury.
23 Q.  How long have you been practicing law?
24 A.  38 years.
25 Q.  Have you been a party in any other lawsuits --

Page 17

1  Q.  Prior to submitting an application for long-term
2  care coverage, did you ever meet Mr. Loden?
3  A.  No.
4  Q.  Are you familiar with Ash Brokerage?
5  A.  Yes.
6  Q.  Who are they?
7  A.  From what I've read recently, they are the
8  connection between Mr. Loden and Mutual of Omaha.
9  Q.  What was it you recently read that give you that
10  impression?
11  A.  I'm not sure.
12  Q.  Did you ever communicate directly with anyone at
13  Ash Brokerage?
14  A.  I don't recall.
15  Q.  Did you ever meet with anyone at Ash Brokerage?
16  A.  No.
17  Q.  Did you ever speak with a Brittany Jordan at Ash
18  Brokerage?
19  A.  I don't recall the name.
20  Q.  Did you ever tell anyone at Ash Brokerage that you
21  and Mr. [redacted] do not live together?
22  A.  I don't believe so.
23  Q.  Why did you elect to apply for coverage with
24  Mutual of Omaha specifically?
25  A.  I didn't elect to buy.  It was just the plan

Page 18

1  I was interested in.  I had no idea that it was
2  Mutual to be -- that I was applying with.  It was
3  recommended by Mr. Loden.
4  Q.  All right.  You said you looked at the plan.  Tell
5  me about the plan.
6  A.  I believe the plan costs approximately $240 a
7  month.  It was coverage of $200 a day, with
8  increases, and a very generous lifetime cap.
9  Q.  And you didn't realize that the plan was offered
10  by Mutual of Omaha?
11  A.  If I did, I don't remember.
12  Q.  Did you look at any other plans from any other
13  insurance companies?
14  A.  I don't recall.
15  Q.  Did you examine a plan from Transamerica?
16  A.  I don't recall.
17  Q.  Did you speak to anyone else in Massachusetts
18  other than Mr. [redacted] about applying for
19  long-term care coverage?
20  A.  I don't recall.
21  Q.  Is it possible you did?
22  A.  Probably not.
23  Q.  At some point did you fill out an application for
24  long-term care coverage?
25  A.  I'm not sure what you mean by fill it out.

Page 19

1      MR. MAGRATTEN: Can you repeat the last
2  question?
3      (QUESTION READ)
4  A.  I signed an application.  I don't recall
5  filling it out.
6      MR. MAGRATTEN: Okay.  Mark this 1.
7      EXHIBIT 1 (DEFENDANT'S EXHIBIT 1
8      MARKED FOR IDENTIFICATION)
9  Q.  Showing you what's been marked Exhibit 1.  I ask
10  you to review Exhibit 1.
11     MR. KLEIN: Look at every page.  Just
12  scan through it.
13     (PAUSE)
14  Q.  So what is Exhibit 1?
15  A.  It reads, Application for Long-Term Care
16  Insurance, Massachusetts.
17  Q.  Is this the application for long-term care
18  insurance that you signed in November of 2014?
19  A.  It appears to be.
20  Q.  Where did you get this application from?
21  A.  From Mr. Loden.
22  Q.  Did you review it before you signed it?
23  A.  I did.
24  Q.  Prior to you getting the application, did somebody
25  interview you?

Page 20

1  A.  I believe so.
2  Q.  Who was that?
3  A.  I don't recall.
4  Q.  How long did the interview take?
5  A.  I don't recall.
6  Q.  Was it just one interview?
7  A.  I don't recall.
8  Q.  Were there multiple phone calls -- strike that.
9  How did the interview take place --
10  A.  By phone.
11  Q.  -- one call, or was there more than one call?
12  A.  I don't recall.
13  Q.  Where were you when you took the call?
14  A.  I don't remember.
15  Q.  When did the call occur?
16  A.  I don't remember.
17  Q.  When you got the application, that's Exhibit 1,
18  did you review it before you signed it?
19  A.  Yes.
20  Q.  What happened after you signed this?
21  A.  We put it down and sat with it for a while.
22  Q.  Why?
23  A.  We had to determine whether we could afford
24  it, whether we wanted to go ahead with it.
25  Q.  Okay.  And how long did this deliberation take

Page 21

1    place?
2  A.  Over a month.
3  Q.  Okay.  What happened next?
4  A.  We sent it to Mr. Loden together with some
5    checks.
6  Q.  Okay.  What happened after that?
7  A.  We received the checks back at some point
8    because we were told that he did not receive the
9    document within 30 days after our signature.
10 Q.  Okay.  What happened after that?
11 A.  We sent a signature page, told to sign and
12   redate it.
13 Q.  What happened after that?
14 A.  We sent the signed and higher check amounts
15   to Mr. Loden.
16 Q.  You said the signed application and --
17 A.  No, the signed signature page.
18 Q.  Signature page and new checks?
19 A.  Because the rates had gone up.
20 Q.  To Mr. Loden?
21 A.  Yes.
22      MR. MAGRATTEN: Mark that, please,
23   Number 2.
24      EXHIBIT 2 (DEFENDANT'S EXHIBIT 2
25      MARKED FOR IDENTIFICATION)

Page 22

1  Q.  Showing you what's been marked as Exhibit 2.
2      (PAUSE)
3  Q.  What is Exhibit 2?
4  A.  It reads Individual Long-Term Care Insurance
5    Application, Mutual of Omaha Insurance Company.
6  Q.  What do you understand Exhibit 2 to be?
7  A.  Second application.
8  Q.  Okay.  And turn your attention, please, to the
9    page with the number 148 in the lower right.
10 A.  Yes.
11 Q.  Is that your signature appearing dated some time
12   in December 2014?
13 A.  Yes.
14 Q.  Is that Mr. _____'s signature next to it also
15   dated December 2014?
16 A.  It appears to be.
17 Q.  All right.  And at the top of that page there's a
18   paragraph numbered 1 that reads, "The underlined
19   applicant agrees that, A, all answers in this
20   application are true and complete and Mutual of
21   Omaha Insurance Company will rely on these answers
22   to determine insurability."  Do you see where that
23   is printed?
24 A.  I do.
25 Q.  Were all answers in this application true and

Page 23

1    complete as of December 2014?
2  A.  I didn't see this application when I signed
3    this page.
4  Q.  All right.  Before you signed the page, did you
5    ask Mr. Loden for a copy of the application?
6  A.  No, because -- no.
7  Q.  All right.  Did you do anything to review the
8    pages -- strike that.  Did you do anything to
9    review the responses in the application before you
10   submitted the signature page in December 2014?
11 A.  No.
12 Q.  What did you do with the signature page on Exhibit
13   2 after you signed it?
14 A.  It was sent to Mr. Loden upon his
15   instructions.
16 Q.  What happened after that?
17 A.  He received it, I hope, and submitted it to
18   whoever he needed to submit it to.
19      MR. MAGRATTEN: Could you read that
20   back, please.
21      (ANSWER READ)
22 Q.  What happened after that?
23 A.  At some point I received a letter from Mutual
24   of Omaha which denied me coverage.  I'm sorry,
25   before that --

Page 24

1  Q.  Go ahead.
2  A.  I'll stand with that.  I'm fine with my
3    answer.
4  Q.  All right.  So I'm clear, let me ask it again more
5    clearly.  You said that after you signed the
6    signature page, which is in Exhibit 2, you sent it
7    to Mr. Loden, and I asked what happened after
8    that.
9  A.  Yes.
10 Q.  Can you answer that question?
11 A.  Someone who represented themselves to be from
12   Mutual of Omaha called me, interviewed me.
13 Q.  Okay.  Now, prior to that phone call and interview
14   had you had any prior direct communications with
15   Mutual of Omaha?
16 A.  Not that I believe.
17 Q.  What happened after the telephone call and
18   interview?
19 A.  After that, that's when I received a denial
20   letter.
21 Q.  What did the denial letter say?
22      MR. KLEIN: Objection.
23 A.  The denial letter said essentially,
24   obviously, the letter speaks for itself, but my
25   memory of it is that I was being denied coverage

Page 25

1  because I took the drug known as Truvada.
2  Q.  What did you do after that?
3     MR. KLEIN: Objection.
4  A.  I thought a lot about whether I wanted to go
5  through an appeals process, which I finally
6  decided to do.
7  Q.  Okay.  What happened next?
8  A.  I drafted a letter appealing it.
9  Q.  What happened after that?
10 A.  Sent the letter to Mutual of Omaha.
11 Q.  What happened next?
12 A.  I received a letter back denying my appeal.
13 Q.  On what basis?
14 A.  That the drug known as Truvada, no matter if
15 it was used as a prophylactic or treatment drug,
16 was a banned drug under their policies, and that
17 even such, as a prophylactic use still banned.
18 Q.  Did you do anything after you received that letter
19 with respect to your efforts to obtain long-term
20 care coverage?
21 A.  I thought about what my next steps were and
22 decided I would not accept their denial.
23 Q.  What did you do next?
24 A.  I talked to some friends, and they told me
25 that I should contact an attorney.

Page 26

1  Q.  Who were the friends you spoke with?
2  A.  Just general friends.  I don't even remember.
3  Q.  You don't remember their names?
4  A.  No.
5  Q.  When did you first consult an attorney about
6  taking legal action?
7  A.  A couple weeks after the letter.
8  Q.  Have you applied for long-term care coverage with
9  any other insurer?
10 A.  No.
11 Q.  Why not?
12 A.  I thought if one of you, one of these
13 companies rejected me for Truvada, I didn't want
14 to go through it again.
15 Q.  Your assumption was no other insurer out there
16 would extend long-term care coverage to you?
17 A.  Correct.
18 Q.  And on what did you base that assumption?
19 A.  Just my general assumption.
20 Q.  Did you have any information to inform that
21 assumption?
22 A.  No.
23 Q.  Have you ever been covered by a long-term care
24 policy?
25 A.  No.

Page 27

1  Q.  Did [ ] Fitness, Inc., offer long-term care
2  coverage to its plan participants?
3  A.  No.
4  Q.  When did you first start taking Truvada as PrEP?
5  A.  I believe November 10th, 2014.
6  Q.  Who prescribed it?
7  A.  Dr. Ronald Katz.
8  Q.  Why did you start taking Truvada?
9  A.  It's -- you know I lived through the
10 holocaust --
11 Q.  I'm sorry?
12 A.  I lived through the holocaust of watching my
13 friends die, so it was an emotional decision.
14 It's tough being in your prime and watching your
15 friends melt away, and I thought what a horrible
16 disease.  I'm sorry for crying.
17    MR. MAGRATTEN: That's all right.  If
18 you need to take a break, that's fine.
19    THE WITNESS: No, I'd like some
20 tissues.
21 A.  To me it was an emotional decision.  I was
22 like damn, if this thing can do this, if it can
23 prevent one person from probably getting HIV --
24 sorry --
25    MR. MAGRATTEN: Take your time.

Page 28

1  A.  Then I'm there.  I read about its efficacy,
2  which is amazing, and I thought even though I'm
3  low risk, why not try it, just to make sure.
4     You know, I've walked through the streets of
5  Boston and I see houses where my friends lived,
6  and they're not there anymore and I watched them
7  die, I watched them melt away, you know, just
8  really a horrible thing to watch.  When it happens
9  by the dozens, when the first thing you read is
10 the obituaries in the morning, and they're 40
11 years old; it's horrible.  And I thought, damn,
12 wow, what a great thing this company is doing.
13 And I talked to my doctor, and he said that there
14 were very few side effects, if any, and he said
15 try it.  I'm sorry.
16    MR. MAGRATTEN: It's all right.
17 Q.  Your discussion with your doctor, that was
18 Dr. Katz?
19 A.  Yes.
20 Q.  Do you understand that Truvada is a medication for
21 individuals who are at high risk of contracting
22 HIV?
23    MR. KLEIN: Objection.
24 A.  I did not.
25 Q.  You just testified about your discussion with

**Page 33**

1  visit date of November 10, 2014. Did you see
2  Dr. Katz on that day?
3  A. I assume so.
4  Q. The note indicates reviewed compliance, risks.
5  What does that refer to?
6     MR. KLEIN: Objection. I'm going to
7  ask him -- instruct him not to answer because I
8  think that the magistrate's order limits your
9  discovery to the records that Mutual had before it
10 in the application process and to any inquiries
11 they made of Doe during the application process.
12    (SO NOTED)
13 Q. The next line, "Please read package literature
14 instruction side effects." What does that refer
15 to?
16    MR. KLEIN: Same objection.
17    (SO NOTED)
18 Q. The next line reads, "F/U three months, HIV test
19 then," what does that refer to?
20    MR. KLEIN: Same objection.
21    (SO NOTED)
22 Q. The last line reads, "Precautions discussed in
23 detail." What does that refer to?
24    MR. KLEIN: Same objection.
25    (SO NOTED)

**Page 34**

1  Q. Direct your attention, please, to Exhibit 4. What
2  is Exhibit 4?
3  A. It appears to be a similar medical record.
4  Q. From Dr. Katz --
5  A. Yes. With the word addendum on it from
6  Dr. Katz.
7  Q. Okay. The record indicates pertains to a visit
8  date November 10, 2014, correct?
9  A. Correct.
10 Q. All right. The record indicates, "Truvada written
11 today for its indication." Do you see that?
12 A. I see that.
13 Q. "Prevention of HIV," do you see that?
14 A. I do.
15 Q. Why was Dr. Katz prescribing Truvada on this day
16 for prevention of HIV in your case?
17    MR. KLEIN: Objection. Lack of
18 foundation and --
19    MR. MAGRATTEN: You can answer?
20    MR. KLEIN: You can't testify to
21 communications with Dr. Katz. I'm going to
22 instruct you not to testify about any
23 communications you had with Dr. Katz, and I'll
24 also object to the form of the question as to --
25 he can't -- you asked why Dr. Katz was doing

**Page 35**

1  something.
2     THE WITNESS: Apparently -- should I
3  answer?
4     MR. MAGRATTEN: You can answer the
5  question.
6     MR. KLEIN: I'm going to instruct him
7  not to answer the question as asked for the same
8  reasons I've already articulated.
9  Q. The next line in the record, "We reviewed side
10 effects and followed up in detail." What does
11 that refer to?
12    MR. KLEIN: Objection. I'm going to
13 instruct him not to answer for anything other
14 than -- because, Brooks, the magistrate's order
15 limits what you're entitled to through the records
16 Mutual had at the time of the application and to
17 the questions it asked Doe at the time of the
18 application.
19    (SO NOTED)
20 Q. You testified previously that you were at low risk
21 for contracting HIV. What do you mean by that?
22 A. I am in a committed relationship, and as such
23 my understanding is that my risk of contracting
24 HIV is very low risk.
25 Q. Any other reasons that you believe that you are at

**Page 36**

1  low risk for acquiring HIV?
2  A. No others. I mean -- I think I stated what I
3  believe.
4  Q. You said you were at low risk for acquiring HIV,
5  but your knowledge is that you have some risk of
6  acquiring HIV?
7  A. I think we all have some risk of acquiring
8  HIV.
9  Q. In your case, what was your risk of acquiring HIV?
10 A. Well, I work in a gym, there's times when
11 there's blood and vomit and fecal matter I might
12 come in contact with.
13 Q. Any other reasons?
14 A. No.
15    MR. KLEIN: We've been going about
16 an hour, can we take a short break?
17    MR. MAGRATTEN: Sure.
18    (BRIEF RECESS)
19 Q. Turning your attention back to Exhibit 3, about
20 two-thirds of the way down that text there is a
21 line that reads, "F/U here three months." Did you
22 have a follow-up examination with Katz in about
23 February 2015?
24    MR. KLEIN: Objection. I'm going to
25 instruct him not to answer that based on the

Page 41

1  A.  Or even October.
2  Q.  As you sit here today, are you aware of any
3  specific scientific or medical information
4  authoritative peer reviewed journals that support
5  the allegations in Paragraph 15?
6      MR. KLEIN: Objection.  Calls for an
7  expert opinion.
8  A.  The information seems to have gotten even
9  more certain.
10 Q.  Okay.  I thank you, but that's not my question.
11 As you sit here today, are you aware of any
12 specific articles that support the allegations of
13 Paragraph 15?
14     MR. KLEIN: Objection.  Calls for an
15 expert opinion.
16 A.  No.
17 Q.  Paragraph 16 says, "Use of Truvada PrEP has been
18 hailed by public health and medical authorities as
19 a scientific breakthrough that can end the HIV
20 epidemic"; do you see that?
21 A.  Yes.
22 Q.  As you sit here today can you identify any public
23 health or medical authorities that have made this
24 claim?
25     MR. KLEIN: Objection.  Calls for an

Page 42

1  expert opinion.
2  A.  No.
3  Q.  In Paragraph 18 you say Mutual of Omaha was aware
4  of Doe's sexual orientation from his application;
5  do you see that?
6  A.  Yes.
7  Q.  What's your basis for making that allegation?
8  A.  That I had lived with -- had been in a
9  committed relationship with ████████, so we
10 sent the application together as a submitted
11 couple.
12 Q.  Okay.  Does the application anywhere indicate you
13 were a committed couple?
14 A.  I believe so.  I don't recall.
15 Q.  Can you look at Exhibit 1 or Exhibit 2 and show me
16 where it says that?
17 A.  We were told -- (witness perusing documents)
18 "Partner means one person who is your spouse.  Do
19 you have a partner?  Yes.  Is he/she applying for
20 coverage?  Yes."  Page 136.
21     MR. KLEIN: Are you on Exhibit 2 or
22 1?
23     THE WITNESS: I'm on Exhibit 2.
24 Q.  All right.  Paragraph 23 you say, "A person who is
25 on Truvada has a dramatically lower risk of

Page 43

1  acquiring HIV infection than a similarly situated
2  person who is not on Truvada."  What is your basis
3  for saying that?
4      MR. KLEIN: Objection.  Calls for an
5  expert opinion.
6  A.  My investigations.
7  Q.  Can you be more specific?
8  A.  Articles I read through Googling.
9  Q.  Okay.  So as an individual who takes one Truvada
10 pill a week at a dramatically -- strike that.  If
11 an individual who takes one Truvada pill a week,
12 is he or she at a dramatically lower risk of
13 acquiring HIV infection than a similarly situated
14 person who is not on Truvada?
15     MR. KLEIN: Objection.  Calls for an
16 expert opinion.
17 A.  I'm not aware of the facts of that.  I
18 haven't done -- strike that.
19 Q.  You'd agree with me the effectiveness of Truvada
20 depends on compliance with prescription
21 instructions?
22     MR. KLEIN: Objection.  Calls for an
23 expert opinion.
24 A.  I don't know what you mean by compliance.
25     MR. MAGRATTEN: Taking the medication

Page 44

1  as indicated.
2      MR. KLEIN: Same objection.
3  A.  I have heard -- I can't agree with that, no.
4  Q.  Why not?
5  A.  Because I'm not an expert.
6  Q.  So, in your opinion -- strike that.  So, in
7  saying, in making the allegation in Paragraph 23,
8  you're saying a person who is on Truvada has a
9  dramatically lower risk of acquiring HIV
10 irrespective of their adherence to prescription
11 instructions?
12     MR. KLEIN: Objection.  Calls for an
13 expert opinion.
14 A.  I believe the paragraph reads as it reads.
15 Q.  But my question is your allegation in Paragraph
16 23, is that true for any individual taking
17 Truvada?
18     MR. KLEIN: Objection.  Calls for an
19 expert opinion.  You can answer if you know.
20 A.  I don't know.
21 Q.  Okay.  In Paragraph 24 you say, "The individuals
22 who take Truvada as PrEP are predominantly gay
23 men, and Mutual of Omaha was aware of this at the
24 time it denied Doe's application."  What's your
25 basis for making that claim?

Page 45

 1  MR. KLEIN: Objection.  It calls for
 2  an expert opinion.
 3  A.  Again, I don't know.
 4  Q.  Do you have a basis in good faith to make that
 5  allegation in Paragraph 24?
 6      MR. KLEIN: Objection.  It calls for
 7  an expert opinion.
 8  A.  Yes.
 9  Q.  What is that basis?
10  A.  That most of the people I know who take
11  Truvada are gay.  Most of the articles I've read
12  discuss gay men taking it.
13  Q.  And what is your basis for saying that Mutual of
14  Omaha was aware of this at the time it denied your
15  application?
16      MR. KLEIN: Objection.  Calls for an
17  expert opinion, and calls for information beyond
18  the allegation of the complaint.
19  A.  I'm unable to answer that question.
20  Q.  Do you have a good faith basis for claiming that
21  Mutual of Omaha was aware that Truvada as PrEP was
22  taken by predominantly gay men at the time it
23  denied your application?
24      MR. KLEIN: Objection.  Calls for an
25  expert opinion.  Also calls for a legal conclusion

Page 46

 1  insofar as the complaint is a legal document that
 2  is prepared by an attorney, it's not a sworn
 3  statement time of the plaintiff, and that's the
 4  basis for my objection.
 5  A.  No.
 6  Q.  In paragraph 25 you say, "Mutual of Omaha's
 7  decision to deny Doe long-term care insurance
 8  because he is on PrEP was not based on a sound
 9  medical basis or rational underwriting policy."
10  Stop there.  What is your basis for making that
11  claim?
12      MR. KLEIN: Objection.  Calls for a
13  legal conclusion as well as expert testimony as
14  well as information to be elicited from the
15  defendant in discovery.
16      MR. MAGRATTEN: You can answer the
17  question.
18  A.  Truvada is a means of eliminating HIV, and
19  for someone to be denied underwriting of the
20  policy doesn't make any sense to me.
21  Q.  Do you have any other basis for making that claim?
22      MR. KLEIN: Same objection as to the
23  preceding question.
24  A.  Yes.
25  Q.  What else?

Page 47

 1  A.  I felt that their underwriting policies were
 2  written prior to the date that PrEP was declared
 3  to be approved for prophylactic use, and that
 4  their policies are outdated.
 5  Q.  When did you form this belief?
 6  A.  When I looked up their pamphlet of
 7  underwriting policies.
 8  Q.  When did you do that?
 9  A.  After I got denied coverage.
10  Q.  In Paragraph 26 you go on to claim that, "Mutual
11  of Omaha's decision to deny your application was
12  based on bias against gay men."  I'll stop there.
13  What is your basis for making that claim?
14      MR. KLEIN: Objection.  Calls for a
15  legal conclusion.  Calls for expert testimony, and
16  calls for facts to be elicited from the defendant
17  in discovery.
18  A.  I don't have an answer.
19  Q.  So you have no good faith basis to make that
20  claim?
21  A.  I did not say that.
22      MR. KLEIN: Objection to the words
23  good faith, which are vague and ambiguous as used
24  in this context and calls for a legal conclusion
25  about the proper basis for the complaint.

Page 48

 1  A.  I didn't say that.  I said I don't have an
 2  answer.
 3  Q.  All right.  I'm trying to understand what is your
 4  basis -- strike that.  You're an attorney admitted
 5  to practice in Massachusetts, correct?
 6  A.  Correct.
 7  Q.  You're aware the rules of practice in
 8  Massachusetts require a good faith basis in law
 9  and fact to file a complaint in the courts of
10  Massachusetts, correct?
11  A.  Yes.
12  Q.  So, you've made a claim here in Paragraph 25 that
13  the denial of your application for insurance was
14  based on bias against gay men.  I'm trying to
15  understand what is your good faith basis in law or
16  fact to make that allegation?
17      MR. KLEIN: Objection.  Calls for
18  expert testimony, calls for a legal conclusion,
19  uses terms that are undefined and are legal terms
20  that notwithstanding the fact that someone is an
21  attorney is a matter of a legal issue, and that
22  such information will be responded to in the
23  Answers to Interrogatories.
24  A.  I discussed with my attorney and decided that
25  this was a good faith assertion.

Page 65

1  answer if you know.
2  A.  I don't know.
3  Q.  Does the long-term use of Truvada increase the
4  risk of stroke?
5     MR. KLEIN: Objection. Calls for an
6  expert medical opinion.
7  A.  I don't know.
8  Q.  Does the long-term use of Truvada increase the
9  risk of cardiovascular disease?
10    MR. KLEIN: Objection. Calls for an
11 expert medical opinion.
12 A.  I don't know.
13 Q.  Does the long-term use of Truvada increase the
14 risk of dementia?
15    MR. KLEIN: Objection. Calls for an
16 expert medical opinion.
17 A.  I don't know.
18 Q.  Does the long-term use of Truvada increase the
19 risk of drug resistant sexually transmitted
20 diseases?
21    MR. KLEIN: Objection. Calls for an
22 expert medical opinion.
23 A.  I don't know.
24 Q.  You testified earlier that Dr. Katz told you that
25 the side effects of Truvada are minimal; do you

Page 66

1  recall saying that?
2  A.  Correct.
3  Q.  What specifically did he say about the side
4  effects of Truvada?
5     MR. KLEIN: Objection. I'm going to
6  instruct him not to answer that on the basis of
7  the magistrate's order, and that she has
8  restricted Mutual of Omaha to information in Doe's
9  medical records and the information it had in the
10 application and other documents at the time of its
11 denial.
12    (SO NOTED)
13 Q.  What are the long-term health risks of an HIV
14 infection?
15    MR. KLEIN: Objection. Calls for an
16 expert medical opinion.
17 A.  I don't know.
18 Q.  Do they include cardiovascular disease?
19    MR. KLEIN: Objection. Calls for an
20 expert medical opinion.
21 A.  I don't know.
22 Q.  Do they include lung disease?
23    MR. KLEIN: Objection. Calls for an
24 expert medical opinion.
25 A.  I don't know.

Page 67

1  Q.  Do they include cancer?
2     MR. KLEIN: Objection. Calls for an
3  expert medical opinion.
4  A.  Again, I don't know.
5  Q.  Do they include neurocognitive disorders?
6     MR. KLEIN: Objection. Calls for an
7  expert medical opinion.
8  A.  Again, I don't know.
9  Q.  Do they include liver disease?
10    MR. KLEIN: Objection. Calls for an
11 expert medical opinion.
12 A.  I don't know.
13 Q.  Are you aware of any insurance company that will
14 issue long-term care coverage to someone taking
15 Truvada?
16 A.  I'm not aware.
17 Q.  Are you aware of any insurance company that will
18 issue long-term care coverage to someone who is
19 HIV positive?
20 A.  I'm not aware.
21 Q.  Did you drive here this morning?
22 A.  Yes, sir.
23 Q.  Okay. In your car?
24 A.  Yes, sir.
25 Q.  Where is your car registered?

Page 68

1  A.  Rhode Island. Can I correct something?
2     MR. MAGRATTEN: Yes.
3  A.  It wasn't my car. It's a business car.
4  Q.  All right. This is a car for ___ Fitness?
5  A.  Yes. It's leased.
6  Q.  Do you have a personal car?
7  A.  No.
8     MR. MAGRATTEN: One minute.
9     (BRIEF PAUSE)
10    MR. MAGRATTEN: I have no more
11 questions. We're done.
12    THE REPORTER: Do you want a
13 transcript?
14    MR. KLEIN: I do. Mini electronic.
15    (DEPOSITION CLOSED AT 11:33 A.M.)

# Exhibit C
# <u>Vol. II</u>

# In The Matter Of:

*John Doe v.*
*Mutual of Omaha Insurance Company*

*March 14, 2018*

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Original File 3-14-18.txt.txt
**Min-U-Script® with Word Index**

**Page 1**

```
                UNITED STATES DISTRICT COURT

                  DISTRICT OF MASSACHUSETTS

JOHN DOE,

     Plaintiff,

  vs.            CASE NO. 1:16-cv-11381-GAO

MUTUAL OF OMAHA

INSURANCE COMPANY,

     Defendant.
------------------------------x


                CONTINUED DEPOSITION OF

                   ███████████

                Wednesday, March 14, 2018

                     10:45 a.m.

                   Pierce Atwood, LLP

                   100 Summer Street

                Boston, Massachusetts 02110


                  Laurie K. Langer, RPR
```

**Page 2**

```
              APPEARANCES

ON BEHALF OF THE PLAINTIFF(s):
   BY:   Bennett H. Klein, Esq.
         GLBTQ Legal Advocates & Defenders
         18 Tremont Street
         9th Floor
         Boston, Massachusetts 02108
         (617) 426-1350
         bklein@glad.org

ON BEHALF OF THE DEFENDANT(s):
   BY:   Brooks R. Magratten, Esq.
         PIERCE ATWOOD, LLP
         One Financial Plaza
         26th Floor
         Providence, Rhode Island 02903
         (401) 490-3422
         bmagratten@pierceatwood.com
```

**Page 3**

```
                INDEX OF EXAMINATION

WITNESS:  ███████████

EXAMINATION                              PAGE NO.
By Mr. Magratten                              4


                 INDEX TO EXHIBITS

NO.     DESCRIPTION                      PAGE NO.
 7      Amended Complaint                     4


(Original exhibits attached to original transcript)
```

**Page 4**

P R O C E E D I N G S

███████████

having been satisfactorily identified by the production of his driver's license, and duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION

BY MR. MAGRATTEN:

Q. Mr. ████, we're gathered this morning for the continuation of your deposition.

You may recall at the first deposition you gave in this case your attorney instructed you not to answer certain questions. The Court has determined that some of those objections were improper, so we're back today for additional questions.

MR. MAGRATTEN: Can you mark that, please, as Exhibit 7.

(Deposition Exhibit No. 7 marked for identification.)

Q. Mr. ████, I'm showing you what's been marked as Exhibit 7. The same rules we talked about at the beginning of the last deposition still apply. I'm going

Page 21

1    Q. All right. You allege in paragraph 26 that
2    Mutual of Omaha failed to treat you in accordance with
3    an actual and accurate classification of your risk
4    because of stereotypes.
5        What are the facts upon which you rely in
6    alleging that Mutual of Omaha failed to treat you in
7    accordance with an accurate, excuse me, an actual and
8    accurate classification of your risk because of
9    stereotypes?
10           MR. KLEIN: Objection. Calls for expert
11   opinion and a legal conclusion.
12   **A. I left that to my attorney. But also, again, the**
13   **Truvada is close to 100 percent effective and 80 percent**
14   **of PrEP users, Truvada users, are gay men.**
15   Q. You refer in paragraph 26 to negative attitudes
16   about the nature and riskiness of your sexuality because
17   you are a gay man.
18       What are the negative attitudes that you allege
19   Mutual of Omaha exhibited?
20           MR. KLEIN: Objection. Calls for an expert
21   opinion. And a legal conclusion.
22   **A. That the Truvada being used -- I'm sorry. That**
23   **Truvada is 100 percent effective, close to it, and that**
24   **80 percent of the users are gay men.**

Page 22

1    Q. Your allegation about negative attitudes about
2    the nature and riskiness of your sexuality, did you
3    observe those attitudes in any discussions you had with
4    anybody at Mutual of Omaha?
5    **A. It was observed in my denial.**
6    Q. Okay. My question was did you observe the
7    negative attitudes in any conversations you had with
8    anybody at Mutual of Omaha?
9    **A. No.**
10   Q. Did you observe these negative attitudes in any
11   written communications with Mutual of Omaha?
12   **A. Yes.**
13   Q. Where?
14   **A. My denial letters.**
15   Q. Anything else?
16   **A. Not that I have seen.**
17   Q. All right. You refer in paragraph 26 to negative
18   attitudes about gay male sexuality in general.
19       Did you observe these negative attitudes in any
20   conversations that you had with anyone at Mutual of
21   Omaha?
22   **A. I did not.**
23   Q. Did you observe these negative attitudes in any
24   written communication with anybody at Mutual of Omaha?

Page 23

1    **A. My denial letters.**
2    Q. Anything else?
3    **A. Not that I have personally.**
4    Q. I'm sorry. Not that you have what?
5    **A. Personally.**
6    Q. Paragraph 28 you allege, "by denying the
7    long-term care insurance because he is on PrEP, Mutual
8    of Omaha failed to treat Doe in accordance with an
9    actual and accurate classification of his risk because
10   of myths, stereotypes, and unscientific beliefs about
11   the transmission of HIV."
12       What are the unscientific beliefs about
13   transmission of HIV that you allege in paragraph 28?
14           MR. KLEIN: Objection. Calls for an expert
15   opinion.
16   **A. Truvada is close to 100 percent effective.**
17   Q. Yes. But you wrote here, "unscientific beliefs
18   about the transmission of HIV." What is it about the
19   transmission of HIV that you allege Mutual of Omaha held
20   unscientific beliefs about?
21           MR. KLEIN: Objection. Asked and answered.
22   And calls for an expert opinion.
23   **A. Their denial of my application.**
24   Q. I understand. Can you tell me anything more

Page 24

1    about the unscientific beliefs about the transmission of
2    HIV as alleged in paragraph 28?
3            MR. KLEIN: Objection. Asked and answered.
4    And calls for an expert opinion.
5    **A. I cannot.**
6    Q. Paragraph 29 you allege that, "by denying Doe
7    long-term care insurance because he is on PrEP, Mutual
8    of Omaha engaged in unfair and discriminatory
9    classification of risk by failing to treat Doe the same
10   as other persons of the same risk." And I'll stop
11   there.
12       What are you referring to when you say "the same
13   risk"?
14           MR. KLEIN: Objection. Calls for a legal
15   conclusion and an expert opinion.
16   **A. I left that to my attorney.**
17   Q. As you sit here today and looking at paragraph
18   29, do you have any knowledge of what the phrase "the
19   same risk" refers to?
20           MR. KLEIN: Objection. Calls for an expert
21   opinion and a legal conclusion.
22   **A. I do not.**
23   ==Q. All right. Moving down to paragraph 31 which==
24   ==states, "Defendant Mutual of Omaha is a place of public==

**Page 25**

1  accommodation within the meaning of Mass. General Laws
2  Chapter 272, Section 92A." And I'll stop there.
3       What is your basis for saying that Mutual of
4  Omaha is a place of public accommodation?
5       MR. KLEIN: Objection. This is -- this
6  calls for a legal conclusion. This is a statement of
7  law, not of fact.
8   A.  This was left up to my attorney.
9   Q.  As you sit here today can you tell me any facts
10 upon which you rely upon in making this allegation?
11      MR. KLEIN: Objection. The same objection.
12 It calls for a legal conclusion. This is a statement of
13 law, not a fact.
14  A.  Again, that Truvada is 100 percent or close to
15 100 percent effective and that the use of Truvada is
16 80 percent generally used by gay men.
17  Q.  Anything else? Any other facts upon which you
18 rely in making the allegation that Mutual of Omaha is a
19 place of public accommodation within the meaning of
20 Mass. General laws?
21      MR. KLEIN: Objection. The same objection.
22 Calls for a legal conclusion.
23  A.  Not that I personally have.
24  Q.  Turning to paragraph 32. You allege, "Plaintiff

**Page 26**

1  Doe is within the protected class of the prohibition on
2  disability discrimination in Mass. General Laws Chapter
3  272, Section 98, because Defendant Mutual of Omaha
4  regarded him as disabled within the meaning of Mass.
5  General Laws Chapter 151B, Section 1, Subsection 17."
6       Do you see that?
7   A.  Yes, sir.
8   Q.  Okay. What are the facts upon which you rely in
9  alleging that Mutual of Omaha regarded you as disabled?
10      MR. KLEIN: Objection. Calls for a legal
11 conclusion. And I want to just caution you if you do
12 not know what these terms mean you should, you know, you
13 need to tell Mr. Magratten that you do not understand.
14  A.  Yes, I do not understand. I'm not familiar with
15 those terms.
16  Q.  So as --
17  A.  I left that up to my attorney.
18  Q.  What is your -- as you read paragraph 32 what is
19 your understanding of the term "disabled"?
20      MR. KLEIN: Objection. Calls for a legal
21 conclusion. That is a term of law.
22  A.  I do not know.
23      MR. KLEIN: It's not a fact.
24  Q.  Turning to paragraph 35, you state, "Plaintiff

**Page 27**

1  Doe was otherwise qualified for the long-term care
2  insurance he applied for, but Defendant Mutual of Omaha
3  discriminated against Plaintiff Doe in access to a place
4  of public accommodation based on sexual orientation in
5  violation of Mass. General Laws Chapter 272, Section
6  98." And I'll stop there.
7       MR. KLEIN: Objection. Calls for a legal
8  conclusion.
9       MR. MAGRATTEN: Let me get the full question
10 out.
11      MR. KLEIN: I apologize.
12  Q.  I'm going to start again. Referring to paragraph
13 35 of the Amended Complaint, which states, "Plaintiff
14 Doe was otherwise qualified for the long-term care
15 insurance he applied for, but Defendant Mutual of Omaha
16 discriminated against Plaintiff Doe in access to a place
17 of public accommodation based on sexual orientation in
18 violation of Mass. General Laws Chapter 272, Section
19 98."
20      And I will stop at that point and ask you what
21 are the facts upon which you rely in making this
22 allegation?
23      MR. KLEIN: Objection. Calls for a legal
24 conclusion and expert testimony.

**Page 28**

1   A.  I am not familiar with the words. I'm not
2  familiar with section -- Chapter 272, Section 98. And,
3  therefore, that was left up to my attorney.
4   Q.  Are you familiar with the phrase, "place of
5  public accommodation"?
6   A.  No, sir.
7       MR. KLEIN: Objection. I'm sorry.
8   Q.  All right. I think that's all I have.
9       MR. KLEIN: I have no questions.
10      (Whereupon, the deposition concluded at
11 approximately 11:24 a.m.)