# Exhibit H

```
                                        1
 1              UNITED STATES DISTRICT COURT
                       for the
 2              DISTRICT OF MASSACHUSETTS
                CIVIL ACTION NO.  1:16-cv-11381
 3

 4

 5   X------------------------- X

 6   JOHN DOE,                            TELEPHONIC
             Plaintiff,                   CONFERENCE
 7                                        CIVIL
             v.                           ACTION
 8                                        DEPOSITION
     MUTUAL OF OMAHA INSURANCE            OF:
 9   COMPANY,                             TERESA-ANN
             Defendant,                   CURRERI
10
     X------------------------- X
11

12

13   T R A N S C R I P T   of the stenographic notes

14
     of the proceedings in the above-entitled matter as
15

16   taken by and before DEBRA A. BAPTIST, a Certified

17
     Shorthand Reporter and Notary Public of New Jersey,
18

19   at offices of STATE SHORTHAND REPORTING SERVICE,

20
     212 Monmouth Road, Oakhurst, New Jersey, 07755, on
21

22   Wednesday, September 6, 2017 commencing at three

23
     minutes after two in the afternoon.
24

25
```

```
                                        2
 1              A P P E A R A N C E S

 2

 3
         GLBTQ LEGAL ADVOCATES & DEFENDERS, ESQS.
 4       BY:  BENNETT KLEIN, ESQ.
              30 Winter Street, Suite 800
 5            Boston, Massachusetts 02108
         Attorneys for the Plaintiff.
 6

 7       PIERCE ATWOOD, LLP
         BY:  BROOKS MAGRATTEN, ESQ.
 8            72 Pine Street
              Providence, Rhode Island 02903
 9       Attorneys for the Defendant,
         Mutual of Omaha Insurance Company.
10

11       CHIEF LEGAL OFFICE ASH BROKERAGE CORPORATION
         BY:  JEFFREY V. GERY, ESQ.
12            888 South Harrison Street, Suite 900
              Fort Wayne, Indiana 46802
13       Attorneys for Ash Brokerage Corporation.
```

```
                                        3
 1                    I N D E X

 2              EXAMINATIONS

 3   Witness       Direct   Cross   Redirect   Recross

 4   TERESA-ANN CURRERI
     By Mr. Magratten    4
 5   By Mr. Klein               39

 6

 7              EXHIBITS

 8   No.   Description                          Page

 9
     1     Pierce Atwood Binder labeled John     58
10         Doe versus Mutual of Omaha Ash
           Brokerage documents..................
```

```
                                        4
 1   TERESA-ANN CURRERI, 331 Newman Springs Road,
 2   Suite 135, Red Bank, New Jersey 07701 having been
 3   sworn by the court reporter, testified as follows:
 4
 5   DIRECT EXAMINATION BY MR. MAGRATTEN:
 6       Q    Good afternoon, Miss Curreri. This
 7   is Brooks Magratten. And thank you very much for
 8   come in today and participating in this deposition.
 9   Have you been in a deposition before?
10   A    I have not.
11       Q    Okay. It's a simple procedure. I'm
12   going to be asking you some questions and Mr. Klein
13   may have some questions for you. If at any time you
14   don't clearly hear or understand a question that I
15   have asked please stop me and ask me to repeat or
16   rephrase the question. It's important going
17   forward that you and I both understand that you
18   will only be responding to those questions that you
19   have clearly heard and understood. Is that
20   agreeable?
21   A    It is.
22       Q    And are you able to hear me okay over
23   the telephone?
24   A    I can. I am just going to increase the
25   volume a little bit and it should be better.
```

**Page 5**

1  Q    If at any time the volume drops let
2  me know, I'll try to speak up louder.
3  A    Thank you.
4  Q    And I sent to you, Miss Curreri, a
5  binder with some Bates stamped numbered documents
6  that were produced to us by Ash Brokerage. Do you
7  have that with you today?
8  A    I do have the binder. I don't have -- I'm
9  not sure what stamps you're referring to.
10 Q    Well, you'll see on the pages in the
11 binder in the lower right corner each one has a
12 number?
13 A    Perfect.
14 Q    And that's the only thing I'm talking
15 about.
16 A    Okay.
17 Q    So as we get into the deposition I
18 may ask you to turn to a certain numbered page in
19 the binder and Mr. Klein and Mr. Gery have the same
20 documents so we'll all be on the same page so to
21 speak.
22      Okay. And Ms. Curreri, you're
23 employed by Ash Brokerage Corporation. Is that
24 correct?
25 A    Yes.

**Page 6**

1  Q    What is Ash Brokerage Corporation?
2  A    It is a marketing company that supports
3  agents with several lines of authorities in
4  representing multiple carriers. Ultimately we help
5  agents find the best solution for their client
6  within the life insurance, disability insurance,
7  long term care and annuity market.
8  Q    And how long have you been with Ash?
9  A    Seventeen years.
10 Q    Congratulations.
11      And where is Ash Brokerage located?
12 A    I am in the Red Bank, New Jersey office.
13 And the home office is in Fort Wayne, Indiana.
14 Q    Okay. Is there an office in
15 Massachusetts?
16 A    No. Not that I'm aware of. I don't believe
17 so.
18 Q    And what is your title presently?
19 A    Senior Long Term Care Consultant.
20 Q    How long have you held that position?
21 A    For more than - for more than five years.
22 Q    Okay. And how long have you been
23 working with long term care insurance?
24 A    A little more than 17. Actually it is more
25 than likely 17 years that I'm working in the long

**Page 7**

1  term market. And it's probably more so like 15
2  that I'm working with Ash Brokerage. Sorry.
3  Q    I see. So in your work with Ash
4  Brokerage you've been working is it primarily with
5  long term care insurance for the last 15 years?
6  A    It is. I work with long term care in the
7  traditional long term care market as well as in the
8  asset based long term care market.
9  Q    Okay. Can you explain to me what you
10 mean by the traditional market and the asset based
11 market?
12 A    Sure. The traditional long term care market
13 is - consists of traditional products that are -
14 that work long term insurance. You're paying
15 annually for a policy. Once you stop paying that
16 premium the policy lapses. If you pass without
17 needing long term care you don't get money back and
18 you don't get a death benefit. So it's a use it or
19 lose it type of insurance. In the asset based
20 market we're looking at solutions that link long
21 term care to either a life insurance chassis or an
22 annuity.
23 Q    Okay. And have you been working in
24 both markets for the last 15 years?
25 A    Yes.

**Page 8**

1  Q    And do you sell long term care
2  insurance for multiple insurers?
3  A    Are you referring to - when you say multiple
4  insurers are you talking about clients that perhaps
5  are working as a group looking for long term care
6  or are you talking about the insurance carrier?
7  Q    Yeah. Let me be more clear. In the
8  traditional long term care market do you sell long
9  term care insurance for more than one insurance
10 company?
11 A    Yes.
12 Q    How many different insurance
13 companies' policies do you sell, and again I'm
14 referring to the long term care traditional LTC
15 market?
16 A    Five. So it was five, two of those carriers
17 are no longer marketing or selling long term care.
18 So within my career it was five and now we're down
19 to three.
20 Q    Okay. Can you identify the five
21 insurers for me?
22 A    Yes. Genworth, John Hancock, Mutual of
23 Omaha, Prudential and Met Life.
24 Q    And in 2015 were you selling long
25 term care policies for those five carriers?

9

1  A   No.
2     Q   Okay. I think you testified a moment
3  ago that you were only selling long term care
4  insurance products in the traditional LTC market
5  for three insurers, is that correct?
6  A   Yes. I do need to add an insurance company
7  to that list. I'm sorry. It's Transamerica.
8     Q   Oh, okay. Do I add that to the list
9  of five you gave me before?
10 A   Yes. So it was six carriers that I've worked
11 for over ten years with.
12    Q   All right. Let's go to 2015. What
13 insurance companies were you selling long term care
14 insurance products for in 2015?
15 A   Transamerica, Genworth, John Hancock and
16 Mutual of Omaha.
17    Q   Okay. And what happened to Prudential
18 and Met Life?
19 A   Both of those carriers had previously
20 stopped selling long term care.
21    Q   Okay. All right. Now just bear with
22 me for one moment. All right. In this case as you
23 may know the issue involves an application for long
24 term care insurance submitted by the Plaintiff,
25 John Doe, which apparently was submitted through a

10

1  financial advisor named J.D. Loden. Do you know
2  who J.D. Loden is?
3  A   Yes, I do.
4     Q   And who is Mr. Loden?
5  A   He's an insurance agent that is appointed
6  with Ash Brokerage.
7     Q   Did you work with Mr. Loden in
8  connection with the application for LTC insurance
9  submitted by the Plaintiff?
10 A   Yes.
11    Q   And was this your first time working
12 with Mr. Loden?
13 A   No, it was not.
14    Q   Okay. Can you tell me briefly how
15 your relationship with Mr. Loden started?
16 A   Mr. Loden came to Ash Brokerage for support
17 in learning about what was available in the long
18 term care market.
19    Q   And when did that happen?
20 A   I do not know when he started working with
21 Ash Brokerage.
22    Q   Okay. And that was sometime before
23 the Plaintiff submitted his application for LTC
24 coverage?
25 A   Yes.

11

1     Q   And did you work with Mr. Loden on
2  any specific projects prior to the Plaintiff
3  applying for LTC coverage?
4  A   I supported him with developing long term
5  care solutions and proposals for clients. I do not
6  recall how many cases, if any, were submitted prior
7  to this specific case.
8     Q   All right. Okay. And a moment ago
9  you said that Mr. Loden was an insurance agent
10 appointed with Ash Brokerage. Can you explain what
11 you mean by that?
12 A   Sure. He submits business to insure carriers
13 through Ash Brokerage. And we support him by
14 following the case through underwriting and giving
15 him policy status on what's happening in
16 underwriting and is essentially the client advocate
17 with the underwriter.
18    Q   Do you advise Mr. Loden what type of
19 insurance to purchase or from what companies to
20 purchase insurance?
21 A   Yes.
22    Q   Okay. Let's talk specifically about
23 the application submitted by ▒▒▒▒▒ and ▒▒▒
24 ▒▒▒▒▒▒▒. Tell me about your involvement with that
25 application?

12

1  A   I initially became involved when Mr. Loden
2  had sent a communication to Amy Ash requesting a
3  long term care solutions for those clients. I then
4  looked at what was available in the market and sent
5  him a long term care solution with Mutual of Omaha
6  because their price was competitive and their
7  product afforded his clients flexibility at time of
8  claim.
9     Q   Okay. Who is Amy Ash?
10 A   She is a case manager on the life side that
11 J.D. had worked with in the past for life
12 insurance.
13    Q   I see. So was Miss Ash J.D.'s first
14 point of contact with Ash Brokerage?
15 A   Not typically. She might have been the last
16 point of contact with him, though.
17    Q   Oh, okay. I'm sorry. I thought you
18 said a moment ago that your involvement with ▒▒▒
19 ▒▒▒▒▒▒ application began with Amy Ash making a
20 request for long term care solutions?
21 A   Yes. So J.D. sent a communication to Amy Ash
22 requesting long term care support for this specific
23 case. And Amy forwarded it to me. When I said --
24    Q   Okay.
25 A   Sorry.

13

1  Q  Go ahead, please.
2  A  When I said she might have been his last
3  contact, she might have been the last person that
4  he dealt with on the life insurance side, not long
5  term care but the life insurance side.
6  Q  Okay. So when a request comes to you
7  for a long term care solution what does that mean?
8  A  Ultimately an agent wants to have a long
9  term care discussion with the client and it's my
10 job to gather information and facts and suggest a
11 long term care carrier that would, of course, have
12 a competitive price point and provide the client a
13 better chance of gaining coverage.
14 Q  All right. And did you recommend an
15 insurer to Mr. Loden for ▇▇▇ and ▇▇▇?
16 A  I did. Mutual of Omaha.
17 Q  Okay. Did you recommend any other
18 insurers?
19 A  I did not.
20 Q  And why did you recommend Mutual of
21 Omaha specifically?
22 A  Mutual of Omaha had - might not have been
23 the cheapest policy but it had competitive premiums
24 and there were features in the policy that would
25 afford the gentlemen richer long term care benefits

14

1  at probable time of claim.
2  Q  Can you be more specific?
3  A  Sure. So this specific carrier has a few
4  features that other carriers typically did not.
5  The first is that it has a calendar day elimination
6  period. The second is that it has a cash
7  alternative option. The other was a benefit that
8  would be paid if the client had passed within a
9  certain time frame of the policy being issued.
10 Q  Okay. Was there a discount available
11 for same sex couples?
12 A  Yes, there is.
13    MR. KLEIN: Objection.
14 Q  And how did the discount work?
15 A  The carrier would afford a couples discount
16 for people that are in a committed relationship
17 living together for the last three years.
18 Q  And was that irrespective of whether
19 it was homosexual or heterosexual couple?
20 A  Correct.
21 Q  Okay. And was that policy in line
22 with other insurers?
23 A  It is.
24 Q  Okay. I guess my question is do other
25 - did the other insurers also -- Let me strike that

15

1  and start again.
2     Did other insurers also offer a
3  discount for same sex couples other than Mutual of
4  Omaha?
5  A  Yes.
6  Q  Okay. So can you please walk me
7  through the process? I think you testified you got
8  a communication from Amy Ash --
9  A  I did.
10 Q  -- is that correct?
11 A  Yes.
12 Q  And she was asking you for a long
13 term care solution for ▇▇▇ and ▇▇▇?
14 A  She forwarded an E-mail from J.D. Loden in
15 which he requested a long term care solution for
16 the gentlemen.
17 Q  All right. And what did you do next?
18 A  I looked at the products that we had in the
19 market. I compared prices and found the Mutual of
20 Omaha provided a better price point and like I said
21 flexibility for the gentlemen.
22 Q  Okay. And what did you do next?
23 A  I prepared a personalized proposal and sent
24 that E-Mail to J.D. Loden for him to present to the
25 clients.

16

1  Q  And where were you when you did all
2  this?
3  A  At my place of employment.
4  Q  In Red Bank, New Jersey?
5  A  Yes.
6  Q  Okay. And what happened after you
7  sent these quotes to Mr. Loden?
8  A  I believe that Mr. Loden and I had a handful
9  of conversations where he asked questions about the
10 solution that I was suggesting and why I was making
11 that suggestion.
12 Q  Okay.
13 A  He --
14 Q  And was Mr. Loden in his office at
15 the time?
16 A  I do not know where he was located whenever
17 those conversations were had.
18 Q  Okay. That's fine.
19    And what happened next?
20 A  J.D. had forwarded an E-mail with - an
21 E-mail from ▇▇▇ where he outlined what
22 medical concerns he had that he thought would be a
23 concern to the insurance company to make sure it
24 wouldn't be a problem. And that medical concern
25 was Lyme's - history of Lyme's Disease that was

**17**

1  cured.
2  Q   All right. And what happened next?
3  A   Forgive me, I'm trying to recall the - how
4  we proceeded from that point. We changed the
5  illustration a couple of times where they wanted to
6  get within a specific price point. Whether it was
7  hire or lower, I don't recall. So we revised
8  proposals. There was another presentation from
9  J.D. to the clients and I believe at one point I
10 recall having a conversation with the clients to
11 answer some questions that they had on the product
12 and what was available in the market.
13 Q   All right. That was my next
14 question. Did you ever have any discussion
15 directly with ■■■■?
16 A   I did.
17 Q   And when did that occur?
18 A   That was in September. I believe it was
19 September of 2014.
20 Q   Okay. And were you in your New Jersey
21 office at the time?
22 A   Yes.
23 Q   Okay. And what was that discussion
24 about?
25 A   The gentleman asked some questions about the

**18**

1  product itself. I do not recall exactly what those
2  general product questions were. And then we did -
3  I did answer some questions regarding underwriting
4  and what the insurance company would look at.
5  Q   Okay. And what specifically did ■■■
6  ■■■ ask?
7  A   We were talking - I believe I recall we were
8  talking about the Lyme's medication, so the Lyme's
9  Disease and the Lyme's medication. I had said - I
10 recall suggesting that they provide a list of
11 medications that they had taken or were concerned
12 about so I can give them a better idea of their
13 insurability. And when prompted, the only
14 information they gave back was information
15 regarding the Lyme's Disease.
16 Q   All right. Did you have any
17 discussion with ■■■ about Truvada?
18 A   None.
19 Q   Okay. Did you have any other
20 conversations with ■■■ except for that one
21 telephone conference in September 2014?
22 A   No. I do not - I don't recall having any
23 other communications directly with the clients.
24 Q   Okay. Am I safe in assuming that all
25 your other conversations were with Mr. Loden?

**19**

1  A   Yes.
2  Q   May I ask you, Miss Curreri, to
3  please turn in your binder a document number 0245?
4  A   (Complies). Okay. I'm there.
5  Q   Okay. Can you tell me what this
6  document is?
7  A   It looks like an E-mail that was sent to the
8  agent on Wednesday July 23rd in which I did in fact
9  send him an illustration for Transamerica's long
10 term care product as well.
11 Q   As well as the Mutual of Omaha
12 projection?
13 A   Yes.
14 Q   Okay. Your first letter there - the
15 first line you say Mutual of Omaha has had a
16 product change affective Friday the 18th. What
17 does that refer to?
18 A   Mutual of Omaha had had a -- Occasional the
19 insurance carriers update products. The product
20 change may have a rate change, it may be a change
21 in underwriting or a change in what they're
22 offering as far as inflation options or other
23 riders that are available.
24 Q   Okay. Can you please look at the
25 documents that have been marked 0213, to 0236?

**20**

1  A   (Complies). Okay. I'm there.
2  Q   What are these documents?
3  A   That is the personalized long term care
4  proposal that I prepared for them.
5  Q   All right. Are those all the
6  proposals that you prepared for them?
7  A   It is the -- In these pages, this is - it
8  would not be 1, 2 -- Let me look at the dates as
9  well. It does not have - the Transamerica
10 proposals were not prepared here. So forgive me, I
11 want to look back at that E-Mail and look at the
12 date on this.
13 Q   That's all right. What I'm concerned
14 about is this cluster of documents from 0213 to
15 0236, are those the Mutual of Omaha projections
16 that you forwarded to Mr. Loden?
17 A   Yes.
18 Q   Okay. And can you turn please to the
19 document number 240?
20 A   (Complies). Okay. I'm there.
21 Q   Okay. And what is this document?
22 A   This was my reply to J.D.'s request of Amy
23 Ash for the long term care solution for ■■■ and
24 ■■■.
25 Q   Okay. At the bottom of that second

**25**

1  A   Yes.
2  Q   And who was that?
3  A   Megan Diehm, D-i-e-h-m.
4  Q   Okay. What does the case manager do?
5  A   The case manager works only on applications
6  that were formally submitted to the insurance
7  company. They monitor the application through the
8  underwriting process and work as a liaison between
9  the agent and the insurance company. She gives the
10 agent updates on where the application is in the
11 underwriting process.
12 Q   All right. So once Ms. Diehm had ▇
13 ▇ application she submitted that to Mutual of
14 Omaha; is that correct?
15 A   Yes.
16 Q   All right. And I'm going to ask you
17 to turn please to the documents in your binder
18 beginning at 0371?
19 A   (Complies). Okay. I'm there.
20 Q   And I realize there has been some
21 information redacted by Ash from this document but
22 can you tell me generally what this document is?
23 A   This is a formal Mutual of Omaha Long Term
24 Care Application.
25 Q   All right. And this was signed by

**26**

1  ▇ on November 1st, 2014; is that correct?
2  A   Yes.
3  Q   All right. And what happened after
4  this applications went to Mutual of Omaha?
5  A   The insurance carrier then ordered any
6  requirements that they would need to underwrite the
7  policy. They would order any medical records or
8  telephone interviews that they would use to
9  consider the client for long term care coverage.
10 Q   All right. Can you turn please to
11 the document number 001?
12 A   Yes. I'm here.
13 Q   All right. And I direct your
14 attention to the top half of that document. What
15 is that?
16 A   Are you talking -- Are you referring to the
17 time and date stamp of the E-mail?
18 Q   Well, I'm really referring to that
19 first E-mail from Megan Diehm to Darlene Mazza.
20 Have you seen that before?
21 A   Yes.
22 Q   Okay. The E-mail begins This
23 application is stale dated. What does that mean to
24 you?
25 A   Ultimately the application was signed and

**27**

1  submitted over 30 days later.
2  Q   Okay.
3  A   So the insurance carrier would see that as
4  not a valid application.
5  Q   Okay. Did Mutual of Omaha ask for a
6  new application?
7  A   Yes.
8      MR. KLEIN: Objection. Objection.
9  Q   You can answer the question if you
10 can?
11 A   Yes.
12 Q   Okay. So what happened next?
13 A   The agent worked on getting a new
14 application with new signatures and dates.
15     MR. KLEIN: Objection.
16 Q   Okay. I'm going to direct your
17 attention to the documents numbered 019 through
18 044. Can you tell me what those are?
19 A   This is a formal application to Mutual of
20 Omaha for long term care dated December 2014.
21 Q   Okay. Is this document, 019 through
22 044, the second submitted application to Mutual of
23 Omaha?
24 A   Yes.
25 Q   Thank you. So what happened to this

**28**

1  application?
2  A   This application was then formally reviewed
3  and requirements were ordered. Those requirements
4  being any medical records or telephone interviews
5  that the insurance company would review to
6  underwrite the policy or the application I should
7  say.
8  Q   And when you say these things were
9  ordered they were ordered by Mutual of Omaha?
10 A   Yes.
11 Q   Okay. And what happened next?
12 A   The insurance carrier ordered a telephone
13 interview from ▇ and ordered medical
14 records. And the case --
15 Q   Okay.
16 A   And the case for ▇ was denied based
17 off of information that was provided in the
18 telephone interview.
19 Q   And what information was that?
20 A   The use of Truvada was disclosed during that
21 telephone interview.
22 Q   Okay. And that was the reason for
23 Mutual of Omaha to deny the application?
24 A   It is.
25 Q   Okay. What happened after that?

**33**

1  foundation.
2      Q    You can answer the question.
3  A    Truvada is on all of their printed auto
4  decline medication lists.
5      Q    I see. And that would include
6  Transamerica, Genworth, John Hancock?
7  A    Yes.
8      Q    Okay. By the way, who is Danielle
9  Gater?
10 A    She's my partner. She at the time was my
11 partner supporting the southeast region.
12     Q    I see. Is she another LTC
13 specialist?
14 A    At the time she was. She is now on the
15 annuity sales team.
16     Q    Okay. Now as you sit here today are
17 you aware of any insurer who will issue a long term
18 care policy to someone who is taking Truvada?
19 A    No.
20     Q    And as you sit here today are you
21 aware of any insurer who will issue a LTC policy to
22 someone who is HIV positive?
23 A    No.
24     Q    Prior to our deposition today have
25 you had any discussions with Mr. Klein who is on

**34**

1  the line?
2  A    No.
3      Q    Prior to today have you had
4  discussions with anyone else about this particular
5  lawsuit?
6  A    Yes.
7      Q    And with whom?
8  A    It would be with Jeff Gery.
9      Q    Okay. Anyone other than --
10 A    And --
11     Q    I'm sorry. Go ahead?
12 A    As well as my direct Vice-President, Tim
13 Kukieza, the Vice-President of Long Term Care.
14     Q    Okay. Anyone else?
15 A    And Chad Eyrich, who is my direct manager.
16     Q    Okay. Prior to the deposition today
17 have you had conversations with anyone outside of
18 Ash Brokerage about this lawsuit?
19 A    No.
20     Q    Okay. After you were initially
21 contacted to work on the application for LTC
22 coverage submitted by ▓▓▓ was any part of the
23 processing of this application done in
24 Massachusetts?
25 A    No.

**35**

1          MR. KLEIN: Objection. Objection.
2  A    The clients to my recollection signed the
3  application in Massachusetts.
4      Q    Okay. Anything else?
5  A    Nothing else that I'm aware of.
6      Q    Okay. Now yesterday Ash Brokerage
7  provided us with a four page document, it looks
8  like claim notes. Do you have those?
9  A    Yes.
10     Q    I'm sorry, not claim notes but some
11 sort of computerized notes. Do you have those?
12 A    Yes.
13     Q    Okay. I'm going to direct your
14 attention please to the second note dated
15 August 29, 2014. Okay? Do you see that?
16 A    Yes.
17     Q    And who is Brittany Jordan?
18 A    Brittany Jordan is a colleague of mine
19 working on the long term care sales team.
20     Q    Okay. Is she - does she work with you
21 in New Jersey?
22 A    She is in the New Jersey office. Yes.
23     Q    Okay. The top line, left message for
24 John to discuss the appease as both ▓▓▓ and ▓▓▓
25 do not live together, as well as need some

**36**

1  additional information on ▓▓▓ health. Please
2  note as shown on the app - they do not live
3  together. Do you see that?
4  A    I do.
5      Q    Okay. What does this refer to?
6  A    ==When we initially talked about this case==
7  ==J.D. Loden wanted to find a carrier that would==
8  ==consider an application for same sex partners or==
9  ==asked ultimately if long term care carriers did==
10 ==that. And I had said yes and advised him as long==
11 ==as they are living together for three consecutive==
12 ==years the insurance company will consider domestic==
13 ==partners or people that are not married living==
14 ==together for three years in a loving relationship==
15 ==at that point the insurance company would provide==
16 ==that couples or partner discount. After the==
17 ==telephone interview was completed by Norvetta==
18 ==Cannon and I was out of the office on vacation==
19 ==Brittany Jordan connected directly to J.D. to let==
20 ==him know that the gentlemen gave two different==
21 ==addresses. So that was a point of concern.==
22     Q    I'm sorry, what do you mean you say
23 they gave different addresses, is that on the first
24 application?
25 A    I didn't review that. I can get there and