**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____
JOHN DOE,                                )
      Plaintiff                     )
                                         )
v.                                       )
                                         )    No. 1:16-cv-11381-GAO
MUTUAL OF OMAHA                          )
INSURANCE COMPANY,                       )
      Defendant                     )
_____)


**PLAINTIFF JOHN DOE'S OPPOSITION TO MUTUAL OF OMAHA INSURANCE
COMPANY'S MOTION IN LIMINE TO STRIKE DR. KENNETH MAYER'S REPORT
AND OPINIONS IN PART**

**INTRODUCTION**

      This case is a state law antidiscrimination claim challenging Defendant Mutual of Omaha

Insurance Company's ("Mutual") blanket policy of excluding all individuals who take Truvada

as pre-exposure prophylaxis for HIV (PrEP) from long-term care insurance. By letters dated

February 9, 2015 (initial denial) and April 22, 2015 (denial of appeal), Plaintiff John Doe's

("Doe") application for long-term care insurance was denied solely because he takes PrEP. _See_

Letter from Counsel Submitting Documents Referenced at Hearing on Discovery Motions,

Docket No. 60, at 2-4.  Doe asserts claims for discrimination on the basis of sexual orientation

and his perceived disability. There is no jury claim in this case, as Doe seeks equitable relief

only. He seeks two forms of relief: (1) an order that Mutual issue the policy that he applied for in

2015 with the same rates and conditions in effect at that time (Complaint, Dkt. No. 1-1, Request

for Relief No. 2); (2) a "permanent injunction enjoining Mutual of Omaha from categorically

excluding from its long-term care insurance individuals, including Doe, who take the medication

Truvada as prevention for HIV[.]" Complaint, Dkt. No. 1-1, Request for Relief No. 1. *See also* Amended Complaint, Dkt. No. 97 (same).

Mutual's motion in limine asks the Court to strike a significant portion of the opinions of Doe's expert, Kenneth Mayer, M.D., asserting that Dr. Mayer "relies on information that came into existence after February 9, 2015." Mutual Memorandum, Dkt. No. 109 at 1.[1] This Court should deny Mutual's motion to exclude Dr. Mayer's opinions because:

 (1) Post-April 2015 data is, at a minimum, squarely relevant to Doe's request for prospective injunctive relief. It is also relevant to the assessment of Mutual's defense that it denied Doe's application because there was insufficient information about Truvada in 2015, and Doe's rejoinder that this defense is a pretext for discrimination. Mutual has not changed its categorical exclusion of PrEP users, even with the benefit of post-2015 data. A fact finder could reasonably infer that Mutual's failure to change its policy in the face of current evidence shows that it's rationale that there was insufficient evidence about PrEP in 2015 is pretextual. *See* Argument § A, *infra*.

(2)  Mutual makes broad, conclusory statements about Dr. Mayer's opinions without a careful, precise examination of their bases.  It states that several paragraphs were almost entirely based on post-2015 studies, when that is demonstrably false. It also ignores that Dr. Mayer's opinions are based not simply on studies, but also on his training, clinical experience treating

---

[1] Mutual asserts that the Court excluded all post-February 9, 2015 information in its Order on discovery motions. *See* Dkt. No. 61. That Order made no such ruling. It determined only that Doe's personal medical information after the date that Mutual evaluated and denied his application was not relevant. *Id*. at 7. The relevance of evidence depends upon the reason for which it is being offered, and thus the Court's Order cannot be read as an absolute exclusion of all evidence as of a certain date. In any event, to the extent that Mutual claims any limitation of evidence based on the time of the denial of Doe's application, the applicable date is the April 22, 2015 denial of Doe's appeal.

patients, communications and interactions with other clinicians, and knowledge accumulated

from the community of PrEP researchers and infectious diseases clinicians, including

information obtained at specialized medical conferences. "Experts may testify on the basis of

experience." *Brown v. Wal-Mart Stores, Inc.*, 402 F. Supp. 2d 303, 308 (D. Me. 2005). *See also*

*Wyman v. Yates-Am. Mach. Co.*, 2016 U.S. Dist. LEXIS 150402, at *29 (D. Me. 2016)

("knowledge and experience" from 22 years working in the field qualified expert to give

opinion); Fed. R. Evid. 702 (witness may be "qualified as an expert by knowledge, skill,

experience, training, or education"). In addition, Mutual's motion also fails to acknowledge that

the admissibility of evidence can depend on the purpose for which it is being introduced, and

instead sweeps anything dated post-2015 into the same general, undifferentiated category. Thus,

even assuming a limitation of evidence to research available as of April 22, 2015, there is more

than adequate basis for Dr. Mayer's opinions. *See* Argument § B, *infra*.

## ARGUMENT

I.    **THIS COURT SHOULD DENY MUTUAL'S MOTION IN LIMINE BECAUSE THERE IS A SUFFICIENT BASIS FOR ALL OF DR. MAYER'S OPINIONS AND DETERMINATIONS OF ADMISSIBILITY OF EVIDENCE ARE BETTER MADE IN THE CONTEXT OF SUMMARY JUDGMENT OR TRIAL.**

A court "has the power to exclude evidence in limine only when evidence is clearly

inadmissible on all possible grounds." *Hawthorne Partners v. AT&T Techs., Inc.*, 831 F. Supp.

1398, 1400 (N.D. Ill. 1993). *See also Farouk Sys., Inc. v. Chi Nail Franchises, LLC,* 2015 U.S.

Dist. LEXIS 192204, at *2 (C.D. Cal. 2015) ("To exclude evidence on a motion in limine, the

evidence must be 'clearly inadmissible on all potential grounds'" (quoting *Indiana Ins. Co. v.*

*General Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004))). "Unless evidence meets this

high standard, evidentiary rulings should be deferred until trial so that questions of foundation,

relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners*, 831 F. Supp. At 1400. *See also Farouk*, 2015 U.S. Dist. LEXIS 192204, at *2 ("a court is almost always better situated during the actual trial to assess the value and utility of evidence"). This is particularly true in a bench trial because "all doubts at a bench trial should be resolved in favor of admissibility." *Commerce Funding Corp. v. Comprehensive Habitation Servs.*, 2004 U.S. Dist. LEXIS 17791, at *15 (S.D.N.Y. 2004) (quoting *Dreyful Ashby, Inc. v. S/S "Rouen"*, 1989 U.S. Dist. LEXIS 14799, at *6 (S.D.N.Y. 1989)).

### A. Post-2015 Data is Relevant to Doe's Claim for Prospective Injunctive Relief and as Evidence of Pretext.

There is no basis for this Court to exclude a priori scientific studies or data published or presented to the medical community after April 22, 2015. Such evidence is, at a minimum, relevant to two important aspects of this case. First, data after the date of Mutual's final denial of Doe's application is obviously relevant to his claim for prospective injunctive relief. Doe has standing to seek a prospective injunction because if the Court were to rule that there was insufficient data about PrEP to invalidate Mutual's categorical exclusion as of 2015, then Doe would have the right to reapply for long-term care insurance. In that case, he would still be harmed by Mutual's continuing discriminatory refusal to offer an insurance policy solely because an individual takes PrEP. *See e.g., Donahue v. City of Boston*, 304 F.3d 110, 119 (1st Cir. 2002) (noting in the equal protection context that "a plaintiff may establish standing for prospective relief if he has or is likely to be 'exposed to unequal treatment'") (quoting *Wooden v. Bd. of Regents of the Univ. Sys. Of Ga.*, 247 F.3d 1262, 1279 (11th Cir. 2001)); *Furtick v. Medford Housing Authority*, 963 F.Supp. 64, 68 (D. Mass. 1997) ("A plaintiff satisfies the constitutional requirements for standing when she alleges a 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'") (quoting *Allen v.*

4

*Wright,* 468 U.S. 737, 751 (1984)). Data about PrEP up until the time of trial and a ruling from this Court is relevant to Doe's claim for prospective injunctive relief.

Second, it is anticipated that Mutual will argue that its categorical exclusion of PrEP users was reasonable and legitimate in 2015 because there was insufficient information about PrEP known at that time.[2] Mutual, however, continues to maintain its exclusionary policy, even in light of the additional information about PrEP to date, information which bolsters the conclusion that Truvada is safe and highly effective. A fact finder is entitled to consider the current data on PrEP and infer that Mutual's continued refusal to change its policy in light of that data shows that its "too new" rationale offered for Doe's denial in 2015 is pretextual or otherwise illegitimate.

Post-2015 data is at the very least relevant for these two reasons. At this early juncture, Mutual cannot meet the "high standard" required for the exclusion of evidence, prior to the Court's examination of the facts and arguments at summary judgment or trial, i.e., the standard that post-2015 data be shown to be "inadmissible on all possible grounds." *Hawthorne*, 831 F. Supp. at 1400. The motion in limine should be denied.

**B.    Dr. Mayer's Report Establishes That There is an Adequate Basis for All His Opinions.**

Even assuming a limitation to studies published or presented prior to April 22, 2015, an examination of Dr. Mayer's report reveals that he has provided an adequate basis for all of his

---

[2] In his summary judgment motion, Doe will present facts showing that there was sufficient evidence about the safety and efficacy of PrEP in 2015; that Mutual's policy of excluding from long-term care insurance only those people at risk for HIV who take a prophylactic does not advance its proffered rationale of reducing the number of people with HIV in its insured pool; and that Mutual's proffered rationale that there was insufficient data about PrEP in 2015 is undercut by its inclusion of insureds who take many newly approved FDA medications for which Mutual acknowledges there is not long-term data.

opinions. Mutual's contention to the contrary reveals several flaws. In some instances, Mutual simply ignores the extent of pre-April 22, 2015 data cited. Further, Dr. Mayer's inclusion of *both* pre- and post-April 22, 2015 studies and presentations in his report cannot lead to a conclusion that there is no basis for an opinion about the efficacy of PrEP as of April 22, 2015. Mutual also ignores that Dr. Mayer's opinions are based on his training, and experience, and knowledge as well as his attendance at presentations at peer reviewed international medical meetings. *See* Mayer Deposition at 35, Mutual Memorandum Ex. B, Dkt. No. 109-2 at 7; Mayer Report, Mutual Memorandum Ex. A, Dkt. No. 109-1 at ¶¶ 6, 31, 37.

Turning to Mutual's assertions about Dr. Mayer's expert report,[3] Mutual starts by claiming in its memorandum that "[o]f those studies he cited [in paragraphs 24, 25, 26, and 28] most were dated after February 2015." Mutual Memorandum, Dkt. No. 109 at 2. This claim is baseless. All of the three studies cited in paragraph 24 were prior to the date of Mutual's denial of Doe's application. The abstract of the third study (available on the web), the PROUD study, indicates that data from the study was first presented at an international AIDS conference in February 2015, and later published in the journal Lancet.[4] Paragraph 25 cites one study dated 2012, a post hoc analysis, showing no HIV infections among those who took PrEP four to seven

---

[3] At the outset, Doe notes that paragraphs 11, 12, 14, 15 and 16 of the Mayer Report are simply background about HIV disease. There does not appear to be any reason to limit background to knowledge of HIV as of 2015, particularly in light of Doe's request for prospective injunctive relief. In any event, several of the sources cited from the CDC's website would be largely unchanged as of 2015 (for example, paragraph 11 discussing rates of HIV transmission which indicates merely that it was "updated" on December 4, 2015).

[4] To the extent that Mutual asserts that evidence should be limited to that available at the time of Doe's denial, that includes data presented at medical conferences. Mutual has no basis to claim that evidence should be limited to data available to it, rather than the medical community, where its own personnel testified that Mutual did not research or review studies and information on PrEP in 2014 and 2015 at the time of Doe's application, or when it received his appeal. *See* Deposition of Lisa Ging, RN pursuant to Fed R. Civ. P. 30(b)(6), Exhibit A attached hereto, at 53-55, 170-171, 201-202.

days a week. Paragraph 26 cites one study, an open label study dated 2014, showing no HIV infections among those who took PrEP daily. Paragraph 27 cites one study, the PROUD study. The abstract cited in that paragraph (available on the web) indicates that the data was presented at an international AIDS conference in February 2015. Paragraph 28 cites one study, the IPERGAY study. Although not cited in Dr. Mayer's report, that data was, in fact, also presented at international AIDS conferences in July 2014 and February 2015. *See* Fonsart J, Loze B, Morel S, et al. *Tenofovir and emtricitabine pharmacokinetics in plasma and saliva following a single dose of TDF 600mg/FTC 400mg: implications for on demand PrEP (ANRS Ipergay)*. 20th International AIDS Conference, Melbourne, Australia, abstract LBPE28, July 20-25, 2014. Molina JM, Capitant C, Spire B, et al. *On Demand PrEP With Oral TDF-FTC in MSM: Results of the ANRS Ipergay Trial*. Conference on Retroviruses and Opportunistic Infections, Seattle, abstract 23LB, February 23-26, 2015. In light of these studies, the Court must reject Mutual's assertion that Dr. Mayer has no basis for his opinions in paragraphs 19 and 30 of his report on the efficacy of PrEP as of 2015.[5]

Mutual also challenges Dr. Mayer's opinion about adherence to the PrEP medication regimen in a real-world setting (i.e., whether patients take PrEP as directed). *See* Mutual Memorandum, Dkt. No. 109, at 2-3. Mutual misunderstands Dr. Mayer's opinion when it says that all of the open label and post hoc studies were after 2015, or that the open label studies are the only studies relevant to adherence. Paragraphs 25-28 describe data prior to April 2015 demonstrating no HIV infections among those who took PrEP as directed. Further, the opinion

---

[5] In response to this motion in limine, Doe will not engage in a discussion of the weight to be given to Dr. Mayer's opinions. However, Mutual's characterization that "*almost all* [the studies Dr. Mayer relies on] were presented after February 2015" (Mutual Memorandum at 3, emphasis added), even if true, is fatal to its motion. Even if Dr. Mayer had relied on only *one* study, that would go to the weight to be given to his opinions and not their admissibility.

that Mutual seeks to strike is not based on studies alone. It is based on Dr. Mayer's "knowledge accumulated from the community of PrEP researchers and infectious disease clinicians, and [his] own clinical experience." *See* Mayer Report at ¶ 31 (opining that "it is uncommon that an individual seeks out PrEP and does not take it" and explaining how he reaches that conclusion).[6]

Mutual next contests Dr. Mayer's opinion that condoms "show a range of protection of seventy to eighty percent." Mayer Report at ¶ 32. Mutual's quibbling here is curious, because its objection is that Dr. Mayer testified that he last reviewed a compendium of studies on the CDC's website within two months of his deposition. Mutual Memorandum at 3. The date Dr. Mayer last looked at a website says nothing, of course, about the dates of the studies reviewed. Dr. Mayer is one of the world's leading authorities on HIV prevention. Mutual can certainly explore his opinion further at trial to make its point, if there is one, but there is nothing justifying an exclusion of Dr. Mayer's opinion in toto at the present time.

Mutual's objection to Dr. Mayer's opinion that "studies of PrEP demonstrate that Truvada is well tolerated by patients" is that his opinion is based on all of the studies he cited. Mutual Memorandum, Dkt. No. 109 at 3-4; Mayer Deposition, Ex. B to Mutual Memorandum, at 33-35. Again, Mutual mischaracterizes those citations as "primarily published after February 9, 2015." Mutual Memorandum, Dkt. No. 109, at 4. But even if that were true, that objection goes to the weight of Dr. Mayer's opinion, not its admissibility. Further, Dr. Mayer testified that conclusions about the safety of PrEP are also based on the approval and recommendations of

---

[6] Mutual makes much of Dr. Mayer's discussion of the Kaiser study as important. Mutual Memorandum, Dkt. No. 109, at 3. The description of a 2016 study as important does not lead to the conclusion that Dr. Mayer did not have a basis for his opinions about patient adherence as of April 22, 2015.

"the food and drug, FDA and Centers for Disease Control and Prevention." Mayer Deposition at 34.

Finally, Mutual takes aim at Dr. Mayer's opinion that individuals who use PrEP are predominantly gay men. Mutual Memorandum, Dkt. No. 109, at 4. Dr. Mayer provided several bases for his opinion that 80% of PrEP users are gay men. *See* Mayer Report at ¶ 37. Based on his knowledge of HIV prevention, his academic experience, his clinical experience and discussion with colleagues, Dr. Mayer opines that "[i]t is well known in the field of HIV medicine and by clinicians and researchers with knowledge of HIV and PrEP that approximately 80 percent of PrEP users to date are gay men." *Id*. Mutual's issue with Dr. Mayer's opinion is all the more surprising because its own medical director and designated expert, Bruce Henricks, M.D., testified at his deposition that he agreed with these opinions. *See* Deposition of Bruce Henricks, M.D., Exhibit B hereto at 178-180.

Mutual's objection to the data cited in paragraphs 36-37 of Dr. Mayer's report overlooks the purpose served by this information. Data about the percentage of PrEP users who are gay men is relevant to Doe's claim that Mutual's policy excluding PrEP users has a disparate impact based on sexual orientation. *See Currier v. Nat'l Bd. Of Med. Exam'rs*, 462 Mass. 1, 20 (2012) (disparate impact claims available under the Massachusetts public accommodation statute); *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) ("a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale") (quoting *Ricci v. Destefano*, 557 U.S. 557, 577 (2009). For purposes of demonstrating a disparate impact of Mutual's policies in 2015, it does not matter that the data referenced in paragraph 37 of the Mayer Report was presented at a conference in 2017. What matters is that it

shows the demographics of PrEP users in 2015. *See* Mayer Report at ¶ 37 (discussing data that 89.82% of PrEP users in 2015 were men, followed by an opinion that "[v]irtually all male users of PrEP are men who have sex with men").[7]

An examination of Dr. Mayer's report indicates that there is more than adequate foundation for the admissibility of all his opinions, including as of the date of Mutual's denial of Doe's appeal.

## CONCLUSION

For the foregoing reasons, this Court should deny Mutual of Omaha Insurance Company's Motion in Limine to Strike Dr. Kenneth Mayer's Report and Opinions in Part.

Dated: May 31, 2018                         Respectfully submitted,
                                            JOHN DOE
                                            By his attorneys,

                                            /s/ Bennett H. Klein
                                            Bennett H. Klein
                                            BBO # 550702
                                            GLBTQ Legal Advocates & Defenders
                                            18 Tremont St., Suite 950
                                            Boston, MA 02108
                                            617-426-1350
                                            bklein@glad.org

                                            /s/ John P. Ward
                                            John P. Ward
                                            BBO # 515860
                                            Law Offices of John P. Ward
                                            584 Castro St., No. 802
                                            San Francisco, CA 94114
                                            johnpward@gmail.com

---

[7] A defendant's actual knowledge of the statistical disparity at the time of the discriminatory act is clearly unnecessary where the issue is not one of discriminatory intent or conscious bias. *See Inclusive Cmtys.*, 135 S. Ct. at 2522 ("disparate-impact liability . . . permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment").

## CERTIFICATE OF SERVICE

I certify that the within document was electronically filed with the clerk of the court on

May 31, 2018, and that it is available for viewing and downloading from the Court's ECF

system. Service by electronic means has been effectuated on all counsel of record.

Brooks R. Magratten, BBO# 650393
Pierce Atwood LLP
One Financial Plaza, 26th Floor
Providence, RI 02903
(401) 588-5113
bmagratten@pierceatwood.com

Mark A. Pogue, BBO# 550807
Pierce Atwood LLP
One Financial Plaza, 26th Floor
Providence, RI 02903
(401) 490-3422
mpogue@pierceatwood.com

Katharine E. Kohm, BBO# 675362
Pierce Atwood LLP
One Financial Plaza, 26th Floor
Providence, RI 02903
(401) 490-3422
kkohm@pierceatwood.com

Nicole Kinsely, BBO # 682528
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1185
nkinsley@foleyhoag.com

/s/ Bennett H. Klein
Bennett H. Klein
BBO # 550702
GLBTQ Legal Advocates & Defenders
18 Tremont St., Suite 950
Boston, MA 02108
617-426-1350
bklein@glad.org

# Exhibit A

```
 1                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2
     JOHN DOE,               ) C.A. NO. 1:16-CV-11381-GAO
 3                           )
             PLAINTIFF,      ) DEPOSITION OF
 4                           ) LISA GING, RN
        VS.                  )
 5                           )
     MUTUAL OF OMAHA         )
 6   INSURANCE COMPANY,      )
                             )
 7           DEFENDANT.      )

 8   - - - - - - - - - - - - -

 9              DEPOSITION OF LISA GING, RN, taken before

10   Morgan M. Catania, RPR, CSR(IA), General Notary

11   Public within and for the State of Nebraska,

12   beginning at 10:11 a.m., on July 19, 2017, at

13   Thomas & Thomas Court Reporters & Certified Legal

14   Video, LLC, 1321 Jones Street, Omaha, Nebraska.

15

16

17

18

19

20

21

22

23

24

25
```

2

1                          A P P E A R A N C E S

2       FOR THE PLAINTIFF:
        MR. BENNETT KLEIN
3       MS. JENNIFER LEVI
        GLBTQ LEGAL ADVOCATES & DEFENDERS (GLAD)
4       30 Winter Street, Suite 800
        Boston, Massachusetts 02108
5       (617) 426-1350 (Phone)
        (617) 426-3594 (Fax)
6       bklein@glad.org
        jlevi@glad.org
7
        FOR THE DEFENDANT:
8       MR. BROOKS R. MAGRATTEN
        PIERCE ATWOOD, LLP
9       72 Pine Street
        Providence, Rhode Island 02903
10      (401) 490-3422 (Phone)
        bmagratten@pierceatwood.com
11
        and
12
        MS. SUSAN L. LEWIS
13      (via telephone)
        ASSOCIATE GENERAL COUNSEL, LAW OPERATION
14      MUTUAL OF OMAHA INSURANCE COMPANY
        3300 Mutual of Omaha Plaza
15      Omaha, Nebraska 68175
        (402) 351-2543 (Phone)
16      (402) 351-5906 (Fax)
        susan.lewis@mutualofomaha.com
17

18

19

20

21

22

23

24

25

                                                                    3

1                          I N D E X

2      CASE CAPTION ........................... Page      1
       APPEARANCES ............................ Page      2
3      INDEX .................................. Page      3
       TESTIMONY .............................. Page      4
4      REPORTER CERTIFICATE ................... Page    226

5      DIRECT EXAMINATION:
            By Mr. Klein ...................... Page      4
6

7                        E X H I B I T S

8      EXHIBIT NO.                                     MARKED

9       1. AMENDED NOTICE OF DEPOSITION                  PM

10      3. AMENDED NOTICE OF DEPOSITION                   6

11      4. MUTUAL LONG-TERM CARE APPLICATION             72

12      5. CDC CLINICAL PRACTICE GUIDELINES FOR          89
           PREP, MAY 2014
13
        6. MUTUAL'S POSITION STATEMENT TO MCAD           91
14
        7. TELEPHONE INTERVIEW OF JOHN DOE              187
15
        8. RELEASE POINT DOCUMENTS                      188
16
        9. FAXES WITH ATTACHED DOCUMENTS               194
17
       10. MUTUAL OF OMAHA NOTES                        199
18
       ***("PM" denotes exhibits previously marked for
19     identification.)

20

21

22

23

24

25

Page 52

1  pre-exposure prophylaxis for HIV?
2          MR. MAGRATTEN:  Objection to form.
3      Could you read that question back, please?
4          (Whereupon, the pending question
5          was read back by the court
           reporter.)
6          MR. MAGRATTEN:  Objection to form.
7      You can respond.
8          THE WITNESS:  Long-term care
9  underwriting would not be responsible for
10 determining the efficacy of Truvada.
11 BY MR. KLEIN:
12     Q.  Who would be?
13         MR. MAGRATTEN:  Objection to form.
14 BY MR. KLEIN:
15     Q.  Which personnel at Mutual of Omaha would
16 be responsible for determining the efficacy of
17 Truvada?
18         MR. MAGRATTEN:  Objection to form.
19         THE WITNESS:  No personnel at Mutual
20 of Omaha would be responsible for determining
21 effectiveness.
22 BY MR. KLEIN:
23     Q.  Why is that?
24         MR. MAGRATTEN:  Objection to form.
25         THE WITNESS:  It would be determined

Page 53

1  by the drug manufacturer and studies that were done.
2  Those would not be done by Mutual of Omaha.
3  BY MR. KLEIN:
4      Q.  In 2014 and 2015 had Mutual of Omaha
5  reviewed the information you described about the
6  efficacy of Truvada?
7          MR. MAGRATTEN:  Objection to form.
8          THE WITNESS:  Are you able to ask the
9  question as long-term care underwriting --
10 BY MR. KLEIN:
11     Q.  Yes.
12     A.  -- rather than Mutual Of Omaha?
13     Q.  Yes.
14     A.  I can't respond to a question for Mutual
15 of Omaha.
16     Q.  All right.  That's fair enough.  And you
17 can assume -- I will do my best to include that in
18 every question.  But you can assume that I'm
19 referring, when I say "Mutual," only to long-term
20 care insurance.
21     So in 2014 and 2015 had Mutual of Omaha
22 long-term care insurance reviewed the studies and
23 information on the efficacy of Truvada?
24     A.  We determined the medication was
25 uninsurable.

Page 54

1      Q.  That's not my question.
2          My question was did Mutual of Omaha
3  long-term care insurance review the studies and
4  information on the efficacy of Truvada?
5      A.  No.
6      Q.  What -- what did Mutual rely upon for its
7  determination that Truvada as PrEP was an
8  uninsurable medication?
9          MR. MAGRATTEN:  Objection to form.
10         THE WITNESS:  The manufacturer's
11 indications for usage of the medication.
12 BY MR. KLEIN:
13     Q.  Who reviewed that?
14     A.  I did.
15     Q.  In what year did you review that?
16     A.  I don't know.
17     Q.  Was it prior to the time you reviewed
18 Doe's application?
19     A.  It's been listed as an uninsurable
20 medication since at least 2009; so, yes.
21     Q.  Truvada was approved by the FDA for use as
22 pre-exposure prophylaxis in HIV negative individuals
23 in 2012.  Did you review the studies of the efficacy
24 of Truvada as PrEP at any time from -- after 2012?
25         MR. MAGRATTEN:  Objection to form.

Page 55

1          THE WITNESS:  No.
2  BY MR. KLEIN:
3      Q.  When you -- in the -- in the course of
4  your job duties as a chief of long-term care
5  underwriting, do you review the efficacy of various
6  medications?
7      A.  I do not.
8      Q.  You do not.  Okay.
9      So is it fair to say, then, that Truvada
10 as PrEP is the only -- well, strike that.
11     As chief underwriter for long-term care
12 insurance, do you determine -- what do you -- do you
13 make any determinations about the efficacy of
14 various medications?
15         MR. MAGRATTEN:  Objection:  Asked and
16 answered.
17         THE WITNESS:  I do not.
18 BY MR. KLEIN:
19     Q.  Okay.  Who at Mutual of Omaha long-term
20 care insurance is responsible for that?
21         MR. MAGRATTEN:  Objection:  Asked and
22 answered.
23         THE WITNESS:  No one at Mutual of
24 Omaha is responsible for determining the efficacy of
25 a medication.

Page 168

1    MR. MAGRATTEN: Same objection.
2    THE WITNESS: The individual with HIV
3  is uninsurable.
4  BY MR. KLEIN:
5    Q. Okay. Based on your experience and
6  education as a long-term care insurance underwriter,
7  do you believe that the risk assessment of someone
8  with HIV is the equivalent of the risk assessment of
9  someone without HIV who uses PrEP?
10    MR. MAGRATTEN: Objection:
11  Hypothetical question. Seeks expert opinion.
12    THE WITNESS: Can you break that down
13  for me?
14  BY MR. KLEIN:
15    Q. Sure.
16    What I'm asking is you exclude people with
17  HIV from long-term care insurance; correct?
18    A. Correct.
19    Q. And you also exclude people who take PrEP
20  but do not currently have HIV disease from long-term
21  care insurance; correct?
22    A. Correct.
23    Q. Okay. And I'm asking you how do you
24  compare the risk from a long-term care insurance
25  risk perspective of someone who has HIV and someone

Page 169

1  who doesn't have HIV but is on PrEP?
2    MR. MAGRATTEN: Objection:
3  Hypothetical question. Seeks expert opinion.
4    THE WITNESS: Both are uninsurable.
5  BY MR. KLEIN:
6    Q. Is one a greater risk than the other?
7    MR. MAGRATTEN: Same objections.
8    THE WITNESS: The individual who is
9  on PrEP has been deemed to be at a high risk of
10  acquiring HIV. So if they acquire HIV, then, yes,
11  the risk is the same.
12  BY MR. KLEIN:
13    Q. Okay. So you -- for all intents and
14  purposes, for long-term care insurance underwriting
15  you deem a person who is on PrEP as the same risk as
16  someone who has HIV disease; is that correct?
17    MR. MAGRATTEN: Objection: Seeks --
18  a hypothetical question. Seeks expert opinion.
19    THE WITNESS: We deem the person on
20  PrEP to be an uninsurable risk. We deem the person
21  with HIV to be an uninsurable risk.
22  BY MR. KLEIN:
23    Q. Okay.
24    MR. MAGRATTEN: Do you want a few
25  minutes to go through your notes?

Page 170

1    MR. KLEIN: I don't need that.
2    MR. MAGRATTEN: Okay.
3    MR. KLEIN: I mean, I'm going to take
4  about 30 seconds. But I'm not close to the end.
5    MR. MAGRATTEN: Okay.
6    MR. KLEIN: But making progress.
7    MR. MAGRATTEN: Okay. How are you
8  doing? Do you want a break?
9    THE WITNESS: No. I'm all right.
10    MR. KLEIN: Yeah. When --
11    THE WITNESS: You want one?
12    MR. MAGRATTEN: No. That's all
13  right.
14  BY MR. KLEIN:
15    Q. Whenever you want a break, please let me
16  know because I understand it's a long day for you.
17  So just say the word anytime.
18    A. I'm good.
19    Q. Okay. Now, I think you testified at some
20  point that an underwriting assessment can include
21  additional research regarding a health condition; is
22  that correct?
23    A. If the underwriter is not familiar with
24  the health condition, they need to look it up, yes.
25    Q. Okay. And at the time of Doe's

Page 171

1  application, did any person in Mutual's underwriting
2  department do additional research regarding Truvada
3  as PrEP?
4    A. The medication was listed as uninsurable;
5  so the underwriter correctly followed the guidelines
6  and declined the application.
7    Q. Okay. So they didn't do any additional
8  research at that time?
9    A. No.
10    Q. Okay. And at the time of Doe's
11  application in 2015, did the underwriting -- did
12  anybody involved in the underwriting of Mutual of
13  Omaha do additional research with regard to the
14  prospects of somebody newly diagnosed with HIV?
15    MR. MAGRATTEN: Objection to form.
16    THE WITNESS: The condition was
17  listed as uninsurable. No additional research was
18  warranted.
19  BY MR. KLEIN:
20    Q. Okay. Now, I would like to ask you some
21  questions now about the -- and -- and you've
22  answered some of this or you have referred to some
23  of this, let me say, about the steps that Mutual
24  takes to evaluate a long-term care insurance
25  application, particularly in -- at the time of Doe's

Lisa Ging
7/19/2017

53 (200 - 203)

Page 200

1 Exhibit 10?
2     A.  Not in this format and not all of this.
3 The underwriting notes would have been available to
4 me in our underwriting file.
5     Q.  Okay.  And have you -- have you
6 reviewed -- so this is -- is it accurate to say --
7 this document was also produced by Mutual of Omaha
8 to the defendant.  Is it fair to say that this is a
9 collection of notes made by various Mutual of Omaha
10 personnel in the context of underwriting Doe's
11 application?
12     A.  Underwriting doesn't have access to call
13 logs.  We can't see that information; so I can't
14 speak to that.  Anything that's in regard to
15 underwriting notes, then, yes.
16     Q.  What -- what are -- what are call logs?
17     A.  The customer service representatives at
18 LTCG field calls.
19     Q.  Okay.  So this document includes call
20 logs.  Does it also include underwriting notes?
21     A.  The first entry says "call logs"; so the
22 first two entries appear to be from call logs.
23 Anything that's identified as "green note pad entry"
24 would be something that underwriting could see or
25 created.

Page 201

1     Q.  Okay.  Did you -- all right.
2         Well, let's -- let me just -- after Doe's
3 application was denied, he appealed; is that
4 correct?
5     A.  Yes.
6     Q.  And did you handle the review of his
7 appeal?
8     A.  Yes.
9     Q.  All right.  And you made the decision to
10 uphold the denial?
11     A.  Correct.
12     Q.  All right.  And when you were -- were --
13 when you were handling the appeal, what information
14 did you look at?
15     A.  The application, pharmaceutical check,
16 interview, and medical records and the initial
17 decline letter and the underwriter's notes.
18     Q.  Did you also review Doe's appeal letter?
19     A.  Yes.
20     Q.  All right.  And you reviewed the
21 underwriting notes that are contained in Exhibit 10?
22     A.  Yes.
23     Q.  Okay.  At the time that you undertook a
24 review of Doe's appeal, did you do any further
25 research into -- into the medical literature about

Page 202

1 PrEP?
2     A.  No.
3     Q.  Okay.  What was your basis for upholding
4 the denial of Doe's application?
5     A.  He's taking Truvada, and we do not insure
6 anyone who takes Truvada.
7     Q.  Okay.  Okay.
8         Turning -- now, these pages are not
9 numbered; so I will do my best to designate them.
10 But turning to the second page of Exhibit 10, there
11 is a reference to a person named Aymie Fransen.  Do
12 you see that?
13     A.  Yes.
14     Q.  Do you know who she is?
15     A.  Yes.
16     Q.  Who is she?
17     A.  She is a case manager.  She is an employee
18 of LTCG.
19     Q.  So she is not employed by Mutual of Omaha?
20     A.  She's an employee of LTCG who does work
21 for Mutual of Omaha cases.
22     Q.  Okay.  Now, you see below this that there
23 are certain designations -- there are certain --
24 there seem to be certain notes about Doe's medical
25 history.  What does "LOV 5/14 routine" refer to, if

Page 203

1 you know?
2     A.  Last office visit May 2014 for routine
3 exam.
4     Q.  Okay.  And what about "Last cpe/cmp 5/14"?
5     A.  Last complete physical exam/complete
6 metabolic panel, May 2014.
7     Q.  Okay.  And below that there is a list of
8 various medications -- Ambien and Lorazepam for
9 sleep aid, Atorvastatin for cholesterol, and
10 testosterone.  Where would that information have
11 been obtained?
12     A.  The application.
13     Q.  All right.  And were any of those -- did
14 any -- were any of those medications grounds for
15 exclusion?
16     A.  No.
17     Q.  Okay.  And then it says "Health:  Lyme's
18 2011."  Where would that have been obtained?
19     A.  The application.
20     Q.  Okay.  And then it -- a few lines below it
21 says "select."  Do you see that -- that line?
22     A.  Yes.
23     Q.  What does that mean?  What is that
24 referring to?
25     A.  The rating class that he applied for.

Thomas & Thomas Court Reporters
and Certified Legal Video, LLC

1321 Jones Street, Omaha, NE 68102
Tel: (402) 556-5000 | Fax: (402) 556-2037

# Exhibit B

```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
      JOHN DOE,                    ) C.A. NO. 1:16-CV-11381-GAO
 3                                 )
                 PLAINTIFF,        ) DEPOSITION OF
 4                                 ) BRUCE HENRICKS, M.D.
           VS.                     )
 5                                 )
      MUTUAL OF OMAHA              )
 6    INSURANCE COMPANY,           )
                                   )
 7               DEFENDANT.        )

 8    - - - - - - - - - - - - -

 9               DEPOSITION OF BRUCE HENRICKS, M.D., taken

10    before Morgan M. Catania, RPR, CSR(IA), General

11    Notary Public within and for the State of Nebraska,

12    beginning at 8:25 a.m., on March 29, 2018, at

13    Thomas & Thomas Court Reporters & Certified Legal

14    Video, LLC, 1321 Jones Street, Omaha, Nebraska.

15

16

17

18

19

20

21

22

23

24

25
```

2

1                    A P P E A R A N C E S

2     FOR THE PLAINTIFF:
      MR. BENNETT KLEIN
3     GLBTQ LEGAL ADVOCATES & DEFENDERS (GLAD)
      30 Winter Street, Suite 800
4     Boston, Massachusetts 02108
      (617) 426-1350 (Phone)
5     (617) 426-3594 (Fax)
      bklein@glad.org
6
      FOR THE DEFENDANT:
7     MR. BROOKS R. MAGRATTEN
      PIERCE ATWOOD, LLP
8     72 Pine Street
      Providence, Rhode Island 02903
9     (401) 490-3422 (Phone)
      bmagratten@pierceatwood.com
10
      and
11
      MS. SUSAN L. LEWIS
12    ASSOCIATE GENERAL COUNSEL, LAW OPERATION
      MUTUAL OF OMAHA INSURANCE COMPANY
13    3300 Mutual of Omaha Plaza
      Omaha, Nebraska 68175
14    (402) 351-2543 (Phone)
      (402) 351-5906 (Fax)
15    susan.lewis@mutualofomaha.com

16

17

18

19

20

21

22

23

24

25

```
                                                               3

 1                        I N D E X

 2   CASE CAPTION .......................... Page    1
     APPEARANCES ........................... Page    2
 3   INDEX ................................. Page    3
     TESTIMONY ............................. Page    5
 4   REPORTER CERTIFICATE .................. Page  186

 5   DIRECT EXAMINATION:
           By Mr. Klein .................... Page    5
 6

 7                     E X H I B I T S

 8   EXHIBIT NO.                                MARKED

 9     1. NOTICE OF DEPOSITION                      5

10     2. DR. HENRICK'S CV                          25

11     3. REPORT OF BRUCE W. HENRICKS, M.D. FACP    35

12     4. TANZEUM (ALBIGLUTIDE) TYPEWRITTEN         90

13     5. A CLINICAL REVIEW OF GLP-1 RECEPTOR       91
           AGONISTS ARTICLE
14
       6. TRULICITY (DULAGLUTIDE) TYPEWRITTEN       95
15
       7. DULAGLUTIDE ARTICLE                       97
16
       8. FARXIGA (DAPAGLIFLOZIN) TYPEWRITTEN       99
17
       9. DAPAGLIFLOZIN EFFICACY AND SAFETY ARTICLE 100
18
      10. REPARTHA (EVOLOCUMAB) TYPEWRITTEN         101
19
      11. EVOLOCUMAB ARTICLE                        104
20
      12. PRALUENT (ALIROCUMAB) TYPEWRITTEN         106
21
      13. ADVERSE EVENTS FOR NEW CHOLESTEROL DRUGS  108
22        LOW BUT LONG-TERM EFFECTS UNKNOWN ARTICLE

23    14. ALIROCUMAB ARTICLE                        113

24    15. FDA PRESCRIBING INFO FOR KYNAMRO          115

25    16. KYNAMRO (MIPOMERSEN) TYPEWRITTEN          119
```

Page 176

1 BY MR. KLEIN:
2     Q.  I seem to only have one of these so.
3         Exhibit No. 32 is a column by the surgeon
4 general in 2012 in a journal called "Public Health
5 Reports," and it's called "Surgeon General's
6 Perspectives," and the subheading is "Medication
7 Adherence:  Helping patients take their medicines as
8 directed."
9         And the first line of this study says
10 "Seventy-five percent of Americans have trouble
11 taking their medicine as directed."
12         Do you agree with that?
13     A.  Yes.
14         (Exhibit No. 33
15         marked for identification.)
16 BY MR. KLEIN:
17     Q.  Okay.  Exhibit 33 is a review article
18 called "The significance of compliance and
19 persistence in the treatment of diabetes,
20 hypertension, and dyslipidaemia: a review."  These
21 conditions are well-known risk factors for
22 cardiovascular disease; is that right?
23     A.  That's right.
24     Q.  And cardiovascular disease increases the
25 risk of morbidity?

Page 177

1     A.  It does.
2     Q.  Does it increase the risk of long-term
3 care claims?
4     A.  Yes.
5     Q.  In this review published in 2007, it says,
6 "According to the World Health Organization,
7 non-compliance with long-term medication for
8 conditions such as hypertension, dyslipidaemia and
9 diabetes is a common problem that leads to
10 compromised health benefits and serious economic
11 consequences in terms of wasted time, money and
12 uncured disease."
13         Do you agree with that statement?
14     A.  Yes.
15     Q.  Can I direct your attention, please, to
16 page 82 under the heading "Conclusions"?
17     A.  Yes.  I have it.
18     Q.  The first sentence says "In this
19 systematic review, poor compliance and persistence
20 with cardiovascular and antidiabetic medication
21 proved to be a significant problem, with almost 30%
22 of days 'on therapy' not actually covered by
23 medication and only 59% of patients having
24 medication for more than 80% of their days 'on
25 therapy' in the year."

Page 178

1         Is that statement consistent with your own
2 understanding of the issue of patient non-adherence
3 to medication?
4     A.  Speaking as --
5         MR. MAGRATTEN:  Objection.
6         THE WITNESS:  Speaking as a prior
7 clinician, those numbers don't surprise me.
8         (Exhibit No. 34
9         marked for identification.)
10 BY MR. KLEIN:
11     Q.  Do you recognize number --
12 Doc, Exhibit No. 34?
13     A.  I do.
14     Q.  Have you read it?
15     A.  Yes.
16     Q.  Okay.  Can I direct your attention to
17 paragraph 37 on page 14?
18     A.  Okay.
19     Q.  And the first sentence of paragraph 37
20 says "The individuals who use PrEP are predominately
21 gay men."
22         Do you agree with that statement?
23     A.  Yes.
24     Q.  And why do you agree with that?
25     A.  From my research of Truvada over the past

Page 179

1 number of months, that's substantiated.
2     Q.  On page 15 --
3     A.  Uh-huh.
4     Q.  -- about four sentences down, there is a
5 sentence that says the primary sexual risk -- risk
6 factors for PrEP are receptive and, to a lesser
7 extent, insertive anal intercourse.
8         Do you agree with that statement?
9     A.  Yes.
10     Q.  The next sentence says "Heterosexual men
11 do not engage in receptive anal intercourse, and
12 uncommonly engage in insertive anal intercourse with
13 female partners."
14         Do you agree with that statement?
15     A.  I have no background to answer that.
16     Q.  Okay.  So you have no reason --
17     A.  No.
18     Q.  -- to disagree with it?
19     A.  I have no reason to disagree.
20     Q.  Okay.  The final sentence of that
21 paragraph says "It is well-known in the field of HIV
22 medicine and by clinicians and researchers with
23 knowledge of HIV and PrEP that approximately
24 80 percent of PrEP users to date are gay men."
25         Do you agree with that statement?

Bruce Henricks, MD                                          48 (180 - 183)
3/28/2018

---

Page 180

1    A. Yes.
2    Q. Okay. Below that it says "Mutual of
3  Omaha's categorical exclusion of PrEP users from
4  long-term care insurance is irrational and based on
5  a gross misunderstanding of the nature of HIV
6  transmission."
7        Do you agree with that statement?
8    A. No.
9        MR. MAGRATTEN: Objection.
10 BY MR. KLEIN:
11   Q. Okay. Good. Just making sure we are all
12 awake.
13       Is coronary artery disease a serious
14 health condition?
15   A. Absolutely.
16   Q. And is using tobacco while one has
17 coronary artery disease something that would
18 exacerbate that condition?
19   A. Potentially, yes.
20   Q. Why do you say "potentially"?
21   A. In general it does increase the risk of
22 more cardiovascular events. That's not true in all
23 individuals, but in general it's a true statement.
24   Q. Okay. And what are the medical or health
25 consequences for somebody with coronary artery

Page 181

1  disease who smokes?
2    A. There is a myriad of issues. If you have
3  coronary disease and smoke on a regular basis, you
4  increase your chance of another cardiovascular event
5  by at least 50 percent. There is also -- if you're
6  a long-term smoker that can accommodate a concern
7  about chronic lung disease and -- imposed from the
8  use of tobacco. The effect on, not only the heart,
9  but the entire cardiovascular system is there; so
10 it's -- it's manifold.
11   Q. And for someone who smokes in the presence
12 of coronary artery disease, what are the
13 consequences for long-term care needs?
14       MR. MAGRATTEN: Objection.
15       THE WITNESS: It can increase their
16 risk of needing those benefits.
17 BY MR. KLEIN:
18   Q. Significantly?
19   A. Yes.
20   Q. Okay. Do you know if Mutual has an
21 absolute exclusion of offering long-term care
22 insurance to somebody who uses tobacco in the
23 presence of coronary artery disease?
24   A. I do not.
25   Q. Okay. Is the issuance of a long-term care

Page 182

1  insurance policy to a person with coronary artery
2  disease who smokes consistent with a conservative
3  philosophy of underwriting?
4        MR. MAGRATTEN: Objection.
5        THE WITNESS: It's based upon our
6  comfort level with coronary disease, smoking, and
7  other major adult impairments from the insurance
8  industry and our partners at the reinsurance level
9  and also our actuarial consultants like Milliman and
10 Roberts.
11 BY MR. KLEIN:
12   Q. Is smoking -- so smoking itself is bad for
13 your health; right?
14   A. Yes.
15   Q. I mean, that's -- everybody agrees with
16 that one; right?
17   A. Correct.
18   Q. Okay. And is it your understanding that,
19 under Mutual's underwriting policies, a person can
20 smoke an unlimited amount in an unlimited duration
21 and still get the select rate?
22   A. Categorically it would -- that would
23 not -- the answer categorically to that is no. We
24 would -- we would -- we would make our determination
25 based, again, upon the quality of the physician

Page 183

1  records and what it revealed to us as to the
2  significance of their lung disease and their
3  functional status.
4    Q. Well, let's say an applicant for long-term
5  care insurance in 2015 has no lung disease or
6  manifestations of harm from smoking, but they smoke
7  a significant amount. Let's say two packs a day.
8  Okay? And they have done so for two decades.
9    A. Uh-huh.
10   Q. That person, as far as I understand the
11 underwriting manual, gets the -- is, if they are
12 otherwise qualified, gets the select rate. Is that
13 your understanding?
14       MR. MAGRATTEN: Objection.
15       THE WITNESS: I would have to look at
16 the manual. I have no reason to doubt that comment.
17 BY MR. KLEIN:
18   Q. Okay. And is giving the select rate to
19 someone who smokes two packs a day for two decades
20 or more consistent with a conservative philosophy of
21 underwriting?
22       MR. MAGRATTEN: Objection.
23       THE WITNESS: As it relates to our
24 experience with the industry and the resources that
25 we use to formulate underwriting policy, that would

---