# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

JOHN DOE,                                    )
Plaintiff                                    )
                                             )
v.                                           )
                                             )     No. 1:16-cv-11381-GAO
                                             )
MUTUAL OF OMAHA                              )     *Leave to file granted on:____(date of order)*
INSURANCE COMPANY,                           )
Defendant                                    )
_____)

### [PROPOSED]
### DEFENDANT MUTUAL OF OMAHA INSURANCE COMPANY'S REPLY TO PLAINTIFF'S OPPOSITION TO ITS MOTION IN LIMINE TO STRIKE DR. KENNETH MAYER'S REPORT AND OPINIONS IN PART

Defendant Mutual of Omaha Insurance Company ("Mutual of Omaha") replies to

Plaintiff John Doe's ("Plaintiff") Objection [Doc. #116] to Mutual of Omaha's Motion in Limine

to Strike Dr. Kenneth Mayer's Report and Opinions in Part [Doc. #108, 109].

On February 9, 2015, Mutual of Omaha denied Plaintiff's application for long term care

("LTC") coverage based upon its underwriting guidelines.  Two Court orders established that

this February 2015 date serves as the outer limit of information that is relevant to this case.

[Doc. #61 (precluding discovery of Plaintiff after Feb. 9, 2015)]; [Doc. #103 (discovery is

limited to "matters that were contained in the [Plaintiff's] LTC insurance application or in

documents upon which Mutual relied in evaluating [Plaintiff]'s application.")].  Portions of Dr.

Mayer's report and opinions must therefore be precluded to the extent he relied upon information

that came into existence after February 9, 2015.

Plaintiff makes two contentions in his objection: first, that the data relied upon by Dr.

Mayer from after February 9, 2015, is relevant to Doe's potential request for "prospective

injunctive relief" and second, that Dr. Mayer's opinions should not be precluded because he

augmented his reliance on these post-February 9, 2015 studies, with other pre-February 9, 2015 information. [Doc. #116 at 2-3].

Plaintiff's first contention requires this Court to make a series of assumptions and predictions about the future that obfuscate the real issue. Plaintiff acknowledged that his prayer for the relief requests that "Mutual issue the policy that he applied in 2015 with the same rates and conditions in effect at that time," not a chance for him to reapply for a policy, and for a "permanent injunction enjoining Mutual of Omaha from categorically excluding from its long-term care insurance individuals . . . who take the medication Truvada." [Doc. #116 at 1] (emphasis added). Plaintiff then states that "[he] has standing to seek a prospective injunction because [1] if the Court were to rule that there was insufficient data about PrEP to invalidate Mutual's categorical exclusion as of 2015, [2] then Doe would have the right to reapply for long-term care insurance. In that case, he would still be harmed by Mutual's [3] continuing discriminatory refusal to offer an insurance policy solely because an individual takes PrEP." [Doc. #116 at 4] (emphasis added). Simply put, Plaintiff's claims are based on the 2015 application denial and his request for a permanent injunction pertains only to those facts. Nowhere in his pleadings is a request for the factfinder to examine a set of potential and hypothetical facts that might occur in the future. And, in any event, this Court has already deemed post-February 2015 information "irrelevant" to this case. [Doc. #61 at 5 ("If, as Doe alleges, that decision was discriminatory, Doe should be put in the position he would have been had Mutual issued the policy at that time. Whether his medical circumstances have changed since then is irrelevant."). Likewise, evidence of Mutual of Omaha's current underwriting policies regarding Truvada cannot inform nor is relevant to its underwriting policies in 2015, which are the policies at issue here.

With respect to Plaintiff's second contention, Mutual of Omaha provides this Court with a chart presenting Dr. Mayer's seventeen disputed opinions, subject to this motion, and the cited sources for each. (Exhibit 1 - chart).  Paragraphs 11, 12, 16, 27, 28, 29 32, 33, 36, 37, and 39 are based exclusively on post-February 9, 2015 sources.  Id.  The portions of paragraphs 15 and 24 that Mutual requests this Court to preclude are based exclusively on post-February 9, 2015 sources as well. Id.

As for the remaining four paragraphs, 14, 19, 30, 31, for these opinions, Dr. Mayer relies on sources that are primarily dated post-February 9, 2015.  Id. (illustrating that each of these paragraphs relies on numerous sources, the majority of which are dated after February 2015).  Moreover, paragraphs 19, 30, and 31 all relied on the "Kaiser study," which Dr. Mayer emphasized was "so important because there is a huge period of follow-up from a large number of individuals . . . [i]n a total real world setting, it was not a clinical trial."  (Doc. #109 at Exhibit B at 42:8-42:12).  The sources for this "so important" "Kaiser study" were all published after February 2015. (Exhibit 1 at para. 29 (summarizing a study of "PrEP at Kaiser Permanente Northern California").

Plaintiff suggests that even if Dr. Mayer did not rely on the information he gained from these numerous post-February 9, 2015 sources, he still can offer the exact same opinion that he formulated with post-February 9, 2015 information.  That position lacks merit.  See Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc., 2006 WL 1663357 (N.D. Ga. June 14, 2006) (excluding expert's opinion because he relied on facts excluded from evidence and included damages for multiple claims that had been dismissed); People v. Scott, 123 Cal. Rptr. 2d 253, 254 (Cal. App. 2002) ("[The expert], one of [defendant's] evaluators, told the court that it would be impossible for him to testify because he relied on all that excluded information to

reach his opinion: 'If I can't testify to that information, how I employed that reasoning, I would not be able to provide truthful testimony before the Court.' He felt it would be unethical and unprofessional to give a partial explanation for his opinion."); see also Sabal Trail Transmission, LLC v. Real Estate, No. 4:16-CV-097, 2018 WL 2305768, at *7 (M.D. Ga. May 21, 2018) ("Given that the Court has excluded some of the evidence [expert] relied on in reaching her valuation opinion, the Court will permit [expert] to amend her report").

At bottom, it is fundamentally unfair to allow Plaintiff to claim that Mutual of Omaha's February 2015 underwriting policies were incorrect or discriminatory based on information that was not available in February 2015. These portions of Dr. Mayer's report and opinions to be offered at trial should be stricken to the extent they are grounded in facts and data available only after February 2015.

**WHEREFORE** Mutual of Omaha respectfully requests this Court grant its motion in limine [Doc. #108, 109] and:

1. strike paragraphs 11, 12, 14, 15 (in part), 16, 19, 24 (in part), 27, 28, 29, 30, 31, 32, 33, 36, 37, and 39 from Dr. Mayer's expert report (see Doc. #109 at Exhibit C for redactions);

2. preclude Dr. Mayer from testifying at trial about the above paragraphs and the opinions therein; and

3. preclude Plaintiff from citing to or relying on the above paragraphs and the opinions therein in any pleading.

Respectfully submitted,

MUTUAL OF OMAHA
INSURANCE COMPANY,
By Its Attorneys,

_____, 2018                  _/s/_____ _____
                                     Brooks R. Magratten, Esq. BBO#650393
                                     Katharine Kohm, Esq. BBO#675362
                                     PIERCE ATWOOD LLP
                                     72 Pine Street, 5th Floor
                                     Providence, RI 02903
                                     (401) 490-3422
                                     (401) 588-5166 (fax)
                                     bmagratten@pierceatwood.com
                                     kkohm@pierceatwood.com


### CERTIFICATE OF SERVICE

I certify that the within document was electronically filed with the clerk of the court on _____, 2018, and that it is available for viewing and downloading from the Court's ECF system. Service by electronic means has been effectuated on all counsel of record.

Bennett H. Klein, BBO# 550702
GLBTQ Legal Advocates & Defenders
30 Winter St. Suite 800
Boston, MA 02108
617-426-1350
bklein@glad.org

John P. Ward, BBO# 515860
Law Offices of John P. Ward
584 Castro St., No. 802
San Francisco, CA 94114
415-255-4996
johnpward@gmail.com

                                     _/s/_____ _____

# exhibit 1

| Mayer Report Paragraph # | Mayer Report Paragraph | Proposed Redaction | Source #s cited in Mayer Report [Doc. #109 at Exh. A] | Source(s) Date(s) | Source #s cited in Mayer Deposition | Source(s) Date(s) | Testimony in Deposition [Doc. #109 at Exh. B] |
|---|---|---|---|---|---|---|---|
| 11 | Exposure to any virus, including HIV, does not necessarily mean that infection occurs. HIV transmission is a low probability event because HIV is a virus of low infectivity, meaning that it takes a large volume of virus to transmit infection. Unprotected, receptive anal sex with an HIV positive partner is estimated to transmit infection at the rate of 138 times per 10,000 instances (1.38%), insertive vaginal intercourse is estimated to transmit in only 4 instances out of 10,000 (0.04%), and oral sex carries an estimated rate of transmission deemed negligible at less than 1 instance out of 10,000 (less than 0.01%). In contrast, HIV transmission through a blood transfusion from an infected source occurs significantly more effectively, at an estimated rate of 9,250 per 10,000 exposures. Blood transfusions are no longer a source of transmission due to HIV testing of the blood supply. | Redact All | 1 | 12/4/2015 | N/A | 1 | Mayer Dep. 13:21-13:15 |
| 12 | Treatment for HIV disease has advanced dramatically since the inception of the epidemic. In the late 1990s the advent of oral highly active antiretroviral (ARV) medications (sometimes referred to as antiretroviral therapy, or ART) transformed HIV from a disease in which people could quickly progress to AIDS, and for many debilitation and death, to a condition that can be controlled similar to diabetes or other chronic manageable diseases. Highly active ARV medications suppress HIV replication. ARV medications have resulted in extraordinary changes to the health and longevity of people with HIV. The United States Centers for Disease Control and Prevention has concluded that today with proper medical care, "HIV can be controlled" and "someone diagnosed with HIV and treated before the disease is far advanced can live nearly as long as someone who does not have HIV." | Redact All | 2 | 5/30/2017 | N/A | N/A | N/A |
| 14 | For example, it is now established that individuals who are infected with HIV, take ARV as prescribed, and have an undetectable viral load have effectively no risk of transmitting HIV to an HIV-negative partner. Viral load refers to the amount of virus in blood. Undetectable viral load means that the amount of HIV in blood is so low it cannot be measured by routine technology. Oral ARV medications are highly effective at reducing an HIV-infected individual's viral load to undetectable. | Redact All | N/A | N/A | 4, 6, 22 | 7/18/2011, 7/12/2016, 7/23/2017 | Mayer Dep. 14:16-17:18 |
| 15 | Studies looking at whether people with HIV become non-infectious if they are on highly active ARV have examined sero-discordant couples (i.e., couples in which one partner is HIV-positive and the other partner is HIV-negative) who report condomless sex. The first efficacy trial to demonstrate that early initiation of highly active ARV decreased HIV transmission, known as HPTN 052, found a 96% reduction in HIV transmission from HIV-infected persons to their partners. (pre-2015 source) Subsequently, initial results of the PARTNER study, which included greater numbers of gay couples than HPTN 052, were presented at the Conference on Retroviruses and Opportunistic Infections in 2014 and reported in NAM AIDSMAP in March 2014. Those results showed no transmission within couples from a partner with an undetectable viral load in an estimated 16,400 occasions of sex in same-sex couples and 28,000 in heterosexual couples. (pre-2015 source) <u>The study results were ultimately published in the Journal of the American Medical Association in 2016, and demonstrated that there were no cases of HIV transmission among 1,166 HIV serodiscordant couples, who reported 22,000 condomless sex acts among gay couples and 36,000 condomless sex acts among heterosexual couples.</u> | Redact Part (underlined) | 6 | 7/12/2016 | N/A | N/A | N/A |
| 16 | The CDC recently concluded that: "When ART results in viral suppression, defined as less than 200 copies/ml or undetectable levels, it prevents sexual HIV transmission. Across three different studies, including thousands of couples and many thousand acts of sex without a condom or pre-exposure prophylaxis (PrEP), no HIV transmissions to an HIV-negative partner were observed when the HIV-positive person was virally suppressed. This means that people who take ART daily as prescribed and achieve and maintain an undetectable viral load have effectively no risk of sexually transmitting the virus to an HIV-negative partner." | Redact All | 7 | 9/27/2017 | N/A | N/A | N/A |

| Mayer Report Paragraph # | Mayer Report Paragraph | Proposed Redaction | Source #s cited in Mayer Report [Doc. #109 at Exh. A] | Source(s) Date(s) | Source #s cited in Mayer Deposition | Source(s) Date(s) | Testimony in Deposition [Doc. #109 at Exh. B] |
|---|---|---|---|---|---|---|---|
| 19 | Scientific research and data demonstrate that PrEP reduces the risk of HIV transmission among gay and bisexual men and transgender women by close to 100% when taken daily. I base this conclusion on the post-hoc analyses, open label studies, and demonstration projects that followed the initial double blind placebo controlled studies of PrEP. | Redact All | N/A | N/A | 8, 13, 16, 18, 11, 15; 10, 11, 16, 17; 20, 21 | 11/23/2010, 9/12/2012, 12/15/2016, 11/27/2015, 1/2/2016, 12/1/2015; 2/23/2015, 1/2/2016, 12/15/2016, 11/15/2015; 12/1/2014, 1/1/2016 | Mayer Dep. 17:19 - 22:17 |
| 24 | Placebo based trials demonstrated the effectiveness of PrEP to reduce HIV incidence on a population-based intention to treat basis. The Iniciativa Profilaxis Pre-Exposicion (iPrEX) study published in 2010 was a large randomized study of 2,499 men and transgender women who had sex with men in the United States, Peru, Ecuador, Brazil, Thailand, and South Africa followed for 3,324 person years (a person-year is a measure of aggregate exposure obtained by multiplying the number of people in a trial by the duration of follow-up. In the case of iPrEX, the number of 3,324 person years for a trial that enrolled 2,499 participants, means that the average follow-up per participant was more than 1 year and 4 months. A large number of person years of follow-up is helpful when looking for the occurrence of uncommon adverse events). The study found a relative reduction of HIV incidence on an "intention to treat basis" of 44%. (Source 8) The 44% decrease in HIV incidence was statistically significant (i.e. there was no likelihood that the finding was accidental) and demonstrated that PrEP could have a population level impact in reducing HIV, especially when men who have sex with men account for approximately 70% of all new HIV infections in the United States. The Partners PrEP trial was another large randomized trial of 4,758 HIV serodiscordant heterosexual couples that showed Truvada reduced the risk of becoming infected by 75% on an intention to treat basis. (Source 9) These two studies formed the basis for the FDA's approval of PrEP in July 2012. <u>Subsequent studies continued to demonstrate the effectiveness of PrEP on an "intention to treat" basis. The PROUD study of gay men in England, for example, found an 86% reduction in HIV incidence on an "intention to treat" basis. (Source 10 & 11) A chart showing the results of PrEP efficacy trials on an intention to treat basis is set forth in: (Source 12)</u> | Redact Part (underlined) | 8, 9, 10, 11, 12 | 11/23/2010, 7/11/2012, 2/23/2015, 1/2/2016, 7/1/2015 | N/A | N/A | Mayer Dep. 24:13; 33:19-33:22 |
| 27 | The PROUD study enrolled men who have sex with men in 13 sexual health clinics in England between November 2012 and April 2014. The study had two groups: gay men who wanted and were provided PrEP immediately, and gay men with demonstrated risk for HIV who were placed on the waiting list. HIV incidence in the control group was 7% whereas HIV incidence in the intervention group was under 1%. There were no HIV infections among participants taking PrEP four to seven times per week. The results of the PROUD study removed any doubts about the efficacy of PrEP in a real-world setting. | Redact All | 10, 11 | 2/23/2015, 1/2/2016 | N/A | N/A | Mayer Dep.33:19-33:22 |
| 28 | The IPERGAY study was a double blind placebo trial that involved an assessment of pericoital dosing of PrEP. The post hoc analysis of the IPERGAY results showed no HIV transmission among those who were highly adherent. | Redact All | 15 | 12/1/2015 | N/A | N/A | N/A |
| 29 | A study of men who have sex with men initiating PrEP at Kaiser Permanente Northern California, a large integrated healthcare system in San Francisco, found no HIV seroconversions during PrEP use. In this study over 972 individuals initiated PrEP, accumulating 850 person-years of PrEP use. The study was particularly important, since it was not conducted as part of a clinical trial, but rather reflected PrEP use in a real world setting. | Redact All | 16, 17 | 12/15/2016, 11/15/2015 | N/A | N/A | 42:6-42:18 |

| Mayer Report Paragraph # | Mayer Report Paragraph | Proposed Redaction | Source #s cited in Mayer Report [Doc. #109 at Exh. A] | Source(s) Date(s) | Source #s cited in Mayer Deposition | Source(s) Date(s) | Testimony in Deposition [Doc. #109 at Exh. B] |
|---|---|---|---|---|---|---|---|
| 30 | The preponderance of the data to date suggest that PrEP is safe and well-tolerated, and has been associated with highly significant decreases in HIV incidence when used as prescribed. PrEP efficacy approaches 100% when the medication is taken on a daily basis. | Redact All | N/A | N/A | 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21 | 12/4/2015, 5/30/2017, 7/1/2014, 7/18/2011, 3/4/2014, 7/12/2016, 9/27/2017, 11/23/2010, 7/11/2012, 2/23/2015, 1/2/2016, 7/1/2015, 9/12/2012, 7/22/2014, 12/1/2015, 12/15/2016, 11/15/2015, 11/27/2015, 7/23/2017, 12/1/2014, 1/1/2016 | Mayer Dep. 33:23-34:11 |
| 31 | Adherence to PrEP is strongly correlated to the level of HIV protection. Demonstration projects and open label studies show a high level of adherence among those who seek out PrEP in a real-world setting. Based on my direct experience with scientific studies of PrEP, knowledge of the medical literature on PrEP, knowledge accumulated from the community of PrEP researchers and infectious disease clinicians, and my own clinical experience, it is my opinion that it is uncommon that an individual seeks out PrEP and does not take it. First, PrEP is voluntary. Nobody forces a person to take PrEP nor is it prescribed to alleviate any symptoms or disease. Second, the stigma associated with PrEP, and the concern that a provider is judging an individual who seeks PrEP, is a barrier to people accessing PrEP. THUS, individuals who initiate PrEP need to be comfortable enough to disclose to their providers that they are engaging in behaviors that might put them at increased risk for HIV. In addition, PrEP is a simple regimen that consists of one pill a day that is well tolerated. For these reasons people who seek out PrEP are generally strongly motivated to adhere to the medication regimen. | Redact All | N/A | N/A | 20, 21, 16, 17 | 12/1/2014, 1/1/2016, 12/15/2016, 11/15/2015 | Mayer Dep. 33:23-35:17 |
| 32 | PrEP is more effective at preventing HIV than condoms. Studies of the real-world efficacy of condoms in protecting against HIV show a range of protection of seventy to eighty percent. Since condoms can protect against other STDs, it is reasonable for sexually active people to consider using PrEP AND condoms, but not either/or. | Redact All | N/A | N/A | 23 | updated continuously & Mayer reviewed as of 11/2017 | Mayer Dep. 42:19-43:19 |
| 33 | The studies of PrEP demonstrate that Truvada is a medication that is well tolerated by patients with side effects that are modest, easily monitored and managed, and reversible. No serious adverse events have been reported in the PrEP studies. There have been some cases of mild decrease in creatine clearance (a marker of kidney function). This is easily managed by routine blood tests for kidney function. PrEP is stopped when these minor side effects are detected and in all cases kidney function has returned to normal levels. There have been no reports of kidney issues progressing in people who use PrEP. There have also been cases of small decrease in bone mineral density. None of these minor decreases has risen to the level of osteopenia and are reversed when PrEP is stopped. No fractures have been reported due to PrEP use. Further, unlike other medications with similar or greater risk of side effects, PrEP is not a medication that has to be taken long-term for a chronic condition. It is taken during periods of time when the circumstances of a person's life indicate that they are at higher risk for exposure to HIV. | Redact All | N/A | N/A | 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 20, 21 | 11/23/2010, 7/11/2012, 2/23/2015, 1/2/2016, 7/1/2015, 9/12/2012, 7/22/2014, 12/1/2015, 12/15/2016, 11/15/2015, 12/1/2014, 1/1/2016 | Mayer Dep. 43:20-44:6 emphasizing "definitive clinical trials," which are source 10 (2015), 11 (2016), 16 (2016), and 17 (2015). |

| Mayer Report Paragraph # | Mayer Report Paragraph | Proposed Redaction | Source #s cited in Mayer Report [Doc. #109 at Exh. A] | Source(s) Date(s) | Source #s cited in Mayer Deposition | Source(s) Date(s) | Testimony in Deposition [Doc. #109 at Exh. B] |
|---|---|---|---|---|---|---|---|
| 36 | Men who have sex with men account for approximately 70% of new HIV infections annually in the United States. Gay men are therefore particularly likely to seek to minimize their risk of HIV infection by taking PrEP. The CDC estimates that approximately 25% of sexually active men who have sex with men would benefit from PrEP while approximately 0.4% of sexually active heterosexual adults would benefit from PrEP. | Redact All | 18 | 11/27/2015 | N/A | N/A | N/A |
| 37 | The individuals who use PrEP are predominantly gay men. I base this conclusion on the following considerations. Data from Gilead Pharmaceuticals, the manufacturer of PrEP, indicate that in 2015, the year that Mutual of Omaha denied long-term care insurance to the plaintiff in this case, 89.82% of PrEP users were men. During the period 2012-2016, 84.75% of PrEP users were men. (Source 12) Virtually all male users of PrEP are men who have sex with men (MSM). The primary sexual risk factors for PrEP use are receptive, and to a lesser extent, insertive anal intercourse. Heterosexual men do not engage in receptive anal intercourse, and uncommonly engage in insertive anal intercourse with female partners. Because MSM by definition are having sex with other MSM, their likelihood of being exposed to HIV is much greater than that of heterosexuals, since they are engaging in behaviors that are most efficient for HIV transmission, with a limited partner pool (i.e. MSM are a small minority of the general population) which has an increased HIV prevalence. I also base this conclusion on my knowledge of HIV treatment and prevention obtained during my years of presentations and attendance at specialized medical conferences, my experience as an editor and reviewer for authoritative journals in the field, and my regular and long-term contact and communication with other clinicians and researchers specializing in HIV and PrEP. In my clinical experience, and the experiences of my colleagues discussed at conferences, most patients who inquire about and are ultimately prescribed PrEP are gay men. It is well-known in the field of HIV medicine and by clinicians and researchers with knowledge of HIV and PrEP that approximately 80 percent of PrEP users to date are gay men. | Redact All | 19 | 7/23/2017 | 19 | 7/23/2017 | Mayer Dep. 47:7-47:18 |
| 39 | The stated reason for Mutual of Omaha's exclusion of PrEP users is to reduce the prevalence of HIV disease in its insured pool. It is reasonable to assume, however, that Mutual of Omaha's policy will lead to increased prevalence of HIV in its insured pool. Mutual of Omaha's policy is based on the fallacy of PrEP as a proxy for HIV risk. Most people at risk for HIV are not on PrEP. The CDC has estimated that approximately 1.2 million Americans have indications for benefit from PrEP. (Source 11) To date only about 150,000 individuals have used PrEP. Mutual of Omaha's policy creates a perverse incentive for its applicants not to use a highly effective FDA- and CDC-approved HIV preventative technology without having any way of otherwise validating HIV risk in its applicant pool. | Redact All | 18 | 11/27/2015 | N/A | N/A | Mayer Dep. 48:14-48:22 |