## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE,
     Plaintiff

v.

MUTUAL OF OMAHA
INSURANCE COMPANY,
     Defendant

No. 1:16-cv-11381-GAO

## PLAINTIFF JOHN DOE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR <u>SUMMARY JUDGMENT</u>

## <u>INTRODUCTION</u>

Plaintiff John Doe (Doe) applied for long-term care insurance from Mutual of Omaha Insurance Company (Mutual). Despite the fact that he was otherwise eligible, defendant Mutual denied his application, solely because Doe takes PrEP, a highly effective medication that offers pre-exposure protection against HIV disease. The refusal was based entirely on Mutual's policy of rejecting a priori any applicant for long-term care insurance who takes PrEP. The undisputed facts demonstrate that Mutual's action constituted impermissible discrimination based on sexual orientation and disability, in violation of M.G.L. c. 272, § 98. The sexual orientation discrimination results from the fact that Mutual's policy disparately and adversely impacts gay men, who constitute 80% of PrEP users. The disability-based discrimination stems from the fact that Mutual regarded Doe as having a disability.

There is no legitimate business reason for Mutual's exclusionary rule, a rule that flies in the face of common sense. Indeed, regulators from the state of New York just said as much,

rejecting as irrational the blanket exclusion of those who take a preventative. "Issuers may not unfairly discriminate in their underwriting or rate setting based on an applicant's use of HIV prevention strategies, such as PrEP … These underwriting practices in which adverse underwriting decisions are applied to individuals who take PrEP to mitigate the risk of contracting HIV, but no adverse underwriting decisions are applied to individuals with the same level of potential exposure to HIV who do not take PrEP to mitigate the risk of contracting HIV, are neither based on sound actuarial principles nor related to actual or reasonably anticipated experience." *See* New York Department of Financial Services Insurance Circular Letter No. 8 (June 22, 2018), https://www.dfs.ny.gov/insurance/circltr/2018/cl2018_08.pdf. In support of his motion for summary judgment, Doe has provided an authoritative expert opinion on the efficacy of PrEP. But the Court need not rely solely on that opinion to find for Doe. Mutual's two experts, and its medical director, have admitted that Mutual's "no PrEP users" policy is contrary to its own stated underwriting goal of reducing the number of people with HIV among its insureds. The irrationality of Mutual's policy is glaring. Most people who have some risk of contracting HIV are not on PrEP, but Mutual sells them long-term care insurance without assessing their level of risk. Mutual excludes applicants who take PrEP as directed and, according to its medical director, are at low risk for HIV and insurable. At the same time, Mutual sells insurance to similarly situated applicants who do not take PrEP and are, by the admission of its medical director, at higher risk for HIV.

Mutual has proffered two other "justifications" for its policy, neither of which can withstand scrutiny. Mutual asserts that PrEP users may not adhere to the medication regimen (a once daily pill) or recommended follow-up. However, with respect to all other applicants for whom there is concern about nonadherence, Mutual makes individualized assessments of

nonadherence by examining medical records as part of the underwriting process. Mutual also justifies the a priori exclusion of PrEP users because it asserts there is a lack of long-term data. However, Mutual admits that it is not concerned about the lack of long-term data for scores of other new FDA- approved medications, some of which have serious documented adverse consequences such as an increased risk for dementia.

Mutual moves for summary judgment on Doe's disability claim, but not his sexual orientation claim. It devotes the majority of its summary judgment memorandum to a defense of lack of personal jurisdiction which borders on the frivolous and is, in any event, waived.

## STATEMENT OF FACTS[1]

In 2014 and 2015 Mutual marketed, offered, sold, and issued long-term care insurance to people in Massachusetts. It did this pursuant to a license from the Commonwealth. SOF ¶¶ 1-8. Mutual has an office in Massachusetts from which it markets and offers its long-term care insurance, but it primarily sells this product through authorized agents (sometimes, interchangeably called "producers"). SOF ¶¶ 4-6.

In 2014 Doe's Partner (now spouse) contacted his financial advisor, JD Loden, to inquire about obtaining long-term care insurance for Doe and Doe's Partner. The two men sought a product that offered a discount for domestic partners. SOF ¶¶ 10, 13. Loden enlisted the assistance of Ash Brokerage to identify such companies, and based on that information, ultimately recommended a Mutual long-term care insurance product to Doe and his partner. SOF ¶¶ 10-14. Loden was an agent authorized to solicit applications for and sell Mutual's products. In

---

[1] A summary of the facts relevant to the personal jurisdiction issue raised by Mutual is in Argument, § I (B), *infra*.

compliance with Mutual's requirements (and Massachusetts law), Loden became licensed to sell insurance in Massachusetts for this transaction. SOF ¶¶ 15, 19-21.

Mutual underwrote Doe's application, which involved an assessment of his risk of future need for long-term care services. The process included a review of his application, an interview, medical records, and a pharmacy check of prescriptions. SOF ¶¶ 46-48. Although Doe was otherwise qualified for long-term care insurance from Mutual, Mutual denied his application solely because he took the medication Truvada as pre-exposure prophylaxis for HIV (PrEP). SOF ¶¶ 41, 44, 49.

Truvada is a medication that was approved by the federal Food and Drug Administration (FDA) in 2004 to treat HIV infection. SOF ¶ 50. The FDA approved it as a preventative in at risk HIV-uninfected individuals in 2012. SOF ¶ 52. Although Mutual never researched or reviewed studies or information on the use or efficacy of PrEP at any time during Doe's application process or in the context of denying his application (SOF ¶¶ 53-56), Mutual has maintained a blanket policy of denying coverage for long-term care insurance to anyone who takes Truvada as PrEP, regardless of the reason. SOF ¶¶ 57-58. Both Doe's and Mutual's experts agree that 80% of PrEP users are gay men. SOF ¶¶ 103-104; 105-108 (expert testimony explaining reasons for the disproportionate impact).

Mutual has articulated inconsistent and shifting reasons for its categorical exclusion of PrEP users. Its chief underwriter has asserted that individuals on PrEP are at high risk for HIV. Mutual's medical director and designated expert, however, disclaims that basis, and instead relies on an asserted lack of long-term data about PrEP. SOF ¶¶ 61-67. Doe has presented expert testimony from a leading authority on HIV prevention that scientific studies indicate that PrEP reduces the risk of HIV transmission by close to 100% if taken daily as a single pill (SOF ¶¶ 94-

95; ¶¶ 68-102, describing scientific studies). However, the Court need not rely on this opinion to conclude that Mutual's "no PrEP users" policy is counterfactual and does not meet any stated goal of reducing the number of people with HIV in its insured pool. Most people at risk for HIV are not on PrEP, but Mutual does not inquire about HIV risk in its application and underwriting process (e.g., applicants' risk factors for HIV or use of condoms). SOF ¶¶ 110-112. Mutual's own experts and medical director admit that comparing two long-term care insurance applicants with identical sexual practices, one of whom takes PrEP as directed and the other does not take PrEP, the individual who is *not* on PrEP presents the higher risk of contracting HIV. SOF ¶¶ 113-114. Mutual's designated expert and medical director, Bruce Henricks, M.D., stated that people at "low" risk for HIV are eligible for Mutual's long-term care insurance. SOF ¶ 118. He speculated, without any evidence, that PrEP use may "foster promiscuity," though he answered "heavens, no" when asked if promiscuity, as he defines it, was grounds for exclusion from long-term care insurance. SOF ¶¶ 115-116. Dr. Henricks then admitted that a person who engages in "promiscuity," as he defines it, and takes PrEP as directed, is at "low risk" for HIV, while a similarly situated person not on PrEP would be at "high" risk for HIV. SOF ¶¶ 118-119. Dr. Henricks' conclusions are hardly surprising since he acknowledges that PrEP is "highly effective" against HIV. SOF ¶ 120.

    Mutual also asserts that its exclusion is justified because people may not take PrEP as directed or comply with recommended follow-up monitoring. SOF ¶¶ 123, 134. Dr. Henricks, however, acknowledged that this is true for all medications, and in fact rates of adherence to medications and follow-up are generally low for all patients. SOF ¶¶ 124-128; 134-136. For all applicants Mutual addresses these concerns about non-adherence in its underwriting procedures by conducting an individualized review of medical records for adherence and compliance.

Mutual acknowledges it could also do this for PrEP. SOF ¶¶ 130-133; 137-146. Finally, Mutual's assertion that there is not long-term data on the efficacy and toxicities of PrEP (SOF ¶ 147) is belied by its disclaimer of any policy or practice denying long-term care insurance to people who take new FDA approved medications. SOF ¶¶ 148-149. When asked about Mutual's policies with respect to a range of new FDA approved medications, Dr. Henricks repeatedly testified that a similar lack of long-term data on toxities and efficacy was not a reason to place those medications on its uninsurable list. SOF ¶¶ 150-198.

Dr. Henricks testified that comparing two otherwise qualified individuals with identical sexual practices, and one takes PrEP and the other does not, he has "no specific information" to conclude that the person on PrEP is at higher risk for long-term care insurance claims. SOF ¶ 122.

## ARGUMENT[2]

### I.    THIS COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANT.

#### A.    Mutual has Failed to Preserve and Has Waived the Defense of Lack of Personal Jurisdiction.

It has been settled beyond peradventure that Fed. R. Civ. P. 12(h)(1)(B) provides a "strict waiver rule" as to the defense of lack of personal jurisdiction such that a defendant "wishing to raise [a lack of personal jurisdiction] must do so in their first defensive move, be it a Rule 12 motion or a responsive pleading." *Glater v. Eli Lilly & Co.,* 712 F.2d 735, 738 (1st Cir. 1983); *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Industries Fund,* 967 F.2d 688, 691-692 (1st Cir. 1992)(same); *Pruco Life Ins. Co. v. Wilmington Trust Co.,* 616 F.

---

[2] Doe agrees with and adopts the "Summary Judgment Standard of Review". Def.'s Mem. in Supp. of Mot. for Summ. J. 6-7, Dkt. No. 112.

Supp. 2d 210, 214 (D. R.I. 2009)(noting repeated First Circuit statements on the applicable

standard).[3]  "A defendant who files a responsive pleading, but who does not object to the

personal jurisdiction of the court, has, in effect, consented to the court's jurisdiction." *Pilgrim*

*Badge & Label Corp. v. Barrios,* 857 F.2d 1, 3 (1st Cir. 1988) (per curiam).

It is undisputed that Mutual neither filed a motion to dismiss nor raised personal

jurisdiction as a defense in its Answer filed on July 5, 2016. *See* Dkt. No. 9. Further, Mutual's

assertion of the defense of personal jurisdiction in its Answer to Plaintiff's Amended Complaint

(Dkt. No. 104) some 19 months later does not revive its defense. *See, e.g., Pruco Life Ins. Co.,*

616 F. Supp. 2d at 214-215 ("… the majority of courts have held a subsequent responsive

pleading cannot revive a 12(b)(2) defense once waived"); *Ribeiro v. Baby Trend, Inc.,* 2016 U.S.

Dist. LEXIS 71190 at *13 (D. Neb., June 1, 2016)("… the filing of an amended complaint does

not revive a Rule 12(b) defense that was previously waived").

Even if Mutual could somehow evade the strict requirements of Rule 12(h)(1)(B) – and it

cannot – its efforts to raise personal jurisdiction at this late stage of the litigation founder because

of Mutual's dilatory and inconsistent conduct.  Satisfying Rule 12(h)(1)(B) does "not preserve

the defense in perpetuity," as it can also be lost by conduct.  *Continental Bank, N.A. v. Meyer,* 10

F.3d 1293, 1297 (7th Cir. 1993)(quoting *Burton v. Northern Dutchess Hosp.,* 106 F.R.D. 477,

481 (S.D.N.Y. 1985)); *Manchester Knitted Fashions,* 967 F.2d at 692 (submission by conduct);

*Precision Etchings & Findings v. LGP Gem,* 953 F.2d 21, 23 (1st Cir. 1992)(personal jurisdiction

---

[3] Upon removal, the Federal Rules of Civil Procedure apply.  *See* Fed. R. Civ. P. 81(c)(1);
*Savarese v. Edrick Transfer & Storage, Inc.,* 513 F.2d 140, 145 (9th Cir. 1975); *Bavone v. Eli
Lilly & Co.,* 2006 U.S. Dist. LEXIS 22996 at *16 n.1 (S.D. Ill., April 24, 2006)(citing cases).
The legal standards under Massachusetts law, however, are the same. *See*, e.g., *Raposo v. Evans*,
71 Mass. App. Ct. 379, 383-384 (2008).

may be implied by conduct); *Marcial Ucin, S.A. v. SS Galicia,* 723 F.2d 994, 996 (1st Cir. 1983)(personal jurisdiction can be waived "by submission through conduct").

Here, it is undisputed that Mutual engaged in full-out litigation against the Plaintiff's claim for two years prior to moving for summary judgment and raising the personal jurisdiction defense,[4] including: making Rule 26 disclosures; negotiating a protective order (Dkt. No. 27); engaging in written discovery and numerous depositions, including two trips to Nebraska; seeking the Court's intervention in numerous discovery motions; and most recently, filing a motion to strike part of Plaintiff's expert report (Dkt. No. 108). *See generally*, Docket.

After all of this, Mutual has removed the jurisdiction defense from the cupboard. This type of "extended inaction" and "participation in, or encouragement of " judicial proceedings,"*Precision Etchings,* 953 F.2d at 25, is attempting "to obtain the very delay which Rule 12 was designed to prevent." *Marcial Ucin*, 723 F.2d at 997.  As the Supreme Judicial Court has noted, to ignore such conduct "would permit a party to keep the defense of lack of personal jurisdiction in its back pocket, even while engaging in conduct signaling that it is submitting to the court's jurisdiction."  *Am. Int'l Ins. Co. v. Robert Seuffer GMBH & Co.,* 468 Mass. 109, 118 (2014).

Without putting too fine a point on it, if this level of litigation engagement over two years is not sufficient to find that a personal jurisdiction defense has been forfeited by conduct, it beggars the imagination what would suffice.  Case law shows that it amounts to waiver.  *See, e.g., Pruco Life Ins. Co.,* 616 F. Supp. 2d at 216 (waited eight months; defense waived); *Continental Bank,* 10 F.3d at 1297 (fully litigated the merits over 2 ½ years; defense waived);

---

[4] The plaintiff's initial Complaint was filed in Massachusetts Superior Court on May 31, 2016. Mutual moved for summary judgment in this court on May 18, 2018. Dkt. No. 110.

*Schwartz v. M/V Gulf Supplier*, 116 F. Supp. 2d 831, 835 (S.D. Texas 2000)(extensive pretrial activity for nine months before motion; defense waived); *Am. Int'l Ins. Co. v. Ziabicki Imp. Co.,* 2012 Mass. Super. LEXIS 178 at *15 - *16 (Mass. Superior Court, July 5, 2012) *aff'd sub nom. Am. Int'l Ins. Co. v. Robert Seuffer GMBH & Co.,* 468 Mass. 109 (2014)(motion served after discovery expired and 21 months after the complaint was filed; defense waived).

For these reasons, this court should hold that Mutual's defense of a lack of personal jurisdiction has been waived.

**B.     A Transaction in Which Mutual's Agent Purposefully Obtained a Massachusetts License in Order to Sell a Policy to be Issued in Massachusetts, to People Living and Present in Massachusetts, Which Mutual Then Denied Through Letters Mailed to Massachusetts, Satisfies the Requirements of the Massachusetts Long-Arm Statute and Due Process.**

For jurisdictional issues in diversity cases, a federal court is the "functional equivalent of a state court sitting in the forum state." *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016) (internal citation omitted). To establish personal jurisdiction over Mutual, Doe must "meet the requirements of both the Massachusetts long-arm statute [M.G.L. c. 223A] and the due process clause of the Fourteenth Amendment." *A. Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016); *see also Exxon Mobile Corp. v. Attorney General*, 479 Mass. 312, 314 (2018) (same). Because the long-arm statute is not "coextensive with the parameters of due process … a determination under the long-arm statute is to precede consideration of the constitutional question." *SCVNGR, Inc. v. Punchh, Inc.*, 478 Mass. 324, 325 (2017); *see also A.Corp.*, 812 F.3d at 59. Doe "has the burden of establishing the facts upon which the question of personal jurisdiction over [Mutual] is to be determined." *Exxon Mobile*, 479 Mass. at 314 (quoting *Droukas v. Divers Training Acad., Inc.,* 375 Mass. 149, 151 (1978)).

9

Mutual's argument that this Court lacks personal jurisdiction over it rests entirely on a sleight of hand. Similarly to many contemporary couples and individuals, Doe and his partner (now spouse) divide their living time between two places: Boston and nearby Rhode Island. SOF ¶ 29-31 (Doe was present at the Boston property three to four days a week and at the Rhode Island property four to five days a week). Mutual has seized upon this unremarkable fact to defeat this Court's jurisdiction over the parties.

The linchpin of Mutual's argument (unsupported by a single citation to authorities)— that this Court is without jurisdiction because Doe is allegedly a citizen of Rhode Island (*see* Def.'s Mem. 11, Dkt. No. 112)— reflects a profound misunderstanding of the law of personal jurisdiction. The inquiry regarding personal jurisdiction has nothing to do with Doe's citizenship, but rather focuses on the "connection between the forum and the specific claims at issue[.]" *Bristol-Myers Squibb Co*. v. *Superior Court*, 137 S.Ct. 1773, 1781 (2017); *see also Bridge St. Auto, Inc. v. Green Valley Oil, LLC*, 985 F. Supp. 2d 96, 109 (D. Mass. 2013) ("Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities."). For example, had Doe been denied admission to an insurance seminar conducted by Mutual in Boston because he is gay or disabled, not even Mutual could seriously deny that a Massachusetts court would have jurisdiction over his complaint, whether Doe is a citizen of Rhode Island, California, or any of the states in between. This basic principle is so evident it has rarely needed articulation. *See, e.g.*, *City Co. of New York, Inc. v. Stern*, 110 F.2d 601, 604 (8th Cir. 1940) ("Jurisdiction of courts to determine controversies does not necessarily depend upon the residence of the parties within the territorial jurisdiction of the court. A citizen of a foreign state may maintain a suit in the courts of another state[.]").

Once this fallacy is cleared up, Mutual's argument evaporates. Mutual's insistent focus on Doe's Rhode Island activities (Def.'s Mem. 15, Dkt. No. 112) underscores its deliberate avoidance of the reality that every aspect of the transaction at issue here is connected to Massachusetts.  Mutual, through its agent, J.D. Loden, who specifically obtained a Massachusetts insurance license for this purpose, was selling Doe an insurance policy to be issued under the laws of Massachusetts, to people present and living in Massachusetts as reflected in their application, and that prospective Massachusetts policy was ultimately denied by mailing two letters into Massachusetts. See SOF § B, ¶¶ 10-45. There is not a single fact connecting Rhode Island to this insurance transaction. When the salient facts are laid out, this case involves a straightforward application of the requirements of the Massachusetts long-arm statute and due process.

These are the relevant facts: Mutual sells its long-term care insurance through authorized agents. SOF ¶ 4. Mutual acknowledges that the producer for the application from Doe and his partner, J.D. Loden, "became registered" to sell insurance in Massachusetts (Def.'s Mem. 16, Dkt. No. 112), but this innocuous-sounding averment is misleading. As instructed by Ash Brokerage, also a Mutual agent, Mutual required that Loden obtain a producer's license in Massachusetts for this specific transaction, and he was additionally required to complete the new Massachusetts long-term care insurance continuing education requirements, in order to "solicit" or "write" a Massachusetts insurance contract for Doe and his partner. SOF ¶¶ 15, 19, 20-21. Loden's testimony reveals the essential nature of the transaction. He obtained the Massachusetts license because, "you have to have a license for that state to write an insurance contract for a resident of that state … You can't solicit or write a contract unless you're licensed," acknowledging that means in the state you are writing it for. SOF ¶ 21.

11

Every aspect of the application and transaction went forward on the basis that it was a Massachusetts issued insurance policy for individuals present and living in Massachusetts. The Ash Brokerage representative, Teresa-Ann Curreri, wrote to Loden with proposed quotes "for your MA clients." SOF ¶ 21. Each page of the quotes bears a header stating, "Issue State: Massachusetts," denoting where the policy was to be issued. SOF ¶¶ 22-25. Further, Doe does have a clear connection to the forum state.  There is no dispute that he lives part-time in Massachusetts. SOF ¶¶ 29-31. When the application process began, an issue arose as to the couple's place of residence. SOF ¶¶ 32-33. After speaking with Doe to resolve the issue, Ash Brokerage sent the couple a pre-populated application form, listing the address for the couple as a Boston address. SOF ¶¶ 34-38. Having been given information it does not dispute about the living situation of Doe and his partner, Mutual, through its agents, regarded the couple's application as one for a Massachusetts policy. Doe was forthcoming about his dual living situation; Mutual cannot now complain about its agent's determination. The application was denied by Mutual due to Doe's PrEP use, and the denial was affirmed after Doe's unsuccessful internal appeal to Mutual. SOF ¶¶ 41, 43, 44. Both denials were communicated by letters addressed to Doe at his Boston address listed on the application that Mutual underwrote; Doe's appeal letterhead also used the Boston address. SOF ¶¶ 42, 43, 45.

1.    **Doe's Claim Meets the Requirements of § 3(a) of the Massachusetts Long-Arm Statute.**

Section 3(a) of the Massachusetts long-arm statute provides that a "court may exercise personal jurisdiction over a person … as to a cause of action in law or equity arising from the person's … transacting any business in the commonwealth." M.G.L. c. 223A, § 3(a).  Turning to the first requirement, that Mutual "trans[acts] any business in the commonwealth," courts

construe that language in a "generous manner," and "focus on 'whether the defendant[s] attempted to participate in the commonwealth's economic life.'" *Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015) (quoting *United Elec., Radio & Mach. Workers of Am v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st Cir. 1992)); *see also Access Now, Inc. v. Otter Prods., LLC*, 280 F. Supp. 3d 287, 291 (D. Mass. 2017) ("the definition of 'transacting' is construed broadly under Massachusetts law."). "[A]ny purposeful acts … can be considered 'transacting business'" under the long-arm statute. *Berry v. Cook*, 2011 Mass. Super. LEXIS 2015, *6 (September 8, 2011) (quoting *LaForest v. Ameriquest Mortg. Co.*, 383 F. Supp. 2d 278, 283 (D. Mass. 2005)).

Here, Mutual literally transacts business in Massachusetts. Mutual is licensed by the Commonwealth to sell long-term care insurance in Massachusetts, sells and issues its long-term care insurance products in Massachusetts, has a division office in Massachusetts where its producers offer its long-term care insurance products, and maintains an interactive website through which consumers in Massachusetts can leave contact information to be solicited for its insurance products. SOF ¶¶ 1, 3, 6, 7-8. This easily satisfies the "transacts business" requirement. *See, e.g., Access Now*, 280 F. Supp. 3d at 291 (defendant was registered to do business in and has a field marketing representative in Massachusetts); *Edwards v. Radventures*, 164 F. Supp. 2d 190, 194 (D. Mass. 2001) (sales to Massachusetts citizens, a website through which Massachusetts sales were solicited, and a Massachusetts sales location).

Under § 3(a), the "arising from" requirement is met when "'the claim was made possible by, or lies in the wake of, the transaction of business in the forum State.'" *Access Now*, 280 F. Supp. 3d at 291 (quoting *Tatro v. Manor Care, Inc.,* 416 Mass. 763 (1994)). "The inquiry ultimately boils down to a 'but for' causation test which asks '[d]id the defendant's contacts with

the Commonwealth constitute the first step in a train of events that result[ed] in the personal injury.'" *Access Now*, 280 F. Supp. 3d at 291 (quoting *Lyle Richards Int'l, Ltd. v. Ashworth*, *Inc.*, 132 F.3d 111, 114 (1st Cir. 1997)).

Simply, a claim based on the denial of an insurance policy that was to be "issued" in Massachusetts pursuant to Mutual's Massachusetts-granted authority to do so, that was offered to Doe under the authority of the Massachusetts license of Mutual's agent, and that was denied through letters mailed to Massachusetts, "arises from" Mutual's transaction of its insurance business in Massachusetts.

Mutual's sole objection to the application of the Massachusetts long-arm statute is a single sentence at the very end of its discussion of the long-arm statute, in which it states, "whether Plaintiff can satisfy the Massachusetts long-arm statute depends on whether Plaintiff is a citizen of another state and therefore will not feel the alleged harm in the Commonwealth." Def.'s Mem. 11, Dkt. No. 112. This is a statement of metaphysics, not law. Mutual provides no citation for this proposition, and there is nothing in the case law on the long-arm-statute pointing to the relevance of where Doe "feel[s]" anything. The facts demonstrate that Mutual availed itself of its licensure to do business in Massachusetts by selling, issuing, underwriting, and ultimately denying a Massachusetts insurance policy to individuals living in Massachusetts, including mailing the denial letters that give rise to this claim into Massachusetts. The provisions of M.G.L. c. 223A, § 3(a) are satisfied.

### 2. Litigation in Massachusetts Arising From the Denial of Doe's Application Comports with Due Process.

The constitutional requirements for personal jurisdiction are well-established. The "due process clause requires that to subject a nonresident defendant to jurisdiction within a state the

defendant must 'have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *A Corp.*, 812 F.3d at 59 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)). The "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014). The First Circuit has established a three-pronged test to determine if jurisdiction over a nonresident defendant is proper under the Due Process Clause: (1) whether the claim directly arises out of, or relates to, the defendant's forum state activities; (2) whether the defendant's in-state contacts represent a purposeful availment of the privilege of conducting business in the forum state, thereby invoking the benefits and protections of the state's laws and making the defendant's involuntary presence before the state's courts foreseeable; and (3) whether the exercise of jurisdiction is reasonable. *Cosart*, 804 F.3d at 20. Mutual addresses only the first prong.

The relatedness inquiry is a "flexible, relaxed standard[.]" *Grice v. VIM Holdings Grp., LLC*, 280 F. Supp. 3d 258, 271 (D. Mass. 2017). It focuses on the "nexus between [plaintiff's] claims and [the defendant's] forum-based activities." *A Corp.*, 812 F.3d at 59 (citing *Adelson v. Hananel*, 652 F.3d 75, 81 (1st Cir. 2011)). Specific jurisdiction may arise out of a single contact if it creates a "substantial connection" with the state. *See Grice*, 280 F. Supp. 3d at 272 (citing *Burger King Corp. v. Rudewicz*, 471 U.S. 462, 475 (1985)); *see also Landmark Bank v. Machera*, 736 F. Supp. 375, 379 (D. Mass. 1990) ("the necessary level of minimum contacts can be quite low— indeed, a single contact with the forum can be sufficient, as long as the cause of action arises out of the contact."). In *Baskin-Robbins*, the First Circuit held that two letters addressed to a plaintiff in Massachusetts were sufficiently related to a contested franchise

agreement to satisfy the relatedness requirement because "it is the letters that set the present controversy in motion." *Baskin-Robbins*, 825 F.3d at 36.

In this case, the two letters denying Doe's application for a Massachusetts-issued insurance policy that Mutual mailed into Massachusetts are the precipitating event of Doe's suit challenging that denial. These letters establish the predicate nexus between Doe's claims and Mutual's forum-based activities. But the Court need not rely upon the denial letters alone. The entire course of conduct here, beginning with the presentation of premium quotes for a Massachusetts-issued policy, emanates from Mutual's Massachusetts-based contacts. When Loden obtained a Massachusetts license to solicit the sale of a Massachusetts-issued policy, Mutual, through its agent, reached into Massachusetts with the purpose of entering into a contractual relationship with Doe. The relatedness requirement is easily satisfied.

The "purposeful availment inquiry is intended 'to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state.'" *A Corp*., 812 F.3d at 60 (quoting *Sawtelle v. Farrell*, 70 F.3d 1381, 1391 (1st Cir. 1995)). This prong asks whether a nonresident defendant "'deliberately target[ed] its behavior toward the society or economy of a particular forum [such that] the forum should have the power to subject the defendant to judgment regarding that behavior.'" *Baskins-Robbins Franchising*, 825 F.3d at 36 (alterations in original) (quoting *Carreras v. PMG Collins, LLC*, 660 F.3d 549, 555 (1st Cir. 2011)). "The 'key focal points are the voluntariness of the defendants' relevant Massachusetts contacts and the foreseeability of the defendants falling subject to Massachusetts's jurisdiction.'" *Access Now*, 280 F. Supp. 3d at 293 (quoting *Copia Commc'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1, 5 (1st Cir. 2016)). These requirements are easily met. Mutual was selling a Massachusetts policy through an agent who also obtained a Massachusetts license to conduct business here with

the intention of entering into a contract issued pursuant to the regulatory authority of Massachusetts. These are hardly random or fortuitous interactions with the Massachusetts society and economy. Through these deliberate activities it was clearly foreseeable that Mutual would be required to answer for its conduct in a Massachusetts court, in connection with its solicitation and denial of a sale in Massachusetts.

Finally, with respect to the reasonableness of the court's exercising jurisdiction over Mutual, where, as here, the plaintiff has established relatedness and purposeful availment, the defendant must "'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Exxon Mobile*, 479 Mass. at 323 (quoting *Burger King Corp.*, 471 U.S. at 477)). It is "'presumptively not unreasonable' for a Court to assert personal jurisdiction over a defendant once it has been established that the claim arises out of the forum-based conduct and the defendant purposefully availed itself of other laws of the forum state[,]" such as, in this case, the insurance laws. *Grice*, 280 F. Supp. 3d at 274 (quoting *Burger King Corp.*, 471 U.S. at 476)). While First Circuit precedent employs a number of factors to assess reasonableness, they are only "'intended to aid the court in achieving substantial justice,' and play a larger role in close cases." *A Corp.*, 812 F.3d at 61 (quoting *Adelson v. Hananel*, 510 F.3d 43, 51 (1st Cir. 2007)). Having availed itself of the Commonwealth's insurance licensing and economy in soliciting the sale of a Massachusetts insurance policy, and mailed the denial letters giving rise to this claim into Massachusetts, it is hardly unreasonable for Mutual to answer to a suit here.

Much of Mutual's discussion lays out, in the abstract, the well-established black letter law of personal jurisdiction about which there is no disagreement. However, when Mutual turns to the application of those principles to the actual facts of this case, it relies upon inapposite

cases in which the defendant had no direct connection with the forum state related to the claim at issue. For example, in *Bristol-Myers Squibb,* a 2017 Supreme Court decision about a claim for personal injuries from the sale of a drug, there was a complete "lack of any identifiable connection between [the plaintiff's] claims and the nonresident defendant's activities [in the state.]" *Exxon Mobile*, 479 Mass. at 321 n. 8 (distinguishing *Bristol-Myers Squib).* For example, as the Supreme Court noted, the nonresident plaintiffs suing in California "did not allege that they obtained [the drug] through California physicians or from any other California source; nor did they claim that they were injured by [the drug] in California." *Bristol-Myers Squibb*, 137 S. Ct. at 1778.[5] In this case, in contrast, Mutual was selling, underwriting, and ultimately denying a Massachusetts product on the assumption, and in fact reality, that the prospective insureds were in Massachusetts. Mutual also cites *Gulf Oil Ltd. P'Ship v. Petro Mktg. Grp.*, 2018 U.S. Dist. LEXIS 55478 (D. Mass. Mar. 30, 2018) for the proposition that Doe does not "feel the effects" of Mutual's out-of-state conduct in Massachusetts." Def.'s Mem. 15, Dkt. No. 112. In that case the Court ruled that "Gulf's argument for specific jurisdiction fails because its claims against BP in this suit do not arise from, nor are they related to, BP's commercial activities in Massachusetts." *Gulf Oil*, 2018 U.S. Dist. LEXIS 55478 at *9. The "effects test" is employed as an alternative means of asserting jurisdiction where, unlike here, there is no direct interaction with the forum state. *See Gulf Oil*, 2018 U.S. Dist. LEXIS 55478 at *9 ("Gulf argues that BP's necessary claim-related Massachusetts contacts arise because Gulf has suffered the effects of BP's wrongful conduct committed elsewhere.").

---

[5] *See* Def.'s Mem. 15, Dkt. No. 112 (citing *Bristol-Myers* as support for its point "[t]hat Mutual does some business in Massachusetts is immaterial to the specific jurisdiction inquiry where those business contacts are not connected to Plaintiff's claims").

Mutual has purposefully and deliberated availed itself of conducting its insurance business in Massachusetts, including sending the denial letters into the state, and its solicitation and prospective sale of a Massachusetts policy to Doe arise directly out of that business. This Court has personal jurisdiction over Mutual.

## II.    THE UNDISPUTED FACTS DEMONSTRATE THAT MUTUAL DISCRIMINATED AGAINST JOHN DOE ON THE BASIS OF SEXUAL ORIENTATION AND DISABILITY IN VIOLATION OF M.G.L. C. 272, § 98.

The Massachusetts Public Accommodation statute provides in relevant part:

> Whoever makes *any distinction, discrimination, or restriction* on account of race, color, religious creed, national origin, sex, gender identity, sexual orientation … deafness, blindness or any physical or mental disability or ancestry relative to the admission of any person to, *or his treatment in* any place of public accommodation, resort or amusement, as defined in section ninety-two A, or whoever aids or incites such distinction, discrimination or restriction, shall be [subject to liability].

M.G.L. c. 272, § 98 (emphasis added). In order to prevail, Doe must prove that: (1) he is a member of a protected class; (2) that Mutual subjected him to "any distinction, discrimination, or restriction" on account of his protected class status; (3) relative to his admission to or treatment in a place of public accommodation. *See Joyce v. Town of Dennis,* 705 F. Supp. 2d 74, 85 (D. Mass. 2010); *Soltys v. Wellesley Country Club,* 2002 Mass. Super. LEXIS 550 at *20 (Oct. 28, 2002); *Stropnicky v. Nathanson*, 1997 Mass. Comm. Discrim. LEXIS 12, *12 (Feb. 25, 1997).

## A.    Mutual is a Place of Public Accommodation Because it Offers and Sells Long-Term Care Insurance to Consumers in Massachusetts, and its Denial of an Insurance Policy to Doe is Subject to the Provisions of M.G.L. c. 272, § 98.

Turning to the definition of a place of public accommodation, the salient language includes "*any* place … which is open to and accepts or solicits the patronage of the general public." M.G.L. c. 272, § 92A (emphasis added). Mutual does not attempt to deny that it comes

within this language as it offers, sells, and markets long-term care insurance to people in Massachusetts. SOF ¶¶ 1, 2, 3, 7-8.

Further, Mutual's denial of an insurance application, and its policy excluding applicants who take PrEP from long-term care insurance, is a transaction that comes within the bounds of the public accommodation statute. *See Samartin v. Metropolitan Life Ins. Co.*, 2005 Mass. Comm. Discrim. LEXIS 43 (2005). *Samartin* involved a challenge to a limit on the duration of benefits for mental disability due to "mental illness or nervous disorder," as compared to coverage for physical disabilities, in a long-term disability insurance policy. *Id*. at *1-2. The Commission concluded that the challenged "provision of LTD benefits to Complainant is subject to" M.G.L. c. 272, §§ 92A and 98. *Samartin*, 2005 Mass. Comm. Discrim. LEXIS 43 at *21. In *Currier v. Nat'l Bd. Of Med. Examiners,* 462 Mass. 1, 19 (2012), the Supreme Judicial Court endorsed *Samartin* and gave it substantial deference as the Commission's interpretation of its governing statute.

Mutual's sole objection to the application of M.G.L. c. 272, § 98, that "[p]laintiff's application involved no physical office of Mutual in Massachusetts" (Def. Mem. 18, Dkt. No. 112), has been rejected by the Supreme Judicial Court's holding in *Currier*. *See* 462 Mass. at 20. The Court rejected an argument by the National Board of Medical Examiners (NBME) that its reasonable accommodations policies were not subject to    § 98 because it did not maintain a physical presence in Massachusetts. *Currier*, 462 Mass. at 17-20.

The Court held that "the 'equal accommodations, advantages, facilities and privileges' afforded by the statute are not restricted to a person's entrance into a physical structure.  . . . Rather, the statutory protections extend to situations where *services are required that do not require a person to enter a physical structure*, *requiring equal access to the advantages and*

20

*privileges of services and services providers*." *Currier*, 462 Mass. at 19 (emphasis added) (citing

*Samartin*, 2005 Mass. Comm. Discrim. LEXIS at 19-20). The Court gave deference to and

endorsed the reasoning of the Massachusetts Commission Against Discrimination in concluding

that:

> [T]imes are such today where business is increasingly conducted
> through the Internet or over telephones. To limit the statute's reach
> to physical accessibility would be contrary to the goals of the statute and
> "would allow any number of discriminatory actions that the statute
> prohibits."

*Currier*, 462 Mass. At 19 (quoting *Samartin*, 2005 Mass. Comm. Discrim. LEXIS at *21). Thus,

even though NBME did not have a physical presence in Massachusetts, it was subject to M.G.L.

c. 272, § 98 because it was the entity that "controls the conditions under which the exam is

administered and whether accommodations may be granted to examinees[.] … [T]he active

provision of testing services in Massachusetts, *which services by their nature are mobile*, is

sufficient to bring the NBME within the reach of the statute." *Id.* at 19-20 (emphasis added).

Mutual is a service provider in Massachusetts; it is licensed to offer, sell, and issue its

long-term care insurance products in Massachusetts. Applying *Currier's* reasoning and holding,

the fact that Mutual's agent, Loden, transacted the business of selling a Mutual insurance policy

to people in Massachusetts via telephone, email, and mail, rather than through a physical

storefront, or that the denial letters were mailed into Massachusetts, is immaterial to the

application of the statute. *Currier* instructs that those modes of communication used to offer,

sell, and deny Doe a Massachusetts insurance policy are simply the modern-day equivalent of

walking into a storefront in Massachusetts for the very same purpose.

Mutual attempts to evade the obvious import of *Currier* by incorrectly asserting that its

holding was dependent upon the fact that an out-of-state entity hired an in-state entity to provide

21

a physical site, and that "all ... cases still involve a connection to some physical location." Def.'s

Mem. 18, Dkt. No. 112. This misses *Currier*'s controlling premise, repeatedly emphasized by the

Court, that business transactions with the public are no longer limited to physical locations. The

long-term disability policy in *Samartin*, upon which the Court heavily relied, did not involve a

"connection to some physical location." Of course many cases under M.G.L. c. 272, § 98 will

involve access to a physical place, such as a club, but Defendant's citation of pre-*Currier* cases

involving such places does not change *Currier*'s holding.

    Mutual's denial of insurance to Doe, and its policy categorically excluding HIV-negative

individuals who take PrEP from long-term care insurance, are subject to the antidiscrimination

provisions of M.G.L. c. 272, § 98.

    **B.**    **The Undisputed Facts Establish that Mutual Discriminated Against Doe on the Basis of his Sexual Orientation in Violation of M.G.L. c. 272, § 98 Because Mutual, Without Adequate Justification, Denies Long-Term Care Insurance to All PrEP Users, 80% of Whom are Gay Men.**

    A plaintiff may bring a disparate impact claim under M.G.L. c. 272, § 98. *See Currier*,

462 Mass. at 20 ("The language of [G.L. c. 272, §98] … shows no intent to limit its application

to only cases involving intentional, [and] purposeful discrimination … [W]e conclude, as a

matter of law, that [a] disparate impact claim is not prohibited under the public accommodation

statute."). A "[d]isparate impact occurs when a decision disproportionately disadvantage[s]

members of a protected class." *Burbank Apartments Tenant Ass'n v. Kargman*, 474 Mass. 107,

121 (2016) (alterations in original) (internal quotation marks omitted) (finding disparate impact

theory available under Massachusetts housing antidiscrimination law). *See also EEOC v.*

*Steamship Clerks Union, Local 1066*, 48 F.3d 594, 601 (1st Cir. 1995) ("Discrimination may

also result from otherwise neutral policies and practices that, when actuated in real-life settings,

operate to the distinct disadvantage of certain classes of individuals."); *Sch. Comm. of Braintree v. Mass. Comm'n Against Discrimination*, 377 Mass. 424, 429 n.10 (describing disparate impact liability as involving "practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another.").

Discriminatory motive or intent is not a necessary element of a disparate impact claim. *See Tex. Dep't of Housing and Cmty. Affairs v. Inclusive Cmtys Project*, 135 S. Ct. 2507, 2513 (2015) ("In contrast to a disparate treatment case, where a 'plaintiff must establish that the defendant had a discriminatory intent or motive,' a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale.'") (quoting *Ricci v. Destefano*, 557 U.S. 557, 577 (2009), and finding disparate impact theory available under federal fair housing act); *Sch.l Comm. of Braintree*, 377 Mass. at 429 (discriminatory motive is not an element of proof). As Justice Kennedy explained in *Inclusive Communities*, disparate impact liability "plays a role in uncovering discriminatory intent: It permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment." *Inclusive Cmtys,* 135 S. Ct. at 2522.

In *Burbank*, the Supreme Judicial Court adopted for Massachusetts housing discrimination law the well-established burden-shifting framework utilized by the Supreme Court in *Inclusive Communities*. *Burbank*, 474 Mass. at 126. Under that framework, the plaintiff initially "has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." *Inclusive Cmtys*, 135 S. Ct. at 2514 (quoting 24 C.F.R. § 100.500 (c)(1) (2014)).  A plaintiff may rely on a statistical disparity showing how a specifically identified policy affects a protected class as compared to others, and must demonstrate a causal connection

23

between the policy and the disparate impact. *Inclusive Cmtys*, 135 S. Ct. at 2523-2524. Once the plaintiff makes out this prima facie case, the defendant bears the burden of proving that the challenged policy is "necessary to achieve a valid interest." *Id.* at 2523. Finally, if the defendant meets its burden, the plaintiff may still prevail by proving that the defendant's interests could be served by "'an available alternative … practice that has less disparate impact and serves the [entity's] legitimate needs.'" *Id.* at 2511 (quoting *Ricci*, *supra* at 578). This framework in *Burbank* should be followed in analyzing Doe's disparate impact claim here.[6]

     **1.**     **The Undisputed Facts Establish a Prima Facie Case of Discrimination Under a Disparate Impact Theory Because 80% of PrEP Users Are Gay Men.**

A prima facie case under a disparate impact theory is "shown by proof that the plaintiff has suffered an injury because a facially neutral policy deprives members of a protected group in disproportionate numbers of a benefit available to non-members of the group." *R.I. Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 123-124 (D.R.I. 2015); *See also Inclusive Cmtys*, 135 S. Ct. at 2514, 2523-2524.[7]  Mutual's blanket exclusion of PrEP users from long-term care

---

[6] *Inclusive Communities* and *Burbank*, in the housing discrimination context, are the most recent articulation of the framework for disparate impact claims. The burden-shifting framework they lay out follows the long-established and accepted precedent in the employment context first established by the Supreme Court in *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 656 (1989), and also applicable to the public accommodations context. *See Hardie v. NCAA,* 861 F.3d 875, 881-883 (9th Cir. 2017) (declining to decide whether the federal Title II public accommodations law encompasses disparate-impact claims, but noting that the burden-shifting framework in *Wards Cove* and *Inclusive Communities* would be the applicable framework); *EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 601-602(1st Cir. 1995) (setting out the *Wards Cove* burden-shifting framework in detail in a Title VII case).

[7] *See also Steamship Clerks*, 48 F.3d at 601("In the disparate impact milieu, the prima facie case consists of three elements: identification, impact, and causation. First, the plaintiff must identify the challenged employment practice or policy, and pinpoint the defendant's use of it. Second, the plaintiff must demonstrate a disparate impact on a group characteristic, such as race, that falls within the protective ambit of Title VII. Third, the plaintiff must demonstrate a causal impact

24

insurance on its face disproportionately impacts gay men, a protected class under Massachusetts law.

It is undisputed that Mutual has a policy that a priori excludes every user of PrEP from purchasing its long-term care insurance solely on that basis. SOF ¶¶ 57-58. It is also undisputed that this policy has a statistically disparate impact on a group characteristic, sexual orientation. Bruce Henricks, M.D., Mutual's Medical Director and expert witness, agrees with Doe's expert, Kenneth Mayer, M.D., that "individuals who use PrEP are predominantly gay men," and that "approximately 80 percent of PrEP users are gay men." SOF ¶¶ 103-104. A disparity of this extraordinary magnitude easily constitutes the required "disparate impact." *See, e.g., Bradley v. Pizzaco of Neb., Inc.,* 7 F.3d 795, 796 (8th Cir. 1993) (an employer's no-beard policy was found to result in a disproportionate impact based on race because approximately 50% of African-American males suffered from psuedofolliculitis barbae, half of whom were unable to shave); *Greater New Orleans Fair Housing Action Center v. St. Bernard Parish*, 641 F. Supp. 2d 563, 567 (E.D. La. 2009) (challenging housing policy which reduced availability of structures with five or more units, and lowered rental stock; disparate impact shown where 17.61% of African-American households lived in structures with 5 or more units, compared to only 9.54% of Caucasian households, and 51.7% of African-American households lived in rental units compared to just over 25% of Caucasian households).

Doe, a gay man who applied for long-term care insurance with his same-sex partner, is within the protected class. He would have been issued a long-term care insurance policy but for the direct application of Mutual's "no PrEP users" policy, which disproportionately impacts gay

---

between the identified practice and the disparate impact.") (citing *Wards Cove*, 490 U.S. at 650-657).

men who are the main users of PrEP. SOF ¶ 49.  He has established a prima facie case of discrimination under his disparate impact theory.

> ### 2. The Undisputed Facts Demonstrate that Mutual Cannot Meet its Burden of Proving That its Categorical Exclusion of PrEP Users is Necessary to Achieve a Valid Interest.

Because Doe has established a prima facie case by showing that Mutual's underwriting practice and policy regarding PrEP has a disproportionate adverse effect on gay men, Mutual has the burden of proving that the challenged policy "is necessary to achieve a valid interest." *Inclusive Cmtys*, 135 S.Ct. at 2523. Mutual cannot meet this burden because: (1) the undisputed facts show its "no PrEP users" policy bears no logical or rational relationship to its stated interest in reducing the number of people with HIV in its insured pool; and (2) its proffered concern that PrEP users may not adhere to their medication regimen or follow-up monitoring is belied by the existence of underwriting practices that address these same concerns for patients on other medications; and 3) its justification that PrEP was too new and therefore lacked long-term data is similarly eviscerated by its lack of a similar concern for numerous other new medications, including some that have documented complications of greater concern for long-term care insurance underwriting than has PrEP.

> ### i. Reducing People with HIV in Insured Pool.

One of the reasons Mutual proffers for its PrEP exclusion is the goal of reducing the number of people with HIV in its insured pool. *See* SOF ¶¶ 61, 63 (testimony of Lisa Ging that Truvada is excluded because "someone has HIV or they are at high risk for acquiring HIV"; "[i]f you develop HIV, you may need to utilize long-term care services"). Mutual's stated actuarial principles for long-term care insurance require that applicants of the same risk be categorized similarly, and applicants of a lesser risk should not be categorized adversely to an applicant of a

higher risk. SOF ¶ 59; *see also* SOF ¶ 60 ("If the overall risk for needing long-term care is the same, [applicants] should be receiving the same rate classification"). Mutual's "no PrEP users" policy, however, is counterfactual; by its own admission, it excludes the relatively lower risk applicant, and offers its insurance to the relatively higher risk applicant.

Most people at risk for HIV are not on PrEP. SOF ¶ 110. Mutual's application and underwriting review process does not ask applicants about risk factors for HIV. SOF ¶¶ 111-112. Mutual will thus inevitably insure people who are at risk for, and will contract, HIV. A policy that excludes only those people at risk for HIV who take a preventative bears no rational or logical relationship to the goal of reducing the incidence of HIV among its insureds. *See* SOF ¶¶ 113-119.  Mutual's Medical Director and expert, Dr. Henricks, testified that comparing two long-term care insurance applicants with identical sexual practices, where one takes PrEP as directed and the other person does not take PrEP, the individual who is not on PrEP presents the higher risk of contracting HIV. SOF ¶ 113. Asked about the same comparison, Mutual's actuarial expert, Allen Schmitz, concluded that "it feels like the individual who is not taking PrEP is a higher risk" for HIV. SOF ¶ 114. Dr. Henricks repeated a similar position when asked about his reference in his expert report to the possibility that people on PrEP would engage in "promiscuity." SOF ¶ 115. Dr. Henricks acknowledged that Mutual does not screen for "promiscuous" behavior, SOF ¶ 116, and opined that, with respect to a person who engages in "promiscuity" however he defines it and takes PrEP as directed, "[t]he risk of [HIV] is low." SOF ¶ 117. Dr.  Henricks stated that an otherwise qualified applicant who is at low risk for HIV is "of course" eligible for long-term care insurance from Mutual." SOF ¶ 118. In contrast, Dr. Henricks testified that a person who engages in "promiscuity," is not on PrEP, and does not use a condom is at high risk for HIV. SOF ¶ 119. By Mutual's own admissions, the person at higher

risk for HIV is offered its insurance, while the person at lower risk is denied the insurance, contrary to its own underwriting principles and goals. *See also* New York Insurance Policy, discussed *supra*, https://www.dfs.ny.gov/insurance/circltr/2018/cl2018_08.pdf (concluding that insurance policies that exclude "individuals who take PrEP to mitigate the risk of contracting HIV are neither based on sound actuarial principals nor related to actual or reasonably anticipated experience.").

Indeed, Dr. Henricks has acknowledged the correctness of Plaintiff's logic. Dr. Henricks agrees that "PrEP is highly effective against HIV infection when taken as required," and that the benefits of PrEP as of 2015 were "the prevention of HIV acquisition." SOF ¶¶ 120-121. Asked if there were benefits to taking PrEP, Dr. Henricks testified:

> In my professional opinion, yes… It has the potential to be quite efficacious in preventing the acquisition of HIV if it's used properly, which properly would be they're adherent to the proper dosage, they go through an initial pretreatment evaluation, and then are rigorous in their follow up as prescribed by the FDA and the package insert on follow up on Truvada's use.

SOF ¶ 157. Plaintiff's expert, Dr. Mayer, a leading authority on HIV prevention and PrEP, concludes that the efficacy of PrEP approaches 100 percent when taken daily as directed. SOF ¶¶ 94-95. It is not necessary, however, for the Court to credit Dr. Mayer's opinion in order to conclude that Mutual has not met its burden to prove a valid interest for its exclusion of PrEP users. A requirement of near perfection is hardly Mutual's standard for efficacy, and Dr. Henricks' acknowledgement of its efficacy is more than sufficient on this point.

In sum, the effect of Mutual's PrEP exclusion is to carve out and exclude from its pool of applicants who may have some risk for HIV *only* those individuals who are taking a highly effective preventative tool, while offering insurance to similarly situated individuals who are not

28

taking a highly effective preventative tool. That is not rational. Dr. Henricks underscored the

lack of any valid interest served by Mutual's PrEP exclusion when he concluded that when

comparing two otherwise qualified individuals with identical sexual practices, where one takes

PrEP and the other does not, he has "no specific information" to conclude that the person on

PrEP is at higher risk for long-term care insurance claims. SOF ¶ 122.

   **ii.**  **Risk of Nonadherence to Medication and Follow-up.**

 Mutual next asserts that it has a valid interest in excluding PrEP users because they may

not adhere to taking PrEP daily or comply with recommended follow-up monitoring. SOF ¶¶

123, 134. Now, nonadherence to medication is, as Dr. Henricks acknowledges, a widespread

problem for insurers, including Mutual. SOF ¶¶ 124-128. He agrees that the effectiveness of

every medication taken by every patient is influenced by adherence to the recommended

regimen, and that 75% of Americans have trouble taking their medication as directed, which may

result in harm and increased morbidity. SOF ¶¶ 124-128. In the case of other medications,

Mutual has a standard practice for addressing this very concern. It conducts an individualized

assessment of medication adherence at the time of underwriting the application by "looking at

the medical records … [t]he physician assessment and documentation of such … It's the best

source of data." SOF ¶ 131.  Dr. Henricks acknowledged that Mutual could similarly assess

adherence by PrEP users and, under its regular policy, could exclude those who are nonadherent.

SOF ¶ 133. Mutual's categorical exclusion of all PrEP users without regard to individual

adherence is all the more concerning in light of Dr. Mayer's assessment based on his

professional, clinical, and research experience that "it is uncommon that an individual seeks out

PrEP and does not take it." Mayer Aff. ¶ 32.

Dr. Henricks also acknowledges that patients on all medications do not always comply with recommended monitoring and follow-up for medications. SOF ¶¶ 135-136. Similarly to medication adherence, Mutual assesses applicants' compliance with medical follow-up on an individualized basis by looking at the medical records it requests in the underwriting process. SOF ¶¶ 138-143; *see also* SOF ¶ 137 (It is "fairly simple … if the physician recommends they come back in three months and they come back in three months"). Dr. Henricks testified that an applicant's compliance with the recommended follow-up for PrEP would be assessed by the medical records "if the physician did a good job of recording it," which he acknowledged would be true for many medications not excluded by Mutual. SOF ¶¶ 144-145. *See also* SOF ¶ 146 (same procedure to assess pre-PrEP evaluation).

Mutual does not deny insurance carte blanche for any other drug for reasons related to medication adherence or compliance follow-up. Its inconsistent, *sui generis* policy with respect to PrEP demonstrates that the exclusion is unnecessary.

    **iii.**       **The Newness of PrEP.**

Mutual insists that its blanket exclusion of PrEP users is valid and necessary because PrEP is a relatively new drug for which Mutual does not have "extensive claims experience," nor is there long-term data on its efficacy and toxicities. SOF ¶ 147.[8] This assertion is at odds with the undisputed fact that Mutual denies any practice or policy placing all new FDA-approved

---

[8] See Henricks Report, Appendix 135 (p. 7) ("no real conclusions on the long-term implications of Truvada therapy or related toxicities that would allow analysis of their potential influence on morbidity"; insufficient "data to answer the questions of long-term toxicities and their impact on morbidity"; lack of data "to assess the long-term, real-world safety profile"; and lack of "time and extensive claims experience"). *See also* Schmitz Report, Appendix 152 (p. 8) ("Truvada as PrEP is a relatively new drug and the long-term effects of Truvada are unknown").

medications on the uninsurable list, even though long-term data for those medications is equally unavailable. SOF ¶¶ 148-149.

In fact, an examination of the medications discussed in Section J of Plaintiff's Statement of Undisputed Facts reveals that Mutual has not excluded users of numerous new medications which Dr. Henricks repeatedly acknowledged similarly lack extensive claims experience or long-term data on efficacy or toxicities. *See, e.g.* SOF ¶¶ 166-170 (lack of information about long-term safety and toxicities as well as extensive claims data about the medication Tanzeum was not a reason to exclude a user of Tanzeum upon FDA approval in 2014); SOF ¶¶ 171-175 (Trulicity was a diabetes drug FDA approved in 2014 and Dr. Henricks acknowledged that there was not sufficient information to make conclusions about its long-term toxicities, safety and efficacy); SOF ¶ 177-178 (Farxiga was FDA approved in 2014 and its "long-term safety and efficacy were unknown," but that is not a reason to place it on uninsurable medication list). *See also generally,* medications discussed at SOF ¶¶ 150-198.

Four of the medications listed in Section J (i) of Plaintiff's Statement of Undisputed Material Facts prominently highlight the speciousness of Mutual's reliance on the lack of long-term data about PrEP. The medication Duavee was approved by the FDA in 2013. SOF ¶ 150. It can increase the risk of dementia, which Dr. Henricks testified was "absolutely" a concern and should warrant caution for long-term care insurance underwriting as it is one of the leading areas of claims. SOF ¶¶ 152-154. Notwithstanding that concern or the newness of the medication, Dr. Henricks did not think that people who take Duavee should be excluded from long-term care insurance because there may be potential side effects that are offset by the benefits of its use. SOF ¶¶ 155-156. PrEP has not been associated with any significant adverse events or side

effects. SOF ¶ 199. Dr. Henricks acknowledges the benefits of taking PrEP. SOF ¶ 157. Nevertheless, Mutual insures people who take Duavee, but not PrEP.

Similarly, Steglatro was approved by the FDA for treatment of diabetes in 2017, SOF ¶ 160, but, according to Dr. Henricks, that would not be a reason to exclude people who take it from long-term care insurance. SOF ¶ 161. Steglatro can cause kidney impairment and there have been reports of acute kidney injury, some requiring hospitalization. SOF ¶¶ 162-163. Notably, rather than be concerned about the lack of long-term data, Dr. Henricks responded to reports of acute kidney injury associated with Steglatro by testifying that he would wait for more data and follow-up studies, but would not exclude users of that medication in the meantime. SOF ¶¶ 164-165

The medication Zurampic was approved by the FDA in 2015 for treatment of gout, but its newness was not a reason to exclude users of drug. SOF ¶¶ 194, 196. Dr. Henricks testified that the incidence of serum creatine elevations (a measure of kidney function) was not a reason to exclude users of this medication because it is "reversible, meaning , if you remove the drug, the renal function returns to normal." SOF ¶ 203. At the same time, Dr. Henricks agrees that minor serum creatine elevations have also been reported in some users of PrEP, and that such elevations are reversible. SOF ¶¶ 200, 202. But Mutual does not apply to PrEP the same underwriting standard it applies to Zurampic.

Finally, the medication Breo Ellipto was approved by the FDA in 2013. SOF ¶ 187. The fact that this was a new medication and that users must be monitored for cataracts, glaucoma and bone mineral density was not a reason for Mutual to exclude users of this medication because "it is just monitoring the patient's status," SOF ¶¶ 188-193. While there have been cases of reversible small decreases in bone mineral density in PrEP users, Dr. Henricks agrees that there

is no basis to support even monitoring for bone mineral density among PrEP users. SOF ¶¶ 204-208.

Mutual's disregard for the lack of long-term data and demonstrated side effects with respect to other new medications again demonstrates that Mutual has no legitimate, defensible justification for its PrEP ban.

The undisputed evidence demonstrates that Mutual cannot carry its burden of establishing that its exclusion of PrEP users is "necessary to achieve a valid interest," *Inclusive Cmtys*, 135 S. Ct. at 2523. In the absence of a legitimate business reason for a policy that has a disparate and negative impact on the protected class of gay men, this Court should enter summary judgment in favor of Doe on Count II (sexual orientation discrimination) of the Amended Complaint.[9]

**C.  The Undisputed Facts Show that Mutual Violated the Prohibition of Discrimination on the Basis of Disability in M.G.L. c. 272, § 98 Because Mutual "Regarded" Doe as Disabled and Excluded Him from Long-Term Care Insurance Without Any Legitimate Reason.**

Doe has established that he was qualified for Mutual's long-term care insurance but for his use of PrEP, SOF ¶ 49, and that Mutual discriminated against him without any valid or legitimate reason. *See* Argument § II (B) (2), *supra*. The sole remaining element Doe must prove under Count I (Disability Discrimination) of his Amended Complaint is that he is a member of

---

[9] Because Mutual cannot meet its burden, Doe need not prove that there is an available practice that has less disparate impact and serves Mutual's legitimate needs. *See Inclusive Cmtys*, 135 S. Ct. at 2518. Nevertheless, it is patent from the facts set forth in Doe's Statement of Undisputed Facts and this memorandum that Mutual meets its underwriting interests by an individualized assessment of the applicant, including a case-by-case examination of adherence to medication regimens and compliance protocols. The undisputed facts show that such an individualized determination, rather than an a priori categorical exclusion, would satisfy its interests with respect to PrEP as well.

the protected class with respect to M.G.L. c. 272, § 98's prohibition of discrimination based on "physical or mental disability."

Doe is within the protected class because Mutual "regarded" him as disabled. Importantly, the "regarded as" inquiry does not involve an ultimate determination of whether Mutual had a legitimate reason for its underwriting decision or otherwise discriminated against Doe. Rather, it is an inquiry into whether a belief or apprehension that the plaintiff is or will become disabled was the apparent basis for an adverse action, thereby bringing the plaintiff within the protected class and triggering the next steps of the prima facie case (e.g., an employer who refuses to hire an overweight applicant based on a concern he or she will develop heart disease and be unable to perform the job). *See Doukas v. Metropolitan Life Ins. Co.*, 1997 U.S. Dist. LEXIS 21757 (D.N.H. Oct. 21, 1997) (holding that insurer regards plaintiff as disabled based on fear she will become disabled in future), discussed in § 2, *infra*.

Doe does not have HIV or any disqualifying health condition, but Mutual regarded him as disabled in two different ways.  First, the testimony of Lisa Ging reveals that for purposes of assessing Doe's risk for needing long-term care services, Mutual treated Doe as if he did, in fact, have HIV. Second, the undisputed facts demonstrate that Mutual denied Doe long-term care insurance because of its concern or fear that he would contract HIV in the future. *See* § 2, *infra*.

1.    **The Definition of Disability in M.G.L. c. 272, § 98 Includes a "Regarded as" Component.**

Mutual asserts incorrectly that because § 98 does not define the term "physical or mental disability," it must not include a "regarded as" component. *See* Def.'s Mem. 23, Dkt. No. 112. The term "physical or mental disability" was added to M.G.L. c. 272, § 98 in 1979, the first inclusion of that category in any Massachusetts nondiscrimination statute. *See* 1979 Mass. Acts

34

c. 595. Although undefined within the contours of § 98, there is no plain, ordinary, or

unambiguous meaning of the term "disability" for purposes of an antidiscrimination statute, as

compared, for example, to statutes providing cash assistance, or medical or housing benefits, for

people who are unable to work due to disability.

There is only one logical and sensible place to look for a definition consistent with the

purpose and intent of § 98.  The term "physical or mental disability" in § 98 must be read

consistently with the definition of the *identical* term, "physical or mental handicap," that just five

years earlier Congress had adopted for the nondiscrimination provision of a statute with an

*identical* purpose, the federal Rehabilitation Act.[10] In 1974 Congress broadened the definition of

"handicapped individual" applicable to § 504 of the Rehabilitation Act of 1973 in order to

achieve the nondiscrimination goals of that statute.[11] The now familiar three-pronged definition

of  a "handicapped individual" includes: "Any person who (A) has a physical or mental

impairment which substantially limits one or more major life activities of such individual; (B)  a

record of such an impairment, or (C) being regarded as having such an impairment."[12]

---

[10] As the Supreme Judicial Court has twice noted, there is "no substantive distinction between"
the terms "disability" and "handicap." *Flagg v. AliMed, Inc.*, 466 Mass. 23, 35 n. 25 (2013);
*Dahill v. Police Dep't of Boston*, 434 Mass. 233, 236 n.7 (2001) (same).

[11] § 504 of the Rehabilitation Act of 1973 was the first federal disability antidiscrimination
provision. It reads: "No otherwise qualified individual with a disability … shall, solely by reason
of her or his disability, be excluded from the participation in, be denied the benefits of, or be
subjected to discrimination under any program or activity receiving Federal financial assistance."
29 U.S.C. § 794(a).

[12] 29 USCS § 705 (9)(b) (amended 2008) (Amending statute to cite to identical language within
the ADA). The definitions of "disability" in subsequent federal antidiscrimination statutes were
also modeled on the Rehabilitation Act. *See, e.g.,* 42 U.S.C. § 3602(h) (Fair Housing Act) and 42
U.S.C. § 12102(1) (ADA).

Although Mutual acknowledges that the term "physical or mental disability" is undefined in § 98, it proceeds to speculate that it must mean "actual disability." *See* Def.'s Mem. 22, Dkt. No. 112. That conjecture hardly illuminates the scope of the protected class in a nondiscrimination law (e.g., the degree or manner in which a health condition affects a person), and Mutual offers no definitional guidance. Mutual's view of the scope of § 98 would also eviscerate a civil rights statute by, for example, permitting a hotel to exclude an overweight person based on the fear he or she might have a heart attack on the premises, or a restaurant to exclude a person with a facial deformity on the basis he or she would upset the other customers.

In light of the consistency of language and purpose between § 98 and the Rehabilitation Act, and their proximity in time, as well as the baselessness of Mutual's cramped view of the definition, this Court must conclude that the Legislature intended and presumed that the federal definition would be applicable to § 98. See *Leslie v. Hee Man Chie*, 81 F. Supp. 2d 217, 226 (D. Mass. 2000) ("Interpretation of Massachusetts Public Accommodation Statute proceeds 'hand in hand' with the interpretation of the Americans with Disabilities Act and the Rehabilitation Act.") (citing *Abbott v. Bragdon*, 107 F.3d 934, 937 n.1 (1st Cir. 1997)).

2.    **The Undisputed Facts Demonstrate That Mutual Regarded Doe as Disabled in its Underwriting Decision to Deny Him Long-Term Care Insurance Solely Because He Takes PrEP.**

The "regarded as" prong of the definition of disability recognizes that individuals can be "handicapped" either as a result of real physical or mental limitations that flowed from impairments and/or as a result of societal responses to such impairments. As the Supreme Court explained in a leading case addressing the definition of handicap under the Rehabilitation Act, "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *Sch. Bd. of*

*Nassau County v. Arline*, 480 U.S. 273, 284 (1987). Under the Rehabilitation Act's regulatory

definition, a person is "regarded as having an impairment" if she or he:

> (A) has a physical or mental impairment that does not substantially
> limit major life activities but that is treated by a [covered entity] as
> constituting such a limitation;
>
> (B) has a physical or mental impairment that substantially limits major
> life activities only as a result of the attitudes of others toward such
> impairment;
>
> *(C) has none of the impairments [defined in ... this section] but is
> treated by a [covered entity] as having such an impairment.*

45 C.F.R. § 84.3(j)(2)(IV) (emphasis added).[13] Doe proceeds under paragraph (C).

The "regarded as" prong reflects back on the first prong of the definition of disability- a

physical or mental impairment that substantially limits one or more of an individual's major life

activities. For purposes of assessing Doe's "regarded as" claim, the starting point is the settled

law that HIV, regardless of the stage of disease progression, is a disability under

antidiscrimination statutes – in other words, based on the meaning of the statutory language and

the profound consequences of HIV infection, HIV is an impairment, and it always substantially

limits one or more of a person's major life activities. *See Abbott v. Bragdon,* 163 F.3d 87, 88 (1st

Cir. 1998) (it is "established that asymptomatic HIV constitutes a disability under the ADA");

*Mass Comm'n Against Discrimination & Sylvester Mitchell v. Mal's Auto Service Center*, 2006

Mass. Comm. Discrim. LEXIS 68, 11-12 (2006).[14]

---

[13] The identical regulatory definition is used in the ADA and the Federal Fair Housing Acts
Amendments of 1988. *See, e.g.* 24 C.F.R. 100.201(d); 29 C.F.R. 1615.103(4).

[14] It is also worth noting that under both Massachusetts and federal law whether an impairment
substantially limits major life activities is determined without regard to any treatments or
mitigating measures for the impairment. *See Dahill*, 434 Mass. at 238-242; ADA Amendments
Act of 2008, Pub. L. No. 110-325 September 25, 2008, 122 Stat. 3553, § 3 (4)(E)(i). As

Mutual "regarded" Doe as disabled. <u>First</u>, Mutual's underwriting principles assess a person's risk for needing long-term care services in the future. SOF ¶ 46. Mutual states that its goal is to classify like risks the same. SOF ¶¶ 59-60. Doe does not have HIV, or any disqualifying health condition, but the undisputed facts demonstrate that Mutual classified his risk for needing long-term care in the future the same as if he did, in fact, have HIV. Mutual's 30(b)(6) witness explained that Mutual excludes PrEP users because "[i]f you develop HIV, you may need to utilize long-term care services." SOF ¶ 63. Then, asked to compare the risk from a long-term care insurance perspective between someone who has HIV, and someone who doesn't have HIV, but is on PrEP, she answered:

> The individual who is on PrEP has been deemed to be at high risk of acquiring HIV. *So, if they acquire HIV, then, yes, the risk is the same.*

SOF ¶ 64. Mutual thus treats a person who does not have HIV (the PrEP user) identically to a person who does have HIV for purposes of the assessment of risk for long-term care insurance eligibility. By treating the two exactly the same for risk assessment purposes, Mutual regards people without HIV as "having such an impairment." 45 C.F.R. § 84.3(j)(2)(IV).

<u>Second</u>, the undisputed facts demonstrate that although Mutual did not perceive Doe to have HIV presently, it denied him long-term care insurance because of its concern or fear that he would contract HIV in the future. This Court must reject Mutual's assertion that adverse action based on "the *higher risk* of contracting HIV" is not within the "regarded as" prong. Def.'s Mem. 21, Dkt. No. 112 (emphasis in original). Consider an analogy in the employment context. A person is indisputably "regarded as" disabled under Paragraph C, *supra*, if an employer says,

---

plaintiff's expert, Dr. Mayer, explained, without current treatments HIV progresses quickly to AIDS and for many debilitation and death. Mayer Aff. at ¶ 9.

38

"You're fired because I am concerned you have HIV." There is no principled way to distinguish this scenario from that of an employer telling an employee, "You're fired because I am concerned you *will* have HIV." The temporal distinction cannot be dispositive. The same principle applies here where Mutual acted upon a concern that Doe would become disabled.

In fact, courts have ruled that "the purpose of the ADA requires that ADA protection extend to cover perception of possible future disability." *Winslow v. IDS Life Ins. Co.,* 29 F. Supp. 2d 557, 561 (D. Minn. 1998); *Doukas v. Metropolitan Life Ins. Co.,* 1997 U.S. Dist. LEXIS 21757, *13 (D.N.H. Oct. 21, 1997) ("[L]imiting the ADA's protection to instances when the defendant considered the plaintiff's limitation to be immediate would defeat the central purpose of the [regarded as] definition."). In *Doukas* the plaintiff was denied mortgage disability insurance because she had been diagnosed with bipolar disorder and was taking lithium, but was not presently limited in any way. *Doukas*, 1997 U.S. Dist. LEXIS 21757 at *2. The insurer argued that she was not regarded as disabled because the statutory language required a present limitation of a major life activity; it claimed the decision denying the plaintiff insurance was based on the likelihood that she would become disabled in the future. *Id.* at * 11-12. The Court rejected that argument because the "regarded as" prong seeks to eliminate discrimination based on "[f]ear, [which] almost by definition refers not to actual present conditions, but to anticipated or future consequences." *Id.* at *12. The Court concluded that "the distinction between present and future limitations is not dispositive." *Id.* at *14. Similarly, *Winslow* involved a plaintiff who was denied long-term disability insurance because she revealed treatment for mild depression, without any current limitation. *Winslo*w, 29 F. Supp. 2d at 558. The Court noted that "perceptions about an applicant's future inability to work are the only logical criteria upon which denial of long-term disability insurance … would be based." *Id.* at 560. The Court concluded that

39

"the purpose of the ADA requires that ADA protection extend to cover perception of possible future disability." *Id.* at 561. Here, although Doe does not presently have an impairment, the reasoning of *Doukas* and *Winslow*, and the remedial purpose of disability antidiscrimination law, preclude any meaningful distinction between adverse action based on a concern that Doe has HIV presently, and a concern that Doe will contract HIV in the future. To rule that Doe cannot pursue a claim, and prove that he was treated unequally to other applicants because of unfounded concerns about the comparative HIV risk of PrEP users, would be contrary to the purposes of § 98 and would allow HIV-related discrimination to go unchecked.

Because the undisputed facts establish that Mutual "regarded" Doe as disabled, this Court should deny Mutual's motion for summary judgment on Count I of the Amended Complaint.[15] Further, because Doe has established that he was otherwise qualified for long-term care insurance and that Mutual discriminated against him without legitimate reason because of its concerns that he would contract HIV, this Court should enter judgment for Doe on Count I of the Amended Complaint.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Mutual's Motion for Summary Judgment and enter Summary Judgment for Doe on Counts I and II of the Amended Complaint.

---

[15] In its motion Mutual simply asserted that Doe cannot establish he was "regarded as" disabled, but did not address any other elements of Doe's claim for discrimination on the basis of disability. *See* Def.'s Mem. 20-23, Dkt. No. 112

Dated: July 18, 2018

Respectfully submitted,
JOHN DOE
By his attorneys,


/s/ Bennett H. Klein
Bennett H. Klein
BBO # 550702
GLBTQ Legal Advocates & Defenders
18 Tremont Street, Suite 950
Boston, MA 02108
617-426-1350
bklein@glad.org

/s/ John P. Ward
John P. Ward
BBO # 515860
Law Offices of John P. Ward
584 Castro St., No. 802
San Francisco, CA 94114
johnpward@gmail.com

<u>**CERTIFICATE OF SERVICE**</u>

I certify that the within document was electronically filed with the clerk of the court on

July 18, 2018, and that it is available for viewing and downloading from the Court's ECF

system. Service by electronic means has been effectuated on all counsel of record.

Brooks R. Magratten, BBO# 650393
Pierce Atwood LLP
One Financial Plaza, 26th Floor
Providence, RI 02903
(401) 588-5113
bmagratten@pierceatwood.com

Mark A. Pogue, BBO# 550807
Pierce Atwood LLP
One Financial Plaza, 26th Floor
Providence, RI 02903
(401) 490-3422
mpogue@pierceatwood.com

Katharine E. Kohm, BBO# 675362
Pierce Atwood LLP
One Financial Plaza, 26th Floor
Providence, RI 02903
(401) 490-3422
kkohm@pierceatwood.com

Nicole Kinsely, BBO # 682528
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1185
nkinsley@foleyhoag.com

                                        /s/ Bennett H. Klein
                                        Bennett H. Klein
                                        BBO # 550702
                                        GLBTQ Legal Advocates & Defenders
                                        18 Tremont St., Suite 950
                                        Boston, MA 02108
                                        617-426-1350
                                        bklein@glad.org