# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE,                                     )
      Plaintiff                            )
                                           )
v.                                            )
                                           )    No. 1:16-cv-11381-GAO
MUTUAL OF OMAHA                               )
INSURANCE COMPANY,                            )
      Defendant                            )
                                           )

## PLAINTIFF JOHN DOE'S APPENDIX OF EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT

Respectfully submitted,
JOHN DOE
By his attorneys,


/s/ Bennett Klein
Bennett H. Klein
BBO # 550702
GLBTQ Legal Advocates & Defenders
18 Tremont Street, Suite 950
Boston, MA 02108
617-426-1350
bklein@glad.org

John P. Ward
BBO # 515860
Law Offices of John P. Ward
584 Castro St., No. 802
San Francisco, CA 94114
415-255-4996
johnpward@gmail.com

## CERTIFICATE OF SERVICE

I certify that the within document was electronically filed with the clerk of the court on

July 18, 2018, and that it is available for viewing and downloading from the Court's ECF

system. Service by electronic means has been effectuated on all counsel of record.

Brooks R. Magratten, BBO# 650393
Pierce Atwood LLP
One Financial Plaza, 26th Floor
Providence, RI 02903
(401) 588-5113
bmagratten@pierceatwood.com

Mark A. Pogue, BBO# 550807
Pierce Atwood LLP
One Financial Plaza, 26th Floor
Providence, RI 02903
(401) 490-3422
mpogue@pierceatwood.com

Katharine E. Kohm, BBO# 675362
Pierce Atwood LLP
One Financial Plaza, 26th Floor
Providence, RI 02903
(401) 490-3422
kkohm@pierceatwood.com

Nicole Kinsely, BBO # 682528
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1185
nkinsley@foleyhoag.com

/s/ Bennett H. Klein
Bennett H. Klein
BBO # 550702
GLBTQ Legal Advocates & Defenders
18 Tremont St., Suite 950
Boston, MA 02108
617-426-1350
bklein@glad.org

# Table of Contents

Exhibit A- Pages from the Deposition of Noel Devries…………………………………………..1

Exhibit B- Pages from the Deposition of Doe's Spouse……………………………………......9

Exhibit C- Pages from the Deposition of Teresa-Ann Curreri…………………………………..12

Exhibit D- Pages from the Deposition of John David (JD) Loden………………………………24

Exhibit E- Defendant's Responses to Plaintiff's Second Set of Interrogatories…………………30

Exhibit F- Email dated May 15, 2014 from Teresa-Ann Curreri to JD Loden…………………34

Exhibit G- Mutualcare Secure Solution Long-Term Care Insurance Policy Quote Document….36

Exhibit H- Pages from the Deposition of John Doe………………………………………………..48

Exhibit I- Email dated September 3, 2014 from Brittany Jordan to JD Loden…………………53

Exhibit J- First Page of Doe and Doe's Partner's Application for Long-Term Care Insurance…56

Exhibit K- Letter from Mutual to Doe date February 9, 2015 Denying Application for

       Long-Term Care Insurance……………………………………………………………58

Exhibit L- Letter from Doe to Mutual Dated March 30, 2015 Appealing Denial………………61

Exhibit M- Letter from Mutual to Doe Dated April 22, 2015 Denying Appeal…………………65

Exhibit N- Pages from the Deposition of Lisa Ging……………………………………………67

Exhibit O- Defendant's Response to Plaintiff's First Set of Interrogatories……………………83

Exhibit P- Pages from the Deposition of Michael Wilkins, M.D………………………………87

Exhibit Q- Pages from the Deposition of Allen Schmitz, M.D…………………………………92

Exhibit R- Pages from the Deposition of Bruce Henircks, M.D………………………………...98

Exhibit S- Expert Report of Bruce Henricks, M.D……………………………………………128

Exhibit T- Expert Report of Allen Schmitz……………………………………………………142

Exhibit U- First Page of FDA Drug Information on Duavee………………………………….161

Exhibit V- First Page of FDA Drug Information on Steglatro…………………………………163

Exhibit W- First Page of FDA Information on Tanzeum………………………………………165

Exhibit X- First Page of FDA Drug Information on Trulicity…………………………………167

Exhibit Y- First Page of FDA Drug Information on Farxiga…………………………………...169

Exhibit Z- First Page of FDA Drug Information on Repatha…………………………………171

Exhibit AA- First Page of FDA Drug Information on Kynamro………………………………173

Exhibit BB- First Page of FDA Drug Information on Breo Ellipta……………………………175

Exhibit CC- First Page of FDA Drug Information on Zurampic………………………………177

# Exhibit A

```
 1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 2
    JOHN DOE,               ) C.A. NO. 1:16-CV-11381-GAO
 3                          )
            PLAINTIFF,      ) DEPOSITION OF
 4                          ) NOEL DEVRIES
        VS.                 )
 5                          )
    MUTUAL OF OMAHA         )
 6  INSURANCE COMPANY,      )
                            )
 7          DEFENDANT.      )

 8  - - - - - - - - - - - - - -

 9              DEPOSITION OF NOEL DEVRIES, taken before

10  Morgan M. Catania, RPR, CSR(IA), General Notary

11  Public within and for the State of Nebraska,

12  beginning at 9:18 a.m., on July 19, 2017, at

13  Thomas & Thomas Court Reporters & Certified Legal

14  Video, LLC, 1321 Jones Street, Omaha, Nebraska.

15

16

17

18

19

20

21

22

23

24

25
```

Noel DeVries
7/19/2017

5 (8 - 11)

| Page 8 |
| --- |

1    A.   Can include long-term care insurance.
2    Q.   All right.  Now, prior to 2016 -- or let
3  me -- let me ask it this way.  Between 2014 and
4  2016 -- strike that.
5        In the years 2014 and 2015, what were your
6  job duties and responsibilities at Mutual of Omaha?
7    A.   Same.  I was involved in the creation of
8  marketing materials.  I just wasn't leading the team
9  at that time.
10    Q.   Okay.  And did that also include
11  prospecting materials between 2014 and '15?
12    A.   Uh-huh.
13    Q.   All right.  And what was your role on that
14  team?
15    A.   Can you clarify?
16    Q.   Yeah.
17        You said you weren't leading the team.
18  You said you were involved in the creation and
19  prospecting materials.
20    A.   Uh-huh.
21    Q.   What -- what did you do in your job?
22    A.   So we collaborated on essential pieces
23  that were needed to educate consumers on product
24  material content as well as producer content.
25    Q.   And what was your title in 2014 and '15?

| Page 9 |
| --- |

1    A.   Marketing manager.
2    Q.   Marketing manager.  Okay.
3        In the years 2014 and 2015, did Mutual of
4  Omaha Insurance Company sell long-term care
5  insurance to people in Massachusetts?
6    A.   Yes.
7    Q.   All right.  Did the long-term care
8  insurance product go by the brand name MutualCare
9  Solutions?
10    A.   That was the portfolio name.
11    Q.   What do you mean by "portfolio name"?
12    A.   Portfolio name was MutualCare Solutions,
13  and inside of that portfolio we offered two
14  products, which was MutualCare Secure Solution and
15  then MutualCare Custom Solution.
16    Q.   Okay.  What is MutualCare Custom Solution?
17    A.   It's a traditional long-term care product.
18    Q.   And how would you describe a traditional
19  long-term care product?
20    A.   It's a product that provides flexibility
21  for consumers in the event that a long-term care
22  need arises.
23    Q.   Okay.  And what is MutualCare Secure
24  Solution?
25    A.   A long-term care product.

| Page 10 |
| --- |

1    Q.   Okay.  And how does it differ?  I'm sorry.
2  And what is MutualCare Custom Solution?
3    A.   They are both long-term care products.
4    Q.   How does the Custom Solution differ from
5  the Secure Solution product?
6    A.   More product flexibility.
7    Q.   In the Custom?
8    A.   Uh-huh.
9    Q.   All right.  Would that include, for
10  example, cash benefits for home health care?
11    A.   Yes.  They both include cash benefit.
12    Q.   Okay.  And during 2014 and 2015, Mutual of
13  Omaha sold both the MutualCare Secure Solution
14  product and the MutualCare Custom Solution product
15  to individuals in Massachusetts?
16    A.   Uh-huh.
17    Q.   All right.  And how did Mutual go about
18  selling long-term care insurance products to
19  individuals in Massachusetts in 2014 and '15?
20    A.   From a marketing perspective, our
21  responsibility was to have marketing materials
22  available for accessibility for producers to use.
23    Q.   During 2014 and 2015, did Mutual advertise
24  its long-term care insurance products in
25  Massachusetts?

| Page 11 |
| --- |

1    A.   We made our marketing materials available
2  in our systems.
3    Q.   All right.  And when you say your systems,
4  do you mean a website?
5    A.   Yes.  A producer website where producers
6  could obtain our product brochures.
7    Q.   Now, it's also -- is it -- in 2014 and '15
8  was there -- did Mutual of Omaha maintain a website
9  that was aimed at providing information about its
10  long-term care insurance products to consumers
11  directly?
12    A.   Yes.
13    Q.   All right.  And was the website intended
14  to solicit individuals to purchase Mutual of Omaha's
15  long-term care products?
16    A.   It was intended to educate consumers.
17  Secondary was the solicitation where they could
18  enter information to get -- for an agent to contact
19  them.
20    Q.   All right.  So one of the goals of the
21  website for long-term care insurance in 2014 and
22  2015 was to -- was to obtain applicants for
23  long-term care insurance; is that correct?
24    A.   No.
25    Q.   Okay.  You just indicated -- well, let

Thomas & Thomas Court Reporters
and Certified Legal Video, LLC

1321 Jones Street, Omaha, NE 68102
Tel: (402) 556-5000 | Fax: (402) 556-2037

Page 12

1  me -- let me --
2          MR. KLEIN:  Can I mark this as
3  Exhibit 2?
4          (Exhibit No. 2
5          marked for identification.)
6  BY MR. KLEIN:
7      Q.  Now, can you please take a look at
8  Exhibit 2?
9      A.  Uh-huh.
10     Q.  Have you -- this, I will tell you, is a
11 printout of part of Mutual of Omaha's website for
12 for 2017.  You will see below the copyright 2017.
13     A.  Uh-huh.
14     Q.  Have you seen this -- this material
15 before?
16     A.  Yes, I have.
17     Q.  Okay.  And did Mutual of Omaha have
18 website material substantially similar to Exhibit 2
19 in 2014 and 2015?
20         MR. MAGRATTEN:  Objection to the
21 form.
22         You can answer.
23         THE WITNESS:  The intent -- the --
24 Mutual of Omaha's website is there for educating
25 consumers for a variety of products.  Consumers are

Page 13

1  able to go and click on long-term care and get to an
2  additional landing page if they would like to
3  request additional information.
4  BY MR. KLEIN:
5      Q.  All right.  And that was true in 2014 and
6  '15?
7      A.  2014 and '15.
8      Q.  All right.  So in 2014 and '15 consumers
9  in all 50 states could go to Mutual's website that
10 described its long-term care insurance products; is
11 that correct?
12     A.  All states may not have been approved at
13 that time.
14     Q.  All right.  All right.
15         In 2014 and '15 could consumers in
16 Massachusetts go to Mutual's website for information
17 about its long-term care insurance products?
18     A.  Yes.
19     Q.  All right.  And you said the purpose was
20 to educate the consumers about Mutual's long-term
21 care insurance products; is that right?
22     A.  The need.
23     Q.  About the need for long-term care
24 insurance.
25         And what was the ultimate goal of that

Page 14

1  education?
2      A.  For -- to create awareness and for
3  consumers to engage and ask for -- us for additional
4  information.
5      Q.  Additional information towards what end?
6      A.  To talk specific about the product itself.
7      Q.  With the aim of ultimately selling that
8  product to consumers in Massachusetts; is that
9  correct?
10     A.  Correct.
11     Q.  Okay.  Now, in -- you will see on
12 Exhibit 2 -- and you've described this already --
13 there is a block on the right-hand side that allows
14 the consumer to fill in his or her name and contact
15 information; is that correct?
16     A.  Correct.
17     Q.  And was that also on Mutual's website for
18 long-term care insurance in 2014 and '15?
19     A.  Yes.
20     Q.  All right.  And what was the purpose of
21 that?
22     A.  It's information gathering for that
23 information to come back in to us for a producer to
24 contact them.
25     Q.  All right.  And you will see below -- if

Page 15

1  we can't read it, I do have it on another -- on
2  another exhibit.  But in the small print below the
3  contact block, it indicates the consumer is giving
4  permission to be contacted by a Mutual agent or
5  producer; is that correct?
6      A.  That's correct.
7      Q.  All right.  And was that information also
8  on the website in 2014 and 2015?
9      A.  Yes.
10     Q.  Okay.  Now, is it correct that in 2014
11 Mutual of Omaha sold insurance -- long-term care
12 insurance to people in Massachusetts through a
13 network of producers and agents?
14     A.  Can you clarify?
15     Q.  What -- what wasn't clear?
16     A.  "A network of producers and agents."
17     Q.  All right.  Is it -- is it correct that in
18 2014 and 2015 Mutual of Omaha sold long-term care
19 insurance to people in Massachusetts through
20 authorized agents and producers?
21     A.  Yes.
22     Q.  All right.  And what is -- we're using the
23 word "agent" and "producer."  Are they different or
24 are they synonymous?
25     A.  A producer is someone that's considered a

Noel DeVries                                                    7 (16 - 19)
7/19/2017

Page 16

1  broker that can sell multiple companies.  And an
2  agent is someone that's on our -- like, a career
3  side.  But they are used interchangeably.
4      Q.  Is an -- is an agent an employee of Mutual
5  of Omaha?
6      A.  They are not.
7      Q.  They are contractors?
8      A.  Correct.
9          MR. MAGRATTEN:  Objection to form.
10 BY MR. KLEIN:
11     Q.  Okay.  Now, one -- one other thing
12 about -- before I move on -- about Exhibit 2.
13         You'll see there is also a toll-free
14 number in the upper right-hand corner of Exhibit 2?
15         I'm sorry.  You have to answer verbally so
16 that the --
17     A.  Oh, yes.  Yes.
18     Q.  -- court reporter can get it.
19         Okay.  Was a toll-free number also on
20 Mutual of Omaha's website for long-term care
21 insurance products in 2014 and '15?
22     A.  Yes.
23     Q.  All right.  And what was the purpose of
24 having a toll-free number for consumers in
25 Massachusetts?

Page 17

1      A.  I'm -- I do not know.
2      Q.  Okay.  You're not aware when it says call
3  the 800 number to schedule an appointment what that
4  refers to?
5      A.  I don't know what the -- that -- no.
6      Q.  Okay.  Can you describe for me what the
7  role of an agent or producer is in offering Mutual
8  of Omaha's long-term care insurance to people in
9  Massachusetts in 2014 and '15?
10         MR. MAGRATTEN:  Objection to form.
11         You can answer.
12         THE WITNESS:  Their -- their goal and
13 their purpose is to talk to consumers about
14 insurance products.
15 BY MR. KLEIN:
16     Q.  Well, let's say I'm an individual in
17 Massachusetts in the years 2014 and '15.  I fill out
18 the contact form on your website to express interest
19 in purchasing long-term care insurance.  What
20 happens next?
21     A.  That is then given to a producer to then
22 follow up with that consumer.
23     Q.  What steps does the producer take in the
24 process of selling long-term care insurance to that
25 individual?

Page 18

1      A.  They -- they essentially talk to them in
2  regards to what their needs are and they fact find.
3  And then they discuss solutions and then running a
4  quote.
5      Q.  Okay.  And "discuss solutions" meaning
6  that they discuss various features of a long-term
7  care insurance product for that individual?
8      A.  It can, yes.
9      Q.  All right.  Assuming the person tells the
10 producer "I want to purchase a long-term care
11 insurance product from Mutual of Omaha," what --
12 what actual steps does the producer take to
13 effectuate that?
14     A.  They would run an illustration or a quote.
15     Q.  And when you say "a quote," do you mean
16 a -- well, what do you mean by "a quote"?
17     A.  They put in the information about the
18 client to tell them approximately what the product
19 would cost.
20     Q.  Okay.  And does it also tell them what
21 their benefits would be?
22     A.  Correct.
23     Q.  All right.  Now, those -- would those be
24 the same steps that would be taken by an agent?
25     A.  Yes.

Page 19

1      Q.  All right.  And are there contractual
2  arrangements between a producer or arrangement -- a
3  producer or agent in Mutual of Omaha Insurance
4  Company?
5          MR. MAGRATTEN:  Objection to form.
6          THE WITNESS:  There is contracting
7  paperwork.
8  BY MR. KLEIN:
9      Q.  Okay.  So the producers or agents are
10 authorized to -- to discuss with a client their
11 long-term care insurance needs and provide them a
12 quote; right?
13     A.  Clarify what you mean by "authorize."
14     Q.  They are authorized by Mutual of Omaha
15 Insurance Company to discuss Mutual's products and
16 provide a quote to the client; correct?
17     A.  There is requirements that have to be put
18 in place before they can sell a long-term care
19 policy.
20     Q.  There were requirements that had to be put
21 in place before a producer or agent can sell a
22 long-term care insurance policy?
23     A.  Correct.
24     Q.  And what are those requirements?
25     A.  I am -- I'm aware of them.  It's not my --

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                    Tel: (402) 556-5000 | Fax: (402) 556-2037

005

Page 20

1  Q. Okay.
2  A. I'm not close enough to it.
3  Q. But is it correct to say that -- that the
4  agents have -- well, is it correct to say that an
5  agent or producer selling -- selling a Mutual of
6  Omaha long-term care insurance product is acting on
7  behalf of Mutual of Omaha Insurance Company?
8      MR. MAGRATTEN: Objection to form.
9      THE WITNESS: A producer -- they are
10 not employees of Mutual of Omaha.
11 BY MR. KLEIN:
12 Q. But they are acting on -- they are
13 authorized to sell Mutual's products; correct?
14 A. They are contracted to sell Mutual of
15 Omaha's products.
16 Q. Okay. And you said they have requirements
17 that -- or obligations that they have to Mutual of
18 Omaha Insurance Company in order to sell Mutual's
19 products?
20 A. Correct.
21 Q. All right. So is it correct to say that
22 Mutual of Omaha issues instructions or directives to
23 producers and agents about the criteria for selling
24 its products?
25     MR. MAGRATTEN: Objection to form.

Page 21

1      THE WITNESS: There is -- there is a
2  protocol in place that has to be met in the system.
3  But, again, that's not my area of focus.
4  BY MR. KLEIN:
5  Q. But the producer or agent, in order to
6  sell Mutual's long-term care insurance, has to
7  comply with Mutual of Omaha's requirements as set
8  forth in a contract?
9  A. Yes.
10 Q. All right. And the producer or agent, in
11 order to sell long-term care insurance from Mutual
12 of Omaha, must act consistent with Mutual's policies
13 and procedures; is that correct?
14     MR. MAGRATTEN: Objection to form.
15     THE WITNESS: Yes.
16 BY MR. KLEIN:
17 Q. Okay. Now, you indicated that a producer
18 or agent will provide a quote for a prospective
19 long-term care insurance customer that would include
20 the cost and the benefits; is that correct?
21 A. Correct.
22 Q. All right. Where does the agent or
23 producer get the information to -- to produce the
24 quote?
25 A. That information would be on our producer

Page 22

1  website.
2  Q. And what is a producer website?
3  A. It's a password-protected website that
4  agents log in to to run quotes.
5  Q. Does that website have proprietary
6  information of Mutual of Omaha Insurance Company?
7      MR. MAGRATTEN: Objection to form.
8      THE WITNESS: It has the rates to
9  our -- to our products.
10 BY MR. KLEIN:
11 Q. Okay. And only authorized producers or
12 agents can authorize that website; is that correct?
13     MR. MAGRATTEN: Objection: Form.
14 BY MR. KLEIN:
15 Q. I'm sorry. Let me just rephrase that.
16     Who has access to the producer website?
17 A. Contracted producers.
18 Q. All right. And agents as well?
19 A. And agents, yes.
20 Q. Okay. Does Mutual of Omaha Insurance
21 Company require that a producer or agent receive
22 training and education about Mutual's products?
23 A. We offer training.
24 Q. Is it required of producers or agents?
25 A. We make our materials accessible for

Page 23

1  training for them to use. As far as confirming that
2  every -- I mean, it's not my area of focus.
3  Q. All right. Now, does Mutual of Omaha
4  require that the producer or agent be licensed to
5  sell long-term care insurance in the state where the
6  applicants are?
7  A. I don't know.
8  Q. Who would know that?
9  A. Someone in contracting.
10 Q. Is there -- at Mutual of Omaha, is there a
11 contracting department?
12 A. Yes.
13 Q. Okay. Do you know who is the head of that
14 department?
15 A. I do not.
16 Q. Okay. Do you know anybody in that
17 department?
18 A. Not off the top of my head.
19 Q. Okay. Now, in 2014 and 2015 did a
20 producer or agent have to be located physically in
21 Massachusetts in order to sell a long-term care
22 insurance policy to an individual in Massachusetts?
23 A. I don't know.
24 Q. Who would know that?
25 A. Contracting. Producer service contracting

Noel DeVries                                                                                    9 (24 - 27)
7/19/2017

Page 24

1  and licensing.
2     Q.  What is the name of the department that
3  would --
4     A.  I believe it's under producer services
5  contracting and licensing.
6     Q.  All right.  Now -- I'm almost done, but I
7  have a couple more questions.
8        Just to clarify, Mutual accepted
9  applications for long-term care insurance products
10 from people in Massachusetts in 2014 and '15?
11    A.  Yes.
12    Q.  And those applications were processed by
13 agents or producers authorized by Mutual of Omaha to
14 do so; is that correct?
15    A.  Yes.
16    Q.  All right.  And once an application is
17 received, what is the role of the producer or agent?
18    A.  Clarify -- what do you mean by "received"?
19    Q.  All right.  Do the producers or agents
20 assist in a consumer to fill out an application for
21 long-term care insurance?
22    A.  Yes.
23    Q.  All right.  And after the application is
24 filled out, is it then submitted to Mutual of Omaha?
25    A.  It can be submitted directly to Mutual of

Page 25

1  Omaha.
2     Q.  What else would happen to it?
3     A.  It could go to their marketing
4  organization first.
5     Q.  Okay.  To a producer's marketing
6  organization?
7     A.  Yes.
8     Q.  All right.  And then ultimately is the
9  application from the producer or marketing agent
10 submitted to Mutual of Omaha?
11    A.  Yes.
12    Q.  All right.  And after the application is
13 submitted to Mutual of Omaha, is it correct that
14 Mutual of Omaha is responsible for determining
15 whether to ultimately issue a long-term care
16 insurance contract to that applicant?
17    A.  Yes.
18        MR. MAGRATTEN:  Objection to form.
19        THE WITNESS:  Yes.
20 BY MR. KLEIN:
21    Q.  Okay.  So after an application is
22 submitted, Mutual of Omaha underwrites the
23 insurance; is that correct?
24    A.  Yes.
25    Q.  All right.  And by underwriting -- well,

Page 26

1  what -- what do you understand the term
2  "underwriting" to mean?
3     A.  We evaluate the case to determine
4  eligibility.
5     Q.  Okay.  All right.
6        And that is the sole responsibility of
7  Mutual of Omaha Insurance Company?
8        MR. MAGRATTEN:  Objection to form.
9        THE WITNESS:  Yes.
10 BY MR. KLEIN:
11    Q.  Okay.  Aside from the website, are
12 there -- are there any ways that Mutual of Omaha
13 advertises -- advertised its long-term care
14 insurance products in Massachusetts in the years
15 2014 and 2015?
16    A.  No.
17    Q.  Okay.  In 2014 and 2015 did Mutual of
18 Omaha have producers or agents in Massachusetts?
19    A.  Yes.
20    Q.  All right.  In 2014 and 2015 was Mutual of
21 Omaha Insurance Company licensed to offer long-term
22 care insurance -- licensed by the Commonwealth of
23 Massachusetts to offer long-term care insurance?
24    A.  Yes.
25    Q.  Okay.  In 2014 and 2015 did Mutual have

Page 27

1  any office in Massachusetts, to your knowledge?
2     A.  A division office.
3     Q.  Okay.  And what was the division office in
4  Massachusetts?
5     A.  Clarify.
6     Q.  You said it has a division office.  What
7  is that?
8     A.  It's -- a division office is on our agency
9  side, and agents work out of there offering our
10 insurance products.
11    Q.  Okay.  Do you know where it was located?
12    A.  Not off the top of my head.
13    Q.  Okay.  In 2014 and 2015 did Mutual of
14 Omaha have any employees in Massachusetts?
15    A.  Not on the individual side, no.
16    Q.  Okay.  What employees did it have in
17 Massachusetts?
18    A.  I don't know.
19        MR. KLEIN:  Okay.  All right.
20 Brooks, I think that my question about whether a
21 producer or agent had to be located in Massachusetts
22 to -- in order to sell long-term care insurance to
23 people in Massachusetts and the question about
24 whether the producer or agent had to be licensed in
25 the state of the applicant is within the scope of

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                     Tel: (402) 556-5000 | Fax: (402) 556-2037

007



Page 28

1  No. 1.  Certainly the first question about a
2  producer or agent, whether that person has to be
3  located has -- is within the scope of the activities
4  that Mutual undertook to offer -- offer for sale or
5  sell long-term care insurance in Massachusetts.
6          Can you -- are you willing to produce
7  somebody to answer that question during this
8  30(b)(6) deposition?
9          MR. MAGRATTEN:  Well, I think that's
10  a debatable point whether -- the question of whether
11  the agent or producer must be in Massachusetts to
12  sell to Massachusetts.  I don't read Topic No. 1 to
13  cover that point.
14          But I think it's -- it may be something
15  that we -- information that we can get to you.
16          MR. KLEIN:  Okay.
17          MR. MAGRATTEN:  Perhaps not in a
18  deposition context but...
19          MR. KLEIN:  Okay.
20          MR. MAGRATTEN:  Find some other way.
21          MR. KLEIN:  All right.  Well, we can
22  talk about that off the record at some point.  But I
23  do -- I will have to ascertain that through some
24  means.
25          MR. MAGRATTEN:  Yeah.

Page 29

DEVRIES - Cross (By Ms. Magratten)         29
1          MR. KLEIN:  Okay.  Can I have just a
2  moment?
3          (Discussion had off the record.)
4  BY MR. KLEIN:
5    Q.  One further question.  Can the agent or
6  producer agree to sell Mutual of Omaha -- can a
7  agent or producer sell Mutual of Omaha and Mutual of
8  Omaha insurance product without permission from
9  Mutual?
10          MR. MAGRATTEN:  Objection to form.
11          THE WITNESS:  Can you repeat that?
12  BY MR. KLEIN:
13    Q.  Sure.
14      Is an agent or producer -- can an agent or
15  producer sell a Mutual of Omaha insurance product
16  without permission or authorization from Mutual of
17  Omaha Insurance Company?
18      A.  No.
19          MR. KLEIN:  Okay.  Thank you.  I
20  don't have any further questions.
21          MR. MAGRATTEN:  I actually have one
22  follow-up question.
23          MR. KLEIN:  Yep.
24
25

Page 30

30
CROSS-EXAMINATION
1  BY MR. MAGRATTEN:
2    Q.  Ms. DeVries, Mr. Klein asked the question
3  whether Mutual of Omaha did anything to advertise
4  LTC products in Massachusetts other than the
5  website.  Do you recall the question?
6      A.  Yes.
7    Q.  Did Mutual of Omaha provide advertising
8  materials to agents and producers to use if they
9  wished?
10      A.  Yes, we did.
11          MR. MAGRATTEN:  Okay.  I don't have
12  anything further; so we are concluded with this
13  first witness of the 30(b)(6) deposition.
14          (9:57 a.m. - Adjournment.)
15          ** ** ** **
16
17
18
19
20
21
22
23
24
25

# Exhibit B

# In The Matter Of:

*John Doe  v.*

*Mutual of Omaha Insurance Company*

---

[Doe's Partner]



*March 14, 2018*

---

*68 Commercial Wharf • Boston, MA 02110*

*888.825.3376 - 617.399.0130*

*Global Coverage*

*court-reporting.com*



Min-U-Script® with Word Index

John Doe  v.
**Mutual of Omaha Insurance Company**

*March 14, 2018*





Page 9

Page 10

---

Page 11

1   Q.  All right.  And that was with Mutual of Omaha?
2   **A.  That is correct.**
3   Q.  How did that process begin, the process of
4   applying for long-term care insurance?
5   **A.  Can you be more specific?**
6   Q.  Sure.  What made you decide to apply for
7   long-term care insurance?
8   **A.  My parents both had long term health care**
9   **insurance and I saw the benefits of it.**
10  Q.  Your parents when they were alive were in Naples,
11  Florida?
12  **A.  That is correct.**
13  Q.  So what did you do next?
14  **A.  With regard to?**
15  Q.  Applying for long-term care insurance.
16  **A.  I contacted the individual who sold them their**
17  **policy.**
18  Q.  Who was that?
19  **A.  His name is J.D. Loden.**
20  Q.  When did you do that?
21  **A.  I don't recall exactly.**
22  Q.  Would that have been in 2014?
23  **A.  That sounds about right.**
24  Q.  And who is J.D. Loden?

Page 12

# Exhibit C

**1**

```
                UNITED STATES DISTRICT COURT
                         for the
                DISTRICT OF MASSACHUSETTS
                CIVIL ACTION NO. 1:16-cv-11381



X-------------------------  X

JOHN DOE,                        TELEPHONIC
           Plaintiff,            CONFERENCE
                                 CIVIL
           v.                    ACTION
                                 DEPOSITION
MUTUAL OF OMAHA INSURANCE         OF:
COMPANY,                         TERESA-ANN
           Defendant,            CURRERI

X-------------------------  X


T R A N S C R I P T   of the stenographic notes

of the proceedings in the above-entitled matter as

taken by and before DEBRA A. BAPTIST, a Certified

Shorthand Reporter and Notary Public of New Jersey,

at offices of STATE SHORTHAND REPORTING SERVICE,

212 Monmouth Road, Oakhurst, New Jersey, 07755, on

Wednesday, September 6, 2017 commencing at three

minutes after two in the afternoon.
```

**2**

```
                A P P E A R A N C E S



GLBTQ LEGAL ADVOCATES & DEFENDERS, ESQS.
BY:  BENNETT KLEIN, ESQ.
     30 Winter Street, Suite 800
     Boston, Massachusetts 02108
Attorneys for the Plaintiff.


PIERCE ATWOOD, LLP
BY:  BROOKS MAGRATTEN, ESQ.
     72 Pine Street
     Providence, Rhode Island 02903
Attorneys for the Defendant,
Mutual of Omaha Insurance Company.


CHIEF LEGAL OFFICE ASH BROKERAGE CORPORATION
BY:  JEFFREY V. GERY, ESQ.
     888 South Harrison Street, Suite 900
     Fort Wayne, Indiana 46802
Attorneys for Ash Brokerage Corporation.
```

**3**

```
                I N D E X

            EXAMINATIONS

Witness      Direct   Cross   Redirect   Recross

TERESA-ANN CURRERI
By Mr. Magratten      4
By Mr. Klein          39


            EXHIBITS

No.    Description                         Page

  1       Pierce Atwood Binder labeled John    58
          Doe versus Mutual of Omaha Ash
          Brokerage documents...................
```

**4**

TERESA-ANN CURRERI, 331 Newman Springs Road,
Suite 135, Red Bank, New Jersey 07701 having been
sworn by the court reporter, testified as follows:

DIRECT EXAMINATION BY MR. MAGRATTEN:

Q    Good afternoon, Miss Curreri. This
is Brooks Magratten. And thank you very much for
come in today and participating in this deposition.
Have you been in a deposition before?

A    I have not.

Q    Okay. It's a simple procedure. I'm
going to be asking you some questions and Mr. Klein
may have some questions for you. If at any time you
don't clearly hear or understand a question that I
have asked please stop me and ask me to repeat or
rephrase the question. It's important going
forward that you and I both understand that you
will only be responding to those questions that you
have clearly heard and understood. Is that
agreeable?

A    It is.

Q    And are you able to hear me okay over
the telephone?

A    I can. I am just going to increase the
volume a little bit and it should be better.

5

1  Q    If at any time the volume drops let
2  me know, I'll try to speak up louder.
3  A    Thank you.
4  Q    And I sent to you, Miss Curreri, a
5  binder with some Bates stamped numbered documents
6  that were produced to us by Ash Brokerage. Do you
7  have that with you today?
8  A    I do have the binder. I don't have -- I'm
9  not sure what stamps you're referring to.
10  Q    Well, you'll see on the pages in the
11  binder in the lower right corner each one has a
12  number?
13  A    Perfect.
14  Q    And that's the only thing I'm talking
15  about.
16  A    Okay.
17  Q    So as we get into the deposition I
18  may ask you to turn to a certain numbered page in
19  the binder and Mr. Klein and Mr. Gery have the same
20  documents so we'll all be on the same page so to
21  speak.
22     Okay. And Ms. Curreri, you're
23  employed by Ash Brokerage Corporation. Is that
24  correct?
25  A    Yes.

6

1  Q    What is Ash Brokerage Corporation?
2  A    It is a marketing company that supports
3  agents with several lines of authorities in
4  representing multiple carriers. Ultimately we help
5  agents find the best solution for their client
6  within the life insurance, disability insurance,
7  long term care and annuity market.
8  Q    And how long have you been with Ash?
9  A    Seventeen years.
10  Q    Congratulations.
11     And where is Ash Brokerage located?
12  A    I am in the Red Bank, New Jersey office.
13  And the home office is in Fort Wayne, Indiana.
14  Q    Okay. Is there an office in
15  Massachusetts?
16  A    No. Not that I'm aware of. I don't believe
17  so.
18  Q    And what is your title presently?
19  A    Senior Long Term Care Consultant.
20  Q    How long have you held that position?
21  A    For more than - for more than five years.
22  Q    Okay. And how long have you been
23  working with long term care insurance?
24  A    A little more than 17. Actually it is more
25  than likely 17 years that I'm working in the long

7

1  term market. And it's probably more so like 15
2  that I'm working with Ash Brokerage. Sorry.
3  Q    I see. So in your work with Ash
4  Brokerage you've been working is it primarily with
5  long term care insurance for the last 15 years?
6  A    It is. I work with long term care in the
7  traditional long term care market as well as in the
8  asset based long term care market.
9  Q    Okay. Can you explain to me what you
10  mean by the traditional market and the asset based
11  market?
12  A    Sure. The traditional long term care market
13  is - consists of traditional products that are -
14  that work long term insurance. You're paying
15  annually for a policy. Once you stop paying that
16  premium the policy lapses. If you pass without
17  needing long term care you don't get money back and
18  you don't get a death benefit. So it's a use it or
19  lose it type of insurance. In the asset based
20  market we're looking at solutions that link long
21  term care to either a life insurance chassis or an
22  annuity.
23  Q    Okay. And have you been working in
24  both markets for the last 15 years?
25  A    Yes.

8

1  Q    And do you sell long term care
2  insurance for multiple insurers?
3  A    Are you referring to - when you say multiple
4  insurers are you talking about clients that perhaps
5  are working as a group looking for long term care
6  or are you talking about the insurance carrier?
7  Q    Yeah. Let me be more clear. In the
8  traditional long term care market do you sell long
9  term care insurance for more than one insurance
10  company?
11  A    Yes.
12  Q    How many different insurance
13  companies' policies do you sell, and again I'm
14  referring to the long term care traditional LTC
15  market?
16  A    Five. So it was five, two of those carriers
17  are no longer marketing or selling long term care.
18  So within my career it was five and now we're down
19  to three.
20  Q    Okay. Can you identify the five
21  insurers for me?
22  A    Yes. Genworth, John Hancock, Mutual of
23  Omaha, Prudential and Met Life.
24  Q    And in 2015 were you selling long
25  term care policies for those five carriers?

9

1  A    No.
2      Q    Okay. I think you testified a moment
3  ago that you were only selling long term care
4  insurance products in the traditional LTC market
5  for three insurers, is that correct?
6  A    Yes. I do need to add an insurance company
7  to that list. I'm sorry. It's Transamerica.
8      Q    Oh, okay. Do I add that to the list
9  of five you gave me before?
10  A    Yes. So it was six carriers that I've worked
11  for over ten years with.
12      Q    All right. Let's go to 2015. What
13  insurance companies were you selling long term care
14  insurance products for in 2015?
15  A    Transamerica, Genworth, John Hancock and
16  Mutual of Omaha.
17      Q    Okay. And what happened to Prudential
18  and Met Life?
19  A    Both of those carriers had previously
20  stopped selling long term care.
21      Q    Okay. All right. Now just bear with
22  me for one moment. All right. In this case as you
23  may know the issue involves an application for long
24  term care insurance submitted by the Plaintiff,
25  John Doe, which apparently was submitted through a

10

1  financial advisor named J.D. Loden. Do you know
2  who J.D. Loden is?
3  A    Yes, I do.
4      Q    And who is Mr. Loden?
5  A    He's an insurance agent that is appointed
6  with Ash Brokerage.
7      Q    Did you work with Mr. Loden in
8  connection with the application for LTC insurance
9  submitted by the Plaintiff?
10  A    Yes.
11      Q    And was this your first time working
12  with Mr. Loden?
13  A    No, it was not.
14      Q    Okay. Can you tell me briefly how
15  your relationship with Mr. Loden started?
16  A    Mr. Loden came to Ash Brokerage for support
17  in learning about what was available in the long
18  term care market.
19      Q    And when did that happen?
20  A    I do not know when he started working with
21  Ash Brokerage.
22      Q    Okay. And that was sometime before
23  the Plaintiff submitted his application for LTC
24  coverage?
25  A    Yes.

11

1      Q    And did you work with Mr. Loden on
2  any specific projects prior to the Plaintiff
3  applying for LTC coverage?
4  A    I supported him with developing long term
5  care solutions and proposals for clients. I do not
6  recall how many cases, if any, were submitted prior
7  to this specific case.
8      Q    All right. Okay. And a moment ago
9  you said that Mr. Loden was an insurance agent
10  appointed with Ash Brokerage. Can you explain what
11  you mean by that?
12  A    Sure. He submits business to insure carriers
13  through Ash Brokerage. And we support him by
14  following the case through underwriting and giving
15  him policy status on what's happening in
16  underwriting and is essentially the client advocate
17  with the underwriter.
18      Q    Do you advise Mr. Loden what type of
19  insurance to purchase or from what companies to
20  purchase insurance?
21  A    Yes.                    [Doe and Doe's Partner]
22      Q    Okay. Let's talk specifically about
23  the application submitted by ▊▊▊ ▊▊ /
24  ▊▊▊    Tell me about your involvement with that
25  application?

12

1  A    I initially became involved when Mr. Loden
2  had sent a communication to Amy Ash requesting a
3  long term care solutions for those clients. I then
4  looked at what was available in the market and sent
5  him a long term care solution with Mutual of Omaha
6  because their price was competitive and their
7  product afforded his clients flexibility at time of
8  claim.
9      Q    Okay. Who is Amy Ash?
10  A    She is a case manager on the life side that
11  J.D. had worked with in the past for life
12  insurance.
13      Q    I see. So was Miss Ash J.D.'s first
14  point of contact with Ash Brokerage?
15  A    Not typically. She might have been the last
16  point of contact with him, though.
17      Q    Oh, okay. I'm sorry. I thought you
18  said a moment ago that your involvement with ▊▊
19  ▊▊▊ application began with Amy Ash making a
20  request for long term care solutions?
21  A    Yes. So J.D. sent a communication to Amy Ash
22  requesting long term care support for this specific
23  case. And Amy forwarded it to me. When I said --
24      Q    Okay.
25  A    Sorry.



**17**

1 cured.
2   Q    All right. And what happened next?
3 A    Forgive me, I'm trying to recall the - how
4 we proceeded from that point. We changed the
5 illustration a couple of times where they wanted to
6 get within a specific price point. Whether it was
7 hire or lower, I don't recall. So we revised
8 proposals. There was another presentation from
9 J.D. to the clients and I believe at one point I
10 recall having a conversation with the clients to
11 answer some questions that they had on the product
12 and what was available in the market.
13   Q    All right. That was my next
14 question. Did you ever have any discussion
15 directly with ▓▓▓▓▓▓
16 A    I did.
17   Q    And when did that occur?
18 A    That was in September. I believe it was
19 September of 2014.
20   Q    Okay. And were you in your New Jersey
21 office at the time?
22 A    Yes.
23   Q    Okay. And what was that discussion
24 about?
25 A    The gentleman asked some questions about the

**18**

1 product itself. I do not recall exactly what those
2 general product questions were. And then we did -
3 I did answer some questions regarding underwriting
4 and what the insurance company would look at.
5   Q    Okay. And what specifically did ▓▓▓▓
6 ▓ ask?
7 A    We were talking - I believe I recall we were
8 talking about the ▓▓▓▓ medication, so the ▓▓▓▓▓
9 ▓ and the ▓▓▓▓ medication. I had said - I
10 recall suggesting that they provide a list of
11 medications that they had taken or were concerned
12 about so I can give them a better idea of their
13 insurability. And when prompted, the only
14 information they gave back was information
15 regarding the ▓▓▓▓▓▓▓.
16   Q    All right. Did you have any
17 discussion with ▓▓▓ ▓▓▓ about Truvada?
18 A    None.
19   Q    Okay. Did you have any other
20 conversations with ▓▓▓▓▓▓ except for that one
21 telephone conference in September 2014?
22 A    No. I do not - I don't recall having any
23 other communications directly with the clients.
24   Q    Okay. Am I safe in assuming that all
25 your other conversations were with Mr. Loden?

**19**

1 A    Yes.
2   Q    May I ask you, Miss Curreri, to
3 please turn in your binder a document number 0245?
4 A    (Complies). Okay. I'm there.
5   Q    Okay. Can you tell me what this
6 document is?
7 A    It looks like an E-mail that was sent to the
8 agent on Wednesday July 23rd in which I did in fact
9 send him an illustration for Transamerica's long
10 term care product as well.
11   Q    As well as the Mutual of Omaha
12 projection?
13 A    Yes.
14   Q    Okay. Your first letter there - the
15 first line you say Mutual of Omaha has had a
16 product change affective Friday the 18th. What
17 does that refer to?
18 A    Mutual of Omaha had a -- Occasional the
19 insurance carriers update products. The product
20 change may have a rate change, it may be a change
21 in underwriting or a change in what they're
22 offering as far as inflation options or other
23 riders that are available.
24   Q    Okay. Can you please look at the
25 documents that have been marked 0213, to 0236?

**20**

1 A    (Complies). Okay. I'm there.
2   Q    What are these documents?
3 A    That is the personalized long term care
4 proposal that I prepared for them.
5   Q    All right. Are those all the
6 proposals that you prepared for them?
7 A    It is the -- In these pages, this is - it
8 would not be 1, 2 -- Let me look at the dates as
9 well. It does not have - the Transamerica
10 proposals were not prepared here. So forgive me, I
11 want to look back at that E-Mail and look at the
12 date on this.
13   Q    That's all right. What I'm concerned
14 about is this cluster of documents from 0213 to
15 0236, are those the Mutual of Omaha projections
16 that you forwarded to Mr. Loden?
17 A    Yes
18   Q    Okay. And can you turn please to the
19 document number 240?
20 A    (Complies). Okay. I'm there.
21   Q    Okay. And what is this document?
22 A    This was my reply to J.D.'s request of Amy
23 Ash for the long term care solution for ▓▓▓▓ and
24 ▓▓▓▓▓
25   Q    Okay. At the bottom of that second



21

1 paragraph you mention a domestic partner discount.
2 And what is that?
3 A    That's the couple discount that I referred
4 to.
5 Q    Okay.
6 A    The partner discount.
7 Q    All right. And I'm sorry, I forgot
8 if I asked this before or not, and was that
9 particular discount unique to Mutual of Omaha?
10 A    It was not.
11 Q    Okay. Bear with me one minute,
12 please.
13 A    Sure.
14 Q    If you can turn to the page number
15 205?
16 A    (Complies). I'm there.
17 Q    All right. What is - it looks like
18 an E-mail on the top of that page. What is that
19 E-Mail?
20 A    This is an E-mail in which J.D. advised me
21 that the couple would like to proceed with an
22 application to Mutual of Omaha. And he's asking --
23 Q    Okay.
24 A    -- for our assistance to take the
25 application.

22

1 Q    All right. And what happened after
2 you got this E-mail from Mr. Loden?
3 A    I don't know if I call him but we ultimately
4 talked about the App Ease process and how we can
5 facilitate calling the client direct to ask the
6 client questions of the Mutual of Omaha
7 application, pre-populate the application and send
8 it to J.D. so that he can meet with the clients to
9 review that application and obtain suggestions.
10 Q    Okay. And was that the process
11 followed here?
12 A    Yes.                                    [Doe]
13 Q    So did somebody at Ash call
14 and                    to begin the application process?
15 A    Yes.              [Doe's Partner]
16 Q    And who did that?
17 A    Norvetta Cannon.
18 Q    I'm sorry, did you say the first name
19 is Norvetta?
20 A    Yes. N like Nancy, o-r-v like Victor,
21 e-t-t-a.
22 Q    Okay. And where does Ms. Cannon work?
23 A    She's no longer employed by Ash Brokerage.
24 Q    Okay. At the time being 2014 into
25 2015 where was Ms. Cannon working?

23

1 A    She was in the home office in Fort Wayne,
2 Indiana.
3 Q    Okay. So I understand, Miss Cannon
4 then telephoned              or              and began
5 eliciting information for the application?
6 A    Correct.
7 Q    And what would be the next step in
8 that process?
9 A    Once that application was prepopulated it
10 was sent to the agent, J.D. Loden, so that he could
11 either meet face-to-face with the clients or have a
12 phone call conversation with the clients and review
13 the application so that the clients can obtain
14 signatures.
15 Q    All right. And what was the next
16 step after that?
17 A    Once the signatures were obtained the
18 application is submitted to Ash Brokerage. We
19 scrub it to make sure that it's completed and send
20 it out to the insurance company.
21 Q    When you say the application is
22 submitted to Ash Brokerage specifically did it come
23 to your attention?
24 A    It did not. It went to the home office.
25 Q    Okay. And who at the home office had

24

1 the application at that point?
2 A    It goes to an I Go Team, an In Good Order
3 Team. It goes to either the In Good Order Team or
4 the Case Management Team. It's essentially the New
5 Business Team. I'm sorry, I know that's a lot of
6 different teams.
7 Q    Okay. We'll call it the New Business
8 Team.
9 A    Yes.
10 Q    And I think you said that they scrub
11 the application?
12 A    Yes. They look through it to make sure that
13 the agent and clients have completed everything
14 that needed to be completed. They've answered all
15 questions and signed in the appropriate places.
16 Q    All right. And this is done in
17 Indiana?
18 A    Yes.
19 Q    Okay. So what happened in this case
20 after the New Business Team got the application and
21 reviewed it?
22 A    The insurance application is sent to the
23 insurance carrier and a case manager is assigned.
24 Q    Okay. Was a case manager assigned in
25              case?

**33**

1  foundation.

2      Q    You can answer the question.

3  A    Truvada is on all of their printed auto

4  decline medication lists.

5      Q    I see. And that would include

6  Transamerica, Genworth, John Hancock?

7  A    Yes.

8      Q    Okay. By the way, who is Danielle

9  Gater?

10  A    She's my partner. She at the time was my

11  partner supporting the southeast region.

12      Q    I see. Is she another LTC

13  specialist?

14  A    At the time she was. She is now on the

15  annuity sales team.

16      Q    Okay. Now as you sit here today are

17  you aware of any insurer who will issue a long term

18  care policy to someone who is taking Truvada?

19  A    No.

20      Q    And as you sit here today are you

21  aware of any insurer who will issue a LTC policy to

22  someone who is HIV positive?

23  A    No.

24      Q    Prior to our deposition today have

25  you had any discussions with Mr. Klein who is on

**34**

1  the line?

2  A    No.

3      Q    Prior to today have you had

4  discussions with anyone else about this particular

5  lawsuit?

6  A    Yes.

7      Q    And with whom?

8  A    It would be with Jeff Gery.

9      Q    Okay. Anyone other than --

10  A    And --

11      Q    I'm sorry. Go ahead?

12  A    As well as my direct Vice-President, Tim

13  Kukieza, the Vice-President of Long Term Care.

14      Q    Okay. Anyone else?

15  A    And Chad Eyrich, who is my direct manager.

16      Q    Okay. Prior to the deposition today

17  have you had conversations with anyone outside of

18  Ash Brokerage about this lawsuit?

19  A    No.

20      Q    Okay. After you were initially

21  contacted to work on the application for LTC

22  coverage submitted by ▓▓▓▓ was any part of the

23  processing of this application done in

24  Massachusetts?

25  A    No.

**35**

1          MR. KLEIN: Objection. Objection.

2  A    The clients to my recollection signed the

3  application in Massachusetts.

4      Q    Okay. Anything else?

5  A    Nothing else that I'm aware of.

6      Q    Okay. Now yesterday Ash Brokerage

7  provided us with a four page document, it looks

8  like claim notes. Do you have those?

9  A    Yes.

10      Q    I'm sorry, not claim notes but some

11  sort of computerized notes. Do you have those?

12  A    Yes.

13      Q    Okay. I'm going to direct your

14  attention please to the second note dated

15  August 29, 2014. Okay? Do you see that?

16  A    Yes.

17      Q    And who is Brittany Jordan?

18  A    Brittany Jordan is a colleague of mine

19  working on the long term care sales team.

20      Q    Okay. Is she - does she work with you

21  in New Jersey?                    [Doe and Doe's Partner]

22  A    She is in the New Jersey office. Yes.

23      Q    Okay. The top line, left message for

24  John to discuss the appease as both ▓▓▓▓▓▓

25  do not live together, as well as need some

**36**

1  additional information on ▓▓▓ health. Please

2  note as shown on the app - they do not live

3  together. Do you see that?

4  A    I do.

5      Q    Okay. What does this refer to?

6  A    When we initially talked about this case

7  J.D. Loden wanted to find a carrier that would

8  consider an application for same sex partners or

9  asked ultimately if long term care carriers did

10  that. And I had said yes and advised him as long

11  as they are living together for three consecutive

12  years the insurance company will consider domestic

13  partners or people that are not married living

14  together for three years in a loving relationship

15  at that point the insurance company would provide

16  that couples or partner discount. After the

17  telephone interview was completed by Norvetta

18  Cannon and I was out of the office on vacation

19  Brittany Jordan connected directly to J.D. to let

20  him know that the gentlemen gave two different

21  addresses. So that was a point of concern.

22      Q    I'm sorry, what do you mean you say

23  they gave different addresses, is that on the first

24  application?

25  A    I didn't review that. I can get there and

37

1  look at it.  Actually I think that we blacked out
2  the information for Applicant B.  So I couldn't
3  tell what the addresses were that they gave.
4  Q    All right.  But do you know where the
5  information came from that indicated that ████
6  and ████████    did not live together?
7  A    That information was given over the phone to
8  Norvetta Cannon when she called to ask the client
9  questions of the application.
10  Q    Okay.  How was that issue resolved?
11  A    I don't know how it was resolved and I don't
12  know what the outcome was of that.
13  Q    Okay.  The entry below that beginning
14  September 3, 2014, begins with spoke with John.  I
15  assume that's John Loden?
16  A    Yes.                    [Doe]
17  Q    Spoke with John.  He asked me to
18  reach out to ██████    regarding medical and clear up
19  information on living situation.  Do you know what
20  that refers to?
21  A    Yes.  In that note that we just referred to,
22  that activity note dated August 9th --
23  Q    Yeah?
24  A    -- in this note there were two points of
25  concern.  The first being that they do not live

[Doe's Partner]

38

1  together and then during that telephone interview
2  where Norvetta was asking medical questions
3  disclosed that he had a history of ████    but he
4  did not give any additional information that would
5  allow us to suggest if he was insurable or not.  So
6  J.D. asked Brittany Jordan if she would call the
7  client to ask those - ask that medical information.
8  Q    Okay.  And was Ash Brokerage able to
9  confirm whether or not Mr. Loden - excuse me -
10  whether or not ████    actually
11  lived together?          [Doe and Doe's Partner]
12  A    I don't know.  I'm looking at this note on
13  September 3rd and I do not see that that part was
14  addressed.
15  Q    All right.  And forgive me if I
16  already asked this but did you ever attempt to find
17  other long term care insurance for ██████?
18  A    Not while the application was submitted.
19  Not until he was declined coverage by Mutual of
20  Omaha.
21  Q    Okay.  And after he was declined
22  coverage did you attempt to find other long term
23  care insurance for him?
24  A    Yes.  That is when Michelle Fairhurst
25  reviewed the medical concern and use of Truvada

39

1  with all of our other traditional long term care
2  carriers.
3  Q    And she was unable to find a long
4  term care insurer that would write a policy for ████
5
6  A    Yes.  Correct.
7  Q    All right.
8  MR. MAGRATTEN:  That's all the
9  questions I have for now.
10  MR. KLEIN:  Okay.  This is Ben Klein.
11  Miss Curreri, my name is Ben Klein and I represent
12  the Plaintiff in this case, ████ ███ who is
13  proceeding under the pseudonym John Doe in this
14  case and I have a few questions too.
15  THE WITNESS:  Okay.
16  MR. KLEIN:  Not too long hopefully so
17  we can get everything underway.  If you could just
18  give me one minute to get myself organized.
19  THE WITNESS:  Absolutely.
20
21  CROSS EXAMINATION BY MR. KLEIN:
22  Q    Miss Curreri, can you explain to me
23  what the relationship is between Ash Brokerage and
24  Mutual of Omaha Insurance Company?
25  A    Yes.  They are one of the insurance carriers

40

1  that Ash Brokerage partners with to offer long term
2  care solutions to the agents that we work with.
3  Q    And can you tell me what you mean by
4  partners with?
5  A    They're one of the carriers that we - the
6  products that we market.  In other words, in our
7  product suite of what we offer our - the agents
8  that we work with we're offering products through
9  Mutual of Omaha, you know, John Hancock and so on.
10  Q    Okay.  All right.  And is it accurate
11  to say that Ash Brokerage is acting as a producer
12  or agent for Mutual of Omaha?
13  MR. MAGRATTEN:  Objection to form.
14  A    I don't think that it is accurate.
15  Q    Okay.  And why would you say it's not
16  accurate?
17  A    We support the agent with Mutual of Omaha.
18  While we offer products through Mutual of Omaha it
19  is the agent that we are more so partnering with.
20  If that makes scenes.
21  Q    Okay.  Was it your understanding that
22  Mr. Loden was an agent acting to sell Mutual of
23  Omaha long term care insurance?
24  MR. MAGRATTEN:  Objection to form.
25  A    It was actually my understanding that Mr.

41

1 Loden was an agent acting on behalf of his client
2 to find the best product for the client; whatever
3 that product may be.
4    Q    Okay. Now does Ash have any
5 contractual relationship with Mutual of Omaha?
6    A    We need to be contracted with Mutual of
7 Omaha to offer it.
8    Q    All right. So there is a contract
9 that authorizes - in 2014 and 2005 was there a
10 contract between Mutual of Omaha and Ash that
11 authorized Ash to market Mutual of Omaha's long
12 term care insurance?
13    A    I don't know specifically what that contract
14 would entail but I know that we were partnering
15 with Mutual of Omaha at that time. I don't know
16 the nuances, you know, the technical parts and
17 aspects of how an insurance carrier is set up to
18 work with Ash Brokerage.
19    Q    Okay. Do you know who at Ash
20 Brokerage might know that?
21    A    I think there are several people that may.
22 I think that perhaps the VP of LTC might be able to
23 answer that question, Tim Kukieza, and anyone that
24 works in that capacity.
25    Q    Can you spell his last name?

42

1 A    K-u-k-i-e-z-a.
2       THE WITNESS: Jeff, I spelled that
3 name right?
4    Q    Okay.
5 A    Sorry. Ago head.
6    Q    That's okay. Now at some point you
7 prepared a quote for the Mutual of Omaha long term
8 care insurance for ████████ and ████████ that
9 had premium information in it, is that correct?
10 A    Yes.
11    Q    And where did you obtain the
12 information to prepare that quote?
13 A    From J.D. Loden.
14    Q    Well, what information did you obtain
15 from Mr. Loden or receive from Mr. Loden?
16 A    So we would need the clients' names, dates
17 of birth. Initially we do want to have some idea
18 of what the medical history is so that we can
19 prepare an appropriate rating for the client. But
20 that's ultimately the minimum that we would need to
21 begin to plug in information to the software.
22    Q    Okay. And then with that information
23 you were able to determine the price that Mutual of
24 Omaha would charge as to the premium for that
25 product. Is that correct?

43

1 A    Correct.
2       MR. MAGRATTEN: Objection to form.
3    Q    Okay. And where did you obtain the
4 information to be able to specify the amount that
5 Mutual of Omaha would charge as premium?
6 A    I --
7       MR. MAGRATTEN: Objection to form.
8 A    I just put the information into the
9 carrier's software, the client's ages, gender,
10 dates of birth and plug in how much of a long term
11 care benefit they were going to consider. So once
12 you plug in the long term care benefit the software
13 automatically outputs what the combined premium
14 would be for both.
15    Q    And when you use the term carrier
16 software were you referring to Mutual of Omaha's
17 software?
18 A    Yes.
19    Q    All right. And how does Ash
20 Brokerage access Mutual of Omaha's software to
21 prepare quotes?
22 A    We have a system called Quote Now in which
23 the carriers that we work with have their software.
24    Q    All right. So is it fair to say that
25 Mutual of Omaha has provided Ash with its

44

1 information about the premiums that it charges in
2 order for Ash to prepare quotes?
3 A    Yes.
4       MR. MAGRATTEN: Objection to form.
5    Q    And is that -- Do you know whether
6 that software is available to any member of the
7 public?
8 A    I don't know the answer to that. It may be
9 on the insurance carrier website.
10    Q    Okay. Now you indicated, I'm just
11 trying to understand the relationship here, that
12 Ash marketed Mutual of Omaha's long term care
13 insurance products. Am I understanding that
14 correctly?
15 A    Yes.
16       MR. MAGRATTEN: Objection to form.
17    Q    I'm sorry, I didn't quite catch the
18 answer?
19 A    Yes.
20    Q    All right. So in that capacity is it
21 fair to say that you were acting as an authorized
22 representative of Mutual of Omaha?
23       MR. MAGRATTEN: Objection to form.
24 A    By using their software? I don't know if
25 that would - if that would qualify me as being a

45

1 representative. If I am a writing agent --
2     Q    Okay.
3  A    -- it makes me a representative of Mutual of
4 Omaha. And in this situation I'm not a writing
5 agent.
6     Q    Right. But I thought you indicated,
7 I'm talking about Ash, that Ash - you indicated I
8 believe that Ash marketed Mutual of Omaha's long
9 term care insurance products in 2014; is that
10 correct?
11  A    Yes, it is.
12        MR. MAGRATTEN: Objection to form.
13     Q    Okay. And do you know what authority
14 Ash Brokerage had to market Mutual's products in
15 2014?
16        MR. MAGRATTEN: Objection to form.
17  A    What authority we had to market that
18 product?
19     Q    Yes?
20  A    We're a marketing company for their
21 products. So ultimately we have the right to
22 present their long term care solution to agents who
23 will then in turn present them to their clients.
24     Q    Okay. And you do that with Mutual's
25 permission, I assume?

46

1        MR. MAGRATTEN: Objection to form.
2  A    I don't know if they need to give us
3 permission to do that to be honest. That's like
4 the licensing and contracting part of it. I don't
5 know the formalities of what that is referred to as
6 or legally what it's called. That's why I'm
7 hesitating to say yes, we were working on behalf of
8 Mutual of Omaha.
9     Q    Okay. Now there were some E-mails
10 between you and Mr. Loden that I won't refer to but
11 just if you recall some E-mails in which you
12 indicated to Mr. Loden that it was a requirement
13 that he obtain a license to sell long term care
14 insurance in Massachusetts. Do you recall those
15 E-mails?
16  A    Yes. Contracting E-mails. They were not - I
17 referred him to our producer services or our
18 contracting team and advised him that in order to
19 sell long term care insurance in Massachusetts he
20 needs to have a nonresident life and health
21 producer's license and long term care continuing
22 education in place.
23     Q    Okay. And do you know if that was a
24 requirement of Mutual of Omaha?
25  A    It is.

47

1     Q    Now with respect to the two clients
2 which we're talking about here, the two individuals
3 that Mr. Loden brought to you, ▮▮▮ and
4 ▮▮▮ was it your understanding that you were
5 working with prospective applicants who were in
6 Massachusetts?
7  A    Yes.
8        MR. MAGRATTEN: Objection to form.
9     Q    Now after the applications are
10 submitted who has the responsibility for
11 underwriting the long term care insurance?
12  A    The insurance carrier, Mutual of Omaha.
13     Q    Okay. And after ▮▮▮ and ▮▮▮
14 ▮▮▮ application was submitted who has the
15 responsibility for determining whether or not to
16 issue a long term care insurance policy to them?
17  A    Mutual of Omaha.
18     Q    And along those same lines, after ▮▮▮
19 ▮▮ and ▮▮▮ submitted the long term care
20 insurance policy to Mutual of Omaha who was the
21 entity responsible for denying coverage to ▮▮▮
22
23  A    Mutual of Omaha.
24     Q    Okay. I'm sorry. I'm just looking at
25 my notes for a moment.

48

1  A    That's okay.
2     Q    Do you know, do you have any
3 understanding of Mr. Loden's relationship with
4 Mutual of Omaha with respect to the long term
5 insurance application at issue in this case?
6  A    I do not.
7     Q    Okay. But I think you indicated
8 before you -- Well, strike that.
9        I want to just call your attention
10 again to the premium quotes we looked at which were
11 two quotes at pages I believe 213 to 236, if I can
12 ask you to take a look at those pages again?
13  A    Sure. I'm there.
14     Q    Okay. Now what exactly, can you just
15 explain to me as somebody who knows nothing about
16 long term care insurance when it says mutual care
17 secure solution premium quote prepared for ▮▮▮ and
18 ▮▮▮ what actually is that?
19  A    This is a personalized illustration or
20 proposal that was developed specifically for ▮▮▮
21 and ▮▮▮ based on their ages, their gender, their
22 state of issue and solving for specific long term
23 care benefits, in this case a monthly benefit of
24 $3,000 for five years with inflation protection.
25     Q    Now does such a premium quote contain



**Page 49**

1  in it the premium that the Insured would pay if
2  their application is accepted?
3      MR. MAGRATTEN: Objection to form.
4  A    It does.  It's right on this page on the
5  bottom box.  It outlines ▮ and ▮ annual,
6  semiannual, yearly or monthly premium and then to
7  the right of there their combined premium payment.
8      Q    And when you say -- Can you point me
9  exactly to which page that is?
10 A    Oh.  I'm not on page stamped 0214.
11     Q    Okay.  Is it correct, it appears to
12 me, that document pages 213 to 223 and 225 to 235
13 are those identical documents?
14 A    They are not.
15     Q    They're not.  And what's the
16 difference?
17 A    So the difference specifically is in how
18 much - what the long term care benefits are.  Page
19 0214 is an illustration giving the clients a
20 monthly long term care benefit of $3,000 and the
21 document on page 0226 is a proposal providing
22 $6,000 a month in long term care benefits.
23     Q    Okay.  And do you know which of these
24 options ▮ and ▮ chose?
25 A    I do not recall but it would be in the

**Page 50**

1  application in the front of this binder.
2      Q    Okay.
3  A    It was $6,000 a month.
4      Q    When you say 6,000 what does that
5  number refer to?
6  A    The monthly long term care benefit that they
7  applied for, so that relates to the illustration
8  and document number 0226.
9      Q    Okay.  And do you know in the entire
10 application, in the entire process between the time
11 of these quotes and the time of the submission of
12 the application were any other premium quote
13 documents prepared for them?
14 A    I don't recall.
15     Q    Okay. One moment, please.
16 A    Sure.
17     Q    Miss Curreri, I just want to ask a
18 couple questions about the domestic partner benefit
19 that Mutual offered?
20 A    Yes.
21     Q    Can you tell me what your
22 understanding was of the requirements for that
23 benefit?
24 A    I referred to it as domestic partner
25 discount.  The carrier refers to it solely as a

**Page 51**

1  partner discount.
2      Q    Was it available in 2014 and 2015 --
3  A    Yes.
4      Q    -- to married couples?
5          And were there any specific
6  eligibility requirement for unmarried partners at
7  that time?
8  A    The only requirement is that they need to be
9  residing together for the last three years.
10     Q    Okay.  And do you know if Mutual had
11 any other specifications about what residing
12 together meant?
13 A    No.
14     Q    Okay. Do you know if Mutual - if          [Doe]
15 somebody could obtain the benefit if they were
16 living together as a long term committed couple but
17 didn't live together seven nights a week?
18         MR. MAGRATTEN: Objection to form.
19 A    I don't know that.
20     Q    Okay.  Now you indicated that Brittany
21 Jordan was the person who had a discussion with
22 [Doe & Doe's Partner] ▮ about the issue of whether they
23 lived together; is that correct?
24 A    Brittany Jordan was asked to call them and
25 there was an activity note that we reviewed which

**Page 52**

1  referenced her obtaining additional information
2  regarding the ▮  But I do not know if she
3  spoke to them specifically regarding their living
4  arrangements.  [medical condition]
5      Q    Okay. Is she still employed with Ash
6  Brokerage, do you know?
7  A    She is.
8      Q    Okay.  And what office is she in?
9  A    The Red Bank, New Jersey office.
10     Q    Okay.  Now - and I'm just confirming
11 my information here in my notes.  It was Norvetta
12 Cannon who took the application over the phone from
13 ▮ is that correct?
14 A    Correct.
15     Q    Okay.  And would she have asked - in
16 the usual process would she have asked each of them
17 where they live?
18 A    Yes.
19     Q    All right.  And do you know whether
20 the application was submitted after the first time
21 that ▮ spoke to Norvetta Cannon or do
22 you think that she spoke to them a second time
23 before the application was submitted?
24 A    Norvetta --
25         MR. MAGRATTEN: Objection to form.

53

1  A    Our system notes indicate that she spoke to
2  ███ on one day and then attempted to connect with
3  ███ at a different number an alternate day. I do
4  not know --
5      Q    Okay.
6      A    -- if any other conversation was had.
7      Q    Okay. If there were would those be
8  reflected in these - in these notes that seem to
9  log all the communications?
10 A    They would be, yes.
11     Q    Okay. Did you have any discussion
12 with Norvetta Cannon about the application?
13 A    I did not.
14     Q    Okay. Now in your -- Do you know
15 whether Mutual charges different premiums based on
16 the geographic location of the Insured?
17 A    They may. Some insurance companies do have
18 different rates depending on what the State
19 approves the product as.
20     Q    But you don't know whether Mutual
21 does, is that correct?
22 A    I cannot say specifically offhand --
23     Q    Okay.
24 A    -- whether they do.
25     Q    Okay. And I'm sorry if this was

54

1  asked, I just want to be clear about this note that
2  is from September 3rd. If you can -- That starts
3  with Spoke with John. He asked me to reach out to
4  ███ regarding medical and clear up information on
5  living situation. Just - if I can just draw your
6  attention to that note?
7  A    On September -- Yes. I'm here. I've got it.
8      Q    Okay. So that's an inbound call on
9  September 3rd. So did John Loden call you?
10 A    No. That was with Brittany Jordan. So right
11 next to --
12     Q    Okay.
13 A    -- App Ease follow-up is the name of the
14 person that managed that activity.
15     Q    I see. Okay. Okay.
16          I'm almost done. I just want to
17 check my notes.
18 A    Sure.
19     Q    Just one question, again this is for
20 clarification. You talked about the App Ease
21 process and is that a service that Ash Brokerage
22 offers?
23 A    It is.
24     Q    All right. And in that process an
25 Ash representative speaks to the applicant and then

55

1  fills in the application, is that correct?
2  A    Correct.
3      Q    All right. And from there you sent
4  it to - in this case the application was sent to
5  J.D. Loden --
6  A    Correct.
7      Q    -- is that correct?
8  A    I believe so, yes.
9      Q    Okay. All right. And so it's fair to
10 say that in the App Ease process the answers
11 provided are based upon the questions asked by the
12 Ash representative taking the application?
13 A    Correct.
14          MR. MAGRATTEN: Objection to form.
15 A    Ash Brokerage asks the questions verbatim
16 and then the application is sent to the agent so
17 that it can be reviewed with the client before
18 signing.
19     Q    Can I just call your attention to a
20 note on the four page document of notes that was
21 produced to us yesterday dated September 18th,
22 2014?
23 A    (Complies). I see September 17th. I don't
24 see September 18th.
25     Q    I'm sorry, December 18th.

56

1  A    Oh, December. Sorry. Okay. I see it.
2      Q    Okay. And it appears to be an inbound
3  call to you, J.D. returned my call. He was
4  frustrated with the clients, ███ and ███ They
5  live in MA --
6  A    Right.
7      Q    -- do you see that?
8  A    Yes.
9      Q    Okay. Does that give you any
10 information about how the issue of their living in
11 different places was resolved?
12          MR. MAGRATTEN: Objection to form.
13 A    No. This has to do with the fact that the
14 clients had signed the application and then held it
15 for 30 days before sending it back so it had gotten
16 stale dated. It has nothing to do with where they
17 live but ultimately the agent had submitted or sent
18 them the application to sign and was waiting for
19 the app to come back signed and then when we
20 received it it was ultimately signed for 30 days
21 before they sent it in.
22     Q    No, I understand that. But there is
23 a reference in the December 18th, 2014, note that
24 you -- strike that.
25          Did you enter into the system the

# Exhibit D

JOHN (JD) LODEN
6/30/2017

## Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHH DOE,

      Plaintiff,

vs.             Civil Action No.:
             1:16-cv-11381

MUTUAL OF OMAHA INS. CO.,

      Defendant.

_____x

DEPOSITION OF:  JOHN DAVID (JD) LODEN
DATE TAKEN:     Friday, June 30, 2017
START TIME:     2:19 p.m.
LOCATION:       5660 Strand Court
                Naples, Florida 34110
COURT REPORTER:  Dianne N. Sarkisian, CSR, RPR,
                Notary Public - State of Florida.

## Page 2

1  APPEARANCES:
2
3      BENNETT H. KLEIN, ESQUIRE
        GLBTQ Legal Advocates & Defenders
4      30 Winter Street
        Suite 800
5      Boston, Massachusetts 02108
        (617) 426-1350
6
           Appearing on behalf of the Plaintiff
7         (via telephone.)
8
9
      BROOKS MAGRATTEN, ESQUIRE
10     Pierce Atwood LLP
        72 Pine Street
11     Suite 500
        Providence, Rhode Island  02903
12     (401) 490-3422
13         Appearing on behalf of the Defendant
         (via telephone.)
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1                INDEX
2  Witness                    Page
   John David (JD) Loden
3
4  DIRECT EXAMINATION
   BY MR. MAGRATTEN:          4
5
6  CROSS EXAMINATION
   BY MR. KLEIN:             30
7  REDIRECT EXAMINATION
   BY MR. MAGRATTEN:         41
8
9              EXHIBITS
10
   Exhibit                   Page
11
   (Exhibits attached to transcript
12  electronically only.)
13  DEFENDANT'S EXHIBIT A, SUBPOENA TO   14
   PRODUCE DOCUMENTS, INFORMATION OR
14  OBJECTS OR TO PERMIT INSPECTION OF
   PREMISES IN A CIVIL ACTION
15
   DEFENDANT'S EXHIBITS B, C, D,      14
16  MUTUALCARE SECURE SOLUTION, LONG TERM
   CARE INSURANCE POLICY
17
   DEFENDANT'S EXHIBIT E, SEPTEMBER 17,  17
18  2014 LETTER
19  DEFENDANT'S EXHIBIT F, MUTUAL CARE   18
   SOLUTIONS APPLICATION
20
   DEFENDANT'S EXHIBIT G, 12/17/14 EMAIL  19
21
   DEFENDANT'S EXHIBIT H, EMAIL CHAIN    21
22
   DEFENDANT'S EXHIBIT I, APPLICATION    24
23  FOR LONG TERM CARE COVERAGE
24  DEFENDANT'S EXHIBIT J, NOTES/HISTORY  28
25

## Page 4

1  Naples, Florida
2  Friday, June 30, 2017
3  2:19 p.m.
4         JOHN DAVID (JD) LODEN,
5   was thereupon called as a witness herein, and after
6   having first been duly sworn to testify to the truth,
7   was examined and testified as follows:
8         DIRECT EXAMINATION
9  BY MR. MAGRATTEN:
10  Q.  All right, Mr. Loden.  Again, I'm Brooks Magratten,
11    representing Mutual of Omaha Insurance Company.
12    Thanks for coming in this afternoon.
13       I'm going to be asking you a series of
14    questions.  If at any time you don't clearly hear or
15    understand a question that I have asked, please let me
16    know and I will rephrase or repeat the question.  It's
17    important as we go through that you only respond to
18    those questions that you clearly heard and understood.
19    Is that agreeable?
20  A.  Yes.
21  Q.  And if at any time you need a break or need something
22    to drink, just let us know.  We can stop the process
23    for a while.
24       Have you ever been at a deposition before?
25  A.  Once.

025

JOHN (JD) LODEN
6/30/2017

**Page 5**

1  Q.  Okay.  Well, I'm just going to be asking you a series
2      of questions, mostly pertaining to ▮▮▮ who's a
3      plaintiff in the case, and I will be referring to some
4      of the exhibits that we shipped to your office
5      previously.  Mr. Klein also has a set of the exhibits.
6          And it's important, JD, when you're done
7      with this deposition, to leave these exhibits with
8      Dianne.  She will take custody of the exhibits and
9      keep them with the transcript.
10         Can you tell us please your occupation, JD?
11 A.  I'm a licensed financial advisor.
12 Q.  How long have you been a licensed financial advisor?
13 A.  31 years.
14 Q.  Who's your employer?
15 A.  I'm self-employed.
16 Q.  Is there a business name you operate under?
17 A.  JD Loden Wealth Management.
18 Q.  And how long has that business been in existence?
19 A.  1998.
20 Q.  So continuously since 1998?
21 A.  Yes.
22 Q.  Do you live in Florida?
23 A.  Yes.
24 Q.  Are you a full-time Florida resident?
25 A.  Yes.

**Page 6**

1  Q.  Do you have any professional licenses?
2  A.  Yes, several.
3  Q.  What are they?
4  A.  Series 7, Series 65.  I have State of Florida
5      insurance licenses for life, health, variable annuity.
6      And the Series 65, I'm a registered representative
7      investment advisor.
8  Q.  Anything else?
9  A.  No.
10 Q.  Tell me, what is your relationship with Mutual of
11     Omaha Insurance Company?
12 A.  I've used their contracts for various client needs.
13     I'm an independent contractor, so occasionally we use
14     their Medicare Supplements or long term care.  On
15     occasion their life insurance, when appropriate, for
16     clients.
17 Q.  So you've sold Medicare Supplement, life insurance,
18     and long term care policies for Mutual of Omaha?
19 A.  Yes.
20 Q.  Have you sold long term care policies written by other
21     insurance companies?
22 A.  Yes.
23 Q.  Can you name a few?
24 A.  Originally, Travelers, CNA, Unum.
25 Q.  Okay.  What is the Ash, A-s-h, Brokerage?

**Page 7**

1  A.  They're an independent marketing organization.  Many
2      advisors around the country -- we call them "IMOs,"
3      independent marketing organizations, I believe, and
4      they have -- they act as like a general agency,
5      representing lots of insurance companies.  So
6      independent advisors like us around the country use
7      them as a resource to obtain quotes for our clients
8      and we typically spreadsheet quotes to clients 'cause
9      our obligation is to provide the best thing for our
10     clients and not sell products.
11 Q.  So if you're selling a client a Mutual of Omaha long
12     term care policy, would you go through Ash Brokerage
13     typically?
14 A.  Well, I used Ash in this occasion to see if I could
15     find something that would provide a spousal discount
16     for a gay couple.
17 Q.  Okay.
18 A.  So Mutual of Omaha offered a contract for, uh, you get
19     a discount when you have two members of a family
20     applying.
21 Q.  Did you solicit long term care coverage from any other
22     insurance companies for ▮▮▮ and his partner?
23 A.  Well, that's what Ash did.  I believe we had quotes
24     from other carriers.  Off the top of my head, it could
25     have been John Hancock maybe, I don't recall, but, you

**Page 8**

1      know, we... We did certainly get quotes from other
2      carriers and found that Mutual of Omaha was a carrier
3      that gave them a discount.
4  Q.  I see.  Provided them a discount as a committed
5      couple?
6  A.  Yes.
7  Q.  I see.
8  A.  In addition, since we... I have an obligation to make
9      sure that the coverage is suitable, that the company
10     has substantial financial resources and high ratings,
11     and that's one of the reasons why we chose them.
12 Q.  Okay.  And other insurance companies are out there.
13     Was it the case that they would not provide a discount
14     in the case of ▮▮▮ and his partner?
15 A.  That's what I was told.
16 Q.  By the Ash Brokerage?
17 A.  Yes.
18 Q.  And did you have a primary contact at Ash Brokerage?
19 A.  Yeah.  I think I put it in the notes and all the
20     emails I supplied Teresa.  I can't pronounce her last
21     name.  It's in the notes and all the emails.
22 Q.  C-u-r-r-e-r-i?
23 A.  Yes.
24 Q.  Curreri?
25 A.  Yeah.

2 (Pages 5 to 8)

JOHN (JD) LODEN
6/30/2017

## Page 13

1  A.  So the conversation of long term care was very
2      prominent because it was an ongoing situation because
3      his parents were older and needing care.
4  Q.  I understand.  Can you walk me through the process
5      that you followed to obtain long term care coverage
6      for ███████ and ███████
7  A.  Well, how we...  A long term care policy has basically
8      three components:  A daily benefit, a pot of money,
9      how long -- how many years, some inflation options.
10     And so what we do is it's our obligation to provide
11     them a spreadsheet of quotes.  They have different
12     waiting periods.  The contracts are pretty...  They're
13     a bit complicated and the definitions vary from one
14     company to another.
15 Q.  All right.  I'm going to take a detour for one moment.
16         In the documents that you have with you,
17     there is a document with the letter A in the upper
18     right-hand corner?
19 A.  Yeah.
20 Q.  Which, uh, is that the subpoena that was served on you
21     in this matter?
22 A.  Yes.
23 Q.  And in response to the subpoena, did you search for
24     records pertaining to ███████
25 A.  Yeah.  I emailed documents to you.  And I actually, as

## Page 14

1      soon as I got this, because we're in such a heightened
2      regulatory environment, I contacted the Compliance
3      Department at my broker-dealer, Cetera, to let them
4      know of this, and I corresponded with their office and
5      provided everything I could find regarding emails and
6      notes and quotes and so forth.
7  Q.  All right.  And thank you for doing that.
8          And you're here today for this deposition
9      pursuant to a subpoena as well, correct?
10 A.  Can you state that again?  I'm not sure what you
11     meant.
12              (DEFENDANT'S EXHIBIT A, SUBPOENA TO PRODUCE
13         DOCUMENTS, INFORMATION OR OBJECTS OR TO
14         PERMIT INSPECTION OF PREMISES IN A CIVIL
15         ACTION WAS MARKED FOR IDENTIFICATION.)
16 BY MR. MAGRATTEN:
17 Q.  Yeah.  You received one subpoena for production of
18     documents, correct, what we just looked at, Exhibit A?
19 A.  Yes.
20 Q.  And then you got a second subpoena to ask you to show
21     up for this deposition?
22 A.  Yes, that's correct.
23              (DEFENDANT'S EXHIBITS B, C, D, MUTUALCARE
24         SECURE SOLUTION, LONG TERM CARE INSURANCE
25         POLICY WAS MARKED FOR IDENTIFICATION.)

## Page 15

1  BY MR. MAGRATTEN:
2  Q.  All right.  There are three similar documents that
3      have been marked Exhibits B, C and D.  What are these
4      documents?
5  A.  These are quotes for long term care.
6  Q.  Quotes from Mutual of Omaha?
7  A.  Yeah, supplied by Ash Brokerage.
8  Q.  That was my next question.  Where did you get these
9      documents?
10 A.  From Ash Brokerage.
11 Q.  Okay.
12 A.  I don't have the software to generate the quotes.
13 Q.  Okay.  And what's the difference between Exhibit B, C
14     and D; is it just sort of the terms of the benefits?
15 A.  Yeah, exactly.  If you look at A, it's, uh...  Let me
16     just skim this real quick.
17         You can see the daily, the maximum monthly
18     amount varies.
19 Q.  Okay.
20 A.  So document B is quoting $6,000 a month with various
21     options throughout the pages, and those options are
22     waiting periods, inflation options, and so forth.
23         And option C is a $3,000 versus $6,000.
24         And then D is...
25         And I believe we had to...  We also had to,

## Page 16

1      during the process they took a long time to review
2      this.  If you see in the notes from the original
3      quotes back in May, by the time we did an application,
4      one of their ages had changed and the premium changed
5      because the age changed, so we had to get some new
6      quotes and an application updated.
7  Q.  I see.  So when you got Exhibits B, C and D, did you
8      forward them to ███████ or ███████ [Doe's Partner]
9  A.  Yeah, via email.  [Doe]
10 Q.  Okay.  And did they select one of these options?
11 A.  Yes.
12 Q.  Do you remember which one?
13 A.  Well, it's designated by the application.
14 Q.  Okay.  Please walk me through, you know, once...  Once
15     ███████ and ███████ selected the parameters of a long
16     term care policy they were interested in, what was the
17     next step?
18 A.  Well, I emailed them the application to complete.  And
19     if you look at the application, it's electronically
20     completed.
21 Q.  And what does that mean?
22 A.  Well, it wasn't handwritten, meaning, it was done with
23     a, you know, computer, you know, checking boxes.  You
24     know, a fillable PDF, I suppose.
25 Q.  So you sent a PDF file of the application to ███████

4  (Pages 13 to 16)

JOHN (JD) LODEN
6/30/2017

Page 21

1  A.  Exactly.
2  Q.  Okay.
3  A.  It's a disclosure requirement for all our documents.
4  Q.  All right.  This is not your office in Lynnfield,
5      Mass?
6  A.  No.
7  Q.  Okay.
8  A.  And that's because it's email, and that's a FINRA
9      requirement.
10              (DEFENDANT'S EXHIBIT H, EMAIL CHAIN
11              WAS MARKED FOR IDENTIFICATION.)
12  BY MR. MAGRATTEN:
13  Q.  Understood.  Thank you.
14              So turning to Exhibit H, and I'd like to
15      start on the second page of Exhibit H.
16              Is Exhibit H an email string between you
17      and ▮▮▮?
18  A.  Um-hum.
19  Q.  Okay.  On the second page at the top it reads,
20      "Unfortunately, the application and checks were sent
21      back to me because more than 30 days had expired
22      between the date you and ▮▮▮ signed the applications
23      and the date the company received the applications."
24              And it goes on to say, "In addition, you
25      both had a birthday since we originally quoted the

Page 22

1      plans.  Therefore, there is a modest monthly premium
2      difference for each ($7.10 ▮▮▮ and $3.38 ▮▮▮  To
3      complete the applications, please sign and date the
4      attached signature pages and return them with new
5      checks, payable to Mutual of Omaha."
6              Do you see where I was reading?
7  A.  Yeah.
8  Q.  Can you explain to me in laymen's terms what's going
9      on there?
10  A.  Yeah.  Again, the applications were forwarded to them.
11      They took a long time to complete the applications.
12      You know -- and it's been some while.  It's very
13      possible -- and I've seen clients, you know, get
14      paperwork, sign a document, but then not return it
15      with whatever response, you know, other forms or
16      premium deposits are required.
17              And so the applications were returned
18      because it didn't comply with the underwriting rules.
19  Q.  Meaning, in terms of the date of the signature and the
20      date the company received the application?
21  A.  Exactly.
22  Q.  Okay.
23  A.  Because, you know, people's health conditions can
24      change from th date they fill out an application to
25      the time the company gets the application.

Page 23

1  Q.  Okay.  And then on the bottom of page 1 of Exhibit H,
2      there's a note.  It appears to be from ▮▮▮  It says,
3      "Hi JD, thank you for the update.  I apologize for any
4      additional work entailed on your behalf as a result of
5      our lapse in not getting back to you sooner.  I will
6      return the application to you this week."
7              That's the email that ▮▮▮ wrote you on
8      December 22?
9  A.  Yeah.
10  Q.  And then you responded on December 23, saying, "What
11      do you want me to do with the checks," correct?
12  A.  Yeah, the other checks.  I didn't know if they wanted
13      me to return them or destroy them.
14  Q.  I see, okay.  And then the top email on page 1 of
15      Exhibit H, this apparently is ▮▮▮ emailing to you
16      again, saying, "I have sent the completed applications
17      to you via FedEx.  I have included two checks for the
18      new premium amounts.  Please destroy the original
19      checks."
20  A.  Yeah.
21  Q.  Did I read that correctly?
22  A.  Yeah.
23  Q.  So when you sent the new applications up to ▮▮▮ for
24      signatures, he completed them and sent them back to
25      you?

Page 24

1  A.  Yeah.
2  Q.  And that would be in your Naples, Florida, office?
3  A.  Correct.
4              (DEFENDANT'S EXHIBIT I, APPLICATION FOR
5              LONG TERM CARE COVERAGE WAS MARKED FOR
6              IDENTIFICATION.)
7  BY MR. MAGRATTEN:
8  Q.  Can we turn to Exhibit I?
9  A.  Sure.
10  Q.  And what is Exhibit I?
11  A.  It's a binder premium.
12  Q.  Is this an application for long term care coverage?
13  A.  Yes.
14  Q.  And turning to page 16, it looks like there are
15      signatures there for ▮▮▮ ▮▮▮ and for ▮▮▮ ▮▮▮
16      The date is not quite clear, but it looks, December
17      2014, correct?
18  A.  Yeah.
19  Q.  So is this the application that ▮▮▮ ▮▮▮ sent you
20      that's referred to in the email that's marked Exhibit
21      H?
22  A.  I believe so.
23  Q.  Okay.  What happened?  Excuse me, what did you do with
24      Exhibit I, once you got it?
25  A.  Well, that was forwarded to Ash Brokerage.  I believe

6 (Pages 21 to 24)

JOHN (JD) LODEN
6/30/2017

---

Page 33

1     clients like ███ ███ is to solicit proposals
2     from companies that actually provide long term care
3     insurance?.
4 A.  What do you mean solicit?
5 Q.  Well, you obtain... One of the things that... One of
6     the services that you provided for ███ ███ was
7     that you obtained, uh, you obtained quotes from
8     insurance companies that actually provide the long
9     term care insurance; is that right?
10 A.  Yes.
11 Q.  And then you, uh... Is it also correct that one of
12     your -- roles that you played here with ███ and
13     ███ is you helped them through the application
14     process?
15 A.  Yeah.
16 Q.  And then... But it's correct that -- and this may
17     seem obvious but I just need to establish it -- you
18     are not a provider of long term care insurance itself.
19     You don't provide the long term care insurance
20     product; is that correct?
21 A.  No, I don't. I don't issue contracts. I don't issue
22     contracts.
23 Q.  And in this case, with ███ ███ the contract
24     was going... The contract for insurance would have
25     been issued by Mutual of Omaha; is that correct?

---

Page 34

[Doe and Doe's Partner]

1 A.  Yes.
2 Q.  And Mutual of Omaha is the entity that would have --
3     that makes the decision about whether to provide the
4     insurance to ███ ███ is that right?
5 A.  Yeah, based on their underwriting criteria.
6 Q.  So they're the people that decide whether to sell the
7     product to ███ ███ in this case; is that right?
8 A.  No, they don't decide to sell it to them. I don't
9     know what you mean. They provide...
10 Q.  Let me... Let me...
11 A.  They provide insurance.
12 Q.  Let me see if I can... They make the underwriting
13     decision; is that right?
14 A.  Yeah.
15 Q.  Okay. And in this case, they declined ███ correct?
16 A.  Yes.
17 Q.  And that decision was solely Mutual of Omaha's
18     decision; is that right?
19 A.  Yes.
20 Q.  Now, there's some reference in the emails that you
21     provided to Mr. Magratten, in emails between you and
22     Teresa Curreri, the need for you to obtain some kind
23     of license to sell insurance in Massachusetts. Does
24     that ring a bell?
25 A.  Yeah. It's very simple. So the... If we are going

---

Page 35

1     to write a policy in a state, we get licensed. We get
2     a nonresident license.
3 Q.  Okay. And did you obtain a nonresident license to
4     sell insurance in Massachusetts in this case?
5 A.  I had to.
6     Okay. But then you in fact did; is that correct?
7 A.  Yeah. I mean, I wouldn't have been able... The
8     carrier and the IMO would not accept an application
9     unless I'm licensed.
10     So was it a requirement of Mutual of Omaha that you,
11     as the broker, obtain a license to sell their product
12     in Massachusetts?
13 A.  Every company has different contracts by state. So
14     they have different terminology, different benefits
15     that they have to require. And we have to have, if
16     you're an investment advisor or an insurance person,
17     you have to have a license for that state to write an
18     insurance contract for a resident of that state.
19 Q.  So in this case you obtained a license to sell
20     insurance in Massachusetts; that's correct?
21 A.  Yes.
22 Q.  And that was a requirement of Mutual of Omaha?
23 A.  Yes.
24     Is that right?
25 A.  Yes. It's a requirement by any insurance company.

---

Page 36

1     You can't solicit or write a contract unless you're
2     licensed.
3 Q.  In the state that you're writing it for?
4 A.  Correct.
5 Q.  Now, I think we said that you obtained the quote from
6     Mutual of Omaha in May of 2014.
7     Can you describe generally what transpired
8     between you and ███ ███ between that time and
9     the time you actually received the application from
10     them?
11 A.  Oh. We discussed the quotes and the benefits
12     associated with each of those quotes. He reviewed the
13     monthly benefit, the different waiting periods,
14     optional benefits. Do you want 100 percent for home
15     care? You know, the inflation benefits. Return of
16     premium. There's all sorts of options. And that's
17     why they received several different quotes.
18     And it's an issue of coming up with a plan
19     that satisfies their need, but also fits their budget.
20 Q.  Now, I want to call your attention if you can take
21     a look at Exhibit E?
22 A.  E, as in Edward?
23 Q.  Yes. Thank you.
24 A.  Yeah?
25 Q.  And again, that's the September 17th, 2014 letter from

---

9 (Pages 33 to 36)

# Exhibit E

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE,
     Plaintiff

v.

MUTUAL OF OMAHA
INSURANCE COMPANY,
     Defendant

No. 1:16-cv-11381-GAO

## DEFENDANT MUTUAL OF OMAHA INSURANCE COMPANY'S RESPONSES TO PLAINTIFF JOHN DOE'S SECOND SET OF INTERROGATORIES

Defendant Mutual of Omaha Insurance Company ("Mutual of Omaha") responds to Plaintiff's Second Set of Interrogatories as follows:

### GENERAL OBJECTIONS

Mutual of Omaha objects generally to Plaintiff's Second Set of Interrogatories on the following grounds:

A.  Defendant objects to each interrogatory to the extent that it seeks to have Defendant answer on behalf of entities other than itself, or on behalf of agents or employees of other entities. Accordingly, Defendant construes these interrogatories to only refer to the Defendant, and Defendant gives the answers below solely on its behalf.

B. Defendant objects to the extent Plaintiff's interrogatories are overly broad, unduly burdensome, vague, ambiguous, disproportionate to the needs of the case and otherwise beyond the scope of permissible discovery.

C.  Defendant objects to the interrogatories to the extent the information requested is protected from disclosure by the attorney-client privilege, the work product doctrine or any other

1

applicable privilege or discovery immunity. Any inadvertent disclosure of material protected by the attorney-client privilege, the work product doctrine or any other applicable privilege or discovery immunity is not intended and shall not constitute a waiver.

D. Defendant objects to Plaintiffs "Instructions" and "Definitions" to the extent they seek to require answers, information, identification of documents or persons or things, supplementation or to impose any obligations beyond what is permitted by the Federal Rules of Civil Procedure and any applicable Local Rules of the District of Massachusetts.

E. Defendant objects to the Interrogatories to the extent they define terms and/or characterize the evidence in this matter. To the extent Defendant adopts any terms used in the Interrogatories; such adoption is expressly limited to its answers to the same.

## SPECIFIC OBJECTIONS AND RESPONSES

Interrogatory No. 1:

Did Loden act as an agent or producer for, on behalf of, or authorized or contracted by Mutual, with respect to the long-term care insurance application submitted by or on behalf of Doe in 2014 and 2015?

Response: Objection. Plaintiff's interrogatory is vague and ambiguous. Without waiving the objection, Mutual of Omaha states that Mr. John David Loden entered into a Special Agent Agreement with Mutual of Omaha pursuant to which he was an independent contractor authorized to solicit product applications. J.D. Loden Wealth Management, Inc. entered into a General Agent Agreement with Mutual of Omaha pursuant to which it was an independent contractor authorized to solicit product applications and recruit other general agents. With respect to applications for insurance products in which Mr. Loden or J.D. Loden Wealth

**032**

Management, Inc. was involved, Mutual of Omaha considered them to be representing the proposed insured.

Interrogatory No. 2:

Please describe the relationship, affiliation, and any contractual arrangement between Loden and Mutual in 2014 and 2015, including with respect to the application for long-term care insurance submitted by or on behalf of Doe.

Response:

See response to interrogatory No. 1.

Interrogatory No. 3:

Did Ash act as an agent or producer for, on behalf of, or authorized or contracted by Mutual, with respect to the long-term care insurance application submitted by or on behalf of Doe is 2014 and 2015?

Response:

Objection. Plaintiff's interrogatory is vague and ambiguous. Without waiving the objection, Mutual of Omaha states that Ash Brokerage Corporation entered into a Master General Agency Agreement with Mutual of Omaha pursuant to which it was an independent contractor authorized to solicit product applications and to recruit general agents. With respect to applications for insurance products in which Ash Brokerage Corporation was involved, Mutual of Omaha considered Ash Brokerage Corporation to be representing the proposed insured.

# Exhibit F

**From:** teresa.curreri@ashbrokerage.com
**To:** jloden@investorscapital.com
**Cc:** Cassandra.Reitzel@ashbrokerage.com; Amy.Ash@ashbrokerage.com
**Subject:** ▮▮ ▮▮ Care Solutions/ Jd Loden
**Date:** Thu, 15 May 2014 14:01:23 -0400

[Doe & Doe's Partner]

Good Afternoon JD,

[Doe & Doe's Partner]

Amy Ash asked that I forward you a care solution for your MA clients, ▮▮▮▮▮▮▮

I've attached the Mutual of Omaha, Mutual Care Secure proposal for your review. In addition to having competitive premiums the base policy includes a calendar day elimination period and cash alternative benefit. The carrier will allow for a domestic partner discount as illustrated providing they have been residing together for the last 3 years.

Mutual of Omaha will require you hold a non-resident life and health producer's license in MA along with the newly approved long-term care partnership continuing education. By way of this communication I'm asking Cassandra Reitzel , contracting specialist, to respond with the ltc CE requirements including information regarding CE reciprocity between FL and MA.

Thank you and have a Great Day

Teresa

**#PaychecksMatter**

**How devastating would it be for your clients to lose their income?** Take advantage of our Disability Insurance Awareness Month resources.

**Teresa Curreri** | Senior LTC Consultant Southeast Region

**Ash Brokerage Corporation**

125 Half Mile Road, Ste. 100 | Red Bank NJ 07701

Toll-free (800) 589-3000 ext. 3219 | Direct (732) 945-1292

Fax 732-978-4057

teresa.curreri@ashbrokerage.com | www.ashbrokerage.com

**Adam Bassett** | LTC Consultant Southeast Region

**035**

ASH 0237

# Exhibit G



## MUTUAL *of* OMAHA INSURANCE COMPANY



# *MutualCare Secure Solution*
# *Long Term Care Insurance Policy*

## Premium Quote

[Doe & Doe's Partner]

**Prepared for:** 

**Presented by:**   John Loden
239-430-0104

Mutual of Omaha Insurance Company, Mutual of Omaha Plaza, Omaha, Nebraska 68175

Presented by: John Loden
Version: v1.08

**Date:** July 23, 2014
**Policy Form:** LTC13

## MUTUAL *of* OMAHA INSURANCE COMPANY

### MutualCare Secure Solution
Long Term Care Insurance Policy Premium Quote

| Designed for: | ▮ | ▮ |
|---|---|---|
| Issue Age: | 56 | 59 |
| Sex: | Male | Male |
| Rate Class: | Select | Select |
| Issue State: | Massachusetts | Massachusetts |

### NURSING HOME/ASSISTED LIVING FACILITY/HOME HEALTH CARE BENEFITS

| | ▮ | ▮ |
|---|---|---|
| Package Plan: | MutualCare Secure Solution | MutualCare Secure Solutions |
| Maximum Monthly Benefit Amount: | $6000 | $6000 |
| Policy Limit ($Months): | $360,000/ 60 Months | $360,000/ 60 Months |
| Assisted Living Facility: | 100% | 100% |
| Home Health Care: | 100% | 100% |
| Cash Benefit - 30% of Home Health Care: | $1800 | $1800 |
| Calendar Day Elimination Period: | 90 Days | 90 Days |
| Inflation Protection Benefit: | 3% Compound (Lifetime) | 3% Compound (Lifetime) |
| | | |
| OPTIONAL BENEFITS: | | |
| Partnership Qualified*: | No | No |
| Nonforfeiture Benefit – | | |
| Shortened Benefit Period | No | No |
| Waiver of Elimination Period – Home | | |
| Health Care | No | No |
| | | |
| Shared Care | No | No |
| Security Benefit** | No | |
| Return of Premium at Death Benefit | No | No |

| PREMIUM | ▮ | | ▮ | Combined |
|---|---|---|---|---|
| MODE: Annual | $2,207.93 | | $2,413.86 | $4,621.79 |
| Semi-annual | $1,126.04 | | $1,231.07 | $2,357.11 |
| Quarterly | $ 574.06 | | $ 627.60 | $1,201.66 |
| Monthly/BSP | $ 198.72 | | $ 217.25 | $ 415.97 |

(Partner Both Applying = ▮ and ▮    $1,980.77 Annual SAVINGS)
Lifetime Premium Option

This is a proposal, not an offer, and is subject to satisfying Mutual of Omaha's underwriting requirements. This policy may not cover all of the costs associated with long-term care incurred by you during the period of coverage. Premium rates are subject to increase. A medical exam may be required for coverage. Please carefully review the accompanying outline of coverage for full description of policy benefits and policy limitations and exclusions. There is an additional cost for premium payments made more frequently than once a year.

** Pays a benefit equal to 60 percent of the reimbursement benefits payable each month (excluding the cash benefit).

Mutual of Omaha Insurance Company, Mutual of Omaha Plaza, Omaha, Nebraska 68175

| | |
|---|---|
| Presented by: John Loden | Date: July 23, 2014 |
| Version: v1.08 | Policy Form: LTC13 |

## MUTUAL *of* OMAHA INSURANCE COMPANY

**MutualCare Secure Solution**
Long Term Care Insurance Policy Premium Quote

| | | | |
|---|---|---|---|
| **Designed for:** | ■ | **Rate Class:** | Select |
| **Issue Age:** | 56 | **Issue State:** | Massachusetts |
| **Sex:** | Male | | |

### ALTERNATE PREMIUMS
**Lifetime Premium Option – Annual Premium Mode**

| MAXIMUM LIFETIME BENEFIT | CALENDAR DAY ELIMINATION PERIOD | | |
|---|---|---|---|
| | 90 Days | 180 Days | 365 Days |
| 2 Years | $1,445.55 | $1,409.41 | $1,373.28 |
| 3 Years | $1,716.94 | $1,674.03 | $1,631.09 |
| 4 Years | $1,972.86 | $1,923.55 | $1,874.22 |
| 5 Years | $2,207.93 | $2,152.73 | $2,097.53 |

**Alternate Premiums are based on:**
**NURSING HOME/ASSISTED LIVING FACILITY/HOME HEALTH CARE**

| | |
|---|---|
| Maximum Monthly Benefit: | $6000 |
| Assisted Living Facility: | 100% |
| Home Health Care: | 100% |
| Cash Benefit - 30% of Home Health Care: | $1800 |
| Inflation Protection Benefit: | 3% Compound (Lifetime) |

Partner Both Applying

This is a proposal, not an offer, and is subject to satisfying Mutual of Omaha's underwriting requirements. This policy may not cover all of the costs associated with long-term care incurred by you during the period of coverage. Premium rates may be subject to increase. A medical exam may be required for coverage. Please carefully review the accompanying outline of coverage for full description of policy benefits and policy limitations and exclusions. There is an additional cost for premium payments made more frequently than once a year.

**Mutual of Omaha Insurance Company, Mutual of Omaha Plaza, Omaha, Nebraska 68175**

| | |
|---|---|
| **Presented by:** John Loden | **Date:** July 23, 2014 |
| **Version:** v1.08 | **Policy Form:** LTC13 |

## MUTUAL *of* OMAHA INSURANCE COMPANY

**MutualCare Secure Solution**
Long Term Care Insurance Policy Premium Quote

| Designed for: | ▮ | **Rate Class:** | Select |
|---|---|---|---|
| **Issue Age:** | 59 | **Issue State:** | Massachusetts |
| **Sex:** | Male | | |

### ALTERNATE PREMIUMS
#### Lifetime Premium Option - Annual Premium Mode

| MAXIMUM LIFETIME BENEFIT | CALENDAR DAY ELIMINATION PERIOD | | |
|---|---|---|---|
| | 90 Days | 180 Days | 365 Days |
| 2 Years | $1,586.64 | $1,546.97 | $1,507.33 |
| 3 Years | $1,878.72 | $1,831.74 | $1,784.77 |
| 4 Years | $2,159.68 | $2,105.69 | $2,051.69 |
| 5 Years | $2,413.86 | $2,353.51 | $2,293.17 |

**Alternate Premiums are based on:**
**NURSING HOME/ASSISTED LIVING FACILITY/HOME HEALTH CARE**

| | |
|---|---|
| Maximum Monthly Benefit: | $6000 |
| Assisted Living Facility: | 100% |
| Home Health Care: | 100% |
| Cash Benefit - 30% of Home Health Care: | $1800 |
| Inflation Protection Benefit: | 3% Compound (Lifetime) |

Partner Both Applying

This is a proposal, not an offer, and is subject to satisfying Mutual of Omaha's underwriting requirements. This policy may not cover all of the costs associated with long-term care incurred by you during the period of coverage. Premium rates may be subject to increase. A medical exam may be required for coverage. Please carefully review the accompanying outline of coverage for full description of policy benefits and policy limitations and exclusions. There is an additional cost for premium payments made more frequently than once a year.

Mutual of Omaha Insurance Company, Mutual of Omaha Plaza, Omaha, Nebraska 68175

| | |
|---|---|
| **Presented by:** John Loden | **Date:** July 23, 2014 |
| **Version:** v1.08 | **Policy Form:** LTC13 |

## MUTUAL *of* OMAHA INSURANCE COMPANY

### MutualCare Secure Solution
Long Term Care Insurance Policy Premium Quote

| | | | |
|---|---|---|---|
| **Designed for:** | ▉ | **Rate Class:** | Select |
| **Issue Age:** | 56 | **Issue State:** | Massachusetts |
| **Sex:** | Male | | |

### BENEFIT INCREASE/PREMIUM COMPARISON

| Package Plan: | MutualCare Secure Solution |
|---|---|
| Maximum Monthly Benefit Amount: | $6000 |
| Policy Limit ($Months): | $360,000/ 60 Months |
| Assisted Living Facility: | 100% |
| Home Health Care: | 100% |
| Cash Benefit - 30% of Home Health Care: | $1800 |
| Calendar Day Elimination Period: | 90 Days |
| Inflation Protection Benefit: | 3% Compound (Lifetime) |
| Mode: | Annual |
| Premium Option: | Lifetime |

| | 5% Compound (Lifetime) Inflation Protection Policy Premium: $4,141.15 | | 4% Compound (Lifetime) Inflation Protection Policy Premium: $3,024.18 | | 3% Compound (Lifetime) Inflation Protection Policy Premium: $2,207.93 | |
|---|---|---|---|---|---|---|
| Policy Year | Maximum Monthly Benefit | Policy Limit** | Maximum Monthly Benefit | Policy Limit** | Maximum Monthly Benefit | Policy Limit** |
| 1 | $ 6000 | $360,000 | $ 6000 | $360,000 | $ 6000 | $360,000 |
| 2 | $ 6300 | $378,000 | $ 6240 | $374,400 | $ 6180 | $370,800 |
| 3 | $ 6615 | $396,900 | $ 6490 | $389,376 | $ 6365 | $381,924 |
| 4 | $ 6946 | $416,745 | $ 6750 | $404,951 | $ 6556 | $393,382 |
| 5 | $ 7293 | $437,582 | $ 7020 | $421,149 | $ 6753 | $405,183 |
| 6 | $ 7658 | $459,461 | $ 7301 | $437,995 | $ 6956 | $417,338 |
| 7 | $ 8041 | $482,434 | $ 7593 | $455,515 | $ 7165 | $429,858 |
| 8 | $ 8443 | $506,556 | $ 7897 | $473,736 | $ 7380 | $442,754 |
| 9 | $ 8865 | $531,884 | $ 8213 | $492,685 | $ 7601 | $456,037 |
| 10 | $ 9308 | $558,478 | $ 8542 | $512,392 | $ 7829 | $469,718 |
| 11 | $ 9773 | $586,402 | $ 8884 | $532,888 | $ 8064 | $483,810 |
| 12 | $ 10262 | $615,722 | $ 9239 | $554,204 | $ 8306 | $498,324 |
| 13 | $ 10775 | $646,508 | $ 9609 | $576,372 | $ 8555 | $513,274 |
| 14 | $ 11314 | $678,833 | $ 9993 | $599,427 | $ 8812 | $528,672 |
| 15 | $ 11880 | $712,775 | $ 10393 | $623,404 | $ 9076 | $544,532 |
| 16 | $ 12474 | $748,414 | $ 10809 | $648,340 | $ 9348 | $560,868 |
| 17 | $ 13098 | $785,835 | $ 11241 | $674,274 | $ 9628 | $577,694 |
| 18 | $ 13753 | $825,127 | $ 11691 | $701,245 | $ 9917 | $595,025 |
| 19 | $ 14441 | $866,383 | $ 12159 | $729,295 | $ 10215 | $612,876 |
| 20 | $ 15163 | $909,702 | $ 12645 | $758,467 | $ 10521 | $631,262 |
| 25 | $ 19353 | $1,161,036 | $ 15385 | $922,791 | $ 12197 | $731,806 |

**The increased Policy Limit amount will vary from the amounts shown here when policy benefits are paid. Refer to the Outline of Coverage for details.

**Mutual of Omaha Insurance Company, Mutual of Omaha Plaza, Omaha, Nebraska 68175**

Presented by: John Loden
Version: v1.08

Date: July 23, 2014
Policy Form: LTC13

## Mutual *of* Omaha Insurance Company

### MutualCare Secure Solution
Long Term Care Insurance Policy Premium Quote

| Designed for: | | | | **Rate Class:** | Select |
|---|---|---|---|---|---|
| **Issue Age:** | 56 | | | **Issue State:** | Massachusetts |
| **Sex:** | Male | | | | |

### BENEFIT INCREASE/PREMIUM COMPARISON

| Package Plan: | MutualCare Secure Solution |
|---|---|
| Maximum Monthly Benefit Amount: | $6000 |
| Policy Limit ($Months): | $360,000/ 60 Months |
| Assisted Living Facility: | 100% |
| Home Health Care: | 100% |
| Cash Benefit - 30% of Home Health Care: | $1800 |
| Calendar Day Elimination Period: | 90 Days |
| Inflation Protection Benefit: | 3% Compound (Lifetime) |
| Mode: | Annual |
| Premium Option: | Lifetime |

| | 5% Compound - 20 Year Inflation Protection Policy Premium: $2,577.61 | | 3% Compound - 20 Year Inflation Protection Policy Premium: $1,899.29 | | No Inflation Policy Premium: $1,130.53 | |
|---|---|---|---|---|---|---|
| Policy Year | Maximum Monthly Benefit | Policy Limit** | Maximum Monthly Benefit | Policy Limit** | Maximum Monthly Benefit | Policy Limit** |
| 1 | $ 6000 | $360,000 | $ 6000 | $360,000 | $6000 | $360,000 |
| 2 | $ 6300 | $378,000 | $ 6180 | $370,800 | $6000 | $360,000 |
| 3 | $ 6615 | $396,900 | $ 6365 | $381,924 | $6000 | $360,000 |
| 4 | $ 6946 | $416,745 | $ 6556 | $393,382 | $6000 | $360,000 |
| 5 | $ 7293 | $437,582 | $ 6753 | $405,183 | $6000 | $360,000 |
| 6 | $ 7658 | $459,461 | $ 6956 | $417,338 | $6000 | $360,000 |
| 7 | $ 8041 | $482,434 | $ 7165 | $429,858 | $6000 | $360,000 |
| 8 | $ 8443 | $506,556 | $ 7380 | $442,754 | $6000 | $360,000 |
| 9 | $ 8865 | $531,884 | $ 7601 | $456,037 | $6000 | $360,000 |
| 10 | $ 9308 | $558,478 | $ 7829 | $469,718 | $6000 | $360,000 |
| 11 | $ 9773 | $586,402 | $ 8064 | $483,810 | $6000 | $360,000 |
| 12 | $ 10262 | $615,722 | $ 8306 | $498,324 | $6000 | $360,000 |
| 13 | $ 10775 | $646,508 | $ 8555 | $513,274 | $6000 | $360,000 |
| 14 | $ 11314 | $678,833 | $ 8812 | $528,672 | $6000 | $360,000 |
| 15 | $ 11880 | $712,775 | $ 9076 | $544,532 | $6000 | $360,000 |
| 16 | $ 12474 | $748,414 | $ 9348 | $560,868 | $6000 | $360,000 |
| 17 | $ 13098 | $785,835 | $ 9628 | $577,694 | $6000 | $360,000 |
| 18 | $ 13753 | $825,127 | $ 9917 | $595,025 | $6000 | $360,000 |
| 19 | $ 14441 | $866,383 | $ 10215 | $612,876 | $6000 | $360,000 |
| 20 | $ 15163 | $909,702 | $ 10521 | $631,262 | $6000 | $360,000 |
| 25 | $ 15163 | $909,702 | $ 10521 | $631,262 | $6000 | $360,000 |

**The increased Policy Limit amount will vary from the amounts shown here when policy benefits are paid. Refer to the Outline of Coverage for details.

Mutual of Omaha Insurance Company, Mutual of Omaha Plaza, Omaha, Nebraska 68175

Presented by: John Loden
Version: v1.08

Date: July 23, 2014
Policy Form: LTC13

# MUTUAL *of* OMAHA INSURANCE COMPANY

## MutualCare Secure Solution
Long Term Care Insurance Policy Premium Quote

| | | | |
|---|---|---|---|
| **Designed for:** | ▉ | **Rate Class:** | Select |
| **Issue Age:** | 59 | **Issue State:** | Massachusetts |
| **Sex:** | Male | | |

### BENEFIT INCREASE/PREMIUM COMPARISON

| | |
|---|---|
| Package Plan: | MutualCare Secure Solution |
| Maximum Monthly Benefit Amount: | $6000 |
| Policy Limit ($Months): | $360,000/ 60 Months |
| Assisted Living Facility: | 100% |
| Home Health Care: | 100% |
| Cash Benefit - 30% of Home Health Care: | $1800 |
| Calendar Day Elimination Period: | 90 Days |
| Inflation Protection Benefit: | 3% Compound (Lifetime) |
| Mode: | Annual |
| Premium Option: | Lifetime |

| | 5% Compound (Lifetime) Inflation Protection Policy Premium: $4,264.82 | | 4% Compound (Lifetime) Inflation Protection Policy Premium: $3,206.02 | | 3% Compound (Lifetime) Inflation Protection Policy Premium: $2,413.86 | |
|---|---|---|---|---|---|---|
| Policy Year | Maximum Monthly Benefit | Policy Limit** | Maximum Monthly Benefit | Policy Limit** | Maximum Monthly Benefit | Policy Limit** |
| 1 | $ 6000 | $360,000 | $ 6000 | $360,000 | $ 6000 | $360,000 |
| 2 | $ 6300 | $378,000 | $ 6240 | $374,400 | $ 6180 | $370,800 |
| 3 | $ 6615 | $396,900 | $ 6490 | $389,376 | $ 6365 | $381,924 |
| 4 | $ 6946 | $416,745 | $ 6750 | $404,951 | $ 6556 | $393,382 |
| 5 | $ 7293 | $437,582 | $ 7020 | $421,149 | $ 6753 | $405,183 |
| 6 | $ 7658 | $459,461 | $ 7301 | $437,995 | $ 6956 | $417,338 |
| 7 | $ 8041 | $482,434 | $ 7593 | $455,515 | $ 7165 | $429,858 |
| 8 | $ 8443 | $506,556 | $ 7897 | $473,736 | $ 7380 | $442,754 |
| 9 | $ 8865 | $531,884 | $ 8213 | $492,685 | $ 7601 | $456,037 |
| 10 | $ 9308 | $558,478 | $ 8542 | $512,392 | $ 7829 | $469,718 |
| 11 | $ 9773 | $586,402 | $ 8884 | $532,888 | $ 8064 | $483,810 |
| 12 | $ 10262 | $615,722 | $ 9239 | $554,204 | $ 8306 | $498,324 |
| 13 | $ 10775 | $646,508 | $ 9609 | $576,372 | $ 8555 | $513,274 |
| 14 | $ 11314 | $678,833 | $ 9993 | $599,427 | $ 8812 | $528,672 |
| 15 | $ 11880 | $712,775 | $ 10393 | $623,404 | $ 9076 | $544,532 |
| 16 | $ 12474 | $748,414 | $ 10809 | $648,340 | $ 9348 | $560,868 |
| 17 | $ 13098 | $785,835 | $ 11241 | $674,274 | $ 9628 | $577,694 |
| 18 | $ 13753 | $825,127 | $ 11691 | $701,245 | $ 9917 | $595,025 |
| 19 | $ 14441 | $866,383 | $ 12159 | $729,295 | $ 10215 | $612,876 |
| 20 | $ 15163 | $909,702 | $ 12645 | $758,467 | $ 10521 | $631,262 |
| 25 | $ 19353 | $1,161,036 | $ 15385 | $922,791 | $ 12197 | $731,806 |

**The increased Policy Limit amount will vary from the amounts shown here when policy benefits are paid. Refer to the Outline of Coverage for details.

**Mutual of Omaha Insurance Company, Mutual of Omaha Plaza, Omaha, Nebraska 68175**

Presented by: John Loden
Version: v1.08

Date: July 23, 2014
Policy Form: LTC13

**043**

## MUTUAL *of* OMAHA INSURANCE COMPANY

### MutualCare Secure Solution
Long Term Care Insurance Policy Premium Quote

| Designed for: | ▉ | | | **Rate Class:** | Select |
| **Issue Age:** | 59 | | | **Issue State:** | Massachusetts |
| **Sex:** | Male | | | | |

| BENEFIT INCREASE/PREMIUM COMPARISON |
|---|

| Package Plan: | MutualCare Secure Solution |
|---|---|
| Maximum Monthly Benefit Amount: | $6000 |
| Policy Limit ($Months): | $360,000/ 60 Months |
| Assisted Living Facility: | 100% |
| Home Health Care: | 100% |
| Cash Benefit - 30% of Home Health Care: | $1800 |
| Calendar Day Elimination Period: | 90 Days |
| Inflation Protection Benefit: | 3% Compound (Lifetime) |
| Mode: | Annual |
| Premium Option: | Lifetime |

| | 5% Compound - 20 Year Inflation Protection | | 3% Compound - 20 Year Inflation Protection | | No Inflation | |
|---|---|---|---|---|---|---|
| | Policy Premium: $2,908.48 | | Policy Premium: $2,125.33 | | Policy Premium: $1,288.08 | |
| Policy Year | Maximum Monthly Benefit | Policy Limit** | Maximum Monthly Benefit | Policy Limit** | Maximum Monthly Benefit | Policy Limit** |
| 1 | $ 6000 | $360,000 | $ 6000 | $360,000 | $6000 | $360,000 |
| 2 | $ 6300 | $378,000 | $ 6180 | $370,800 | $6000 | $360,000 |
| 3 | $ 6615 | $396,900 | $ 6365 | $381,924 | $6000 | $360,000 |
| 4 | $ 6946 | $416,745 | $ 6556 | $393,382 | $6000 | $360,000 |
| 5 | $ 7293 | $437,582 | $ 6753 | $405,183 | $6000 | $360,000 |
| 6 | $ 7658 | $459,461 | $ 6956 | $417,338 | $6000 | $360,000 |
| 7 | $ 8041 | $482,434 | $ 7165 | $429,858 | $6000 | $360,000 |
| 8 | $ 8443 | $506,556 | $ 7380 | $442,754 | $6000 | $360,000 |
| 9 | $ 8865 | $531,884 | $ 7601 | $456,037 | $6000 | $360,000 |
| 10 | $ 9308 | $558,478 | $ 7829 | $469,718 | $6000 | $360,000 |
| 11 | $ 9773 | $586,402 | $ 8064 | $483,810 | $6000 | $360,000 |
| 12 | $ 10262 | $615,722 | $ 8306 | $498,324 | $6000 | $360,000 |
| 13 | $ 10775 | $646,508 | $ 8555 | $513,274 | $6000 | $360,000 |
| 14 | $ 11314 | $678,833 | $ 8812 | $528,672 | $6000 | $360,000 |
| 15 | $ 11880 | $712,775 | $ 9076 | $544,532 | $6000 | $360,000 |
| 16 | $ 12474 | $748,414 | $ 9348 | $560,868 | $6000 | $360,000 |
| 17 | $ 13098 | $785,835 | $ 9628 | $577,694 | $6000 | $360,000 |
| 18 | $ 13753 | $825,127 | $ 9917 | $595,025 | $6000 | $360,000 |
| 19 | $ 14441 | $866,383 | $ 10215 | $612,876 | $6000 | $360,000 |
| 20 | $ 15163 | $909,702 | $ 10521 | $631,262 | $6000 | $360,000 |
| 25 | $ 15163 | $909,702 | $ 10521 | $631,262 | $6000 | $360,000 |

**The increased Policy Limit amount will vary from the amounts shown here when policy benefits are paid. Refer to the Outline of Coverage for details.

**Mutual of Omaha Insurance Company, Mutual of Omaha Plaza, Omaha, Nebraska 68175**

Presented by: John Loden
Version: v1.08

Date: July 23, 2014
Policy Form: LTC13

# Client Input Summary

| | |
|---|---|
| Company: MUTUAL OF OMAHA | July 23, 2014 |
| Product:   MutualCare Solutions - LTC - v1.08 | 2.51.00, 6.37.12 |

## Client Info.

| | |
|---|---|
| Partner Allowances? | Partner & both applying |
| **Client** | |
| Name | ▮ |
| Date of Birth | ▮ |
| Age | 56 |
| Sex | Male |
| Rate Class | Select |
| **Other Applicant** | |
| Other Applicant's Name | ▮ |
| Other Applicant's Date Of Birth | |
| Other Applicant's Current Age Today | 59 |
| Other Applicant's Sex | Male |
| Other Applicant's Rate Class | Select |
| State Code | Massachusetts |

## Plan Info.

| | |
|---|---|
| Package Plan | **MutualCare Secure Solution** |
| **Client** | |
| Solve For | Premium |
| Enter Premium | |
| Maximum Monthly Benefit | 6000 |
| Benefit Multiplier | 60 Months (5 Year) |
| Calendar Day Elimination Period | 90 Day |
| Assisted Living Facility | 100% |
| Assisted Living Facility Reduction | 100% |
| Home Health Care | 100% |
| Home Health Care Reduction | 100% |
| Cash Benefit | 30% |
| Inflation Protection Option | 3% Compound Lifetime Inflation Protection |
| Nonforfeiture Benefit - Shortened Benefit Period | No |
| Waiver of Elimination Period for Home Health Care | No |
| Shared Care | No |
| Security Benefit | |
| Return of Premium at Death Benefit | None |
| Common Employer or Association Group Allowance | No |
| **Other Applicant** | |
| Solve For | Premium |
| Enter Premium | |
| Maximum Monthly Benefit | 6000 |

Page 1 of 3

# Client Input Summary

Company: MUTUAL OF OMAHA                                                    July 23, 2014
Product:   MutualCare Solutions - LTC - v1.08                              2.51.00, 6.37.12

## Plan Info. - Cont'd

| Package Plan | MutualCare Secure Solution |
|---|---|
| Benefit Multiplier | 60 Months (5 Year) |
| Calendar Day Elimination Period | 90 Day |
| Assisted Living Facility | 100% |
| Assisted Living Facility Reduction | 100% |
| Home Health Care | 100% |
| Home Health Care Reduction | 100% |
| Cash Benefit | 30% |
| Inflation Protection Option | 3% Compound Lifetime Inflation Protection |
| Nonforfeiture Benefit - Shortened Benefit Period | No |
| Waiver of Elimination Period for Home Health Care | No |
| Return of Premium at Death Benefit | None |
| Common Employer or Association Group Allowance | No |
| Mode | Annual |
| Premium Option | Lifetime |
| **Client** | |
| ** Premium Result ** | 0 |
| ** Monthly Benefit Result ** | 0 |
| **Other Applicant** | |
| ** Spouse Premium Result ** | 0 |
| ** Spouse Monthly Benefit Result ** | 0 |
| **Total** | |
| ** Total Premium Result ** | 0 |

## Optional Pages

| Optional Pages | Yes |
|---|---|
| Cover Page | Yes |
| Alternate Premiums | Yes |
| Benefit Increase/Premium Comparison | Yes |

## Client Input Summary

| | |
|---|---|
| Company: MUTUAL OF OMAHA | July 23, 2014 |
| Product:   MutualCare Solutions - LTC - v1.08 | 2.51.00, 6.37.12 |

### Agent Info.

| | |
|---|---|
| Agent Name | John Loden |
| Agent Phone Number | 239-430-0104 |
| Coverage written on self/partner? | No |

# Exhibit H

# In The Matter Of:

## *Doe vs*
## *Mutual of Omaha Insurance Company*

---

[Plaintiff John Doe]

███████████

*September 07, 2017*

---



**ALLIED**
**COURT REPORTERS, INC.**
— *and* —
**VIDEO CONFERENCE CENTERS**
Phone:   401-946-5500          Toll Free: 888-443-3767
www.alliedcourtreporters.com   info@alliedcourtreporters.com

*Min-U-Script® with Word Index*

Doe vs
Mutual of Omaha Insurance Company

September 07, 2017

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MASSACHUSETTS
 3
 4   JOHN DOE
          Plaintiff
 5
              vs.              C.A. No. 1:16-cv-11381-GAO
 6
     MUTUAL OF OMAHA
 7   INSURANCE COMPANY
          Defendant
 8
 9
10
11
           DEPOSITION OF ▮▮▮▮▮▮▮, a Plaintiff in
12   the above-entitled case, taken on behalf of the
     Defendant, before Linda L. Guglielmo, RPR-RMR, a
13   Notary Public in and for the State of Rhode
     Island, at the offices of Pierce Atwood, LLP, 72
14   Pine Street, Providence, Rhode Island on September
     7, 2017 at 9:30 A.M.
15
16   APPEARANCES:
17   FOR THE PLAINTIFF.....GLBTQ LEGAL ADVOCATES & DEFENDERS
18                       BY: BENNETT H. KLEIN, ESQ.
                         30 WINTER STREET
18                       BOSTON MA  02108
19
     FOR THE DEFENDANT.....PIERCE ATWOOD, LLP
20                       BY: BROOKS R. MAGRATTEN, ESQ.
                         72 PINE STREET
21                       PROVIDENCE, RI  02903
22
23   ALSO PRESENT: John P. Ward, Esq.
24
25
```

---

**Page 2**

```
 1                I N D E X
 2   WITNESS                                    PAGE
 3   ▮▮▮▮▮▮▮
         EXAMINATION BY MR. MAGRATTEN.............3
 4
 5
 6
 7              E X H I B I T S
 8              (DEFENDANT'S)
     NO.    DESCRIPTION                         PAGE
 9   EXHIBIT 1  APPLICATION FOR LONG TERM CARE
                INSURANCE, 26 PGS.................19
10   EXHIBIT 2  LONG-TERM CARE INSURANCE APPLICATION,
                19 PGS..........................21
11   EXHIBIT 3  DR. KATZ MEDICAL NOTE, 9-24-15......32
     EXHIBIT 4  DR. KATZ MEDICAL NOTE, 10-5-15......32
12   EXHIBIT 5  COMPLAINT, 7 PGS.................37
     EXHIBIT 6  PLAINTIFS'S MEMO IN SUPPORT OF MOTION TO
13              REMAND CASE TO STATE COURT, 10 PGS.......58
14
15
16
17   FOR INSTRUCTIONS TO WITNESS NOT TO ANSWER
     SEE PAGES: 4, 30, 31, 32, 33, 35, 37, 39, 56, 58
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1    (DEPOSITION COMMENCED AT 9:34 A.M.)
 2   Being duly sworn, ▮▮▮▮▮▮, deposes and testifies as follows:
 3
 4    THE REPORTER: Would you state
 5   your full name for the record, please.
 6    THE WITNESS: ▮▮▮ ▮▮▮▮▮
 7    EXAMINATION BY MR. MAGRATTEN
 8   Q.  Good morning, ▮▮▮▮▮ I'm Brooks Magratten,
 9   we're here today for your deposition.  Your
10   counsel, Mr. Klein, has suggested that we
11   stipulate that all objections are preserved except
12   as to form; is that agreeable?
13    MR. KLEIN: Yes.
14   Q.  Have you been at a deposition before?
15   A.  Yes.
16   Q.  How many times?
17   A.  Numerous.
18   Q.  Okay.  You yourself have been deposed before?
19   A.  Yes.
20   Q.  How many times?
21   A.  Once or twice.
22   Q.  Okay.  I'm going to ask you a series of questions
23   related to your lawsuit John Doe versus Mutual of
24   Omaha, if at any time you don't clearly hear or
25   understand a question I've asked, please let me
```

---

**Page 4**

```
 1   know so I can rephrase or repeat the question.
 2   It's important going forward that we both
 3   understand that you will only be responding to
 4   those questions that you have clearly heard and
 5   understood; is that agreeable?
 6   A.  Yes.
 7   Q.  What is your age?
 8   A.  I'm 63.
 9   Q.  Have you taken any medications in the last 24
10   hours?
11    MR. KLEIN: Objection.  I'm going to
12   instruct him not to answer that because although I
13   understand your intent, it's an innocent question,
14   it goes into the area of the magistrate's order
15   about not asking any health questions beyond
16   February 9, 2015.  If you want to ask him if he is
17   on any -- if there's anything that's impairing his
18   ability to understand and answer your questions,
19   that's fine, but I will instruct him not to answer
20   the question about what medications he's taking.
21    (SO NOTED)
22   Q.  Have you taken any medications in the last 24
23   hours that would affect your ability to recall and
24   testify truthfully today?
25   A.  No.
```

---

**Page 5**

1  Q.  Where do you live?
2  A.  I live at ████████ Saunderstown,
3     Rhode Island, and also ████████ Boston,
4     Massachusetts.
5  Q.  ████████ is that a stand-alone house?
6  A.  Yes.        [RI]
7  Q.  Who owns that?
8  A.  I do.
9  Q.  Does anyone else own that property?
10 A.  No.
11 Q.  How long have you owned that property?
12 A.  Over 19 years.
13 Q.  Have you resided there continuously in the last 19
14    years?
15 A.  I'm not sure what you mean by continuously.
16 Q.  Were there any periods of time in the last 19
17    years when you were not at the ████████
18    residence on a weekly basis?     [RI]
19 A.  Yes.
20 Q.  Okay.  When?
21 A.  I don't recall, but there were times where I
22    spent more time in Boston.
23 Q.  Okay.  The ████████ Boston, residence,
24    what kind of structure is that?
25 A.  It's a condominium.

**Page 6**

1  Q.  Who owns that?
2  A.  ████████ [Doe's Spouse]
3  Q.  Is ████████ the sole owner of that property?
4  A.  Yes.
5  Q.  And how often are you in the Boston property
6     clean?
7        MR. KLEIN:  Objection as to time
8     frame.
9  A.  Three to four days a week.
10 Q.  How often are you in the ████████, Rhode
11    Island, property?
12 A.  Four or five days a week.
13 Q.  Was that the case in 2014?
14 A.  Yes.
15 Q.  Was that the case in 2015?
16 A.  Yes.
17 Q.  Do you have a driver's license?
18 A.  Yes.
19 Q.  Issued in what state?
20 A.  Rhode Island.
21 Q.  Did you vote in the last Presidential election?
22 A.  Yes.
23 Q.  Where did you cast your ballot?
24 A.  North Kingstown, Rhode Island.
25 Q.  Do you pay property taxes?

**Page 7**

1  A.  Yes.
2  Q.  Where?
3  A.  Rhode Island.     [Doe's Spouse]
4  Q.  Does ████████ pay property taxes?
5  A.  I don't know.
6  Q.  Do you pay state income taxes?
7  A.  Yes.
8  Q.  Where?
9  A.  Rhode Island and Massachusetts.
10 Q.  All right.  Are you married?
11 A.  Yes.
12 Q.  To whom are you married?
13 A.  ████████ [Doe's Spouse]
14 Q.  Okay.  When did you and ████████ marry?
15 A.  July 14, 2017.
16 Q.  Prior to that were you living together?
17 A.  Yes.
18 Q.  For how long?
19 A.  27 years.
20 Q.  Okay.  Are you a Rhode Island resident?
21     MR. KLEIN:  Objection.  Calls for a
22    legal conclusion.
23 A.  I live in Rhode Island.
24 Q.  The question is are you a Rhode Island resident?
25 A.  I don't understand the term resident.

**Page 8**

1        MR. KLEIN:  Objection.
2  Q.  You don't understand what residency means?
3  A.  In the legal form, no.
4  Q.  Okay.  You completed college?
5  A.  Yes.
6  Q.  Where did you attend college?
7  A.  Lafayette College in Easton, Pennsylvania.
8  Q.  When did you get your degree?
9  A.  1976.
10 Q.  Do you have a law degree?
11 A.  Yes, sir.
12 Q.  Where did you go to law school?
13 A.  University of Miami in Coral Cables, Florida.
14 Q.  When did you get your degree?
15 A.  1979.
16 Q.  That was a JD?
17 A.  Yes, sir.
18 Q.  Have you had any other formal education beyond
19    your law degree in '79?
20 A.  No, sir.
21 Q.  Are you admitted to practice?
22 A.  Yes, sir.
23 Q.  In what states?
24 A.  Massachusetts, and I'm admitted in New York,
25    although it's not current.

Doe vs
Mutual of Omaha Insurance Company

September 07, 2017

Page 17

1  Q.  Prior to submitting an application for long-term
2    care coverage, did you ever meet Mr. Loden?
3  A.  No.
4  Q.  Are you familiar with Ash Brokerage?
5  A.  Yes.
6  Q.  Who are they?
7  A.  From what I've read recently, they are the
8    connection between Mr. Loden and Mutual of Omaha.
9  Q.  What was it you recently read that give you that
10   impression?
11 A.  I'm not sure.
12 Q.  Did you ever communicate directly with anyone at
13   Ash Brokerage?
14 A.  I don't recall.
15 Q.  Did you ever meet with anyone at Ash Brokerage?
16 A.  No.
17 Q.  Did you ever speak with a Brittany Jordan at Ash
18   Brokerage?
19 A.  I don't recall the name.
20 Q.  Did you ever tell anyone at Ash Brokerage that you
21   and [redacted] do not live together?
22 A.  I don't believe so.
23 Q.  Why did you elect to apply for coverage with
24   Mutual of Omaha specifically?
25 A.  I didn't elect to buy.  It was just the plan

Page 18

1    I was interested in.  I had no idea that it was
2    Mutual to be -- that I was applying with.  It was
3    recommended by Mr. Loden.
4  Q.  All right.  You said you looked at the plan.  Tell
5    me about the plan.
6  A.  I believe the plan costs approximately $240 a
7    month.  It was coverage of $200 a day, with
8    increases, and a very generous lifetime cap.
9  Q.  And you didn't realize that the plan was offered
10   by Mutual of Omaha?
11 A.  If I did, I don't remember.
12 Q.  Did you look at any other plans from any other
13   insurance companies?
14 A.  I don't recall.
15 Q.  Did you examine a plan from Transamerica?
16 A.  I don't recall.
17 Q.  Did you speak to anyone else in Massachusetts
18   other than [redacted] about applying for
19   long-term care coverage?                    [Doe's Spouse]
20 A.  I don't recall.
21 Q.  Is it possible you did?
22 A.  Probably not.
23 Q.  At some point did you fill out an application for
24   long-term care coverage?
25 A.  I'm not sure what you mean by fill it out.

Page 19

1    MR. MAGRATTEN:  Can you repeat the last
2    question?
3    (QUESTION READ)
4  A.  I signed an application.  I don't recall
5    filling it out.
6    MR. MAGRATTEN:  Okay.  Mark this 1.
7    EXHIBIT 1 (DEFENDANT'S EXHIBIT 1
8    MARKED FOR IDENTIFICATION)
9  Q.  Showing you what's been marked Exhibit 1.  I ask
10   you to review Exhibit 1.
11   MR. KLEIN:  Look at every page.  Just
12   scan through it.
13   (PAUSE)
14 Q.  So what is Exhibit 1?
15 A.  It reads, Application for Long-Term Care
16   Insurance, Massachusetts.
17 Q.  Is this the application for long-term care
18   insurance that you signed in November of 2014?
19 A.  It appears to be.
20 Q.  Where did you get this application from?
21 A.  From Mr. Loden.
22 Q.  Did you review it before you signed it?
23 A.  I did.
24 Q.  Prior to you getting the application, did somebody
25   interview you?

Page 20

1  A.  I believe so.
2  Q.  Who was that?
3  A.  I don't recall.
4  Q.  How long did the interview take?
5  A.  I don't recall.
6  Q.  Was it just one interview?
7  A.  I don't recall.
8  Q.  Were there multiple phone calls -- strike that.
9    How did the interview take place --
10 A.  By phone.
11 Q.  -- one call, or was there more than one call?
12 A.  I don't recall.
13 Q.  Where were you when you took the call?
14 A.  I don't remember.
15 Q.  When did the call occur?
16 A.  I don't remember.
17 Q.  When you got the application, that's Exhibit 1,
18   did you review it before you signed it?
19 A.  Yes.
20 Q.  What happened after you signed this?
21 A.  We put it down and sat with it for a while.
22 Q.  Why?
23 A.  We had to determine whether we could afford
24   it, whether we wanted to go ahead with it.
25 Q.  Okay.  And how long did this deliberation take

# Exhibit I

**From:** brittany.jordan@ashbrokerage.com
**To:** jloden@investorscapital.com
**Cc:** Teresa.Curreri@ashbrokerage.com; Holly.Harter@ashbrokerage.com
**Subject:** Application for ▮▮▮▮▮▮▮ [Doe and Doe's Partner]
**Date:** Wed, 03 Sep 2014 14:21:14 -0400


Good Afternoon JD,


                         [Doe]

I have connected with ▮▮▮▮ and received the additional information that was needed. Attached please find the Mutual of Omaha application for ▮▮▮▮▮▮▮ Please have the information review to make sure it is all correct. Also please have the following pages singed:

[Doe and Doe's partner]                               [Doe and Doe's Partner]

▮▮▮▮▮▮▮▮ Signatures need on:

Ash Authorization Form

Disclosure statement

Agreements and Acknowledgements Section M

Authorization to disclose personal information Appendix 1

Conditional receipt only needed if submitting premium with application Appendix 3

Long Term Care Insurance (Notice to application regarding replacement of individual accident and sickness or LTC insurance)

Authorization for release of information to my insurance agent and/or agency


You signature need on pages

Ash Authorization Form

Disclosure statement

Please answer question on replacement coverage Section C

Agreements and Acknowledgements Section M

Please fill out product statement and sign

Conditional receipt only needed if submitting premium with application Appendix 3

Long Term Care Insurance (Notice to application regarding replacement of individual accident and sickness or LTC insurance)

Authorization for release of information to my insurance agent and/or agency

Stating on page 30 is the leave behind forms for the client to keep.

I have also spoke with Holly in our licensing department as I am aware you has informed of what is required to move forward with the MA application. Please make sure the LTC CE 4 hour refresher is completed in Flordia along with the 2 hour Massauchrt course for non-residence prior to signing or dating the application.

If you have any questions please do not ehsitate to contact me while Teresa is out of the office.

Best Regards,

Brittany Jordan

When your client is ready to apply, we can complete the application details for you!

**September is Life Insurance Awareness Month** – Plan Your Campaign Now – because #LifeMatters!

-

Sign up for my LTC newsletter **to receive important planning information and industry updates!**

-

**Do you use an iPhone or other mobile device? We have created the Ash LTC Calculator that will help start the LTC planning conversation with your clients. For simple instructions on how to download the app Click here:** https://www.ashbrokerage.com/mobileapps/

Brittany Jordan | LTC Marketing Consultant

**Ash Brokerage Corporation**

125 Half Mile Rd, Suite 100 | Red Bank, NJ 07701

Toll-free (800) 589-3000 ext. 3242 | Direct (732) 945-1288

Brittany.Jordan@ashbrokerage.com | www.ashbrokerage.com

# Exhibit J

INDIVIDUAL LONG-TERM CARE INSURANCE APPLICATION

# MUTUAL OF OMAHA INSURANCE COMPANY
Mutual of Omaha Plaza, Omaha, NE 68175



**Submit Application To:** Long-Term Care Service Office, P.O. Box 64901, St. Paul, MN 55164-0901
**Overnight Submission:** Long-Term Care Service Office, 7805 Hudson Rd., Ste. 180, Woodbury, MN 55125-1591

- [✓] New Business
- [ ] Reinstatement
- [ ] Sponsored/Association Group
- [ ] Common Employer
- [ ] Producer

Each Applicant acknowledges and agrees that if there is more than one Applicant on this application, all information provided may be reviewed or shared with the other Applicant. A completed and signed application will become part of each applicant's policy.

## Section A — GENERAL INFORMATION

| | Applicant A | Applicant B |
|---|---|---|
| **1 Name:** | [Doe] | [Doe's Partner] |
| | Last Name | Last Name |
| | First Name / Middle Initial | First Name / Middle Initial |
| **2 Legal Residence Address:** | | **Legal Residence Address (If Different than Applicant A):** |
| | Number, Street, Apartment Number | Number, Street, Apartment Number |
| | Boston MA ▮ | Boston MA ▮ |
| | City, State, ZIP Code | City, State, ZIP Code |
| **3 Contact Information:** | ( ) – | **Contact Information (If Different than Applicant A):** ( ) – |
| | Daytime Phone Number / Evening Phone Number | Daytime Phone Number / Evening Phone Number |
| | 10:00 a.m. / 12:00 p.m. | 9:00 a.m. / 11:00 p.m. |
| | Best Time to Call Within a 2-Hour Window (i.e., if 5p.m. is indicated, contact window is from 5:00-7:00 p.m.) | Best Time to Call Within a 2-Hour Window (i.e., if 5p.m. is indicated, contact window is from 5:00-7:00 p.m.) |
| | Email Address | Email Address |
| **4 Social Security Number:** | | **Social Security Number:** |
| **5 Birth Date, Age and Sex:** | Month Day Year — Age 6 0 | **Birth Date, Age and Sex:** Month Day Year — Age 5 7 |
| | [✓] Male [ ] Female | [✓] Male [ ] Female |
| **6 Occupation and Duties:** | Occupation | **Occupation and Duties:** Occupation |
| | Occupational Duties | Occupational Duties |

ICC13-MA6012

**SUBMIT TO LTC SERVICE OFFICE**
**057**

ASH 0345 MA

# Exhibit K

Q YXYEP SjSQ ELE MRWYVERGI GSQTER]
P.O. Box 64901
St. Paul, MN 55164-0901



February 9, 2015



[Doe's Boston address]

BOSTON  MA

RE:  Your Application for the Mutual of Omaha Insurance Company Long-Term Care Policy/Certificate
Application Number

Dear           :   [Doe]

Thank you for considering Mutual of Omaha Insurance Company Long-Term Care Policy/Certificate for
your long-term care coverage.  We have completed our underwriting review and regret that we were not
able to approve your application.

We could not offer the coverage you applied for due to your disclosure in your interview of taking
Truvada and confirmed in your medical records from Dr. Katz.  We do not offer coverage if you are taking
this medication regardless of reason as it is on our uninsurable list of medications.

If you or your physician has additional information that you feel may have a bearing on our decision, you
may appeal our decision.  To do so, please submit the information to us within 60 days of the date of this
letter and include your name and Application Number.  We will then notify you in writing of our decision,
or the need for additional information, within 60 days of the date we receive your written request for an
appeal.

You have the right, upon written request to have sent to you the specific information that prompted our
decision.  A summary of rights, regarding this and other personal information, is attached.

If any premium has been submitted, we have enclosed a refund.  If you have any questions about the appeal
process, please call our Customer Service Representatives at 1-877-894-2478.  They are available to
answer your questions Monday through Friday 7:00 a.m. to 5:00 p.m. Central Time or email us at
mutualofomahaltc@ltcg.com.

Sincerely,

John Blair
Underwriting Consultant
Mutual of Omaha Insurance Company

Enclosure(s)

uw027b doc/2338/moojblair
2/9/15 10 34 56 17360945 2338

WF-DOE-000067

## SUMMARY OF RIGHTS

## ACCESS, CORRECTION, AMENDMENT OR DELETION

## OF PERSONAL INFORMATION

You have a right of access to personal information about you in our file, which you reasonably described. You may request correction, amendment or deletion of any information you believe to be incorrect.

Upon request, we'll send you a summary of the information or copies of the records. We'll also tell you to whom we've disclosed items of recorded personal information within the last two years.

If you believe any of the information is incorrect, you may request, in writing, changes to the personal information. We'll tell you if, we followed your request. If we don't agree with you, we'll give you our reasons, and the opportunity to file a statement of dispute. In the future your statement of dispute will be sent with any disclosure of the information which we make. In addition, if we don't agree with you, you may request a review by the commissioner of insurance.

Whether we agree or not, we'll notify any insurance-support organization that furnished us the information. We'll also notify any person you designate, who may have received such information and any person who according to our records received such information within the preceding two years of the dispute.

This right of access doesn't extend to information obtained in connection with or in anticipation of a claim or civil or criminal proceeding. Under certain conditions medical record information will be disclosed only through a health professional named by you.

Rights Summary MA

# Exhibit L

[Doe]



BOSTON, MASSACHUSETTS

March 30, 2015

John Blair
Underwriting Consultant
Mutual of Omaha Insurance Company
P.O. Box 64901
St. Paul, MN 55164-0901

CONFIDENTIAL

Re:    Applicant:
       Application Number

Dear Mr. Blair:

I am in receipt of your letter dated February 9, 2015 denying my application for Long Term Care Insurance. This letter shall serve as an Appeal of your decision in accordance with the terms of the above referenced letter from you with attachments contained therein.

In your denial letter you state: "We could not offer coverage you applied for due your disclosure in your interview of taking Truvada and confirmed in your medical records from Dr. Katz. We do not offer coverage if you are taking this medication regardless of reason as it is on our uninsurable list of medications." Your denial appears to be based on the conclusion that someone who takes Truvada has HIV disease and is therefore uninsurable. In fact, a person who does not currently have HIV disease and takes Truvada as a preventative measure is significantly less likely to be diagnosed with HIV in the future than a person who does not currently have HIV disease and does not take Truvada. Therefore, your decision is not based on sound or reasonable actuarial principles.

Your decision appears to be based on the faulty assumption that my use of Truvada indicates that I have HIV disease. This does not reflect current medical information about the FDA approved uses of Truvada. To the contrary, Truvada is the first drug approved to reduce the risk of HIV infection in uninfected individuals who may engage in sexual activity with HIV-infected partners. Truvada, taken daily, is to be used for pre-exposure prophylaxis (PrEP) in combination with safer sex practices to reduce the risk of sexually-acquired HIV infection in adults at high risk. The most common side effects reported with Truvada included diarrhea, nausea, abdominal pain, headache, and weight loss.

*Admitted in Massachusetts and New York*

[Doe]

████████████████

BOSTON, MASSACHUSETTS

On March 15, 2004 the manufacturer Gilead applied for approval of the drug Truvada, which is a co-formulation of the drugs Viread and Emtriva for the treatment of AIDS. On May 17, 2004, the FDA fast tracked the review of this drug. On August 2, 2004, the FDA approved the use of Truvada for the treatment of AIDS. On July 16, 2012, the FDA approved the use of Truvada for reducing the risk of sexually acquired HIV infection.

Reference is made to a booklet entitled Long-Term Care Insurance Underwriting Guide Long-Term Care I, Long-Term Care II. (Copy attached as Exhibit "A") According to the online document properties listed in the booklet, this booklet was last modified on February 10, 2009. On page 20 of this document, the Truvada is listed as associated with HIV in the portion entitled "Some Medications Associated With Uninsurable Health Conditions". Further, it is stated that "an application should not be submitted if a client is taking any of the following medications."

It is the contention of this appeal that this instruction concerning Truvada is incorrect and outdated. Truvada (PrEP) is a precedent shattering medication. This medication can now be used to assist in the prevention of AIDS. Since the last modification of the booklet in 2009, the purpose of medicating with Truvada has changed drastically for non-HIV infected people. It is no longer a use strictly associated with HIV+ people. It is a pre-exposure prophylaxis (PrEP). It prevents people from getting HIV. Obviously, this is in the best interest of the insuring entity and the insured. The New England Journal of Medicine has stated, after testing, that Oral FTC-TDF (Truvada) "provided protection against the acquisition of HIV infection among the subjects. Detectable blood levels strongly correlated with the prophylactic effect." (Summary Enclosed as ("Exhibit B")

Dr. Anthony Fauci, head of the NIA stated that "highly effacious, in my mind easily over 90 percent if you rigidly adhere to it" (NY Times Article Enclosed as "Exhibit C") Elsewhere in the article, it is stated that when used daily the effective rate is estimated at 99%.

Medical treatment with respect to HIV protection has changed drastically in the past five years. Prior to 2012, Truvada was used as a treatment for sick person who had contracted HIV. Today there are tens of thousands of users, who as conscientious individuals, take Truvada to stop the rampant spread of this horrible disease. HIV can be prevented. To penalize an individual by not approving an Application for Long Term Care Insurance is counterproductive and against responsible public policy. Without addressing legal issues for an applicant under Massachusetts law, the denial of Insurance is simply wrong utilizing reasonable insurance protocols.

*Admitted in Massachusetts and New York*

**063**

[Doe]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ BOSTON, MASSACHUSETTS ▮▮▮

For the reasons set forth above, the undersigned requests that the Insurer grant this Appeal and issue the requested Long Term Care Insurance policy.

Very truly yours,

[Doe]

▮▮▮▮▮▮▮▮

cc:     Janson Wu, Esq.  Executive Director of Gays and Lesbian Advocated and Defenders
        Bennett Klein, Esq. AIDS Law Project /  Gays and Lesbian Advocated and Defenders

*Admitted in Massachusetts and New York*

# Exhibit M

Q YXYEP sjSQ ELE MKWY VERGI GSQ TER]
P.O. Box 64901
St. Paul, MN 55164-0901



April 22, 2015


[Doe's Boston address]

BOSTON MA



RE:  Your Application for the Mutual of Omaha Insurance Company Long-Term Care Policy/Certificate
     Application Number ▮▮▮▮▮▮

Dear ▮▮▮▮▮▮ :  [Doe]

We received and reviewed the additional information you submitted in support of your appeal.  After
careful consideration of all the information provided, we are not able to change our decision.

I'm afraid your letter of March 30, 2015, along with the March 26, 2015 letter from Ronald Katz MD, do
not alter our decision.  We do not offer coverage to anyone who takes the medication Truvada,
regardless of whether it is prescribed to treat an HIV infection, or is used for pre-exposure prophylaxis.
This is in accordance with our underwriting guidelines.

 As per our letter of February 9, 2015, we would consider additional information received within 60 days
of the letter date.  We regret that we will be unable to consider any additional information related to this
application.

You have the right, upon written request to have sent to you the specific information that prompted our
decision.  A summary of rights, regarding this and other personal information, is attached.

We regret that we are unable to give you a more favorable decision.

Sincerely,


Lisa Ging RN
Chief Underwriter
Mutual of Omaha Insurance Company

Enclosure(s)

# Exhibit N

```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2
    JOHN DOE,                ) C.A. NO. 1:16-CV-11381-GAO
 3                          )
            PLAINTIFF,      ) DEPOSITION OF
 4                          ) LISA GING, RN
        VS.                 )
 5                          )
    MUTUAL OF OMAHA         )
 6   INSURANCE COMPANY,      )
                            )
 7            DEFENDANT.     )

 8   - - - - - - - - - - - - -

 9              DEPOSITION OF LISA GING, RN, taken before

10   Morgan M. Catania, RPR, CSR(IA), General Notary

11   Public within and for the State of Nebraska,

12   beginning at 10:11 a.m., on July 19, 2017, at

13   Thomas & Thomas Court Reporters & Certified Legal

14   Video, LLC, 1321 Jones Street, Omaha, Nebraska.

15

16

17

18

19

20

21

22

23

24

25
```

Thomas & Thomas Court Reporters                1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC              Tel: (402) 556-5000 | Fax: (402) 556-2037

**068**

Page 12

1   happy to show a copy if you need to, but it's
2   attached as Exhibit 1 to the defendant's
3   interrogatory answers.
4        It says that as chief underwriter for
5   long-term care you underwrite standard and
6   substandard risks.  Can you tell me what that means?
7        A.  A standard risk is someone who is deemed
8   to have no significant increased risk for
9   utilization benefits.
10       A substandard risk is someone who is
11  deemed to have an increased risk for utilization of
12  benefits but is insurable.
13       Q.  And what is the process of underwriting
14  those risks that you engage in?
15            MR. MAGRATTEN:  Objection to form.
16            THE WITNESS:  We review an
17  application, an interview, medical records, and do a
18  pharmaceutical check.  That was our underwriting at
19  the time of Doe's application.
20  BY MR. KLEIN:
21       Q.  Now, you'll also -- well, I see in your
22  résumé that one of the duties that you list from
23  2008 to present is remain current on changes in
24  medical care and medications.  Is that familiar to
25  you as a provision in your résumé?

Page 13

1        A.  Yes.
2        Q.  All right.  And what does that entail?
3        A.  Review new medications or health
4   conditions.
5        Q.  What do you look at to obtain that
6   information?
7        A.  If we're made aware -- sometimes we're
8   made aware of health conditions or medications via
9   an application.
10       Q.  And what do you do when you're made aware
11  of health conditions or medications via an
12  application?
13       A.  If it's something -- if it's a new
14  medication, we would review to determine whether or
15  not it was a medication we would insure.
16       Q.  What steps would you take to make that
17  determination?
18       A.  Research the medication.
19       Q.  What steps would you take to research the
20  medication?
21       A.  View the manufacturer's website for the
22  prescribing information.
23       Q.  Anything else?
24       A.  No.
25       Q.  So your review of a new medication is

Page 14

1   limited solely to the prescribing information on the
2   manufacturer's website?
3            MR. MAGRATTEN:  Objection to form.
4            THE WITNESS:  If need be, we would
5   involve our medical department.
6   BY MR. KLEIN:
7        Q.  Is there anything else that you would do
8   to review a new medication for underwriting
9   purposes?
10       A.  No.
11       Q.  Now, the next item on your résumé
12  indicates that one of your job duties from 2008 to
13  present is to update underwriting guidelines
14  annually and when new products are released.
15       It goes on to say updates based on our
16  claim experience, industry trends, changes in
17  morbidity and mortality, disease management and
18  trends, and consultation with our medical directors
19  and reinsurer.  Can you tell me what that refers to?
20       A.  Can you break that down --
21       Q.  Sure.  That's fair.
22       A.  -- into individual questions?
23       Q.  That's fair.
24       So one of the duties is update
25  underwriting guidelines annually and when new

Page 15

1   products are released.  What does that involve?
2        A.  There is an annual review of the
3   underwriting guidelines with the manager of
4   long-term care underwriting and the medical
5   directors to see if any changes need to be made.
6        Q.  Who is involved -- what personnel are
7   involved in that review annually?
8        A.  The chief underwriters, the manager of
9   long-term care underwriting, and our medical
10  directors.
11       Q.  In 2014 and 2015 -- well, strike that.
12       Currently how many medical directors does
13  Mutual of Omaha have that would have purview over
14  long-term care insurance?
15            MR. MAGRATTEN:  Objection to form.
16            THE WITNESS:  Three.
17  BY MR. KLEIN:
18       Q.  I'm sorry?
19       A.  Three.
20       Q.  Okay.  And who are they?
21       A.  Mike Wilkins, Bruce Henricks, and Grace.
22  And I'm sorry.  I don't know her last name.  I've
23  not worked with her.
24       Q.  Okay.  I'm sorry.  Grace?
25       A.  Her first name is Grace, yes.

Page 48

1  reason listed as -- in the guide as the primary
2  reason, then they would be uninsurable.  There are
3  off-label uses of medication.  Those are considered
4  on a case-by-case basis.
5      Q.  All right.  And what -- what were the
6  reasons listed in the guide for the use of Truvada
7  as an uninsurable medicine?
8      A.  HIV.
9      Q.  HIV diagnosis?
10     A.  It just states HIV.
11     Q.  Okay.  In 2014 and 2015 were there any
12 exceptions to Mutual's policy that somebody who
13 takes Truvada for PrEP was uninsurable?
14         MR. MAGRATTEN:  Objection to form.
15 You're in the context of long-term care insurance;
16 correct?
17         MR. KLEIN:  Yes.
18         THE WITNESS:  I'm not aware of us
19 issuing coverage to anyone who took the medication
20 Truvada.
21 BY MR. KLEIN:
22     Q.  Is it your understanding of the -- do you
23 understand -- do you have an understanding of
24 Mutual's policy with respect to Truvada as prep in
25 2014 and 2015?

Page 49

1      A.  I can't speak to Mutual's policy.
2      Q.  I'm sorry.  For long-term care insurance?
3      A.  Yes.
4      Q.  All right.  And is it your
5  understanding -- well, based on that understanding,
6  were there any exceptions to the policy that anybody
7  who took PrEP was declined?
8      A.  I'm not aware of us ever knowingly
9  insuring someone who took Truvada?
10     Q.  What was your policy?
11     A.  The medication --
12         MR. MAGRATTEN:  Objection to the
13 form.
14         THE WITNESS:  The medication is
15 uninsurable for long-term care underwriting.
16 BY MR. KLEIN:
17     Q.  All right.  And -- and was it your
18 understanding that there are no -- that under
19 Mutual's long-term care insurance policy with
20 respect to Truvada there were no exceptions that
21 would allow somebody who is taking Truvada to obtain
22 long-term care insurance?
23     A.  Truvada is indicated for the treatment of
24 HIV or for PrEP.  We -- to the best of my knowledge,
25 we never knowingly insured somebody who takes the

Page 50

1  medication Truvada.
2      Q.  Okay.  And that was the goal of the
3  long-term care insurance underwriting in 2014 and
4  '15; correct?
5          MR. MAGRATTEN:  Objection to form.
6          THE WITNESS:  What do you mean by
7  "goal"?
8  BY MR. KLEIN:
9      Q.  Mutual's goal was that anybody -- was
10 it -- was it the policy of Mutual of Omaha that
11 anybody who takes Truvada as PrEP is automatically
12 declined for long-term care insurance?
13         MR. MAGRATTEN:  Objection to form.
14         THE WITNESS:  Long-term care
15 underwriting did not offer coverage to anyone who
16 took the medication Truvada.
17 BY MR. KLEIN:
18     Q.  All right.  And there were no exceptions
19 to that policy that you're aware of?
20     A.  None that I'm aware of.
21     Q.  All right.  So in 2014 and 2015, for
22 purposes of long-term care insurance underwriting,
23 it didn't matter why somebody took pre-exposure --
24 Truvada as PrEP; is that right?
25     A.  The reason they were taking Truvada did

Page 51

1  not matter.  As long as they were taking the
2  medication, they were uninsurable.
3      Q.  Okay.  In 2014 to 2015 did Mutual through
4  its underwriting process ever inquire of somebody
5  who was taking Truvada as PrEP the reasons they
6  decided to go on that medication?
7      A.  No.
8      Q.  Okay.  And was -- were the reasons that
9  somebody decided to go on the medication Truvada
10 relevant in any way to Mutual of Omaha's
11 underwriting practices?
12         MR. MAGRATTEN:  Objection to form.
13         THE WITNESS:  We did not insure
14 anyone who took the medication regardless of the
15 reason they took it.
16 BY MR. KLEIN:
17     Q.  All right.  So the reasons that they took
18 it would be irrelevant to the underwriting process;
19 is that correct?
20         MR. MAGRATTEN:  Objection to form.
21         THE WITNESS:  For long-term care
22 underwriting, that is correct.
23 BY MR. KLEIN:
24     Q.  All right.  Now, did Mutual -- in 2014 and
25 2015, had Mutual assessed the efficacy of Truvada as

Page 52

1 pre-exposure prophylaxis for HIV?
2        MR. MAGRATTEN:  Objection to form.
3        Could you read that question back, please?
4            (Whereupon, the pending question
5        was read back by the court
         reporter.)
6        MR. MAGRATTEN:  Objection to form.
7        You can respond.
8        THE WITNESS:  Long-term care
9 underwriting would not be responsible for
10 determining the efficacy of Truvada.
11 BY MR. KLEIN:
12     Q.   Who would be?
13        MR. MAGRATTEN:  Objection to form.
14 BY MR. KLEIN:
15     Q.   Which personnel at Mutual of Omaha would
16 be responsible for determining the efficacy of
17 Truvada?
18        MR. MAGRATTEN:  Objection to form.
19        THE WITNESS:  No personnel at Mutual
20 of Omaha would be responsible for determining
21 effectiveness.
22 BY MR. KLEIN:
23     Q.   Why is that?
24        MR. MAGRATTEN:  Objection to form.
25        THE WITNESS:  It would be determined

Page 53

1 by the drug manufacturer and studies that were done.
2 Those would not be done by Mutual of Omaha.
3 BY MR. KLEIN:
4     Q.   In 2014 and 2015 had Mutual of Omaha
5 reviewed the information you described about the
6 efficacy of Truvada?
7        MR. MAGRATTEN:  Objection to form.
8        THE WITNESS:  Are you able to ask the
9 question as long-term care underwriting --
10 BY MR. KLEIN:
11     Q.   Yes.
12     A.   -- rather than Mutual Of Omaha?
13     Q.   Yes.
14     A.   I can't respond to a question for Mutual
15 of Omaha.
16     Q.   All right.  That's fair enough.  And you
17 can assume -- I will do my best to include that in
18 every question.  But you can assume that I'm
19 referring, when I say "Mutual," only to long-term
20 care insurance.
21        So in 2014 and 2015 had Mutual of Omaha
22 long-term care insurance reviewed the studies and
23 information on the efficacy of Truvada?
24     A.   We determined the medication was
25 uninsurable.

Page 54

1     Q.   That's not my question.
2        My question was did Mutual of Omaha
3 long-term care insurance review the studies and
4 information on the efficacy of Truvada?
5     A.   No.
6     Q.   What -- what did Mutual rely upon for its
7 determination that Truvada as PrEP was an
8 uninsurable medication?
9        MR. MAGRATTEN:  Objection to form.
10        THE WITNESS:  The manufacturer's
11 indications for usage of the medication.
12 BY MR. KLEIN:
13     Q.   Who reviewed that?
14     A.   I did.
15     Q.   In what year did you review that?
16     A.   I don't know.
17     Q.   Was it prior to the time you reviewed
18 Doe's application?
19     A.   It's been listed as an uninsurable
20 medication since at least 2009; so, yes.
21     Q.   Truvada was approved by the FDA for use as
22 pre-exposure prophylaxis in HIV negative individuals
23 in 2012.  Did you review the studies of the efficacy
24 of Truvada as PrEP at any time from -- after 2012?
25        MR. MAGRATTEN:  Objection to form.

Page 55

1        THE WITNESS:  No.
2 BY MR. KLEIN:
3     Q.   When you -- in the -- in the course of
4 your job duties as a chief of long-term care
5 underwriting, do you review the efficacy of various
6 medications?
7     A.   I do not.
8     Q.   You do not.  Okay.
9        So is it fair to say, then, that Truvada
10 as PrEP is the only -- well, strike that.
11        As chief underwriter for long-term care
12 insurance, do you determine -- what do you -- do you
13 make any determinations about the efficacy of
14 various medications?
15        MR. MAGRATTEN:  Objection:  Asked and
16 answered.
17        THE WITNESS:  I do not.
18 BY MR. KLEIN:
19     Q.   Okay.  Who at Mutual of Omaha long-term
20 care insurance is responsible for that?
21        MR. MAGRATTEN:  Objection:  Asked and
22 answered.
23        THE WITNESS:  No one at Mutual of
24 Omaha is responsible for determining the efficacy of
25 a medication.

Lisa Ging
7/19/2017

18 (60 - 63)

Page 60

```
 1  BY MR. KLEIN:
 2       Q.  What -- under what conditions might
 3  somebody -- well, I'm talking about just based on
 4  the Truvada exclusion alone.
 5       So if somebody is not on Truvada as PrEP
 6  for seven months, would the Truvada exclusion apply
 7  to them for long-term care insurance underwriting?
 8            MR. MAGRATTEN: Objection: Asked and
 9  answered.
10            THE WITNESS: If they are not taking
11  the medication, then it's not factored into
12  underwriting.
13  BY MR. KLEIN:
14       Q.  Now, assume that somebody has gone through
15  the underwriting process and Mutual of Omaha has
16  issued them a long-term care insurance policy.  If
17  that person goes on Truvada as PrEP in the future,
18  the policy can't be voided; is that correct?
19       A.  The policy would --
20            MR. MAGRATTEN: Objection to form.
21            THE WITNESS: -- would not be voided
22  unless the client made a material
23  misrepresentation --
24  BY MR. KLEIN:
25       Q.  Okay.
```

Page 61

```
 1       A.  -- at the time of underwriting.
 2       Q.  Okay.
 3            MR. MAGRATTEN: Ben, I'm going to ask
 4  you to just wait -- wait to ask the next question
 5  until the witness is finished just so we have a
 6  clean transcript.
 7            MR. KLEIN: Thank you.  That's a good
 8  reminder, and I will do my best.
 9  BY MR. KLEIN:
10       Q.  Now, can you tell me: What are the
11  reasons that Mutual of Omaha excludes from long-term
12  care insurance all individuals who use Truvada as
13  PrEP?
14       A.  Because of the indications for the drug.
15  Someone has HIV or they are at high risk of
16  acquiring HIV.
17       Q.  Are there any other reasons?
18       A.  No.
19       Q.  All right.  So somebody who is on Truvada
20  as PrEP does not currently have a diagnosis of HIV
21  disease; is that correct?
22       A.  If they have negative HIV testing, that
23  would be --
24       Q.  Yeah.  Well, if they are on PrEP, the
25  purpose is to prevent HIV disease; right?
```

Page 62

```
 1            MR. MAGRATTEN: Correct.
 2            THE WITNESS: Objection to form.
 3  BY MR. KLEIN:
 4       Q.  All right.  So is the concern -- so is the
 5  concern from a long-term care insurance underwriting
 6  perspective that somebody will become HIV positive
 7  in the future?
 8            MR. MAGRATTEN: Objection to form.
 9            THE WITNESS: The medication is
10  indicated for individuals who are at high risk of
11  acquiring HIV.  We do not insure anybody who has
12  HIV.  Thus, anyone who takes the medication and is
13  deemed high risk for acquiring HIV is uninsurable.
14  BY MR. KLEIN:
15       Q.  Okay.  So the concern, though, is that
16  this applicant who takes Truvada as PrEP may become
17  HIV positive in the future, and that is an
18  exclusion; is that correct?
19            MR. MAGRATTEN: Objection to form.
20            THE WITNESS: The medication is
21  uninsurable.
22  BY MR. KLEIN:
23       Q.  That's not my question.
24       My question is Mutual -- is it correct
25  that Mutual of Omaha long-term care -- that Mutual's
```

Page 63

```
 1  concern with respect to long-term care insurance is
 2  that somebody who takes PrEP is too likely to get
 3  HIV in the future to be insurable?
 4            MR. MAGRATTEN: Objection to form.
 5  BY MR. KLEIN:
 6       Q.  Is that your understanding of the basis
 7  for the policy?
 8            MR. MAGRATTEN: Objection to form.
 9            THE WITNESS: The medication is
10  indicated for those who are at high risk of
11  acquiring HIV.  We do not insure individuals who
12  take the medication Truvada for the reasons it is
13  prescribed.
14  BY MR. KLEIN:
15       Q.  So the concern is that somebody will
16  become HIV positive in the future; is that right?
17            MR. MAGRATTEN: Objection to form.
18            THE WITNESS: The concern is that
19  their physician has determined that they are high
20  risk of acquiring HIV.
21  BY MR. KLEIN:
22       Q.  What is the concern from an underwriting
23  perspective?
24            MR. MAGRATTEN: Objection to form.
25            THE WITNESS: I'm going to need you
```

Page 64

1  to be more specific.
2  BY MR. KLEIN:
3      Q.  Well, somebody who takes Truvada as PrEP
4  doesn't -- they don't have a disqualifying -- HIV is
5  a disqualifying health condition; is that correct?
6      A.  Yes.
7      Q.  All right.  And somebody who takes PrEP
8  doesn't currently have that particular disqualifying
9  health condition; right?
10          MR. MAGRATTEN:  Objection to form.
11          THE WITNESS:  The use of the
12  medication Truvada is uninsurable.
13  BY MR. KLEIN:
14      Q.  No.  But I'm asking what -- I'm trying to
15  understand why that's something Mutual of Omaha
16  long-term care insurance cares about from an
17  underwriting perspective.  What is the concern from
18  a -- from a claims perspective?
19          MR. MAGRATTEN:  Objection to form.
20          THE WITNESS:  I'm not in claims.  The
21  concern is that someone who is determined to need
22  Truvada for PrEP is at high risk of acquiring HIV.
23  BY MR. KLEIN:
24      Q.  All right.  So Mutual of Omaha regards
25  PrEP as a proxy for high risk for HIV?

Page 65

1          MR. MAGRATTEN:  Objection to form.
2          THE WITNESS:  The manufacturer
3  indicates that the drug is used for individuals who
4  are at high risk of acquiring HIV.
5  BY MR. KLEIN:
6      Q.  All right.  But from a long-term care
7  insurance underwriting perspective, the reason why
8  you exclude someone who takes Truvada is because
9  you're concerned that they will have the
10  disqualifying health condition of HIV down the road;
11  is that right?
12          MR. MAGRATTEN:  Objection to form.
13          THE WITNESS:  Our concern is that
14  they have been deemed high risk for acquiring HIV.
15  BY MR. KLEIN:
16      Q.  What is the underwriting concern about
17  being deemed high risk for HIV?
18      A.  If you develop HIV, you may need to
19  utilize long-term care services.
20      Q.  Okay.  And that's the predicate of the
21  Truvada exclusion; is that right?
22          MR. MAGRATTEN:  Objection to form.
23          THE WITNESS:  We don't offer coverage
24  to anyone who takes Truvada because of the
25  indications for usage.

Page 66

1  BY MR. KLEIN:
2      Q.  And your -- but your underlying motivation
3  is that somebody who takes Truvada is too likely to
4  get HIV in the future to make them currently
5  insurable; is that correct?
6          MR. MAGRATTEN:  Objection to form.
7          THE WITNESS:  We don't insure them
8  because they have been deemed to be high risk for
9  acquiring HIV.
10  BY MR. KLEIN:
11      Q.  All right.  So the concern for -- the
12  reason that you are denying the application is that
13  the -- you believe that the medication they are on
14  indicates that they are at risk for HIV in the
15  future?
16          MR. MAGRATTEN:  Objection:  Asked and
17  answered.
18          THE WITNESS:  I don't believe that
19  their medical provider has made that determination.
20  Underwriting does not make that determination.
21  BY MR. KLEIN:
22      Q.  That's your assumption based on the
23  Truvada prescription?
24          MR. MAGRATTEN:  Objection --
25          MR. KLEIN:  Is that correct from --

Page 67

1          MR. MAGRATTEN:  I'm sorry -- go
2  ahead.  Complete the answer -- complete your
3  question.  I will object and then the witness will
4  go.  Sorry.
5  BY MR. KLEIN:
6      Q.  Is it Mutual of Omaha -- Mutual of Omaha's
7  assumption that, if somebody is prescribed Truvada,
8  their health care provider has deemed them at high
9  risk for HIV?
10          MR. MAGRATTEN:  Objection to form.
11          THE WITNESS:  Long-term care
12  underwriting isn't making the assumption.  Their
13  provider has determined that they are at high risk
14  for acquiring HIV and, thus, has prescribed the
15  medication.
16  BY MR. KLEIN:
17      Q.  What is your basis for that statement?
18      A.  The manufacturer determines why the
19  medication is prescribed -- for HIV or those at high
20  risk of acquiring HIV.
21      Q.  All right.  So for purposes of long-term
22  care insurance underwriting, does Mutual of Omaha,
23  then, rely on the assessment of the individual's
24  physician with respect to their risk for HIV?
25      A.  The determination to prescribe a

Page 76

1  BY MR. KLEIN:
2      Q.  Are you familiar with Mutual's long-term
3  care insurance underwriting practices?
4      A.  Yes.
5      Q.  All right.  And you are familiar with how
6  those practices and guidelines are applied to
7  particular applicants?
8      A.  If the underwriter follows the
9  underwriting guidelines, yes.
10     Q.  All right.  And so is there -- for
11 somebody who is diagnosed with HIV today and who is
12 in treatment, is that person eligible for Mutual's
13 long-term care insurance?
14     A.  They are not.
15     Q.  Okay.  And are there any circumstances
16 under which somebody's -- strike that.  Let me --
17 I'll withdraw that question.
18         MR. KLEIN:  Can we go off the record
19 for a second?
20         (Discussion had off the record.
21         (11:55 a.m. - Recess taken.)
22
23
24
25

Page 77

1         (At 12:48 p.m., with all the parties
2  present as before, the following proceedings were
3  had, to-wit:)
4  BY MR. KLEIN:
5      Q.  All right.  Good afternoon.  We'll
6  continue with the questioning.
7          Is it Mutual of Omaha's position in this
8  case that all persons at high risk for HIV use PrEP?
9          MR. MAGRATTEN:  Objection to form.
10         Could you read that question back?
11         (Whereupon, the pending question
12         was read back by the court
           reporter.)
13         MR. MAGRATTEN:  Objection.
14         THE WITNESS:  No.  That wouldn't be
15 our assumption.
16 BY MR. KLEIN:
17     Q.  All right.  And is it your view as a
18 registered nurse and someone with substantial --
19 with strong medical knowledge that all persons at
20 risk for HIV use PrEP?
21         MR. MAGRATTEN:  Objection.
22         THE WITNESS:  No.
23 BY MR. KLEIN:
24     Q.  Okay.  Does Mutual of Omaha long-term
25 care -- well, does Mutual of Omaha require that a

Page 78

1  person refrain from sexual activity as a condition
2  of receiving long-term care insurance?
3          MR. MAGRATTEN:  Objection to form.
4          THE WITNESS:  No.
5  BY MR. KLEIN:
6      Q.  Okay.  Does Mutual of Omaha exclude from
7  long-term care insurance a gay man on the basis that
8  he is engaging in receptive anal sex?
9      A.  No.
10         MR. MAGRATTEN:  Objection to form.
11 BY MR. KLEIN:
12     Q.  Okay.  Does Mutual of Omaha exclude from
13 long-term care insurance any person on the -- on the
14 basis that they are engaging in receptive anal sex?
15         MR. MAGRATTEN:  Objection to form.
16         THE WITNESS:  No.
17 BY MR. KLEIN:
18     Q.  Okay.  Does Mutual of Omaha insurance
19 company exclude from insurance a gay man who engages
20 in receptive anal sex without a condom?
21         MR. MAGRATTEN:  Objection to form.  I
22 mean, can we have context?  Again, we're talking
23 long-term care insurance?
24         MR. KLEIN:  Yes.
25         MR. MAGRATTEN:  And is there a time

Page 79

1  frame?
2          MR. KLEIN:  Let's say from 2012 to
3  present.
4  BY MR. KLEIN:
5      Q.  Does Mutual of Omaha exclude from
6  long-term care insurance in the years 2012 to
7  present a gay man who engages in receptive anal sex
8  without a condom?
9          MR. MAGRATTEN:  Objection to form.
10         THE WITNESS:  Long-term care
11 underwriting would have no knowledge of that unless
12 it was documented in the medical records.
13 BY MR. KLEIN:
14     Q.  Okay.  Does engaging in receptive anal sex
15 without the use of a condom constitute an activity
16 at high risk for HIV?
17         MR. MAGRATTEN:  I'm going to object
18 to the question and instruct the witness not to
19 answer because I think at this point we're drifting
20 into expert opinion.
21         MR. KLEIN:  Well, let me explore the
22 extent of her knowledge as an underwriter of
23 long-term care insurance.  That's all I'm concerned
24 about.
25         MR. MAGRATTEN:  Well, and to be -- to

Page 92

1  date on this.
2      Q.  Okay.  Just to assist you -- or if this
3  will help you at all, the document that was
4  submitted by Mutual of Omaha that discusses its
5  underwriting guidelines is dated November 2015.
6  Does that help you determine whether this guide was
7  used with respect to the application of Doe?
8      A.  Well, we underwrote him in early 2015.
9      Q.  Correct.
10     A.  So I don't know if this is the guide that
11  was used at that time.
12     Q.  Okay.  All right.
13         How often are different versions of the
14  underwriting guide issued?
15         MR. MAGRATTEN:  Objection to form.
16         THE WITNESS:  We generally review the
17  underwriting guide on an annual basis.  If updates
18  are needed, then they would be made and there would
19  be a new version.  I can't say if that happened
20  here.
21  BY MR. KLEIN:
22     Q.  Okay.  Now, I would like to call your
23  attention to page 26 of the underwriting guide which
24  is also Bates stamped No. 307.  Do you have that
25  page in front of you?

Page 93

1      A.  Is this the page that you're referring to?
2  That's page 26.
3      Q.  Yes, it is.
4      A.  Okay.
5      Q.  I'm sorry.  Page 26 of the underwriting
6  guide and Bates -- and Bates stamped by Mutual's
7  attorneys page 307.
8         And you see there is an entry that says
9  bipolar?
10     A.  Yes.
11     Q.  What does that refer to?
12     A.  Manic depression.
13     Q.  Okay.  And below that it says "after
14  3 years, controlled on medication, fully functional
15  not disabled."
16         Do you see that?
17     A.  Yes.
18     Q.  And is somebody with that medical profile
19  offered long-term care insurance by Mutual of Omaha
20  at the select rate?
21     A.  Are you talking about this condition in
22  isolation?
23     Q.  Assuming they are otherwise qualified.
24     A.  Yes.
25     Q.  All right.  Is insurability for bipolar --

Page 94

1  for an otherwise qualified person with manic
2  depression dependent upon the condition being
3  controlled by medication?
4      A.  Yes.
5         MR. MAGRATTEN:  Objection to form.
6         MR. KLEIN:  Did you get the answer?
7         COURT REPORTER:  Yeah.
8  BY MR. KLEIN:
9      Q.  Okay.  Now, after -- assuming after a
10  long-term care insurance policy is issued to someone
11  who has manic depression or is bipolar, does Mutual
12  monitor the then insured's compliance with their
13  bipolar medication?
14     A.  We do not.  We underwrite the health based
15  upon at the time of underwriting.
16     Q.  Okay.  Can manic depression or bipolar
17  worsen or deteriorate if the insured is not
18  compliant with their medication?
19         MR. MAGRATTEN:  Objection:  Calls for
20  both expert opinion and hypothetical question.
21         MR. KLEIN:  Are you instructing her
22  not to answer?
23         MR. MAGRATTEN:  No.
24         MR. KLEIN:  Okay.
25         THE WITNESS:  Would you repeat it

Page 95

1  back?
2         (Whereupon, the pending question
3         was read back by the court
           reporter.)
4         MR. MAGRATTEN:  Same objection.
5         THE WITNESS:  It may; it may not.
6  BY MR. KLEIN:
7      Q.  All right.  What is the purpose of making
8  a condition of insuring someone who has manic
9  depression that it be controlled on medication?
10        MR. MAGRATTEN:  Objection to form.
11        THE WITNESS:  Generally the --
12  generally the standard of care is that condition
13  needs to be managed with medication.  Some people
14  don't do well off medication.
15  BY MR. KLEIN:
16     Q.  Okay.  Now, is it your view as someone who
17  underwrites long-term care insurance that manic
18  depression or bipolar disorder can -- if somebody is
19  not compliant with their medications -- can worsen
20  to the extent that the person would be excluded from
21  long-term care insurance if the underwriting were
22  done at that time?
23        MR. MAGRATTEN:  Objection:  Asks for
24  expert opinion.  Asks for a hypothetical -- asks for
25  an answer to a hypothetical question.

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                      Tel: (402) 556-5000 | Fax: (402) 556-2037

075

Page 96

1    THE WITNESS:  We insure based upon
2  the health at the time of underwriting.
3  BY MR. KLEIN:
4    Q.  I understand.
5    So you don't have a view as to whether
6  somebody who is insured for long-term care insurance
7  and is on medication for manic depression, whether
8  the condition, if they go off the medication, could
9  worsen to the extent they would no longer be
10  eligible for the insurance?
11    MR. MAGRATTEN:  Objection to the form
12  of the question.  Seeks expert opinion, and it
13  seeks -- it's a hypothetical question.
14    THE WITNESS:  Every individual is
15  different.  I can't answer that question.
16  BY MR. KLEIN:
17    Q.  Okay.  Could you please turn to page 30 of
18  the underwriting guide?  Are you there?
19    A.  Uh-huh.
20    Q.  All right.  And do you see the -- the
21  category that says depression?
22    A.  Yes.
23    Q.  Okay.  And do you see about halfway down
24  it says major, less than 70 years of age after
25  six-month -- six months controlled with medication.

Page 97

1  Do you see that?
2    A.  Yes.
3    Q.  Okay.  And is it --
4    MR. MAGRATTEN:  Objection.  You
5  didn't complete the text that's there.
6  BY MR. KLEIN:
7    Q.  All right.  "Fully functional, no
8  psychiatric hospitalizations in the past 3 years."
9  Do you see that?
10    A.  Yes.
11    Q.  All right.  Is it correct that, if
12  somebody is otherwise qualified for long-term care
13  insurance and has that mental health profile, they
14  would receive long-term care insurance at the select
15  rate?
16    A.  If they proved insurable based upon our
17  underwriting, yes.
18    Q.  Okay.  And for that particular individual,
19  is their insurability contingent upon their
20  condition being controlled with medication?
21    MR. MAGRATTEN:  Objection to form.
22    THE WITNESS:  The guideline states
23  that that needs to be controlled with medication,
24  and we follow that guideline.
25

Page 98

1  BY MR. KLEIN:
2    Q.  Okay.  And after the issuance of a
3  long-term care insurance policy to such a person,
4  does Mutual monitor the insured's compliance with
5  their depression medication?
6    MR. MAGRATTEN:  Objection:  Asked and
7  answered.
8    THE WITNESS:  No.
9  BY MR. KLEIN:
10    Q.  Okay.  Why not?
11    MR. MAGRATTEN:  Objection.
12    THE WITNESS:  Underwriting is a
13  snapshot.  It's a moment in time, how somebody looks
14  at the time that we underwrite them.  Once we issue
15  the policy, I have no control what happens to
16  someone.  They could be hit by a car.
17  BY MR. KLEIN:
18    Q.  Okay.  Now, looking further down the page,
19  do you see the heading that says diabetes insipidus?
20    A.  Yes.
21    Q.  And what is diabetes insipidus?
22    A.  It's a endocrine disorder.
23    Q.  All right.  And is somebody who is
24  otherwise qualified for long-term care insurance
25  from Mutual of Omaha who has diabetes insipidus

Page 99

1  controlled on medication eligible for the insurance?
2    MR. MAGRATTEN:  Objection to form.
3    Can you repeat that question, please?
4    (Whereupon, the pending question
5    was read back by the court
    reporter.)
6    THE WITNESS:  If they meet all of our
7  underwriting requirements, yes.
8  BY MR. KLEIN:
9    Q.  Okay.  And it's also true that for such a
10  person eligibility for the insurance is dependent
11  upon their being controlled by medication; correct?
12    A.  It's unlikely they could function if they
13  are not on medication; so, yes.
14    Q.  All right.  All right.
15    And does Mutual of Omaha monitor
16  compliance with the diabetes medication after the
17  issuance of a long-term care policy?
18    MR. MAGRATTEN:  Objection:  Asked and
19  answered.
20    THE WITNESS:  No.
21  BY MR. KLEIN:
22    Q.  Okay.  Why not?
23    A.  As I previously stated, we -- we are
24  underwriting at the time of the application.
25    Q.  Now, do you see below that there are

Thomas & Thomas Court Reporters            1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC             Tel: (402) 556-5000 | Fax: (402) 556-2037

076

Page 100

1  references for Diabetes II and Diabetes Type I or
2  II?
3      A.  Yes.
4      Q.  All right.  Now, assuming that somebody is
5  otherwise qualified for long-term care insurance and
6  they meet the criteria listed in -- in those
7  provisions, would those folks be eligible for
8  long-term care insurance from Mutual of Omaha?
9      A.  This is a very extensive section.
10     Q.  Right.
11     A.  If they met all of the criteria and passed
12  all of our other underwriting, yes, they would be
13  eligible for long-term care insurance.
14     Q.  All right.  And looking at the first
15  section under Diabetes II, one of the provisions is
16  "controlled and stable with diet and exercise or
17  oral medications."  Do you see that provision?
18             MR. MAGRATTEN:  Objection.  That's
19  not the complete text.
20             MR. KLEIN:  I'm just asking her about
21  that provision.
22             THE WITNESS:  Yes.
23  BY MR. KLEIN:
24     Q.  Do you see that?
25     And is -- that provision is one of the

Page 101

1  requirements for somebody with Diabetes Type II
2  receiving insurance; is that correct?
3             MR. MAGRATTEN:  Objection to form.
4             THE WITNESS:  Would you restate that?
5  BY MR. KLEIN:
6      Q.  Well, do you see the provision right where
7  it says Diabetes Type II, one of the factors -- one
8  of the requirements is controlled and stable with
9  diet and exercise or oral medications?
10     A.  Yes.
11     Q.  All right.  And after the issuance of a
12  long-term care insurance policy, does Mutual of
13  Omaha monitor compliance with someone's diet,
14  exercise, and oral medications?
15     A.  No.
16             MR. MAGRATTEN:  Objection.
17  BY MR. KLEIN:
18     Q.  Can I ask you to turn to page 41 of the
19  underwriting guide?  Do you see where it refers to a
20  provision for sleep apnea?
21     A.  Yes.
22     Q.  All right.  And after that it says
23  "responsive to treatment, compliant with CPAP or
24  BIPAP, or dental device"?
25     A.  Yes.

Page 102

1      Q.  All right.  After the issuance of
2  insurance to a person with sleep apnea, does Mutual
3  monitor compliance with someone's CPAP, BIPAP, or
4  dental device?
5             MR. MAGRATTEN:  Objection.
6             THE WITNESS:  No.
7  BY MR. KLEIN:
8      Q.  Okay.  Why not?
9      A.  For the same reasons I stated for the
10  questions you previously asked.
11     Q.  Okay.  Now, could you please turn to
12  page 29 of the underwriting file?  Now, do you see
13  the provision for coronary artery disease?
14     A.  Yes.
15     Q.  All right.  And do you see about -- about
16  the third line down it says "with PVD or carotid
17  artery disease, tobacco free 12 months."  Do you see
18  that provision?
19     A.  Yes.
20     Q.  All right.  What is -- what do you
21  understand to mean "with PVD or carotid artery
22  disease"?
23     A.  Peripheral vascular disease or carotid
24  artery disease.
25     Q.  Okay.  And tobacco free with -- for

Page 103

1  12 months.  And then the underwriting
2  classification, is that I or -- is that an I?  I to
3  IC?
4             MR. MAGRATTEN:  Objection to form.
5  BY MR. KLEIN:
6      Q.  What does I to IC refer to?
7      A.  It's Class I to individual consideration.
8      Q.  Okay.  So what -- what does that mean in
9  terms of the underwriting designation?
10     A.  Class I means the individual would be
11  rated up and have benefit limitations.
12     Q.  Okay.  And IC?
13     A.  IC means individual consideration.  You
14  would have to look at the entire underwriting file.
15     Q.  Okay.  Assume that somebody -- so I assume
16  that there are some people with PVD or carotid
17  artery disease, tobacco free for 12 months who would
18  be approved for long-term care insurance from Mutual
19  of Omaha; is that correct?
20     A.  If they met our underwriting requirements,
21  yes.
22     Q.  Okay.  And after that person is issued a
23  long-term care insurance policy, does Mutual monitor
24  their tobacco use?
25             MR. MAGRATTEN:  Objection:  Asked and

Page 108

1  thus it's uninsurable.
2      Q.  Well, in 2009 Truvada was not approved for
3  PrEP.  It was just a medication for HIV disease
4  itself.  At what point in time did Mutual designate
5  Truvada as PrEP uninsurable?
6              MR. MAGRATTEN:  Objection to form.
7              THE WITNESS:  We never specifically
8  designated it for PrEP.  We said if they are taking
9  the medication, regardless of the reason they take
10 it, they are uninsurable.
11 BY MR. KLEIN:
12     Q.  Okay.  What personnel were involved in the
13 decision to exclude Truvada as PrEP, if any?
14             MR. MAGRATTEN:  Objection to form.
15             THE WITNESS:  It was my
16 recommendation that the medication be listed as
17 uninsurable.  Our medical directors concurred with
18 that.
19 BY MR. KLEIN:
20     Q.  In what year did you do that?
21     A.  I don't know.
22     Q.  Was that specific to PrEP or just Truvada
23 regardless of reason?
24     A.  Truvada regardless of reason.
25     Q.  All right.  You yourself never assessed

Page 109

1  anything about Truvada specific to its use as PrEP;
2  is that correct?
3              MR. MAGRATTEN:  Objection to form.
4              THE WITNESS:  We don't insure anyone
5  who takes the medication; so I don't know what you
6  mean by "assessed."
7  BY MR. KLEIN:
8      Q.  Did you ever evaluate whether Truvada
9  should be on the uninsurable list for the indication
10 of PrEP specifically?
11     A.  We don't insure someone who takes the
12 medication regardless of the reason it's taken.
13     Q.  All right.
14     A.  That would include PrEP.
15     Q.  All right.  So you never specifically
16 evaluated the use of Truvada as PrEP?
17             MR. MAGRATTEN:  Objection to form.
18             THE WITNESS:  What date are you
19 asking?
20 BY MR. KLEIN:
21     Q.  At any time.  Well, let's say prior to
22 2015.
23     A.  I don't know the date.  At some point we
24 added PrEP to the underwriting guide as uninsurable,
25 but it was after this application.

Page 110

1      Q.  Okay.  Now, at the -- the application of
2  Mr. Doe that's at issue in this case was received in
3  January of 2015, and the denial was dated
4  February -- by letter February 9th, 2015.  Is that
5  your understanding?
6              MR. MAGRATTEN:  Objection.
7              THE WITNESS:  I don't know the exact
8  dates, but that's sounds like the appropriate time
9  frame.
10 BY MR. KLEIN:
11     Q.  Okay.  All right.
12         And at the time that you -- Mr. Doe's
13 application was denied because he used the
14 medication Truvada; right?
15     A.  Correct.
16     Q.  All right.  At that time what was Mutual
17 of Omaha relying on for its information about PrEP?
18             MR. MAGRATTEN:  Objection:  Form.
19             THE WITNESS:  We weren't insuring the
20 medication regardless of the reason taken.
21 BY MR. KLEIN:
22     Q.  Okay.  Now, I would like to call your
23 attention, again, to Exhibit 6, which is the -- the
24 Mutual of Omaha's position statement to the
25 Massachusetts Commission Against Discrimination.

Page 111

1  And if I can call your attention to page 11.
2              MR. MAGRATTEN:  Page 11 of what
3  exhibit?
4              MR. KLEIN:  I'm sorry.  Of the
5  position statement itself, not of the exhibit.
6  BY MR. KLEIN:
7      Q.  The last page of the position statement
8  where it -- okay.  Do you see it's dated --
9  page 11 -- November 24, 2015, on the top.  It's
10 signed by Mutual of Omaha's attorney Mark Pogue.  Do
11 you see that?
12     A.  Yes.
13     Q.  All right.  And below that it says
14 [reading] I declare under penalty of perjury that
15 the foregoing is true and accurate to the best of my
16 knowledge and belief.
17         And it's signed by Corey Aldy; is that
18 correct?
19     A.  Yes.
20     Q.  Was she your supervisor in November of
21 2015?
22     A.  Yes.
23     Q.  All right.  And she was familiar with --
24 as far as you understand -- with Mutual of Omaha's
25 underwriting policies with respect to HIV?

Thomas & Thomas Court Reporters                 1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC              Tel: (402) 556-5000 | Fax: (402) 556-2037

078

Page 120

```
1   BY MR. KLEIN:
2       Q.  Those are the complications which you are
3   referring to as complications of HIV disease today?
4       A.  Correct.
5           MR. KLEIN:  Okay.  Can we take a
6   five-minute break?
7           MR. MAGRATTEN:  Sure.
8               (1:51 p.m. - Recess taken.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 121

```
1       (At 1:57 p.m., with all the parties
2   present as before, the following proceedings were
3   had, to-wit:)
4   BY MR. KLEIN:
5       Q.  Ms. Ging, can you tell me based on your
6   knowledge as both a nurse and a long-term care
7   underwriter what are the complications of diabetes
8   insipidus?
9           MR. MAGRATTEN:  Objection:  Asks for
10  expert opinion.
11          THE WITNESS:  I don't know.
12  BY MR. KLEIN:
13      Q.  You don't know?
14      A.  No.
15      Q.  Okay.  Do you not know the specific
16  complications?  Is it your understanding that
17  somebody with diabetes insipidus can, in fact,
18  develop complications?
19          MR. MAGRATTEN:  Objection to form.
20          THE WITNESS:  I would have to refresh
21  my memory about the disease.  I can't answer that
22  now.
23  BY MR. KLEIN:
24      Q.  Okay.  But it's your understanding that
25  people can develop complications from diabetes
```

Page 122

```
1   insipidus?
2       A.  I don't know.
3       Q.  Okay.  All right.  All right.
4       I'm going to switch gears for a moment
5   because one of the things that I would like to --
6   that's one of the subjects for your deposition is
7   some of the objectives and goals of underwriting
8   long-term care insurance.
9       Can you just describe to me what is the
10  concept of underwriting long-term care insurance?
11  What does that mean?
12      A.  It's an assessment of risk.
13      Q.  Risk for what?
14      A.  Risk for the need for long-term care
15  services.
16      Q.  And how does Mutual of Omaha go about
17  underwriting or assessing the risk of the need for
18  long-term care for the -- I'm sorry.  I'm getting
19  tired today.  Let me -- let me start that over.
20      How does Mutual of Omaha go about
21  assessing the risk of the need for long-term care
22  services?
23          MR. MAGRATTEN:  Objection to form.
24          THE WITNESS:  The way you're wording
25  it sounds like you're talking about after they need
```

Page 123

```
1   services.
2   BY MR. KLEIN:
3       Q.  Well, you -- you said that underwriting
4   long-term care insurance involves assessment of the
5   risk for the need for long-term care services.  How
6   does Mutual of Omaha do that?
7       A.  Underwriting reviews an application,
8   interview, and medical records to determine the
9   health of the applicant and if any of those health
10  conditions are likely to result in impairment in
11  activities of daily living or cognitive impairment.
12      Q.  Now, just so I'm understanding you, based
13  on the medical impairments section of the
14  underwriting guide we were just looking at, it's
15  correct, is it, that Mutual of Omaha provides
16  long-term care insurance to people who have some
17  risk of developing complications from a health
18  condition; is that right?
19          MR. MAGRATTEN:  Objection to form.
20          THE WITNESS:  It depends upon the
21  specific case.  We have to underwrite each case
22  individually.
23  BY MR. KLEIN:
24      Q.  And you're guided in doing that by the
25  underwriting guide; correct?
```

Page 168

1    MR. MAGRATTEN: Same objection.
2    THE WITNESS: The individual with HIV
3  is uninsurable.
4  BY MR. KLEIN:
5    Q.  Okay.  Based on your experience and
6  education as a long-term care insurance underwriter,
7  do you believe that the risk assessment of someone
8  with HIV is the equivalent of the risk assessment of
9  someone without HIV who uses PrEP?
10    MR. MAGRATTEN: Objection:
11  Hypothetical question.  Seeks expert opinion.
12    THE WITNESS: Can you break that down
13  for me?
14  BY MR. KLEIN:
15    Q.  Sure.
16    What I'm asking is you exclude people with
17  HIV from long-term care insurance; correct?
18    A.  Correct.
19    Q.  And you also exclude people who take PrEP
20  but do not currently have HIV disease from long-term
21  care insurance; correct?
22    A.  Correct.
23    Q.  Okay.  And I'm asking you how do you
24  compare the risk from a long-term care insurance
25  risk perspective of someone who has HIV and someone

Page 169

1  who doesn't have HIV but is on PrEP?
2    MR. MAGRATTEN: Objection:
3  Hypothetical question.  Seeks expert opinion.
4    THE WITNESS: Both are uninsurable.
5  BY MR. KLEIN:
6    Q.  Is one a greater risk than the other?
7    MR. MAGRATTEN: Same objections.
8    THE WITNESS: The individual who is
9  on PrEP has been deemed to be at a high risk of
10  acquiring HIV.  So if they acquire HIV, then, yes,
11  the risk is the same.
12  BY MR. KLEIN:
13    Q.  Okay.  So you -- for all intents and
14  purposes, for long-term care insurance underwriting
15  you deem a person who is on PrEP as the same risk as
16  someone who has HIV disease; is that correct?
17    MR. MAGRATTEN: Objection: Seeks --
18  a hypothetical question.  Seeks expert opinion.
19    THE WITNESS: We deem the person on
20  PrEP to be an uninsurable risk.  We deem the person
21  with HIV to be an uninsurable risk.
22  BY MR. KLEIN:
23    Q.  Okay.
24    MR. MAGRATTEN: Do you want a few
25  minutes to go through your notes?

Page 170

1    MR. KLEIN: I don't need that.
2    MR. MAGRATTEN: Okay.
3    MR. KLEIN: I mean, I'm going to take
4  about 30 seconds.  But I'm not close to the end.
5    MR. MAGRATTEN: Okay.
6    MR. KLEIN: But making progress.
7    MR. MAGRATTEN: Okay.  How are you
8  doing?  Do you want a break?
9    THE WITNESS: No.  I'm all right.
10    MR. KLEIN: Yeah.  When --
11    THE WITNESS: You want one?
12    MR. MAGRATTEN: No.  That's all
13  right.
14  BY MR. KLEIN:
15    Q.  Whenever you want a break, please let me
16  know because I understand it's a long day for you.
17  So just say the word anytime.
18    A.  I'm good.
19    Q.  Okay.  Now, I think you testified at some
20  point that an underwriting assessment can include
21  additional research regarding a health condition; is
22  that correct?
23    A.  If the underwriter is not familiar with
24  the health condition, they need to look it up, yes.
25    Q.  Okay.  And at the time of Doe's

Page 171

1  application, did any person in Mutual's underwriting
2  department do additional research regarding Truvada
3  as PrEP?
4    A.  The medication was listed as uninsurable;
5  so the underwriter correctly followed the guidelines
6  and declined the application.
7    Q.  Okay.  So they didn't do any additional
8  research at that time?
9    A.  No.
10    Q.  Okay.  And at the time of Doe's
11  application in 2015, did the underwriting -- did
12  anybody involved in the underwriting of Mutual of
13  Omaha do additional research with regard to the
14  prospects of somebody newly diagnosed with HIV?
15    MR. MAGRATTEN: Objection to form.
16    THE WITNESS: The condition was
17  listed as uninsurable.  No additional research was
18  warranted.
19  BY MR. KLEIN:
20    Q.  Okay.  Now, I would like to ask you some
21  questions now about the -- and -- and you've
22  answered some of this or you have referred to some
23  of this, let me say, about the steps that Mutual
24  takes to evaluate a long-term care insurance
25  application, particularly in -- at the time of Doe's

Page 172

1   application in 2015.
2       And could you turn to page 46 of the
3   underwriting manual?  And do you see on that page it
4   says "Underwriting Requirements"?  Do you see that
5   heading?
6       A.  Yes.
7       Q.  All right.  And below that there are boxes
8   that list four things:  Pharmaceutical check,
9   medical records, personal health interview,
10  cognitive assessment.
11      Is that the -- are those the complete
12  steps of medical underwriting for a long-term care
13  insurance applicant in 2015?
14          MR. MAGRATTEN:  Objection to form.
15          THE WITNESS:  At the time of the
16  underwriting of Doe's application, those were the
17  steps that were taken in an individual case.  If it
18  appears to be missing information or the underwriter
19  needs additional information, they would request
20  additional information.
21  BY MR. KLEIN:
22      Q.  And do you mean like -- well, we'll hold
23  that for a moment.  All right.
24      So what is the pharmaceutical check?
25      A.  It's a query of a database for

Page 173

1   prescription fills for an applicant.
2       Q.  And is that something that an applicant
3   fills out in a form authorizing Mutual of Omaha to
4   check?
5       A.  It's included on the authorization that
6   they sign.
7       Q.  Okay.  And is it -- is it a database that
8   includes prescription fills from, like, all
9   pharmacies?
10      A.  It only includes prescription fills from
11  participating pharmacies.
12      Q.  Okay.  And is CVS one of the participating
13  pharmacies?
14      A.  I don't know.
15      Q.  Okay.  And why do you do a
16  prescription check -- a pharmaceutical check?
17      A.  In the event that there is health that the
18  client did not disclose to us.
19      Q.  I'm sorry.  I didn't quite hear you.  In
20  the event what?
21      A.  In the event there is health or
22  medications that the client did not disclose to us.
23      Q.  Okay.  And did you do a pharmaceutical
24  check for Doe?
25      A.  I would have to look at the actual file.

Page 174

1   But it's automatically ordered at the time the
2   application is entered; so I would have to say that
3   I would think so, yes.
4       Q.  Okay.  Do you know what -- you don't know
5   any of the pharmacies that participate in the
6   pharmaceutical check database?
7       A.  I do not.
8       Q.  Okay.  Who would know that?
9       A.  The vendor who has the pharmaceutical
10  database might know.
11      Q.  Nobody at Mutual of Omaha has that
12  information?
13      A.  There is nothing on the information that
14  we get back that lists the pharmacy.
15      Q.  Okay.  And the second section says
16  "medical records" and "all applicants."  And what
17  does that entail?
18      A.  We obtain records from the primary care
19  physician listed on the application.  If there are
20  specialist physicians, we may also request those
21  medical records.
22      Q.  Okay.  And do you know if that was done in
23  Doe's case?
24      A.  We ordered medical records for him, yes.
25      Q.  Okay.  And did you receive those?

Page 175

1       A.  We received medical records.  I don't know
2   if it's his complete medical record.
3       Q.  Okay.  And then the next category is
4   called "personal health interview," and it says
5   telephone, ages 30 to 64.  Face-to-face, ages 65 to
6   79.
7       What is the purpose of a personal health
8   interview?
9       A.  Applicants don't always give all of their
10  health to an agent during the application.
11  Sometimes they are more forthcoming during an
12  interview.
13      Q.  So some of the questions you ask in the
14  personal health interview are the same questions
15  that are asked on the application; is that correct?
16      A.  Not exactly.  The questions asked on the
17  health interview are asking do you have this
18  condition.  They are not going to be worded the same
19  as they are on the application.
20      Q.  All right.  And during the personal health
21  interview as it was conducted in 2015, does the
22  interviewer ask the applicant what medications they
23  are on?
24      A.  Yes.
25      Q.  And what is the purpose of asking the

Page 200

1  Exhibit 10?
2      A.  Not in this format and not all of this.
3  The underwriting notes would have been available to
4  me in our underwriting file.
5      Q.  Okay.  And have you -- have you
6  reviewed -- so this is -- is it accurate to say --
7  this document was also produced by Mutual of Omaha
8  to the defendant.  Is it fair to say that this is a
9  collection of notes made by various Mutual of Omaha
10 personnel in the context of underwriting Doe's
11 application?
12     A.  Underwriting doesn't have access to call
13 logs.  We can't see that information; so I can't
14 speak to that.  Anything that's in regard to
15 underwriting notes, then, yes.
16     Q.  What -- what are -- what are call logs?
17     A.  The customer service representatives at
18 LTCG field calls.
19     Q.  Okay.  So this document includes call
20 logs.  Does it also include underwriting notes?
21     A.  The first entry says "call logs"; so the
22 first two entries appear to be from call logs.
23 Anything that's identified as "green note pad entry"
24 would be something that underwriting could see or
25 created.

Page 201

1      Q.  Okay.  Did you -- all right.
2          Well, let's -- let me just -- after Doe's
3  application was denied, he appealed; is that
4  correct?
5      A.  Yes.
6      Q.  And did you handle the review of his
7  appeal?
8      A.  Yes.
9      Q.  All right.  And you made the decision to
10 uphold the denial?
11     A.  Correct.
12     Q.  All right.  And when you were -- were --
13 when you were handling the appeal, what information
14 did you look at?
15     A.  The application, pharmaceutical check,
16 interview, and medical records and the initial
17 decline letter and the underwriter's notes.
18     Q.  Did you also review Doe's appeal letter?
19     A.  Yes.
20     Q.  All right.  And you reviewed the
21 underwriting notes that are contained in Exhibit 10?
22     A.  Yes.
23     Q.  Okay.  At the time that you undertook a
24 review of Doe's appeal, did you do any further
25 research into -- into the medical literature about

Page 202

1  PrEP?
2      A.  No.
3      Q.  Okay.  What was your basis for upholding
4  the denial of Doe's application?
5      A.  He's taking Truvada, and we do not insure
6  anyone who takes Truvada.
7      Q.  Okay.  Okay.
8          Turning -- now, these pages are not
9  numbered; so I will do my best to designate them.
10 But turning to the second page of Exhibit 10, there
11 is a reference to a person named Aymie Fransen.  Do
12 you see that?
13     A.  Yes.
14     Q.  Do you know who she is?
15     A.  Yes.
16     Q.  Who is she?
17     A.  She is a case manager.  She is an employee
18 of LTCG.
19     Q.  So she is not employed by Mutual of Omaha?
20     A.  She's an employee of LTCG who does work
21 for Mutual of Omaha cases.
22     Q.  Okay.  Now, you see below this that there
23 are certain designations -- there are certain --
24 there seem to be certain notes about Doe's medical
25 history.  What does "LOV 5/14 routine" refer to, if

Page 203

1  you know?
2      A.  Last office visit May 2014 for routine
3  exam.
4      Q.  Okay.  And what about "Last cpe/cmp 5/14"?
5      A.  Last complete physical exam/complete
6  metabolic panel, May 2014.
7      Q.  Okay.  And below that there is a list of
8  various medications -- Ambien and Lorazepam for
9  sleep aid, Atorvastatin for cholesterol, and
10 testosterone.  Where would that information have
11 been obtained?
12     A.  The application.
13     Q.  All right.  And were any of those -- did
14 any -- were any of those medications grounds for
15 exclusion?
16     A.  No.
17     Q.  Okay.  And then it says "Health:  Lyme's
18 2011."  Where would that have been obtained?
19     A.  The application.
20     Q.  Okay.  And then it -- a few lines below it
21 says "select."  Do you see that -- that line?
22     A.  Yes.
23     Q.  What does that mean?  What is that
24 referring to?
25     A.  The rating class that he applied for.

# Exhibit O

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE,                    )
     Plaintiff        )
                )
v.                           )
                )       No. 1:16-cv-11381-GAO
MUTUAL OF OMAHA              )
INSURANCE COMPANY,           )
     Defendant         )
                )

### DEFENDANT MUTUAL OF OMAHA INSURANCE COMPANY'S RESPONSES TO PLAINTIFF JOHN DOE'S FIRST SET OF INTERROGATORIES

Defendant Mutual of Omaha Insurance Company responds to Plaintiff's First Set of Interrogatories as follows:

### GENERAL OBJECTIONS

Defendant  Mutual of Omaha Insurance Company objects generally to Plaintiff's First Set of Interrogatories on the following grounds:

A.  Defendant objects to each interrogatory to the extent that it seeks to have Defendant answer on behalf of entities other than itself, or on behalf of agents or employees of other entities. Accordingly, Defendant construes these interrogatories to only refer to the Defendant, and Defendant gives the answers below solely on its behalf.

B. Defendant objects to the extent Plaintiff's interrogatories are overly broad, unduly burdensome, vague, ambiguous, disproportionate to the needs of the case and otherwise beyond the scope of permissible discovery.

C.  Defendant objects to the interrogatories to the extent the information requested is protected from disclosure by the attorney-client privilege, the work product doctrine or any other

**084**

2015 of the medical, scientific, or underwriting basis for Mutual's exclusion from long-term care insurance of HIV-negative individuals who take Truvada as prevention for HIV.

Answer:  See response to Interrogatory no. 7.

9. Identify the names, job titles, credentials, and addresses of all individuals whom Mutual consulted with or communicated with in the process of its decision to exclude from long-term care insurance individuals who are HIV-negative and are taking the medication Truvada as prevention for HIV.

Answer:  Objection.   Plaintiff's interrogatory is overly broad, vague and not relevant or proportional to the case.   Without waiving the general or specific objections asserted, Mutual of Omaha responds that Mutual of Omaha communicated its underwriting policies to Reinsurance Group of America, a reinsurer.

10. Please state the basis for Mutual's decision to designate Truvada when taken as prevention for HIV by HIV-negative individuals as an uninsurable medication and grounds for disqualification for receiving long-term care insurance.

Answer:  Mutual of Omaha initially designated Truvada as an uninsurable medication when the drug had been approved for treatment of HIV positive individuals.  The basis for that decision was the fact that HIV positive individuals are likely to have a higher claim experience than HIV negative individuals.  Although Truvada was later approved for use as part of an HIV prophylaxis protocol for individuals at increased risk for acquiring HIV infection, Truvada use does not eliminate the risk of acquiring HIV infection.  Further, studies have indicated a potentially significant incidence of sub-optimal compliance (or non-compliance) with HIV prophylaxis protocol guidelines among protocol participants.

Answer: Objection. Plaintiff's interrogatory is overly broad, vague and not relevant or proportional to the case. Without waiving the general or specific objections asserted, Mutual of Omaha responds: Mutual of Omaha received and reviewed Plaintiff's application. It then requested medical records from Plaintiff's healthcare providers. It conducted an interview of the Plaintiff by telephone. It then denied the application due to Plaintiff's Truvada prescription.

18. If Doe had not been taking Truvada as prevention for HIV, would Mutual have issued to him the long-term care insurance policy that he applied for?

Answer: Yes.

19. Identify and describe all communications, written oral (including memoranda, notes, emails or other documents), concerning Mutual's consideration of Doe's application for long-term care insurance and/or its decision to deny long-term care insurance to Doe.

Answer: See Mutual of Omaha's Rule 26(a)(1) disclosures.

20. Please state the name and current home address of every person Mutual intends to call as a witness in this case and that person's anticipated testimony.

Answer: Objection. Plaintiff's interrogatory seeks information protected by the attorney work product privilege. Mutual of Omaha will disclose its trial witnesses in accordance with the Court's pretrial requirements.

As to Objections:

Brooks Magratten, Esq.
Pierce Atwood LLP
72 Pine Street, Suite 500
Providence, RI 02903
401.490.3422
401.588.5166 (fax)
bmagratten@pierceatwood.com

# Exhibit P

```
 1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
 2
       JOHN DOE,                 ) C.A. NO. 1:16-CV-11381-GAO
 3                               )
                PLAINTIFF,       ) DEPOSITION OF
 4                               ) MICHAEL WILKINS, M.D.
           VS.                   )
 5                               )
       MUTUAL OF OMAHA           )
 6     INSURANCE COMPANY,        )
                                 )
 7                DEFENDANT.     )

 8     - - - - - - - - - - - - -

 9                    DEPOSITION OF MICHAEL WILKINS, M.D., taken

10     before Morgan M. Catania, RPR, CSR(IA), General

11     Notary Public within and for the State of Nebraska,

12     beginning at 9:24 a.m., on July 20, 2017, at

13     Thomas & Thomas Court Reporters & Certified Legal

14     Video, LLC, 1321 Jones Street, Omaha, Nebraska.

15

16

17

18

19

20

21

22

23

24

25
```

Thomas & Thomas Court Reporters                1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                 Tel: (402) 556-5000 | Fax: (402) 556-2037

088

Michael Wilkins, MD
7/20/2017

22 (76 - 79)

Page 76

1 equal, or more. It's unknown.
2 BY MR. KLEIN:
3     Q.   Okay.  Forgive me if I've asked this.
4 Just asking a couple of final questions in this area
5 and I can't remember if I asked this.
6         As medical director for long-term care
7 insurance, is it your view that the risk of claims
8 for a person with HIV diagnosed in 2015 whose
9 condition is controlled on medication is greater
10 than the risk of claims for all of the medical
11 impairments listed in the underwriting guidelines
12 that Mutual does offer insurance for?
13         MR. MAGRATTEN:  Objection:  Seeks
14 expert opinion, hypothetical question, and asked and
15 answered.
16         THE WITNESS:  Pardon?
17         MR. MAGRATTEN:  Asked and answered.
18 BY MR. KLEIN:
19     Q.   You can go ahead and answer.
20     A.   It's -- it's unknown.
21     Q.   All right.  And as medical director for
22 long-term care insurance for Mutual of Omaha, is it
23 your view that the risk of claims for someone who is
24 HIV negative and on PrEP is greater than the risk of
25 claims for all of the medical impairments that

Page 77

1 Mutual of Omaha insures?
2     A.   Still unknown.
3         MR. MAGRATTEN:  Same objections.
4         THE WITNESS:  Still unknown.
5 BY MR. KLEIN:
6     Q.   Okay.  Now, we've been reviewing the
7 underwriting guidelines that have underwriting
8 factors or criteria for the insurability of various
9 medical impairments; is that correct?
10     A.   Yes.
11     Q.   All right.  And as medical director for
12 long-term care insurance of Mutual of Omaha, are
13 there any criteria that you believe could be
14 established for coverage of a person diagnosed with
15 HIV in 2015 that would be acceptable to Mutual of
16 Omaha?
17         MR. MAGRATTEN:  Objection:  Seeks
18 expert conclusion.  Hypothetical question.
19 Objection to form.
20         THE WITNESS:  I don't know.  I don't
21 know.
22 BY MR. KLEIN:
23     Q.   You don't know?
24     A.   No.
25     Q.   You don't know if any such criteria could

Page 78

1 be developed?
2         MR. MAGRATTEN:  Objection.
3         THE WITNESS:  No.
4 BY MR. KLEIN:
5     Q.   Okay.  Are you familiar with the
6 medication Truvada?
7     A.   Yes.
8     Q.   What is it?
9     A.   It's an HIV drug antiviral.
10     Q.   Okay.  And what are its uses?
11     A.   It's used for treating HIV-infected
12 persons and can be used as a pre-exposure
13 prophylactic treatment.
14     Q.   All right.  And what is Mutual of Omaha --
15 what is Mutual of Omaha's policy with respect to
16 applicants for long-term care insurance who take
17 Truvada as PrEP in the years 2014 and '15?
18     A.   They are declined.
19     Q.   Okay.  And are there any exceptions to
20 that policy?
21     A.   No.
22     Q.   Doesn't matter why someone is on PrEP?
23     A.   No.
24     Q.   All right.  And what are the reasons that
25 Mutual of Omaha excludes from long-term care --

Page 79

1 strike that.
2         MR. KLEIN:  Can we go off the record
3 for just one second?
4         (Discussion had off the record.)
5         (11:33 a.m. - Recess taken.)

Thomas & Thomas Court Reporters
and Certified Legal Video, LLC

1321 Jones Street, Omaha, NE 68102
Tel: (402) 556-5000 | Fax: (402) 556-2037

Page 80

1    (At 11:44 a.m., with all the parties
2 present as before, the following proceedings were
3 had, to-wit:)
4 BY MR. KLEIN:
5    Q.   When did Mutual of Omaha long-term care
6 insurance designate Truvada as PrEP as a unsurable
7 medication?
8    A.   Truvada in general, I think, has been
9 uninsurable since at least 2008.
10   Q.   Okay.  When PrEP -- and what was the
11 process by which Truvada was placed on the
12 uninsurable medication list in 2008?
13   A.   The drug database, the prescription
14 checking I think was started then, and it was on the
15 list when it -- when it came through at that time.
16   Q.   Are you referring to a drug database
17 maintained by Milliman?
18   A.   Yes.
19   Q.   And what is Milliman?
20   A.   Milliman is a actuarial firm, and they
21 provide a service to the insurance industry with
22 these prescription drug checks.  We call them pharm
23 checks.
24   Q.   Okay.  And Mutual of Omaha began
25 subscribing to that database in 2008?

Page 81

1    A.   I think.  For long-term care.
2    Q.   For long-term care?  Okay.
3    A.   I think -- I think that's the correct
4 date, but I'm -- I don't know that for certain.
5    Q.   All right.  And when -- when a drug is
6 listed as uninsurable by the Milliman subscription
7 database, does Mutual of Omaha do any independent
8 investigation of whether that drug should be on the
9 uninsurable list?
10   A.   They are reviewed.
11   Q.   All right.  And what does the review
12 consist of?
13   A.   Looking at the medication and what it's
14 used for.
15   Q.   Do you also look at the efficacy of the
16 medicine?
17       MR. MAGRATTEN:  Objection to form.
18       THE WITNESS:  I don't know.
19 BY MR. KLEIN:
20   Q.   Who reviews the drug reports from
21 Milliman?
22   A.   The underwriting management team.
23   Q.   Does -- does -- do the medical directors
24 have any role in that?
25   A.   They will -- they will run it -- run it,

Page 82

1 you know, have us review it to see if there is -- if
2 it looks like it's satisfactory.
3    Q.   All right.  Is that true with every
4 medication that's placed on the uninsurable list?
5       MR. MAGRATTEN:  Objection to form.
6       THE WITNESS:  Yeah.  I think at --
7 over -- since 19 -- or since 2008 those have all
8 been looked at, yes.
9 BY MR. KLEIN:
10   Q.   All right.  And do you as medical director
11 participate in the review of the Milliman
12 recommendations?
13   A.   The -- well, like I say, the list -- we --
14 they bring it to us to look at when there are
15 revisions.
16   Q.   All right.  And you're saying that they
17 are reviewed, and one of the things you look at is
18 the medication use; is that correct?
19   A.   Yes.
20   Q.   All right.  And do you also look at the
21 efficacy of the medication for its intended purpose?
22   A.   We don't drill down to the -- I'd say we
23 look at the -- the prescribed indication for that
24 medication.
25   Q.   Okay.  Okay.

Page 83

1       Now, do you know when Truvada was approved
2 for use as PrEP in HIV negative people?
3    A.   I believe 2012.
4    Q.   Okay.  And did -- did you receive any
5 information from Milliman in 2012 or thereafter
6 about the use of Truvada as PrEP?
7    A.   No.
8    Q.   Okay.  And is it also fair to say, then,
9 that -- well, strike that.
10       After Truvada was -- was approved for use
11 in HIV negative people as PrEP, was there any review
12 of it being placed on the uninsurable list for use
13 as PrEP?
14   A.   No.
15   Q.   Did you -- do you know who Lisa Ging is?
16   A.   Yes.
17   Q.   Did you ever have a conversation with
18 Lisa Ging about the use of Truvada as PrEP?
19   A.   I don't recall.
20   Q.   You don't recall ever speaking to her
21 about that?  You don't recall her ever coming to you
22 and saying --
23   A.   It may have been a --
24       MR. MAGRATTEN:  Objection to form.
25

Michael Wilkins, MD
7/20/2017

27 (96 - 99)

Page 96

1    MR. MAGRATTEN: Objection to form.
2        THE WITNESS: Well, that's -- that's
3  what underwriting is. You're comparing risk groups.
4  BY MR. KLEIN:
5    Q. Okay.
6    A. Not individuals. You're comparing risk
7  groups.
8    Q. Okay. So a risk group for a -- so when
9  you say you're comparing groups, you mean groups of
10 people with diagnoses?
11       MR. MAGRATTEN: Objection to form.
12       THE WITNESS: With -- yeah. With
13 medical diagnoses.
14 BY MR. KLEIN:
15   Q. Okay. And so are people who have medical
16 diagnoses that present the same risk of needing
17 long-term services supposed to be treated alike?
18       MR. MAGRATTEN: Objection to form.
19       THE WITNESS: They are treated
20 according to their risk classification.
21 BY MR. KLEIN:
22   Q. Okay. But let's say people who are --
23 people who are categorized as the select risk, let's
24 say. Are all people with other conditions who also
25 meet the criteria of -- let me strike that question.

Page 97

1        People who meet the criteria for select
2  risk present a -- they are presenting a standard
3  risk for long-term care insurance; is that correct?
4        MR. MAGRATTEN: Objection to form.
5        THE WITNESS: If they are deemed
6  standard based on the underwriting criteria, then
7  their policy will be issued and their -- you know,
8  the renumeration fits a standard rate for their
9  gender and their age and the criteria that are used
10 to classify risk.
11 BY MR. KLEIN:
12   Q. And do you know what criteria are used to
13 classify someone as a select risk as opposed to,
14 say, a Class I risk?
15   A. Depends on the impairment.
16   Q. Okay. So people with the same impairment
17 may -- one may have a greater risk than the other?
18   A. Correct.
19   Q. All right. And what is the reason for
20 having different risk classifications?
21   A. It's the basis of insurance, underwriting.
22 Everybody's risk isn't the same based on different
23 factors, one of them being medical history. And the
24 job in underwriting is to assess that risk and
25 decide is it a standard risk? Is it a

Page 98

1  better-than-standard risk? Is it a standard risk
2  that can be issued with, you know, certain
3  restrictions or criteria, or is it a risk that is
4  unacceptable? And that's basically what
5  underwriting does.
6  BY MR. KLEIN:
7    Q. But if it's determined that they have the
8  same risk, then they get the same underwriting
9  classification; is that right?
10       MR. MAGRATTEN: Objection to form.
11       THE WITNESS: Well, it's based on not
12 just medical history; so, I mean...
13 BY MR. KLEIN:
14   Q. But if the overall assessment of risk for
15 needing long-term care is the same, they should be
16 receiving the same rate classification; is that
17 right?
18       MR. MAGRATTEN: Objection to form.
19       THE WITNESS: Yes.
20 BY MR. KLEIN:
21   Q. Okay. And in long-term care insurance
22 underwriting, are comparable risks treated alike
23 with regard to premiums?
24       MR. MAGRATTEN: Objection to form.
25       THE WITNESS: Like I say, it's based

Page 99

1  on gender, age, and then medical history. Those are
2  the ones that I basically deal with.
3  BY MR. KLEIN:
4    Q. Those are the ones that -- those are the
5  factors that determine premiums?
6    A. I don't know if those are all of the
7  factors. Those are the factors that -- that I'm
8  aware of.
9    Q. Okay. And if somebody -- if -- based on
10 those factors, if two different people present a
11 comparable risk, do they pay the same premium?
12       MR. MAGRATTEN: Objection: Asked and
13 answered.
14       THE WITNESS: I thought I answered
15 that.
16 BY MR. KLEIN:
17   Q. Okay. I may have misunderstood. Okay.
18 That's fine.
19       Prior to the advent of PrEP, did Mutual of
20 Omaha long-term care insurance attempt to assess an
21 HIV negative -- an HIV negative person's risk of
22 becoming HIV positive in its insurance underwriting?
23       MR. MAGRATTEN: Objection to form.
24       THE WITNESS: No, I don't think so.
25

# Exhibit Q

# In The Matter Of:

*John Doe  v.*

*Mutual of Omaha Insurance Company*

---

*Allen Schmitz*

*April 24, 2018*

---

*68 Commercial Wharf • Boston, MA 02110*

*888.825.3376 - 617.399.0130*

*Global Coverage*

*court-reporting.com*



Original File Allen Schmitz 4-24-18.txt

Min-U-Script® with Word Index

John Doe　v.
Mutual of Omaha Insurance Company

Allen Schmitz
April 24, 2018

---

Page 33

1　　page, on page seven, the bottom of that page talks
2　about the letter from Mark Pogue and the things noted
3　in that letter and reviewing the underwriting
4　guidelines that Mutual of Omaha has published, a
5　combination of those items.
6 Q　So you relied on a document prepared by Mutual of
7　　Omaha's attorneys submitted to the Massachusetts
8　　Commission Against Discrimination; is that correct?
9 A　One of the things, yes.
10 Q　And the other thing was their underwriting
11　　guidelines?
12 A　Yes.
13 Q　Is there anything else you relied upon to make that
14　　conclusion that you saw no evidence of bias or intent
15　　to discriminate against homosexual men?
16 A　Those are the primary items. The other is just
17　knowing the company and what they do and stand for
18　so ...
19 Q　Okay. When you use the phrase intent to discriminate
20　　in that sentence, what do you mean by that?
21 A　Which sentence? On page eight?
22 Q　In the sentence I just read on page eight. The last
23　　sentence of the first paragraph, I see no evidence
24　　that Mutual of Omaha's underwriting policy with
25　　respect to Truvada is motivated by a bias or intent

---

Page 34

1　　to discriminate against homosexual men.
2　　　What do you mean by the phrase "intent to
3　　discriminate?"
4 A　Intending to not accept coverage to homosexual men.
5 Q　And you have no legal training as I understand?
6　　　MR. MAGRATTEN: I'm sorry, could you repeat
7　　that question.
8　　　(Previous question read by the reporter.)
9　　　THE WITNESS: Correct.
10 BY MR. KLEIN:
11 Q　Now, directing your attention to page one of your
12　report you -- in the first sentence you wrote, I have
13　been retained by Mutual of Omaha Insurance Company to
14　review the actuarial and underwriting considerations
15　associated with the case John Doe versus Mutual of
16　Omaha Insurance Company and render an opinion as to
17　whether Mutual of Omaha's underwriting guidelines are
18　reasonable with respect to Truvada.
19　　　Do you see that sentence?
20 A　Yes.
21 Q　What do you mean by the word "reasonable"?
22 A　That there was a reasonable approach to how you
23　underwrite individuals who are taking Truvada and the
24　underwriting decisions that are made.
25 Q　But what do you mean by reasonable approach? What

---

Page 35

1　　constitutes a reasonable approach as you use that
2　　word in the sentence?
3　　　MR. MAGRATTEN: Objection.
4　　　THE WITNESS: That it's actuarially
5　　appropriate.
6 BY MR. KLEIN:
7 Q　And why is the exclusion of otherwise qualified
8　　people who take Truvada as PrEP actuarially
9　　appropriate in your expert opinion?
10 A　Because the -- excluding individuals who take
11　Truvada -- Truvada is associated with HIV. It was
12　unknown -- it was -- at the time what the impact of
13　Truvada would be, what the risks were. And it was
14　the expert opinion of the underwriter at Mutual of
15　Omaha to exclude it.
16　　　It also had potential to be higher risk in
17　that it was something other carriers were not doing,
18　would not have been consistent with the industry and
19　had the potential to therefore expose Mutual of Omaha
20　to greater risk. And long-term care insurance, you
21　know, as an industry has had many difficulties. And
22　not opening up to new, potential risks is something I
23　think that is -- many companies look at as prudent
24　given the financial state.
25 Q　So you refer in your answer just now to it's unknown

---

Page 36

1　　what the impact of Truvada would be. What do you
2　　mean by that?
3 A　That --
4 Q　What are you referring to?
5 A　That Truvada is a drug associated with HIV, and that
6　has the potential -- and HIV is a risk that long-term
7　care insurers want to avoid.
8 Q　What do you mean when you say it's associated with
9　　HIV? What do you mean by that?
10 A　Well, as you mentioned earlier, it can be taken by
11　individuals who have HIV or taken as PrEP. And taken
12　as PrEP it's still a concern about the efficacy of
13　the drug, particularly with respect to some of the
14　adherence issues as well as just the newness -- at
15　least potential newness at the time of underwriting.
16 Q　If you have two similarly situated individuals with
17　identical sexual practices, one person takes Truvada
18　as PrEP and the other does not, which one presents
19　the highest risk from an actuarial standpoint?
20　　　MR. MAGRATTEN: Objection.
21　　　THE WITNESS: I don't know that that's an
22　　actuarial type of question, but the -- but as you
23　　described the two, the -- the -- I think a lot of the
24　　data is unknown for sure, but based on what I've
25　　read, it feels like the individual who is not taking

---

John Doe v.
Mutual of Omaha Insurance Company

Allen Schmitz
April 24, 2018

Page 37

1  PrEP is higher risk.
2  BY MR. KLEIN:
3  Q  Higher risk for HIV?
4  A  Yes.
5  Q  Now, you also reviewed -- I believe you referred as
6     one of the reasons that this was -- that the denial
7     of insurance to people on PrEP is actuarially
8     appropriate, you refer to -- it unknown what the
9     safety risks of PrEP were; is that correct?
10 A  I don't know if it's safety or just how -- yeah, I
11    think in general what the -- the unknowns around
12    Truvada as PrEP.
13 Q  Are you referring to the unknowns -- what are you
14    referring to, the unknowns around long-term
15    implications or toxicities?
16 A  Yes, the long-term complications of using Truvada as
17    PrEP.
18 Q  From what perspective?
19        MR. MAGRATTEN: Objection.
20        THE WITNESS: From the perspective of does
21    it create additional long-term care risk.
22 BY MR. KLEIN:
23 Q  But what exactly are you talking about with respect
24    to the medication? What would cause additional risks
25    with respect to long-term care that are unknown?

Page 38

1        MR. MAGRATTEN: Objection to form.
2        THE WITNESS: I'm not sure. It could be
3     around how effective it is or adherence issues or
4     there could be other items.
5  BY MR. KLEIN:
6  Q  But you don't know specifically?
7  A  No.
8  Q  Can I direct your attention, please, to page five of
9     your report -- I'm sorry, page four of your report.
10    In page four, section four, you're talking about --
11    it's titled LTC Insurance Background, and it says, As
12    carriers exited the market, those that remained
13    attempted to improve the profitability of new sales
14    and made their underwriting guidelines more
15    restrictive.
16        And how did those insurers make their
17    underwriting guidelines more restrictive?
18        MR. MAGRATTEN: Ben, is that the third
19    paragraph of that page?
20 BY MR. KLEIN:
21 Q  Yes, the third paragraph, the next to last sentence
22    of the third paragraph.
23 A  Okay. I'm just finding the sentence, sorry. So they
24    made them more restrictive by making them -- making
25    it more difficult, if you will, to qualify for

Page 39

1     long-term care insurance, so they may -- for example,
2     maybe they tighten up the waiting period after a
3     stroke before they would accept somebody. Or maybe
4     they tighten up the level of cognitive screening that
5     they do on an individual. And so there is a number
6     of things that have been done over time to tighten up
7     or make more restrictive the level of underwriting.
8  Q  Is it your testimony that a policy of denying
9     long-term care insurance to PrEP, was one of the
10    things that Mutual of Omaha did to make its
11    underwriting guidelines more restrictive?
12        MR. MAGRATTEN: Objection.
13        THE WITNESS: No.
14 BY MR. KLEIN:
15 Q  When you say restrictive then, are you referring to
16    things that they do insure that they tightened up as
17    you referred to?
18 A  Restrictive in terms of restricting who they will
19    agree to provide coverage for.
20 Q  Can you provide me some examples?
21 A  Well, I'll give the one on the stroke. There's
22    some -- perhaps the cognitive screening issues, doing
23    more intensive cognitive screening, doing more
24    face-to-face interviews rather than over-the-phone.
25    Doing more in terms of the number of specific

Page 40

1     conditions, say, with respect to depression or with
2     respect to diabetes. So there are a number of things
3     that I think have tightened over time.
4  Q  But Mutual of Omaha does not exclude people with
5     depression, are you aware of that?
6  A  Yes.
7  Q  And they don't exclude people with diabetes, are you
8     aware of that?
9  A  Yes.
10 Q  So to your knowledge has Mutual of Omaha -- when you
11    made -- when you wrote the sentence on page four of
12    your report with respect to more restrictive
13    underwriting guidelines, did Mutual of Omaha engage
14    in that practice to your knowledge?
15 A  I'm not sure.
16 Q  You're not sure. So you're not sure whether your
17    sentence about long-term carriers attempted to
18    improve the profitability of new sales and made their
19    underwriting guidelines more restrictive, you're not
20    sure whether that sentence applies to Mutual of
21    Omaha?
22 A  It applies to the industry in general, but I am not
23    sure specifically for Mutual of Omaha.
24 Q  Okay. Turning to page five of your expert report --
25    I'm sorry, where am I here? Yeah, I'm sorry, turning

John Doe  v.                                                      Allen Schmitz
Mutual of Omaha Insurance Company                                 April 24, 2018

Page 49

1  Q    Is it a fair statement that applicants of the same
2       risk should be given the same rate classification?
3  A    Yes. I would only say that sometimes there are
4       comorbidities, so without a given potential
5       comorbidity, the base case might be the same risk but
6       one may have, you know, something else that reacts,
7       and so you need to take all of that into account.
8  Q    But other than comorbidity as a general principal, it
9       is correct that applicants of the same risk should be
10      categorized similarly?
11 A    Yes.
12 Q    And would it also follow from that that an applicant
13      of lesser risk should not be categorized adversely to
14      an applicant of higher risk?
15            MR. MAGRATTEN: Objection.
16            THE WITNESS: Generally, yes.
17 BY MR. KLEIN:
18 Q    If I can have you turn to page seven of your report.
19 A    (Witness complies.)
20 Q    In the third full paragraph, last sentence, you say,
21      Studies have shown a significant degree of
22      nonadherence by individuals taking PrEP.
23            Do you see that sentence, and there's a
24      footnote five there?
25 A    Yes.

Page 50

1  Q    And are the studies in footnote five of your report
2       what you're relying on for your opinion about
3       nonadherence?
4  A    Generally, yes.
5  Q    Is there anything else you're relying on?
6  A    No, other than -- I mean those are the primary
7       studies. I think there were others that I reviewed.
8  Q    All right. In the first one that is an article by
9       Grant from the New England Journal of Medicine in
10      2010; is that correct?
11 A    Yes.
12 Q    Did you read that study?
13 A    I did read at least most of it, yes.
14 Q    Did you understand it?
15 A    Generally.
16 Q    Was there material in the study paper that you cited
17      that you did not understand?
18 A    Not that I recall, no.
19 Q    All right. What was the study design or objective of
20      the Grant 2010 article?
21 A    I don't recall.
22 Q    You don't recall, okay. Would the study design or
23      objective be important to the conclusions you draw
24      from a scientific study?
25            MR. MAGRATTEN: Objection.

Page 51

1             THE WITNESS: Perhaps, yes.
2  BY MR. KLEIN:
3  Q    What specifically in this study were you relying on
4       for your opinion about the degree of nonadherence
5       among PrEP users?
6  A    I don't recall.
7  Q    Was your -- I take it it's correct that you read this
8       article and concluded that there were PrEP users who
9       were not adherent to the medication; is that correct?
10 A    Yes.
11 Q    And was the data you were looking at on an intention
12      to treat or an as-treated basis?
13 A    I don't recall.
14 Q    Do you know what those terms mean?
15 A    No.
16 Q    The next study you cite is a Grant article Lancet
17      Infectious Diseases of 2014; is that correct?
18 A    Yes.
19 Q    And did you read that study?
20 A    Yes.
21 Q    Did you understand it?
22 A    Generally.
23 Q    Was there anything in the Grant Lancet 2014 study
24      that you didn't understand?
25 A    Not that I recall.

Page 52

1  Q    What was the study design or objective of the Grant
2       2014 paper?
3  A    I don't recall.
4  Q    Do you have any specific memory of the kind of data
5       you were looking at to make your conclusion about the
6       non adherence of PrEP users?
7  A    Information about adherence in general.
8  Q    All right. Do you recall anything more specific
9       about the type of data that was presented in this
10      paper that led you to that conclusion?
11 A    I don't.
12 Q    The next item you cite is by Hosek, H-O-S-E-K, from
13      the AIDS Society Conference on HIV Pathogenesis
14      Treatment and Prevention in Vancouver 2015, correct?
15            Do you see that?
16 A    Yes.
17 Q    Did you attend that conference?
18 A    No.
19 Q    So you located the abstract in your research?
20 A    Yes.
21 Q    And what was the design of this study?
22 A    I don't recall.
23 Q    Would that have been important to you in making your
24      conclusions?
25 A    Yes.

John Doe  v.
Mutual of Omaha Insurance Company

Allen Schmitz
April 24, 2018

Page 57

1    coverage offer -- the risk pool offered to long-term
2    care insurance applicants.
3 Q  Are there any other reasons?
4 A  Those are the primary ones that I'm thinking about
5    right now.
6 Q  Now, you testified earlier that one of the ways a
7    long-term care insurer could discriminate is if they
8    excluded people based on their race; is that correct?
9 A  Yes.
10 Q  Let's assume that an insurance company views people
11    of a particular race as an increased risk.  In your
12    view as an actuary, is that discrimination?
13        MR. MAGRATTEN: Objection.
14        THE WITNESS: Part of that depends on your
15    definition of discrimination.
16 BY MR. KLEIN:
17 Q  Well, what is your definition, because you used the
18    word discriminate in your report on page eight.
19 A  As I considered it -- to discriminate here was
20    against homosexual men.  As I considered it in my
21    example about race, it was with respect to illegal
22    discrimination.
23 Q  Okay.  So it would be -- if an insurance company said
24    that people of a particular race were excluded
25    because we regard them as an increased risk, that in

Page 58

1    your view would be discrimination?
2 A  Yes.
3 Q  And would the fact that every surer in the industry
4    did that, change that from illegal to legal
5    discrimination in your view?
6 A  No.
7 Q  So the fact that everybody in the industry does it is
8    not in your view a justification for discrimination?
9        MR. MAGRATTEN: Objection.
10        THE WITNESS: Correct.
11 BY MR. KLEIN:
12 Q  Because the discrimination laws wouldn't mean very
13    much if there were a defense based on everyone else
14    does it; is that right?
15        MR. MAGRATTEN: Objection.
16        THE WITNESS: I suppose.
17 BY MR. KLEIN:
18 Q  Now, is it a fair statement that there's no
19    medication that's 100 percent effective?  Would you
20    agree with that?
21        MR. MAGRATTEN: Objection.
22        THE WITNESS: Probably.
23 BY MR. KLEIN:
24 Q  Is part -- is part of your expert opinion based on
25    your views about the efficacy of PrEP?

Page 59

1 A  A part.
2 Q  What part?
3        MR. MAGRATTEN: Objection.
4        THE WITNESS: Well, to the extent it's not
5    effective and -- against a risk that is considered to
6    be a high risk with respect to long-term care
7    insurance, it's potentially an important part.
8 BY MR. KLEIN:
9 Q  Are you offering in this case, any opinion about the
10    efficacy of PrEP?
11 A  Generally just based on studies that I've read.
12 Q  Have you cited any study in your report that measures
13    the efficacy of PrEP?
14 A  The information from the CDC website.
15 Q  Okay.  But that's not a study.  Are you -- have you
16    yourself read and assessed any studies on the
17    efficacy of PrEP?
18 A  I have.
19 Q  And are they cited in your report?
20 A  No, they were general reading.
21 Q  All right.  What studies are you relying upon for any
22    opinion you may have about the efficacy of PrEP?
23 A  None specifically.  The CDC website.
24 Q  Okay.  So you don't have expertise yourself on
25    assessing the efficacy of PrEP; is that correct?

Page 60

1 A  Correct.
2 Q  And you are not familiar with any studies the CDC may
3    have looked at in making its statement; is that
4    correct?
5 A  Correct.
6 Q  In your view is the efficacy of a medication relevant
7    to whether it should be an excluded medication?
8 A  Potentially.
9 Q  Why do you say potentially?
10 A  It depends.  If it is effective and it's applied to a
11    risk that's not a very high risk, yeah.  If it's a
12    very high-risk condition, it will also be an
13    important part.
14 Q  If PrEP was a hundred percent -- strike that.
15        If PrEP were shown to be 99 percent
16    effective, would efficacy be a grounds to make it an
17    excludable medication?
18        MR. MAGRATTEN: Objection.
19        THE WITNESS: I don't know.
20 BY MR. KLEIN:
21 Q  Why do you answer I don't know?  What would you need
22    to know?
23        MR. MAGRATTEN: Objection.
24        THE WITNESS: If the 1 percent always
25    resulted in a long-term care insurance claim, it's

# Exhibit R

```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2
    JOHN DOE,                ) C.A. NO. 1:16-CV-11381-GAO
 3                           )
             PLAINTIFF,      ) DEPOSITION OF
 4                           ) BRUCE HENRICKS, M.D.
        VS.                  )
 5                           )
    MUTUAL OF OMAHA          )
 6  INSURANCE COMPANY,       )
                             )
 7           DEFENDANT.      )

 8  - - - - - - - - - - - - -

 9           DEPOSITION OF BRUCE HENRICKS, M.D., taken

10  before Morgan M. Catania, RPR, CSR(IA), General

11  Notary Public within and for the State of Nebraska,

12  beginning at 8:25 a.m., on March 29, 2018, at

13  Thomas & Thomas Court Reporters & Certified Legal

14  Video, LLC, 1321 Jones Street, Omaha, Nebraska.

15

16

17

18

19

20

21

22

23

24

25
```

Bruce Henricks, MD                                                    6 (12 - 15)
3/28/2018

Page 12

1  have.  We try to -- you know, there should be
2  correlation between whatever medical condition they
3  have and the medications they're on.  If they're --
4  if they're diabetic, they should be on diabetic
5  medications.  We look for correlation there.  As
6  part of the underwriting process we use a industry
7  wide IntelliScript pharmaceutical database, and we
8  look at their recommendations on how medications are
9  handled.  That's all integrated into our final
10 decision.
11     Q.  Okay.  Are there times when you're
12 reviewing and -- the medical data for an applicant
13 and you see that they are on medications that
14 require ongoing monitoring for side effects?
15     A.  Yes.
16     Q.  Okay.  And what is the importance of --
17 for -- for any medication that requires
18 monitoring -- strike that.
19        For any medication that has potential side
20 effects or toxicities, what is the important of --
21 importance of ongoing monitoring?
22     A.  Well, clinically the importance is that
23 you want to make sure the medication is doing what
24 it should therapeutically and not causing harm to
25 the individual.  And that primary responsibility is

Page 13

1  on the attending physician, and we look for their
2  reaction to the patient's response, and is the
3  patient compliant with follow up.
4     Q.  How do you determine if the patient is
5  compliant -- at the underwriting stage how do you
6  determine if the patient is compliant with follow
7  up?
8     A.  Well, if the physician recommends they
9  come back in three months and they come back in
10 three months, it's -- it's fairy simple.
11     Q.  Okay.  And you would do that by a review
12 of the medical records that are submitted from --
13 that are -- strike that.
14        You would -- you would look at the medical
15 records that are requested by Mutual of Omaha to
16 make that determination?
17     A.  Yes.
18     Q.  Okay.  Now, is there an annual review
19 of -- well, you, I assume, understand that Mutual of
20 Omaha has an underwriting guide for its long-term
21 care insurance; is that correct?
22     A.  I do.  I do.
23     Q.  And those are revised on about an annual
24 basis; is that correct?
25     A.  Roughly.

Page 14

1     Q.  Okay.  And is there a review process that
2  goes on each year with respect to any changes that
3  might be made to the underwriting guide?
4     A.  I can't speak directly to the time frame,
5  that it's contractually a year.  We do it
6  periodically.
7     Q.  Okay.  So there's an underwriting review
8  that takes place?
9     A.  Yes.
10     Q.  All right.  And do you participate in
11 that?
12     A.  We do.  It's referred to us by the
13 underwriting management staff at -- from LTC.  And
14 then it's referred to the medical department which
15 includes my two partners and I.  And then we usually
16 collectively sit down and look at the
17 recommendations both from the underwriting
18 department and what may be there from IntelliScript,
19 and then we make determinations about the
20 applicability.
21     Q.  Okay.  So just so I understand, the
22 underwriting department makes some recommendations
23 about revisions to the underwriting guide; is that
24 correct?
25     A.  Yes.

Page 15

1     Q.  Okay.  And then those would be forwarded
2  to the medical directors for review?
3     A.  Correct.
4     Q.  Okay.  And you're one of those medical
5  directors --
6     A.  I am.
7     Q.  -- who reviews that?
8     A.  Correct.
9     Q.  Okay.  And what -- do the -- do the
10 recommendations sometimes include how to -- whether
11 to include or exclude new medications?
12     A.  Periodically, yes.
13     Q.  Okay.  And so one of your jobs would be to
14 review new medications to determine whether they
15 should be included or excluded in the -- strike
16 that.
17        So is one of your jobs in the underwriting
18 review process to assess new medications?
19     A.  Yes.
20     Q.  All right.  And what do you do to assess
21 new medications?
22     A.  We look at how it's used therapeutically,
23 what its clinical indications are, review its
24 toxicities.  We'll do some literature researches on
25 its applicability in that clinical setting and then

Thomas & Thomas Court Reporters                      1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                      Tel: (402) 556-5000 | Fax: (402) 556-2037

Bruce Henricks, MD
3/28/2018

8 (20 - 23)

Page 20

1  duties since 1994?
2      A.  Yes.
3      Q.  Okay.  Do you -- in your role as medical
4  director, do you keep up on new -- new advances in
5  medicine?
6      A.  As best we can.  It's incumbent of the
7  job.
8      Q.  Okay.  And what do you do to keep up with
9  advances?
10     A.  Read periodicals or -- or summation
11  journals of multiple articles.  We all utilize
12  UpToDate, which is a medical resource that's
13  excellent.
14     Q.  UpToDate, is that, like, a database, or is
15  it a --
16     A.  It's an online medical resource that is
17  authored by experts in particular areas of medicine
18  and is updated on a regular basis, and it covers
19  virtually all aspects of adult medical care.
20     Q.  When you review -- putting aside for a
21  moment the annual underwriting review, but when you
22  have a question about an applicant referred to you
23  by the long-term care insurance underwriting
24  department, have you ever had occasion where the
25  patient is taking a drug that you weren't familiar

Page 21

1  with?
2      A.  Yes.
3      Q.  Okay.  And when that occurs, what do you
4  do?
5      A.  We research it.
6      Q.  Okay.  And -- and what steps do you take
7  to research the drug?
8      A.  We'll go to medical resources we have,
9  UpToDate and others to expand our understanding of
10  that drug and its indications.
11     Q.  Now, you -- prior to joining Mutual of
12  Omaha as medical director in 1994, I understand from
13  your curriculum vitae submitted with your report
14  that you were in the practice of medicine?
15     A.  I was.
16     Q.  Okay.  And what was the nature of your
17  practice?
18     A.  It was general internal medicine in a
19  multi-specialty group in a community west of Omaha.
20     Q.  Did you focus on any particular health
21  conditions or...
22     A.  No.  As an internist.  It was a -- it was
23  a general internal medicine practice.  Two-thirds of
24  my practice was age 65 or older.  We specialize in
25  the care of all conditions that affect adults.

Page 22

1      Q.  Okay.  Did you -- but did you have some
2  focus on issues of -- you said most of your patients
3  were age 65 or older; so were you a little bit more
4  focused on medical issues that affect people in that
5  age group?
6      A.  Not really.  I mean, some diseases are
7  more prevalent as you get older and, understandably,
8  we'd see those.  But was there any particular
9  specialization?  No.
10     Q.  Okay.  Now, I assume you prescribed
11  medications for --
12     A.  Absolutely.
13     Q.  -- your patients?
14         And did all of your patients take their
15  medications all the time?
16     A.  No.
17     Q.  Okay.  You're sort of smiling when you say
18  that.  Why is that?
19     A.  Well, compliance is an issue with
20  medication.  Taking the medication as prescribed,
21  that's always a challenge.
22     Q.  Okay.  For patients with a wide range of
23  health conditions?
24     A.  Absolutely.
25     Q.  So fair to say, you know, there is -- I

Page 23

1  mean, would it be accurate to say that patient
2  non-adherence to medications is a significant
3  problem in medicine?
4      A.  That's fair.
5      Q.  Okay.  Did some of the medications that
6  your patients took require ongoing monitoring for --
7      A.  Absolutely.
8      Q.  -- for side effects or toxicities?
9      A.  Yes.
10     Q.  All right.  And were -- some of those
11  patients, were they on medications for life that
12  required ongoing monitoring?
13     A.  Yes.
14     Q.  All right.  And in your experience, did
15  patients always come in for the monitoring at their
16  regular schedule?
17     A.  Occasionally they did not.
18     Q.  Okay.  So patients don't always do the
19  monitor and follow up?
20     A.  No.
21     Q.  Okay.  All right.
22         Is that also a significant problem in
23  medicine?
24     A.  I would say it continues to be, yes.
25     Q.  Okay.  And can the failure to adhere to

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                     Tel: (402) 556-5000 | Fax: (402) 556-2037

Page 24

1  medications for any health condition result in harm
2  to the patient?
3      A.   Yes.
4      Q.   It can result in increased morbidity to
5  the patient?
6      A.   It can.
7      Q.   Yeah.
8          And can the failure to regularly come in
9  for the required monitoring follow up also harm the
10 patient?
11     A.   It has the potential, yes.
12     Q.   When you say "It has the potential,"
13 what -- what do you mean?
14     A.   If they are on a medication that affects
15 their renal function, kidney function, for example,
16 and they don't come in and they continue to take the
17 medication, that's one example of how they could run
18 into trouble.
19     Q.   Okay.  So the failure of a patient to come
20 in for their monitoring could lead to increased
21 morbidity for that patient?
22     A.   That's true.
23     Q.   Okay.  Have you engaged in the clinical
24 practice of medicine since 1994?
25     A.   I have not.

Page 25

1          (Exhibit No. 2
2          marked for identification.)
3  BY MR. KLEIN:
4      Q.   Okay.  I'm now going to -- whoops.  I
5  don't need that.
6          I'm now going to show you what's been
7  marked as Exhibit 2.  Is that a copy of the
8  curriculum vitae that you submitted with your
9  report?
10     A.   It is.
11     Q.   All right.  And just a couple of quick
12 questions.
13         On page -- if you can turn to page 5?
14     A.   Uh-huh.
15     Q.   It's -- there is a list of -- it says
16 continuing education seminars?
17     A.   Right.
18     Q.   And are those seminars that you have
19 attended or presented at?
20     A.   Those are seminars I've attended.
21     Q.   Okay.  And on page 6 it says "continuing
22 education seminars presented for United of Omaha."
23     A.   Correct.
24     Q.   Do you see that heading?
25     A.   I do.

Page 26

1      Q.   Okay.  And what is United of Omaha?
2      A.   That's a division of Mutual of Omaha that
3  focuses on their life side.
4      Q.   I see.  Okay.
5          Now, my review -- and these are seminars
6  that you have spoken at; is that correct?
7      A.   Correct.
8      Q.   About various medications.  So one of them
9  would be -- you've spoken, it seems, quite a bit
10 about diabetes mellitus?
11     A.   Yes.
12     Q.   Okay.  And you've -- you've presented on
13 coronary artery disease?
14     A.   I have.
15     Q.   Okay.  Now, it seems from my review that
16 the last time you have given a presentation was in
17 2009.  Is that -- is that roughly correct?
18     A.   On behalf of Mutual of Omaha in an
19 educational fashion, that may be correct.
20     Q.   Okay.  Since 2009 have you provided any
21 educational training or presentations for others on
22 medical issues?
23     A.   I've been a speaker at medical industry
24 meetings and covered assorted topics.  I also
25 present periodically to the underwriting staff at

Page 27

1  Mutual of Omaha educational programs --
2      Q.   Okay.
3      A.   -- to enhance their knowledge and
4  background in medical impairments.
5      Q.   Okay.  What kind of medical industry
6  meetings have you spoken at since 2009?
7      A.   I've spoken at the Midwest Medical
8  Directors meeting.  That may be -- oh, and at the --
9  there is an underwriter study group called the Risk
10 Appraisal Forum -- Risk Appraisal Forum and Impaired
11 Risk Underwriting Association which is an industry
12 study group.  I've presented there since 2009.
13     Q.   Okay.  When you say the -- when you
14 referred earlier to the Midwest Medical Directors
15 meeting, are those insurance medical directors?
16     A.   They are.
17     Q.   All right.  So when you say "medical
18 industry," what do you mean?
19     A.   We're talking -- I'm talking the insurance
20 medical industry.
21     Q.   I see.  Okay.
22     A.   Okay.
23     Q.   When was the last time you presented on
24 any medical issue to an audience outside of the
25 medical insurance industry?

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                     Tel: (402) 556-5000 | Fax: (402) 556-2037

102

Page 52

1    Q.  Okay.  Now, did you -- in the medical
2  directors department with you and Dr. Wilkins, did
3  you have any -- any other staff?
4    A.  No.
5    Q.  Okay.  So when you talk about doing a
6  literature review or reviewing the medications, that
7  would be something that would be done by you or
8  Dr. Wilkins?
9    A.  Or we'd consult on each other.  We'd
10  ask -- you know, we'd -- we'd both do some work and
11  then we'd discuss it.
12    Q.  Okay.  Okay.
13      Now, you also said there were some
14  anticancer drugs that would have a red flag but
15  would -- but that would warrant some further
16  investigation; is that correct?
17    A.  I did.
18    Q.  Okay.  And what anticancer -- what cancers
19  are you referring to?
20    A.  What I was referring to was the use of
21  something like methotrexate for rheumatoid
22  arthritis.  There is a number of examples, but
23  that's the first that came to my mind --
24    Q.  Okay.
25    A.  -- where it may be categorized as a red

Page 53

1  drug by Milliman and would be in a long-term care
2  applicant.  And we would review that situation and
3  potentially accept the methotrexate as a clinically
4  indicated treatment of that individual's RA,
5  rheumatoid arthritis.
6    Q.  Okay.  You said there were other examples
7  of the anticancer drugs that were red flagged and
8  might warrant some further inquiry?
9    A.  That's the best example I can think of.
10    Q.  Well, then I'm asking you for as many
11  examples.  What other examples are there?  You said
12  there were several.
13    A.  The use of 6MP.
14    Q.  I'm sorry.  What?
15    A.  6MP.
16    Q.  6, the number 6?
17    A.  6, the number 6.  MP, it's for
18  mercaptopurine.  It's an anticancer drug that can be
19  used in inflammatory bowel disease.
20    Q.  Okay.  Anything else?
21    A.  Imuran, I-M-U-R-A-N, can also be used in
22  inflammatory bowel disease.  Those are the ones that
23  immediately come to mind.  That's several.
24    Q.  Anything else you can think of?
25    A.  No.

Page 54

1    Q.  Is methotrexate on the uninsurable
2  medication risk for long-term care insurance?
3    A.  I would have to look that up.
4    Q.  All right.  We can look it up, but I will
5  represent to you for now that it is.
6    A.  Okay.
7    Q.  Okay.  You know, I have the underwriting
8  guides here, but I can represent to you that it is.
9      So in what situations would methotrexate,
10  then, be reviewed for a patient when it has a red
11  flag from Milliman as in your list of uninsurable
12  medications?
13    A.  As I said earlier, if it was referred to
14  the medical department by an underwriter
15  specifically questioning that situation as a case
16  where individual consideration was indicated for
17  this particular applicant, then the medical
18  department would get involved, and we would render
19  an opinion based upon how the medication was used,
20  how effective it was, how well tolerated it was.
21  Was there a lack of toxicity involved here?  And
22  then make a determination if we were comfortable
23  with that risk.
24    Q.  So you would look at the patient's
25  individual response to that?

Page 55

1    A.  Correct.
2    Q.  Okay.  Would you -- and -- and is one of
3  the things you would look at whether they were
4  compliant with the medication?
5    A.  Yes.
6    Q.  Okay.  Why is that important?
7    A.  Because it's a potentially toxic drug that
8  needs follow up and monitoring.
9    Q.  I'm sorry.  I asked if they were compliant
10  with taking the medication.
11    A.  We would look at that.
12    Q.  Okay.  And why is that important?
13    A.  Because methotrexate improperly taken or
14  improperly followed can have toxicities that are
15  significant.
16    Q.  Okay.  I'm talking -- well, we're talking,
17  I think, about two different things.
18      I'm asking you with respect to
19  methotrexate in a patient -- in an applicant that's
20  referred to you, is -- is methotrexate for
21  rheumatoid arthritis, is it a pill?
22    A.  Yes.
23    Q.  And is it generally taken daily?
24    A.  Yes.
25    Q.  All right.  And is one of the things that

Thomas & Thomas Court Reporters                  1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                   Tel: (402) 556-5000 | Fax: (402) 556-2037

103

Page 56

1  you would look at for that applicant, whether they
2  were taking their methotrexate as directed?
3      A.  Yes.
4      Q.  Okay.  And how would you determine that?
5      A.  By looking at the medical records.
6      Q.  Okay.  Would the pharmacy database be
7  helpful in indicating that too with respect to
8  refills?
9      A.  Not as -- not as much as the medical
10 records, the actual doctor's records.
11     Q.  And what in the medical records would tell
12 you that the patient has been taking the medication
13 as directed?
14     A.  The physician's assessment and
15 documentation of such.
16     Q.  Okay.  That's the best way to determine
17 compliance?
18     A.  It's one way.  It's the only way we really
19 have when you are underwriting the case.
20     Q.  Okay.
21     A.  It's the best source of data.
22     Q.  All right.  And would you also look at --
23 for people who take methotrexate, are they -- are
24 they supposed to be monitored for any potential side
25 effects or toxicities?

Page 57

1      A.  Yes.
2      Q.  And -- and what are those?
3      A.  It can have pulmonary toxicity.  It can
4  have liver toxicity.  The prescribing physician
5  generally should know that and follow the patient
6  accordingly.
7      Q.  All right.  What kind of pulmonary
8  toxicity can --
9      A.  It could lead to pulmonary fibrosis.
10     Q.  What is that?
11     A.  Scarring of the lung.
12     Q.  Does that lead to increased morbidity?
13     A.  It can.  And it can lead to increased
14 mortality.
15     Q.  All right.  Okay.
16         Scarring of the lungs is -- is a very
17 harmful thing to the patient.
18     A.  Potentially so, yes.
19     Q.  Okay.  And -- and that's a potential side
20 effect of pulmonary toxicity -- of methotrexate?
21     A.  Yes.
22     Q.  All right.  And how does a physician --
23 for somebody who is on methotrexate, how is that
24 monitored?
25     A.  Their symptoms, their physical exam, and,

Page 58

1  if they have referable symptoms, there might be a
2  chest X-ray or CT scan done of their chest.
3      Q.  All right.  Now, can pulmonary toxicity
4  happen at any time during the course of somebody
5  taking methotrexate?
6      A.  That risk is always apparent.
7      Q.  Risk is always what?
8      A.  Apparent.
9      Q.  Meaning it's always there?
10     A.  Could be, yes.
11     Q.  All right.  Is pulmonary fibrosis -- is
12 that what you said, by the way?
13     A.  Pulmonary fibrosis, yes.
14     Q.  Fibrosis resulting from methotrexate
15 reversible?
16     A.  It has that -- yes, it can be.
17     Q.  Can be reversible.
18         Can it also be irreversible?
19     A.  Yes, that's true.
20     Q.  I'm sorry.  What?
21     A.  That's true.
22     Q.  Yep.
23         And even when it's reversible, does it --
24 does it have any long-term effects for somebody's
25 pulmonary function?

Page 59

1      A.  It can and it cannot.  I mean, it depends
2  on the individual and how they responded.
3      Q.  Okay.  All right.
4         It's a serious side effect.  Wouldn't you
5  say?
6      A.  Absolutely.
7      Q.  All right.  What about -- you said
8  methotrexate also has liver -- potential liver
9  toxicity?
10     A.  Uh-huh.
11     Q.  Okay.  And how is that supposed to be
12 monitored?
13     A.  By liver function tests.
14     Q.  Okay.  And that's a blood test that people
15 come in to a medical office for?
16     A.  That's correct.
17     Q.  All right.  And do you know how often
18 people are supposed to be monitored for liver
19 toxicity when they are on methotrexate?
20     A.  When I was in practice -- and that may
21 have changed since, but we were monitoring people
22 every three months.
23     Q.  Okay.  And people stay on methotrexate
24 long-term for rheumatoid arthritis?
25     A.  Yes.

Thomas & Thomas Court Reporters                1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                 Tel: (402) 556-5000 | Fax: (402) 556-2037

104

Page 60

1  Q.  Okay.  And if somebody isn't monitored
2  every three months for their liver function tests,
3  can harm result?
4  A.  Potentially, yes.
5  Q.  Okay.  Is it -- is it of concern to Mutual
6  of Omaha's long-term care insurance underwriting
7  whether people are -- on methotrexate are being
8  monitored for their liver function tests as
9  directed?
10  A.  Yes.
11  Q.  All right.  And how do you assess that?
12  A.  Looking at the medical records, the
13  physician records.
14  Q.  Okay.  And what would they show?
15  A.  They would show periodic follow up,
16  laboratory testing that was appropriate for the
17  drug, monitoring of the liver function tests, the
18  physician's assessment of -- of how they were doing
19  on the medication and his response or her response
20  to what the laboratory tests showed.
21  Q.  Okay.  Do you know for -- for somebody on
22  methotrexate long term how often they should be
23  monitored for pulmonary toxicity?
24  A.  Again, I would have to call upon my
25  clinical experience.  It was more symptom driven.

Page 61

1  Q.  Okay.
2  A.  If you had a person that was doing well on
3  methotrexate and they were asymptomatic from a
4  pulmonary standpoint and their physical exam was
5  normal, that was sufficient.  If they started
6  developing a cough, had an abnormal exam, then we
7  would do chest X-ray and order a CT scan.
8  Q.  Okay.  If somebody has pulmonary fibrosis
9  resulting from methotrexate, you said in some cases
10  it's reversible.
11  A.  Uh-huh.
12  Q.  What -- what medical procedures or
13  therapies would be -- would be utilized?
14  A.  You stop the drug.
15  Q.  You stop the drug.  Okay.
16  A.  And monitor them.
17  Q.  All right.  And is it possible that, if
18  you stop the drug, then their -- their rheumatoid
19  arthritis would deteriorate?
20  A.  Uh-huh.
21  Q.  Okay.  Now, you also mentioned the
22  medication 6MP, which is for inflammatory bowel
23  disease?
24  A.  Uh-huh.
25  Q.  And that -- is that on the uninsurable

Page 62

1  list?  Do you know?
2  A.  I don't recall.
3  Q.  Okay.  Well, we can check later.
4  But it gets a red flag from Milliman?
5  A.  I'd have to check.
6  Q.  I thought we were talking about medical --
7  A.  Well, you know, I don't have those
8  memorized.
9  Q.  All right.
10  A.  I'm just looking at categories of drugs --
11  Q.  I understand.  Okay.
12  A.  -- that potentially would have a high
13  likelihood of being classified as a red drug.
14  Q.  Okay.  So 6MP -- let's assume that, you
15  know, it has a high likelihood of being classified
16  as a -- as a red drug.  It comes to you for -- for
17  review as medical director, and does 6MP have side
18  effects?
19  A.  Yes.
20  Q.  What kind of side effects?
21  A.  It could have the same hepatic side
22  effects.
23  Q.  That means liver?
24  A.  Liver.
25  Q.  Okay.  Yeah.

Page 63

1  A.  Yeah.
2  Q.  Anything else?
3  A.  That's the biggest concern.
4  Q.  All right.  And what kind of hepatic side
5  effects can 6MP have?
6  A.  Well, you just monitor the liver function
7  test --
8  Q.  Okay.
9  A.  -- by a simple blood test.
10  Q.  And how often is that -- is that done?
11  A.  In a similar fashion.  Probably quarterly,
12  three months.
13  Q.  And that's for irritable bowel disease.
14  And just --
15  A.  No.  It's inflammatory bowel disease.
16  Q.  I'm sorry.  Inflammatory.
17  And what is that exactly?
18  A.  It's a severe inflammatory condition of
19  the bowel.  There are two different types.  There is
20  regional enteritis and ulcerative colitis, both of
21  which are fairly rare but can be very significant.
22  Q.  And do they --
23  A.  6MP is used more commonly in Crohn's
24  disease.
25  Q.  I see.

Bruce Henricks, MD                                                20 (68 - 71)
3/28/2018

Page 68

1  ability.
2      Q.  Okay.  So I guess my question, then, is
3  how does Mutual of Omaha account for the fact that
4  as people who get insurance average from age 55 to
5  62 then continue to age may become forgetful to take
6  their medications?
7          MR. MAGRATTEN:  Objection to form.
8          THE WITNESS:  We don't specifically
9  check for that aside from the results of the MCAS
10  and its significance in our risk assessment.
11  BY MR. KLEIN:
12      Q.  Okay.  So the determination of whether
13  somebody is adherent to medication is made solely at
14  the point of underwriting the application; is that
15  correct?
16      A.  And at -- and how it's supported in the
17  medical records.
18      Q.  Yeah.  But it's made --
19      A.  At the -- at the point of underwriting,
20  yes.
21      Q.  Okay.  And there is no further follow up
22  of adherence after a person is -- receives the
23  insurance and becomes a beneficiary?
24      A.  Once the policy is issued, our ability to
25  assess their clinical status is gone.

Page 69

1      Q.  Okay.  Now, the final drug you mentioned
2  as having -- potentially having a red flag but
3  subject to review is Imuran, I-M-U-R-A-N?
4      A.  Correct.
5      Q.  And is that also for inflammatory bowel
6  disease?
7      A.  It can be used in inflammatory bowel
8  disease, yes.
9      Q.  And what other conditions might it be used
10  for?
11      A.  I don't recall.
12      Q.  Okay.  And what things would you look at
13  when you -- for a particular applicant when you see
14  Imuran?
15      A.  The same types of things that we would
16  look at with 6MP and methotrexate.  We would look at
17  its effect on their liver, its effect on their
18  complete blood count.  Those would be monitored by
19  blood tests.
20      Q.  Okay.  And it's also, I assume, important
21  for somebody on Imuran to take their medication as
22  directed?
23      A.  Yes.
24      Q.  Is it a pill?
25      A.  Yes.

Page 70

1      Q.  Is it supposed to be taken daily?
2      A.  Yes.
3      Q.  And how do you check that someone is
4  adherent?
5      A.  From an underwriting standpoint, we would,
6  again, look at the medical records and the
7  physician's assessment.
8      Q.  Okay.  Okay.
9          Now, going back to your expert report, if
10  I can direct your attention, please, to page 4.  At
11  the very last -- second to last -- the last full
12  sentence on the page says "At the time of
13  application, Truvada for PrEP was not addressed in
14  our reinsurers' underwriting guidelines and was
15  categorized by our actuarial consultant Milliman and
16  Roberts in their pharmacological 'Milliman
17  IntelliScript' as" -- red -- "as a 'red' or high
18  risk medication."
19          Do you see that sentence?
20      A.  I do.
21      Q.  And you wrote that?
22      A.  I did.
23      Q.  Okay.  Now, Doe's application was in
24  January of 2015.  Was that your understanding?
25      A.  Yes.

Page 71

1      Q.  Okay.  And then he appealed, and there was
2  a decision made in April of 2015.  Is that your
3  understanding?
4      A.  Yes.
5      Q.  Okay.  When you're referring to this -- to
6  the Milliman -- to the appearance of Truvada in the
7  Milliman database, did the Milliman IntelliScript
8  database distinguish between PrEP as treatment
9  for -- I'm sorry.  Did the Milliman IntelliScript
10  database distinguish between Truvada as treatment
11  for HIV disease or as pre-exposure prophylaxis for
12  HIV?
13      A.  I don't recall.
14      Q.  You don't recall?
15      A.  I think it -- what I do know, it was
16  listed as a red drug by -- by the IntelliScript
17  report.
18      Q.  Okay.  You don't -- but you don't know, as
19  you sit here today, whether there was a distinction
20  made -- so strike that.
21          Truvada was first approved as a treatment
22  for HIV disease.  Is that your understanding?
23      A.  Yes.
24      Q.  Okay.  And then in 2012 it was approved by
25  the FDA as -- as a prevention for HIV; correct?

Thomas & Thomas Court Reporters                1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC              Tel: (402) 556-5000 | Fax: (402) 556-2037

106

Page 76

1  A.  Yes.
2  Q.  Are there any exceptions?
3  A.  For long-term care insurance in general?
4  Q.  Long-term care insurance.
5  A.  There are no exceptions.
6  Q.  Okay.  Now, in your report you discussed
7  towards the end the reasons that Doe has related in
8  this case that he decided to take PrEP.
9  A.  Yes.
10  Q.  Do you recall that?
11  A.  I do.
12  Q.  Okay.  And where did you learn that
13  information?
14  A.  By looking at his application and
15  information associated with his case.
16  Q.  Well, you didn't -- you did not read his
17  deposition transcript; is that correct?
18  A.  I did not.
19  Q.  All right.  Did -- does the application
20  ask why Doe was on PrEP?
21  A.  The initial application, I don't believe
22  it does.  I honestly don't know.
23  Q.  Well, I'm just wondering where you learned
24  about Doe's explanation for -- for why he took PrEP.
25  A.  I -- as I recall now, I did see portions

Page 77

1  of Doe's deposition.  Not the entire deposition but
2  excerpts of it.
3  Q.  I see.
4  Okay.  And that's where you believe you
5  learned about his explanation for why he takes
6  Truvada as PrEP?
7  A.  Yes.
8  Q.  Okay.  And I think that you in your report
9  characterized Doe's risk for HIV as low or
10  negligible.  Is that your assessment?
11  A.  Yes.
12  Q.  Okay.  And what led you to that
13  assessment?
14  A.  Looking at literature data on the risk
15  potential of certain activities.
16  Q.  Okay.  And what activities?
17  A.  Exposure to bodily fluids.
18  Q.  And what led you to determine that Doe's
19  risk was low or negligible?
20  A.  Looking at what was reported and at CDC
21  data that they had on the risk.
22  Q.  Were you able to assess -- assess that Doe
23  was low or negligible risk -- at low or negligible
24  risk for HIV prior to looking at the literature
25  data?

Page 78

1  A.  Could you rephrase that?
2  Q.  Yeah.
3  You said that you determined that Doe was
4  a low or negligible risk for HIV by looking at the
5  literature data on risk.
6  A.  Uh-huh.
7  Q.  Were you able to make any assessment of
8  his risk for HIV prior to looking at the literature
9  data?
10  A.  No.
11  Q.  And why is that?
12  MR. MAGRATTEN:  Objection.
13  THE WITNESS:  Because it was -- my
14  research of the literature came after I read
15  excerpts of his deposition and his reasons for
16  starting PrEP.
17  BY MR. KLEIN:
18  Q.  Okay.  But I'm saying when you first --
19  when you first read his reasons for starting PrEP,
20  before you did the literature -- literature search,
21  did you -- were you able to make any assessment of
22  his risk for HIV?
23  A.  My personal opinion at the time, which is
24  just mine, was that it would be very low, and that
25  was confirmed by my research.

Page 79

1  Q.  Okay.  And what is that personal opinion
2  based on?  Is that a professional opinion or a
3  personal opinion?
4  A.  That's a professional opinion based upon
5  prior reading and some knowledge of HIV and -- and
6  the risk potential by activity.
7  Q.  So if Doe was at low or negligible --
8  strike that.
9  Is somebody who is at low or negligible
10  risk for HIV and is otherwise qualified, eligible
11  for long-term care insurance from Mutual of Omaha?
12  A.  Of course.
13  Q.  Okay.  So if Doe was at low or negligible
14  risk for HIV, why was he denied long-term care
15  insurance because he takes Truvada?
16  A.  It was because of --
17  MR. MAGRATTEN:  Objection.  Form.
18  THE WITNESS:  It was because of the
19  Truvada.
20  BY MR. KLEIN:
21  Q.  But he was taking Truvada not as treatment
22  for HIV disease.  You understand that?
23  A.  Of course.
24  Q.  Okay.  And yet you determined that he was
25  at low or negligible -- what is the purpose of

Bruce Henricks, MD                                                          23 (80 - 83)
3/28/2018

Page 80

1  denying long-term care insurance to people who take
2  Truvada as PrEP?
3          MR. MAGRATTEN:  Objection to form.
4  BY MR. KLEIN:
5      Q.  If you know.
6      A.  Please restate that.
7      Q.  People who take Truvada as pre-exposure
8  prophylaxis are denied long-term care insurance by
9  Mutual of Omaha; correct?
10     A.  They are not denied it because of taking
11 Truvada for PrEP.  They were -- he was denied
12 because he was taking Truvada.
13     Q.  Okay.  So Mutual of Omaha didn't care that
14 he -- it was for pre-exposure prophylaxis?
15     A.  No.
16     Q.  So he wasn't denied because of
17 anything having to do with his risk for HIV?
18     A.  No.
19         MR. MAGRATTEN:  Ben, we're about an
20 hour and a half into this.  Why don't we --
21         MR. KLEIN:  Yeah.  I'm almost done
22 with this line; so give me just a couple more
23 minutes.  I agree.  I want a break too.
24         MR. MAGRATTEN:  Okay.
25

Page 81

1  BY MR. KLEIN:
2      Q.  So the reason that Mutual of Omaha
3  excludes people who take Truvada is not related to
4  issues about risk for HIV?
5          MR. MAGRATTEN:  Objection to form.
6          THE WITNESS:  In his specific
7  instance he was denied coverage because he was on
8  Truvada.
9  BY MR. KLEIN:
10     Q.  Yes.  But what I'm asking is you have a
11 categorical exclusion of anybody who takes Truvada;
12 is that correct?
13     A.  At the -- yes, at the time he was
14 underwritten, that's true.
15     Q.  Has that changed?
16     A.  It's being considered.
17     Q.  Okay.  Now -- and was one of the reasons
18 that Mutual of Omaha denied insurance to HIV
19 negative people who take Truvada is because it
20 deemed them at substantial risk for HIV infection?
21         MR. MAGRATTEN:  Objection to form.
22         THE WITNESS:  Denial was solely based
23 upon the fact that he was on Truvada.
24 BY MR. KLEIN:
25     Q.  Okay.  It didn't have anything to do with

Page 82

1  a conclusion that he was at substantial risk for
2  HIV?
3      A.  No.
4      Q.  Okay.  And what was it about Truvada that
5  excluded Doe, even though he was at low or
6  negligible risk for HIV infection?
7      A.  We did not have robust enough data from
8  our underwriting sources, our reinsurance
9  colleagues, and evidence from our actuarial
10 consultant Milliman and Roberts that Truvada was a
11 drug that we could have a comfort level with in
12 underwriting.
13     Q.  All right.  Now, you said that the
14 exclusion of people who take Truvada is being
15 reconsidered?
16         MR. MAGRATTEN:  Objection to form.
17         THE WITNESS:  It's being considered.
18 BY MR. KLEIN:
19     Q.  Well, let's just be clear.
20         What's being -- what's being considered
21 is -- is this correct that what's being considered
22 now is providing long-term care insurance to
23 otherwise qualified people who take PrEP?
24     A.  I didn't say that.
25     Q.  Okay.  That's what I'm trying to

Page 83

1  understand.
2          What did you say is being considered?
3      A.  At this point --
4      Q.  Yeah.
5      A.  -- consideration is being made
6  investigating how Truvada could be incorporated into
7  underwriting.
8      Q.  And when you say "incorporated into
9  underwriting," you mean that it wouldn't be an
10 automatic exclusion?
11     A.  Correct.  Or it might be a yellow drug,
12 one that you use extreme caution and exercise
13 individual consideration.
14     Q.  Okay.  And why is that being considered
15 today?
16     A.  In part because of the current environment
17 and the fact that we have more data available to us
18 now than we did in the early winter of 2015.
19     Q.  What do you mean "the current
20 environment"?
21     A.  Just the awareness that the entire
22 insurance industry has about, one, insuring people
23 who are HIV positive for life insurance and the use
24 of Truvada and its appearance in applications for
25 insurance, not only with Mutual of Omaha, but across

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                     Tel: (402) 556-5000 | Fax: (402) 556-2037

**108**

Page 88

1  uninsurable risk of drugs is in keeping with our
2  underwriting -- our underwriting protocol which
3  relies upon our own investigation of new medications
4  [as read].
5        Do you see that?
6        A.  Uh-huh.
7        Q.  And what does Mutual of Omaha do to
8  investigate new medications?
9        A.  As I testified earlier, we get updates
10 from Milliman periodically.
11       Q.  Well, you're talking here just -- just
12 pardon me for interrupting, but you say our own
13 investigation in concert with recommendations from
14 Milliman; so what I want to know is what does your
15 investigation consist of independent of any --
16       A.  Independent?
17       Q.  -- information from Milliman?  Yep.
18       A.  We look at drugs periodically that come
19 about in underwriting exposure, and we'll assess
20 those.
21       Q.  These are new medications?
22       A.  New medications.
23       Q.  All right.  And what do you do to assess
24 them?
25       A.  We just look at the indications for their

Page 89

1  use, the impairments they're associated with, and
2  then assess their -- their applicability to be
3  included in underwriting.
4        Q.  Okay.  And what factors determine whether
5  something is included in underwriting or excluded?
6        A.  It's FDA approved indication, the
7  toxicities of the drug, the safety profile of the
8  drug over time, and its therapeutic benefit.  Does
9  it do what it's supposed to do.
10       Q.  Excuse me one second.
11           Does Mutual have any policy or practice of
12 placing all new FDA approved medications on the
13 uninsurable list for a period of time?
14       A.  No.
15       Q.  Okay.  So some drugs are included in
16 underwriting the moment they are approved by the
17 FDA?
18       A.  If we're unfamiliar with them or our
19 underwriting staff doesn't recognize that drug, then
20 we'll look at it, whether it be for diabetes,
21 coronary artery disease, et cetera.
22       Q.  Okay.  You look at it to see if it -- if
23 the factors militate towards including it?
24       A.  Correct.
25       Q.  Okay.  But the fact that it was just --

Page 90

1  just approved by the FDA does not warrant placing it
2  on the unexclude -- uninsurable list?
3        A.  No, no.
4        Q.  Okay.  Okay.
5           Now, let me explain.  I'm going to ask you
6  some questions about some medications, and I'm going
7  to explain to you what I'm going to do so that we
8  can all kind of be on the same page and also because
9  some of these medications have names that I cannot
10 pronounce.  And for the benefit of the court
11 reporter and the clarity of the record, I'm going to
12 show you a piece of paper that actually has the name
13 of the drug that I'm asking about written on it, and
14 we'll mark that as an exhibit so we can just all be
15 clear about what that medication is.
16       A.  All right.
17           MR. KLEIN:  Okay.  Can I have this
18 marked as the next exhibit?
19               (Exhibit No. 4
20               marked for identification.)
21 BY MR. KLEIN:
22       Q.  Okay.  Dr. Henricks, I'm now showing you
23 what's marked as Exhibit 4, and that is Tanzeum,
24 which also goes under the name albiglutide; is that
25 correct?

Page 91

1        A.  Uh-huh.
2        Q.  Is that a medication for diabetes?
3        A.  I don't recognize it.
4        Q.  You have not heard of that medication?
5        A.  I don't recall it.
6        Q.  Okay.  Do you know -- I'm going -- I know
7  you don't recall it, but I'm going to ask you:  Do
8  you know if that was -- appears -- that was -- I
9  will tell you that that was a medication for Type 2
10 diabetes approved by the FDA in 2014.
11       A.  Uh-huh.
12       Q.  Okay.  Do you know if it was placed on
13 Mutual's uninsurable list?
14       A.  I do not.
15           MR. KLEIN:  Okay.  Now, can I get
16 this marked as Exhibit 5?
17               (Exhibit No. 5
18               marked for identification.)
19 BY MR. KLEIN:
20       Q.  Exhibit 5 is an article from a journal
21 called "Drugs in Context Real-Word Medicine."  Have
22 you ever heard of that?
23       A.  I have not.
24       Q.  Okay.  And it's titled "A clinical review
25 of GLP-1 receptor agonists: efficacy and safety in

Page 92

1  diabetes and beyond."
2      Do you know what GLP-1 receptor agonist
3  is?
4      A.  I recognize the general -- as used in
5  Type 2 diabetes, yes.
6      Q.  I'm sorry.  Do you know what -- you know
7  what a GLP-1 receptor agonist is?
8      A.  In general terms, yes.  It's used in
9  diabetes.
10     Q.  Okay.  And what is that?
11     A.  It's a medication used for diabetes
12 Type 2.
13     Q.  Okay.  And I would -- and diabetes Type 2
14 is not an uninsurable medication -- uninsurable
15 health condition, is it?
16     A.  No.
17     Q.  Okay.  If you could now turn to page 10 of
18 this article.
19     A.  I have it.
20     Q.  Okay.  And you'll see at the top that
21 there is a chart.  Do you see the chart at the top?
22     A.  I do.
23     Q.  And do you see that albiglutide,
24 A-L-B-I-G-L-U-T-I-D-E, is -- is listed as a GLP-1
25 receptor agonist?

Page 93

1      A.  I do.
2      Q.  All right.  Now, if you look at the very
3  last sentence on this page -- or does Mutual
4  exclude -- to your knowledge, does Mutual exclude
5  the general category of GLP-1 receptor agonists as
6  uninsurable medications?
7      A.  No.
8      Q.  Okay.  If you would look at the last
9  sentence of page 10, it reads, "However, since these
10 agents have not been on the market for an extended
11 duration, there is a lack of long-term safety data
12 on cardiovascular mortality and other long-term
13 cardiovascular parameters."
14     Do you see that?
15     A.  I do.
16     Q.  All right.  Would that indication in the
17 medical literature be a reason to exclude a
18 medication from underwriting?
19         MR. MAGRATTEN:  Objection.
20         THE WITNESS:  No.
21 BY MR. KLEIN:
22     Q.  Okay.  Why is that?
23     A.  Because from an insurance underwriting
24 standpoint, we have a great deal of data on coronary
25 artery disease, cardiovascular mortality, and

Page 94

1  cardiovascular -- long-term cardiovascular
2  parameters.  We understand that in detail, and
3  something that's used for diabetes we would really
4  have no issue -- considerable issue with that unless
5  there was reports in the literature subsequent --
6  subsequent to this article or related to this
7  article that showed an unacceptable side effect
8  profile or toxicity profile long term.
9      Q.  Well, this article is indicating -- is --
10 does safety data include the side effect or toxicity
11 profile?
12     A.  Generally.
13     Q.  Okay.  Now, for a drug that was approved
14 by the FDA -- for the drug that -- for a drug that
15 was approved by the FDA in 2014, would Mutual of
16 Omaha long-term care insurance have extensive claims
17 experience over time with that drug?
18     A.  I don't know.
19     Q.  Okay.  For a drug that was approved such
20 as albiglutide by the FDA in 2014, was there in that
21 year data available to assess the long-term real
22 world safety of that drug?
23     A.  I don't know.
24     Q.  Well, how could there be data available to
25 assess the long-term real world safety of a drug in

Page 95

1  2014 when it was just FDA approved in that year?
2      A.  Say it again, please.
3      Q.  How could there be data in 2014 about the
4  long-term real world safety of a drug when it was
5  just FDA approved in 2014?
6      A.  There wouldn't be.
7      Q.  Okay.  And there wouldn't be long-term
8  extensive claims experience for that drug; correct?
9      A.  No.
10     Q.  Okay.  And for a drug like albiglutide
11 that was approved by the FDA in 2014, would there be
12 sufficient data to make conclusions about the
13 long-term implications of that drug that would allow
14 for analysis of its impact on morbidity?
15         MR. MAGRATTEN:  Objection.
16         THE WITNESS:  No.
17 BY MR. KLEIN:
18     Q.  Okay.  And -- okay.
19         MR. KLEIN:  Can I have this marked as
20 the next exhibit?
21         (Exhibit No. 6
22         marked for identification.)
23 BY MR. KLEIN:
24     Q.  Exhibit 6 says Trulicity also known as
25 dulaglutide; is that correct?

Page 96

1    A. Yes, yes.
2    Q. And that was approved by the FDA for
3  treatment of diabetes also in 2014?
4    A. Uh-huh.
5    Q. Are you familiar with that medication?
6    A. Yes.
7    Q. Okay. In 2014 did Mutual of Omaha
8  long-term care insurance have extensive claims
9  experience over time with Trulicity?
10    A. I have no knowledge of that.
11    Q. Well, how could they if it was approved in
12  2014?
13    A. That seems obvious to me.
14    Q. Okay. Is this medication on Mutual's
15  uninsurable list?
16    A. I don't know specifically, but I doubt
17  that it is.
18    Q. Okay. And why do you doubt it?
19    A. Because it's used for Type 2 diabetes.
20    Q. Okay. In 2014 when this drug was approved
21  by the FDA, was there data available to assess the
22  long-term real world safety of Trulicity?
23    A. No.
24    Q. In 2014 when this drug was approved by the
25  FDA, was there information about Trulicity to make

Page 97

1  conclusions about the long-term impact on morbidity
2  for LTC insurance?
3    A. I don't know specifically, but I would --
4  I'm going to -- I would -- in a -- the logical
5  opinion would be no.
6    Q. Okay. In 2014 when Trulicity was approved
7  by the FDA, was there information to make
8  conclusions about the toxicity of Trulicity that
9  would allow analysis of its influence on morbidity?
10    A. No.
11    Q. Okay.
12          (Exhibit No. 7
13          marked for identification.)
14  BY MR. KLEIN:
15    Q. Okay. Exhibit 7 is an article called
16  "Dulaglutide: an evidence-based review of its
17  potential in the treatment of type 2 diabetes."
18       Have you -- have you read anything before
19  about the medication Trulicity?
20    A. Snippets over time, yes.
21    Q. Okay. All right.
22       Do you see on the first page of this
23  article there is a bold heading that says "Place in
24  therapy"?
25    A. Yes. I see that.

Page 98

1    Q. Okay. And the first sentence of that says
2  while -- the first sentence of that indicates that
3  long-term data on safety and efficacy are
4  forthcoming. Do you see that?
5    A. Uh-huh. I do.
6    Q. Okay. Do you agree with that assessment
7  of Trulicity?
8    A. In concert with the timing of its release
9  and -- yes, I do.
10    Q. Okay. And was that a reason to -- was the
11  lack of long-term data on safety and efficacy a
12  reason to place Trulicity on the uninsurable list?
13    A. No.
14    Q. Okay. Why not?
15    A. Your question again, sir?
16    Q. Why was the lack of -- why was the lack of
17  long-term data on safety and efficacy not a reason
18  to place it on the uninsurable list?
19    A. Again, it's used to control Type 2
20  diabetes, which the insurance industry has a deep
21  understanding of and a comfort level with, and it
22  has proven efficacy in controlling diabetes.
23    Q. Of what duration in 2014?
24       MR. MAGRATTEN: Objection to form.
25       THE WITNESS: A limited duration.

Page 99

1       MR. KLEIN: Okay. Can I get this
2  marked as the next exhibit?
3          (Exhibit No. 8
4          marked for identification.)
5       MR. KLEIN: Okay. I'm sorry. That
6  was 8?
7       COURT REPORTER: Yes.
8       MR. KLEIN: Thank you.
9  BY MR. KLEIN:
10    Q. Exhibit 8 lists a medication called
11  Farxiga? Farxiga?
12    A. Farxiga.
13    Q. Farxiga. Okay. F-A-R-X-I-G-A. And then
14  the other name for it is dapagliflozin. Close?
15    A. Close.
16    Q. Close. All right.
17       And that was a medication approved by the
18  FDA in 2014 for Type 2 diabetes. Are you familiar
19  with that drug?
20    A. Yes. I have seen it before.
21    Q. Okay. And is that on Mutual of Omaha's
22  uninsurable list for long-term care insurance?
23    A. I don't believe it is.
24    Q. Okay. In 2014 did Mutual of Omaha
25  long-term care insurance have extensive claims

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                     Tel: (402) 556-5000 | Fax: (402) 556-2037

111

Bruce Henricks, MD                                    28 (100 - 103)
3/28/2018

Page 100

1   experience over time for Farxiga?
2        A.   No.
3        Q.   In 2014 was there data available to assess
4   the long-term real world safety of Farxiga?
5        A.   No.
6        Q.   In 2014 was there information about
7   Farxiga to make conclusions about the long-term
8   implications of its impact on morbidity?
9            MR. MAGRATTEN:  Objection to form.
10           THE WITNESS:  No.
11  BY MR. KLEIN:
12       Q.   Okay.  In 2014 was there information about
13  Farxiga to make conclusions about its toxicities
14  that would allow analysis of its potential influence
15  on morbidity?
16       A.   No.
17           (Exhibit No. 9
18           marked for identification.)
19  BY MR. KLEIN:
20       Q.   Exhibit No. 9 is an article in the journal
21  "Therapeutic Advances in Drug Safety" from 2014, and
22  it's titled "Dapagliflozin efficacy and safety: a
23  perspective review."
24           Have you read about this -- you've read --
25  you say you've read some about this medication?

Page 101

1        A.   Small amounts, yes.
2        Q.   Okay.  In the abstract in the very last
3   line it says "Its long-term safety and efficacy are
4   unknown."
5            Do you see that line?
6        A.   I do.
7        Q.   Do you agree with that?
8        A.   I didn't author the paper, but it makes
9   sense.
10       Q.   Okay.  And is that a reason to place this
11  medication on Mutual's uninsurable list?
12       A.   No.
13       Q.   Why not?
14       A.   Again, it's for the treatment of a
15  condition that's well understood by the insurance
16  industry, and we have a comfort level with that type
17  of situation.
18           MR. KLEIN:  Okay.  Next exhibit.
19           (Exhibit No. 10
20           marked for identification.)
21  BY MR. KLEIN:
22       Q.   The next exhibit -- No. 9?
23           COURT REPORTER:  10.
24  BY MR. KLEIN:
25       Q.   10, sorry, is Repartha [sic] also known as

Page 102

1   evolocumab?
2        A.   Evolocumab, yes.  Evolocumab.
3        Q.   E-V-O-L-O-C-U-M-A-B.
4            Okay.  Are you familiar with that
5   medication?
6        A.   Not really.  I recognize the name.  I
7   would have to look it up.
8        Q.   Okay.  It was approved -- I'll represent
9   to you that it was approved by the FDA in 2015 and
10  to my examination is not on Mutual's uninsurable
11  list.
12       A.   Okay.
13       Q.   Just to state for the record too, if you
14  would like, I have all of the underwriting guides
15  here from -- that have been produced by Mutual, and
16  I would be happy to show those to you if you want to
17  refer to them, but I also think it would take a lot
18  of time.  And if we're wrong, Brooks will point that
19  out at some later stage of this proceeding.
20       A.   That's fine.
21       Q.   But we've looked at that.  Okay.
22           Is it -- do you have a general sense that
23  this is a treatment for high cholesterol that's not
24  a statin?
25       A.   I would have to ask the question.  Is that

Page 103

1   its FDA approved indication is for anti-cholesterol
2   treatment?
3        Q.   Yes.
4        A.   Okay.
5        Q.   Okay.  Now, was this -- was a
6   medication -- was the medication Repartha that was
7   approved in 2015 -- did -- does Mutual of Omaha
8   long-term care have extensive claims experience over
9   time with that medication?
10       A.   No.
11       Q.   With respect to Repartha, does Mutual of
12  Omaha have data available to assess the long-term
13  real world safety of that drug?
14       A.   No.
15       Q.   With respect to Repartha, does Mutual of
16  Omaha have information to make conclusions about the
17  long-term implications of its influence on morbidity
18  for long-term care insurance?
19       A.   No.
20           MR. MAGRATTEN:  Objection.
21  BY MR. KLEIN:
22       Q.   With respect to Repartha, does Mutual of
23  Omaha have information to make conclusions about the
24  toxicities that would allow analysis of its
25  influence on morbidity?

Thomas & Thomas Court Reporters                1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                 Tel: (402) 556-5000 | Fax: (402) 556-2037

112

Page 104

1    A.  No.
2          (Exhibit No. 11
3          marked for identification.)
4  BY MR. KLEIN:
5    Q.  Okay.  I'm showing you an article
6  published in 2016, the year after this drug was FDA
7  approved called "Clinical efficacy and safety of
8  evolocumab for low-density lipoprotein cholesterol
9  reduction."
10   A.  Uh-huh.
11   Q.  Do you understand the phrase "low-density
12 lipoprotein cholesterol reduction"?
13   A.  Yes.
14   Q.  What does that refer to?
15   A.  LDL is a bad type of cholesterol, and this
16 drug is obviously focused on lowering its levels.
17   Q.  Okay.  Now, in the -- on the first page of
18 this article, which is page 163 of the journal --
19   A.  Uh-huh.
20   Q.  -- there is a section called "Abstract."
21       Do you see that?
22   A.  I do.
23   Q.  And almost to the bottom there is a
24 sentence that reads, "However, studies regarding the
25 ability of evolocumab to reduce mortality as well as

Page 105

1  long-term safety concerns are limited."
2       Do you see that?
3    A.  It's in the abstract --
4    Q.  Yes.
5    A.  -- toward the bottom?
6    Q.  Yeah.
7    A.  I see it now.  Okay.
8    Q.  Okay.  You see that sentence?
9    A.  I do.
10   Q.  Okay.  Is the fact that -- that studies
11 regarding long-term safety concerns are limited a
12 reason to exclude this drug from long-term care
13 insurance underwriting?
14   A.  No.
15   Q.  Why is that?
16   A.  Because it's -- again, it's used for
17 hypercholesterolemia, and that's something the
18 insurance industry has a comfort level with and its
19 treatment, and we likely would be at ease using this
20 medication.
21   Q.  So the fact that there could be unknown
22 future safety concerns wouldn't -- wouldn't be a
23 reason to -- to conclude otherwise?
24       MR. MAGRATTEN:  Objection.
25       THE WITNESS:  At this point, no.

Page 106

1  BY MR. KLEIN:
2    Q.  At what point?
3    A.  At the current point presently.
4    Q.  Well, what do you mean by "at this point"?
5  At some future point there might be concerns that
6  would exclude it?
7    A.  That potential exists.  I mean, we deal
8  with drugs all the time that are released by the
9  FDA, put into use, and then we find out later that
10 the toxicity profile is such that the drug is
11 withdrawn.
12   Q.  But the lack of certainty about that
13 didn't cause you to exclude the drug in the first
14 place?
15   A.  No.
16       (Exhibit No. 12
17       marked for identification.)
18 BY MR. KLEIN:
19   Q.  Exhibit 11?
20       COURT REPORTER:  12.
21       MR. KLEIN:  12.  Sorry.
22 BY MR. KLEIN:
23   Q.  The medication listed on Exhibit 12 is
24 Praluent, also known as alirocumab?
25   A.  Uh-huh.

Page 107

1    Q.  Have you heard of that?
2    A.  I have not heard of it.
3       MR. KLEIN:  Okay.  Do you want me to
4  spell these as we go along, or can you get them from
5  the exhibits?
6       COURT REPORTER:  I can get them from
7  the exhibits.
8       MR. KLEIN:  Okay.
9  BY MR. KLEIN:
10   Q.  It's known as a PK -- PCSK9 inhibitor.
11 Does that ring any bell to you in the field of
12 anti-cholesterol medication?
13   A.  No.
14   Q.  Okay.  Do you -- now -- okay.
15       Now, this drug was approved by the FDA in
16 2015.  Would -- in 2015 to date does Mutual of Omaha
17 long-term care have extensive claims experience over
18 time with Praluent?
19   A.  I don't know.
20   Q.  Well, would -- how much time would you
21 need to have extensive claims experience over time
22 that would be acceptable for long-term care
23 insurance underwriting?
24       MR. MAGRATTEN:  Objection.
25       THE WITNESS:  I would say at a

Page 116

1  BY MR. KLEIN:
2      Q.  Okay.  Exhibit 15 is FDA prescribing
3  information from a medication called Kynamro, which
4  is also called mipomersen.  Do you see that in the
5  upper left-hand corner?
6      A.  I do.
7      Q.  Okay.  Have you ever heard of that
8  medication?
9      A.  I have not.
10     Q.  Okay.  That was a cholesterol treatment
11  approved in 2013.  Do you know if this is on
12  Mutual's uninsurable list?
13     A.  I do not.
14     Q.  Okay.  Do you think it should be?
15     A.  I don't know enough about it.
16     Q.  Is the fact that it was FDA approved in
17  2013 -- was that sufficient to place it on the
18  uninsurable list in the year 2013?
19         MR. MAGRATTEN:  Objection.
20         THE WITNESS:  No.
21  BY MR. KLEIN:
22     Q.  What about from any time going forward to
23  present?
24     A.  I don't know anything about the drug; so
25  I'm speculating.

Page 117

1      Q.  Well, I'm asking you if the fact that it
2  was approved in 2013 was reason to put it on the
3  uninsurable list.
4      A.  No.
5      Q.  Okay.  And there wasn't -- Mutual doesn't
6  have long-term claims experience -- extensive claims
7  experience with this drug, does it?
8      A.  I would assume not.
9      Q.  Okay.  And they also wouldn't have data to
10  assess its real world safety?
11     A.  I would assume not.
12     Q.  Or its long-term impact on toxicities?
13     A.  No.
14     Q.  All right.  If I can call your attention
15  to page 5 of 21 on Exhibit 15?
16     A.  Uh-huh.
17     Q.  And there is a heading called "Hepatic
18  Steatosis."
19     A.  A heading?
20         MR. MAGRATTEN:  What page are you on?
21  BY MR. KLEIN:
22     Q.  I'm sorry.  Page 5.  Page 5.
23     A.  Uh-huh.
24     Q.  Do you see --
25     A.  Page 5 of 22?

Page 118

1      Q.  Of 21.  It says page 5 of 21.
2      A.  Mine says 5 of 22.
3         MR. MAGRATTEN:  So does mine.
4         THE WITNESS:  The heading is
5  "Elevation of transaminases."
6         MR. KLEIN:  All right.  Let's --
7         MR. MAGRATTEN:  You're on 15?
8         MR. KLEIN:  Yeah.  It looks like a
9  page was skipped in -- let's go off the record for a
10  second.
11         (Discussion had off the record.)
12  BY MR. KLEIN:
13     Q.  In this document do you see a heading
14  called "Hepatic Steatosis"?
15     A.  I do.
16     Q.  All right.  What is that?
17     A.  That is fat on your liver.
18     Q.  Is that bad for you?
19     A.  Potentially.
20     Q.  What can it lead to?
21     A.  Rarely it can lead to hepatic failure.
22     Q.  Anything else?
23     A.  Abnormal liver function tests.
24     Q.  Does it increase the risk of morbidity in
25  a patient who has that?

Page 119

1      A.  Slightly.
2      Q.  Slightly.  Okay.
3         Would hepatic steatosis be grounds to deny
4  somebody long-term care insurance?
5      A.  No.
6      Q.  Okay.  Okay.  Let's just -- I didn't mark
7  this, but let's just mark this as the next
8  exhibit so that we're consistent with using these
9  designations.  But you don't need to see this, I
10  assume, unless you want to?
11     A.  Oh, no.
12     Q.  Okay.  That's just the list, yeah.
13         (Exhibit No. 16
14         marked for identification.)
15         MR. KLEIN:  Okay.  Next exhibit.
16         (Exhibit No. 17
17         marked for identification.)
18  BY MR. KLEIN:
19     Q.  Okay.  Exhibit 17 identifies the drug
20  Duavee, otherwise it's conjugated
21  estrogens/bazedoxifene.
22     A.  Close, yes.  Good enough.
23     Q.  Have you heard of this medication?
24     A.  I recognize the class of drug.  I don't --
25  have never heard of Duavee.

Page 120

1    Q.   Okay.  But you understand it to be a
2    conjugated estrogen/bazedoxifene?
3        A.   Yes.
4        Q.   Okay.  This was FDA approved in 2013.  Is
5    it on Mutual's uninsurable list?
6        A.   I don't know specifically.
7        Q.   Okay.  Do you think this class of drug
8    should be a grounds for exclusion from long-term
9    care underwriting?
10       A.   Looking at the class of drug, conjugated
11   estrogens, no.
12       Q.   Okay.  Is dementia a concern for long-term
13   care insurance underwriting?
14       A.   Absolutely.
15       Q.   Why is that?
16       A.   It's one of the highest conditions that
17   cause claim in LTC in the industry.
18       Q.   So you would be very cautious about
19   anything that would potentially increase somebody's
20   risk for dementia?
21       A.   Yes.
22           MR. KLEIN:  Okay.  Can I have that as
23   the next exhibit?
24           (Exhibit No. 18
25           marked for identification.)

Page 121

1    BY MR. KLEIN:
2        Q.   Exhibit 18 is the FDA prescribing
3    information for Duavee.
4            And, by the way, do you recognize the
5    general form of these FDA prescriptions?
6        A.   I do, yes.
7        Q.   Okay.  So this is Duavee.  It says initial
8    approval, 2013.  And if you can look at page 3?
9        A.   Uh-huh.
10       Q.   Under "full prescribing information," it
11   says "Warning:  Endometrial cancer, cardiovascular
12   disorders, and probable dementia."
13           Do you see that?
14       A.   I do.
15       Q.   And then in the last bullet point it says
16   the WHI memory study, WHIMS, estrogen-alone
17   ancillary study of WHI reported an increased risk of
18   probable dementia in postmenopausal women 65 years
19   of age and older during 5.2 years of treatment with
20   daily conjugated estrogens alone relative to a
21   placebo.
22           Do you see that?
23       A.   I do.
24       Q.   In light of these findings, why are -- why
25   are -- and this drug is a conjugated estrogen; is

Page 122

1    that correct?
2        A.   Yes.
3        Q.   Okay.  So why are people who take daily
4    conjugated estrogens not excluded from long-term
5    care insurance?
6        A.   Because the insurance industry has a
7    comfort level with the use of conjugated estrogen in
8    women realizing that there may be potential side
9    effects that are offset by benefits of their use.
10       Q.   In your opinion, are there any benefits to
11   taking Truvada as pre-exposure prophylaxis?
12       A.   In my opinion, yes.
13       Q.   In your professional opinion?
14       A.   In my professional opinion, yes.
15       Q.   And what are those benefits?
16       A.   It has the potential to be quite
17   efficacious in preventing the acquisition of HIV if
18   it's used properly, which properly would be they're
19   adherent to the proper dosage, they go through an
20   initial pretreatment evaluation, and then are
21   rigorous in their follow up as prescribed by the FDA
22   and the package insert on follow up of Truvada's
23   use.
24       Q.   Okay.  And was that true in January of
25   2015?

Page 123

1            MR. MAGRATTEN:  Objection.
2            THE WITNESS:  I don't know that --
3    you asked me on a personal level?
4    BY MR. KLEIN:
5        Q.   I'm talking -- well, I'm asking you here
6    as an expert and fact witness in the case.
7        A.   Yes.
8        Q.   Were there potential benefits to the use
9    of Truvada as pre-exposure prophylaxis in January
10   of -- based on your information known in January of
11   2015?
12       A.   I don't believe there was.
13       Q.   You don't think there were any benefits?
14           MR. MAGRATTEN:  Objection.
15           THE WITNESS:  There were some obvious
16   benefits, but part of the answer I thought you were
17   looking for was did we understand the long-term
18   expectations of that drug.
19   BY MR. KLEIN:
20       Q.   No.  That was -- let me rephrase.  That
21   was not what I was asking.
22       A.   Okay.  Please do.
23       Q.   My question is in January of 2015, were
24   there benefits to a person taking Truvada as
25   pre-exposure prophylaxis for HIV?

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC              Tel: (402) 556-5000 | Fax: (402) 556-2037

115

Page 124

1   A.  My expert opinion, yes.
2   Q.  Okay.  And what were those benefits?
3   A.  Again, we're talking my expert opinion?
4   Q.  Yeah.
5   A.  Of the benefits of taking Truvada in 2015?
6   Q.  As PrEP.
7   A.  As PrEP.  It had reported efficacy of
8   somewhere between 60 and 90 percent effectiveness in
9   preventing the acquisition of HIV.
10  Q.  And from your perspective, that's an
11  efficacious result for medication?
12        MR. MAGRATTEN:  Objection.
13        THE WITNESS:  It depends -- well, if
14  we're looking specifically at Truvada and what it's
15  used for, 60 to 90 percent is a fairly wide range,
16  and I would be concerned about the fact that it
17  isn't higher.
18  BY MR. KLEIN:
19  Q.  Well, what about when -- what about --
20  were there -- were there benefits to a person taking
21  Truvada as PrEP as directed in January of 2015?
22  A.  Yes.
23  Q.  Okay.  And what were those benefits?
24  A.  The prevention of HIV acquisition.
25  Q.  Okay.  And that was -- so -- so to someone

Page 125

1   who might have some risk for HIV, it is fair to say
2   that in January of 2015 it was far more beneficial
3   to take PrEP than not to take PrEP?  Is that
4   correct?
5         MR. MAGRATTEN:  Objection.
6         THE WITNESS:  I don't know.
7   BY MR. KLEIN:
8   Q.  What don't you know?
9   A.  Well, your -- restate the question,
10  please.
11  Q.  Sure.
12       For a person who had some risk for HIV
13  infection in January of 2015, is it your expert
14  opinion that it was more beneficial for that person
15  to take PrEP than not take PrEP?
16        MR. MAGRATTEN:  Objection.
17        THE WITNESS:  It would make sense
18  that it would be more beneficial.
19  BY MR. KLEIN:
20  Q.  Okay.  And why is that?
21  A.  Because of the efficacy of the drug, even
22  though there is some concern about the range of its
23  efficacy.
24  Q.  Okay.  And if this person we're talking
25  about who could benefit from PrEP was not taking

Page 126

1   PrEP, they would get long-term care insurance from
2   Mutual of Omaha if they were otherwise qualified; is
3   that right?
4         MR. MAGRATTEN:  Objection.
5         THE WITNESS:  Pardon me.  Please
6   restate that.
7         MR. KLEIN:  Can you read that back?
8         (Whereupon, the pending question
9            was read back by the court
               reporter.)
10        THE WITNESS:  Yes.
11      Thank you.
12  BY MR. KLEIN:
13  Q.  Do you think that in January of 2015 the
14  benefits -- is it your expert opinion that in
15  January 2015 there were potential side effects from
16  PrEP?
17  A.  Yes.
18  Q.  Okay.  And do you think -- is it your
19  expert opinion that in January 2015 the potential
20  side effects of PrEP were offset by the benefits of
21  its use?
22        MR. MAGRATTEN:  Objection.
23        THE WITNESS:  I don't know.
24  BY MR. KLEIN:
25  Q.  And why are you -- so you are unable to

Page 127

1   make a conclusion?
2   A.  I can't draw a conclusion on that.
3   Q.  Why is that?
4   A.  Because you're asking about the long-term
5   effects, which at that point we didn't have a lot of
6   information --
7   Q.  Okay.
8   A.  -- from an insurance perspective with
9   endorsement from our resources that we call upon to
10  make underwriting decisions.
11  Q.  Okay.  I'm almost getting there.  Okay.
12        MR. KLEIN:  Next exhibit, please.
13        (Exhibit No. 19
14           marked for identification.)
15  BY MR. KLEIN:
16  Q.  Okay.  Exhibit 19 is a drug that's causing
17  you to smirk.
18  A.  I like the name.
19  Q.  Luzu, and it's also known as luliconazole?
20  A.  Uh-huh.
21  Q.  All right.  And this was approved by the
22  FDA in 2013.  Are you familiar with this medication?
23  A.  No.
24  Q.  Okay.  Is the fact that it was -- so in
25  2013 there was no -- do you know if it's on Mutual's

Thomas & Thomas Court Reporters              1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC               Tel: (402) 556-5000 | Fax: (402) 556-2037

**116**

Bruce Henricks, MD
3/28/2018

Page 132

1   Q.   And you'll see on the first page in the --
2   in the right-hand column there is a bunch of bullet
3   points?
4   A.   Yes.
5   Q.   And about -- a little less than halfway
6   down just above "adverse reactions" there is a
7   bullet point that says "assess for decrease in bone
8   mineral density initially and periodically
9   thereafter."
10      Do you see that?
11  A.   I do.
12  Q.   Okay.  And would that -- would the need to
13  assess for decrease in bone mineral density be a
14  grounds to exclude a drug from long-term care
15  insurance?
16  A.   No.
17  Q.   Okay.  And why not?
18  A.   If you're just assessing for a decrease in
19  bone mineral density, you're monitoring their
20  status.  Basically you're concerned about
21  osteoporosis, and that comes in all gradations, and
22  certain ones can be accepted, others cannot from a
23  long-term care underwriting standpoint.
24  Q.   Okay.  Okay.  So -- got it.  Okay.
25      But presumably the FDA had a concern that

Page 133

1   this drug could cause a decrease in bone mineral
2   density.  Would that be your assumption too based on
3   this prescribing information?
4       MR. MAGRATTEN:  Objection.
5       THE WITNESS:  They are just asking
6   physicians who use it to exercise caution and be
7   aware of that potential.
8   BY MR. KLEIN:
9   Q.   Well, aren't they directing them to assess
10  for a decrease in bone mineral density?
11      MR. MAGRATTEN:  Objection.
12      THE WITNESS:  That may be clinical.
13  That may be through diagnostic studies.  But they
14  are, yes.  They are asking them to be vigilant.
15  BY MR. KLEIN:
16  Q.   Okay.  And it also says "close monitoring
17  for glaucoma and cataracts is warranted."
18      Do you see that?
19  A.   Uh-huh.
20  Q.   Is that a grounds for excluding a drug
21  from long-term care insurance?
22  A.   No.
23  Q.   Okay.  Can glaucoma increase the risk of
24  morbidity?
25  A.   Yes.

Page 134

1   Q.   Can it increase claims for long-term care
2   insurance?
3   A.   Potentially, yes.
4   Q.   And what about cataracts?
5   A.   Same.
6       (Exhibit No. 23
7       marked for identification.)
8   BY MR. KLEIN:
9   Q.   Okay.  Exhibit 23 is a -- lists the
10  medication Zurampic (lesinurad).  Have you heard of
11  this medication?
12  A.   I have not.
13  Q.   Okay.  It was -- well, let's get the FDA
14  information on it.
15      (Exhibit No. 24
16      marked for identification.)
17  BY MR. KLEIN:
18  Q.   The FDA prescribing information for
19  Zurampic indicates it was approved in 2015.  That
20  would not be a reason to exclude it from long-term
21  care insurance, would it?
22  A.   No.
23  Q.   Okay.  And under "indications and usage,"
24  do you agree that this is a medication for gout?
25  A.   It appears so, yes.

Page 135

1   Q.   Okay.  Do you see there is a black box
2   warning right under the name of the medication on
3   this document?
4   A.   Yes.
5   Q.   Okay.  And it says "Warning:  Risk of
6   acute renal failure."
7       Do you see that?
8   A.   Uh-huh.
9   Q.   Is that warning a basis to exclude this
10  medication from long-term care insurance?
11  A.   No.
12  Q.   Why not?
13  A.   Because it's just a risk.  They don't --
14  and I'm not conversant with the -- the risk
15  potential as far as what percentage is the risk or
16  the -- the risk is not quantified here.  It may be a
17  very minor risk and its -- from this boxed warning,
18  used -- when used without a xanthine oxidase
19  inhibitor.  That's another drug; so you've got two
20  drugs reacting.
21      That warning in and of itself would not
22  make me exclude it from -- or put it on our list of
23  an uninsurable medication.
24  Q.   Well, it says acute renal failure has
25  occurred with Zurampic and was more common when it

Page 136

1  was used given alone, but it has still occurred when
2  it was used in combination with a xanthine.  Is that
3  your reading of that?
4       A.  Uh-huh.  I see that now.
5       Q.  Yep.
6            And that's not a basis to exclude it from
7  long-term care insurance?
8            MR. MAGRATTEN:  Objection.
9            THE WITNESS:  No.
10 BY MR. KLEIN:
11      Q.  Okay.  Can you turn to -- it's the third
12 page, but it's Heading 5 called warnings and
13 precautions.
14      A.  I see it.
15      Q.  And it says Renal events:  Treatment with
16 Zurampic 200 milligrams in compotation [sic] with a
17 xanthine oxidase inhibitor was associated with an
18 increased incidence of serum creatinine elevations
19 [as read].
20           Do you see that?
21      A.  I do.
22      Q.  Is that statement a reason to exclude this
23 medication --
24      A.  No.
25      Q.  -- from long-term care insurance

Page 137

1  underwriting?
2       A.  No.
3       Q.  Why is that?
4       A.  Because it's most of which are reversible,
5  meaning, if you remove the drug, the renal function
6  returns to normal.
7       Q.  Okay.  So if the renal -- if the CR -- if
8  the -- if the serum creatinine elevations are
9  reversible, that is acceptable from a long-term care
10 insurance underwriting perspective?
11           MR. MAGRATTEN:  Objection.
12           THE WITNESS:  It should be, yes.
13 BY MR. KLEIN:
14      Q.  Okay.  Okay.  Almost there.
15           (Exhibit No. 25
16            marked for identification.)
17 BY MR. KLEIN:
18      Q.  25 lists a medication called Steglatro
19 (ertugliflozin).  Do you see that?
20      A.  Anybody's guess.  I've got it, yeah.
21      Q.  All right.  Are you familiar with that
22 drug?
23      A.  I am not.
24      Q.  Okay.

Page 138

1            (Exhibit No. 26
2            marked for identification.)
3  BY MR. KLEIN:
4       Q.  Exhibit 26 is the FDA prescribing
5  information for Steglatro, which indicates, as
6  you'll see, it is a -- this is a treatment for
7  diabetes; is that right?
8       A.  Yes.
9       Q.  And it was approved in 2017.  Do you see
10 that?
11      A.  Yes.
12      Q.  All right.  Is this -- does the fact that
13 it was approved in 2017 -- is that reason to exclude
14 it from long-term care insurance?
15      A.  No.
16      Q.  If you can turn to page 3, Section 5.3?
17      A.  Yes.
18      Q.  It says "Acute Kidney Injury and
19 Impairment in Renal Function.  STEGLATRO causes
20 intravascular volume contraction and can cause renal
21 impairment.  There have been postmarketing reports
22 of acute kidney injury some requiring
23 hospitalization and dialysis in patients receiving
24 SGLT2 inhibitors."
25           Do you see that?

Page 139

1       A.  Uh-huh.
2       Q.  Is that a reason to exclude this drug from
3  long-term care insurance underwriting?
4       A.  Potentially.
5       Q.  But it's not necessarily?
6       A.  Not necessarily but potentially.
7       Q.  How would you make that assessment?
8       A.  Over time and follow-up studies.
9       Q.  Okay.  So you would wait for time and
10 follow-up studies before --
11      A.  Yes.
12      Q.  -- categorically excluding it?
13      A.  Correct.  We would need more data.
14      Q.  Okay.  But in the meantime you would not
15 exclude it?
16           MR. MAGRATTEN:  Objection.
17           THE WITNESS:  No.
18 BY MR. KLEIN:
19      Q.  Okay.  Let's see.  Two more.
20           (Exhibit No. 27
21            marked for identification.)
22 BY MR. KLEIN:
23      Q.  Exhibit 27 lists a drug called Nesina,
24 (alogliptin)?
25      A.  Uh-huh.

Thomas & Thomas Court Reporters                1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                 Tel: (402) 556-5000 | Fax: (402) 556-2037

118

Bruce Henricks, MD                                                40 (148 - 151)
3/28/2018

Page 148

1  90 percent would be very attractive, you know, as a
2  effective therapeutic pharmaceutical.
3       Q.   And is that something that's assessed
4  through research studies?
5       A.   Yes.
6       Q.   Okay.  And when you say consistently above
7  90 percent in research studies, are you referring to
8  a research study that's on a intent-to-treat basis
9  or an as-treated basis?
10           MR. MAGRATTEN:  Objection to form.
11           THE WITNESS:  I'm not familiar enough
12  with the trials and how they're structured to
13  understand what that means.
14  BY MR. KLEIN:
15       Q.   Okay.  So you think that above 90 percent
16  efficacy is effective, but you're not sure how that
17  should be best indicated in a research study?
18       A.   Correct.
19           MR. MAGRATTEN:  Objection.
20  BY MR. KLEIN:
21       Q.   Now, I want you to assume with respect to
22  PrEP -- assume that two individuals who are applying
23  for long-term care insurance have identical sexual
24  practices.  Okay?
25       A.   Uh-huh.

Page 149

1       Q.   One person takes PrEP as directed.  The
2  other person is not on PrEP.  Do you follow that?
3       A.   Yes.
4       Q.   Okay.  Which person presents the higher
5  risk of contracting HIV?
6           MR. MAGRATTEN:  Objection.
7           THE WITNESS:  The one that's not on
8  PrEP.
9  BY MR. KLEIN:
10       Q.   Okay.  Which person in that scenario
11  presents the higher risk of long-term care insurance
12  claims?
13           MR. MAGRATTEN:  Objection.
14           THE WITNESS:  That's an unknown
15  because I don't know what -- the other comorbid
16  conditions they have.
17  BY MR. KLEIN:
18       Q.   And we're talking -- let's -- all right.
19  Let's just -- we're talking about two people -- let
20  me just be clear -- two people who are otherwise
21  qualified.
22       A.   I understand that.
23       Q.   Okay.  And with identical sexual
24  practices.  One takes PrEP as directed, the other is
25  not on PrEP.  Which person has the higher risk for

Page 150

1  long-term care insurance claims?
2           MR. MAGRATTEN:  Objection.
3           THE WITNESS:  I don't know.
4  BY MR. KLEIN:
5       Q.   Okay.  And why is that?
6       A.   Because if they're underwritten for an LTC
7  product, we do that with the data that we have at
8  the time of application and in the workup of the
9  case prior to the issuance of the policy.  Once the
10  policy is issued, we have no knowledge or control
11  over what happens to their health thereafter.
12       Q.   Right.  No.  I understand.  But in the
13  underwriting process.
14       A.   Oh, in the underwriting process?
15       Q.   Yes.  I should have clarified that.
16       A.   Okay.  In the underwriting process who --
17  you're looking at both individuals, then.  Who has
18  the highest risk of --
19       Q.   Who has the higher risk of --
20       A.   Higher risk of --
21       Q.   -- LTC claims?
22       A.   -- needing LTC benefits?
23       Q.   The person on PrEP or the person not on
24  PrEP?
25           MR. MAGRATTEN:  Objection.

Page 151

1           THE WITNESS:  I really don't know.
2  BY MR. KLEIN:
3       Q.   Why are you unable to conclude that?
4           MR. MAGRATTEN:  Objection.
5           THE WITNESS:  Because, as we gain
6  more information on PrEP, the potential exists that
7  they may not have any higher need for LTC benefits
8  than the individual with the same sexual practices
9  who is not on PrEP.
10  BY MR. KLEIN:
11       Q.   What would your assessment be -- so is it
12  correct, then, that for two individuals who are
13  otherwise qualified in the underwriting process with
14  identical sexual practices, one takes PrEP and the
15  other does not, you don't have any information to
16  conclude that the person who takes risk -- who takes
17  PrEP is at a higher risk for LTC claims?
18           MR. MAGRATTEN:  Objection.
19           THE WITNESS:  If I'm hearing your
20  question correctly, the person who is taking PrEP is
21  at no higher risk for LTC claim benefits.
22  BY MR. KLEIN:
23       Q.   Than the person who is not on PrEP; is
24  that correct?
25       A.   That could be.

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC              Tel: (402) 556-5000 | Fax: (402) 556-2037

Page 152

1  Q. So you don't have any specific information
2  to conclude that the person on PrEP is at higher
3  risk for LTC claims?
4       MR. MAGRATTEN: Objection.
5       THE WITNESS: Specific information,
6  no.
7  BY MR. KLEIN:
8  Q. Okay. Now, directing your attention,
9  again, to your expert report, which is one of the
10  exhibits. It's probably 3.
11      Let's see. On page 7 you are discussing
12  the medical literature on PrEP prior to 2015 in the
13  second full paragraph. Do you see that?
14  A. I do.
15  Q. And you say representative of the medical
16  literature before January 2015 are multiple
17  references (10, 12, 13, 14) offered as
18  examples where the period of clinical study ranged
19  from only one and a half to three years [as read].
20  A. Uh-huh.
21  Q. So References 10, 12, 13, and 14 are what
22  you are pointing to as the state of the medical
23  literature in January 2015?
24  A. As a representative, yeah.
25  Q. Representative. Okay.

Page 153

1       Do you know -- when did you first read
2  those studies?
3  A. Within the past six months.
4  Q. Okay. And if you can turn to page 12,
5  Reference 10 is to an article by the author Baeten;
6  right?
7  A. Yes.
8  Q. B-A-E-T-E-N?
9  A. Yes.
10  Q. Do you know what the study design was in
11  that?
12  A. I do not.
13  Q. You do not.
14      Do you know what the purpose of that study
15  was?
16  A. Well, in the title it's antiviral
17  prophylaxis for HIV prevention in heterosexual men
18  and women. I don't remember the details of the
19  article.
20  Q. Well, I'm asking you do you know what
21  the -- do you know what the research objective was?
22  A. I do not.
23  Q. Okay. Does the research objective -- is
24  the research objective of a study indicative of
25  the -- well, strike that.

Page 154

1       What about for Reference 12, which is the
2  Grant article from the Lancet in 2014? Do you know
3  what the research objective of that study was?
4       MR. MAGRATTEN: Objection to form.
5       THE WITNESS: No.
6  BY MR. KLEIN:
7  Q. Do you know what the purpose of that study
8  was?
9  A. No.
10  Q. Okay. Reference 13 -- I'm sorry. That
11  was Reference 13. I apologize.
12  A. Yeah. I see --
13  Q. Reference -- that's okay. The Grant study
14  we were just talking about is Reference No. 13.
15  A. Right.
16  Q. Reference 12 is the Cohen study from the
17  New England Journal of Medicine in 2011.
18  A. Uh-huh.
19  Q. Do you know what the purpose of that study
20  was?
21  A. From the title I would assume it was
22  prophylactic therapy with antivirals. I don't
23  recall the particulars of the study.
24  Q. All right. But the title doesn't tell you
25  what the objective of the study was, does it?

Page 155

1  A. No, it does not.
2  Q. Okay. And the objective of the study is
3  important to its conclusion; is that correct?
4  A. It should be, yes.
5  Q. Okay. Study No. 14 is Anderson from 2012.
6  Do you know what the purpose of that study was?
7  A. I would assume from the title it was to
8  look at the efficacy of Truvada as pre-exposure
9  prophylaxis in same sex men couples or encounters
10  between men having sex with men.
11  Q. Do you know what the objective of the
12  study was?
13  A. I do not.
14  Q. Okay. And that would be important to its
15  conclusion, wouldn't it?
16  A. Potentially so, yes.
17  Q. Yeah.
18      Do you know the difference between a --
19  the concepts "intention to treat" and "as treated"
20  in research study design?
21  A. I couldn't speak to the particulars, no.
22  Q. Okay. Now, at the bottom of page 7 of
23  your report --
24  A. Uh-huh.
25  Q. -- you -- there is a heading called

Page 156

1    "Compliance Issues"; right?
2        A.   Yes.
3        Q.   And those are things -- did you list those
4    as items that you would have concerns about with
5    respect to the underwriting of PrEP?
6        A.   Yes.
7        Q.   Okay.  And the first one is adherence?
8        A.   Uh-huh.
9        Q.   Okay.  Couldn't that be assessed by an
10   examination of the medical records of the applicant?
11       A.   Possibly.  What patients tell their doctor
12   and what they do are two different things.
13       Q.   I see.  Okay.
14            Is that the same for other medications?
15       A.   Absolutely.
16       Q.   Okay.  Now, the second item is "Will the
17   patient comply with the proper pre-PrEP evaluation
18   and testing?"
19       A.   Uh-huh.
20       Q.   Is that correct?
21       A.   Uh-huh.
22       Q.   What do you mean by that?
23       A.   Just as they -- are they compliant with
24   the recommendations from the FDA and the CDC -- CDC
25   on what should be the baseline evaluation of someone

Page 157

1    being considered for PrEP therapy.
2        Q.   So that's before they begin taking the
3    medication?
4        A.   Correct.
5        Q.   Okay.  And so that would appear in the
6    medical records of the person who is subsequently on
7    PrEP; correct?
8        A.   If the physician recorded it.  That's not
9    always the case.
10       Q.   Okay.  And that would be true for the
11   pre-prescription evaluation testing of any number of
12   drugs that Mutual does not exclude; is that correct?
13            MR. MAGRATTEN:  Objection.
14            THE WITNESS:  That's true.
15   BY MR. KLEIN:
16       Q.   In the third provision you say "Will the
17   patient comply with the recommended interval
18   follow-up once on PrEP?"
19       A.   Uh-huh.
20       Q.   And would that be assessed by the medical
21   records of an applicant for long-term care
22   insurance?
23       A.   Potentially, if the physician did a good
24   job of recording all of that.
25       Q.   Okay.  And does a physician always do a

Page 158

1    good job of recording recommended follow up for
2    prescription monitoring?
3        A.   No.
4        Q.   Okay.  And that would be true of many
5    medications that are not excluded by Mutual; is that
6    correct?
7        A.   That's true.
8        Q.   Okay.  Now, on page 8 there is a -- you --
9    you -- under the heading "Chart two" you ask the
10   question "Will the patient comply with and afford
11   the economic reality of taking a medication that
12   costs $1425 per month and the...medical costs of the
13   recommended follow-up while on PrEP"; is that right?
14       A.   Uh-huh.
15       Q.   Okay.  And you reference No. 15.  You
16   reference a publication in UpToDate --
17       A.   Uh-huh.
18       Q.   -- is that correct?
19       A.   Yes.
20       Q.   Okay.  Now, do you have any knowledge --
21   at the time you wrote your report or today, do you
22   have any knowledge of the state of insurance
23   coverage for PrEP in the United States?
24       A.   I do not.
25       Q.   Okay.  So you don't know the -- the

Page 159

1    percentage of private health insurers that are
2    covering the cost of PrEP?
3        A.   I don't.
4        Q.   And you don't know the degree of coverage
5    by state Medicaid agencies?
6        A.   I do not.
7        Q.   And that would -- that lack of knowledge
8    has been true from 2015 to present?
9        A.   Yes.
10       Q.   Okay.  Is Mutual concerned at all that
11   patients who take other important medications might
12   not be able to afford them?
13            MR. MAGRATTEN:  Objection.
14            THE WITNESS:  As it applies to
15   long-term care coverage?
16   BY MR. KLEIN:
17       Q.   Yes.
18       A.   We would have concern if they were not on
19   therapy for a condition that was known to respond
20   favorably to some form of therapy, and they came in
21   with an application, and they had Condition X.
22   There was proven therapy for it, and they weren't
23   taking it or had been noncompliant, that would have
24   a significant impact on our decision to offer them
25   coverage.

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC              Tel: (402) 556-5000 | Fax: (402) 556-2037

121

Bruce Henricks, MD                                                43 (160 - 163)
3/28/2018

Page 160

1  Q.  Well, if a patient applies for long-term
2  care insurance and they're on Truvada, they're
3  obtaining the medication; isn't that right?
4        MR. MAGRATTEN:  Objection.
5        THE WITNESS:  Yes.
6  BY MR. KLEIN:
7  Q.  All right.  So they can afford it, at
8  least as far as you can tell?
9  A.  Uh-huh.
10  Q.  Isn't that correct?
11  A.  Yes.
12  Q.  Okay.  What is the relationship between
13  promiscuity and long-term care insurance
14  underwriting?
15        MR. MAGRATTEN:  Objection.
16        THE WITNESS:  I don't believe there
17  is any.
18  BY MR. KLEIN:
19  Q.  Okay.  What is promiscuity?
20  A.  You're going -- it's going to be my own
21  opinion about that.  That would be -- in the text of
22  sexual practices, it would be unhealthy sexual
23  practices or frequency of exposure to unhealthy
24  sexual practices.
25  Q.  I'm sorry.  Promiscuity means frequency

Page 161

1  of -- can you say that again?
2  A.  Well, promiscuity may just be pursuing or
3  having access to sexual encounters, and in that
4  setting as a medical director you have to ask your
5  question are they exposed to sexually transmitted
6  diseases in this promiscuous behavior?  How frequent
7  is it?  How long has it been going on, et cetera.
8  Q.  What quantum of sexual activity
9  constitutes promiscuity?
10        MR. MAGRATTEN:  Objection.
11        THE WITNESS:  I think that's an
12  individual definition.  I don't know what the -- the
13  standards are for that.
14  BY MR. KLEIN:
15  Q.  Do you know if there are standards?
16  A.  I don't.
17  Q.  Do you -- is promiscuity a medical term?
18  A.  Yes, I think it is.  I haven't checked a
19  medical dictionary recently, but I would assume it's
20  in there -- included.
21  Q.  All right.  What is your assessment of the
22  risk for HIV of a promiscuous person, as you define
23  it, who takes PrEP as directed?
24  A.  The risk is low.
25  Q.  Okay.  And that person is excluded from

Page 162

1  Mutual's long-term care insurance; is that correct?
2  A.  That's true.
3  Q.  Okay.  So a person can be promiscuous and
4  not at high risk for HIV?
5  A.  Potentially so.
6  Q.  Okay.  Now, does Mutual -- is promiscuous
7  behavior, as you defined it, itself a grounds for
8  exclusion from long-term care insurance?
9  A.  Heavens, no.
10  Q.  Okay.  So if a person is not on PrEP, you
11  don't have any interest from a long-term care
12  insurance underwriting perspective of caring how
13  promiscuous they are?
14        MR. MAGRATTEN:  Objection.
15        THE WITNESS:  I'm sorry.  I didn't
16  follow that.
17  BY MR. KLEIN:
18  Q.  Let me try and rephrase that better.
19        You said that promiscuity is not a -- not
20  a grounds for exclusion from long-term care
21  insurance?
22  A.  Correct.
23  Q.  Okay.  Can -- does promiscuity, in your
24  view, have any health risks associated with it in
25  your view as a medical doctor?

Page 163

1  A.  As I said earlier, you worry about
2  exposure to sexually transmitted diseases and the
3  number of partners, the frequency, et cetera, and
4  the implications that may have on their health.
5  Q.  Okay.  And that could include HIV?
6  A.  Yes, it could.
7  Q.  Okay.  Do you -- but I guess it's true,
8  isn't it, that the promiscuous person not on PrEP
9  who is otherwise qualified is offered the LTC
10  insurance?  Right?
11        MR. MAGRATTEN:  Objection.
12        THE WITNESS:  Potentially so, yep.
13  BY MR. KLEIN:
14  Q.  Well, when you say "potentially so," if
15  they are otherwise qualified and they are
16  promiscuous and not on PrEP, they are going to get
17  the LTC insurance; right?
18  A.  If the medical records support that they
19  are getting good care, they're seen on a regular
20  basis, the physician recognizes the -- the potential
21  for sexually transmitted disease and is monitoring
22  for that, we could develop a comfort level to accept
23  that patient.  If they did not have those criteria,
24  we would be very reluctant to offer coverage.
25  Q.  Okay.  And they're not on PrEP?

Thomas & Thomas Court Reporters              1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC              Tel: (402) 556-5000 | Fax: (402) 556-2037

122

Bruce Henricks, MD
3/28/2018

44 (164 - 167)

**Page 164**

1    A. And they're not on PrEP.
2    Q. Okay. And they're not using condoms?
3  Let's just -- I mean, you -- well, let me strike
4  that.
5       You don't inquire whether your applicants
6  use condoms; is that correct?
7    A. We do not.
8    Q. Okay. So you don't look at whether
9  someone is promiscuous; right?
10   A. No.
11   Q. You don't look at whether they are using
12 condoms; right?
13   A. Right.
14   Q. You don't ask whether they are engaging in
15 particular sexual practices like receptive anal
16 intercourse; right?
17   A. Correct.
18   Q. Okay. And so all -- because you don't
19 screen for those individuals, individuals with that
20 profile will be in your applicant pool; isn't that
21 correct?
22   A. Yes.
23   Q. Okay. Is a promiscuous person, as you
24 understand that term, who is not on PrEP -- who is
25 not on PrEP and doesn't use a condom at high risk

**Page 165**

1  for HIV?
2       MR. MAGRATTEN: Objection.
3       THE WITNESS: My opinion?
4  BY MR. KLEIN:
5    Q. In your -- in your opinion as a medical
6  director of Mutual of Omaha and as an expert in this
7  case?
8    A. Yes.
9    Q. Okay. Why doesn't Mutual assess for HIV
10 risk in its long-term care underwriting processes?
11      MR. MAGRATTEN: Objection.
12      THE WITNESS: I don't know the
13 specific reason. We depend a great deal on the
14 medical records and the physician records that we
15 have and depend upon that to be enough information.
16 BY MR. KLEIN:
17   Q. Do you ask about any other activities that
18 may -- like, skydiving or things -- you know, do you
19 ask about any other activities that -- voluntary
20 activities a person may engage in?
21   A. I'm not conversant in the exact detail of
22 our long-term care app, but there are likely
23 questions about dangerous avocations.
24   Q. Okay.
25   A. But I don't know for sure. I would have

**Page 166**

1  to review the document.
2    Q. Okay. Can promiscuous behavior, as you
3  define it, in a insured lead to increased long-term
4  care claims?
5    A. Yes.
6    Q. Now, looking at page 8 --
7    A. Yes.
8    Q. -- under "Issues Relating to PrEP
9  Efficacy."
10   A. Right.
11   Q. You say the effectiveness of PrEP is -- is
12 influenced by the patient's adherence; is that
13 correct?
14   A. Yes.
15   Q. Okay. And that's true of every single
16 medication; is that right?
17   A. That's right.
18   Q. Okay. Now, in the next sentence you say
19 "The documented risk reduction is impacted by
20 medication compliance/adherence and may vary over a
21 range of 44 to over 90%."
22      Did you write that?
23   A. I did.
24   Q. All right. What -- and let me see here.
25      What did -- what do those numbers

**Page 167**

1  represent? Where are they from?
2    A. It's from Reference 10, New England
3  journal article that I listed in the reference
4  section.
5    Q. Okay. Do you know if those numbers which
6  you -- you wrote, a range of 44 to over 90 percent,
7  are numbers based on an intention-to-treat basis or
8  an as-treated basis in research?
9    A. I do not.
10   Q. Would that make a difference to you?
11   A. If I understood what those terms -- what
12 the -- the definitions of those two terms were, it
13 might.
14   Q. Okay. Now, in the next sentence you say
15 "If PrEP is not taken properly to sustain effective
16 blood levels and HIV is contracted, the resultant
17 HIV infection may harbor varying degrees of drug
18 resistence."
19      What do you mean by that?
20   A. Should someone be on PrEP therapy and have
21 ineffective blood levels and they contract HIV, the
22 infection has the potential to harbor varying
23 degrees of drug resistance. Meaning that if they
24 are then recognized as being HIV positive and ART
25 therapy is initiated, they may have a suboptimal

Page 168

1  response because they've developed some resistance
2  to the medication.
3      Q.   Okay.  Do you know the prevalence of
4  transmitted resistance in the randomized controlled
5  PrEP trials?
6      A.   I do not.
7      Q.   Okay.  Would that matter to you?
8      A.   It could.
9      Q.   Okay.  How so?
10     A.   It might change our assessment of the
11  efficacy, therapeutic benefit of -- of PrEP.
12     Q.   So if the prevalence were on the small --
13  if the prevalence of transmitted resistance was on
14  the smaller side, that could have an impact on your
15  thinking?
16     A.   Yes.
17     Q.   Okay.
18              (Exhibit No. 31
19              marked for identification.)
20  BY MR. KLEIN:
21     Q.   Do you recognize, Doc, Exhibit 31?
22     A.   Let me just -- this is from '17?  I don't
23  believe that I've recently read this.
24     Q.   Okay.
25     A.   No.

Page 169

1      Q.   Okay.  I will, then -- I will, then,
2  represent to you that the -- Exhibit 31 is one of
3  the references you relied upon in your expert
4  report.  Do you now recognize this study?
5      A.   Oh, I'm sorry.  You're exactly correct.  I
6  have seen it.
7      Q.   Okay.
8      A.   It was -- yeah.  It's No. 9.  Yeah.
9      Q.   Okay.
10     A.   Yeah.
11     Q.   Now, on --
12     A.   My error.
13     Q.   That's okay.  They all -- all these
14  studies look the same.
15     A.   They tend to blend together.
16     Q.   Can I draw your attention to page 277,
17  Section 3.2?
18     A.   I'm there.
19     Q.   Okay.  That says "Safety Concerns"?
20     A.   Yes.
21     Q.   And about halfway down that column under
22  "Safety Concerns," the authors -- by the way, are
23  the authors of this study familiar to you?
24     A.   No.
25     Q.   It's not actually a study.  It's a review;

Page 170

1  is that correct?
2      A.   Right.  Correct.
3      Q.   Okay.  They are not familiar to you.
4          Do you know whether any of them are
5  experts on PrEP?
6      A.   Specifically, no.
7      Q.   Okay.  About -- so, anyways, about halfway
8  down that column under safety concerns there is the
9  following statement:  "We would expect based on
10  current evidence that the long-term safety profile
11  will be within acceptable limits with favorable
12  benefit-risk profiles considering the impact of PrEP
13  on HIV prevention."
14     A.   I see that.
15     Q.   Do you see that statement?
16     A.   I do.
17     Q.   Do you agree with it?
18     A.   Yes.
19     Q.   Okay.  Under the -- under the Section 3.3
20  "Adverse Effects," the first line says the TDF/FTC
21  (Truvada) combination or TDF alone used for PrEP
22  generally shows a tolerable profile.  In most
23  studies, the experienced side effects did not differ
24  significantly from rates among participants taking
25  placebo."

Page 171

1          Do you see that statement?
2      A.   I do.
3      Q.   Do you agree with it?
4          MR. MAGRATTEN:  Objection.
5          MR. KLEIN:  I'm sorry.  What is the
6  objection?
7          MR. MAGRATTEN:  Objection to form.
8          MR. KLEIN:  Because I asked him if he
9  agreed with the statement?
10         MR. MAGRATTEN:  Yep.
11         THE WITNESS:  I would have to have
12  more data.
13  BY MR. KLEIN:
14     Q.   Okay.  So you don't know whether you agree
15  with that conclusion in this review?
16     A.   That's true.
17     Q.   Okay.  Now, if I could draw your attention
18  to page 281 under No. 4, the heading "Discussion"?
19     A.   Yes.
20     Q.   Second sentence reads, "From the trials
21  reviewed, it is evident that PrEP is highly
22  effective against HIV infection when taken as
23  required.  Most importantly, PrEP seems to be
24  characterized by low adverse effects."
25         Do you see that?

Bruce Henricks, MD                                                46 (172 - 175)
3/28/2018

Page 172

1    A.  I do.
2    Q.  Do you agree with it?
3    A.  I didn't do the research in this study.
4  From what they presented, it would be understandable
5  to agree.
6    Q.  So you agree with it?
7    A.  Yes.
8    Q.  Okay.  A few sentences later in that
9  section, this review that you relied upon says
10 "Generally, even for some side effects listed as
11 serious, such as kidney dysfunction, observed
12 increases in the serum creatinine level return to
13 normal after the discontinuation of PrEP."
14       Do you see that statement?
15   A.  I do.
16   Q.  Do you agree with it?
17   A.  Yes.
18   Q.  Okay.  The next sentence reads, "Tubular
19 renal toxicity from PrEP is rare and active
20 screening is not recommended."
21       Do you agree with that?
22   A.  If you're taking the article at its face
23 value, yes.
24   Q.  Well, you cited this article --
25   A.  Yes, I know.

Page 173

1    Q.  -- and relied upon it as -- for your
2  expert opinion; so I'm asking you.  You don't have
3  to agree with everything in it, of course, but I'm
4  asking you if you do.
5       MR. MAGRATTEN:  Objection to form.
6  BY MR. KLEIN:
7    Q.  Do you agree with -- do you agree with the
8  following statement in this article, quote, "Tubular
9  renal toxicity from PrEP is rare and active
10 screening is not recommended"?
11   A.  Yes, I agree with that.
12   Q.  What's tubular renal toxicity?
13   A.  The renal tubulars is where you exchange
14 electrolytes and water in the kidney as it -- as
15 your -- as the glomerulus is filtering the blood,
16 and tubular renal toxicity would be directly to that
17 portion of the renal tubules, a portion of the
18 glomerulus.
19   Q.  Are there medications that -- are there
20 other medications that you know of that can cause
21 tubular renal toxicity?
22   A.  Yes.
23   Q.  Like what?
24   A.  Some antibiotics that are taken that are
25 given parenterally, if that's IV or by injection.

Page 174

1  There are some cardiac drugs, as I recall.
2    Q.  Are the drugs that you were thinking of in
3  this statement grounds for exclusion from long-term
4  care insurance?
5    A.  No.
6    Q.  Okay.  The article, then, goes on to say
7  "The same applies to the reduction of BMD after
8  cessation in the use of TDF and therefore current
9  evidence does not support constant X-ray monitoring
10 at baseline before initiating PrEP and while taking
11 TDF/FTC."
12       Do you agree with that statement?
13   A.  Yes, I do.
14   Q.  Okay.  What is BMD?
15   A.  Bone mineral density.
16   Q.  Okay.
17   A.  It's a test for osteopenia or
18 osteoporosis.
19   Q.  Okay.  And you agree that there is no
20 evidence to even indicate monitoring for those
21 conditions in PrEP users?
22   A.  Yes.
23   Q.  A little bit further down are the --
24 starting in the fourth line from the bottom on
25 page 281 of this drug safety study there is the

Page 175

1  following statement:  "The use of TDF-based PrEP is
2  yet to present any case report involving serious
3  hepatic complications," any case.
4       Do you agree with that statement?
5    A.  I do.
6    Q.  Okay.  Does Mutual -- some of the drugs
7  that we spoke about this morning actually have had
8  cases of serious hepatic complications.  Do you
9  agree with that?
10       MR. MAGRATTEN:  Objection.
11       THE WITNESS:  You'll have to repeat
12 that again.  I'm sorry.
13 BY MR. KLEIN:
14   Q.  You recall the medications that we
15 discussed this morning?
16   A.  Yes, I do.
17   Q.  And some of those medications actually had
18 documented cases of serious hepatic complications?
19   A.  Yes.
20   Q.  And those drugs were not grounds for
21 exclusion by Mutual; is that correct?
22   A.  That's correct.
23   Q.  Okay.
24       (Exhibit No. 32
25       marked for identification.)

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                     Tel: (402) 556-5000 | Fax: (402) 556-2037

125

Page 176

1   BY MR. KLEIN:
2       Q.  I seem to only have one of these so.
3           Exhibit No. 32 is a column by the surgeon
4   general in 2012 in a journal called "Public Health
5   Reports," and it's called "Surgeon General's
6   Perspectives," and the subheading is "Medication
7   Adherence:  Helping patients take their medicines as
8   directed."
9           And the first line of this study says
10  "Seventy-five percent of Americans have trouble
11  taking their medicine as directed."
12          Do you agree with that?
13      A.  Yes.
14              (Exhibit No. 33
15              marked for identification.)
16  BY MR. KLEIN:
17      Q.  Okay.  Exhibit 33 is a review article
18  called "The significance of compliance and
19  persistence in the treatment of diabetes,
20  hypertension, and dyslipidaemia: a review."  These
21  conditions are well-known risk factors for
22  cardiovascular disease; is that right?
23      A.  That's right.
24      Q.  And cardiovascular disease increases the
25  risk of morbidity?

Page 177

1       A.  It does.
2       Q.  Does it increase the risk of long-term
3   care claims?
4       A.  Yes.
5       Q.  In this review published in 2007, it says,
6   "According to the World Health Organization,
7   non-compliance with long-term medication for
8   conditions such as hypertension, dyslipidaemia and
9   diabetes is a common problem that leads to
10  compromised health benefits and serious economic
11  consequences in terms of wasted time, money and
12  uncured disease."
13          Do you agree with that statement?
14      A.  Yes.
15      Q.  Can I direct your attention, please, to
16  page 82 under the heading "Conclusions"?
17      A.  Yes.  I have it.
18      Q.  The first sentence says "In this
19  systematic review, poor compliance and persistence
20  with cardiovascular and antidiabetic medication
21  proved to be a significant problem, with almost 30%
22  of days 'on therapy' not actually covered by
23  medication and only 59% of patients having
24  medication for more than 80% of their days 'on
25  therapy' in the year."

Page 178

1           Is that statement consistent with your own
2   understanding of the issue of patient non-adherence
3   to medication?
4       A.  Speaking as --
5           MR. MAGRATTEN:  Objection.
6           THE WITNESS:  Speaking as a prior
7   clinician, those numbers don't surprise me.
8               (Exhibit No. 34
9               marked for identification.)
10  BY MR. KLEIN:
11      Q.  Do you recognize number --
12  Doc, Exhibit No. 34?
13      A.  I do.
14      Q.  Have you read it?
15      A.  Yes.
16      Q.  Okay.  Can I direct your attention to
17  paragraph 37 on page 14?
18      A.  Okay.
19      Q.  And the first sentence of paragraph 37
20  says "The individuals who use PrEP are predominately
21  gay men."
22          Do you agree with that statement?
23      A.  Yes.
24      Q.  And why do you agree with that?
25      A.  From my research of Truvada over the past

Page 179

1   number of months, that's substantiated.
2       Q.  On page 15 --
3       A.  Uh-huh.
4       Q.  -- about four sentences down, there is a
5   sentence that says the primary sexual risk -- risk
6   factors for PrEP are receptive and, to a lesser
7   extent, insertive anal intercourse.
8           Do you agree with that statement?
9       A.  Yes.
10      Q.  The next sentence says "Heterosexual men
11  do not engage in receptive anal intercourse, and
12  uncommonly engage in insertive anal intercourse with
13  female partners."
14          Do you agree with that statement?
15      A.  I have no background to answer that.
16      Q.  Okay.  So you have no reason --
17      A.  No.
18      Q.  -- to disagree with it?
19      A.  I have no reason to disagree.
20      Q.  Okay.  The final sentence of that
21  paragraph says "It is well-known in the field of HIV
22  medicine and by clinicians and researchers with
23  knowledge of HIV and PrEP that approximately
24  80 percent of PrEP users to date are gay men."
25          Do you agree with that statement?

Page 180

1    A.  Yes.
2    Q.  Okay.  Below that it says "Mutual of
3  Omaha's categorical exclusion of PrEP users from
4  long-term care insurance is irrational and based on
5  a gross misunderstanding of the nature of HIV
6  transmission."
7        Do you agree with that statement?
8    A.  No.
9        MR. MAGRATTEN:  Objection.
10  BY MR. KLEIN:
11    Q.  Okay.  Good.  Just making sure we are all
12  awake.
13       Is coronary artery disease a serious
14  health condition?
15    A.  Absolutely.
16    Q.  And is using tobacco while one has
17  coronary artery disease something that would
18  exacerbate that condition?
19    A.  Potentially, yes.
20    Q.  Why do you say "potentially"?
21    A.  In general it does increase the risk of
22  more cardiovascular events.  That's not true in all
23  individuals, but in general it's a true statement.
24    Q.  Okay.  And what are the medical or health
25  consequences for somebody with coronary artery

Page 181

1  disease who smokes?
2    A.  There is a myriad of issues.  If you have
3  coronary disease and smoke on a regular basis, you
4  increase your chance of another cardiovascular event
5  by at least 50 percent.  There is also -- if you're
6  a long-term smoker that can accommodate a concern
7  about chronic lung disease and -- imposed from the
8  use of tobacco.  The effect on, not only the heart,
9  but the entire cardiovascular system is there; so
10  it's -- it's manifold.
11    Q.  And for someone who smokes in the presence
12  of coronary artery disease, what are the
13  consequences for long-term care needs?
14        MR. MAGRATTEN:  Objection.
15        THE WITNESS:  It can increase their
16  risk of needing those benefits.
17  BY MR. KLEIN:
18    Q.  Significantly?
19    A.  Yes.
20    Q.  Okay.  Do you know if Mutual has an
21  absolute exclusion of offering long-term care
22  insurance to somebody who uses tobacco in the
23  presence of coronary artery disease?
24    A.  I do not.
25    Q.  Okay.  Is the issuance of a long-term care

Page 182

1  insurance policy to a person with coronary artery
2  disease who smokes consistent with a conservative
3  philosophy of underwriting?
4        MR. MAGRATTEN:  Objection.
5        THE WITNESS:  It's based upon our
6  comfort level with coronary disease, smoking, and
7  other major adult impairments from the insurance
8  industry and our partners at the reinsurance level
9  and also our actuarial consultants like Milliman and
10  Roberts.
11  BY MR. KLEIN:
12    Q.  Is smoking -- so smoking itself is bad for
13  your health; right?
14    A.  Yes.
15    Q.  I mean, that's -- everybody agrees with
16  that one; right?
17    A.  Correct.
18    Q.  Okay.  And is it your understanding that,
19  under Mutual's underwriting policies, a person can
20  smoke an unlimited amount in an unlimited duration
21  and still get the select rate?
22    A.  Categorically it would -- that would
23  not -- the answer categorically to that is no.  We
24  would -- we would -- we would make our determination
25  based, again, upon the quality of the physician

Page 183

1  records and what it revealed to us as to the
2  significance of their lung disease and their
3  functional status.
4    Q.  Well, let's say an applicant for long-term
5  care insurance in 2015 has no lung disease or
6  manifestations of harm from smoking, but they smoke
7  a significant amount.  Let's say two packs a day.
8  Okay?  And they have done so for two decades.
9    A.  Uh-huh.
10    Q.  That person, as far as I understand the
11  underwriting manual, gets the -- is, if they are
12  otherwise qualified, gets the select rate.  Is that
13  your understanding?
14        MR. MAGRATTEN:  Objection.
15        THE WITNESS:  I would have to look at
16  the manual.  I have no reason to doubt that comment.
17  BY MR. KLEIN:
18    Q.  Okay.  And is giving the select rate to
19  someone who smokes two packs a day for two decades
20  or more consistent with a conservative philosophy of
21  underwriting?
22        MR. MAGRATTEN:  Objection.
23        THE WITNESS:  As it relates to our
24  experience with the industry and the resources that
25  we use to formulate underwriting policy, that would

# Exhibit S

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE
     Plaintiff

v.

MUTUAL OF OMAHA INSURANCE COMPANY       No.  1:16-cv-11381-GAO
     Defendant

## REPORT OF BRUCE W. HENRICKS, M.D. FACP

## PROFESSIONAL PROFILE

I am a Vice President and Medical Director at Mutual of Omaha Insurance Company. I have been with the company for 23 years this summer and have functioned as a medical resource to the underwriting department of both United of Omaha Life Insurance Company and Mutual of Omaha Insurance Company within the Individual Underwriting and Individual Product and Risk Management division.  The insurance product lines for which I am responsible include:  Life, Long Term Care (LTC), Disability Income (DI), Critical Illness (CI), Medicare Supplement, and Single Premium Immediate Annuities.  My experience with Mutual's LTC product and its underwriting and staff date from 1994.

Prior to joining the Mutual of Omaha Companies (the "Companies") in 1994, I was in the clinical practice of Internal Medicine within a multi-specialty medical group for 16 years.

I have testified at trial and by deposition in one prior case:  *H. Lefler vs. Mutual of Omaha Insurance Company* in 2007.

I have included my curriculum vitae which documents my professional background, industry presentations, and prior publications.

My professional responsibilities for the Companies includes the preparation of this report and I have not been additionally compensated for work on this document.

The opinions I have in this report have come from my prior medical training, the experience of private practice, and my tenure in insurance medicine.  I have cited contributory references at the close of this document.

## ROLE AS A MEDICAL DIRECTOR

As a Medical Director my primary responsibilities are to address the underwriters' specific questions on cases within underwriting both from the standpoint of properly interpreting medical data and evaluating their overall risk assessment.  In that regard, the Medical Department devotes considerable time to medical education as teaching opportunities present in daily case work.  Our department also holds regular education sessions on medical impairments to supplement the underwriters' understanding and comfort with risk selection.

Risk assessment is based upon the merits of the case, the underwriter's training and experience, actuarial data on morbidity and mortality provided from our re-insurance underwriting guidelines, Mutual's underwriting philosophy, and input from the Medical Department.  Our primary function is to help underwriters assess medical risk and interpret how it should be rated in concert with the recommendations from our reinsurers.  Our Medical Department serves as a consultative resource to the Companies and their Underwriting Departments. While our input and opinion on a particular case is influential, we do not make final determinations on case outcomes. Final decisions are left to the Underwriting Department.

We depend upon our reinsurance company partners for their guidance on underwriting insurance product risks.  Our treaties with them are contractual, and we are audited by them to validate our adherence to a mutually agreed upon approach to risk assessment. That applies to all insurance, is company specific, and each product line has a separate set of reinsurer product-specific guidelines (an underwriting manual).  Reinsurers have research and development divisions ("R&D") comprised of physicians, medical directors, and actuaries who evaluate advances in medicine as to their utility in proper risk selection.  Their R&D covers medical impairments previously underwritten and those where medical progress creates opportunities for new coverage.   The Mutual of Omaha Companies, like most direct carriers (companies that sell direct to consumers), depend heavily upon their reinsurance partners for underwriting guidance and pricing recommendations.

## AN OVERVIEW OF INSURANCE PRODUCT UNDERWRITING

Mutual's underwriting philosophy is founded upon and evolves from our own claims experience, industry-wide claims, and actuarial data that is insurance product line-specific.  As noted, it also is influenced by our reinsurance contractual relationships. Insurance products, (Life, DI, and LTC for example) have different levels of risk tolerance based upon the particular benefits of the product and are thus underwritten accordingly.  The focus in life insurance is solely on mortality and what factors create a higher risk of early death that is not expected from the risk assessment and actuarial pricing at the time of initial underwriting.  Ultimately a single claim is paid.

Insurance products like DI and LTC where the duration of benefits may be payable over years to decades the underwriting is approached in a significantly more conservative

fashion. This results from the risk(s) of coverage inherent to the respective insurance product (DI or LTC), and the potential for prolonged intervals of replacing lost income into an individual's mid to late sixties, or providing outpatient or confined care for the compromised or elderly during their last decade.

## LTC AT MUTUAL OF OMAHA AND THE ENVIRONMENT

Mutual of Omaha has offered LTC insurance products since 1987. LTC insurance had its origin in the late 1970's and gained popularity in the late 1980's and early 1990's. In contrast, the beginnings of life insurance date from the late 17th century in England. In North America actuaries have been working on mortality tables and pricing life insurance for nearly 200 years. LTC by comparison is relatively young. The industry and underwriters are challenged to deal with a population that has benefited from medical progress, is living longer, and fostered demographics where individuals over age 70 are some of the fastest growing segments of our society. Collectively, these factors have put immense stress on the LTC industry and offer insight into its' current difficulties.

Over the past 15 years or more, the LTC industry has contracted primarily due to extremely adverse claim experience and more recently the influence of low interest rates. The number of companies writing LTC has gone from 15-20 a decade ago to group of 5 or 6 major players at present. Many have simply exited the market, while others have sustained and continue to incur ongoing losses, which in some cases, amounts to billions of dollars. The appeal of the LTC market has been dramatically tarnished by unexpected claims on a product line that in many instances was, in hindsight, underpriced from the outset. Nearly all LTC companies have underestimated how long policyholders would live and claims last. Re-pricing initiatives have been made by the LTC industry, but their efficacy and ability to sustain the product line indefinitely is still in question. Accordingly, all current LTC insurance companies have taken a very conservative approach to new business and how it is underwritten. To meet their responsibility to pay appropriate claims for their policy owners and remain financially solvent every LTC carrier strives to classify new applicants for insurance accurately and set premiums commensurate with the risk.

At Mutual of Omaha we have traditionally approached the underwriting of LTC in a conservative fashion. As of 2015 we required medical records (attending physician's statements) on every applicant to supplement the rigorous and multi-faceted LTC risk assessment process. The acquisition of, and labor costs to review medical records are high but prove cost-effective in light of the history of LTC in the broader market place. Underwriting attempts to categorize the risks accurately from the current status of the proposed insured's medical conditions at the time of application. Those impairments may then worsen or new ones arise spontaneously during the life of a policy that may remain in force for decades.

Underwriting insurance products is very near-sighted in that we assess a condition(s) acutely at application and make a risk assessment prediction that we are contractually

bound to for the life of the policy. The balance between the initial risk assessment and pricing and what actually occurs over time is partially an unknown and creates varying degrees of risk while the policy is in force. New, unrecognized, or worsened medical conditions that evolve after underwriting and policy issue are then beyond the initial risk assessment and pricing assumptions. The LTC insurance industry realizes that some degree of uncertainty remains regarding the adequacy of LTC pricing. It is imperative that the companies ensure their ability to fulfill the financial obligations to their policyholders while remaining fiscally solvent for the long term. As a result, LTC insurance ranks as one of the most conservatively underwritten products largely from its long duration of coverage and the risk that what is underwritten at application may hold no resemblance to what actually occurs medically to the policy owner over time.

### HIV AND LTC INSURANCE AT MUTUAL OF OMAHA

The Mutual of Omaha Companies have chosen not to offer LTC insurance coverage to Human Immunodeficiency Virus (HIV) positive individuals. We are not aware of any LTC competitor who has adopted a different stance. Our decision initially was based upon the significant morbidity associated with HIV and its almost certain insidious progression to AIDS (acquired immunodeficiency syndrome) when untreated. The unacceptable risk of opportunistic infections, assorted malignancies and the steady incapacitation of the individuals' immune system exceeded our ability, and that of the LTC industry, to price the risk for LTC benefits. The advent of effective anti-retroviral therapy ("ART") in the mid 1990's has altered the prognosis of treated HIV significantly. Though the progress made is dramatic its impact on morbidity remains incompletely studied and has provided little or no long-term industry data on those HIV positive. The deficits in data include what the HIV positive population's true utilization of LTC benefits will be, and how that will influence claims experience.

The Mutual of Omaha Companies have not recorded nor are aware of a LTC claim directly related to HIV from the review of our underwriting and actuarial databases Furthermore Mutual of Omaha is not aware of any industry-wide data on HIV related LTC claims.

### TRUVADA, PHARMACOLOGIC DATABASES, AND MUTUAL OF OMAHA

Emtricitabine-tenofovir disoproxil fumarate ("Truvada") is a combination drug released for pre-exposure prophylaxis ("PrEP") in HIV by the FDA in the summer of 2012. The case in question originated with an application for LTC insurance benefits with the Mutual of Omaha Companies received in January of 2015. His application was the first occasion where a proposed insured using Truvada had applied for Mutual's LTC benefits.

At that time of application, Truvada for PrEP was not addressed in our reinsurers' underwriting guidelines and was categorized by our actuarial consultant Milliman and Roberts in their pharmacologic database, "Milliman IntelliScript" as a "red" or high risk medication. IntelliScript is a risk management tool provided to the insurance industry

that categorizes part of an applicant's risk from their specific use of prescription medications. Mutual of Omaha has been using Milliman's IntelliScript since 2006 as part of its underwriting protocol on a number of insurance products. Its value to Mutual of Omaha and the broader insurance industry has been excellent. Milliman is an established leader in actuarial services held in high regard by the insurance community.

A "red" designation by IntelliScript indicates the underwriting of the case should be approached with particular caution since the medication may be utilized in high risk or generally uninsurable situations. During the initial underwriting of the proposed insured the IntelliScript report listed Truvada while the medication section of the formal application did not. The use of Truvada was later admitted during the personal health interview ("PHI") by the applicant.

In our LTC underwriting guidelines we have a list of medications which when utilized by the applicant eliminates them from further consideration for coverage. Truvada was part of that list and further evaluation of the application was curtailed. IntelliScript's designation for Truvada was consistent with their classification of other anti-retroviral medications that fall in their "red" category along with additional medications associated with uninsurable or high risk medical impairments. Mutual of Omaha's inclusion of Truvada on our "uninsurable list of drugs" is in keeping with our underwriting protocol which relies upon our own investigation of new mediations in concert with recommendations from Milliman. Milliman does their own research and re-evaluation of IntelliScript. Mutual of Omaha does periodic reviews of Milliman Intelliscript recommendations coupled with our own evaluations of new medications that present in the course of underwriting.

## THE IMPACT OF HIV ADVANCES ON UNDERWRITING AND PRICING

Since the introduction of combination antiretroviral therapy ("ART") in 1996, the natural history of HIV disease has been radically altered. Despite the lack of an effective vaccine or cure, the sustained decrease in mortality and the progression of a HIV infection to AIDS in HIV positive individuals has been dramatic. Individuals who are appropriately treated and void of other significant comorbidities can now be expected to have a life expectancy approaching that of the general population. While this important medical advancement is beginning to influence the accessibility of Life insurance coverage in the U.S. (SwissRe **7**) and globally, broad industry acceptance by multi-line carriers for other insurance products remains lacking. Candidates for life coverage must meet very stringent underwriting criteria and are highly rated (multiples of a standard premium) to allow an offer.

The impact of effective ART for those HIV positive and PrEP with Truvada on multiple insurance products is being reviewed. This is occurring at both the reinsurance level (companies that insure part of the risk with major carriers) and with some direct carriers. Mutual of Omaha is part of that group beginning to investigate coverage for certain (non-life insurance) product lines. Though we have nearly twenty years of ART data, that experience has not yet yielded to meaningful morbidity improvements tested by

time and actuarial science.  Nor has PrEP been addressed in our current reinsurers' underwriting manuals.

Potential medical advances described in clinical studies may harbor real morbidity and mortality improvements but do so from controlled environments.  The rigors of the study's design and results may not be applicable in the setting that deals with the general population at large.  Reinsurer R&D divisions, and industry actuarial consultants evaluate their applicability to underwriting basing recommendations upon how those advancements influence the natural progression of the medical impairment(s) over time, and how it impacts claims experience.  The insurance industry deals with very large numbers (into the tens of thousands) of individuals potentially at risk.  Medical advances must have actuarial and statistical relevance before they are integrated into better product pricing or new coverage for heretofore unacceptable risks. That involves the study of credible medical outcomes over time and actuarial modeling and testing of claims data to validate their utility.

Understandably, the entire process may take years before a medical advancement influences the pricing of a product or allows offers to previously uninsurable risks. Doing so without the proven impact of the medical advancement and proper actuarial modeling of its influence on morbidity, mortality and claims could lead to vulnerability and unacceptable risk.  Risk that could lead to "anti-selection" where an insurer offers new, or greatly reduced pricing on a medical risk previously viewed more conservatively, if at all, by its competitors. That block of potentially high risk business could rapidly be channeled to a single carrier making them highly vulnerable.  The industry as a whole works diligently to avoid being anti-selected against. No insurance carrier wants to autonomously pioneer access to an insurance product without the endorsement of its reinsurers and the actuarial community.

An important example of where medical progress has had a significant positive impact on insurability is in Hepatitis C.  Improvements in the evaluation and treatment of this common form of virally induced chronic liver disease have allowed the reinsurance and actuarial communities to reevaluate prior pricing assumptions. Where no, or highly rated offers predominated a few years ago we now commonly will make offers with a low sub-standard to standard rating.  This is one of many conditions where better pricing has benefited from medical science.  The process works; it just takes time for the advancement (a new form of medicinal treatment, a new or improved surgical technique, a combination of treatment modalities, etc.) to satisfy the prerequisites essential to the insurance industry.

## UNDERWRITING CONCERNS RELATED TO TRUVADA

At the time of application in January of 2015, Truvada was only in its third year of FDA approved availability for PrEP.  There were no reinsurance recommendations on how to deal with Truvada in underwriting at the time and its rating as a "red" drug by Milliman's IntelliScript signified that extreme underwriting caution should be exercised.  The state

of knowledge from reputable insurance industry resources on Truvada was understandably extremely limited at that juncture, and remains largely so today.

There are reported to be 1.2 million candidates for PrEP therapy in the U.S. To date only about 145,000 prescriptions for Truvada have been written representing only 0.045% of the U.S. population. In early 2015, those numbers would have been even smaller. This small cohort of individuals coupled with the relatively short time Truvada had been approved as PrEP has not provided enough data to answer the questions of long-term toxicities and their impact on morbidity. Additional concerns relate to the recommended pre-treatment evaluation of candidates for PrEP (**Chart one**), recommended protocols for the follow-up of PrEP once on treatment (**Chart two**), the impact of PrEP medication compliance on efficacy, and the risk of HIV resistance associated with improper HIV status surveillance pre-PrEP, and the failure to monitor HIV status once on PrEP should an individual become HIV positive.

The medical literature prior to January of 2015 I have reviewed has no real conclusions on the long-term implications of Truvada therapy or related toxicities that would allow analysis of their potential influence on morbidity. Representative of the medical literature before January 2015, are multiple references (**10, 12, 13,** and **14**) offered as examples where the period of clinical study ranged only from one and one half, to three years. Reference (**9**) from Drug Safety was a literature search from January of 2001 to April 2016 using 4 large databases and focusing on safety concerns of PrEP utilizing the medications in Truvada. In the review, they acknowledge "that the trials discussed are short term and do not give the opportunity to assess the long-term, real-world safety profile of the products used for PrEP". Although published after early 2015, the review still provides historical perspective on the absence of long-term safety data related to Truvada present in the medical literature at the time. The absence of such data severely compromises the insurance industry's ability to properly assess and price potential risk(s) that may exist for decades within a LTC policy.

The merits of Truvada within a well-designed and controlled medical study may not be routinely applicable to the general population interested in protection afforded by LTC or other morbidity-related insurance products. Demographic, socioeconomic, and cultural influences may alter actual results dramatically. The impact of which cannot be fully evaluated without the benefit of time and extensive claims experience.

PrEP with Truvada has the potential to be a significant advancement in efforts to check the spread of HIV. Amidst that potential, however, are many issues which complicate its use and full evaluation:

## Compliance Issues

Will the patient adhere to taking a medication once daily?
Will the patient comply with the proper pre-PrEP evaluation and testing?
    (**Chart one**)
Will the patient comply with the recommended interval follow-up once on PrEP?

(**Chart two**)

Will the patient comply with and afford the economic reality of taking a medication that costs $1425 per month and the comprehensive medical costs of the recommended follow-up while taking PrEP? (Reference **15**)

Will the patient recognize that Truvada is not 100% effective and additional protective measures are recommended?

Will PrEP therapy alter behavior and foster promiscuity?

## Issues Relating to PrEP Efficacy

Truvada's effectiveness in preventing HIV is directly influenced by the patient's adherence to taking it.

The documented risk reduction is impacted by medication compliance/adherence and may vary over a range of 44 to over 90% (Reference **10**)

If PrEP is not taken properly to sustain effective blood levels, and HIV is contracted, the resultant HIV infection may harbor varying degrees of drug resistance.  If HIV is acquired from ineffectual PrEP administration, and then well treated each scenario mentioned here could lead to an elevated risk of morbidity and the need for LTC benefits.

## UNDERWRITING CONCERNS RELATED TO THE APPLICATION IN QUESTION

The rationale behind the applicant's decision to begin Truvada as PrEP is a bit perplexing when his exposure risk was negligible from the data he provided and by his own comments.  In the personal health interview (PHI), taken as part of routine LTC underwriting, he is the reported owner of gym facilities.  It would seem unusual in the scope of his responsibilities that there would be regular exposure to blood, vomit and fecal material.  Even as a gym participant, exposure to bodily fluids poses an infinitesimally low risk of HIV infection.  The exposure of traumatized or inflamed skin, or mucosal membranes to blood would carry a risk approaching one in a thousand.  Even with respect for his right of personal choice, the decision to begin PrEP seems curious and seemingly at his discretion alone.  Medical records available to Mutual of Omaha fail to show any consultative discussion of PrEP with his physician nor evidence of adherence to recommended protocols for pre-treatment evaluation.

Although the side-effects of Truvada are mild and generally self-limited, his decision to accept those and the potential of long-term systemic toxicities yet to be fully evaluated, and the considerable overall expense of PrEP raises some red flags from a risk selection perspective.  Those concerns are amplified by his own assessment that his HIV risk was low.  We also did not know his HIV status (beyond what he represented in his application) at the initiation of PrEP nor was there medical records evidence of being immunized for Hepatitis B.  Many would consider that to be the standard of care in gay men.

**CONCLUSION**

Based upon my insurance industry experience, medical knowledge, and review of the case and Truvada it is my professional opinion that our action to decline was consistent with our underwriting guidelines in force at the time of application.  Our decision was fair and reasonable in concert with our LTC underwriting standards and that of the industry, and void of discrimination directed at applicant's using Truvada-PrEP.  The decision to avoid an offer of coverage stemmed largely from concerns over a novel medication that lacked reliable long-term data on its manifold implications related to the risk of morbidity and their influence on the need for LTC benefits.

**Chart One:**

Evaluation of patients prior to initiation of pre-exposure prophylaxis (PrEP) against HIV, from references (**1, 2** and **15**)

**Before Initiating PrEP**
Determine eligibility
>Document negative HIV test(s) immediately before starting PrEP

>Test for acute HIV infection with HIV RNA if patient has symptoms consistent with acute HIV infection or has had a high-risk exposure in the last four weeks

>Confirm the patient is at substantial, ongoing, high risk for acquiring HIV infection based upon a detailed sexual and drug use history and results of sexually transmitted infection (STI) testing

>Confirm that calculated estimated glomerular filtration rate is >/= 60ml/min/1/73 meter squared

Other recommended tests to determine risks of PrEP

>Screen for HBV hepatitis B virus

>Obtain urinalysis in patients with risk factors for renal disease

>Perform DXA scan in patients with, or at high risk for, osteoporosis

**Beginning PrEP medication regimen**

>Prescribe 1 tablet of TDF-FTX daily

>In general, prescribe no more than a 90 day supply, renewable only after HIV testing confirms that patient remains HIV uninfected

>Provide counselling on condoms, risk reduction, and PrEP medication adherence

**Chart Two:**

Monitoring patients during administration of pre-exposure prophylaxis (PrEP) against HIV, from references (**1**, **2**, and **15**)

**One month after starting PrEP:**

> Evaluate and support PrEP medication adherence

> Assess risk behaviors and provide risk-reduction counseling and condoms

> Evaluate for side effects

**Three months after starting PrEP:**

> Evaluate and support PrEP medication adherence

> Perform HIV test

> Assess risk behaviors and provide risk-reduction counseling and condoms

> Check serum creatinine in all patients

> Test for STIs among individuals with high-risk behaviors, even if patient is asymptomatic

**Every three months thereafter:**

> Evaluate and support PrEP medication adherence

> Perform HIV test

> Assess risk behaviors and provide risk-reduction counseling and condoms

> Monitor creatinine in patients at risk for renal disease, others should be checked every six months

> Test for STIs among individuals with high-risk behaviors, even if without symptoms

**On discontinuing PrEP (at patient request, for safety concerns)**

> Perform HIV test(s) to determine whether HIV infection has occurred.
> If the patient has chronic HBV infection, the decision to switch to an alternative agent or to monitor for HBV flare should be discussed with a provider experienced in the management of HBV

**Reference Sources**

The following references and publications have been utilized to formulate my opinions in this report:

Centers for Disease Control
.
1.  Pre-exposure Prophylaxis (PrEP) for HIV prevention- May 2014

2.  Pre-exposure Prophylaxis for the Prevention of HIV Infection in the United States - 2014

Munich Reinsurance Company.  Truvada PrEP

3.  North American Underwriting Manual- EDGE publication July 2016

4.  Underwriting Considerations for Pre-Exposure Prophylaxis against HIV Infection with Truvada 2015

Voya Financial

5.  Insuring HIV:  Not if, but when?
    February 2017

American Council of Life Insurers (ACLI) Medical Section Scientific Program

6.  HIV Long Term Prognosis:  Optimistic Outcomes.
    February 2014

7.  SwissRe Life Guide, https://globaluw.guides.swissre.com
    HIV infection and AIDS
    Information and Adult ratings sections.

8.  The BODY PRO, The HIV Resource for Health Professionals
    Weighing the Risks of TDF/FTC PrEP Effects in People Without HIV
    Winter 2012

9.  Pre-Exposure Prophylaxis for HIV Prevention:  Safety Concerns
    *Drug Safety* 2017, 40(4): 273-283

10.  Baeten JM, Donnell D, et al.  Antiviral Prophylaxis for HIV Prevention in Heterosexual Men and Women. *N Engl J Med* 2012;367; 399-410

11.  Mayer KH, Ramjee G, The current status of the use of oral medication to Prevent HIV transmission.  *Curr Opin HIV AIDS.*2015; July, 10(4); 226

**140**

-232

12.  Cohen MS, Chen YQ, et al. Prevention of HIV-1 Infection with Early Anti-retroviral Therapy. *N Engl J Med* 2011;354; 493-505

13.  Grant RM, Anderson PL, McMahan V, et al. Uptake of pre-exposure prophylaxis, sexual practices, and HIV incidence in men and transgender women who have sex with men: a cohort study. *Lancet Infect Dis* 2014;14; 820-29

14.  Anderson PL, Glidden DV, et al. Emtricitabine-tenofovir exposure and pre-exposure prophylaxis efficacy in men who have sex with men.*Sci Transl Med* 2012; Sep 12;4(151): 151ra15

15.  UpToDate:  http://www.uptodate.com  2018 UptoDate, Inc.

Krakower D. Mayer KH. Patient evaluation and selection for HIV pre-exposure prophylaxis. Post TW, ed, UpToDate, Waltham, MA:UpToDate Inc

UpToDate is an evidence based physician-authored clinical decision support resource.  More than 6500 world-renowned physician authors and editors synthesize the most recent medical information into recommendations used by 1.3 million physicians in 187 countries and by nearly 90% of major academic medical centers in the U.S.

UpToDate has been recognized as a valuable medical resource for over a decade and was used to provide background on PrEP-Truvada in addition to the current state of knowledge.

# Exhibit T

Milliman Client Report



# Mutual of Omaha
## Expert Report in the Matter of
### John Doe v. Mutual of Omaha Insurance Company
### No. 1:16-cv-11381-GAO

Prepared for:
**Mutual of Omaha**

Prepared by:
**Milliman, Inc.**

**Allen J. Schmitz, FSA, MAAA**
Principal and Consulting Actuary

15800 Bluemound Road
Suite 100
Brookfield, WI 53005
USA
Tel   +1 262 784 2250
Fax   +1 262 923 3680

milliman.com

February 13, 2018

**143**

**Milliman** Client Report

## TABLE OF CONTENTS

I.    **INTRODUCTION** ............................................................................................................... 1

II.   **SUMMARY OF ALLEN SCHMITZ'S EXPERIENCE** ........................................................... 2

III.  **CAVEATS** ........................................................................................................................... 3

IV.  **LTC INSURANCE BACKGROUND** ................................................................................... 4

V.   **LTC UNDERWRITING AND HIV** ....................................................................................... 5

VI.  **TRUVADA** ........................................................................................................................... 7

VII. **CONCLUSION** ................................................................................................................... 8

**APPENDICES**

Appendix A: Biography and Curriculum Vitae
Appendix B: Information Reviewed

---

**Mutual of Omaha Insurance Company**
Expert Report in the Matter of John Doe v. Mutual of Omaha Insurance Company No. 1:16-cv-11381-GAO

February 13, 2018

## I.    INTRODUCTION

I have been retained by Mutual of Omaha Insurance Company to review the actuarial and underwriting considerations associated with the case John Doe v. Mutual of Omaha Insurance Company and render an opinion as to whether Mutual of Omaha's underwriting guidelines are reasonable with respect to Truvada.

Both Milliman, Inc. (Milliman) and I personally have assisted Mutual of Omaha with actuarial modeling and experience analysis on their Long-Term Care (LTC) insurance business. Notwithstanding this past and ongoing client relationship, I have been asked for, and present here, my independent professional analyses, judgments, and opinions. My retention for this assignment was conditioned on my freedom and ability to provide an independent expert opinion.

Milliman is among the world's largest providers of actuarial and related products and services. Founded in 1947, Milliman is an independent firm with offices in major cities around the globe. We offer consulting services in employee benefits, healthcare and long-term care, life insurance and financial services, and property and casualty insurance. We have more actuaries specializing in LTC insurance than any other consulting firm. Milliman's LTC insurance claim cost guidelines (*Guidelines*) are developed from a comprehensive LTC claims database that contains claim experience data from 10 of the top 15 companies measured by inforce lives. The *Guidelines* provide a flexible, but consistent basis to help companies price and manage their LTC insurance business.

**Mutual of Omaha Insurance Company**
Expert Report in the Matter of John Doe v. Mutual of Omaha Insurance Company No. 1:16-cv-11381-GAO

Page 1

February 13, 2018

**145**

## II.    SUMMARY OF ALLEN SCHMITZ'S EXPERIENCE

I am a Principal and Consulting Actuary of Milliman, Inc. My primary area of expertise is LTC insurance. I have worked in the LTC insurance industry for more than 25 years. As an actuary, I work closely on issues related to rating, underwriting, experience analysis, and financial projections. I have extensive experience working with state insurance departments and LTC insurance companies with respect to pricing of policies and rate filings. I testified before Congress on the actuarial implications of the CLASS ACT – the LTC reform provision in the Patient Protection and Affordable Care Act.

I am a frequent speaker and writer on subjects primarily relating to LTC insurance. I have been significantly involved in various industry professional committees. I am currently Chair of the American Academy of Actuaries LTC and Disability Income Work Group. I am also currently a member of the American Academy of Actuaries Board of Directors.

A copy of my Biography and Curriculum Vitae are attached as Appendix A.

The cases below represent prior expert witness work where I either testified or provided a deposition.

- 2009, Frank and Margaret Hatfield and Ronald and Karen Murphy v. Kentucky Department of Insurance and Transamerica Life Insurance, Administrative Hearing; Expert Report and Testimony.

- 2010, Ralph D. Rouse, Jr. v. Linda M. Springer, Director of US Office of Personnel Management Case Number 06-2088 (RWR); Expert Report and Deposition.

I am being compensated at my normal hourly rate of $615 that is irrespective and independent of the conclusions I reached in this case.

**Mutual of Omaha Insurance Company**
Expert Report in the Matter of John Doe v. Mutual of Omaha Insurance Company No. 1:16-cv-11381-GAO

Page 2

February 13, 2018

**146**

## III.    CAVEATS

This report is prepared with respect to the matter of John Doe v. Mutual of Omaha Insurance Company No.1:16-cv-11381-GAO and is not intended, nor is it suitable, for other purposes. The report should not be shared with those not involved with this case without the written permission of Milliman, Inc. This report is not intended to benefit any third party. To the extent permission is granted to distribute this report, it must be distributed in its entirety.

I have relied on the information presented to me and listed in Appendix B of this report. I reserve the right to amend or supplement the conclusions in this report if and when new data or information becomes available.

I, Allen Schmitz, am associated with Milliman. I am a member of the American Academy of Actuaries and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion contained in this report. To the best of my knowledge and belief, this report is complete and accurate and has been prepared in accordance with generally recognized and accepted actuarial principles and practices.

**Mutual of Omaha Insurance Company**                                                                                                    Page 3
Expert Report in the Matter of John Doe v. Mutual of Omaha Insurance Company No. 1:16-cv-11381-GAO

February 13, 2018

## IV.    LTC INSURANCE BACKGROUND

LTC insurance is generally sold as guaranteed renewable with premiums intended to be level over the life of the product. Guaranteed renewable means that the policy cannot be cancelled for any reason other than non-payment of premiums, and rates for an individual can only be changed for an entire class of policyholders. Policies sold to individuals are underwritten. Underwriting commonly includes gathering medical and other information on an applicant to assess the risk for LTC insurance coverage. The product design commonly includes a pool of money benefit that reimburses (up to a maximum daily or monthly benefit) for home care, assisted living facility, or nursing facility expenses. A common benefit eligibility trigger requires assistance with at least two of six activities of daily living (ADL) (eating, bathing, dressing, toileting, transferring, or continence) or severe cognitive impairment.

LTC insurance was introduced in the 1970s. Sales of the product grew, particularly during the 1990s and early 2000s. The product evolved during that time period. Underwriting guidelines became more restrictive as companies gained claim experience and learned more about risks. Coverage expanded beyond nursing home care to include home care and assisted living facilities. Changes to the tax code in the late 1990s caused insurers to standardize provisions in LTC insurance contracts, such as the requirements to qualify for benefits to include specific ADLs and definition of severe cognitive impairment.

The LTC market in 2015 was in a state of significant contraction. In the late 1990s, more than 100 companies were selling LTC insurance policies. By 2009, most of these companies stopped selling LTC insurance policies[1]. In 2014, there were less than 20 insurers selling individual LTC insurance policies[2]. There were about 750,000 LTC insurance policies sold in 2002 and by 2014 that number was less than 150,000[3]. Many carriers exited the market by discontinuing new product sales. Reasons for carriers exiting the market were many, but poor financial performance was a significant contributing factor. As carriers exited the market, those that remained attempted to improve the profitability of new sales and made their underwriting guidelines more restrictive. Many LTC insurance blocks that were sold in the 1990s and 2000s have struggled financially. Some carriers have gone insolvent and others that are part of large multi-line organizations have filed for significant rate increases and / or taken significant reserve charges.

---

[1] Cohen, Kaur, Darnell, "Exiting the Market: Understanding the Factors Behind Carriers' Decision to Leave the Long-Term Care Insurance Market," July 2013.

[2] Broker World, "Milliman Long Term Care Insurance Survey," 2015.

[3] LIMRA, "U.S. Individual Long-Term Care Insurance," 2014.

**Mutual of Omaha Insurance Company**
Expert Report in the Matter of John Doe v. Mutual of Omaha Insurance Company No. 1:16-cv-11381-GAO

Page 4

February 13, 2018

**148**

Milliman Client Report

## V.    LTC UNDERWRITING AND HIV

Underwriting is a critical part of individual LTC insurance policies. From an actuarial perspective, it is necessary to align the level of underwriting with the pricing and underlying risk being insured. A significant challenge in underwriting LTC insurance is the long-term nature of the product. Claims are often not expected, on average, for 20 or more years after an application has been accepted. The company must assess the risk of LTC needs over decades after an applicant is offered coverage. Therefore, examining both medical and non-medical factors are important underwriting considerations. In pricing LTC insurance and aligning the underwriting to the pricing, it is common to examine the underwriting information collected (such as medical records, phone interviews, face-to-face interviews, and drug screens) and the general underwriting decisions made with that information. This examination includes consideration of what conditions or combinations of conditions are uninsurable. In setting pricing assumptions, the actuary must consider underwriting and the effect of selection and classification of applicants, as required in Actuarial Standard of Practice (ASOP) #18 on LTC Insurance.

I am not aware of any insurer that accepted individuals who are HIV positive for LTC coverage in 2015 or at present. In researching the underwriting of HIV, I interviewed five carriers, three brokers who sell products for multiple companies, and an LTC insurance third party administrator (TPA).

In determining whether to accept HIV coverage, insurers consider the additional risk associated with the condition. Medical literature indicates HIV infection weakens your immune system, making you susceptible to numerous infections and certain types of cancers[4]. Actuaries often rely on data to develop appropriate risk classification and lack of data can be a reason to be concerned about the risk. The Milliman *Guidelines* claim cost data contain a very small number of claims where the primary diagnosis is HIV or AIDS. However, the *Guidelines* data generally only provide the primary diagnosis of a claim and, therefore, a claimant's complete medical history is not present in the *Guidelines* data. Where there is little data available actuaries look to expert opinion (including that of underwriters and medical directors) and standard industry practices with respect to a given risk. This approach complies with the Actuarial Standard of Practice (ASOP) #12 on Risk Classification. Some relevant sections of ASOP #12 are included below.

> *3.2.1 Relationship of Risk Characteristics and Expected Outcomes – The actuary should select risk characteristics that are related to expected outcomes. A relationship between a risk characteristic and an expected outcome, such as cost, is demonstrated if it can be shown that the variation in actual or reasonably anticipated experience correlates to the risk characteristic. In demonstrating a relationship, the actuary may use relevant information from any reliable source, including statistical or other mathematical analysis of available data. The actuary may also use clinical experience and expert opinion.*
>
> *Rates within a risk classification system would be considered equitable if differences in rates reflect material differences in expected cost for risk characteristics. In the context of rates, the word fair is often used in place of the word equitable.*
>
> *The actuary should consider the interdependence of risk characteristics. To the extent the actuary expects the interdependence to have a material impact on the operation of the risk classification system, the actuary should make appropriate adjustments.*
>
> *Sometimes it is appropriate for the actuary to make inferences without specific demonstration. For example, it might not be necessary to demonstrate that persons with seriously impaired, uncorrected vision would represent higher risks as operators of motor vehicles.*
>
> *3.2.2 Causality – While the actuary should select risk characteristics that are related to expected outcomes, it is not necessary for the actuary to establish a cause and effect relationship between the risk characteristic and expected outcome in order to use a specific risk characteristic.*

---

[4] Harvard Health Publishing, "HIV/AIDS," *2014,* https://www.health.harvard.edu/diseases-and-conditions/hiv-aids.

**Mutual of Omaha Insurance Company**                                                                                                      Page 5
Expert Report in the Matter of John Doe v. Mutual of Omaha Insurance Company No. 1:16-cv-11381-GAO

February 13, 2018

**149**

*3.2.6 Industry Practices – When selecting risk characteristics, the actuary should consider usual and customary risk classification practices for the type of financial or personal security system under consideration.*

In determining underwriting criteria, a company must consider risk classification strategies of other carriers in the industry. If a carrier is the only one, or one of only a few, who accepts certain conditions with higher risk, that carrier may end up with an insurance pool of increased risk. Similarly, if an insurer is among the first to accept a new condition with potentially higher risk, that insurer may attract a higher number of individuals with that condition and disproportionally increase the risk of the insured pool. Appropriate management of the risk pool of LTC insurance policies is critical to the financial viability of the product.

Mutual of Omaha's LTC insurance underwriting guidelines with respect to HIV are generally consistent with other LTC insurance carriers.

**Mutual of Omaha Insurance Company**
Expert Report in the Matter of John Doe v. Mutual of Omaha Insurance Company No. 1:16-cv-11381-GAO

February 13, 2018

Page 6

**150**

## VI.    TRUVADA

As stated on the website https://www.truvada.com, *Truvada is a prescription medicine that is used to treat HIV-1 infection in people who weigh at least 35 kg (77 pounds). Because Truvada by itself is not a complete treatment for HIV-1, it must be used together with other HIV-1 medicines.*

Also noted on the same website https://www.truvada.com, *Truvada for PrEP (pre-exposure prophylaxis) is a prescription medicine that can help reduce the risk of getting HIV-1 when taken every day and used together with safer sex practices.*

- *TRUVADA for PrEP is only for adults who are at high risk of getting HIV through sex*
- *You must be HIV-negative before you start taking TRUVADA for PrEP*

The following is noted on the CDC website https://www.cdc.gov/hiv/risk/prep/index.html: "Pre-exposure prophylaxis, or PrEP, is a way for people who do not have HIV, but who are at substantial risk of getting it, to prevent HIV infection by taking a pill every day. The pill (brand name Truvada) contains two medicines (tenofovir and emtricitabine) that are used in combination with other medicines to treat HIV. When someone is exposed to HIV through sex or injection drug use, these medicines can work to keep the virus from establishing a permanent infection. When taken consistently, PrEP has been shown to reduce the risk of HIV infection in people who are at high risk by up to 92%. PrEP is much less effective if it is not taken consistently." Studies have shown a significant degree of non-adherence by individuals taking PrEP[5].

There is no data available on the long-term consequences of Truvada for PrEP use or the utilization of LTC benefits by those who take Truvada as PrEP. An incremental risk for an LTC policy can be significant when measured over the many years that an insurance contract may remain in effect. The majority of LTC insurance carriers automatically decline individuals who use Truvada.

Milliman Intelliscript is an informational product currently used by approximately 18 LTC insurance companies. The base product classifies medications as red, yellow, or green corresponding to high, medium, or low risk. Truvada in 2015 was classified as a red, or high risk drug in the base Intelliscript product. Truvada was classified as red because it is associated with HIV. There are multiple drugs that are classified as red (more than 275 in 2015) in the base Intelliscript product. Some clients automatically decline any red drug. Others use the red classification as a basis for further investigation and heightened scrutiny in underwriting an applicant.

Mutual of Omaha's LTC insurance underwriting guidelines with respect to Truvada are consistent with most other LTC insurers in the industry. I am aware of only two carriers currently that do not have an automatic decline for Truvada. Those carriers will submit applications for LTC coverage by those taking Truvada for review on an individual underwriting basis with heightened scrutiny.

Plaintiff alleges that Mutual of Omaha's underwriting guidelines with respect to Truvada are biased against homosexual men. Based on information provided in Mutual of Omaha's underwriting guidelines and approach to underwriting, I do not see any evidence that this is the case. As noted in the November 24, 2018 letter from Mark Pogue to the Commonwealth of Massachusetts, Mutual of Omaha has no interest in the sexual orientation of its policyholders. Its applications do not request information on this topic, its medical history questionnaire does not inquire into this topic and its underwriting guidelines do not make reference to this topic. Since 2011 Mutual of Omaha has sold more than 150 LTC insurance policies to male partners who submitted joint applications and are presumably homosexual.

---

[5] Grant RM, Lama JR, Anderson PL, et al. "Preexposure chemoprophylaxis for HIV prevention in men who have sex with men." N Engl J Med. 2010;363(27):2587–99.;
Grant RM, Anderson PL, McMahan V, et al. "Uptake of pre-exposure prophylaxis, sexual practices, and HIV incidence in men and transgender women who have sex with men: a cohort study." Lancet Infect Dis. 2014;14(9):820–9.;
Hosek S, Rudy B, Landovitz R, et al. "An HIV pre-exposure prophylaxis (PrEP) demonstration project and safety study for young men who have sex with men in the United States," 8th International AIDS Society Conference on HIV Pathogenesis, Treatment and Prevention, Vancouver, British Columbia. 2015. Abstract TUAC0204LB.

Mutual of Omaha Insurance Company                                                                    Page 7
Expert Report in the Matter of John Doe v. Mutual of Omaha Insurance Company No. 1:16-cv-11381-GAO

February 13, 2018

Milliman Client Report

## VII.    CONCLUSION

In my professional opinion, to a reasonable degree of certainty in my field, Mutual of Omaha's policy to exclude individuals who use Truvada is consistent with the industry approach and is reasonable from an actuarial perspective. I see no evidence that Mutual of Omaha's underwriting policy with respect to Truvada is motivated by a bias or intent to discriminate against homosexual men.

Because so little is known about the demands for LTC benefits by HIV positive individuals, the industry, as of 2015, did not extend coverage to HIV positive individuals. Truvada as PrEP is designed for individuals at high risk for acquiring HIV. When taken as instructed, PrEP has been shown to reduce the risk of HIV infection by up to 92%. PrEP, however, is less effective if it is not taken as directed. Studies have shown a significant degree of non-adherence by individuals taking PrEP[6]. Truvada as PrEP is a relatively new drug and the long term effects of Truvada are not yet known. The demand for LTC benefits associated with HIV or PrEP use is unknown. Given the poor financial performance of the LTC insurance industry in recent decades in general, it is reasonable and prudent for carriers to decline new and unknown risks such as those presented by PrEP users.

---

[6] Grant RM, Lama JR, Anderson PL, et al. "Preexposure chemoprophylaxis for HIV prevention in men who have sex with men." N Engl J Med. 2010;363(27):2587–99.;
Grant RM, Anderson PL, McMahan V, et al. "Uptake of pre-exposure prophylaxis, sexual practices, and HIV incidence in men and transgender women who have sex with men: a cohort study." Lancet Infect Dis. 2014;14(9):820–9.;
Hosek S, Rudy B, Landovitz R, et al. "An HIV pre-exposure prophylaxis (PrEP) demonstration project and safety study for young men who have sex with men in the United States," 8th International AIDS Society Conference on HIV Pathogenesis, Treatment and Prevention, Vancouver, British Columbia. 2015. Abstract TUAC0204LB.

**Mutual of Omaha Insurance Company**                                                                                    Page 8
Expert Report in the Matter of John Doe v. Mutual of Omaha Insurance Company No. 1:16-cv-11381-GAO

February 13, 2018

**152**

Milliman Client Report

# APPENDIX A

## Biography and Curriculum Vitae

**Mutual of Omaha Insurance Company**
Expert Report in the Matter of John Doe v. Mutual of Omaha Insurance Company No. 1:16-cv-11381-GAO

February 13, 2018

**153**

Milliman **Bio**

**Allen J. Schmitz**
FSA, MAAA
Principal, Consulting Actuary

 Milliman

## CURRENT RESPONSIBILITY

Al is a principal and consulting actuary with the Chicago-Milwaukee office of Milliman. He joined the firm in 1998.

## EXPERIENCE

Al's area of expertise is senior healthcare products, with a primary focus on long-term care (LTC) insurance. He has worked with most of the major LTC insurance carriers in the United States, assisting with product development, financial projections, appraisals, compliance issues, and experience analysis.

Al is an expert witness on issues relating to rating, underwriting, and financial projections. He has also testified before the United States Congress on actuarial implications of the CLASS Act—the LTC reform provision in the Patient Protection and Affordable Care Act.

Al is also involved in LTC on the international front, working with Milliman's Hong Kong office on projects in Singapore and Japan. In addition, Al leads the International Actuarial Association LTC topic team.

Al has assisted clients with Medicare bid preparation and Medicaid LTC rate analysis. He has also worked with various healthcare reform projects and initiatives that examine innovative approaches to healthcare financing.

Prior to joining Milliman, Al worked for eight years at an insurance company in life insurance and LTC product development.

## PROFESSIONAL AFFILIATIONS

Al has been significantly involved in various industry professional committees as Chair of the American Academy of Actuaries Long-Term Care / Disability Committee, Leader of the International Actuarial Association (IAA) Long-Term Care Team, member of the Society of Actuaries LTC Section Council, and board member of the Academy of Actuaries.

He was also part of a small group of actuaries representing the profession through a Society of Actuaries and Academy of Actuaries committee that provided analysis to the U.S. Senate Committee on Health, Education, Labor and Pensions with respect to potential LTC reform.

## PUBLICATION AND PRESENTATIONS

Al has written numerous articles for the Society of Actuaries, Milliman, and other publications. He is a frequent speaker at industry meetings.

He is a co-author of the LTC insurance Study Note that is used by the Society of Actuaries Education and Examination Committee as required reading for its Design and Pricing Exam.

## PROFESSIONAL DESIGNATIONS

- Fellow, Society of Actuaries
- Member, American Academy of Actuaries

## EDUCATION

- BS, University of Wisconsin, Oshkosh
- MBA, Marquette University



15800 Bluemound Road, Suite 100
Brookfield, WI 53005-6043
Tel +1 262 784 2250   Fax +1 262 923 3680   Direct +1 262 796 3477
Email allen.schmitz@milliman.com

milliman.com

**154**

Curriculum Vitae
Allen J. Schmitz, FSA – Principal and Consulting Actuary

## SPEECHES AND PRESENTATIONS

"Mortality of Disabled Persons:  Insured Experience and the Impact on LTC Insurance Modeling", 2017 SOA Annual Meeting, Boston, MA, October 2017

"Points-to-Ponder – Valuation", 17th Annual Intercompany Long Term Care Insurance Conference, Jacksonville, FL, March 2017

"Modeling LTC Reform Options", 16th Annual Intercompany Long Term Care Insurance Conference, San Antonio, TX, March 2016

"Long-Term Care", American Academy of Actuaries 2015 Annual Meeting and Public Policy Forum, Washington, DC, November 2015

"Financing Long-Term Services and Supports", Health Affairs Briefing, Washington, DC, November 2015

"Public/Private Solutions and Collaboration in LTC", 15th Annual Intercompany Long Term Care Insurance Conference, Colorado Springs, Colorado, March 2015

"American Academy of Actuaries PBR Committee", 15th Annual Intercompany Long Term Care Insurance Conference, Colorado Springs, Colorado, March 2015

"Mortality and First Principles Modeling", 14th Annual Intercompany Long Term Care Insurance Conference, Orlando, FL, March 2014

"Long-Term Care Around the World", 2012 LIMRA DI and LTC Conference, Las Vegas, NV, September 2012

"Get In or Get Out?  The Long-Term Care Insurance Market", 2012 Intercompany Long Term Care Insurance Conference, Las Vegas, NV, March 2012

"Stochastic Modeling with an LTC Framework", 2011 Society of Actuaries Annual Meeting, Chicago, IL, October 2011

"Advanced Topics Related to Valuation", Eleventh Annual Intercompany Long Term Care Insurance (LTCI) Conference, Atlanta, GA, March 2011

"Living Up to It's Name: How to Fix the CLASS Act", Urban Institute Forum, Washington, DC, March 2011

"The Implementation and Sustainability of the New Government-Administered Community Living Assistance Services and Supports (CLASS) Program", Congressional Testimony – U.S. House of Representatives, Committee on Energy and Commerce, Washington DC, March 2011

"The CLASS Act", LIMRA LTC & DI Conference, Orlando, FL, September 2010

"The CLASS Act", NAHU's Annual Convention, Chicago, IL, June 2010

"The Economics of a Public Long Term Care Program", Tenth Annual Intercompany LTCI Conference, New Orleans, LA, March 2010

"Expected Morbidity Improvement & the Potential Impact on LTC", Tenth Annual Intercompany LTCI Conference, New Orleans, LA, March 2010

"LTCI Under Health Care Reform: Oil and Water or Ham and Eggs?", Society of Actuaries Annual Meeting, Boston, MA, October 2009

"LTC Pricing", Society of Actuaries Health Pricing Boot Camp, Seattle, WA, August 2009

**155**

## SPEECHES AND PRESENTATIONS (Cont.)

"Solutions for Affordable Health Insurance", Society of Actuaries ReFocus 2009 Conference, Las Vegas, NV, March 2009

"Using Experience Analysis to Set Future Expectations", 2009 Intercompany LTCI Conference, Reno, NV, March 2009

"Financing Long Term Care", Joint Colloquium of the IACA, PBSS and IAAHS Sections of the International Actuarial Association, Boston, MA, May 2008
"Long-Term Care: What Have We Learned?", Milliman Health Forum, Phoenix, AZ, March 2008

"Same Team? – LTC Sales, Marketing and Actuarial", Jacksonville, FL, March 2008
"Future Purchase Options vs. Traditional Inflation Options", LTCI Producers Summit, Atlanta, GA, February 2008

"Preparing for the Future: Modeling LTC", 2007 SOA Annual Meeting, Washington, DC, October 2007

"Using Experience Analysis in Pricing", 7th Annual Intercompany LTCI Conference, Dallas, TX, March 2007

"LTC Morbidity – Under the Microscope and Still a Blur", DI & LTC Insurers' Forum, Orlando, FL, September 2006

"Comfortable with Your Reserves?", Sixth Annual Intercompany LTCI Conference, Anaheim, CA, February 2006

"Group LTCI Rate Increases", Sixth Annual Intercompany LTCI Conference, Anaheim, CA, February 2006

"NAIC Experience Reporting Forms", Society of Actuaries Annual Meeting, New York, NY, November 2005
"Long-Term Care Insurance Regulatory Update", Valuation Actuary Symposium, Orlando, FL, September 2005

"Health System Modeling", 2nd Flagship Course on National Health Insurance Scheme, Abuja, Nigeria, May 2005

"LTC Rate Increases", Society of Actuaries Intercompany LTCI Conference, Orlando, FL, January 2005

"Building Group LTC Insurance Expertise & Sales", Group LTCI Forum, Boston, MA, May 2004

"The Current State of the Long Term Care Insurance Market in the U.S.", IAAHS Colloquium, Dresden, Germany, April 2004

"LTC Pricing/Profitability", GE State-of-the-Art Forum, Naples, FL, October, 2003

"Alternatives for When You Can't Close the Sale", Milliman/LOMA LTC Conference, Denver, CO, September 2003

"Rate Stabilization – What Does it Mean to Me?", Society of Actuaries Long Term Care Meeting, Las Vegas, NV, January 2003

"Understanding the Guaranteed Renewable Aspects of Long Term Care", Society of Actuaries Meeting, Boston, MA, October 2002

"Milliman Long-Term Care Guidelines", Milliman Health Forum, Scottsdale, AZ, March 2002

"The LTCI Market for Traditional Life and Annuity Carriers", The Conference of Consulting Actuaries, San Antonio, TX, October 2001

## SPEECHES AND PRESENTATIONS (Cont.)

"Long-Term Care Valuation Issues – Valuation Committee Update", Society of Actuaries Meeting, Dallas, TX, June 2001

"Sources of Actuarial Data", Society of Actuaries Intercompany LTCI Conference, Miami, FL, January 2001

"Long Term Care Valuation Issues", Workshop, Society of Actuaries meeting, Washington, D.C., September 2000

"Exploring the Impact of Consolidation in the LTC Insurance Market", Institute for International Research, Boston, MA, August 2000

"Pricing New Long Term Care Products – Shared Care Rider", Panelist, Society of Actuaries meeting, Las Vegas, NV, May 2000

"Long Term Care Insurance Market Trends", Milliman & Robertson, Inc. Health Forum, Palm Desert, AZ, March 2000

## PUBLICATIONS

"First Principles Modeling for LTC: A Series Summary, Society of Actuaries – Long-Term Care News, August 2017

"Premium Estimates for Policy Options to Finance Long-Term Services and Supports, Milliman Client Report, November 2015

"The Pluses and Minuses of the Long-Term Care Insurance Market", The Actuary, June/July 2011

"Perspectives on the Community Living Assistance Services and Support (CLASS) Act", Milliman Research Report, September 2010

"Health Care Reform's CLASS Act", Broker World, February 2010

"Adverse Selection and the CLASS Act", Health Insurance Underwriter, February 2010

"Get Ready for New LTC Insurance Experience Forms!", Long-Term Care News, December 2009

"Moving Beyond Retrospective Testing for LTCI Reserves", Society of Actuaries, Long Term Care News, December 2007

"Pricing Long Term Care", Study Note for Society of Actuaries Examinations, 2007

"Will the Medicare Modernization Act Jump Start Growth in Employer-Sponsored Long-Term Care Insurance?", Society of Actuaries, Long Term Care News, April 2004

"Long Term Care Insurance Rate Increase Considerations", Society of Actuaries, Long Term Care News, December 2003

"Pricing Long Term Care", Study Note for Society of Actuaries Examinations, 2003

"Entering the Long Term Care Insurance Market", The Wisconsin Public Employers Labor Relations Association Newsletter, July 2000

"Long Term Care Insurance", Actuarial Digest, December 1998

**Curriculum Vitae - Allen J. Schmitz**                                                                    **Page 4**
**COMMITTEE MEMBERSHIPS (ORGANIZATIONS)**

Chair of American Academy of Actuaries LTC / Disability Committee (2015 – Present)

Board Member of the American Academy of Actuaries (2016 – Present)

Leader of International Actuarial Association Long Term Care Team (2010 – 2016)

Member of Society of Actuaries Long Term Care Section Council (2008 – 2010)

**EDUCATION**

M.B.A. Marquette University - 2001

B.S. University of Wisconsin-Oshkosh – 1990

**158**

# APPENDIX B

## Information Reviewed

**Mutual of Omaha Insurance Company**
Expert Report in the Matter of John Doe v. Mutual of Omaha Insurance Company No. 1:16-cv-11381-GAO

February 13, 2018

**159**

# APPENDIX B

## Information Reviewed for This Report

Actuarial Standards Board, Actuarial Standard of Practice No. 12, Risk Classification (for All Practice Areas), Doc. No. 132, December 2005 (Updated for Deviation Language Effective May 1, 2011)

Actuarial Standards Board, Actuarial Standard of Practice No. 18, Long-Term Care Insurance, Doc. No. 136, January 1999 (Updated for Deviation Language Effective May 1, 2011)

United States District Court for the District of Massachusetts, No. 1:16-cv-11381-GAO, John Doe v. Mutual of Omaha Insurance Company, Expert Report of Kenneth Mayer, M.D.

United States District Court for the District of Massachusetts, Civil Action No. 1:16-cv-11381, John Doe v. Mutual of Omaha Insurance Company, Telephonic Conference Civil Action Deposition of Teresa-Ann Curreri

Commonwealth of Massachusetts, Barry Field v. Mutual of Omaha Insurance Company, Complaint under Massachusetts General Law Chapter 272, § 98

"Are These Companies Discriminating Against PrEP Users?" by Ben Klein and Alex Weinstein, The Advocate, December 07, 2017

Letter (and attachments) dated November 24, 2015 from Mark A. Pogue, Pierce Atwood LLP, to Keith Healey, The Commonwealth of Massachusetts Commission Against Discrimination, Re: John Doe v. Mutual of Omaha, MCAD Docket Number: 15BPA02661

# Exhibit U

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use DUAVEE safely and effectively. See full prescribing information for DUAVEE.

**DUAVEE® (conjugated estrogens/bazedoxifene) tablets for oral use**
Initial U.S. approval: 2013

---

**WARNING: ENDOMETRIAL CANCER, CARDIOVASCULAR DISORDERS, AND PROBABLE DEMENTIA**
*See full prescribing information for complete Boxed Warning.*

- **Women taking DUAVEE should not take additional estrogens (5.1)**
- **There is an increased risk of endometrial cancer in a woman with a uterus who uses unopposed estrogens (5.1, 5.3)**
- **Estrogen therapy should not be used for the prevention of cardiovascular disease or dementia (5.2, 5.4)**
- **The Women's Health Initiative (WHI) estrogen-alone substudy reported increased risks of stroke and deep vein thrombosis (DVT) (5.2)**
- **The WHI Memory Study (WHIMS) estrogen-alone ancillary study of WHI reported an increased risk of probable dementia in postmenopausal women 65 years of age and older (5.4)**

---

-----------------------------INDICATIONS AND USAGE----------------------------

DUAVEE is a combination of conjugated estrogens with an estrogen agonist/antagonist indicated for treatment of the following conditions in women with a uterus:

- Treatment of moderate to severe vasomotor symptoms associated with menopause (1.1)
- Prevention of postmenopausal osteoporosis (1.2)

Limitation of Use: DUAVEE should be used for the shortest duration consistent with treatment goals and risks for the individual woman (1.3)

-------------------DOSAGE AND ADMINISTRATION------------------

- Take one tablet orally once daily (2)

---------------------DOSAGE FORMS AND STRENGTHS-------------------

Tablet containing conjugated estrogens 0.45 mg and bazedoxifene 20 mg (3)

------------------------------CONTRAINDICATIONS------------------------------

- Undiagnosed abnormal uterine bleeding (4, 5.3)
- Known, suspected, or past history of breast cancer (4, 5.3)
- Known or suspected estrogen-dependent neoplasia (4, 5.3)
- Active or past history of venous thromboembolism (4, 5.2)
- Active or past history of arterial thromboembolism (4, 5.2)
- Hypersensitivity (angioedema, anaphylaxis) to estrogens, bazedoxifene, or any ingredients (4)

- Known hepatic impairment or disease (4, 5.9, 8.7, 12.3)
- Known protein C, protein S, or antithrombin deficiency or other known thrombophilic disorders (4)
- Pregnancy, women who may become pregnant, and nursing mothers (4, 8.1, 8.3)

-------------------------WARNINGS AND PRECAUTIONS------------------------

- Women taking DUAVEE should not take progestins, additional estrogens or additional estrogen agonist/antagonists (5.1)
- Cardiovascular disorders, including venous thromboembolism, pulmonary embolism, stroke, and retinal vascular thrombosis (5.2, 5.6)
- Malignant neoplasms, including endometrial cancer, breast cancer, and ovarian cancer (5.3)
- Estrogens increase the risk of gallbladder disease (5.5)
- Discontinue estrogen if loss of vision, severe hypertriglyceridemia or cholestatic jaundice occurs (5.6, 5.8, 5.9)
- Monitor thyroid function in women on thyroid replacement therapy (5.10, 5.17)

-------------------------------ADVERSE REACTIONS-----------------------------

In four prospective, randomized, placebo-controlled trials the common adverse reactions (incidence ≥ 5%) were muscle spasms, nausea, diarrhea, dyspepsia, abdominal pain upper, oropharyngeal pain, dizziness, and neck pain (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Pfizer Inc. at 1-800-438-1985 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

-------------------------------DRUG INTERACTIONS-----------------------------

No drug interaction studies were conducted with DUAVEE. Estrogens are metabolized partially by CYP3A4. Concomitant use of DUAVEE with CYP3A4 inhibitors may increase the exposure of conjugated estrogens and thereby may increase the risk of endometrial hyperplasia (7.1).

-------------------------USE IN SPECIFIC POPULATIONS------------------------

- Geriatric Use: DUAVEE was not studied in women aged 75 or older (8.5, 12.3); use in this population is not recommended (2.7, 8.5)
- An increased risk of probable dementia in women over 65 years of age was reported in the Women's Health Initiative Memory ancillary studies of the Women's Health Initiative (5.4, 8.5, 14.6)
- Renal Impairment: DUAVEE was not studied in women with renal impairment; use in this population is not recommended (2.6, 8.6, 12.3)
- Body Mass Index: Women with BMI > 27 kg/m$^2$ may have an increased risk of endometrial hyperplasia (8.8)

**See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling.**

**Revision date: 10/2013**

# Exhibit V

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use STEGLATRO safely and effectively. See full prescribing information for STEGLATRO.

**STEGLATRO™ (ertugliflozin) tablets, for oral use**
Initial U.S. Approval: 2017

--------------------------INDICATIONS AND USAGE--------------------------
STEGLATRO is a sodium glucose co-transporter 2 (SGLT2) inhibitor indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. (1)

**Limitations of Use:**
- Not for the treatment of type 1 diabetes mellitus or diabetic ketoacidosis. (1)

----------------------DOSAGE AND ADMINISTRATION----------------------
- Recommended starting dose is 5 mg once daily, taken in the morning, with or without food. (2.1)
- Increase dose to 15 mg once daily in those tolerating STEGLATRO and needing additional glycemic control. (2.1)
- Assess renal function before initiating STEGLATRO and periodically thereafter (2.2):
  o Do not use in patients with an estimated glomerular filtration rate (eGFR) below 30 mL/minute/1.73 m$^2$.
  o Initiation is not recommended in patients with an eGFR of 30 to less than 60 mL/minute/1.73 m$^2$.
  o Continued use is not recommended in patients with an eGFR persistently between 30 and less than 60 mL/min/1.73 m$^2$.

------------------DOSAGE FORMS AND STRENGTHS------------------
Tablets: 5 mg and 15 mg (3)

----------------------------CONTRAINDICATIONS----------------------------
- Severe renal impairment, end-stage renal disease, or dialysis. (4, 5.3)
- History of serious hypersensitivity reaction to STEGLATRO. (4)

----------------------WARNINGS AND PRECAUTIONS----------------------
- Hypotension: May occur particularly in patients with renal impairment, the elderly, or patients on diuretics. Before initiating, assess and correct volume status. Monitor for signs and symptoms during therapy. (5.1)

- Ketoacidosis: Assess patients who present with signs and symptoms of metabolic acidosis for ketoacidosis, regardless of blood glucose level. If suspected, discontinue, evaluate, and treat promptly. Before initiating, consider risk factors for ketoacidosis. Patients may require monitoring and temporary discontinuation of therapy in clinical situations known to predispose to ketoacidosis. (5.2)
- Acute Kidney Injury and Impairment in Renal Function: Consider temporarily discontinuing in settings of reduced oral intake or fluid losses. If acute kidney injury occurs, discontinue and promptly treat. Monitor renal function. (5.3)
- Urosepsis and Pyelonephritis: Evaluate patients for signs and symptoms of urinary tract infections and treat promptly, if indicated. (5.4)
- Lower Limb Amputation: Before initiating, consider factors that may increase risk of amputation. Monitor patients for infections or ulcers of lower limbs, and discontinue if these occur. (5.5)
- Hypoglycemia: Consider a lower dose of insulin or insulin secretagogue to reduce risk of hypoglycemia when used in combination. (5.6)
- Genital Mycotic Infections: Monitor and treat if indicated. (5.7)
- Increased LDL-C: Monitor and treat as appropriate. (5.8)

------------------------------ADVERSE REACTIONS------------------------------
- The most common adverse reactions associated with STEGLATRO (incidence ≥ 5%) were female genital mycotic infections. (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Merck Sharp & Dohme Corp., a subsidiary of Merck & Co., Inc., at 1-877-888-4231 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

----------------------USE IN SPECIFIC POPULATIONS----------------------
- Pregnancy: Advise females of the potential risk to a fetus especially during the second and third trimesters. (8.1)
- Lactation: Breastfeeding not recommended. (8.2)
- Geriatrics: Higher incidence of adverse reactions related to reduced intravascular volume. (5.1, 8.5)
- Renal Impairment: Higher incidence of adverse reactions related to reduced intravascular volume and renal function. (5.1, 5.3, 8.6)

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide.**

**Revised: 12/2017**

**FULL PRESCRIBING INFORMATION: CONTENTS***

**1    INDICATIONS AND USAGE**
**2    DOSAGE AND ADMINISTRATION**
   2.1    Recommended Dosage
   2.2    Patients with Renal Impairment
**3    DOSAGE FORMS AND STRENGTHS**
**4    CONTRAINDICATIONS**
**5    WARNINGS AND PRECAUTIONS**
   5.1    Hypotension
   5.2    Ketoacidosis
   5.3    Acute Kidney Injury and Impairment in Renal Function
   5.4    Urosepsis and Pyelonephritis
   5.5    Lower Limb Amputation
   5.6    Hypoglycemia with Concomitant Use with Insulin and Insulin Secretagogues
   5.7    Genital Mycotic Infections
   5.8    Increases in Low-Density Lipoprotein Cholesterol (LDL-C)
   5.9    Macrovascular Outcomes
**6    ADVERSE REACTIONS**
   6.1    Clinical Trials Experience
**7    DRUG INTERACTIONS**
   7.1    Concomitant Use with Insulin and Insulin Secretagogues
   7.2    Positive Urine Glucose Test
   7.3    Interference with 1,5-anhydroglucitol (1,5-AG) Assay
**8    USE IN SPECIFIC POPULATIONS**
   8.1    Pregnancy
   8.2    Lactation
   8.4    Pediatric Use
   8.5    Geriatric Use
   8.6    Renal Impairment
   8.7    Hepatic Impairment
**10    OVERDOSAGE**
**11    DESCRIPTION**
**12    CLINICAL PHARMACOLOGY**
   12.1    Mechanism of Action
   12.2    Pharmacodynamics
   12.3    Pharmacokinetics
**13    NONCLINICAL TOXICOLOGY**
   13.1    Carcinogenesis, Mutagenesis, Impairment of Fertility
**14    CLINICAL STUDIES**
   14.1    Overview of Clinical Studies in Patients with Type 2 Diabetes Mellitus
   14.2    Clinical Study of Monotherapy Use of STEGLATRO in Patients with Type 2 Diabetes Mellitus
   14.3    Clinical Studies of Combination Therapy Use of STEGLATRO in Patients with Type 2 Diabetes Mellitus
   14.4    Clinical Study of STEGLATRO in Patients with Moderate Renal Impairment and Type 2 Diabetes Mellitus
**16    HOW SUPPLIED/STORAGE AND HANDLING**
**17    PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed.

# Exhibit W

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use TANZEUM safely and effectively. See full prescribing information for TANZEUM.**

**TANZEUM (albiglutide) for injection, for subcutaneous use**
Initial U.S. Approval: 2014

---

**WARNING: RISK OF THYROID C-CELL TUMORS**
*See full prescribing information for complete boxed warning.*
- **Carcinogenicity of albiglutide could not be assessed in rodents, but other glucagon-like peptide-1 (GLP-1) receptor agonists have caused thyroid C-cell tumors in rodents at clinically relevant exposures. Human relevance of GLP-1 receptor agonist induced C-cell tumors in rodents has not been determined. It is unknown whether TANZEUM causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans (5.1, 13.1).**
- **TANZEUM is contraindicated in patients with a personal or family history of MTC or in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2). Counsel patients regarding the potential risk of MTC and symptoms of thyroid tumors (4.1, 5.1).**

---

**------------------------RECENT MAJOR CHANGES ------------------------**
| | |
|---|---|
| Boxed Warning | 03/2015 |
| Indications and Usage, Limitations of Use (1) | 03/2015 |
| Warnings and Precautions, Risk of Thyroid C-cell Tumors (5.1) | 03/2015 |

**------------------------INDICATIONS AND USAGE ------------------------**
TANZEUM is a GLP-1 receptor agonist indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. (1)

Limitations of Use:
- Not recommended as first-line therapy for patients inadequately controlled on diet and exercise. (1, 5.1)
- Has not been studied in patients with a history of pancreatitis. Consider other antidiabetic therapies in patients with a history of pancreatitis. (1, 5.2)
- Not for treatment of type 1 diabetes mellitus or diabetic ketoacidosis. (1)
- Not for patients with pre-existing severe gastrointestinal disease. (1)
- Has not been studied in combination with prandial insulin. (1)

**------------------------DOSAGE AND ADMINISTRATION ------------------------**
- Administer once weekly at any time of day, without regard to meals. (2.1)
- Inject subcutaneously in the abdomen, thigh, or upper arm. (2.1)
- Initiate at 30 mg subcutaneously once weekly. Dose can be increased to 50 mg once weekly in patients requiring additional glycemic control. (2.1)
- If a dose is missed, administer within 3 days of missed dose. (2.1)
- See Full Prescribing Information and Patient Instructions for Use for reconstitution of lyophilized powder and administration. (2.4, 2.5, 17)

**--------------------DOSAGE FORMS AND STRENGTHS --------------------**
For injection: 30 mg or 50 mg in a single-dose Pen. (3)

**------------------------CONTRAINDICATIONS ------------------------**
- TANZEUM is contraindicated in patients with a personal or family history of medullary thyroid carcinoma or in patients with Multiple Endocrine Neoplasia syndrome type 2. (4.1)
- TANZEUM is contraindicated in patients with a prior serious hypersensitivity reaction to albiglutide or any of the product components. (4.2, 5.4)

**------------------------WARNINGS AND PRECAUTIONS------------------------**
- Thyroid C-cell Tumors: See Boxed Warning. (5.1)
- Pancreatitis: Discontinue promptly if suspected. Do not restart if confirmed. Consider other antidiabetic therapies in patients with a history of pancreatitis. (5.2)
- Hypoglycemia: Can occur when used in combination with insulin secretagogues (e.g., sulfonylureas) or insulin. Consider lowering sulfonylurea or insulin dosage when taking TANZEUM. (5.3)
- Hypersensitivity Reactions: Discontinue TANZEUM if suspected. Monitor and treat promptly per standard of care until signs and symptoms resolve. (5.4)
- Renal Impairment: Monitor renal function in patients with renal impairment reporting severe adverse gastrointestinal reactions. (5.5)
- Macrovascular Outcomes: There have been no clinical trials establishing conclusive evidence of macrovascular risk reduction with TANZEUM or any other antidiabetic drug. (5.6)

**------------------------ADVERSE REACTIONS ------------------------**
Adverse reactions, reported in ≥5% of patients treated TANZEUM and more frequently than in patients on placebo, were upper respiratory tract infection, diarrhea, nausea, injection site reaction, cough, back pain, arthralgia, sinusitis, and influenza. (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact GlaxoSmithKline at 1-888-825-5249 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

**------------------------DRUG INTERACTIONS ------------------------**
TANZEUM delays gastric emptying. May impact absorption of concomitantly administered oral medications. (7)

**------------------------USE IN SPECIFIC POPULATIONS ------------------------**
- Pregnancy: TANZEUM may cause fetal harm; only use if potential benefit justifies potential risk to fetus. (8.1)
- Nursing Mothers: Discontinue nursing or discontinue TANZEUM. (8.3)
- Renal Impairment: No dosage adjustment recommended. Monitor renal function in patients with renal impairment reporting severe adverse gastrointestinal reactions. (5.5, 8.6)

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide.**

**Revised: 05/2015**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***
**WARNING: RISK OF THYROID C-CELL TUMORS**
**1 INDICATIONS AND USAGE**
**2 DOSAGE AND ADMINISTRATION**
  2.1 Dosage
  2.2 Concomitant Use with an Insulin Secretagogue (e.g., Sulfonylurea) or with Insulin
  2.3 Dosage in Patients with Renal Impairment
  2.4 Reconstitution of the Lyophilized Powder
  2.5 Important Administration Instructions
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
  4.1 Medullary Thyroid Carcinoma
  4.2 Hypersensitivity
**5 WARNINGS AND PRECAUTIONS**
  5.1 Risk of Thyroid C-cell Tumors
  5.2 Acute Pancreatitis
  5.3 Hypoglycemia with Concomitant Use of Insulin Secretagogues or Insulin
  5.4 Hypersensitivity Reactions
  5.5 Renal Impairment
  5.6 Macrovascular Outcomes
**6 ADVERSE REACTIONS**
  6.1 Clinical Trials Experience
**7 DRUG INTERACTIONS**
**8 USE IN SPECIFIC POPULATIONS**
  8.1 Pregnancy
  8.3 Nursing Mothers
  8.4 Pediatric Use
  8.5 Geriatric Use
  8.6 Renal Impairment
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
  12.1 Mechanism of Action
  12.2 Pharmacodynamics
  12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
  13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
  13.3 Reproductive and Developmental Toxicity
**14 CLINICAL STUDIES**
  14.1 Monotherapy
  14.2 Combination Therapy
  14.3 Type 2 Diabetes Mellitus Patients with Renal Impairment
**16 HOW SUPPLIED/STORAGE AND HANDLING**
  16.1 How Supplied
  16.2 Storage and Handling
**17 PATIENT COUNSELING INFORMATION**
*Sections or subsections omitted from the full prescribing information are not listed.

# Exhibit X

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use TRULICITY safely and effectively. See full prescribing information for TRULICITY.

**TRULICITY (dulaglutide) injection, for subcutaneous use**
Initial U.S. Approval: 2014

---

**WARNING: RISK OF THYROID C-CELL TUMORS**

*See full prescribing information for complete boxed warning.*

- **Dulaglutide causes thyroid C-cell tumors in rats. It is unknown whether TRULICITY causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans as the human relevance of dulaglutide-induced rodent thyroid C-cell tumors has not been determined (5.1, 13.1).**
- **TRULICITY is contraindicated in patients with a personal or family history of MTC and in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2). Counsel patients regarding the potential risk of MTC and symptoms of thyroid tumors (4.1, 5.1).**

---

------------------------------ RECENT MAJOR CHANGES ------------------------------
INDICATIONS AND USAGE
    Limitations of Use (1.1)                                    01/2017

------------------------------ INDICATIONS AND USAGE ------------------------------
TRULICITY® is a glucagon-like peptide 1 (GLP-1) receptor agonist indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

Limitations of Use:
- Not recommended as first-line therapy for patients inadequately controlled on diet and exercise (1.1, 5.1).
- Has not been studied in patients with a history of pancreatitis. Consider another antidiabetic therapy (1, 5.2).
- Not for treatment of type 1 diabetes mellitus or diabetic ketoacidosis.
- Not for patients with pre-existing severe gastrointestinal disease.

------------------------ DOSAGE AND ADMINISTRATION ------------------------
- Administer once weekly at any time of day (2.1).
- Inject subcutaneously in the abdomen, thigh, or upper arm (2.1).
- Initiate at 0.75 mg subcutaneously once weekly. Dose can be increased to 1.5 mg once weekly for additional glycemic control (2.1).
- If a dose is missed administer within 3 days of missed dose (2.1).

------------------------ DOSAGE FORMS AND STRENGTHS ------------------------
- Injection: 0.75 mg/0.5 mL solution in a single-dose pen (3)
- Injection: 1.5 mg/0.5 mL solution in a single-dose pen (3)
- Injection: 0.75 mg/0.5 mL solution in a single-dose prefilled syringe (3)
- Injection: 1.5 mg/0.5 mL solution in a single-dose prefilled syringe (3)

------------------------------ CONTRAINDICATIONS ------------------------------
- TRULICITY is contraindicated in patients with a personal or family history of medullary thyroid carcinoma or in patients with Multiple Endocrine Neoplasia syndrome type 2 (4.1, 5.1, 13.1).
- TRULICITY is contraindicated in patients with a prior serious hypersensitivity reaction to TRULICITY or any of the product components (4.2, 5.4).

------------------------ WARNINGS AND PRECAUTIONS ------------------------
- *Thyroid C-cell Tumors:* See Boxed Warning (5.1).
- *Pancreatitis:* Has been reported in clinical trials. Discontinue promptly if pancreatitis is suspected. Do not restart if pancreatitis is confirmed. Consider other antidiabetic therapies in patients with history of pancreatitis (5.2).
- *Hypoglycemia:* When TRULICITY is used with an insulin secretagogue (e.g., a sulfonylurea) or insulin, consider lowering the dose of the sulfonylurea or insulin to reduce the risk of hypoglycemia (5.3).
- *Hypersensitivity Reactions:* Discontinue TRULICITY if suspected. Monitor and treat promptly per standard of care until signs and symptoms resolve (5.4).
- *Renal Impairment:* Monitor renal function in patients with renal impairment reporting severe adverse gastrointestinal reactions (5.5).
- *Severe Gastrointestinal Disease:* Use may be associated with gastrointestinal adverse reactions, sometimes severe. Has not been studied in patients with severe gastrointestinal disease and is not recommended in these patients (5.6).
- *Macrovascular outcomes:* There have been no studies establishing conclusive evidence of macrovascular risk reduction with TRULICITY (5.7).

------------------------------ ADVERSE REACTIONS ------------------------------
The most common adverse reactions, reported in ≥5% of patients treated with TRULICITY are: nausea, diarrhea, vomiting, abdominal pain, and decreased appetite (6.1).

**To report SUSPECTED ADVERSE REACTIONS, contact Eli Lilly and Company at 1-800-LillyRx (1-800-545-5979) or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

------------------------------ DRUG INTERACTIONS ------------------------------
Dulaglutide slows gastric emptying and may impact absorption of concomitantly administered oral medications (7.1, 12.3).

------------------------ USE IN SPECIFIC POPULATIONS ------------------------
- Pregnancy: TRULICITY should be used during pregnancy only if the potential benefit justifies the potential risk to fetus (8.1).
- Renal Impairment: No dosage adjustment recommended. Monitor renal function in patients with renal impairment reporting severe adverse gastrointestinal reactions (5.5, 8.7).

**See 17 for PATIENT COUNSELING INFORMATION and FDA-approved Medication Guide**

                                                    **Revised: 01/2017**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**WARNING: RISK OF THYROID C-CELL TUMORS**
**1    INDICATIONS AND USAGE**
    1.1    Limitations of Use
**2    DOSAGE AND ADMINISTRATION**
    2.1    Dosage
    2.2    Concomitant Use with an Insulin Secretagogue (e.g., Sulfonylurea) or with Insulin
    2.3    Dosage in Patients with Renal Impairment
    2.4    Important Administration Instructions
**3    DOSAGE FORMS AND STRENGTHS**
**4    CONTRAINDICATIONS**
    4.1    Medullary Thyroid Carcinoma
    4.2    Hypersensitivity
**5    WARNINGS AND PRECAUTIONS**
    5.1    Risk of Thyroid C-cell Tumors
    5.2    Pancreatitis
    5.3    Hypoglycemia with Concomitant Use of Insulin Secretagogues or Insulin
    5.4    Hypersensitivity Reactions
    5.5    Renal Impairment
    5.6    Severe Gastrointestinal Disease
    5.7    Macrovascular Outcomes
**6    ADVERSE REACTIONS**
    6.1    Clinical Studies Experience
**7    DRUG INTERACTIONS**
    7.1    Oral Medications
**8    USE IN SPECIFIC POPULATIONS**
    8.1    Pregnancy
    8.2    Lactation
    8.4    Pediatric Use
    8.5    Geriatric Use
    8.6    Hepatic Impairment
    8.7    Renal Impairment
    8.8    Gastroparesis
**10    OVERDOSAGE**
**11    DESCRIPTION**
**12    CLINICAL PHARMACOLOGY**
    12.1    Mechanism of Action
    12.2    Pharmacodynamics

# Exhibit Y

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use FARXIGA safely and effectively. See full prescribing information for FARXIGA.**

**FARXIGA® (dapagliflozin) tablets, for oral use**
Initial U.S. Approval: 2014

--------------------------RECENT MAJOR CHANGES--------------------------
| | |
|---|---|
| Dosage and Administration (2.2) | 06/2016 |
| Contraindications (4) | 06/2016 |
| Warnings and Precautions (5) | 08/2016 |

-------------------------- INDICATIONS AND USAGE --------------------------
FARXIGA is a sodium-glucose cotransporter 2 (SGLT2) inhibitor indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. (1)

Limitation of use:
- Not for treatment of type 1 diabetes mellitus or diabetic ketoacidosis. (1.1)

-------------------- DOSAGE AND ADMINISTRATION --------------------
- The recommended starting dose is 5 mg once daily, taken in the morning, with or without food. (2.1)
- Dose can be increased to 10 mg once daily in patients tolerating FARXIGA who require additional glycemic control. (2.1)
- Assess renal function before initiating FARXIGA and periodically thereafter. (2.2)
- Initiation is not recommended in patients with an eGFR less than 60 mL/min/1.73 m$^2$. (2.2)
- Use of FARXIGA is not recommended in patients with an eGFR persistently between 30 and less than 60 mL/min/1.73 m$^2$. (2.2)

-------------------- DOSAGE FORMS AND STRENGTHS --------------------
- Tablets: 5 mg and 10 mg (3)

-------------------------- CONTRAINDICATIONS --------------------------
- History of serious hypersensitivity reaction to FARXIGA. (4)
- Severe renal impairment, end-stage renal disease, or dialysis. (4)

-------------------------- WARNINGS AND PRECAUTIONS --------------------------
- *Hypotension* Before initiating FARXIGA, assess volume status and correct hypovolemia in the elderly, in patients with renal impairment or low systolic blood pressure, and in patients on diuretics. Monitor for signs and symptoms during therapy. (5 1, 6.1)

- *Ketoacidosis* Assess patients who present with signs and symptoms of metabolic acidosis for ketoacidosis regardless of blood glucose level. If suspected, discontinue FARXIGA, evaluate and treat promptly. Before initiating FARXIGA, consider risk factors for ketoacidosis. Patients on FARXIGA may require monitoring and temporary discontinuation of therapy in clinical situations known to predispose to ketoacidosis. (5.2)
- *Acute Kidney Injury and Impairment in Renal Function* Consider temporarily discontinuing in settings of reduced oral intake or fluid losses. If acute kidney injury occurs, discontinue and promptly treat. Monitor renal function during therapy. (5.3)
- *Urosepsis and Pyelonephritis* Evaluate for signs and symptoms of urinary tract infections and treat promptly, if indicated. (5.4)
- *Hypoglycemia* In patients taking insulin or an insulin secretagogue with FARXIGA, consider a lower dose of insulin or the insulin secretagogue to reduce the risk of hypoglycemia. (5.5)
- *Genital Mycotic Infections* Monitor and treat if indicated. (5.6)
- *Increased LDL-C* Monitor and treat per standard of care. (5.7)
- *Bladder Cancer* An imbalance in bladder cancers was observed in clinical trials. FARXIGA should not be used in patients with active bladder cancer and should be used with caution in patients with a prior history of bladder cancer. (5.8)
- *Macrovascular Outcomes* There have been no clinical studies establishing conclusive evidence of macrovascular risk reduction with FARXIGA or any other antidiabetic drug. (5.9)

-------------------------- ADVERSE REACTIONS --------------------------
- The most common adverse reactions associated with FARXIGA (5% or greater incidence) were female genital mycotic infections, nasopharyngitis, and urinary tract infections. (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact AstraZeneca at 1-800- 236-9933 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

-------------------- USE IN SPECIFIC POPULATIONS --------------------
- *Pregnancy* There are no adequate and well-controlled studies in pregnant women. Use during pregnancy only if the potential benefit justifies the potential risk to the fetus. (8.1)
- *Nursing Mothers* Discontinue FARXIGA or discontinue nursing. (8.3)
- *Geriatrics* Higher incidence of adverse reactions related to reduced intravascular volume. (5.1, 8.5)
- *Renal Impairment* Higher incidence of adverse reactions related to reduced intravascular volume and renal function. (5.3, 6.1, 8.6)

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide**

**Revised: 3/2017**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***
**1 INDICATIONS AND USAGE**
  1.1 Limitation of Use
**2 DOSAGE AND ADMINISTRATION**
  2.1 Recommended Dosing
  2.2 Patients with Renal Impairment
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
  5.1 Hypotension
  5.2 Ketoacidosis
  5.3 Acute Kidney Injury and Impairment in Renal Function
  5.4 Urosepsis and Pyelonephritis
  5.5 Hypoglycemia with Concomitant Use with Insulin and Insulin Secretagogues
  5.6 Genital Mycotic Infections
  5.7 Increases in Low-Density Lipoprotein Cholesterol (LDL-C)
  5.8 Bladder Cancer
  5.9 Macrovascular Outcomes
**6 ADVERSE REACTIONS**
  6.1 Clinical Trials Experience
  6.2 Postmarketing Experience
**7 DRUG INTERACTIONS**
  7.1 Positive Urine Glucose Test
  7.2 Interference with 1,5-anhydroglucitol (1,5-AG) Assay
**8 USE IN SPECIFIC POPULATIONS**
  8.1 Pregnancy

  8.3 Nursing Mothers
  8.4 Pediatric Use
  8.5 Geriatric Use
  8.6 Renal Impairment
  8.7 Hepatic Impairment
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
  12.1 Mechanism of Action
  12.2 Pharmacodynamics
  12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
  13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
**14 CLINICAL STUDIES**
  14.1 Overview of Clinical Studies of FARXIGA for Type 2 Diabetes
  14.2 Monotherapy
  14.3 Initial Combination Therapy with Metformin XR
  14.4 Add-On to Metformin
  14.5 Active Glipizide-Controlled Study Add-On to Metformin
  14.6 Add-On Combination Therapy with Other Antidiabetic Agents
  14.7 Use in Patients with Type 2 Diabetes and Renal Impairment
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed.

# Exhibit Z

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use REPATHA® safely and effectively. See full prescribing information for REPATHA.**

**REPATHA (evolocumab) injection, for subcutaneous use**
Initial U.S. Approval: 2015

------------------RECENT MAJOR CHANGES------------------------
Indications and Usage (1.1, 1.2)                    x/20xx

-----------------------INDICATIONS AND USAGE-------------------------
REPATHA is a PCSK9 (proprotein convertase subtilisin kexin type 9) inhibitor antibody indicated:
• to reduce the risk of myocardial infarction, stroke, and coronary revascularization in adults with established cardiovascular disease. (1.1)
• as an adjunct to diet, alone or in combination with other lipid-lowering therapies (e.g., statins, ezetimibe), for treatment of adults with primary hyperlipidemia (including heterozygous familial hypercholesterolemia) to reduce low-density lipoprotein cholesterol (LDL-C). (1.2)
• as an adjunct to diet and other LDL-lowering therapies (e.g., statins, ezetimibe, LDL apheresis) in patients with homozygous familial hypercholesterolemia (HoFH) who require additional lowering of LDL-C. (1.3)

----------------------DOSAGE AND ADMINISTRATION-----------------------
• Administer subcutaneously. (2.1)
• Adults with established cardiovascular disease or primary hyperlipidemia (including heterozygous familial hypercholesterolemia): 140 mg every 2 weeks or 420 mg once monthly in abdomen, thigh, or upper arm. (2.1)
• HoFH: 420 mg once monthly. (2.1)
• The 420 mg dose of REPATHA can be administered:
  o over 9 minutes by using the single-use on-body infusor with prefilled cartridge, or
  o by giving 3 injections consecutively within 30 minutes using the single-use prefilled autoinjector or single-use prefilled syringe. (2.2)
• See Dosage and Administration for important administration instructions. (2.2)

--------------------DOSAGE FORMS AND STRENGTHS----------------------
• Injection: 140 mg/mL solution in a single-use prefilled syringe (3)
• Injection: 140 mg/mL solution in a single-use prefilled SureClick® autoinjector (3)
• Injection: 420 mg/3.5 mL solution in a single-use Pushtronex® system (on-body infusor with prefilled cartridge) (3)

------------------------------CONTRAINDICATIONS-----------------------------
Patients with a history of a serious hypersensitivity reaction to REPATHA. (4)

--------------------------WARNINGS AND PRECAUTIONS--------------------------
Allergic Reactions: Rash and urticaria have occurred. If signs or symptoms of serious allergic reactions occur, discontinue treatment with REPATHA, treat according to the standard of care, and monitor until signs and symptoms resolve. (5.1)

-------------------------------ADVERSE REACTIONS-------------------------------
Common adverse reactions in clinical trials in primary hyperlipidemia (including HeFH) (> 5% of patients treated with REPATHA and occurring more frequently than placebo): nasopharyngitis, upper respiratory tract infection, influenza, back pain, and injection site reactions. (6)

Common adverse reactions in the cardiovascular outcomes trial (> 5% of patients treated with REPATHA and occurring more frequently than placebo): diabetes mellitus, nasopharyngitis and upper respiratory tract infection. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Amgen Medical Information at 1-800-77-AMGEN (1-800-772-6436) or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

**See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling.**

Revised: 12/2017

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**1    INDICATIONS AND USAGE**
    1.1    Prevention of Cardiovascular Events
    1.2    Primary Hyperlipidemia (Including Heterozygous Familial Hypercholesterolemia)
    1.3    Homozygous Familial Hypercholesterolemia
**2    DOSAGE AND ADMINISTRATION**
    2.1    Recommended Dosage
    2.2    Important Administration Instructions
**3    DOSAGE FORMS AND STRENGTHS**
**4    CONTRAINDICATIONS**
**5    WARNINGS AND PRECAUTIONS**
    5.1    Allergic Reactions
**6    ADVERSE REACTIONS**
    6.1    Clinical Trials Experience
    6.2    Immunogenicity
**8    USE IN SPECIFIC POPULATIONS**
    8.1    Pregnancy
    8.2    Lactation
    8.4    Pediatric Use
    8.5    Geriatric Use
    8.6    Renal Impairment
    8.7    Hepatic Impairment
**11    DESCRIPTION**
**12    CLINICAL PHARMACOLOGY**
    12.1    Mechanism of Action
    12.2    Pharmacodynamics
    12.3    Pharmacokinetics
**13    NONCLINICAL TOXICOLOGY**
    13.1    Carcinogenesis, Mutagenesis, Impairment of Fertility
    13.2    Animal Toxicology and/or Pharmacology
**14    CLINICAL STUDIES**
    14.1    Prevention of Cardiovascular Events
    14.2    Primary Hyperlipidemia (Including Heterozygous Familial Hypercholesterolemia)
    14.3    Homozygous Familial Hypercholesterolemia (HoFH)
**16    HOW SUPPLIED/STORAGE AND HANDLING**
**17    PATIENT COUNSELING INFORMATION**

\* Sections or subsections omitted from the full prescribing information are not listed.

Amgen Proprietary - Confidential

# Exhibit AA

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use KYNAMRO safely and effectively. See full prescribing information for KYNAMRO.**

**KYNAMRO (mipomersen sodium) Injection**
Solution for Subcutaneous Injection
Initial U.S. Approval: 2013

---

**WARNING: RISK OF HEPATOTOXICITY**

*See full prescribing information for complete boxed warning.*

KYNAMRO can cause elevations in transaminases (5.1).
- **Measure alanine aminotransferase (ALT), aspartate aminotransferase (AST), alkaline phosphatase, and total bilirubin before initiating treatment and then ALT and AST regularly as recommended (2.3, 5.1)**
- **During treatment, withhold the dose of KYNAMRO if the ALT or AST is ≥3 times the upper limit of normal (ULN) (2.3, 5.1).**
- **Discontinue KYNAMRO for clinically significant liver toxicity (2.3, 5.1).**

KYNAMRO increases hepatic fat (hepatic steatosis) with or without concomitant increases in transaminases (5.1).
- **Hepatic steatosis associated with KYNAMRO may be a risk factor for progressive liver disease, including steatohepatitis and cirrhosis (5 1).**

Because of the risk of hepatotoxicity, KYNAMRO is available only through a restricted program called the KYNAMRO REMS (5.2).

---

**-----------------------INDICATIONS AND USAGE-----------------------**
KYNAMRO® is an oligonucleotide inhibitor of apolipoprotein B-100 synthesis indicated as an adjunct to lipid-lowering medications and diet to reduce low density lipoprotein-cholesterol (LDL-C), apolipoprotein B (apo B), total cholesterol (TC), and non-high density lipoprotein-cholesterol (non HDL-C) in patients with homozygous familial hypercholesterolemia (HoFH) (1).

Limitations of Use:
- The safety and effectiveness of KYNAMRO have not been established in patients with hypercholesterolemia who do not have HoFH.
- The effect of KYNAMRO on cardiovascular morbidity and mortality has not been determined.
- The use of KYNAMRO as an adjunct to LDL apheresis is not recommended.

**----------------------DOSAGE AND ADMINISTRATION----------------------**
- 200 mg once weekly as a subcutaneous injection (2 1)
- Before treatment, measure ALT, AST, alkaline phosphatase, and total bilirubin (2.1)

**--------------------DOSAGE FORMS AND STRENGTHS--------------------**
- Single-use vial containing 1 mL of a 200 mg/mL solution (3)
- Single-use pre-filled syringe containing 1 mL of a 200 mg/mL solution (3)

**--------------------------CONTRAINDICATIONS--------------------------**
- Moderate or severe hepatic impairment, or active liver disease, including unexplained persistent elevations of serum transaminases (4)
- Known sensitivity to product components (4)

**--------------------WARNINGS AND PRECAUTIONS--------------------**
- Injection site reactions occur in 84% of patients and typically consist of one or more of the following: erythema, pain, tenderness, pruritus and local swelling (5.3)
- Flu-like symptoms, which typically occur within 2 days after an injection, occur in 30% of patients and include one or more of the following: influenza-like illness, pyrexia, chills, myalgia, arthralgia, malaise or fatigue (5.4)

**--------------------------ADVERSE REACTIONS--------------------------**
The most commonly reported adverse reactions (incidence ≥ 10% and greater than placebo) are injection site reactions, flu-like symptoms, nausea, headache and elevations in serum transaminases, specifically ALT (5.4, 6).

**----------------------USE IN SPECIFIC POPULATIONS----------------------**
- Nursing mothers: Discontinue drug or nursing (8.3).
- Pediatric Patients: Safety and effectiveness not established (8.4).

**To report SUSPECTED ADVERSE REACTIONS, contact Genzyme Corporation at 1-800-745-4447 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch**

*See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling*

*Revised 2/2015*

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**WARNING: RISK OF HEPATOTOXICITY**
**1    INDICATIONS AND USAGE**
**2    DOSAGE AND ADMINISTRATION**
    2.1 General Dosing Information
    2.2 Administration
    2.3 Adjustments for Patients Developing Transaminase Elevations
**3    DOSAGE FORMS AND STRENGTHS**
**4    CONTRAINDICATIONS**
**5    WARNINGS AND PRECAUTIONS**
    5.1 Risk of Hepatotoxicity
    5.2 KYNAMRO REMS
    5.3 Injection Site Reactions
    5.4 Flu-Like symptoms
**6    ADVERSE REACTIONS**
    6.1 Clinical Trials
    6.2 Postmarketing Experience
**7    DRUG INTERACTIONS**
**8    USE IN SPECIFIC POPULATIONS**
    8.1 Pregnancy
    8.3 Nursing Mothers
    8.4 Pediatric Use
    8.5 Geriatric Use
    8.6 Females of Reproductive Potential
    8.7 Renal Impairment
    8.8 Hepatic Impairment
**10    OVERDOSAGE**
**11    DESCRIPTION**
**12    CLINICAL PHARMACOLOGY**
    12.1 Mechanism of Action
    12.2 Pharmacodynamics
    12.3 Pharmacokinetics
**13    NONCLINICAL TOXICOLOGY**
    13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
    13.2 Animal Pharmacology and/or Toxicology
**14    CLINICAL STUDIES**
**16    HOW SUPPLIED/STORAGE AND HANDLING**
**17    PATIENT COUNSELING INFORMATION**

\*Sections or subsections omitted from the full prescribing information are not listed

# Exhibit BB

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use the BREO ELLIPTA inhaler safely and effectively. See full prescribing information for BREO ELLIPTA.**

**BREO ELLIPTA (fluticasone furoate and vilanterol inhalation powder)**
**FOR ORAL INHALATION USE**
**Initial U.S. Approval: 2013**

---

**WARNING: ASTHMA-RELATED DEATH**
*See full prescribing information for complete boxed warning.*
- **Long-acting beta₂-adrenergic agonists (LABA), such as vilanterol, one of the active ingredients in BREO ELLIPTA, increase the risk of asthma-related death. A placebo-controlled trial with another LABA (salmeterol) showed an increase in asthma-related deaths in subjects receiving salmeterol. This finding with salmeterol is considered a class effect of all LABA, including vilanterol. (5.1)**
- **The safety and efficacy of BREO ELLIPTA in patients with asthma have not been established. BREO ELLIPTA is not indicated for the treatment of asthma. (5.1)**

---

**------------------------------INDICATIONS AND USAGE------------------------------**
BREO ELLIPTA is a combination of fluticasone furoate, an inhaled corticosteroid (ICS), and vilanterol, a long-acting beta₂-adrenergic agonist (LABA), indicated for long-term, once-daily, maintenance treatment of airflow obstruction and for reducing exacerbations in patients with chronic obstructive pulmonary disease (COPD). (1)

Important limitations: Not indicated for relief of acute bronchospasm or for treatment of asthma. (1, 5.2)

**------------------------DOSAGE AND ADMINISTRATION------------------------**
- For oral inhalation only. (2)
- Maintenance treatment of COPD: 1 inhalation of BREO ELLIPTA 100 mcg/25 mcg once daily. (2)

**----------------------DOSAGE FORMS AND STRENGTHS----------------------**
Inhalation Powder. Inhaler containing 2 double-foil blister strips of powder formulation for oral inhalation. One strip contains fluticasone furoate 100 mcg per blister and the other contains vilanterol 25 mcg per blister. (3)

**------------------------------CONTRAINDICATIONS------------------------------**
Severe hypersensitivity to milk proteins or any ingredients. (4)

**------------------------WARNINGS and PRECAUTIONS------------------------**
- LABA increase the risk of asthma-related death. (5.1)
- Do not initiate in acutely deteriorating COPD or to treat acute symptoms. (5.2)
- Do not use in combination with an additional medicine containing LABA because of risk of overdose. (5.3)
- *Candida albicans* infection of the mouth and pharynx may occur. Monitor patients periodically. Advise the patient to rinse his/her mouth without swallowing after inhalation to help reduce the risk. (5.4)

- Increased risk of pneumonia in patients with COPD taking BREO ELLIPTA. Monitor patients for signs and symptoms of pneumonia. (5.5)
- Potential worsening of infections (e.g., existing tuberculosis; fungal, bacterial, viral, or parasitic infection; ocular herpes simplex). Use with caution in patients with these infections. More serious or even fatal course of chickenpox or measles can occur in susceptible patients. (5.6)
- Risk of impaired adrenal function when transferring from systemic corticosteroids. Taper patients slowly from systemic corticosteroids if transferring to BREO ELLIPTA. (5.7)
- Hypercorticism and adrenal suppression may occur with very high dosages or at the regular dosage in susceptible individuals. If such changes occur, discontinue BREO ELLIPTA slowly. (5.8)
- If paradoxical bronchospasm occurs, discontinue BREO ELLIPTA and institute alternative therapy. (5.10)
- Use with caution in patients with cardiovascular disorders because of beta-adrenergic stimulation. (5.13)
- Assess for decrease in bone mineral density initially and periodically thereafter. (5.13)
- Close monitoring for glaucoma and cataracts is warranted. (5.14)
- Use with caution in patients with convulsive disorders, thyrotoxicosis, diabetes mellitus, and ketoacidosis. (5.15)
- Be alert to hypokalemia and hyperglycemia. (5.16)

**------------------------------ADVERSE REACTIONS------------------------------**
Most common adverse reactions (incidence ≥3%) are nasopharyngitis, upper respiratory tract infection, headache, and oral candidiasis. (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact GlaxoSmithKline at 1-888-825-5249 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

**------------------------------DRUG INTERACTIONS------------------------------**
- Strong cytochrome P450 3A4 inhibitors (e.g., ketoconazole): Use with caution. May cause systemic corticosteroid and cardiovascular effects. (7.1)
- Monoamine oxidase inhibitors and tricyclic antidepressants: Use with extreme caution. May potentiate effect of vilanterol on vascular system. (7.2)
- Beta-blockers: Use with caution. May block bronchodilatory effects of beta-agonists and produce severe bronchospasm. (7.3)
- Diuretics: Use with caution. Electrocardiographic changes and/or hypokalemia associated with non–potassium-sparing diuretics may worsen with concomitant beta-agonists. (7.4)

**------------------------USE IN SPECIFIC POPULATIONS------------------------**
Hepatic impairment: Fluticasone furoate exposure may increase in patients with moderate or severe impairment. Monitor for systemic corticosteroid effects. (8.6, 12.3)

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide.**

**Revised: XX/2013**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***
**WARNING: ASTHMA-RELATED DEATH**
**1   INDICATIONS AND USAGE**
**2   DOSAGE AND ADMINISTRATION**
**3   DOSAGE FORMS AND STRENGTHS**
**4   CONTRAINDICATIONS**
**5   WARNINGS AND PRECAUTIONS**
   5.1   Asthma-Related Death
   5.2   Deterioration of Disease and Acute Episodes
   5.3   Excessive Use of BREO ELLIPTA and Use With Other Long-Acting Beta₂-Agonists
   5.4   Local Effects of Inhaled Corticosteroids
   5.5   Pneumonia
   5.6   Immunosuppression
   5.7   Transferring Patients From Systemic Corticosteroid Therapy
   5.8   Hypercorticism and Adrenal Suppression
   5.9   Drug Interactions With Strong Cytochrome P450 3A4 Inhibitors
   5.10   Paradoxical Bronchospasm

   5.11   Hypersensitivity Reactions
   5.12   Cardiovascular Effects
   5.13   Reduction in Bone Mineral Density
   5.14   Glaucoma and Cataracts
   5.15   Coexisting Conditions
   5.16   Hypokalemia and Hyperglycemia
**6   ADVERSE REACTIONS**
   6.1   Clinical Trials Experience
**7   DRUG INTERACTIONS**
   7.1   Inhibitors of Cytochrome P450 3A4
   7.2   Monoamine Oxidase Inhibitors and Tricyclic Antidepressants
   7.3   Beta-Adrenergic Receptor Blocking Agents
   7.4   Non–Potassium-Sparing Diuretics
**8   USE IN SPECIFIC POPULATIONS**
   8.1   Pregnancy
   8.2   Labor and Delivery
   8.3   Nursing Mothers
   8.4   Pediatric Use
   8.5   Geriatric Use
   8.6   Hepatic Impairment

1

**176**

# Exhibit CC

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use ZURAMPIC safely and effectively. See full prescribing information for ZURAMPIC.

ZURAMPIC® (lesinurad) tablets, for oral use
Initial U.S. Approval: 2015

---

> **WARNING: RISK OF ACUTE RENAL FAILURE, MORE COMMON WHEN USED WITHOUT A XANTHINE OXIDASE INHIBITOR**
>
> *See full prescribing information for complete boxed warning.*
> - Acute renal failure has occurred with ZURAMPIC and was more common when ZURAMPIC was given alone.
> - ZURAMPIC should be used in combination with a xanthine oxidase inhibitor. (1.1, 5.1, 6.1)

--------------------------- INDICATIONS AND USAGE ---------------------------
ZURAMPIC is a URAT1 inhibitor indicated in combination with a xanthine oxidase inhibitor for the treatment of hyperuricemia associated with gout in patients who have not achieved target serum uric acid levels with a xanthine oxidase inhibitor alone. (1)

Limitations of Use:
- ZURAMPIC is not recommended for the treatment of asymptomatic hyperuricemia. (1.1)
- ZURAMPIC should not be used as monotherapy. (1.1, 5.1)

----------------------- DOSAGE AND ADMINISTRATION -----------------------
- ZURAMPIC is recommended at 200 mg once daily in combination with a xanthine oxidase inhibitor, including allopurinol or febuxostat. The maximum daily dose of ZURAMPIC is 200 mg. (2.1)
- Failure to take ZURAMPIC with a xanthine oxidase inhibitor may increase the risk of renal adverse reactions. (2.1, 5.1)
- ZURAMPIC tablets should be taken in the morning with food and water. (2.1)
- Patients should be instructed to stay well hydrated. (2.1)
- Assess renal function before initiating ZURAMPIC. Do not initiate ZURAMPIC if eCLcr is below 45 mL/min. (2.2)
- Discontinue ZURAMPIC if eCLcr persistently falls below 45 mL/min. (2.2)

--------------------- DOSAGE FORMS AND STRENGTHS ---------------------
Tablet: 200 mg. (3)

--------------------------- CONTRAINDICATIONS ---------------------------
- Severe renal impairment, end stage renal disease, kidney transplant recipients, or patients on dialysis. (4, 8.6)
- Tumor lysis syndrome or Lesch-Nyhan syndrome. (4)

--------------------- WARNINGS AND PRECAUTIONS ---------------------
- *Renal events*: Adverse reactions related to renal function have occurred after initiating ZURAMPIC. A higher incidence was observed at the 400 mg dose, with the highest incidence occurring with monotherapy use. Monitor renal function at initiation and during therapy with ZURAMPIC, particularly in patients with eCLcr below 60 mL/min, and evaluate for signs and symptoms of acute uric acid nephropathy. (5.1)
- *Cardiovascular events*: Major adverse cardiovascular events were observed with ZURAMPIC; a causal relationship has not been established. (5.2)

--------------------------- ADVERSE REACTIONS ---------------------------
Most common adverse reactions in 12-month controlled clinical trials (occurring in greater than or equal to 2% of patients treated with ZURAMPIC in combination with a xanthine oxidase inhibitor and more frequently than on a xanthine oxidase inhibitor alone) were headache, influenza, blood creatinine increased, and gastroesophageal reflux disease. (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact AstraZeneca at 1-800-236-9933 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

--------------------------- DRUG INTERACTIONS ---------------------------
- Moderate Cytochrome P450 2C9 (CYP2C9) Inhibitors: Use with caution. (7.1)
- Sensitive CYP3A Substrates: Monitor for efficacy of the CYP3A substrate. (7.2)

--------------------- USE IN SPECIFIC POPULATIONS ---------------------
- Renal impairment: Not recommended for patients with eCLcr below 45 mL/min. . (2.2, 5.1, 8.6)
- Hepatic impairment: Not recommended for patients with severe hepatic impairment. (8.7)

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide**

**Revised: 12/2015**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**1 INDICATIONS AND USAGE**
    1.1 Limitations of Use
**2 DOSAGE AND ADMINISTRATION**
    2.1 Recommended Dosing
    2.2 Patients with Renal Impairment
    2.3 Gout Flares
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
    5.1 Renal Events
    5.2 Cardiovascular Events
**6 ADVERSE REACTIONS**
    6.1 Clinical Trials Experience
**7 DRUG INTERACTIONS**
    7.1 CYP2C9 Inhibitors, CYP2C9 Poor Metabolizers, and CYP2C9 inducers
    7.2 CYP3A Substrates
    7.3 Epoxide Hydrolase Inhibitors
    7.4 Hormonal Contraceptives
    7.5 Aspirin
**8 USE IN SPECIFIC POPULATIONS**
    8.1 Pregnancy
    8.2 Lactation
    8.4 Pediatric Use
    8.5 Geriatric Use
    8.6 Renal Impairment
    8.7 Hepatic Impairment
    8.8 Secondary Hyperuricemia
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
    12.1 Mechanism of Action
    12.2 Pharmacodynamics
    12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
    13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
**14 CLINICAL STUDIES**
    14.1 Overview of Clinical Studies of ZURAMPIC
    14.2 Add-on to Allopurinol in Inadequate Responders
    14.3 Combination with Febuxostat in Tophaceous Gout
    14.4 Gout Flares and Tophus Outcomes
    14.5 Use in Patients with Renal Impairment
**16 HOW SUPPLIED/STORAGE AND HANDLING**
    16.1 How Supplied
    16.2 Storage and Handling
**17 PATIENT COUNSELING INFORMATION**
**MEDICATION GUIDE**

\*Sections or subsections omitted from the full prescribing information are not listed.